R. Rex Parris (SBN 96567)
   rrparris@parrislawyers.com
Kitty K. Szeto (SBN 258136)
   kszeto@ parrislawyers.com
John M. Bickford (SBN 280929)
   jbickford@parrislawyers.com
Eric N. Wilson (SBN 291815)
   ewilson@parrislawyers.com
**PARRIS LAW FIRM**
43364 10th Street West
Lancaster, California 93534
Telephone:(661) 949-2595
Facsimile: (661) 949-7524

Attorneys for Plaintiff and the Putative Class

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELE DEL VALLE; an individual, for herself and all members of the putative class,<br><br>                    Plaintiff,<br><br>          v.<br><br>GLOBAL EXCHANGE VACATION CLUB, a California corporation; RESORT VACATIONS, INC., a Nevada corporation; GLOBAL VACATIONS MARKETING CORP., a Nevada corporation, GLOBAL EXCHANGE DEVELOPMENT, CORP., a Nevada corporation, and DOES 1 through 100, inclusive,<br><br>                    Defendants. | Case No.:  8:16-cv-02149<br><br>**CLASS ACTION**<br><br>**PLAINTIFF'S APPENDIX OF EVIDENCE**<br><br>Date:          January 9, 2017<br>Time:          8:30 a.m.<br>Courtroom:  9C<br>Judge:        David O. Carter |

## <u>PLAINTIFF'S APPENDIX OF EVIDENCE</u>

| | | | |
|---|---|---|---|
| 1. | | **Declaration of John M. Bickford (Depositions)** | PA - 00002 |
| | A. | Deposition Transcript of Richard D. Sargent | PA - 00006 |
| | B. | Deposition Transcript of Myles Bryson | PA - 00062 |
| | C. | Deposition Transcript of Michele Del Valle | PA - 00119 |
| 2. | | **Declaration of John M. Bickford (Documents)** | PA - 00135 |
| | A. | Touch Screen Interface 1 | PA - 00139 |
| | B. | Touch Screen Interface 2 | PA - 00150 |
| | C. | Two Lead Slips | PA - 00159 |
| | D. | MSI Vendor Agreement | PA - 00161 |
| | E. | Defendant's Responses to Plaintiff's Special Interrogatories, Set One. | PA - 00169 |
| | F. | Phone Records | PA - 00187 |
| | G. | Defendant's Responses to Plaintiff's Special Interrogatories, Set Two | PA - 00192 |
| | H. | Rule 7-3 M&C | PA - 00204 |
| | I. | Rule 7-3 Confirmation | PA - 00206 |
| 3. | | **Declaration of Michele Del Valle** | PA - 00208 |
| 4. | | **Declaration of R. Rex Parris** | PA - 00213 |
| 5. | | **Declaration of Jeffrey A. Hansen in Support of Motion for Class Certification** | PA - 00220 |

EXHIBIT "1"

1  R. Rex Parris (SBN 96567)
       rrparris@parrislawyers.com
2  Kitty K. Szeto (SBN 258136)
       kszeto@ parrislawyers.com
3  John M. Bickford (SBN 280929)
       jbickford@parrislawyers.com
4  Eric N. Wilson (SBN 291815)
       ewilson@parrislawyers.com
5  **PARRIS LAW FIRM**
   43364 10th Street West
6  Lancaster, California 93534
   Telephone:(661) 949-2595
7  Facsimile: (661) 949-7524

8  Attorneys for Plaintiff and the Putative Class

9

10                 **UNITED STATES DISTRICT COURT**

11                 **CENTRAL DISTRICT OF CALIFORNIA**

12

13  MICHELE DEL VALLE; an individual,    )   Case No.:  8:16-cv-02149
    for herself and all members of the putative )
    class,                                )   **CLASS ACTION**
14                                        )
                                          )   **DECLARATION OF JOHN M.**
15            Plaintiff,                   )   **BICKFORD (DEPOSITIONS)**
                                          )
16        v.                              )   Date:       January 9, 2017
                                          )   Time:       8:30 a.m.
17  GLOBAL EXCHANGE VACATION             )   Courtroom:  9C
    CLUB, a California corporation;        )   Judge:      David O. Carter
18  RESORT VACATIONS, INC., a Nevada      )
    corporation; GLOBAL VACATIONS        )
    MARKETING CORP., a Nevada            )
19  corporation, GLOBAL EXCHANGE         )
    DEVELOPMENT, CORP., a Nevada          )
20  corporation, and DOES 1 through 100,  )
    inclusive,                            )
21                                        )
                                          )
22            Defendants.                 )
    _____)
23

24

25

26

27

28

---

## <u>DECLARATION OF JOHN M. BICKFORD</u>

I, John M. Bickford, declare as follows:

1.     I am an attorney duly licensed to practice before all courts of the State of California and an associate at the Parris Law Firm, attorneys of record for Plaintiff Michele Del Valle ("Plaintiff") and the putative class.   The facts set forth in this declaration are within my personal knowledge and, if called as a witness, I could and would competently testify as follows:

2.     On April 12, 2016, Plaintiff began the Person(s) Most Knowledge Deposition of GEVC and RVI.   Richard D. Sargent testified on behalf of GEVC and RVI.   Attached hereto as **Exhibit "A"** are true and correct copies of excerpts of Mr. Sargent's deposition.

3.     On April 13, 2016, Plaintiff continued the Person(s) Most Knowledge Deposition of GEVC and RVI.   Myles Bryson testified on behalf of GEVC and RVI. Attached hereto as **Exhibit "B"** are true and correct copies of excerpts of Mr. Bryson's deposition.

4.     On April 14, 2016, Defendant GEVC took the deposition of Plaintiff. Attached hereto as **Exhibit "C"** are true and correct copies of excerpts of Plaintiff's deposition.

/ / / /
/ / / /
/ / / /
/ / / /
/ / / /
/ / / /

1    I declare under penalty of perjury under the laws of the United States of America

2    that the foregoing is true and correct.

3    Executed on this 7th day of December 2016 at Lancaster, California.

4

5    _____

6    John M. Bickford

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

PA - 00004

EXHIBIT "A"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

MICHELE DEL VALLE, ON BEHALF   )
OF HERSELF AND ALL OTHERS      )
SIMILARLY SITUATED,            )
                               )
              PLAINTIFFS,      )
                               )
     VS.                       ) NO.
                               ) 30-2014-00745279-CU-MC-CXC
GLOBAL EXCHANGE VACATION CLUB, )
A CALIFORNIA CORPORATION; AND  )
DOES 1 THROUGH 100, INCLUSIVE, )
                               )
              DEFENDANTS.      )
_____)

VIDEOTAPED DEPOSITION OF RICHARD D. SARGENT

TUESDAY, APRIL 12, 2016

9:59 A.M.

REPORTED BY:

VICTORIA K. DAVIS

C.S.R. NO. 4192

1            SO, FOR EXAMPLE, IF I WERE TO ASK YOU HOW LONG

2     THIS TABLE IS, YOU COULD PROBABLY GIVE ME AN ESTIMATION

3     BASED ON YOUR KNOWLEDGE AND THAT WOULD BE PROPER FOR YOU

4     TO GIVE ME THAT ESTIMATION.

5            IF I WERE TO ASK YOU HOW BIG IS THE TABLE IN THE

6     OTHER ROOM, YOU PROBABLY COULDN'T ANSWER THAT QUESTION

7     UNLESS YOU'VE BEEN THERE.

8            DO YOU UNDERSTAND?

9     A    THANK YOU.

10    Q    GOING BACK TO THAT ORIGINAL QUESTION, DO YOU

11    KNOW WHAT THEY ALLEGE THEY SHOULD HAVE BEEN CLASSIFIED AS

12    EXEMPT OR NONEXEMPT EMPLOYEES?

13    A    I DO NOT.

14    Q    DID THAT CASE RESOLVE?

15    A    IT WAS SETTLED.

16    Q    WERE THEY CURRENT EMPLOYEES WHEN THEY FILED THE

17    LAWSUIT?

18    A    YES.

19    Q    ALL THREE OF THEM?

20    A    YES.

21    Q    AND YOU MENTIONED THIS WAS IN REGARDS TO ONE OF

22    YOUR COMPANIES, GLOBAL VACATIONS MARKETING CORP.?

23    A    CORRECT.

24    Q    WHAT IS GLOBAL VACATIONS MARKETING CORP.?

25    A    IT IS A MARKETING CORPORATION.

9

DEPOSITION OF RICHARD D. SARGENT

1    Q    FOR WHAT?

2    A    THE SALES AND MARKETING OF VACATION OWNERSHIP.

3    Q    WHAT DO YOU MEAN WHEN YOU SAY VACATION

4    OWNERSHIP?

5    A    TIMESHARE SALES.

6    Q    DOES IT STILL EXIST TODAY?

7    A    YES.

8    Q    DOES IT MARKET FOR SOME OTHER COMPANY?

9    A    IT CURRENTLY DOES NOT MARKET FOR ANYBODY.

10   Q    SO IS IT AN INACTIVE CORPORATION?

11   A    IT IS.

12   Q    HOW LONG HAS IT BEEN INACTIVE?

13   A    MY BEST ESTIMATION IS FOUR YEARS.

14   Q    WHAT DID IT MARKET FOR BEFORE THAT?

15   A    TIMESHARE.

16   Q    THE QUESTION'S A LITTLE DIFFERENT.  I'M ASKING

17   DID IT MARKET FOR ANOTHER COMPANY?  DID IT MARKET FOR A

18   GROUP OF CLIENTS?  WHO WAS IT CONTRACTING WITH TO MARKET

19   FOR?

20        MR. EHRLICH:  OBJECTION, ASKED AND ANSWERED,

21   COMPOUND.

22        YOU CAN ANSWER.

23        THE WITNESS:  I DON'T QUITE UNDERSTAND.  I SOLD

24   TIMESHARES.  WE SOLD GLOBAL EXCHANGE VACATION CLUB

25   TIMESHARES.

10

DEPOSITION OF RICHARD D. SARGENT

1     Q     BY MR. BICKFORD:  I SEE.  SO GLOBAL EXCHANGE

2   VACATION CLUB IS A SEPARATE COMPANY FROM GLOBAL VACATIONS

3   MARKETING CORP.?

4     A     YES.

5     Q     AND GLOBAL VACATIONS MARKETING CORP. WHEN IT WAS

6   ACTIVE FOUR YEARS AGO SOLD TIMESHARES IN GLOBAL EXCHANGE

7   VACATION CLUB?

8     A     SOLD MEMBERSHIPS, YES, TIMESHARE MEMBERSHIPS.

9     Q     YOU CORRECTED ME WITH THE TERM MEMBERSHIP.  IS

10  THERE SOMETHING I'M SAYING THAT WOULDN'T ACTUALLY BE

11  CORRECT IN THE WAY I PHRASED THAT LAST QUESTION?

12    A     NO.  I THINK I WAS JUST BEING MORE SPECIFIC.  WE

13  DON'T SELL WEEKS, THEY DON'T GET A DEED.  IT'S A

14  MEMBERSHIP.  IT'S STILL CLASSIFIED AS A TIMESHARE SALE.

15    Q     AND I MAY BE ASKING YOU QUESTIONS THAT TO YOU

16  ARE SOMEWHAT --

17    A     I UNDERSTAND.

18    Q     -- SOMEWHAT SIMILAR OR EASY TO UNDERSTAND BUT

19  FOR ME WHO DOESN'T OWN A TIMESHARE, HAS VERY LIMITED

20  EXPERIENCE WITH TIMESHARES, WOULD SEEM LIKE A SILLY

21  QUESTION COMING FROM, SO, THANK YOU FOR THAT.

22          SO THIS GLOBAL EXCHANGE VACATION CLUB, IS THIS

23  THE CURRENT DEFENDANT IN THIS LAWSUIT HERE TODAY?

24    A     YES.

25    Q     AND GLOBAL VACATIONS MARKETING CORP. SOLD THE

11

PA - 00009

DEPOSITION OF RICHARD D. SARGENT

1    WE DIDN'T MAKE IT GO AWAY, WE DIDN'T HIDE IT, WE JUST

2    SHUT IT DOWN, OPENED A NEW ENTITY, AND AFTER A PERIOD OF

3    TIME, GLOBAL VACATIONS WOULDN'T BE AROUND ANYMORE.

4        Q    WHAT DID THE REAL ESTATE AGENTS DO FOR GLOBAL

5    VACATIONS MARKETING CORP.?

6        A    THEY SOLD TIMESHARES.

7        Q    HOW DID THEY DO THAT?  WAS IT DOOR TO DOOR?  WAS

8    IT A GROUP MEETING?

9        A    YES.  WE, THE MARKETING COMPANY GENERATES TOURS

10   FOR PROSPECTIVE CLIENTS TO A SALES PRESENTATION AT AN

11   OFF-SITE SCALES GALLERY.

12       Q    HOW WOULD THEY GENERATE THOSE TOURS?

13       A    THERE'S A MULTIPLE OF WAYS BUT BASICALLY WE

14   GENERATE LEADS.  THE BIGGEST WAY TO GET THEM IS WE WOULD

15   GENERATE A LEAD AT A CONCERT, A VENUE, A SHOW, A BOAT

16   SHOW, A FAIR AND WE'D GENERATE A LEAD AND THEN WE'D CALL

17   THAT LEAD FROM OUR TELEMARKETING CENTER AND INVITE THEM

18   TO A PRESENTATION.

19       Q    SO WERE THE REAL ESTATE AGENTS THE TELEMARKETERS?

20       A    NO.

21       Q    THEY WERE THE ONES PRESENTING AT THE

22   PRESENTATION TOURS?

23       A    THEY WERE AT THE SHOW, YES.  TELEMARKETERS WERE

24   AT THE TELEMARKETING ROOM.

25       Q    YOU SAID ROUGHLY FOUR OR FIVE YEARS AGO, THE

14

PA - 00010

DEPOSITION OF RICHARD D. SARGENT

1      A     EMPLOYEES.

2      Q     WERE THEY ENTITLED TO A BONUS BASED UPON THE

3  SALE?

4      A     ABSOLUTELY.

5      Q     BOTH?

6      A     BOTH.

7      Q     WHAT ABOUT THE PROMOTERS?  ARE THEY ENTITLED TO

8  BONUSES BASED UPON THE NUMBER OF LEADS THAT THEY

9  GENERATE?

10     A     YES.

11     Q     SO ABOUT FOUR YEARS AGO, GLOBAL VACATIONS

12 MARKETING CORP. CLOSED OR WENT INACTIVE, CORRECT?

13     A     YES.

14     Q     AND THAT WAS WHAT YOU MENTIONED, A POSSIBLE

15 LIABILITY RESULTING FROM THAT KIND OF SALES.

16     A     THAT'S CORRECT.

17     Q     SO DID SOMEONE TAKE OVER EXCLUSIVE MARKETING OF

18 TIMESHARES IN GEVC?

19     A     YES.  I FORMED A NEW CORPORATION.

20     Q     WHAT CORPORATION IS THAT?

21     A     RESORT VACATIONS, INC.

22     Q     CAN WE CALL THEM RVI?

23     A     YES.

24     Q     IS THAT WHAT YOU CALL IT?

25     A     THAT IS WHAT WE CALL IT.

                                                    22

PA - 00011

DEPOSITION OF RICHARD D. SARGENT

```
1       Q    I DON'T WANT TO BE MAKING STUFF UP.

2            SO I'M A LITTLE CONFUSED IN THE SENSE OF THE

3   REASON WHY YOU CLOSED GLOBAL VACATIONS MARKETING CORP.

4   WAS BECAUSE OF THE POTENTIAL LIABILITY AND EXPOSURE BUT

5   THEN YOU FORMED A NEW COMPANY?

6       A    CORRECT.

7       Q    WAS IT INCORPORATED DIFFERENTLY TO CHANGE

8   POSSIBLE EXPOSURE?

9       A    NO.  THE CONCEPT WAS THAT, YOU KNOW, WE'RE NOT

10  GOING TO CLOSE IT, IT'S STILL ALIVE, BUT WE'RE NOT GOING

11  TO MAKE IT EASY FOR ANYBODY, FOR OLD EMPLOYEES TO COME

12  BACK.

13           SO IF SOMEBODY WORKED FOR US THREE YEARS AGO AND

14  THEY'RE HEARING WHAT'S GOING ON AT MARRIOTT AND THEY GET

15  TWO OR THREE GUYS, THEY MIGHT GO TO AN ATTORNEY AND THEY

16  LOOK UP GLOBAL VACATIONS AND IT'S NOT DOING BUSINESS.

17           IF THEY LOOKED A LITTLE FURTHER, THEY WOULD FIND

18  US AS RVI BUT THEY'VE GOT TO GO THE EXTRA STEP AND THAT'S

19  WHY WE DID IT.

20      Q    SO IT MAKES IT HARDER TO FIND.

21      A    THAT IS CORRECT.

22      Q    NOW FROM THE SWITCH FROM GLOBAL VACATIONS

23  MARKETING CORP. TO RVI, DID THE EMPLOYEES GENERALLY STAY

24  THE SAME?

25      A    ABSOLUTELY.
```

23

PA - 00012

DEPOSITION OF RICHARD D. SARGENT

```
 1      Q    SO IT WAS ESSENTIALLY A NAME CHANGE.

 2      A    CORRECT.

 3      Q    SO WE HAVE THE SAME PRESIDENT, YOU?

 4      A    YES.

 5      Q    AND THE SAME VICE PRESIDENT CHRIS ROCCO?

 6      A    ROCCO, YES.

 7      Q    HE CURRENTLY IS?

 8      A    YES.

 9      Q    AND THE VICE PRESIDENT OF SALES IS?

10      A    THE SALES IS ROCCO, VP OF MARKETING IS MICHALEC,

11 M-I-C-H-A-L-E-C.

12      Q    VICE PRESIDENT OF OPERATIONS IS BJ?

13      A    KELLY, K-E-L-L-Y.

14      Q    THIS IS ME TRYING TO READ MY SCRIBBLY WRITING.

15 WE STILL HAVE APPROXIMATELY 10 CORPORATE STAFF?

16      A    MAYBE 12 NOW.

17      Q    AND THE SAME DIVISION OF LABOR WHEN IT COMES TO

18 MARKETING EMPLOYEES AND SALE EMPLOYEES?

19      A    YES.  EVERYTHING'S THE SAME.  THERE'S A FEW MORE

20 IN EACH DIVISION.  THERE'S MORE PEOPLE IN PROMOTIONS,

21 THERE'S MORE PEOPLE IN TELEMARKETING TODAY THAN THERE WAS

22 FOUR YEAR AS.

23      Q    WE'RE GOING TO GET ON TO THIS A LITTLE MORE IN

24 DEPTH ABOUT RVI BUT FIRST I'D LIKE TO GO OVER SOME

25 HOUSEKEEPING HERE.
```

24

PA - 00013

DEPOSITION OF RICHARD D. SARGENT

1    COMPANIES?

2        A    IT NEGOTIATES LEASES, ABSOLUTELY.

3        Q    AND WHICH ONES ARE THOSE?

4        A    RVI.  I'M TRYING TO THINK IF I'VE DONE ANY OTHER

5    LEASES.  IT'S JUST RVI RIGHT NOW.

6        Q    I THINK I NEED A LITTLE BIT OF EDUCATING ON

7    ESSENTIALLY HOW TIMESHARES WORK.

8        A    OKAY.

9        Q    HOW THE PRODUCT IS SOLD, HOW DOES ONE PURCHASE,

10   WHAT EXACTLY ARE YOU PURCHASING, WHAT SORT OF INTEREST.

11   LET'S BEGIN.

12            CAN YOU EXPLAIN TO ME HOW A TIMESHARE GOES

13   THROUGH THE PROCESS OF ACQUIRING IT TO IT BEING SOLD TO A

14   CONSUMER.

15            MR. EHRLICH:  I'M GOING TO JUST OBJECT FOR THE

16   RECORD THAT IT CALLS FOR A NARRATIVE BUT YOU WANT THE

17   WHOLE, EXPLAIN HOW HE ACQUIRES FROM A TO Z.

18            MR. BICKFORD:  I NEED SOME EDUCATING IN ORDER TO

19   ASK MORE INTELLIGENT QUESTIONS.

20            MR. EHRLICH:  YOU'VE GOT AN EXPERT RIGHT HERE.

21            THE WITNESS:  I WOULD LIKE YOU TO CLARIFY THE

22   QUESTION FOR ME.  DO YOU WANT TO KNOW HOW MY PRODUCT

23   WORKS OR HOW A TIMESHARE IN GENERAL WORKS?

24       Q    BY MR. BICKFORD:  SINCE THIS IS A CASE ABOUT

25   GLOBAL EXCHANGE VACATION CLUB AND ITS RELATED COMPANY

33

PA - 00014

DEPOSITION OF RICHARD D. SARGENT

1   RVI, WHY DON'T YOU GIVE ME THE LAYMAN'S TERMS OF HOW

2   EITHER GEVC ACQUIRES A PROPERTY OR RVI SELLS IT.  WHY

3   DON'T YOU TELL ME HOW THAT WORKS.  I'M PROBABLY SAYING IT

4   WRONG, SO WHY DON'T YOU TELL ME HOW IT WORKS.

5        MR. EHRLICH:  I'M JUST GOING TO OBJECT TO THE

6   QUESTION TO THE EXTENT THAT HE TALKED ABOUT GEVC AND

7   OTHER RELATED COMPANIES LIKE RVI.  GO AHEAD.

8        THE WITNESS:  AS A REAL ESTATE BROKER, I'VE BEEN

9   IN THE TIMESHARE INDUSTRY FOR 35 YEARS, I'VE WORKED FOR

10  MANY DEVELOPERS, MANY TIMESHARE PROJECTS.

11       A TIMESHARE PROJECT YEARS AND YEARS AGO WOULD BE

12  25 UNITS IN PALM SPRINGS AND WE SELL 52 WEEKS 25 TIMES.

13  ONCE THAT PROJECT IS SOLD OUT, IT BECOMES JUST A

14  HOMEOWNERS ASSOCIATION OWNED BY THE MEMBERS THAT BOUGHT

15  IT AND CONTROLLED AND RUN BY ELECTED MEMBERS OF THOSE

16  OWNERS.

17       AND AS A REAL ESTATE AGENT BACK THEN, YOU WOULD

18  BE UNEMPLOYED AND YOU'D HAVE TO GO FIND ANOTHER JOB.  SO

19  I'VE HAD MANY JOBS IN THE INDUSTRY.

20       THE PRODUCT OF VACATION OWNERSHIP OR TIMESHARE

21  HAS EVOLVED OVER THE YEARS.  TODAY -- LET ME REGRESS FOR

22  JUST A MINUTE.

23       30 YEARS AGO THE AVERAGE TIMESHARE OWNER WAS 52

24  YEARS OLD, COLLEGE EDUCATED, MEDIUM INCOME, MARRIED.

25  TODAY THE AVERAGE TIMESHARE OWNER IS 52 YEARS OLD,

34

PA - 00015

DEPOSITION OF RICHARD D. SARGENT

1    COLLEGE EDUCATED, MEDIUM INCOME SO THAT PERSON HASN'T

2    CHANGED WHO'S BUYING THE PRODUCT.

3         WHAT'S HAPPENING IS THE OLDER PEOPLE THAT BOUGHT

4    30 YEARS AGO, THEIR KIDS DON'T WANT THE PRODUCT, THEY

5    DON'T WANT THE MAINTENANCE FEE, THEY DON'T WANT A

6    MAINTENANCE FEE OF $900 HANGING AROUND THEIR NECK AND

7    IT'S HURTING THE RESORTS.

8         SO MANY WEEKS ARE BEING FORECLOSED ON OR NOT

9    FORECLOSED ON AND MANY TIMESHARE RESORTS ARE IN TROUBLE,

10   THEY DON'T HAVE ENOUGH MONEY TO OPERATE THE RESORTS.

11        I SAW AN OPPORTUNITY TO ACQUIRE THESE INTERVALS

12   AND CREATE A CLUB CONCEPT.  SO I WENT TO THE DEPARTMENT

13   OF REAL ESTATE, I REGISTERED GLOBAL EXCHANGE VACATION

14   CLUB AS A TIMESHARE ENTITY.  IT'S CONSIDERED A MULTI-

15   DESTINATION VACATION TIMESHARE CLUB.

16        AND THEN I PURCHASED INVENTORY AND BOUGHT THE

17   300 WEEKS AT VISTA MIRAGE, 200 WEEKS AT HAVASU DUNES AND

18   NOW WE HAVE 12 PROPERTIES IN THE CLUB.  WE TAKE THAT

19   INVENTORY AND WE DROP IT INTO THE CLUB, AND THEN THE CLUB

20   SELLS POINT MEMBERSHIPS INSTEAD OF WEEKS.

21        SO, AGAIN, I DON'T MEAN TO CONFUSE YOU BUT IT'S

22   GONE FROM BUYING THE THIRD WEEK OF THE YEAR IN UNIT

23   NUMBER FOUR AT VISTA MIRAGE TO NOW IT'S A POINTS BASED

24   SYSTEM, YOU BUY 50,000 POINTS AND YOU GO PLAY IN THE

25   SYSTEM WITH POINTS.

35

PA - 00016

DEPOSITION OF RICHARD D. SARGENT

1          50,000 MIGHT GET YOU ONE WEEK IN HAWAII IN A ONE

2   BEDROOM PRIME TIME OR THREE WEEKS IN A STUDIO OFF SEASON

3   IN CANCUN.  EVERY WEEK HAS A POINT VALUE AND THAT'S WHAT

4   GEVC IS, A POINTS-BASED VACATION CLUB.  SO THAT'S THE

5   LAYMAN'S TERMS OF HOW IT WORKS.

6       Q    BY MR. BICKFORD:  SO WHO DO YOU BUY THE WEEKS

7   FROM?  YOU SAID THERE WAS FORECLOSURES.  IS THAT MAINLY

8   IT?

9       A    WELL, I BUY THE WEEKS FROM THE ASSOCIATIONS.

10      Q    SO LIKE AN EXISTING TIMESHARE PROPERTY --

11      A    ABSOLUTELY.

12      Q    -- HAS EMPTY WEEKS.  THEY'RE LOOKING TO HAVE

13  THAT SOLD AND YOU PURCHASE THEM OR YOU SELL ON BEHALF?

14  HOW DOES IT WORK?

15      A    NO.  WHEN WE STARTED, WE SOLD ON A NET LISTING

16  AGREEMENT WITH VISTA MIRAGE AND HAVASU DUNES.  ONCE WE

17  PUT THEM IN THE CLUB, OBVIOUSLY WE HAD TO GET REGISTERED

18  WITH THE DEPARTMENT OF REAL ESTATE.  SO, NO, WE ACQUIRE

19  THE INVENTORY FROM SOLD OUT RESORTS AND IT'S THEIR WHAT

20  WE WOULD CALL DEAD INVENTORY.

21          UNFORTUNATELY FOR THE HOMEOWNERS OF THESE OLDER

22  RESORTS, THEY HAVE NO WAY TO FORECLOSE ON A PROPERTY,

23  THEY HAVE NO MONEY TO MARKET AND SELL IT NOR DO THEY KNOW

24  HOW AND FOR ANY ENTREPRENEURIAL GUY LIKE ME, THERE'S NO

25  FINANCING AVAILABLE TO SELL THE TIMESHARES ON AN

36

PA - 00017

1   INDIVIDUAL BASIS TO AN INDIVIDUAL RESORT.

2           SO WE WERE ABLE TO PUT THIS WHOLE THING TOGETHER

3   AND LOOK LIKE A REGULAR TIMESHARE COMPANY AND GET REGULAR

4   FINANCING AND IT TOOK YEARS BUT THAT'S WHAT WE DO.

5           MR. EHRLICH:  YOU WANT TO GO OFF THE RECORD FOR

6   A SECOND?

7           MR. BICKFORD:  NO, I'VE GOT THIS.

8       Q   BY MR. BICKFORD:  I JUST WANT TO MAKE SURE

9   BECAUSE WHEN WE DEAL WITH COMPANIES, IT'S ALWAYS

10  DIFFICULT TO PINPOINT WHAT COMPANY'S DOING WHAT.

11      A   OKAY.

12      Q   WHAT COMPANY IS PURCHASING THE INTEREST IN THE

13  TIMESHARES?

14      A   GLOBAL EXCHANGE DEVELOPMENT CORP.

15      Q   ALL RIGHT.  SO GLOBAL EXCHANGE DEVELOPMENT CORP.

16  IS SITTING THERE WITH X AMOUNT OF WEEKS IT HAS AND IT

17  WANTS TO SELL THAT AND HOW DO THOSE WEEKS END UP BECOMING

18  PART OF GEVC?

19      A   GEVC OWNS NO WEEKS.  TO HAVE A TIMESHARE

20  DEVELOPMENT, YOU HAVE TO BE A DEVELOPER.  YOU CAN'T BE A

21  SALES AND MARKETING COMPANY.  I CAN'T BE RVI AND GO TO

22  THE DEPARTMENT OF REAL ESTATE AND SAY I WANT TO BUILD

23  THIS TIMESHARE, ONLY DEVELOPERS CAN DO THAT.

24          SO YOU FORM A DEVELOPMENT COMPANY AND IT'S MORE

25  LIKE A SHELL.  SO THE DEVELOPMENT COMPANY GOT THE

37

DEPOSITION OF RICHARD D. SARGENT

1    CALIFORNIA PUBLIC REPORT THAT ALLOWS US TO SELL THE

2    PRODUCT.  IT NEVER CONTROLS ANYTHING.  IT DEDICATES THE

3    UNITS OVER AS WE BUY THEM, SO IT'S A ONE-TWO THING.  SO I

4    BUY 300 WEEKS AT GRAND DESTINATIONS --

5        Q    YOU SAY I, BUT I WANT KNOW WHICH COMPANY.

6        A    GLOBAL EXCHANGE DEVELOPMENT CORP. ACQUIRES

7    INTERVALS FROM A RESORT, X RESORT.  SOMETIMES WE HAVE TO

8    CLEAN UP THE INVENTORY, SO RVI WOULD PAY TO CLEAN UP THE

9    INVENTORY.

10       Q    WHAT DOES IT MEAN TO CLEAN UP THE INVENTORY?

11       A    WELL, YOU'VE GOT DEAD WEEKS OUT THERE THAT

12   PEOPLE HAVE WALKED AWAY, YOU CAN'T FIND THEM, THEY

13   HAVEN'T PAID MAINTENANCE FEES IN YEARS.  I HAVE TO HAVE

14   CLEAN TITLE.  THE DEPARTMENT OF REAL ESTATE WON'T LET ME

15   PUT THE INVENTORY AND SELL IT TO A CONSUMER UNLESS I HAVE

16   TITLE INSURANCE, UNLESS -- YOU HAVE TO HAVE CLEAN TITLE.

17            SO WE GO IN AND FORECLOSE --

18       Q    IS THAT RVI?

19       A    RVI GOES IN, FORECLOSES, WE DO THE JUDICIAL

20   FORECLOSES, WE GET THIS INVENTORY CLEANED UP.

21            SO NOW WE HAVE --

22       Q    THE TITLE CLEAN.

23       A    MIGHT HAVE STARTED WITH 500, WE END UP WITH 380.

24   SO WE HAVE CLEANED AND PRESSED 380 INTERVALS.  SO GLOBAL

25   EXCHANGE DEVELOPMENT CORPORATION ACQUIRES THAT INVENTORY

38

PA - 00019

1    AND HOLDS IT FOR ABOUT 13 SECONDS, THEN IT DEDICATES

2    THOSE UNITS OVER TO GEVC.

3        Q    WHAT DOES IT MEAN TO DEDICATE?

4        A    WE GIVE THEM THE WEEKS.  WE DEDICATE IT TO THE

5    CLUB.  THEY NO LONGER OWN IT, WE HAVE NO CONTROL OVER IT,

6    IT'S GONE.

7        Q    THEN WHAT HAPPENS?

8        A    THEN GEDC HAS THE EXCLUSIVE RIGHT TO SELL THE

9    MEMBERSHIPS.

10       Q    GEVC?

11       A    GEDC, THE DEVELOPER.

12       Q    WHERE DOES RVI COME INTO PLAY?

13       A    RVI DOES THE SALES AND MARKETING.  THE

14   DEVELOPMENT COMPANY JUST DOES THAT.

15       Q    SO IS RVI SELLING THE WEEKS ON BEHALF OF GEDC?

16       A    YES.  IT IS THE BROKERAGE.

17       Q    AND GEDC IS TECHNICALLY THE ONE WHO SELLS THE

18   MEMBERSHIPS IN GEVC?

19       A    CORRECT.  THAT MAY NOT BE TRUE BECAUSE THE SALES

20   ACTUALLY TAKE PLACE IN THE REAL ESTATE BROKERAGE COMPANY

21   WHICH IS RVI.  SO I GUESS THE BEST WAY WOULD BE THAT RVI

22   HAS A CONTRACT TO SELL GEDC'S RIGHTS OR INTERESTS.

23       Q    AND GEDC HAS RIGHTS AND INTERESTS IN GLOBAL

24   EXCHANGE VACATION CLUB?

25       A    GEDC HAS RIGHTS OR INTEREST IN THE MEMBERSHIPS

39

PA - 00020

1    CREATED.  IT HAS NO RIGHTS OR INTEREST IN THE CLUB.

2       Q    THAT'S WHAT I MEANT.  SO THE MEMBERSHIPS, THE

3    EMPTY WEEKS.

4       A    THE UNSOLD MEMBERSHIPS OR POINTS.

5            (A DISCUSSION WAS HELD BETWEEN THE WITNESS

6            AND HIS COUNSEL.)

7            MR. BICKFORD:  NO.  NO.

8            MR. EHRLICH:  THE QUESTION'S ANSWERED ALREADY.

9            MR. BICKFORD:  NO, NO, I KNOW BUT YOU CAN GO OFF

10   THE RECORD.

11           MR. EHRLICH:  I ABSOLUTELY CAN.

12           MR. BICKFORD:  NO, NO, YOU CANNOT.

13           MR. EHRLICH:  THERE'S NO QUESTION PENDING.

14   WE'LL TAKE A BREAK.

15           MR. BICKFORD:  THIS IS COACHING THE RECORD.

16   HOLD ON.  HOLD ON.

17           MR. EHRLICH:  IT'S NOT COACHING ANYTHING.  LET'S

18   TAKE A BREAK.  I HAVE A RIGHT TO CLARIFY.

19           MR. BICKFORD:  WE CAN TAKE A BREAK BUT WHAT YOU

20   CAN'T DO IS START COACHING.

21           ALL RIGHT, WE'RE NOT GOING OFF THE RECORD.

22           MR. EHRLICH:  THERE'S NO QUESTION PENDING.

23           MR. BICKFORD:  THEY'RE LEAVING.  WE'RE STAYING

24   ON THE RECORD.

25           FOR THE RECORD, COUNSEL AND THE DEPONENT ARE

                                                          40

PA - 00021

DEPOSITION OF RICHARD D. SARGENT

```
1       Q    I SEE.

2       A    I'VE BOUGHT MULTIPLE PRODUCTS FROM CASABLANCA.

3       Q    WHAT I THOUGHT YOU MEANT WAS THAT YOU ONLY

4  PURCHASED ONE TRIP.

5       A    NO.

6       Q    I SEE.  DO YOU KNOW WHAT SUNSET GETAWAYS IS?

7       A    YES.

8       Q    WHAT'S THAT?

9       A    IT IS A DBA OF RESORT VACATIONS, INC., I THINK.

10 THAT MIGHT BE BETTER ANSWERED BY MILES.

11      Q    OKAY.  WHAT ARE THE DBA'S OF RESORT VACATIONS,

12 INC.?

13      A    WE HAVE TRAVEL MEDIA, WE HAVE SUNSET GETAWAYS,

14 WE HAVE -- I'M SORRY, I CAN'T REMEMBER THE OTHER ONES.

15 MILES CAN ANSWER THOSE QUESTIONS FOR YOU.

16      Q    DO YOU KNOW APPROXIMATELY HOW MANY DBA'S, TO

17 YOUR KNOWLEDGE?  SOUNDS LIKE YOU THINK THERE'S MORE THAN

18 JUST THE TWO YOU MENTIONED.

19      A    OH, THERE IS, THERE'S PROBABLY A COUPLE MORE.

20      Q    TO YOUR KNOWLEDGE, ARE THERE ANY DBA'S FOR GEVC?

21      A    NO.

22      Q    TO YOUR KNOWLEDGE, ARE THERE ANY DBA'S FOR GEDC?

23      A    YES.

24      Q    WHAT'S THAT?

25      A    GEVC.
```

60

PA - 00022

DEPOSITION OF RICHARD D. SARGENT

1       A    CORRECT.

2       Q    SO SOMEONE WHO HAS A MEMBERSHIP IN GEVC HAS

3  POINTS IN GEVC, IF THEY DON'T WANT TO VACATION AT ONE OF

4  THESE LISTED, THEY CAN USE THEIR POINTS SOMEWHERE ELSE.

5       A    CORRECT.

6       Q    AND THAT COULD BE QUITE AN EXHAUSTIVE LIST

7  BECAUSE IT'S THE LARGEST?

8       A    4,000 RESORTS IN OVER 100 COUNTRIES.

9       Q    I FIGURED.  YOU MAY HAVE ANSWERED THIS BUT JUST

10  TO BE CLEAR, RVI DOES MARKETING FOR NO OTHER COMPANY; IS

11  THAT CORRECT?

12      A    THAT IS CORRECT.

13      Q    THEY JUST MARKET FOR, ONE SECOND, GEDC.

14      A    THAT IS CORRECT.

15      Q    DOES GEDC HAVE A WEBSITE?

16      A    YES.

17      Q    WHAT IS THAT WEBSITE?

18      A    GLOBAL VACATIONS -- GLOBALEXCHANGEVACATIONS.COM,

19  VACATIONS WITH AN S.

20      Q    WHAT'S THE PURPOSE OF THAT WEBSITE?  MIGHT HAVE

21  MULTIPLE PURPOSES.  IF YOU CAN LIST THEM OFF.

22      A    CERTAINLY.  WE LIST OUR FINANCIALS FOR THE

23  MEMBERS, WE LIST THE BOARD MINUTES, WE LIST AVAILABLE

24  INVENTORY, SPECIALS THAT WE RUN INTO.  THERE'S COMMENT

25  SECTIONS FOR PEOPLE TO SAY THEIR FAVORITE RESORTS AND

76

PA - 00023

DEPOSITION OF RICHARD D. SARGENT

1      Q    SO THE WEBSITE IS MORE FOR, I'M TRYING TO THINK

2    OF THE RIGHT WORD, SHOWING LEGITIMACY OF THE COMPANY WHEN

3    DEVELOPING, WHEN NEGOTIATING CONTRACTS AT VENUES?

4      A    AS OPPOSED TO FOR MEMBERS OR ANYTHING LIKE THAT,

5    YES.  THAT'S WHAT IT'S TOTALLY USED FOR.

6      Q    SO THERE'S NO OTHER PURPOSE FOR

7    RESORTVACATIONSINC.NET?

8      A    NO.

9      Q    DOES RESORT VACATIONS, INC., HAVE ANY OTHER

10   WEBSITES, FOR EXAMPLE, UNDER ANY OF ITS DBA NAMES?

11     A    YES.

12     Q    WHAT ARE THOSE?

13     A    WELL, I DON'T KNOW THE NAMES OF THEM BUT THEY'RE

14   ALL THE NAMES OF THE DBA'S.  TRAVELMEDIA.NET OR .COM.

15   I'M TRYING TO THINK OF THE NAMES OF THE DBA'S.

16   SUNSETGETAWAYS.COM OR .NET.  WHATEVER THE DBA'S ARE ARE

17   THE NAMES OF THE WEBSITES.

18     Q    WHY ALL THE DBA'S?

19     A    WHY ALL THE DBA'S?

20     Q    WHY ARE THEIR MULTIPLE DBA'S FOR RESORT VACATIONS,

21   INC.?

22     A    THEY'RE USED FOR DIFFERENT PURPOSES.

23     Q    SO WHAT WOULD THE PURPOSE OF THE NAME OF TRAVEL

24   MEDIA BE USED FOR?

25     A    SO TRAVEL MEDIA IS THE NAME THAT WE BOOK OUR

78

PA - 00024

DEPOSITION OF RICHARD D. SARGENT

1    TOURS UNDER AT THE TELEMARKETING CENTER.  SO IT'S TRAVEL

2    MEDIA THAT GOES OUT, WE CALL AS TRAVEL MEDIA BECAUSE

3    THAT'S WHO WE CALL AS, AND THEN WE INVITE YOU TO A

4    TIMESHARE PRESENTATION AND THAT TIMESHARE PRESENTATION IS

5    OF GLOBAL EXCHANGE VACATION CLUB.

6        Q    WHAT ABOUT SUNSET GETAWAYS?

7        A    SAME THING.

8        Q    SO THERE WILL BE TELEMARKETERS WILL CALL AS

9    SUNSET GETAWAYS?

10       A    CORRECT.

11       Q    IS THAT A DIFFERENT TELEMARKETING LOCATION?

12       A    YES.

13       Q    OKAY.  AND YOU UNDERSTAND, I WANT TO MAKE SURE

14   WE'RE ON THE SAME PAGE AND I THINK WE ARE ABOUT

15   TELEMARKETING LOCATION, I MEAN LIKE A BUILDING AND A

16   ROOM.

17       A    EXACTLY.  WE HAVE MULTIPLE PHONES.

18       Q    I'LL PROBABLY GET TO ALL THAT LATER.

19       A    SURE.

20       Q    RIGHT NOW WE HAVE THE DBA FOR RVI, ONE OF THEM

21   IS TRAVEL MEDIA AND ONE OF THEM IS SUNSET GETAWAYS.  IS

22   THERE ANYTHING ELSE?

23       A    THERE ARE MORE.  I THINK MILES WOULD BE THE ONE,

24   HE'LL KNOW WHAT ALL THOSE ARE.

25       Q    OKAY.  SO I THINK NOW IS A GOOD TIME TO GO ON A

79

PA - 00025

DEPOSITION OF RICHARD D. SARGENT

1    BREAK.  IF NOT, WE'LL OPEN ANOTHER SUBJECT THAT WILL TAKE

2    ANOTHER HOUR.

3            MR. EHRLICH:  THAT'S FINE.

4            THE VIDEOGRAPHER:  WE ARE NOW GOING OFF THE

5    RECORD, THE TIME IS 11:57 A.M.

6            (LUNCH RECESS.)

7            THE VIDEOGRAPHER:  WE ARE NOW BACK ON THE

8    RECORD, THE TIME IS 12:47 P.M.

9        Q    BY MR. BICKFORD:  WHERE ARE THE SALES CENTERS

10   FOR RVI?  PHYSICAL LOCATION.

11       A    CURRENTLY?

12       Q    CURRENTLY.

13       A    ENCINO, NEWPORT BEACH AND ONTARIO.

14       Q    DO YOU HAVE THE ADDRESSES?

15       A    NO.

16       Q    ARE THERE ADDITIONAL SALES CENTERS OPERATING

17   UNDER THE NAME TRAVEL MEDIA?

18       A    NO.

19       Q    ANY ADDITIONAL SALES CENTERS OPERATING UNDER THE

20   NAME SUNSET GETAWAYS?

21       A    NO.

22       Q    WHERE IS THE LOCATION OF RVI'S TELEMARKETING

23   CENTERS?

24       A    WE HAVE A TELEMARKETING CENTER IN SANTA ANA,

25   IRVINE AND ARIZONA.  PHOENIX, I BELIEVE.

80

DALENE COURT REPORTING  661.341.3929

DEPOSITION OF RICHARD D. SARGENT

1    Q    APPROXIMATELY HOW MANY TELEMARKETERS WORK AT THE

2    SANTA ANA CENTER?

3    A    THERE ARE 30 STATIONS AND IT VARIES.

4    Q    WHAT DO YOU MEAN BY STATIONS?

5    A    TELEMARKETING STATIONS, THE LITTLE BOOTHS.  AND

6    WE WOULD LOVE IT TO BE FULL BUT IT'S NEVER FULL.

7    Q    WHY IS IT NEVER FULL?

8    A    JUST TALENT.

9    Q    MEANING PEOPLE WHO ARE QUALIFIED TO HANDLE THE

10   POSITION?

11   A    WELL, LIKE ANY SALES ORGANIZATION, WHETHER

12   YOU'RE SELLING ON THE PHONE TRYING TO SET AN APPOINTMENT

13   OR YOU'RE TRYING TO SELL A TIMESHARE IN THE SALES ROOM,

14   SOME PEOPLE ARE GOOD AT IT, SOME PEOPLE AREN'T.

15        SO IF YOU HAVE A BASE OF 20 DECENT PEOPLE, YOU

16   KNOW, PEOPLE ARE TURNING OVER, IT'S A PART-TIME JOB.

17   IT'S JUST NEVER FULL.

18   Q    WHAT'S THE SANTA ANA CENTER'S HOURS OF OPERATION?

19   A    WE BASICALLY WORK, AND MILES CAN VERIFY, I

20   OBVIOUSLY DON'T SET THE SCHEDULES, BUT IT'S MONDAY -- OR

21   SUNDAY THROUGH THURSDAY 5:00 TO 9:00, 4:30 TO 9:00,

22   SOMETHING LIKE THAT.

23   Q    HOW MANY TELEMARKETERS ARE AT THE IRVINE

24   LOCATION?

25   A    WE HAVE 30 OUTBOUND PHONES AND WE HAVE, I

81

PA - 00027

DEPOSITION OF RICHARD D. SARGENT

1   BELIEVE IT'S 12 INBOUND PHONES.

2      Q    SO --

3      A    SO, AGAIN, IT'S, YOU KNOW, IT'S 20 PEOPLE THERE

4   ALWAYS, THEY JUST ROTATE OUT.  PEOPLE DON'T SHOW UP.

5      Q    WHY DON'T THEY HAVE TO SHOW UP IF THEY DON'T

6   WANT TO?  IS IT INDEPENDENT CONTRACTOR WORK?

7      A    NO, PEOPLE DON'T SHOW UP FOR WORK.  IF YOU'VE

8   GOT EMPLOYEES, ESPECIALLY, YOU KNOW, TELEMARKETERS,

9   THEY'RE GOING TO MISS A DAY HERE AND THERE.  WHEN YOU GET

10  30 PEOPLE OR 30 SEATS, FIVE PEOPLE A DAY DON'T SHOW UP.

11     Q    AND WHY DON'T THEY SHOW UP, FIVE PEOPLE A DAY?

12  THE REASON WHY I'M ASKING IS BASED ON MY EXPERIENCE, A

13  TYPICAL ORGANIZATION OF 30 PEOPLE, YOU CAN EXPECT MOST TO

14  SHOW UP A DAY, IF NOT, MAYBE ONE OR TWO PEOPLE NOT THERE.

15  SO WHY IS IT HIGHER?

16         MR. EHRLICH:  I'M GOING TO OBJECT, IT CALLS FOR

17  SPECULATION, BUT YOU CAN GO AHEAD AND ANSWER.

18     Q    BY MR. BICKFORD:  TO THE EXTENT YOU KNOW.

19     A    I WOULD ASSUME THAT IT'S BECAUSE IT'S A

20  PART-TIME JOB.  THEY'VE ALL GOT OTHER JOBS, THEY'VE GOT

21  TO COME FROM OTHER WORK, IT'S NOT THEIR MAIN JOB, AND

22  THAT'S AN ASSUMPTION.

23     Q    BASED ON YOUR UNDERSTANDING OF THE POSITION?

24     A    ABSOLUTELY.  RUNNING PHONE ROOMS FOR 35 YEARS.

25     Q    SURE.  SO AT THE IRVINE LOCATION, THERE'S 30

                                                        82

1    OUTBOUND STATIONS?

2       A    CORRECT.

3       Q    AND YOU SAID 12 INBOUND STATIONS?

4       A    I BELIEVE SO.

5       Q    ROUGHLY.

6       A    ROUGHLY, YES.

7       Q    AND ABOUT 20 EMPLOYEES THERE ON ANY GIVEN TIME

8    WHILE IT'S OPEN.

9       A    YES.

10      Q    AND THE HOURS OF OPERATION FOR THAT ARE?

11      A    SAME.  ALTHOUGH THE INBOUND IS DAYTIME.  IN

12   OTHER WORDS, PEOPLE DON'T CALL IN AT NIGHT.  THE INBOUND

13   CALLS ARE DURING THE DAY.

14      Q    WHAT'S THE PURPOSE OF INBOUND CALLS?

15      A    EVERYTHING IS THE SAME PURPOSE, TO BOOK A TOUR.

16      Q    SO WHY ARE PEOPLE CALLING THE INBOUND?  LET ME

17   CHANGE THE WAY I PHRASED THAT.

18           WHERE DO PEOPLE GET THE NUMBER TO CALL THE

19   INBOUND?

20      A    WE USE VARIOUS MARKETING TECHNIQUES.  SIGN

21   SPINNERS, BILLBOARDS, ADS IN NEWSPAPERS, THAT KIND OF

22   STUFF.

23      Q    THOSE PEOPLE WOULD CALL?

24      A    CALL AN 800 NUMBER.

25      Q    AND THAT IS ROUTED TO THE IRVINE CENTER.  AND

83

DEPOSITION OF RICHARD D. SARGENT

1    THE OTHER STATIONS ARE DEVOTED TO OUTBOUND TELEMARKETING.

2        A    YES, SIR.

3        Q    AND THE ARIZONA, PHOENIX LOCATION, SAME

4    QUESTION, HOW MANY PEOPLE, HOW MANY STATIONS?

5        A    WE HAVE 16 STATIONS.  IT'S A BRAND NEW CENTER

6    AND WE'RE TESTING THAT ABILITY TO GET OUT FROM UNDERNEATH

7    CALIFORNIA AND THE REQUIREMENTS OF CALIFORNIA.  $10 AN

8    HOUR IS KILLING US.

9        Q    IT'S GOING TO 15.

10       A    THERE'S NO DOUBT ABOUT IT AND WE MIGHT BE IN

11   ARIZONA.

12       Q    YOU SAID THOSE ARE THE CURRENT LOCATIONS.

13   LOCATIONS IN THE PAST, LIST SOME OF THOSE.

14       A    IN THE PAST, FOR THE FIRST SIX OR SEVEN YEARS OF

15   THE OPERATION, WE WERE LOCATED IN COSTA MESA, THE

16   MARKETING CENTER, AND FROM THERE WE MOVED TO A LOCATION

17   IN SANTA ANA.  YOU'RE ASKING ABOUT TELEMARKETING.

18       Q    THE TELEMARKETING LOCATIONS.

19       A    SO WE ONLY HAD ONE BIG CENTER UNTIL WE'VE JUST

20   RECENTLY BROKE THEM UP BECAUSE OF WHAT WE BELIEVE IS A

21   TALENT POOL.  YOU CAN'T GET 70 GOOD PEOPLE ON THE PHONES.

22   ONCE YOU GET PAST 40, IT'S JUST A ROLLING, YOU NEVER CAN

23   BUILD IT UP.

24       Q    SO GENERALLY WITH THE EXCEPTION OF THE PHOENIX

25   LOCATION, SOUTHERN CALIFORNIA?

                                                          84

PA - 00030

DEPOSITION OF RICHARD D. SARGENT

1       A    UM-HUM.

2       Q    WHERE DID YOU SAY RVI'S HEADQUARTERS WERE?

3       A    WE'RE CURRENTLY LOCATED IN SAN JUAN CAPISTRANO.

4       Q    SO THE, WHAT WOULD YOU DESCRIBE, THE MAIN OFFICE?

5       A    YEAH, OUR CORPORATE OFFICES.

6       Q    THE CORPORATE OFFICE IS NOT AT THE SAME PLACE AS

7   THE TELEMARKETING.

8       A    NO.

9       Q    OKAY.  ANY OTHER LOCATIONS, TELEMARKETING

10  LOCATIONS?

11      A    NO.

12      Q    SO IF I CAN JUST RECAP, STARTED ALL AT COSTA

13  MESA, MOVED TO SANTA ANA AND FROM THERE YOU EXPANDED OUT

14  TO IRVINE AND NOW PHOENIX?

15      A    CORRECT.  WELL, IT'S A DIFFERENT LOCATION IN

16  SANTA ANA.

17      Q    BUT THE REASON FOR THAT IS YOU CAN GET MORE

18  QUALIFIED PEOPLE ON A LARGE GEOGRAPHICAL SPREAD?

19      A    YES.

20      Q    IS THERE A SUPERVISING EMPLOYEE AT THE SANTA ANA

21  LOCATION?

22      A    THERE IS A TELEMARKETING SUPERVISOR AT ALL

23  LOCATIONS.

24      Q    I WAS GOING TO GO THROUGH EACH ONE.

25      A    OKAY.

85

PA - 00031

1   RECORD, THE TIME IS 1:08 P.M.

2        Q    BY MR. BICKFORD:  WE'RE LOOKING AT EXHIBIT 5

3   WHICH IS THE TOUCHSCREEN INTERFACE OF WHAT YOU DESCRIBED

4   AS FORTITUDE MEDIA, CORRECT?

5        A    YES.

6        Q    HOW DID YOU KNOW BY LOOKING AT THIS IT WAS

7   FORTITUDE MEDIA?

8        A    THE GROVE.

9        Q    WHY IS THAT?

10       A    BECAUSE HE DOES THE GROVE.

11       Q    GOT IT.  ANYTHING ABOUT THE BACKGROUND OR THE

12   QUESTIONS BEING ASKED?

13       A    NO.

14       Q    WOULD THE QUESTIONS BEING ASKED BE THE SAME?

15       A    MILES WOULD BE THE GUY TO ANSWER THAT.

16       Q    SURE.  IF YOU KNOW OR IF YOU DON'T KNOW, THAT'S

17   FINE, YOU CAN SAY I DON'T KNOW.

18       A    I DON'T KNOW.

19       Q    WHAT IN HERE CONSTITUTES PRIOR EXPRESS CONSENT

20   TO CALL A CELL PHONE?

21       A    THE DETAILS OF PARTICIPATION.

22       Q    SURE.  WHAT SENTENCE IN THERE?

23       A    "BY CHECKING THE AND PRESSING THE NEXT ARROW

24   BOX, THIS WILL SERVE AS MY ELECTRONIC SIGNATURE.  I

25   VERIFY THAT THE ABOVE INFORMATION IS TRUE AT THE ABOVE

94

PA - 00032

DEPOSITION OF RICHARD D. SARGENT

1    ADDRESS OR TEXT IS -- THE INFORMATION IS TRUE AT THE

2    ABOVE ADDRESS OR BY TEXT OR VOICE CONTACT TO MY CELLULAR

3    PHONE OR HOME ADDRESS NUMBERS PROVIDED BY ME IN OR ON

4    THIS ELECTRONIC ENTRY OR MY EMAIL ADDRESS PROVIDED

5    REGARDING THIS AND FUTURE PROMOTIONAL OFFERS REGARDLESS

6    OF ANY PRIOR ELECTION TO THE CONTRARY."

7         UP ABOVE THAT IT STATES, "I VERIFY THAT THE

8    INFORMATION PROVIDED IS TRUE AND AGREE TO BE CONTACTED BY

9    RESORT VACATIONS, INC., FORTITUDE MEDIA, INC., AND ITS

10   PARTNERS FOR RESORT STAY" -- EXCUSE ME, "FORTITUDE MEDIA,

11   INC., AND ITS PARTNER PARTNERS OR RESORT STAY

12   INTERNATIONAL, LLC, AT THE ABOVE ADDRESS, BY TEXT OR

13   VOICE CONTACT TO MY CELLULAR OR HOME TELEPHONE NUMBERS

14   PROVIDED BY ME IN OR ON THIS ELECTRONIC ENTRY OR MY EMAIL

15   ADDRESS PROVIDED REGARDING THE TRUE PROMOTIONAL --

16   REGARDING THIS AND FUTURE PROMOTIONAL OFFERS REGARDLESS

17   OF ANY PRIOR ELECTION TO THE CONTRARY."

18   Q    AND YOU READ THE LAST SENTENCE IN THAT BIG

19   PARAGRAPH, CORRECT?

20   A    YES.

21   Q    DOES IT STATE ANYWHERE THERE, DOES IT MENTION

22   GLOBAL EXCHANGE VACATION CLUB?

23   A    NO.

24   Q    AND THIS IS HOW RVI, THAT LANGUAGE IS HOW RVI

25   CLAIMS IT GETS PRIOR EXPRESS CONSENT TO CALL CELL PHONES,

95

PA - 00033

DEPOSITION OF RICHARD D. SARGENT

1   CORRECT?

2           MR. EHRLICH:  I OBJECT TO THE EXTENT IT CALLS

3   FOR A LEGAL CONCLUSION.

4           YOU CAN ANSWER GIVING YOUR UNDERSTANDING.

5           THE WITNESS:  WE LIST GLOBAL EXCHANGE

6   DEVELOPMENT, THE DEVELOPER OF THE CLUB, AND RVI, WHO IS

7   THE MARKETER, YES, THAT IS HOW WE GET PERMISSION TO CALL.

8       Q   BY MR. BICKFORD:  OKAY.  AND IF YOU FLIP

9   THROUGH, TO THE EXTENT YOU KNOW, IS THIS THE ORDER IT

10  APPEARS ON THE TOUCHSCREEN?

11      A   I BELIEVE SO.

12      Q   I'M GOING TO ASK THIS OF MILES SINCE HE WOULD

13  KNOW BETTER.

14      A   SURE.

15      Q   SO THEN AFTER CLICKING NEXT, THEY WOULD THEN

16  ENTER THEIR NAME, THEIR LAST NAME, THEIR PHONE NUMBER AND

17  SEVERAL QUESTIONS.

18      A   CORRECT.

19      Q   SUCH AS THEIR AGE GROUP, WHETHER THEY'RE MARRIED

20  AND APPROXIMATE INCOME ABOVE 40 OR LESS THAN 40.

21      A   OKAY.

22      Q   AND THEIR ZIP CODE.

23      A   I WOULD TELL YOU OURS IS A LITTLE DIFFERENT.

24      Q   HOW IS IT DIFFERENT?

25      A   WE ACTUALLY DO SURVEYS FOR THE VENUES.  SO AT

96

DEPOSITION OF RICHARD D. SARGENT

1    STAPLES CENTER, THEY WANT TO KNOW COKE VERSUS PEPSI, DO

2    WE PUT -- WHATEVER QUESTIONS THAT THEY WANT, WE PROVIDE

3    THAT DATA TO THE VENUE.

4        Q    OKAY.  SURE.  BUT THE QUESTIONS THAT ARE HERE

5    WOULD BE THE SAME ON YOURS, RIGHT?

6        A    YES.

7        Q    BECAUSE ESPECIALLY ON RVI 11, THOSE QUESTIONS

8    THERE WOULD BE PERTINENT IN DETERMINING WHETHER

9    SOMETHING'S A QUALIFIED LEAD, CORRECT?

10       A    YES.

11       Q    I'VE DEALT WITH OTHER TIMESHARE COMPANIES AND

12   THESE SAME QUESTIONS COME UP OVER AND OVER AGAIN.  THESE

13   ARE FAIRLY STANDARD INFORMATION QUESTIONS.

14       A    VERY BASIC.

15       Q    WHAT IS IT YOU'RE LOOKING FOR HERE FOR A

16   QUALIFIED LEAD WITH THESE QUESTIONS?

17       A    THE LEAD THAT I WOULD BUY FROM FORTITUDE MEDIA

18   WOULD NEED TO BE AGE GROUP OF BETWEEN 25 AND 73, IN THIS

19   CASE, MARRIED OR CO-HAB, WE WOULD TAKE 20 PERCENT, WE'LL

20   BUY 20 PERCENT OF THE SINGLE WOMEN.  WE DON'T TAKE SINGLE

21   MEN.  AND AN INCOME OF ABOVE $40,000.

22       Q    AND THAT LANGUAGE, THAT LAST SENTENCE, IS THAT

23   THE SAME LANGUAGE THAT'S USED TO OBTAIN PRIOR EXPRESS

24   CONSENT FROM YOUR TOUCHSCREEN?

25       A    YOU'RE GOING TO HAVE TO -- I'M GOING TO SAY YES

97

DEPOSITION OF RICHARD D. SARGENT

1    BUT I DON'T KNOW FOR SURE BUT MILES WOULD KNOW.

2       Q    OKAY.  SO IN THIS CASE, IT WAS FORTITUDE MEDIA

3    AND FORTITUDE MEDIA RAN THIS AT THE GROVE, RIGHT?

4       A    RIGHT.

5       Q    AND WHAT HAPPENS WITH THE LEADS THEN?  LET'S SAY

6    THEY -- HOW MANY DO YOU THINK THEY GOT HERE, IF YOU CAN

7    GIVE ME A NUMBER TO WORK WITH?

8       A    IT DEPENDS ON THE EVENT.  IF IT'S A KIDS' EVENT,

9    LOTS OF PARENTS COME AND YOU GET LOTS OF QUALIFIED LEADS.

10   IF IT'S A CONCERT, DEPENDING ON THE CONCERT, BECAUSE

11   WE'VE GOT TO ATTEND ALL OF THEM, THAT'S KIND OF THE DEAL.

12           SO IF IT'S A HIP HOP THING, YOU'RE NOT GOING TO

13   DO SO WELL.  IF IT'S FLEETWOOD MAC, THOSE ARE OUR PEOPLE.

14      Q    SURE.

15      A    SO IT JUST DEPENDS ON THE VENUE.

16      Q    CAN YOU GIVE ME A RANGE?

17      A    I'M GOING TO SAY MAYBE FOUR PERCENT OF THE

18   PEOPLE THAT ATTEND I THINK WOULD BE A FAIR NUMBER.  SO IF

19   5,000 PEOPLE WENT TO THE CONCERT, WE'D GET 200 QUALIFIED

20   LEADS.

21      Q    OKAY.  IN THIS CASE, SINCE THIS WAS A FORTITUDE

22   MEDIA, YOU WOULD BUY THOSE QUALIFIED LEADS FROM FORTITUDE

23   MEDIA --

24      A    CORRECT.

25      Q    -- AT AN GREED UPON RATE.

                                                            98

DEPOSITION OF RICHARD D. SARGENT

1      A     YES.

2      Q     WHAT HAPPENS TO THOSE LEADS THEN?

3      A     THE LEADS GET SCRUBBED AGAINST -- WELL, FIRST WE

4   SCRUB THEM BEFORE WE BUY THEM AGAINST OUR INTERNAL DO NOT

5   CALL AND THEN WE LOAD THEM INTO OUR SYSTEM.

6      Q     FIRST I'M HEARING OF AN INTERNAL DO NOT CALL.

7   WHAT IS YOUR INTERNAL DO NOT CALL?

8      A     THAT'S NOT THE FIRST YOU'VE HEARD OF IT.  YOU

9   ACTUALLY GOT A LIST OF 111,000 OF THEM.

10     Q     I SEE.  SO YOUR INTERNAL DO NOT CALL IS PEOPLE

11  WHO HAVE SAID AHEAD OF TIME I DON'T WANT TO BE CALLED.

12     A     YES.  DO NOT CONTACT ME.

13     Q     BUT YOUR INTERNAL DO NOT CALL LIST IS NOT

14  SCRUBBING AGAINST THE NATIONAL DO NOT CALL LIST?

15     A     IT'S IN ADDITION TO.  THEY MAY OR MAY NOT BE ON

16  THE DNC.  WE'RE REQUIRED TO CARRY AN INTERNAL DO NOT

17  CALL.

18     Q     BUT WHAT ABOUT SCRUBBING THOSE LEADS AGAINST THE

19  NATIONAL DO NOT CALL LIST?

20     A     WE DO NOT DO THAT.

21     Q     WHY IS THAT?

22     A     BECAUSE WE HAVE PERMISSION TO CALL THEM.

23     Q     SO THEN ONCE THOSE ARE SCRUBBED AGAINST YOUR

24  INTERNAL DO NOT CALL LIST, WHAT HAPPENS TO THOSE LEADS

25  THEN?

                                                        99

PA - 00037

DEPOSITION OF RICHARD D. SARGENT

1       A       THEY GET LOADED INTO THE SYSTEM.

2       Q       DO YOU PROVIDE THOSE LEADS TO ANY THIRD PARTY?

3       A       NO.

4       Q       DO YOU PROVIDE THOSE LEADS TO ANY THIRD PARTY

5   MAKING CALLS ON YOUR BEHALF TO GENERATE QUALIFIED TOURS?

6       A       NO.

7       Q       JUST TO BUILD SOME FOUNDATION, DOES RVI CONTRACT

8   WITH OTHER COMPANIES TO TELEMARKET AND GENERATE QUALIFIED

9   LEADS?

10      A       YES.

11      Q       WHO ARE THOSE COMPANIES?   AND THIS IS THROUGHOUT

12   THE ENTIRE HISTORY.

13      A       OH, GOD.

14              MR. EHRLICH:   IT MIGHT HELP IF WE DO IT BY YEAR.

15      Q       BY MR. BICKFORD:   LET'S DO WHO IT IS NOW?

16      A       WE USE TWO COMPANIES IN THE PHILIPPINES, IVT,

17   WHICH IS INTERVOICE TECHNOLOGIES, I BELIEVE THE NAME IS,

18   AND THERE'S ANOTHER ONE, I CAN'T THINK OF THE NAME.

19      Q       MARKETING SOLUTIONS?

20      A       MARKETING SOLUTIONS AND KALEO DOES SOME

21   TELEMARKETING.

22      Q       THOSE ARE THE CURRENT?

23      A       YES.

24      Q       CAN YOU THINK OF ANY OTHER CURRENT?

25      A       NO.

                                                        100

PA - 00038

DEPOSITION OF RICHARD D. SARGENT

```
 1      Q    THERE MIGHT NOT BE ANOTHER.

 2      A    NO.

 3      Q    WHAT ABOUT PRIOR TO THESE THREE?  ANY OTHERS?

 4   I'LL MAKE THIS A LITTLE EASIER ON YOU.

 5           WHEN WAS THIS COMPLAINT FILED?  2004.  LET'S DO

 6   ANYTHING FROM 2009 ONWARD.

 7      A    THE COMPLAINT WAS FILED IN 2004?

 8      Q    I'M SORRY, 2014.

 9      A    I'M SORRY, WOULD YOU ASK THE QUESTION AGAIN.

10      Q    SO WE DON'T WASTE OUR TIME, LET'S GO FROM --

11   WHAT ARE THE VENDORS FROM 2009 ONWARDS?

12      A    YOU'LL HAVE TO ASK MILES.

13      Q    DO YOU KNOW ANY?

14      A    THAT DID TELEMARKETING?

15      Q    UM-HUM.

16      A    NO.

17      Q    OKAY.  MILES WOULD KNOW?

18      A    YES.

19           MR. BICKFORD:  JOE, HE WAS DESIGNATED FOR NUMBER

20   THREE WHICH IS RVI'S RELATIONSHIP WITH ALL THIRD-PARTY

21   VENDORS THAT WERE HIRED TO MAKE TELEMARKETING CALLS ON

22   ITS BEHALF DURING THE CLASS PERIOD.

23           SO WOULD MILES ACTUALLY BE THE PROPER PMK ON

24   THAT?

25           MR. EHRLICH:  MILES WOULD PROBABLY BE THE PMK.
```

101

1   I THINK RICK'S GIVEN YOU THE PERTINENT INFORMATION.

2          MR. BICKFORD:  IT SOUNDS LIKE --

3          MR. EHRLICH:  I THINK YOU HAD THE CLASS PERIOD

4   FROM 2010 TO THE PRESENT.

5          MR. BICKFORD:  I SAID 2009 BECAUSE I DIDN'T KNOW

6   WHAT TIME IN 2010.

7          MR. EHRLICH:  GOT YOU.  BUT FOR 2010, MILES

8   WOULD DEFINITELY KNOW.

9          MR. BICKFORD:  HE'LL BE ABLE TO ANSWER THAT

10  QUESTION TOMORROW.

11         MR. EHRLICH:  RIGHT.  MORE THAN LIKELY.  IF NOT,

12  WE'LL FIND THE INFORMATION FOR YOU.

13     Q    BY MR. BICKFORD:  YOU CAN STACK THEM UP.  I

14  BELIEVE YOU ANSWERED THIS BUT RVI DOES NOT PROVIDE ITS

15  LEADS TO INTERVOICE TECHNOLOGIES?

16     A    NO.

17     Q    RVI DOES NOT PROVIDE IT'S LEADS TO MARKETING

18  SOLUTIONS?

19     A    NO.

20     Q    RVI DOES NOT PROVIDE ITS LEADS TO KALEO

21  TELEMARKETING?

22     A    NO.

23     Q    WHY IS THAT?

24     A    BECAUSE WE DON'T PROVIDE OUR LEADS TO ANYBODY.

25  IF THEY WANT ME TO BUY A TOUR OR THEY WANT TO PROVIDE A

102

DEPOSITION OF RICHARD D. SARGENT

1    LEAD, WE BUY IT FROM THEM OR AT LEAST FORTITUDE.  THEY

2    DON'T DO LEADS, THEY DO TOURS.  WE PAY FOR THE CONSUMER,

3    NOT FOR A LEAD OR A BOOKING OR ANYTHING.  THE GUY'S GOT

4    TO SHOW UP, HE'S GOT TO BE QUALIFIED, WE PAY THEM.

5              MR. BICKFORD:  6.

6              (THE DOCUMENT REFERRED TO WAS MARKED

7              BY THE CSR AS PLAINTIFF'S EXHIBIT 6

8              FOR IDENTIFICATION, AND ATTACHED TO

9              AND MADE A PART OF THIS DEPOSITION.)

10             MR. EHRLICH:  6, DID YOU SAY?

11             MR. BICKFORD:  UM-HUM.

12        Q    BY MR. BICKFORD:  DO YOU KNOW WHAT THIS IS?

13        A    I BELIEVE THAT IT'S A LIST OF NAMES.  IN LOOKING

14   AT IT, I WOULD SAY, BECAUSE IT'S FROM STEVE HAMENKA WHO

15   IS WITH -- I THINK IT'S THE NAMES WE BOUGHT FROM THIS

16   CONCERT THAT WE'RE ALL TALKING ABOUT HERE BECAUSE I SAW

17   DEL VALLE'S NAME ON IT.

18        Q    WHO IS STEVE HAMENKA?

19        A    HE'S THE OWNER OF FORTITUDE MEDIA.

20        Q    WHO IS CARL GEVC 2013 TOLEDO?

21        A    CARL TOLEDO IS AN IT GUY WHO USED TO WORK FOR

22   RVI.

23        Q    WHAT WAS HIS ROLE?  YOU SAID IT.  WHAT DID HE

24   DO?

25        A    THAT'S A GOOD QUESTION.  I'LL LET MILES ANSWER

103

PA - 00041

DEPOSITION OF RICHARD D. SARGENT

1     A     NOW IT IS.

2     Q     BEFORE THAT, IT WAS THESE POLYCOM PHONES.

3     A     RIGHT.

4     Q     AND BEFORE THAT?

5     A     IT WAS JUST REGULAR PHONE LINES.

6     Q     SO, TO YOUR KNOWLEDGE, WHEN WERE THE POLYCOM

7   PHONES USED?

8     A     ABOUT A YEAR BEFORE THE MYTEL.

9     Q     HOW DID THEY WORK?

10     A     YOU PICKED UP THE PHONE AND DIALED THE LEADS.

11   WE PRINTED THE LEADS AND THEY PICKED UP THE PHONE.  THE

12   DIFFERENCE BETWEEN THIS AND A REGULAR PHONE IS THE COST

13   OF THE PHONE CALL.  THIS IS WHERE YOU GET INTO VOICEOVER

14   IP.  SO THESE ARE INTERNET PHONES, THEY'RE NOT HARD LINE

15   PHONES WITH THE PHONE COMPANY.

16     Q     SO IT'S CHEAPER?

17     A     IT'S CHEAPER THAN THE LINES.

18     Q     SO THE PROCESS WAS STILL THE SAME, THE ONLY

19   THING DIFFERENT BETWEEN THE PHONES BEFORE THE POLYCOM

20   PHONES AND THE POLYCOM PHONES WAS JUST THE COST BECAUSE

21   IT WAS OVER THE INTERNET?

22     A     CORRECT.

23           MR. EHRLICH:  I'M SORRY, I DIDN'T HEAR THAT.

24           MR. BICKFORD:  DO YOU WANT TO READ SOMETHING

25   BACK?

                                                    112

DEPOSITION OF RICHARD D. SARGENT

```
 1    A    I DON'T.

 2    Q    OKAY.

 3         MR. BICKFORD:  EXHIBIT 10 WHICH IS RVI 18.

 4         (THE DOCUMENT REFERRED TO WAS MARKED

 5         BY THE CSR AS PLAINTIFF'S EXHIBIT 10

 6         FOR IDENTIFICATION, AND ATTACHED TO

 7         AND MADE A PART OF THIS DEPOSITION.)

 8    Q    BY MR. BICKFORD:  WE'RE LOOKING AT SOMETHING

 9  VERY SIMILAR TO RVI 17, EXHIBIT 9.  WHAT IS THIS?

10    A    OKAY, TO MY KNOWLEDGE, WE ENTERED IN THE PHONE

11  NUMBERS INTO THE DATABASE FROM YOUR COMPLAINT, THIS ONE

12  CAME UP WITH MISS DEL VALLE.  THERE'S NO RECORD OF THIS

13  IN OUR SYSTEM SO WHEN WE PUT IN THAT PHONE NUMBER, WE

14  DON'T HAVE THAT LEAD.

15    Q    OKAY.  EARLIER YOU STATED THAT SOME EMPLOYEES

16  WILL CALL AND SAY THEY'RE CALLING FROM TRAVEL MEDIA,

17  CORRECT?

18    A    YES.

19    Q    AND SOME TELEMARKETERS WILL CALL AND SAY THEY'RE

20  FROM, CALLING FROM SUNSET GETAWAYS?

21    A    NO.

22    Q    SUNSET VACATIONS, IS THAT IT?

23    A    NO EMPLOYEES CALL AND SAY THAT THEY ARE SUNSET

24  GETAWAYS.

25    Q    SO WHEN IS THE NAME SUNSET GETAWAYS USED?
```

                                                        119

DEPOSITION OF RICHARD D. SARGENT

```
1      A     WE USE SUNSET GETAWAYS FOR ONE OF THE

2   TELEMARKETERS IN THE PHILIPPINES.

3      Q     I SEE.  WHICH TELEMARKETER IS THAT?

4      A     I BELIEVE -- IT'S ONE OF THE TWO.  THERE'S TWO

5   DBA'S.  ONE GOES TO IVT, ONE GOES TO THE OTHER MARKETING

6   COMPANY.  MILES COULD TELL YOU WHICH IS WHICH.  I DO NOT

7   KNOW.

8      Q     DO YOU KNOW WHY -- DID YOU ASK THEM TO CALL AND

9   SAY THEY'RE SUNSET GETAWAYS?

10     A     YES.

11     Q     AND WHY IS THAT?

12     A     BECAUSE WE WANT TO IDENTIFY, IF THERE'S A

13  PROBLEM, SOMEBODY CALLED A SITUATION, WE WANT TO IDENTIFY

14  WHO MADE THAT PHONE CALL.

15     Q     AND THE OTHER COMPANY IN THE PHILIPPINES, WHAT

16  DO THEY SAY THEY'RE CALLING FROM?

17     A     AGAIN, THERE'S ONLY TWO AND ONE CALLS -- I DON'T

18  KNOW THE NAME OF THE OTHER DBA BUT MILES CAN PROVIDE YOU

19  THAT INFORMATION.

20     Q     OKAY.  SO TO YOUR KNOWLEDGE, INTERVOICE

21  TECHNOLOGIES DOESN'T CALL AND SAY HI, THIS IS JOHN FROM

22  INTERVOICE TECHNOLOGIES, CAN I SPEAK TO SOMEONE, RIGHT?

23     A     THAT IS CORRECT.

24     Q     THEY SAY THAT THEIR NAME IS SOMETHING.

25     A     IF THEY'RE CALLING FOR US, THEY'RE GOING TO SAY
```

120

PA - 00044

DEPOSITION OF RICHARD D. SARGENT

1    THEIR NAME IS SUNSET GETAWAYS, ONE OF THE TWO DBA'S WE

2    HAVE FOR THAT PURPOSE.

3        Q    WOULD ANYONE CALL AND SAY THIS IS GLOBAL

4    EXCHANGE VACATION CLUB?

5        A    NO.  THEY'RE NOT SUPPOSED TO.

6        Q    WHY ARE THEY NOT SUPPOSED TO?

7        A    BECAUSE WE WANT THEM TO USE SUNSET GETAWAYS.

8        Q    OR WHATEVER THE OTHER NAME IS.

9        A    OR WHATEVER THE OTHER NAME IS.

10       Q    AND THE REASON FOR THAT IS YOU CAN KEEP TRACK OF

11   WHERE THE PROBLEMS ARE COMING FROM?

12       A    IF THERE'S A PROBLEM, WE KNOW PHONE ROOM,

13   BECAUSE SOMETHING WOULD COME UP AND THEY'D DO THIS AND WE

14   HAVE NO WAY OF KNOWING.

15       Q    WHAT ABOUT KALEO?

16       A    IT'S KALEO, IT'S HAWAIIAN.

17       Q    KALEO.

18       A    SO KALEO MARKETING IS AN OPC ORGANIZATION.

19   THEIR MAIN BUSINESS IS OUTSIDE PUBLIC CONTACT.  SO

20   THEY'LL GO TO THE SAME VENUES WE ALL GO TO ONLY THEY DO

21   DIRECT BOOKINGS WITH THE CONSUMERS.  THEY ALSO COLLECT

22   LEADS.  MOST OF THEIR TELEMARKETING IS VERIFYING AND

23   CONFIRMING BOOKINGS THEY'VE ALREADY SET OR NO SHOWS, BUT

24   THEY DO CALL LEADS AS WELL THAT THEY COLLECT ON THEIR

25   OWN.

121

PA - 00045

DEPOSITION OF RICHARD D. SARGENT

1    NEED IT AND I'LL TALK TO MILES ABOUT THAT BECAUSE I'M

2    SURE HE WOULD KNOW.  WELL, I'M NOT SURE BUT I HOPE.

3        A    HE'LL KNOW IF IT'S THERE OR NOT.

4        Q    SO IF YOU MAKE A CALL, TALKING ABOUT RVI RIGHT

5    NOW, IF YOU MAKE A CALL AND SOMEONE DOES NOT WANT TO BE

6    CONTACTED IN THE FUTURE, HOW DO YOU ENSURE THAT DOESN'T

7    HAPPEN?

8        A    WE MARKET A -- IT IS -- WHAT IS THE WORD I'M

9    LOOKING FOR, NOT DISPOSED, WE MARKET IT AS A TOL.

10       Q    WHAT DOES THAT MEAN?

11       A    TAKE OFF LIST.

12       Q    ARE THEY PUT ON A SEPARATE LIST, AN INTERNAL DO

13   NOT CALL LIST?

14       A    AN INTERNAL DO NOT CALL LIST.  SO THEY'RE PUT

15   INTO THE DATABASE AS A TOL AS MISS DEL VALLE WAS.

16       Q    HOW DO YOU KNOW -- YOU'RE POINTING AT ONE OF THE

17   EXHIBITS.

18       A    YES.  I'M POINTING AT THE EXHIBIT THAT YOU

19   SHOWED ME.

20       Q    EXHIBIT 9.

21       A    YES, EXHIBIT 9.  YOU CAN SEE THE STATUS OF HER

22   LEAD IS TOL.

23       Q    I SEE.

24       A    SO WE TOOK HER OFF THE LIST.

25       Q    WAS SHE TAKEN OFF BECAUSE SHE SUED OR WAS SHE

                                                      133

PA - 00046

DEPOSITION OF RICHARD D. SARGENT

```
1      Q    THE NATIONAL DNC?

2      A    YES, THE NATIONAL DNC.

3      Q    WHAT ABOUT YOUR INTERNAL DNC?

4      A    HE HAS A COPY OF THAT THAT'S UPDATED I BELIEVE

5   WEEKLY AND THEY SCRUB THEIR LEADS AGAINST THAT.  AS FAR

6   AS IVT, YOU KNOW, SHE SCRUBS AGAINST THE DNC, SHE BEING

7   GRACE, AND THAT'S HOW WE DO IT.

8      Q    AND IS THAT, YOU SAID THE DNC.  IS THAT THE

9   NATIONAL DNC?

10     A    YES, AND THE INTERNAL THAT WE PROVIDE.

11     Q    TO YOUR KNOWLEDGE, HAS MARKETING SOLUTIONS --

12   WELL, WHERE DOES MARKETING SOLUTIONS GET THE NUMBERS TO

13   TELEMARKET FROM?

14     A    I HAVE NO IDEA.

15     Q    HAVE YOU EVER ASKED?

16     A    I HAVE NEVER ASKED, NO.

17     Q    WHY IS THAT?

18     A    THAT'S A MARKETING THING.  I THINK MILES CAN

19   ANSWER THAT FOR YOU.

20     Q    WHEN WAS THE LAST TIME YOU SPOKE TO MR. DAIGLE?

21     A    NINE OR 10 MONTHS AGO.

22     Q    OKAY.

23          MR. BICKFORD:  WHAT WERE TWO QUESTIONS AGO?

24   WHAT DID I ASK TWO QUESTIONS AGO?  CAN YOU READ IT BACK.

25          (RECORD READ.)
```

136

DALENE COURT REPORTING  661.341.3929

PA - 00047

DEPOSITION OF RICHARD D. SARGENT

1      Q     BY MR. BICKFORD:   WHERE DID IVT GET THE NUMBERS

2   TO TELEMARKET TO?

3      A     I DON'T KNOW.

4      Q     HAVE YOU EVER ASKED?

5      A     WE USED -- I USED TO PROVIDE NUMBERS FROM A

6   PHONE, YOU KNOW, FROM A MARKETING HOUSE.  WE WOULD BUY

7   THREE CENT NUMBERS AND PROVIDE THEM TO HER.

8      Q     WHEN WAS THIS?

9      A     THAT WAS BACK IN THE BEGINNING, 2006, 2007.

10     Q     UNTIL WHEN?

11     A     WE DID IT FOR THREE OR FOUR YEARS.

12     Q     2006, STARTING SOMETIME IN 2006 TO 2007 FOR

13  ABOUT THREE YEARS, YOU PURCHASED LEAD LISTS?

14     A     CORRECT.

15     Q     AND YOU'D GIVE THOSE LEAD LISTS OR SELL THE LEAD

16  LISTS?

17     A     I WOULD GIVE THE LEAD LIST TO IVT.

18     Q     AND WOULD YOU SCRUB THOSE LEAD LISTS AGAINST THE

19  NATIONAL DO NOT CALL?

20     A     YES.  WE HANDLED THOSE LEADS IN-HOUSE, SO WE

21  WOULD SCRUB THEM AND SEND HER LIKE 20,000 LEADS A WEEK

22  AND WE WOULD SCRUB THEM AGAINST THE INTERNAL, THE

23  OUTSIDE.

24     Q     WOULD YOU SCRUB AGAINST A CELL PHONE?

25     A     NO.

                                                        137

PA - 00048

DEPOSITION OF RICHARD D. SARGENT

```
1      A    THAT IS CORRECT.

2      Q    HOW OFTEN DOES SHE COME TO TOWN, TO YOUR

3    KNOWLEDGE?

4      A    MAYBE EVERY OTHER YEAR.

5      Q    WHERE DOES HER FAMILY LIVE, DO YOU KNOW?

6      A    LA.

7      Q    DO YOU KNOW WHERE?

8      A    I HAVE NO IDEA.

9      Q    WHERE DID YOU SEE HER THE LAST TIME YOU WERE

10   HERE?  WHERE DID YOU GUYS MEET UP?

11     A    AT THE OFFICE, CORPORATE OFFICE OF RVI.

12     Q    DOWN IN MISSION VIEJO?

13     A    MISSION VIEJO.

14     Q    WHAT STEPS DOES RVI TAKE TO ENSURE THAT

15   MARKETING SOLUTIONS ISN'T CALLING CELL PHONES WITH AN

16   AUTOMATIC DIALING SYSTEM --

17     A    I HAVE NO IDEA.

18     Q    -- WITHOUT PRIOR CONSENT?

19          MR. EHRLICH:  IF YOU DON'T KNOW, SAY YOU DON'T

20   KNOW.

21          THE WITNESS:  I SAID I HAVE NO IDEA.  OH, I

22   DON'T KNOW, OKAY.

23     Q    BY MR. BICKFORD:  WHAT STEPS DOES RVI TAKE TO

24   ENSURE THAT IVT DOES NOT CALL CELL PHONES USING AN

25   AUTOMATIC TELEPHONE DIALING SYSTEM WITHOUT PRIOR EXPRESS
```

139

PA - 00049

DEPOSITION OF RICHARD D. SARGENT

```
 1   CONSENT?

 2     A    I DON'T KNOW.

 3          MR. EHRLICH:  I THINK MILES BRYSON WOULD BE THE

 4   PMK ON THAT.

 5          MR. BICKFORD:  OKAY.

 6     Q    BY MR. BICKFORD:  HOW OFTEN DO YOU RECEIVE

 7   QUALIFIED TOURS FROM MARKETING SOLUTIONS AND IVT?  IS IT

 8   WEEKLY?

 9     A    WELL, EVERY DAY THAT WE'RE OPEN, SO THURSDAY,

10   FRIDAY, SATURDAY, SUNDAY WE GET SOME.

11     Q    OKAY.  IF YOU WERE TO ASK MARKETING SOLUTIONS

12   FOR THE OUTBOUND CALL NUMBERS IT USED TO TELEMARKET,

13   WOULD MARK PROVIDE THAT TO YOU?

14     A    I DON'T KNOW.

15     Q    YOU UNDERSTAND THE QUESTION, THOUGH?

16     A    I THINK SO.

17     Q    JUST TO MAKE SURE WE'RE CLEAR, WHEN YOU CALL,

18   THERE'S AN -- YOU RECEIVE A CALL ON THE CALLER ID

19   INCLUDING THE CALLS FROM OVERSEAS.  WAS THAT YOUR

20   UNDERSTANDING OF THE QUESTION?

21     A    YES.  WELL, ACTUALLY WHAT I WAS THINKING YOU

22   WERE SAYING WAS WOULD HE PROVIDE ME A LIST OF WHO HE

23   CALLED.

24     Q    NO, I'M SAYING THE TELEPHONES HE USES ARE

25   TYPICALLY, UNLESS THEY'RE SPOOFED, ASSIGNED TO A NUMBER
```

140

PA - 00050

DEPOSITION OF RICHARD D. SARGENT

1      Q    AGAIN, YOU'VE NEVER ASKED HER WHERE SHE GETS HER

2   LEADS FROM?

3      A    I HAVE NOT.

4      Q    AND THE MARKETING SOLUTIONS INTERNATIONAL, THE

5   ONE IN THE PHILIPPINES, ABOUT HOW MANY TELEMARKETERS DO

6   THEY HAVE?

7      A    I HAVE NO IDEA.

8      Q    YOU THINK IT'S BIGGER OR SMALLER THAN IVT?

9      A    I THINK IT'S MUCH BIGGER.

10     Q    EVEN THOUGH IT'S A NEWER COMPANY, IT'S MUCH

11  LARGER?

12     A    I DON'T KNOW THAT IT'S NEWER.  I HAVE NO IDEA

13  HOW LONG MARK DAIGLE HAS OWNED THAT COMPANY.

14     Q    SO YOU CAME WHEN HE ALREADY HAD A PREEXISTING

15  BUSINESS?

16     A    NO.  MARK WORKED FOR ANOTHER COMPANY, HE

17  INTRODUCED ME TO GRACE, I'VE BEEN DOING BUSINESS WITH

18  GRACE.  I'D LOST TRACK OF MARK DAIGLE AND WHAT HE WAS

19  DOING.  I MEAN, I HEAR.  WHEN I WENT OUT THERE, I HAD

20  DINNER WITH HIM THAT YEAR.

21          HE COMES BACK TO THE UNITED STATES, I PROBABLY

22  SAW HIM IN 2012, BUT I HAVEN'T DONE ANY BUSINESS WITH HIM

23  UNTIL A COUPLE OF YEARS AGO, MAYBE 18 MONTHS AGO.

24     Q    DOES RVI TAKE ANY STEPS -- STRIKE THAT.

25          TO YOUR KNOWLEDGE, DOES RVI TAKE ANY STEPS TO

                                                    158

DEPOSITION OF RICHARD D. SARGENT

1    ENSURE THAT MARKETING SOLUTIONS INTERNATIONAL, THE

2    PHILIPPINES COMPANY, DOESN'T USE AUTOMATIC TELEPHONE

3    DIALING SYSTEMS?

4           MR. EHRLICH:  I'M GOING TO JUST OBJECT THAT IT'S

5    PROBABLY A BETTER QUESTION FOR MILES BRYSON, BUT YOU CAN

6    GO AHEAD AND GIVE YOUR KNOWLEDGE.

7           THE WITNESS:  I DON'T KNOW.

8       Q   BY MR. BICKFORD:  TO YOUR KNOWLEDGE, DOES RVI

9    TAKE ANY STEPS TO ENSURE THAT IVT DOESN'T MAKE CALLS

10   USING AN AUTOMATIC TELEPHONE DIALING SYSTEM?

11          MR. EHRLICH:  SAME OBJECTION.  GO AHEAD, YOU CAN

12   ANSWER.

13          THE WITNESS:  I DON'T KNOW.

14          MR. BICKFORD:  LET'S TAKE A BREAK.

15          THE VIDEOGRAPHER:  WE'RE NOW GOING OFF THE

16   RECORD, THE TIME IS 2:41 P.M.

17          (RECESS.)

18          THE VIDEOGRAPHER:  WE ARE NOW BACK ON THE

19   RECORD, THE TIME IS 3:27 P.M.

20      Q   BY MR. BICKFORD:  SO DURING THE BREAK,

21   MR. SARGENT, YOU CALLED YOUR ASSOCIATES AT RVI, CORRECT?

22      A   YES.

23      Q   THEY SAID THEY'LL BE ABLE TO PRODUCE THE

24   AGREEMENTS, THE VENDOR AGREEMENTS?

25      A   YES.

159

1    EXHIBIT 18 WHICH IS BATES STAMPED DEL VALLE 712 THROUGH

2    726.  IT IS THE PHONE RECORDS OF THE PLAINTIFF, MICHELE

3    DEL VALLE, FROM THE DATE OF SEPTEMBER 21ST, 2014 TO

4    OCTOBER 20TH, 2014.

5             THE WITNESS:  OKAY.

6      Q    BY MR. BICKFORD:  EARLIER YOU TESTIFIED THAT RVI

7    DOES NOT PROVIDE ITS LEADS TO MARKETING SOLUTIONS

8    INTERNATIONAL; IS THAT CORRECT?

9      A    ABSOLUTELY.

10     Q    YOU ALSO TESTIFIED THAT RVI DOES NOT PROVIDE ITS

11   LEADS TO INTERVOICE TECHNOLOGIES; IS THAT CORRECT?

12     A    THAT IS CORRECT.

13     Q    ON PAGE 718.

14     A    OKAY.

15     Q    YOU'LL SEE I'VE HIGHLIGHTED IT TO MAKE IT CLEAR.

16     A    RIGHT.

17     Q    7:02, A CALL CAME IN, ACTUALLY ON CALL WAITING,

18   APPEARS TO BE, IF I'M READING THIS CORRECTLY, FROM A

19   NUMBER 949-200-5342.

20     A    OKAY.

21     Q    DOES THAT NUMBER APPEAR ON THE NUMBERS LISTED IN

22   DISCOVERY RESPONSE NINE FOR THOSE ASSOCIATED WITH

23   MARKETING SOLUTIONS INTERNATIONAL?

24     A    THAT'S THESE SIX NUMBERS, YES, LINE 27.

25     Q    THAT WOULD INDICATE THAT MARKETING SOLUTIONS

                                                         164

DEPOSITION OF RICHARD D. SARGENT

1    INTERNATIONAL CALLED HER NUMBER; IS THAT CORRECT?

2        A    THAT WOULD BE CORRECT.

3        Q    AND I'LL ALSO NOTE THAT BASED UPON THIS NUMBER,

4    THIS IS THE 949-439-8867 NUMBER.

5        A    OKAY.

6        Q    DO YOU AGREE THAT I'M READING THIS CORRECTLY TO

7    YOUR KNOWLEDGE OF READING PHONE RECORDS?

8        A    YES, IT APPEARS THAT THAT'S THE PHONE NUMBER.

9        Q    SO MARKETING SOLUTIONS, BASED ON YOUR

10   UNDERSTANDING READING THIS, MARKETING SOLUTIONS

11   INTERNATIONAL DID CALL HER; IS THAT CORRECT?

12       A    YES.

13       Q    DO YOU HAVE ANY IDEA HOW MARKETING SOLUTIONS

14   INTERNATIONAL OBTAINED THAT PHONE NUMBER?

15       A    I HAVE NO IDEA.

16           MR. EHRLICH:  I JUST WANT TO OBJECT, I BELIEVE

17   THAT'S ANOTHER TOPIC THAT MILES IS PROBABLY BETTER AT

18   ANSWERING.

19           MR. BICKFORD:  I KNOW, AND PROBABLY REPEAT THE

20   SAME QUESTIONS WITH HIM TOMORROW.

21       Q    BY MR. BICKFORD:  TO YOUR KNOWLEDGE, DO YOU HAVE

22   ANY IDEA IF MARKETING SOLUTIONS INTERNATIONAL GOT PRIOR

23   EXPRESS CONSENT TO CALL THAT NUMBER?

24       A    I HAVE NO IDEA.  I DON'T KNOW.

25       Q    WHAT IS IT YOU'RE LOOKING FOR?

165

PA - 00054

DEPOSITION OF RICHARD D. SARGENT

1      A      I WAS LOOKING FOR THE LEAD LIST TO SEE IF THAT'S

2   THE NUMBER THAT WE RECEIVED.

3      Q      IT IS, BUT I'LL HELP YOU OUT WITH THAT.

4      A      THAT WAS PRETTY EARLY ON.

5      Q      IT'S GOING TO BE EXHIBIT 9, I BELIEVE.

6      A      THERE IT IS.  OKAY.

7      Q      SO YOU'VE COMPARED THE NUMBER THAT SHE WAS

8   CALLED ON TO MARKETING SOLUTIONS INTERNATIONAL TO YOUR

9   LEAD SLIP WHICH IS EXHIBIT NUMBER 9 AND YOU WOULD AGREE

10  THAT'S THE SAME PHONE NUMBER; IS THAT CORRECT?

11     A      IT IS.

12     Q      BUT, AGAIN, YOU TESTIFIED EARLIER THAT RVI DOES

13  NOT PROVIDE ITS LEADS TO MSI, CORRECT?

14            MR. EHRLICH:  OBJECTION, ASKED AND ANSWERED.

15     Q      BY MR. BICKFORD:  YOU CAN ANSWER.

16     A      YES.

17     Q      SO YOU CERTAINLY -- TO YOUR KNOWLEDGE, RVI

18  CERTAINLY DID NOT PROVIDE THAT NUMBER TO MSI, CORRECT?

19     A      THAT IS CORRECT.

20     Q      WHAT ARE WE AT, 19?

21     A      YES.

22            (THE DOCUMENT REFERRED TO WAS MARKED

23            BY THE CSR AS PLAINTIFF'S EXHIBIT 19

24            FOR IDENTIFICATION, AND ATTACHED TO

25            AND MADE A PART OF THIS DEPOSITION.)

166

DALENE COURT REPORTING  661.341.3929

DEPOSITION OF RICHARD D. SARGENT

```
1      Q    BY MR. BICKFORD:  I'VE HANDED YOU EXHIBIT

2   NUMBER 19 WHICH IS DEL VALLE 762 THROUGH 779 WHICH IS

3   PLAINTIFF'S PHONE RECORDS FOR THE MONTHS OF

4   NOVEMBER 21ST, 2014 TO DECEMBER 20TH, 2014.  IF YOU'LL

5   TURN TO PAGE 764.

6      A    OKAY.

7      Q    I'VE HIGHLIGHTED IT FOR YOU.  IT APPEARS THAT ON

8   DECEMBER 4TH AT 7:22 P.M., AN INCOMING CALL WAS RECEIVED

9   FROM THE NUMBER 909-243-1174?

10     A    47.

11     Q    THANK YOU, 1147.  IF YOU GO AND COMPARE THAT TO

12  THE LIST OF NUMBERS IN EXHIBIT 17, DO YOU SEE THAT NUMBER

13  LISTED UNDER IVT?

14     A    IT APPEARS TO BE NUMBER 16 ON THE IVT LIST.

15     Q    LINE 16?

16     A    LINE 16, YES.

17     Q    DOES IT APPEAR, BASED ON THIS, THAT PLAINTIFF

18  MICHELLE DEL VALLE RECEIVED A CALL TO WHAT IS A DIFFERENT

19  NUMBER THIS TIME, 949-287-2405, ON DECEMBER 4TH AT 7:22

20  P.M. FROM YOUR CONTRACTOR IVT?

21     A    YES.

22     Q    IF YOU GO TO PAGE 766, TWO PAGES OVER.

23     A    OKAY.

24     Q    YOU'LL SEE THAT ON SUNDAY, DECEMBER 14TH, THE

25  FIRST OF TWO HIGHLIGHTED AT 7:58 P.M., AN INCOMING CALL
```

167

1    WAS RECEIVED FROM THE NUMBER 714-912-6964.

2         A    OKAY.

3         Q    DO YOU SEE THAT NUMBER LISTED IN DEFENDANT'S

4    DISCOVERY RESPONSES UNDER NUMBERS USED BY MSI?

5         A    YES, NUMBER 26, LINE 26.

6         Q    SO IT APPEARS AS THOUGH YOUR CONTRACTOR MSI

7    CALLED PLAINTIFF MICHELLE DEL VALLE AT HER 949-287-2405

8    NUMBER ON SUNDAY, DECEMBER 14TH AT 7:58 P.M.?

9         A    YES.

10        Q    DO YOU HAVE ANY IDEA HOW MSI GOT THAT NUMBER?

11        A    I HAVE NO IDEA.  DO WE HAVE THAT NUMBER?

12        Q    NO.

13        A    I MEANT DOES RVI HAVE THAT NUMBER?  I DON'T

14   BELIEVE WE DO.

15        Q    I'M JUST ASKING THE QUESTION.  DO YOU HAVE ANY

16   IDEA HOW MSI GOT THAT NUMBER?

17        A    I'M SORRY, NO, I DO NOT.

18        Q    DO YOU KNOW IF MSI GOT PRIOR EXPRESS CONSENT TO

19   CALL THAT NUMBER?

20        A    I DO NOT.

21        Q    DO YOU KNOW IF MSI USED AN AUTOMATIC DIALING

22   SYSTEM TO CALL THAT NUMBER?

23        A    I DO NOT.

24        Q    JUST A FEW QUESTIONS.  IF YOU CAN GO BACK TO THE

25   IVT NUMBER TWO PAGES EARLIER.

168

DEPOSITION OF RICHARD D. SARGENT

```
 1     A    OKAY.

 2     Q    I'M LOOKING AT THE 7:22 CALL ON DECEMBER 4TH.

 3   DO YOU KNOW HOW IVT GOT THAT NUMBER?

 4     A    I DO NOT.

 5     Q    DO YOU KNOW IF IVT GOT PRIOR EXPRESS CONSENT TO

 6   CALL THAT NUMBER?

 7     A    I DO NOT.

 8     Q    DO YOU KNOW IF IVT USED AN AUTOMATIC DIALING

 9   SYSTEM TO CALL THAT NUMBER?

10     A    I DO NOT.

11     Q    YOU CAN PUT THOSE BOTH ASIDE.

12     A    OKAY.

13     Q    SO EARLIER YOU STATED THAT IVT AND MSI WOULD

14   SEND YOU PERIODICALLY, WOULD IT BE THROUGH EMAIL, THE

15   NUMBERS THEY USE FOR THEIR OUTBOUND CALLS?

16     A    YES.

17     Q    HOW OFTEN DID THAT HAPPEN?

18     A    THAT WOULD BE A MILES QUESTION.

19     Q    OKAY.  I THINK WE'LL HAVE A LONG CONVERSATION

20   WITH MILES ABOUT THIS BECAUSE I DO THINK WE ARE MISSING

21   SOME NUMBERS THAT WERE CALLED BUT I'LL TALK ABOUT THAT

22   WITH MILES TOMORROW.

23     A    OKAY.

24     Q    BUT THESE WOULD BE MEMORIALIZED IN AN EMAIL

25   PROBABLY?
```

169

0190

1  STATE OF CALIFORNIA.                )

2                                      ) SS.

3  COUNTY OF LOS ANGELES              )

4

5

6

7

8

9          I, THE UNDERSIGNED, CONFIRM THAT I HAVE READ THE

10  FOREGOING DEPOSITION, AND I DECLARE, UNDER PENALTY OF

11  PERJURY, THAT THE FOREGOING IS A TRUE AND CORRECT

12  TRANSCRIPT OF MY TESTIMONY CONTAINED THEREIN.

13

14          EXECUTED THIS _27th_ DAY OF _MAY_, 2016, AT

15  _San Juan Capistrano_, CALIFORNIA.

16

17

18

19

20          _____

                    RICHARD D. SARGENT

21

22

23

24

REPORTER'S CERTIFICATE

STATE OF CALIFORNIA   )
                      ) SS.
COUNTY OF LOS ANGELES)

I, VICTORIA K. DAVIS, CERTIFIED SHORTHAND REPORTER

NO. 4192, AUTHORIZED TO ADMINISTER OATHS PURSUANT TO THE

CALIFORNIA CODE OF CIVIL PROCEDURE, DO HEREBY CERTIFY:

THAT, PRIOR TO BEING EXAMINED, THE WITNESS NAMED IN

THE FOREGOING DEPOSITION, TO WIT, RICHARD D. SARGENT, WAS

BY ME DULY SWORN TO TESTIFY THE TRUTH, THE WHOLE TRUTH,

AND NOTHING BUT THE TRUTH;

THAT THE DEPOSITION OF THE WITNESS IN THIS PROCEEDING

WAS TAKEN DOWN BY ME IN STENOTYPE AT THE TIME AND PLACE

THEREIN NAMED AND THEREAFTER TRANSCRIBED BY

COMPUTER-AIDED TRANSCRIPTION UNDER MY DIRECTION.

THE DISMANTLING OF THIS ORIGINAL TRANSCRIPT WILL VOID

THE REPORTER'S CERTIFICATE.

I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE

EVENT OF THE ACTION.

WITNESS MY HAND THIS _18th_ DAY OF

_April_ , 2016.

VICTORIA K. DAVIS
STATE OF CALIFORNIA
C.S.R. NO. 4192

191

PA - 00060

EXHIBIT "B"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| MICHELE DEL VALLE, an individual, for herself and all members of the putative class, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) CASE NO.30-2014- ) 00745279-CU-MC-CXC |
| GLOBAL EXCHANGE VACATION CLUB, a California Corporation, and DOES 1 THROUGH 100, inclusive, | ) ) ) ) |
| Defendants. | ) ) |

DEPOSITION OF MYLES BRYSON

Wednesday, April 13, 2016

Los Angeles, California

REPORTED BY:

JULIA A. DOUVILLE
CSR 9446 (Pages 1-133)

-and-

LEESA DURRANT
CSR 11899 (Pages 134-252)

1

PA - 00062

DEPOSITION OF MYLES BRYSON

```
1    different call center locations?

2         A    Yes.

3         Q    Okay.  What are the three center -- call

4    center locations?

5         A    There was one in Irvine.  Do you want specific

6    addresses?

7         Q    Yes.  That would be great.  Let's get them

8    listed out with the addresses, and then we'll see what

9    we need to do from there.

10        A    And I don't have all the addresses on the top

11   of my head.

12        Q    To the best of you knowledge.

13        A    So there's 17682 Mitchell North, Suite 100,

14   Irvine, 92614.  There's one in Santa Ana that I don't

15   know the address off the top of my head.  And then I

16   really don't know the answer of the call center in

17   Phoenix.

18        Q    Are there sales presentations that occur at

19   these three addresses as well?

20        A    No.

21        Q    So the only thing that occurs at these three

22   addresses are telemarketing?

23        A    Correct.

24        Q    Any other offices there for any other type of

25   function within the company other than marketing?
```

71

PA - 00063

DEPOSITION OF MYLES BRYSON

```
1       A    Correct.

2       Q    Don't worry.  You're not getting sued for

3   that.

4            Okay.  So we were talking about corporate

5   structure.  We were talking about the call center

6   managers.  Who were under the call center managers?

7       A    They have some verifiers.

8       Q    What's a verifier do?

9       A    Verify the appointment.

10      Q    How do they verify appointments?

11      A    I'm sorry?

12      Q    How do they do that?

13      A    Over the phone.

14      Q    So they call individuals who express interest

15  in coming to a tour?

16      A    No.  So the -- the telemarketers would set

17  appointments.  And then once an appointment was set,

18  they would transfer it to a verifier.  And the verifier

19  would verify the appointment.

20      Q    I see.  So once someone's expressed interest,

21  the call is transferred to a verifier?

22      A    No.

23      Q    Okay.  So explain so I understand.

24      A    So the telemarketer sets an appointment.

25      Q    Okay.
```

                                                          80

DEPOSITION OF MYLES BRYSON

```
 1        A    So it's past the interest.  They've said an
 2   appointment.  Once that appointment's been set, then
 3   that client then gets verified that that's what they'd
 4   like to do.  They verify that they'd like the --
 5   whatever the -- the gift is that's being offered.
 6        Q    Okay.  So what does verifying entail then?
 7   I'm just a little confused because I see that the
 8   telemarketer will actually set the appointment and then
 9   send it over to the verifier.  What does the verifier
10   add that the telemarket doesn't add?
11        A    Hopefully nothing.
12        Q    Okay.  So it's verifying?
13        A    That's exactly correct.
14        Q    Verifying that the appointment has been set
15   and that the gift that they're requesting is the one
16   that they're requesting?
17        A    Correct.
18        Q    Okay.
19        A    And that the details have been provided to
20   them.
21        Q    How many -- well, we'll get to that.
22             Are there verifiers at each location?
23        A    Yes.
24        Q    Okay.  And is there someone else underneath
25   the call center managers?
```

81

PA - 00065

DEPOSITION OF MYLES BRYSON

1      Q     Okay.  And briefly -- because we'll get into

2   the more in-depth -- what does a telemarketer do?

3      A     Makes phone calls.

4      Q     Outbound?

5      A     Yes.

6      Q     So how many verifiers -- well, let me phrase

7   it differently.

8            Is there one verifier for each location?

9      A     There's two for the -- for the full rooms --

10   excuse me -- and one in Phoenix right now.

11      Q     So there's two verifiers in Irvine?

12      A     Yes.

13      Q     Two verifiers in Santa Ana?

14      A     Yes.

15      Q     And one verifier in Phoenix?

16      A     Yes.

17      Q     Okay.  And how many production assistant

18   managers are there?

19      A     How many production assistants are there?

20      Q     Assistants.  I'm sorry.  I added "manager" on

21   there.  Production assistant, yes.

22      A     There's one in each --

23      Q     One in each.

24      A     -- location.

25      Q     And how many telemarketers are there?

84

PA - 00066

DEPOSITION OF MYLES BRYSON

```
 1       A     Different.  So there's 30 chairs in Irvine,
 2   there's 30 chairs in Santa Ana, and there's 16 chairs in
 3   Arizona.
 4       Q     And are those chairs filled every day?
 5       A     Depends.
 6       Q     Ideally it would be?
 7       A     Would be great.
 8       Q     So do you know approximately how many
 9   telemarketers are at Irvine right now?
10       A     Employed or coming to work?
11       Q     Yeah, employed.
12       A     I honestly don't know.
13       Q     Okay.  Is it around 20?
14       A     Probably.
15       Q     And what about the Santa Ana location?
16       A     Probably fairly similar.
17       Q     And the Phoenix?
18       A     Probably around ten.
19       Q     Okay.  What's the purpose of the Phoenix
20   location?  Are they -- are they telemarketing to
21   California?
22       A     Uh-huh.
23       Q     And why is -- why Phoenix?
24       A     We had an opportunity to get a talented
25   manager, and there was a physical location that was able
```

85

PA - 00067

DEPOSITION OF MYLES BRYSON

1    to be acquired.

2        Q    So these individuals are -- these

3    telemarketers in Phoenix are still calling into Southern

4    California?

5        A    Correct.

6        Q    Does RVI telemarket -- well, where do they

7    telemarket to?

8        A    Southern California.

9        Q    Okay.  All -- well, let's define "Southern

10   California.  What does that mean?

11       A    Well, I'm only here three years.  So I'm not

12   the most knowledgeable but --

13       Q    Well, so based on your experience in the past

14   three years, where --

15       A    Greater Los Angeles.

16       Q    San Diego?

17       A    No.

18       Q    Ventura County?

19       A    Very lightly.  But we're trying to get there.

20       Q    Los Angeles County?

21       A    Yes.

22       Q    Orange County?

23       A    Yes.

24       Q    Inland Empire?

25       A    To some degree.

86

PA - 00068

DEPOSITION OF MYLES BRYSON

1    Q    Well, we can break that apart.  Riverside

2  County?

3    A    Yes.  Again, some of it.

4    Q    And San Bernardino County?

5    A    Some of it.

6    Q    Any other counties that there's been some or a

7  little?

8    A    Don't believe so.

9    Q    Okay.  I can't even think of any other county

10  besides --

11    A    I can't either.

12    Q    -- San Diego and maybe Imperial Valley, but I

13  doubt you'd telemarket there.

14    A    Never heard of that.

15    Q    Who does RVI provide marketing to?

16    A    I'm sorry?

17    Q    Who does RVI provide marketing to?

18    A    We -- we -- exclusively for Rick's.  We

19  deliver tours to RVI showrooms exclusively.

20    Q    And do you know what's being sold in those

21  showrooms?

22    A    I believe the Global Exchange Vacation Club

23  homeowners association or product or -- again, I'm not

24  involved with the sales.

25    Q    I understand.  Have you ever attended a sales

87

DALENE COURT REPORTING  661.341.3929

PA - 00069

DEPOSITION OF MYLES BRYSON

```
 1   functionality.

 2        Q    And so who would be responsible for creating

 3   these websites?

 4        A    We would contract out.

 5        Q    Okay.  Do you know who the contractor was?

 6        A    No.  In fact, I think the RVI one and

 7   Travelmedia ones, we actually built in-house.

 8        Q    So, to your knowledge or to your

 9   understanding, Travelmedia and RVI, you believe, was

10   built in-house?

11        A    I think so.

12        Q    And you're just unsure about Sunset Getaways

13   and Celebrate Vacations?

14        A    Yes, I'm not sure.

15        Q    Okay.

16        A    They're very basic.  So I would -- they could

17   well have been built in-house.

18        Q    Okay.  What's Travelmedia?

19        A    Travelmedia is the calling d.b.a. for RVI.

20        Q    And why does RVI have a calling d.b.a.?

21        A    It just makes more sense.

22        Q    In what way?

23        A    Just clearer to the client.

24        Q    Which client?

25        A    The prospects that we call.
```

89

PA - 00070

DEPOSITION OF MYLES BRYSON

1     Q     I see.  And what's more clear about it?

2     A     It's -- I -- it was in place when I got there.

3  So, I guess, maybe I'll just answer it that way.

4     Q     That's fine.  That's fine.

5     A     It's easier that way, so --

6     Q     I just -- I guess I'm just confused about

7  what's easier about it.  I can understand that it was in

8  place when you got there.  But based on your knowledge

9  and experience, what's easier about having a calling

10 d.b.a.?

11    A     You just -- it's -- it's about what's

12 happening.  So they were -- my understanding is they

13 were doing a lot of car promotions and Travelmedia was

14 the -- the entity that called on behalf of the car

15 promotions.

16    Q     I see.  So we talked about sales present -- or

17 not sales presentations, I'm sorry -- attending events

18 at venues and getting information via touch screen?

19    A     Yes.

20    Q     That would be more RVI --

21    A     Yes.

22    Q     -- in name?

23    A     Yes.

24    Q     But when there is calling, it's Travelmedia?

25    A     Correct.

                                                        90

DEPOSITION OF MYLES BRYSON

1        Q      And I guess I can understand what you mean by

2   "easier" now in the sense that it's easier to just call

3   the people who go out to venues RVI and the people who

4   make the calls Travelmedia.   Is that correct?

5        A      I don't know.   That's -- could be getting into

6   speculation.   I don't know.

7        Q      Okay.   Well, you said it was easier.   I'm just

8   trying to figure out why you think it's easier.

9        A      Probably bad choice of words.

10       Q      Okay.   So do you know who came up with the

11  name Travelmedia?

12       A      No.

13       Q      What's Sunset Getaways?

14       A      That is the entity for the -- one of the

15  Filipino call centers.

16       Q      Which one?   Well, strike that.

17              Who are the two Filipino call centers?

18       A      IVT and MSI.

19       Q      Okay.   So Sunset Getaways, well, you said it's

20  the entity for one of the Philippine call centers.   I

21  guess I'm confused.   What do you mean by that?

22       A      It's, again, just -- it's the d.b.a. for them

23  to call on behalf of.   It allows us to identify the call

24  center.

25       Q      Okay.   So let's build some foundation.   RVI

91

DEPOSITION OF MYLES BRYSON

1   has contracted with two Filipino call center companies;

2   correct?

3       A    I believe so, yes.

4       Q    And one of those is IVT?

5       A    Yes.

6       Q    And one of those is MSI?

7       A    Yes.

8       Q    And I know, but let's make the record clear.

9   What does "IVT" stand for?

10      A    I don't know.

11      Q    Intervoice Technologies?

12      A    That could be it.

13      Q    Okay.  And to your knowledge, what does "MSI"

14  stand for?

15      A    Marketing Solutions International.

16      Q    Okay.  And Sunset Getaways is what you have

17  asked one of these Filipino call companies to identify

18  as when they place outbound telemarketing calls?

19      A    Correct.

20      Q    Okay.  And so which one is that?

21      A    Again, I don't know which one's which.  I

22  think -- I don't know.

23      Q    Can you find out?

24      A    Yes.

25      Q    Okay.  Because Rick said you would know.

                                                    92

DALENE COURT REPORTING  661.341.3929

PA - 00073

DEPOSITION OF MYLES BRYSON

```
 1        A    Okay.  I just don't know off the top of my
 2   head.  I could give you a wrong answer.  That's --
 3        Q    Yeah.
 4        A    -- what I'm trying to avoid.
 5        Q    We need to find this out.
 6        A    I mean, I could guess, and I think I'm right
 7   but --
 8        Q    Don't guess.
 9        MR. EHRLICH:  We'll make a call.
10        Q    BY MR. BICKFORD:  Don't guess.  I'd rather --
11        MR. EHRLICH:  We'll make a call on a break --
12        MR. BICKFORD:  I'd rather like --
13        MR. EHRLICH:  -- and we'll come back.
14        Q    BY MR. BICKFORD:  -- when we take lunch, you
15   can call --
16        A    Okay.
17        Q    -- and find out because Rick -- Rick threw
18   that one on you.
19        A    I'm 90 percent sure.  But, again, you're
20   asking me something --
21        Q    Okay.
22        MR. EHRLICH:  We'll make the call.  We'll fill it
23   in.
24        THE WITNESS:  Okay.
25        MR. BICKFORD:  Well, why not -- yesterday I had
```

93

DEPOSITION OF MYLES BRYSON

1   some trouble getting my lunch and back in time.  Why

2   don't we take an early lunch because I'm in a good place

3   to stop.

4        MR. EHRLICH:  Okay.

5        MR. BICKFORD:  We will go on break 'til 12:30.

6        MR. EHRLICH:  Okay.

7        MR. BICKFORD:  You can make a call.  We can find

8   out that information just so we can be clear.

9        THE WITNESS:  Okay.

10        MR. BICKFORD:  And we'll go, and we'll talk about

11   the rest.  Okay?

12        THE WITNESS:  Okay.

13        MR. EHRLICH:  All right.  Thanks.

14        VIDEOGRAPHER:  We are now going off the record, and

15   the time is approximately 11:43 A.M.

16            (Lunch recess.)

17        VIDEOGRAPHER:  We're now going back on the record,

18   and the time is approximately 12:39 P.M.

19        Q    BY MR. BICKFORD:  Okay.  Before lunch we were

20   talking about Sunset Getaways and Celebrate Vacation.

21   Do you recall that?

22        A    Yes.

23        Q    And you testified that those were the calling

24   names for the two Filipino call centers which we're

25   calling IBT and MSI; correct?

94

PA - 00075

DEPOSITION OF MYLES BRYSON

1      A      Correct.

2      Q      And you said that you are like 90 percent sure

3   which name was -- that corresponded with which Filipino

4   company, but you weren't sure.   So you made a phone

5   call; correct?

6      A      Correct.

7      Q      And who did you call?

8      A      Tim Michaelec.

9      Q      Okay.   And what did you ask him?

10      A      He didn't answer.   I sent him a text, and he

11   responded.   I said, "Is Sunset Getaways with IVT?"

12             And he said, "Yes."

13      Q      Okay.   So Sunset Getaways is the name that IVT

14   uses when it makes calls; correct?

15      A      Correct.

16      Q      And Sunset Getaways is just a d.b.a. for RVI;

17   correct?

18      A      A -- it's a d.b.a.

19      Q      For RVI?

20      A      I believe so, yes.

21      Q      Okay.   And so that would mean Celebration

22   Vacation --

23             Is it "Vacation" or "Vacations"?

24      A      I believe it's plural.

25      Q      Okay.   So Celebration Vacations would be the

95

DALENE COURT REPORTING   661.341.3929

DEPOSITION OF MYLES BRYSON

1    calling name that MSI uses --

2         A    Correct.

3         Q    -- when it calls to book tours for RVI;

4    correct?

5         A    I believe so, yes.

6         Q    And Celebration Vacations is really a d.b.a.

7    for RVI?

8         A    Yes.

9         Q    Okay.  And what's the purpose of having these

10    two different names for these two different Filipino

11    companies?

12         A    Identifiers.

13         Q    Can you elaborate.  What does "identifiers"

14    mean?

15         A    Just so we can keep all of the -- the calls

16    and the communications straight so we'd know which was

17    which group.

18         Q    And what's the purpose of doing that?

19         A    So that we can keep track.

20         Q    And why would you want to keep track?

21         A    We have to pay them.

22         Q    Any other reasons?

23         A    Just to keep track.  I mean, there would

24    probably be a variety of reasons; but, I mean, that's

25    first thing I can think of is -- is for payment.  If

96

DEPOSITION OF MYLES BRYSON

1    there was ever a challenge, we'd also be able to

2    identify the challenge.

3        Q    Like, what's a challenge?   What do you mean by

4    that?

5        A    Well, if there was a complaint about

6    something.

7        Q    What kind of complaint?

8        A    Could be various.   They could have felt

9    somebody was rude.   They could have felt somebody didn't

10   speak to them properly, didn't get the right

11   information.

12       Q    Have you ever received a complaint like that?

13       A    Yeah.

14       Q    And -- and how does one complain about the

15   calls from Sunset Getaways and/or Celebration Vacations?

16       A    The place that we -- I got it from was on --

17   it's a website that you know of that they would go to

18   the "Contact Us" page and let us know.

19       Q    The website for these d.b.a.'s?

20       A    Yes.

21       Q    Okay.   So if someone was complaining either

22   about -- well, for any reason, they could go on to those

23   two websites and make a complaint; correct?

24       A    Yes.

25       Q    And then because -- based on which website

97

PA - 00078

DEPOSITION OF MYLES BRYSON

1    they make the complaint on, you could determine which

2    Filipino company, whether MSI or IVT, is the one that

3    made the call?

4         A    They would define that, yes.

5         Q    Okay.  Do you know who came up with the name

6    Sunset Getaways?

7         A    No.  I don't recall.

8         Q    Do you know who came up with the name

9    Celebration Vacations?

10        A    I don't recall.

11        Q    Okay.  Since September, 2010, has RVI

12   contracted with any other third party, other than IVT or

13   MSI, to make telemarketing calls to book qualified

14   tours?

15        A    Yes.

16        Q    Who is that?

17        A    They're in the -- the list -- or in the pile

18   of agreements.  I'd have to probably go back through to

19   give you the exact names.

20        Q    Okay.  What I'd like to exclude from that is

21   OPC's.

22        A    Okay.

23        Q    So these are -- these are entities that were

24   hired exclusively to make telemarketing outbound calls.

25        A    Right.

                                                        98

PA - 00079

```
 1      A     No. 5 --

 2      Q     Okay.

 3      A     -- yes.  And No. 4 is RVI's.

 4      Q     Okay.  And how long has this touch screen

 5   interface, RVI's touch screen interface, Exhibit No. 4,

 6   been in use?

 7      A     Since approximately March of 2014.

 8      Q     And what was in use by RVI prior to March,

 9   2014?

10      A     The Fortitude.

11      Q     Okay.  So prior to March, 2014, the only touch

12   screen interface that was being used was the touch

13   screen interface that was used by Fortitude Media, which

14   is Exhibit No. 5?

15      A     To the best of my knowledge.

16      Q     Okay.

17      A     I'm not certain prior to that.

18      Q     Prior to when?

19      A     Prior to my arrival.

20      Q     Okay.  So prior to March, 2014, to when you

21   started the company, did RVI have its own touch screen

22   interface?

23      A     No.

24      Q     Okay.  What's going on?

25      MR. EHRLICH:  I'm just look -- I'm just comparing
```

112

DEPOSITION OF MYLES BRYSON

1    the two; that's all.

2          MR. BICKFORD:   Okay.

3          THE WITNESS:   They're basically the same questions,

4    just a different graphic.

5          MR. EHRLICH:   Right.

6          Q    BY MR. BICKFORD:   So, to your knowledge, RVI

7    began using its own touch screen interface in March of

8    2014?

9          A    Correct.

10         Q    Have you seen the equipment, the touch screen

11   interfaces?

12         A    Yes.

13         Q    And where are they stored?

14         A    Various locations.

15         Q    RVI offices?

16         A    Some of them, yeah.   Some of them stay at the

17   Staples Center.

18         Q    I see.   Okay.   So some of them --

19         A    Remain in the venue.

20         Q    Okay.

21         A    Yeah.

22         Q    And can you give me a brief -- I went over

23   this a little bit with -- with Mr. Sargent yesterday,

24   but can you give me a brief location of the venues RVI

25   uses.   Not Fortitude Media.   RVI.

113

DEPOSITION OF MYLES BRYSON

1       A    Yeah.  So we use the Staples Center, the

2   StubHub Center, the Wiltern Theater, Rabobank Arena,

3   Riverside Municipal Amphitheater, the Fox Theater,

4   Irvine Amphitheater, The Forum, and without writing them

5   down, I -- I think that's it.

6       Q    Okay.

7       A    And then various -- you know, we may do some

8   one-off shows here and there.

9       Q    Like bridal showers sometimes?

10      A    A bridal show or a car show or something along

11  those lines.

12      Q    Okay.

13      A    NASCAR.  Sorry.  We do the NASCAR event out in

14  Fontana.

15      Q    And does RVI display these touchscreens at

16  every event at these locations?

17      A    Most.

18      Q    Okay.  And there's contracts with RVI and all

19  these venues?

20      A    Or the management group.

21      Q    Oh, I see.  The management group, that would

22  be more than one of these venues; right?

23      A    Correct.

24      Q    Okay.  Now, in addition to the documents

25  produced -- or the documents in Exhibit 4, there would

114

DEPOSITION OF MYLES BRYSON

1    actually be other screenshots of surveys that the venues

2    have asked you to perform?

3        A    Very rarely.

4        Q    Okay.  So it's not always the case?

5        A    Yeah.

6        Q    Okay.  So with that exception, the way you've

7    produced Exhibit 4 to me is the order and how it would

8    appear when someone interacts with the touch screen

9    interface?

10       A    Correct.

11       Q    Okay.  And you just -- just so I know you're

12   clear, can you go through and make sure that it's in the

13   correct order.

14       A    Now, once I get into here and you get into

15   just these questions, I -- I can only make an assumption

16   they stayed in the right order.  I -- I honestly don't

17   know.

18       Q    Okay.

19       A    But I believe so.  But there's no relevance to

20   the order.  It's just a series of nine or ten questions.

21   But I believe this is the correct order.

22       Q    Okay.  No reason to believe it's not the

23   correct order?

24       A    Correct.

25       Q    Okay.  And do you have any reason to believe

                                                        115

DEPOSITION OF MYLES BRYSON

1    that any screenshot is missing, other than those surveys

2    that the venues will sometimes ask you to perform?

3        A    No.

4        Q    Okay.  Now, where within here does RVI obtain

5    prior express consent to call cellphones?

6        A    Page 3.

7        Q    Can you read to me what RVI contends is prior

8    express consent to call a cellphone.

9        A    "By clicking on the 'I agree' box, this will

10            serve as my electronic signature.  I verify the

11            following information is true and agree to be

12            contacted by Resort Vacations Inc., Solar Savings

13            America, and/or Take2/GI at the address entered,

14            by text or voice contact to my cellular or home

15            telephone numbers provided by me in or on this

16            electronic entry, or to my e-mail address by way

17            of manual or automated telephone dialing system

18            regarding this and future promotional offers,

19            regardless of any prior election to the contrary.

20            I consent that any contact by phone may be

21            recorded.  I understand that I'm not required to

22            sign this agreement directly or indirectly or agree

23            to enter into such an agreement as a condition of

24            purchasing any property, goods, or services."

25        Q    Do you know who wrote that language?

116

DALENE COURT REPORTING  661.341.3929

PA - 00084

DEPOSITION OF MYLES BRYSON

1      A    I would -- I -- I would assume I probably had

2  something to do with writing it, and then we would have

3  had it reviewed by an attorney.

4      Q    Okay.  Do you know when approximately you

5  wrote that?

6      A    It would have been somewhere around March of

7  2014.  But it's been amended since.

8      Q    Okay.  Who is Solar Savings of -- Solar

9  Savings America?

10     A    It was a group that we were going to work with

11  with data but we chose not to.

12     Q    Okay.  And what -- what did they do?  When you

13  say "work with data," what sort of things would they do?

14     A    They sell solar.

15     Q    Like solar panels?

16     A    I just know that they sell solar services.

17  What they sell, I have no idea.

18     Q    So how would you work with them to provide

19  data?

20     A    They -- they were asking if they could acquire

21  leads from us.

22     Q    Okay.  Did that ever occur?

23     A    No.

24     Q    Okay.  So at some point in time, Solar Savings

25  of America asked you to include their name in there in

                                                      117

DEPOSITION OF MYLES BRYSON

```
 1    someone enters the -- their input, their data, into this
 2    touch screen interface.
 3              So I'm just going to ask:  If someone comes
 4    up, they enter their information into the touch screen
 5    interface, what happens then?
 6        A    They go to the event.
 7        Q    What happens to their data?
 8        A    Oh, it's stored inside the machine until the
 9    end of the event.
10        Q    And then what happens?
11        A    It's removed from the machine and brought into
12    the -- the I.T. department.
13        Q    How is it removed?
14        A    Through a thumb drive.
15        Q    Okay.  And then it's brought into the data
16    department?  What's the data department?  What are you
17    referring to?
18        A    I.T. department.
19        Q    I.T. department.  Where is the I.T.
20    department?
21        A    At 17682 Mitchell.
22        Q    Irvine?
23        A    Yes.
24        Q    And then what happens to it?
25        A    It's decrypted, and then it's put into our
```

120

DALENE COURT REPORTING   661.341.3929

DEPOSITION OF MYLES BRYSON

1    system and ran against our files to ensure that any of

2    the people that are on that list that have asked us not

3    to call them again is removed.  And they take out all of

4    the information that does not meet the qualifications

5    that we discussed prior.

6         Q     You're referring to the internal do-not-call

7    list?

8         A     The internal do-not-call list, the owners,

9    other areas, the people we wouldn't want to call.

10        Q     Yeah, so you scrub against your internal

11   do-not-call list; correct?

12        A     Correct.

13        Q     And then you take out individuals who would

14   not fit the criteria that we discussed earlier?

15        A     Don't meet the promotion, correct.

16        Q     Sure.  You know, more than 40- or now $50,000?

17        A     Correct.

18        Q     Not in the right age group?

19        A     Correct.

20        Q     Are those individuals who are removed eligible

21   to win the prize?

22        A     Absolutely.

23        Q     Okay.  And then what happens?

24        A     The information, once it's -- it's scrubbed

25   and prepared and is sure that it's clean, it will go

                                                         121

PA - 00087

DEPOSITION OF MYLES BRYSON

1    into a campaign and be submitted out to the call

2    centers.

3        Q    And then they're called?

4        A    Yes.

5        Q    Okay.  How do the call centers work?

6        A    I don't understand the question.

7        Q    Sure.  It's a little confusing.  Well, you

8    said there's been two systems.  One was the old

9    database, the time -- what was it called? --

10       A    Trackmaster.

11       Q    -- Trackmaster, and the new one, which was

12   custom.

13            Let's talk about the new one.

14       A    Okay.

15       Q    And, again, what are the dates for this again

16   approximately?

17       A    I think somewhere in 2013.

18       Q    Okay.  So how does a telemarketer make calls

19   since -- when -- when the new database came into effect?

20       A    So the new -- again, you're -- you're asking a

21   mixed question.  So you're asking me about a database,

22   and then you're asking me about telemarketers.  I don't

23   understand your question.

24       Q    Okay.  So -- so, well, let's talk about today.

25   How does a telemarketer make calls today?

                                                        122

DEPOSITION OF MYLES BRYSON

```
1      A    A telemarketer sits down at their station,
2   they log into a phone, and then they will then ask for a
3   lead.
4      Q    How do they do that?
5      A    They push "Get Next."
6      Q    "Get Next"?
7      A    Yes.
8      Q    What do they push that on?
9      A    On a telephone.
10     Q    What kind of telephone?
11     A    A Mitel.
12     Q    So they push a button called "Get Next," and
13  what happens?
14     A    A name pops up with a phone number.
15     Q    Where does it pop up?
16     A    On the screen.
17     Q    On the telephone screen?
18     A    Yes.
19     Q    And then what happens?
20     A    They push "Dial."
21     Q    And then it connects them through?
22     A    Then it dials the phone.  It doesn't connect
23  anything.  Just dials the phone.
24     Q    It dials the number?
25     A    Yeah.
```

123

DEPOSITION OF MYLES BRYSON

```
 1        Q    Okay.  And let's say someone doesn't pick up.
 2   What happens next?
 3        A    They disposition the call.
 4        Q    Hang up?
 5        A    Well, whatever it was.  So if no one answered
 6   the phone, they would disposition it as a no -- no
 7   answer.
 8        Q    I guess I'm confused as to what "disposition"
 9   means.  What does that mean?
10        A    An outcome of a call.
11        Q    Okay.  And how do they do that?
12        A    On the screen, they push a button, says "Show
13   Dispositions."
14        Q    How big is the screen on these phones?
15        A    3 inches by five inches, 2 1/2 inches by 5
16   inches.
17        Q    So larger probably than a typical phone but
18   not huge?
19        A    Yeah.  It's just a normal desk phone like you
20   see all over today.
21        Q    Okay.  I'm looking at that phone over there.
22        A    That was the old ones.
23        Q    Okay.  Okay.  And yesterday Mr. Sargent said
24   that there's some sort of algorithm to determine when to
25   call people back.  Is -- is that correct?
```

124

DEPOSITION OF MYLES BRYSON

1      A     I don't know anything.  There's no algorithms

2   in our system.

3      Q     So what would prevent someone from getting

4   called -- you know, say they didn't pick up.  What would

5   prevent them from getting called repeatedly over and

6   over and over again?

7      A     Yeah, we -- just our procedures.

8      Q     Okay.  So how does the -- how does the

9   telephone retrieve the number to call when you press

10  next -- "Get Next"?

11     A     I don't understand the question.

12     Q     Okay.  So you've -- you said that these

13  telemarketers sit down.

14     A     Yeah.

15     Q     Do they have a headset?

16     A     Yes.

17     Q     Okay.  So they choose, and they may put on

18  their headset.  And then they press a button saying "Get

19  Next"?

20     A     They log in first.

21     Q     They log into their phone, and then they press

22  a button called "Get Next"?

23     A     Yes.

24     Q     And then a name and number will pop up on the

25  phone screen?

125

DEPOSITION OF MYLES BRYSON

```
 1       A    Correct.

 2       Q    And how does that happen?  How does that

 3  number end up on their screen simply by pressing "Get

 4  Next"?

 5       A    Yeah, so our I.T. department selects data that

 6  we want to call that day.  And they will create a list,

 7  and that list will be put into the system that the

 8  production assistant will then apply to specific

 9  telemarketers.

10       Q    Okay.  And what happens when --

11            Or does it ever happen where the telemarketers

12  call everybody on the list for that day?

13       A    No.

14       Q    Okay.  So what happens when someone doesn't

15  pick up and the disposition is "Didn't Pick Up."  Are

16  they put back into that list for the day and possibly

17  re-called that day?

18       A    No.

19       Q    And how does that happen?  How do we -- that

20  not happen, I mean?

21       A    Okay.  So the -- the system can only call a

22  number once until it's put back into the system as a new

23  record.

24       Q    Okay.  So if someone is -- does not pick up --

25       A    Yeah.
```

126

DEPOSITION OF MYLES BRYSON

1    Q    -- what happens to that person then?

2    A    That -- filed away as a "no answer," and

3 depending on -- it will be used in a future day.

4    Q    But someone has to manually put it back into

5 the system?

6    A    Correct.

7    Q    Probably not manually, but you know what I

8 mean.  Via computer or electronic?

9    A    Yes.

10    Q    Okay.  And is there a procedure for

11 determining when to put numbers back into the system?

12    A    Yes.

13    Q    And what's that procedure?

14    A    You let a client receive five phone calls to a

15 no-answer over a period of about six to seven days, and

16 then you'll put the number away.

17    Q    What does "putting it away" mean?

18    A    We just store it away until a future time and

19 give it some time to possibly get the people back from

20 vacation or wherever they may be.

21    Q    And is this policy written down?

22    A    No.

23    Q    Okay.  Who developed it?

24    A    Myself and the I.T. manager.

25    Q    Who's the I.T. manager again?

127

DEPOSITION OF MYLES BRYSON

1      A     Jeff Brown.

2      Q     Okay.  Okay.  So the leads that are generated

3    from the touch screen interface, RVI's touch screen

4    interface, are they ever run against the National

5    D.N.C.?

6      A     No.

7      Q     Are the leads that are generated from RVI's

8    touch screen interface ever subject to a cellphone

9    scrub?

10     A     No.

11     Q     Are the leads that are generated from RVI's

12   touch screen interface provided to IVT?

13     A     No.

14     Q     Are the leads generated from RVI's touch

15   screen interface provided to Celebration Vacations?

16     A     No.

17     Q     Okay.  Let's look at Exhibit 5, which you

18   testified was the touch screen interface for Fortitude

19   Media; correct?

20     A     Yes.

21     Q     What's Fortitude Media?

22     A     A vendor.

23     Q     What do they do?

24     A     They collect data and OPC at events.

25     Q     What's "OPC" stand for?

                                                    128

PA - 00094

DEPOSITION OF MYLES BRYSON

```
1       A    I have a GVEC.net e-mail address and I have a

2   Resort Vacations e-mail address.

3       Q    What was the other one?

4       A    Resort Vacations, Inc.

5       Q    So that's your e-mail there, Myles Bryson?

6       A    I use the Resort Vacations one primarily, yes,

7   but that's the one Steve sends it to.

8       Q    Who's Jeff Brown?

9       A    IT manager.

10      Q    Do you know what VPT, Inc. stands for?

11      A    No, have no idea.

12      Q    All right.  Earlier we discussed how the

13  telemarketers function now with the Mitel phones; right?

14      A    Okay.

15      Q    How long have the Mitel phones been in use?

16      A    I don't have an exact date.

17      Q    That's fine.

18      A    Probably sometime in 2014, I believe.

19      Q    And they're in current use today; right?

20      A    Yes.

21      Q    What was used before the Mitel phones?

22      A    Polycom's.

23      Q    So how did the telemarketers work with the

24  Polycom phones?  What was the difference?

25      A    The leads were handed to them on paper.
```

135

PA - 00095

DEPOSITION OF MYLES BRYSON

1       Q       Then what would happen?

2       A       They would dial the phone number.

3       Q       Did they have a computer at their desks?

4       A       No, they still don't.

5       Q       How would they mark the disposition of the

6  call?

7       A       If you want to show me one of the -- that lead

8  form there, I can show you.

9       Q       You're pointing to something in my stack here.

10      A       Right under your phone.

11      Q       This?

12      A       Your phone.

13      MR. EHRLICH:   He's talking about the little lead

14  slips.

15      THE WITNESS:   The little white ones there.   That's

16  a lead slip.   That's how they would be handed out.

17  BY MR. BICKFORD:

18      Q       I'll give them to you.   Let's talk about them

19  now.

20      MR. EHRLICH:   Don't write on them.

21  BY MR. BICKFORD:

22      Q       You can write on this one.

23      MR. EHRLICH:   Do you want to make a copy of it and

24  then write on it?

25      MR. BICKFORD:   No.   No.   I don't think anyone needs

136

1    to write on anything actually come to think of it

2    because you have a copy of it already.  So this will be

3    Exhibit 7.

4              (Whereupon Plaintiffs' Exhibit 7 was marked

5         for identification by the Court Reporter.)

6    BY MR. BICKFORD:

7         Q    This is what the witness was just pointing to?

8         A    Correct.

9         Q    I think I have an extra one.  Here you go.

10   MR. EHRLICH:   Thank you.

11   BY MR. BICKFORD:

12        Q    So what are we looking at here?

13        A    This would be a lead slip.  These would be

14   produced for each number that we were going to put out

15   into the call center that day and you would see here

16   that they would have the ability to put a final outcome

17   or disposition on the lead following a call.

18        Q    Okay.  So this is -- looks like it was cut.

19   It was probably part of a larger sheet of paper.

20        A    Correct.

21        Q    Would it have been precut by the time that it

22   was given to them?

23        A    Absolutely.

24        Q    Okay.  So they would receive a stack of these

25   smaller pieces of paper; correct?

                                                          137

DEPOSITION OF MYLES BRYSON

1      A    Twenty in a pile.

2      Q    Twenty in a pile.   They would call the number

3  located up in the upper right-hand corner?

4      A    Correct.

5      Q    So in this case we have Michelle Del Valle;

6  correct?

7      A    Correct.

8      Q    And attached Brian Delaware?

9      A    Correct.

10     Q    Separate number for both; right?

11     A    Correct.

12     Q    Okay.  And so the telemarketers would receive

13  this slip of paper, along with others?

14     A    Correct.

15     Q    They would call the number.  And where do they

16  put the disposition?  Can you point me to where that

17  would be?

18     A    Right beside where it says, "circle status"

19  and "Q status."

20     Q    So let's go over what all of these mean.

21  Circle status is "TOL," what does that mean?

22     A    Take off list.

23     Q    What does that mean?

24     A    It's a request by a client to not receive

25  further phone calls.

                                                      138

DEPOSITION OF MYLES BRYSON

1      Q    Okay.  Do you know why they moved or closed

2   down?

3      A    Just the showroom -- I think the lease was

4   expiring and it was time to get to a new location.  They

5   had been there a long time.

6      Q    What about Long Beach, do you know

7   approximately when?

8      A    It was a temporary location.  It had bad

9   internet service and things.  We just couldn't function

10  properly.

11     Q    Let's go back to talking about the

12  telemarketers under the old Polycom phones.

13     A    Okay.

14     Q    So they would take these lead lists, Exhibit

15  7, and they would call them; right?

16     A    Correct.

17     Q    When they were done, what would they do?  Go

18  back for more?

19     A    Correct.

20     Q    Okay.  Exhibit 8 which is Bates stamped RVI 14

21  through 16.

22          (Whereupon Plaintiffs' Exhibit 8 was marked

23     for identification by the Court Reporter.)

24  BY MR. BICKFORD:

25     Q    What are we looking at here?

143

PA - 00099

DEPOSITION OF MYLES BRYSON

1     Q    There should be.  Yeah.  That's right.  Okay.

2  Approximately how many calls does RVI's call centers

3  make in a day?

4     A    10,000.

5     Q    Approximately how many calls does MSI make in

6  a day for RVI?

7     A    No idea.

8     Q    Have you ever asked?

9     A    No.

10    Q    Do you know how many telemarketers MSI has?

11    A    No.

12    Q    How many tours do the RVI telemarketers on

13 average provide?

14    A    Per person or total?

15    Q    Total.

16    MR. EHRLICH:  Excuse me.  Vague and ambiguous as to

17 time.  Do you mean in a day?  Week?  Month?

18 BY MR. BICKFORD:

19    Q    How do you do it?

20    A    We measure it all.

21    Q    Well, I want to compare it to MSI and IVT.  So

22 how many qualified tours on average, I understand it's

23 going to fluctuate, does IVT provide?

24    A    In what period?

25    Q    You know it by day, you know it by week or you

168

PA - 00100

DEPOSITION OF MYLES BRYSON

1    know it by month?

2        A    We tend to go by week.

3        Q    Let's go by week.   So by week, how many does

4    IVT provide?

5        A    Around 50.

6        Q    What about MSI?

7        A    Fifty to 60.

8        Q    What about RVI?

9        A    About 130.

10       Q    Do you know why RVI has more qualified tours

11   produced than IVT or MSI?

12       A    No, I don't know.   Probably allocation of

13   staff but it would be an assumption.

14       Q    Do you know how many telemarketers IVT has?

15       A    No.

16       Q    Do you know how many telemarketers MSI has?

17       A    No.

18       Q    What's the telephone service that RVI uses?

19       A    Telephone service?

20       Q    Is it 8x8?

21       A    No.

22       Q    What is it?

23       A    Intelepeer.

24       Q    Say that again.

25       A    Intelepeer.

169

PA - 00101

DEPOSITION OF MYLES BRYSON

1    those are more of openers, getting people to see if

2    they're interested?

3        A    Correct.

4        Q    Then once someone is interested, they would

5    use a script like this or this to set the appointment as

6    it says at the top; right?

7        A    Correct.

8        Q    Okay.  Place that one to the side.  Does RVI

9    provide scripts to MSI?

10       A    No.

11       Q    But RVI does require that MSI state that it is

12   Celebration Vacations; correct?

13       A    Correct.  Request.

14       Q    Okay.  Does RVI provide call scripts to Sunset

15   Getaways?

16       A    No.

17       Q    But RVI does request that IVT -- let me

18   rephrase that.  I'm using the dba's.

19            Does RVI provide scripts to IVT?

20       A    No.

21       Q    RVI does ask IVT to use the name Sunset

22   Getaways in its calls; correct?

23       A    Correct.

24       Q    Okay.  Are there any documents that reflect

25   what you want IVT to be saying on these calls?

                                                    176

DEPOSITION OF MYLES BRYSON

1     A     No.

2     Q     Are there any documents that require what RVI

3   wants MSI to be saying on these calls?

4     A     No.

5     Q     There's no e-mail correspondence that would

6   say what we expect -- RVI expects in these calls?

7     A     Not that I'm aware of.

8     Q     Okay.  If you were looking for these

9   documents, where would you go to try to see if they

10  existed?

11    A     I would have assumed they would have been

12  submitted to me and so I -- I don't know where I would

13  go from here.

14    Q     Okay.

15        MR. EHRLICH:  Just to check up on that, I'll check

16  to see if it was done but it would be prior to his time.

17  If anything was used, I will let you know.

18        MR. BICKFORD:  Very well.  These things -- he's

19  saying it doesn't exist.  It might not exist.

20        MR. EHRLICH:  It might not.  I'll check and let you

21  know.

22        MR. BICKFORD:  Okay.  We're about to switch to some

23  different things.  Let's take a break.

24        VIDEOGRAPHER:  We're now going off the record.  The

25  time is approximately 2:35 p.m.

                                                        177

DEPOSITION OF MYLES BRYSON

```
 1        Q    Do you know if Kaleo Marketing scrubs against
 2   the National Do Not Call List?
 3        A    I don't know.
 4        Q    Do you know if Kaleo Marketing scrubs against
 5   the -- does cell phone scrubs?
 6        A    I don't know.
 7        Q    Why not?
 8        A    They're an independent contractor.
 9        Q    Does that mean you just never asked?
10        A    I don't get involved in their day-to-day
11   business.
12        Q    So, no, never asked?
13        A    I've never asked.
14        Q    Has anyone at RVI asked?
15        A    I don't know.
16        Q    So Kaleo Marketing will send qualified tours
17   over to RVI showrooms?
18        A    Correct.
19        Q    I believe I asked this.  I just want to be
20   clear for my mind.  Has RVI given Kaleo Marketing
21   scripts?
22        A    No.
23        Q    Earlier we talked about two Philippine
24   companies were assigned different names that they would
25   use on their calls?
```

185

PA - 00104

DEPOSITION OF MYLES BRYSON

1     A     Correct.

2     Q     IVT would use Sunset Getaways?

3     A     Yes.   Sorry.

4     Q     And MSI would use Celebration Vacations?

5     A     Correct.

6     Q     Does Kaleo Marketing have a name that it uses?

7     A     Kaleo Marketing.

8     Q     And why is it that you didn't provide them

9     with a name you would like to make the calls under?

10    A     Didn't see a need.   Didn't have any complaints

11    coming from their areas.

12    Q     Okay.   So the reason why MSI and IVT were

13    provided names is because complaints tended to come from

14    those vendors?

15    A     Correct.   We would hear rumblings and we would

16    want to make sure we could define between the two.

17    Q     Okay.   To your knowledge, does Kaleo Marketing

18    have a website?

19    A     I don't know.

20    Q     Okay.   So if a complaint was made about a call

21    Kaleo Marketing made to generate a qualified tour for

22    RVI, how would RVI become aware of that?

23    MR. EHRLICH:   Objection.   Improper hypothetical.

24    Misstates prior testimony.   You can answer it if you

25    can.

186

PA - 00105

DEPOSITION OF MYLES BRYSON

```
 1      Q     A lawsuit?

 2      A     Us and MSI had a problem?

 3      Q     Yeah.

 4      A     No, not that I'm aware of.

 5      Q     You said earlier RVI does not provide MSI with

 6   lists to call?

 7      A     Correct.

 8      Q     You're not aware of how MSI gets its numbers

 9   to call?

10      A     Correct.

11      Q     Why is that?

12      A     They're their own entity.

13      Q     Does MSI get prior expressed consent to call

14   cellular telephones?

15      A     I don't know.

16      Q     Does RVI scrub any lists against the National

17   Do Not Call List?

18      A     Does RVI?

19      Q     I beg your pardon.  Does MSI?

20      A     I don't know.

21      Q     Just to make the record clear.  Does MSI scrub

22   against the National Do Not Call List?

23      A     I don't know.  They're instructed to do so by

24   us.

25      Q     Does MSI perform cell phone scrubs?
```

193

DEPOSITION OF MYLES BRYSON

```
 1      A    I don't know.

 2      Q    Are they instructed by RVI to perform a cell

 3 phone scrub?

 4      A    They're instructed to follow all of the

 5 federal and state --

 6      Q    Where does it say that?

 7      A    On page No. 3, under 6, under warranties, "MSI

 8 shall conduct its business and operations in compliance

 9 with all of the applicable laws where it's qualified and

10 registered to do business."

11      Q    So it does state that, but nowhere does it

12 expressly state that they must scrub against the Do Not

13 Call List?

14      A    I don't know.

15      Q    You can look at the agreement.

16      A    Okay.  Oh, yep, in Exhibit A.

17      Q    Okay.  Where are you looking at?

18      A    "Telemarketing list hygiene" at the bottom.

19      Q    Where does it require them to scrub against --

20      A    Okay.  "Federal, state and internal DNC

21 policies to ensure calls -- that our clients are not

22 barraged on behalf of RVI."

23      Q    It says "barraged"?

24      A    It does.  It says "barraged."

25      Q    Where are we looking?  I'm looking at the
```

194

PA - 00107

DEPOSITION OF MYLES BRYSON

1      Q      Does it state anywhere in here that MSI must

2  obtain prior consent to call cell phones?

3      A      I don't believe so.

4      Q      Does it state anywhere in here that MSI cannot

5  use an automatic telephone dialing system to call

6  cellular telephones without prior expressed consent?

7      A      Again, other than to follow all Federal, State

8  guidelines, no.

9      Q      Does it state anywhere here -- expressly, to

10  follow the Telephone Consumer Protection Act?

11      A      No, I don't believe so.

12      Q      What steps does RVI take to ensure that MSI

13  complies with the Telephone Consumer Protection Act?

14      A      They've given us assurances that they do.

15      Q      Besides that, has RVI taken any steps to

16  insure that MSI follows the Telephone Consumer

17  Protection Act?

18      A      Not to my knowledge.

19      Q      Okay.  Put that off to the side.  Do you know

20  what equipment MSI uses to make

21          Telephone calls?

22      A      I believe it's Vista Dial.

23      Q      You know that how?

24      A      Just from memory.  I believe that they both

25  responded that they used the Vista Dial.

197

DEPOSITION OF MYLES BRYSON

1        Q     This request was made in response to --

2    responding to discovery we asked questions that the

3    plaintiff asked.

4        A     Correct.

5        Q     So you didn't know ahead of time what they

6    used?

7        A     Correct.

8        Q     Okay.  As I said earlier, you know, we have a

9    lot of vendor agreements here this morning; right?

10       A     Yes.

11       Q     And Intervoice Technologies is not in there;

12   right?

13       A     Correct.

14       Q     So to your knowledge, do you know if there is

15   a written agreement between Intervoice Technologies and

16   RVI?

17       A     Not that I'm aware of.

18       Q     To your knowledge, is there an agreement

19   between Intervoice Technologies and its predecessor --

20   do you know what its predecessor was?

21       A     I don't even know what you're talking about.

22       Q     Okay.  RVI changed its name.  Global Vacations

23   Marketing Corp., have you ever heard of that?

24       A     No.

25       Q     It's what RVI or its predecessor used to be

198

DALENE COURT REPORTING  661.341.3929

PA - 00109

DEPOSITION OF MYLES BRYSON

```
 1        Q    All right.  Okay.  This is Exhibit 41.

 2             (Whereupon Plaintiffs' Exhibit 41 was marked

 3        for identification by the Court Reporter.)

 4   BY MR. BICKFORD:

 5        Q    Keep 40 in front of you.

 6        A    Okay.

 7        Q    And Exhibit 41 is Bates stamped Del Valle 712

 8   through 726.  It is the plaintiff's AT&T phone records

 9   for the period of September 21st, 2014 through October

10   20th, 2014.

11             If you will flip to Del Valle 000718.

12        A    Okay.

13        Q    Do you see I have highlighted it to make it

14   easy?

15        A    Uh-huh.

16        Q    You'll see that on Tuesday, September 30th,

17   2014, plaintiff, Michelle Del Valle at 7:02 p.m.

18   received a call and it went to her call waiting from a

19   number (949) 200-5342?  Do you see that?

20        A    Yes.

21        Q    And is that one of the numbers listed that MSI

22   uses?

23        A    Yes.

24        Q    And where is that?

25        A    No. 27.
```

227

PA - 00110

DEPOSITION OF MYLES BRYSON

1      Q     Line 27.   So based on this, it appears that

2   MSI made a call to plaintiff, Michelle Del Valle on

3   September 30th at 7:02 p.m.?

4      A     It would appear.

5      Q     And I will also note that the plaintiff had

6   multiple cell phones during this time period and this

7   was to her (949) 439-8867 number.   Do you see that?

8      A     Yes.

9      Q     If you'll go into Exhibit 41 that's the same

10  number that Michelle Del Valle purportedly provided to

11  RVI at one of the touch screen -- at the Gordon

12  Lightfoot concert?

13     A     Correct.

14     Q     Yet RVI did not provide that number to

15  Marketing Solutions International?

16     A     Correct.

17     Q     Does RVI know why Marketing Solutions

18  International called Michelle Del Valle on September

19  30th at 7:02?

20     A     No.   Done with 41?

21     Q     Leave the numbers in front of you.

22     A     Forty-one?

23     Q     You can put that aside.   Okay.   This is

24  Exhibit 42 which is Del Valle 762 through 779, the

25  plaintiff, Michelle Del Valle's AT&T phone records for

228

DEPOSITION OF MYLES BRYSON

1    November 21st, 2014 through December 20th, 2014.

2              (Whereupon Plaintiffs' Exhibit 42 was marked

3         for identification by the Court Reporter.)

4    BY MR. BICKFORD:

5         Q    If you go to Del Valle 764, it's the third

6    page, I have highlighted a number there as well.  Do you

7    see that?

8         A    Uh-huh.

9         Q    This is for a different phone number, (949)

10   287-2405.

11        A    Okay.

12        Q    Do you see that?

13        A    Yeah.

14        Q    Okay.  It appears that on December 4th, 7:22

15   p.m. Michelle Del Valle received an incoming call from

16   the number (909) 243-1147, do you see that?

17        A    Uh-huh.

18        Q    Is that one of the numbers associated with

19   Intervoice Technologies?

20        A    Yes.

21        Q    What line is that?

22        A    Sixteen.  Yeah, 16.

23        Q    So it appears that Intervoice Technologies

24   called the plaintiff, Michelle Del Valle, on December

25   4th, 2014 at 7:22?

229

DEPOSITION OF MYLES BRYSON

1     A    Okay.  Yes.

2     Q    This is different than the number that the

3   plaintiff provided at the Gordon Lightfoot concert?

4     A    Yes.

5     Q    Did RVI provide IVT with this number?

6     A    No.

7     Q    Does RVI know why IVT called this number?

8     A    No.

9     Q    Two more pages to 766?

10    A    Okay.

11    Q    You'll see on December 14th at 7:58 p.m.,

12   plaintiff, Michelle Del Valle, received a called from

13        (714) 912-6964.

14    A    Okay.

15    Q    Is that number associated with the numbers

16   listed that are used by MSI?

17    A    Yes.

18    Q    What line is that?

19    A    Twenty-six.

20    Q    So it appears that MSI called the plaintiff,

21   Michelle Del Valle, December 14th, 2014 at 7:58 p.m.?

22    A    Yes.

23   MR. EHRLICH:  What's the date again?

24   THE WITNESS:  Are we on the 14th or the 17th?

25   BY MR. BICKFORD:

230

DEPOSITION OF MYLES BRYSON

```
1        A    Would have been the same thing, two or three.

2        Q    Are there any e-mails?

3        A    I don't believe so.

4        Q    What about e-mails from them to you?

5        A    I don't believe so.

6        Q    You testified earlier that you asked IVT what

7    equipment they used to place calls?

8        A    I believe so, yes.

9        Q    Was that on that same call?

10       A    I don't know.

11       Q    What about with MSI, you asked them as well?

12       A    I believe so, yes.

13       Q    They both used VICIdial?

14       A    I believe that's correct.

15       Q    Okay.  Place both of those off to the side.

16       A    Forty and 41?

17       Q    Everything, yeah.  One of them should be 43.

18   Just checking to make sure I didn't miss anything.  We

19   might be sitting here for 15 minutes and quiet and that

20   would be a good thing actually.

21            To your knowledge, are there any other

22   contracts between RVI and Marketing Solutions

23   International?

24       A    I don't believe so.

25       Q    Are there any amendments to that agreement?
```

240

251

1    STATE OF CALIFORNIA          )

2                                 )  SS.

3    COUNTY OF LOS ANGELES        )

4

5           I, the undersigned, hereby certify under

6    Penalty of perjury under the laws of the State of

7    California that the foregoing testimony is true and

8    correct.

9           Executed this _____26_____ day of

10   __May_____, 20_16_ at ___Irvine___,

11   California.

12   _____

13                MYLES BRYSON

14

15

16

17

18

19

20

21

22

23

24

25

DALENE COURT REPORTING   661.341.3929

PA - 00115

```
1   STATE OF CALIFORNIA        )
                               ) SS.
2   COUNTY OF LOS ANGELES      )

3

4        I, LEESA DURRANT, C.S.R. NO. 11899, RPR, in and

5   for the State of California, do hereby certify:

6        That prior to being examined, the witness named

7   in the foregoing deposition was by me duly sworn to

8   testify to the truth, the whole truth, and nothing but

9   the truth;

10        That said deposition was taken down by me in

11  shorthand at the time and place therein named and

12  thereafter transcribed under my direction, and the same

13  is a true, correct, and complete transcript of said

14  proceedings;

15        That if the foregoing pertains to the original

16  transcript of a deposition in a Federal Case, before

17  completion of the proceedings, review of the transcript

18  (  ) was (  ) was not required.

19        I further certify that I am not interested in the

20  event of the action.

21        Witness my hand this 27 day of April, 2016.

22

23        _____

24        LEESA DURRANT, C.S.R. NO. 11899, RPR

25
```

```
 1        STATE OF CALIFORNIA        )

 2                                   )  SS:

 3        COUNTY OF LOS ANGELES      )

 4

 5            I, JULIA A. DOUVILLE, CSR No. 9446, do hereby

 6        certify:

 7            That the foregoing deposition was taken before me

 8        at the time and place herein set forth, at which time

 9        the witness was placed under oath by me;

10            That the testimony of the witness and all

11        objections made at the time of the examination were

12        recorded stenographically by me and were thereafter

13        transcribed under my direction and supervision and that

14        the foregoing is a true record of same.

15            I further certify that I am neither counsel for

16        nor related to any party to said action, nor in anywise

17        interested in the outcome thereof.

18            IN WITNESS WHEREOF, I have subscribed my name this

19        25th day of April, 2016.

20

21

22            _____

23            JULIA A. DOUVILLE, CSR NO. 9446

24

25
```

EXHIBIT "C"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE

```
                              )
MICHELE DEL VALLE, ON BEHALF OF )
HERSELF AND ALL OTHERS SIMILARLY)
SITUATED,                       )
                              )
            PLAINTIFFS,  )   CASE NO.
                         )   30-2014-00745279-
    VS.                  )   CU-MC-CXC
                         )
GLOBAL EXCHANGE VACATION CLUB, A)
CALIFORNIA CORPORATION; AND DOES)
1 THROUGH 100, INCLUSIVE,       )
                              )
            DEFENDANTS.   )
_____)
```

DEPOSITION OF MICHELE DEL VALLE

THURSDAY, APRIL 14, 2016

REPORTED BY:
CLAUDIA BADANO, CSR 8974

1

PA - 00119

DEPOSITION OF MICHELE DEL VALLE

1    THERE?

2        A.   ACCOUNTING.

3        Q.   APPROXIMATELY HOW LONG WERE YOU AT THE BALBOA

4    BAY CLUB?  I'M JUST LOOKING FOR GENERAL.

5        A.   OKAY.  ABOUT TWO, THREE YEARS.

6        Q.   AND WHAT, IF ANYTHING, DID YOU DO FOR

7    EMPLOYMENT AFTER THAT?

8        A.   OH, GOSH.  RETAIL.

9        Q.   APPROXIMATELY HOW LONG?

10       A.   PROBABLY ABOUT I WOULD SAY MAYBE FROM FIVE TO

11   TEN YEARS.

12       Q.   SO NOW WE'RE RIGHT AROUND 2000, GIVE OR TAKE A

13   FEW YEARS.

14       A.   RIGHT.

15       Q.   DID YOU CHANGE JOBS AFTER THAT?

16       A.   YES, I DID.  LET'S SEE.  YOU KNOW, I -- I

17   CAN'T REMEMBER.  I KNOW I --

18       Q.   IT HAPPENS TO ME ALL THE TIME.

19       A.   YEAH.  I JUST -- I MEAN, THERE'S A -- YEAH.  I

20   CAN'T REMEMBER EXACTLY.

21       Q.   MAYBE IT'S BETTER IF WE WORK BACKWARDS TO THAT

22   TIME.  ARE YOU PRESENTLY EMPLOYED?

23       A.   I WORK FOR MYSELF.

24       Q.   WHAT DO YOU DO?

25       A.   ANTIQUING.  ANTIQUES AND COLLECTIBLES.

                                                        12

DEPOSITION OF MICHELE DEL VALLE

1     Q.   DO YOU HAVE A SHOP?

2     A.   OUT OF MY HOME.

3     Q.   ABOUT HOW LONG HAVE YOU BEEN SELF-EMPLOYED?

4     A.   FOR AT LEAST TEN YEARS.

5     Q.   OKAY.  HAS IT ALWAYS BEEN --

6     A.   JUST ANTIQUING?

7     Q.   -- ANTIQUES AND COLLECTIBLES?

8     A.   NO.  I WORK FOR LYFT.

9     Q.   A LYFT DRIVER FOR A WHILE?

10    A.   YES.

11    Q.   I TOOK LYFT TWICE YESTERDAY.

12    A.   OH, VERY GOOD.

13    Q.   AND SO BETWEEN RETAIL AND ANTIQUES AND

14   COLLECTIBLES AND LYFT, WERE THERE ANY OTHER JOBS THAT

15   YOU REMEMBER?

16    A.   YES.  AS A MATTER OF FACT.  I WORKED ON A

17   CRUISE SHIP.  YEAH, SO MANY YEARS AND SO MANY DIFFERENT

18   THINGS, IT'S HARD TO REMEMBER THE CHRONOLOGICAL.

19    Q.   RIGHT.

20    A.   I ALSO WORKED AT LOS CABALLEROS SPORTS VILLAGE

21   IN FOUNTAIN VALLEY.

22    Q.   LOS CABALLEROS?

23    A.   SPORTS VILLAGE.

24    Q.   SPORTS VILLAGE.  IS THAT A RESTAURANT?

25    A.   NO.  IT'S A BIG -- IT SITS ON 16 ACRES,

13

```
1    HAVE MADE CALLS TO THE COMPANY.

2        Q.   OKAY.  AND THAT'S WHAT I'M GOING TO GET INTO

3    IN A SECOND.

4        A.   OKAY.

5        Q.   AND, AGAIN, YOU WERE NOT CHARGED FOR THAT

6    CALL?

7        A.   NO.

8        Q.   WHEN I SAY "CHARGED," I MEAN ANYTHING EXTRA.

9        A.   RIGHT.

10       Q.   SO THE CALLS THAT ARE THE BASIS FOR YOUR

11   COMPLAINT -- YOUR CLAIM IN THIS CASE -- IN YOUR MIND

12   WHATEVER YOU CAN RECOLLECT, CAN YOU GIVE ME THE

13   SEQUENCE OF WHAT OCCURRED?  IN OTHER WORDS, DID SOMEONE

14   CALL AND LEAVE A MESSAGE?  DID SOMEONE TRY TO CALL YOU?

15   DID YOU GET A CALL?  DID YOU CALL SOMEONE BACK?  THAT'S

16   WHAT I'M TRYING TO ASCERTAIN.

17       A.   OKAY.  SO YOU WANT ME TO DESCRIBE WHAT -- WITH

18   THIS COMPANY.

19       Q.   AS BEST YOU CAN RECALL WHAT HAPPENED.

20       A.   OKAY.  I DID GET A CALL.  I SPOKE WITH

21   SOMEBODY.  THEN AFTER THE -- I DID GO SEE THE

22   PRESENTATION.  AND THEN AFTER THE PRESENTATION WAS

23   FINISHED, WITHIN I THINK A DAY OR TWO DAYS I WAS

24   GETTING CALLS AGAIN.  THEY ASKED ME TO GIVE THEM

25   NUMBERS OF FRIENDS OR FAMILY.  I SAID NO.  THEY KEPT
```

38

1   CALLING.

2          AND THEN I DON'T -- THERE CAME A TIME WHERE I

3   WAS SO FRUSTRATED THAT I DID SOME RESEARCH TO TRY AND

4   FIND A COMPANY -- WHAT I REMEMBER IS ASKING THE PEOPLE

5   WHERE ARE YOU CALLING FROM.

6      Q.   OKAY.

7      A.   AND THEN THEY WOULD -- I DON'T REMEMBER IF

8   THEY TOLD ME, BUT SINCE THEY ALL HAD A FILIPINO ACCENT,

9   I KNEW THEY WERE FROM THE PHILIPPINES, SO I FINALLY

10  DECIDED THAT I WAS GOING TO DO SOME RESEARCH AND TRY

11  AND FIND THE COMPANY IN THE UNITED STATES.

12         I BELIEVE I DID RESEARCH ON THE INTERNET,

13  FINALLY CAME WITH A NUMBER THAT WAS LOCATED IN IRVINE.

14  AND I CALLED.  I ASKED FOR A SUPERVISOR.  I SPOKE WITH

15  A SUPERVISOR AND I TOLD HIM HOW FRUSTRATED I WAS THAT

16  THEIR COMPANY KEPT CALLING ME.  I ASKED THEM TO STOP

17  CALLING ME, AND I WANT MY NUMBER TAKEN OFF OF THEIR

18  CALL LIST.

19         AND HE ACTUALLY SAID HE WAS VERY SORRY.  HE

20  WOULD -- THAT HE WOULD GET AHOLD OF WHOEVER IS CALLING

21  AND HAVE MY PHONE NUMBER TAKEN OFF.

22     Q.   DID THE CALLS STOP?

23     A.   NO.

24     Q.   APPROXIMATELY HOW MANY MORE CALLS DID YOU GET?

25     A.   I CAN'T TELL YOU HOW MANY MORE, BUT I --

                                                    39

PA - 00123

DEPOSITION OF MICHELE DEL VALLE

```
 1      Q.   APPROXIMATELY.

 2      A.   I COULDN'T GIVE YOU A NUMBER.

 3      Q.   OKAY.

 4      A.   HONESTLY.  YEAH, I COULDN'T GIVE YOU A NUMBER.

 5 IT JUST -- THE VOLUME OF IT DIDN'T STOP.

 6      Q.   OKAY.

 7      A.   AND THEN I CALLED THE COMPANY AGAIN.

 8      Q.   OKAY.

 9      A.   I CALLED THE IRVINE COMPANY AGAIN.  GOT A

10 DIFFERENT SUPERVISOR.  ADVISED HIM AGAIN, AND HE ALSO

11 GAVE ME THE SAME STORY.  AND THE CALLS DIDN'T STOP.

12      Q.   SO THE CALLS YOU WERE GETTING ARE MORE THAN

13 THE CALLS YOU'VE SEEN SO FAR RIGHT HERE?

14      A.   YEAH.  WHAT I REMEMBER, YEAH.  I DO REMEMBER

15 MORE.

16      Q.   APPROXIMATELY IN TOTAL, WERE THERE MORE THAN

17 TEN CALLS?

18      A.   OVER THE WHOLE COURSE OF TIME?

19      Q.   YES.

20      A.   OH, GOSH, YES.

21      Q.   MORE THAN 20?

22      A.   I COULDN'T GIVE YOU -- OVER TEN I COULD SAY

23 YES.  BUT OVER ANOTHER NUMBER I CAN'T TELL YOU.

24      Q.   ALL ON THE SAME PHONE NUMBER?

25      A.   YOU KNOW, THAT I COULDN'T REMEMBER.  I
```

                                                          40

DEPOSITION OF MICHELE DEL VALLE

1   HONESTLY COULDN'T REMEMBER.

2      Q.   DO YOU KNOW THE NAME OF THE COMPANY THAT YOU

3   WENT TO WHEN YOU ATTENDED THE PRESENTATION?

4      A.   ISN'T IT GLOBAL -- GLOBAL, SOMETHING,

5   EXCHANGE.  I KNOW IT WAS A TIMESHARE.

6      Q.   OKAY.

7      A.   VACATION TIMESHARE.

8      Q.   AND WHERE WAS IT?

9      A.   I WENT TO ONTARIO.

10     Q.   DO YOU REMEMBER THE DATE YOU WENT?

11     A.   NO.

12     Q.   APPROXIMATELY MONTH?

13     A.   NO.

14     Q.   DID YOU GET A GIFT FOR ATTENDING?

15     A.   I DID.

16     Q.   DO YOU RECALL WHAT YOU RECEIVED?

17     A.   I RECEIVED A GIFT CERTIFICATE FOR

18  RESTAURANT.COM AND A VOUCHER FOR A FREE TRAVEL

19  SOMEWHERE.

20     Q.   DID YOU USE THE RESTAURANT.COM CERTIFICATE?

21     A.   I USED SOME OF IT.

22     Q.   OKAY.  DO YOU RECALL WHAT IT ENTAILED?

23     A.   I BELIEVE IT WAS GOING ON THE WEBSITE, I

24  THINK, AND CHOOSING A RESTAURANT AND THAT WAS IT.  AND

25  THEN JUST GETTING A COUPON TO GO INTO THAT RESTAURANT.

41

PA - 00125

DEPOSITION OF MICHELE DEL VALLE

```
 1      A.   I KNOW IT HAD GLOBAL IN IT, THE GLOBAL -- ALL
 2  I CAN REMEMBER IS THE TWO WORDS GLOBAL AND EXCHANGE.
 3      Q.   OKAY.  GLOBAL EXCHANGE?
 4      A.   SOMETHING LIKE THAT.  I ONLY REMEMBER THE TWO
 5  WORDS.
 6      Q.   YOU EARLIER TESTIFIED THAT YOU ATTENDED A
 7  PRESENTATION AND THEN A DAY OR TWO LATER YOU STARTED
 8  GETTING CALLS AGAIN.
 9      A.   YES.
10      Q.   PRIOR TO ATTENDING THE PRESENTATION, WERE YOU
11  GETTING REGULAR CALLS?
12      A.   FROM --
13      Q.   FROM SOMEONE WITH A FILIPINO ACCENT?
14      A.   NO.
15      Q.   PRIOR TO ATTENDING THE PRESENTATION,
16  APPROXIMATELY HOW MANY CALLS THAT YOU ANSWERED AND
17  SPOKE TO?  WAS IT ONLY THAT ONE CALL WITH THE GENTLEMAN
18  WITH THE FILIPINO ACCENT?
19      A.   NO.
20      Q.   APPROXIMATELY HOW MANY CALLS?
21      A.   I DON'T REMEMBER HOW MANY CALLS, BUT WHAT I DO
22  REMEMBER IS I GAVE IN TO GOING TO THE PRESENTATION SO
23  HE WOULD STOP CALLING.
24      Q.   OKAY.  SO HE HAD CALLED YOU -- SOMEONE HAD
25  CALLED YOU A NUMBER OF TIMES?
```

47

PA - 00126

DEPOSITION OF MICHELE DEL VALLE

```
1      A.   RIGHT, YES.

2      Q.   IF YOU RECEIVED ALL THOSE CALLS, THEY SHOULD

3   BE SOMEWHERE IN YOUR RECORDS; IS THAT CORRECT?

4      A.   THEY SHOULD BE, YES.

5      Q.   OKAY.  AND WERE THEY ALL IN THIS SAME TIME

6   FRAME OF NOVEMBER, DECEMBER 2014?

7      A.   FROM WHAT I REMEMBER, IT'S IN THE SAME EITHER

8   24 TO 48 HOURS.

9      Q.   ALL THE CALLS?

10     A.   WHEN I FINALLY SAID I WILL GO.  BECAUSE THEY

11  KEPT -- THEY KEPT CALLING.

12     Q.   OKAY.  SO I'M JUST GOING TO MAKE SURE I GET

13  THIS RIGHT.  WITHIN 24, 48 HOURS OF AGREEING OF GOING

14  TO THE TIMESHARE PRESENTATION, YOU RECEIVED A BARRAGE

15  OF CALLS?

16          MR. BICKFORD:  MISSTATES TESTIMONY.

17          MR. EHRLICH:  THAT'S WHAT I'M TRYING TO

18  CLARIFY.  ALL THESE CALLS YOU GOT, YOU FINALLY GAVE IN.

19          THE WITNESS:  RIGHT.

20  BY MR. EHRLICH:

21     Q.   ABOUT HOW MUCH TIME PASSED BEFORE YOU GAVE IN,

22  FROM THE FIRST CALL TO WHEN YOU GAVE IN ABOUT?

23     A.   I COULDN'T EVEN TELL YOU.

24     Q.   ARE WE TALKING WEEKS?  DAYS?

25     A.   OH, GOSH, NO.  WITHIN THOSE 28, 48 HOURS.
```

48

DEPOSITION OF MICHELE DEL VALLE

1       Q.    OKAY.

2       A.    YEAH.

3       Q.    AND ABOUT -- WHETHER IT'S WEEKS OR A MONTH,

4   AFTER YOU AGREED TO GO, WAS IT WITHIN DAYS THAT YOU

5   WENT TO THE TIMESHARE OR WAS IT --

6       A.    FROM WHAT I COULD RECALL, YES.

7       Q.    SO IT WAS WITHIN A FEW DAYS LATER, GIVE OR

8   TAKE?

9       A.    RIGHT.

10       Q.    AND, AGAIN, IF WE'RE LOOKING AT THE CALLS IN

11   THIS CASE, THEY SEEM TO BE NOVEMBER, DECEMBER, 2014; IS

12   THAT CORRECT?  IF I'M WRONG, JUST LET ME KNOW.

13           MR. BICKFORD:  I'M CONFUSED BY YOUR QUESTION

14   BECAUSE I THINK --

15           MR. EHRLICH:  MAYBE I GOT THE WRONG DATES.

16           MR. BICKFORD:  ARE YOU REFERRING TO THOSE

17   CALLS?

18           MR. EHRLICH:  YES.  I AM REFERRING AND I'M

19   ASKING IF THAT'S THE TIME PERIOD WE'RE TALKING ABOUT

20   HERE.  THE CALLS THAT ARE THE BASIS OF THIS CASE SEEM

21   TO BE 12-3, 12-4, I SEE AN INCOMING.  I SEE A CALL

22   WAITING ON -- OH, I SEE SEPTEMBER 30TH.

23       Q.    WOULD IT BE THEN THE FALL OF 2014?

24       A.    I KNOW IT WAS IN 2014.

25       Q.    OKAY.

                                                    49

DALENE COURT REPORTING  661.341.3929

1    IN MY MEMORY.

2       Q.   I'M GOING TO DEVIATE JUST FOR A SECOND SO I

3    DON'T FORGET.

4       A.   OKAY.

5       Q.   DO YOU HAVE AN INTERNET PRESENCE?

6            MR. BICKFORD:  VAGUE AS TO "INTERNET

7    PRESENCE."

8            THE WITNESS:  YEAH, I DON'T KNOW.

9    BY MR. EHRLICH:

10      Q.   YOU HAVE AN ANTIQUE COLLECTIBLE BUSINESS?

11      A.   YES.

12      Q.   DO YOU HAVE A WEBSITE?

13      A.   NO.

14      Q.   DO YOU PUT ADS ON THE INTERNET?

15      A.   YES.

16      Q.   DO YOU PUT ANY ADS WITH CRAIGSLIST?

17      A.   YES.

18      Q.   HOW OFTEN DO YOU HAVE ADS ON CRAIGSLIST?

19      A.   ALL THE TIME.

20      Q.   ALL THE TIME.  AND DO YOU HAVE ANYTHING ON

21   AMAZON?

22      A.   YES.

23      Q.   ANY OTHER SALES WEBSITES, THINGS OF THAT

24   NATURE, THAT YOU HAVE ADS ON THE INTERNET?

25      A.   DURING THIS TIME OR CURRENTLY?

57

DEPOSITION OF MICHELE DEL VALLE

1       Q.    DURING THIS TIME.

2       A.    FROM WHAT I REMEMBER, THAT'S IT.

3       Q.    AMAZON, CRAIGSLIST?

4       A.    RIGHT.

5       Q.    WE'LL GET BACK TO THAT LATER.

6       A.    OKAY.

7       Q.    BEFORE AS I WAS GOING THROUGH THIS SUMMARY OF

8    WHAT YOU TOLD ME HAPPENED, YOU HAD SPOKEN TO THE

9    SUPERVISOR.  THE CALLS DID NOT STOP.  YOU CALLED IRVINE

10   AGAIN AND YOU SPOKE TO SOMEONE THERE AGAIN; CORRECT?

11      A.    YES.

12      Q.    DO YOU RECALL ABOUT HOW LONG THE SECOND PHONE

13   CALL WAS?

14      A.    I HONESTLY COULDN'T TELL YOU.

15      Q.    A FEW MINUTES?

16      A.    HOW LONG IT WAS?

17      Q.    YEAH.

18      A.    ALL I CAN REMEMBER, IT WAS LESS THAN THE FIRST

19   ONE.

20      Q.    OKAY.

21      A.    YEAH.

22      Q.    AND YOUR BEST RECOLLECTION IS HE SAID THAT HE

23   WOULD TAKE YOU OFF THE LIST AND TRY TO STOP THE CALLS?

24      A.    YES.

25      Q.    BUT THE CALLS DIDN'T STOP?

                                                              58

PA - 00130

DEPOSITION OF MICHELE DEL VALLE

1       A.   NO.

2       Q.   AFTER THE SECOND CALL, I BELIEVE YOU TESTIFIED

3   YOU HAD MORE THAN TEN CALLS AFTER THAT.

4       A.   YES.

5       Q.   SO SPOKE TO THE SUPERVISOR FOR A SECOND TIME,

6   AT LEAST TEN CALLS?

7       A.   YES.

8       Q.   AND, AGAIN, ONLY BECAUSE I'VE MOVED FORWARD A

9   LITTLE BIT, THE CALLS THAT CAME AFTER THE SECOND TIME,

10  YOU DON'T SPECIFICALLY REMEMBER ON WHICH PHONE NUMBER?

11      A.   NO, I CAN'T.

12      Q.   CAN YOU RECALL WHETHER OR NOT YOU EVER

13  RECEIVED ANY OF THESE ANNOYING CALLS ON THE

14  (714) 325-7358 NUMBER?

15      A.   I CAN'T RECALL, NO.

16      Q.   AS FAR AS THE 8867 NUMBER OR THE 2405, DO YOU

17  HAVE ANY RECOLLECTION WHETHER YOU SEEMED TO GET MORE ON

18  ONE OR THE OTHER?

19      A.   THERE WAS ONE NUMBER, BUT I CAN'T TELL YOU

20  WHICH NUMBER IT WAS.

21      Q.   OKAY.

22      A.   BECAUSE I ALWAYS HAD THOSE PHONES WITH ME,

23  SO...

24      Q.   OKAY.

25      A.   TO REMEMBER THREE PHONE CALLS -- THREE PHONES

59

PA - 00131

```
 1    STATE OF CALIFORNIA      )

 2    COUNTY OF LOS ANGELES   ) SS.

 3

 4

 5         I, MICHELE DEL VALLE, HEREBY CERTIFY UNDER

 6    PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF

 7    CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

 8         EXECUTED THIS    4th DAY OF May

 9                    , 2016 AT Costa Mesa

10    CALIFORNIA.

11

12

13

14              MICHELE DEL VALLE

15

16

17

18

19

20

21

22

23

24

25
                                                    74
```

PA - 00132

1   STATE OF CALIFORNIA      )

2   COUNTY OF LOS ANGELES    )   SS.

3

4           I, CLAUDIA BADANO, C.S.R. NO. 8974, IN AND FOR

5   THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

6           THAT, PRIOR TO BEING EXAMINED, THE WITNESS

7   NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY SWORN

8   TO TESTIFY THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

9   THE TRUTH;

10          THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN

11  SHORTHAND AT THE TIME AND PLACE THEREIN NAMED, AND

12  THEREAFTER REDUCED TO TYPEWRITING UNDER MY DIRECTION,

13  AND THE SAME IS A TRUE, CORRECT AND COMPLETE TRANSCRIPT

14  OF SAID PROCEEDINGS;

15          I FURTHER CERTIFY THAT I AM NOT INTERESTED IN

16  THE EVENT OF THE ACTION.

17          WITNESS MY HAND THIS 26th DAY OF April,

18  2016.

19

20

21          CERTIFIED SHORTHAND

22          REPORTER FOR THE

23          STATE OF CALIFORNIA

24

25

                                                        75

PA - 00133

EXHIBIT "2"

R. Rex Parris (SBN 96567)
    rrparris@parrislawyers.com
Kitty K. Szeto (SBN 258136)
    kszeto@ parrislawyers.com
John M. Bickford (SBN 280929)
    jbickford@parrislawyers.com
Eric N. Wilson (SBN 291815)
    ewilson@parrislawyers.com
**PARRIS LAW FIRM**
43364 10th Street West
Lancaster, California 93534
Telephone:(661) 949-2595
Facsimile: (661) 949-7524

Attorneys for Plaintiff and the Putative Class

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELE DEL VALLE; an individual, for herself and all members of the putative class, <br><br> Plaintiff, <br><br> v. <br><br> GLOBAL EXCHANGE VACATION CLUB, a California corporation; RESORT VACATIONS, INC., a Nevada corporation; GLOBAL VACATIONS MARKETING CORP., a Nevada corporation, GLOBAL EXCHANGE DEVELOPMENT, CORP., a Nevada corporation, and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: 8:16-cv-02149 <br><br> **CLASS ACTION** <br><br> **DECLARATION OF JOHN M. BICKFORD (DOCUMENTS)** <br><br> Date:       January 9, 2017 <br> Time:       8:30 a.m. <br> Courtroom: 9C <br> Judge:      David O. Carter |

## DECLARATION OF JOHN M. BICKFORD

I, John M. Bickford, declare as follows:

1.      I am an attorney duly licensed to practice before all courts of the State of California and an associate at the Parris Law Firm, attorneys of record for Plaintiff Michele Del Valle ("Plaintiff") and the putative class.   The facts set forth in this declaration are within my personal knowledge and, if called as a witness, I could and would competently testify as follows:

2.      During discovery, Defendant Global Exchange Vacation Club ("GEVC") produced screenshots from its touchscreen interface used to collect telephone numbers to telemarket.   Attached hereto as **Exhibits "A"** and **"B"** are screenshots from the two different versions of this interface.

3.      During discovery, GEVC produced what it calls "lead slips."   Attached hereto as **Exhibit "C"** is a true and correct copy of two lead slips.

4.      During discovery, GEVC produced RVI's vendor agreement with MSI. Attached hereto as **Exhibit "D"** is a true and correct copy of this agreement.

5.      On September 30, 2014, Plaintiff served GEVC with Plaintiff's Special Interrogatories (Set One) to Defendant Global Exchange Vacation Club.   On December 1, 2014, GEVC served Plaintiff with its initial responses.   On May 18, 2015, GEVC served Plaintiff with Defendant Global Exchange Vacation Club's <u>Further</u> Response to Plaintiff's Special Interrogatories, Set One.   Verifications to these further responses were served April 13, 2016.   Attached hereto as **Exhibit "E"** is a true and correct copy of these further responses.

/ / / /

1

6.     Attached hereto as **Exhibit "F"** are true and correct copies of excerpts of Plaintiff's cell phone records. Highlights have been added to make it easier to identify the calls at issue.

7.     On February 2, 2015, Plaintiff served GEVC with Plaintiff's Special Interrogatories (Set Two) to Defendant Global Exchange Vacation Club. On March 25, 2014, GEVC served Plaintiff with its initial responses. On May 18, 2015, GEVC served Plaintiff with Defendant Global Exchange Vacation Club's <u>Further</u> Response to Plaintiff's Special Interrogatories, Set Two. Verifications to these further responses were served April 13, 2016. Attached hereto as **Exhibit "G"** is a true and correct copy of these further responses.

8.     Attached hereto as **Exhibit "H"** is a true and correct copy of Plaintiff's meet-and-confer letter dated December 5, 2016 attempting to schedule a time to telephonically meet-and-confer with GEVC's counsel about Plaintiff's Motion for Class Certification.

9.     Attached hereto as **Exhibit "I"** is a true and correct copy of Plaintiff's meet-and-confer letter dated December 6, 2016 confirming the parties meet-and-conferred and that Plaintiff has satisfied her obligations under Central District Local Rule 7-3.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 7th day of December 2016 at Lancaster, California.

_____
John M. Bickford

2

DECLARATION OF JOHN M. (DOCUMENTS)

EXHIBIT "A"









WIN 4 VIP TICKETS   STAPLES Center

**THE 2016 GREAT TICKET GIVEAWAY**
NO PURCHASE OR PAYMENT OF ANY KIND IS NECESSARY TO ENTER OR WIN THIS SWEEPSTAKES

**OFFICIAL RULES: CONSUMER DISCLOSURE:** Sponsors: Resort Vacations Inc (RVI). Eligibility: Open to U.S. legal residents age 18 or older. Sponsors, employees, and their immediate family are not eligible. Entries must be complete to be eligible. Limit one entry per person, regardless of entry method. Void where prohibited by law. Winning: Monthly Prizes will be tickets to upcoming events (odds of winning 12/295,258). Recipient need not be present. Official notice to a recipient will be by phone. Recipient must claim prize within 30 days. If the prize is not claimed it will be awarded in a subsequent drawing. All taxes and charges are the sole responsibility of the recipient. To receive the prize, recipient must sign an affidavit of authorization and release, including consent to use name, photo, likeness, and address by the sponsors for the purpose of advertising, publicity, and promotion, without additional compensation or permission, unless prohibited by law. General rules: Sponsors reserve the right at their sole discretion to modify, terminate, or suspend all or a portion of this giveaway, should an un-authorized human interference, fraud, printing, internet virus, hackers or other causes beyond the control of the sponsors corrupt or impair administration, security, fairness, or proper operation of this giveaway. Sponsors assume no responsibility for lost, late, incomplete or illegible entries. Sponsors are not liable for injury, loss, or damage of any kind resulting from acceptance or use of the giveaway or participation in this giveaway. This Giveaway is not promoted, sponsored and/or administrated by the management or owners of any point of promotion locations such as shopping malls, movie theaters, fairs, special events or retail stores. The 2016 Great Ticket Giveaway ends December 31, 2016. This promotion is being used for the promoting of Global Exchange Development Corp (GEDC), whose business is the sale of vacation ownership. The 2016 Great Ticket Giveaway is guaranteed by RVI. 17682 Mitchell St. N. Suite #100, Irvine, CA 92614; GEDC, 30448 Rancho Viejo Rd. Suite 150, San Juan Capistrano, CA 92675. This promotion is void where prohibited. Monthly drawings will result in one randomly selected entrant being drawn on or about the 5th day of the following month. Changes to the prize to an equal or greater value prize may be substituted. If less than 50,000 qualified entries are received a prize of less value will be substituted. Odds are based on the number of entries. Executed Affidavit of Eligibility along with a Liability Release and Publicity Release required. At the discretion of RVI/GEDC additional prizes may be awarded. If you have any questions regarding this promotion, please contact the Promotions Dept. located at 17682 Mitchell St. N. Suite #100, Irvine, CA 92614.

By clicking on the "I AGREE" box, this will serve as my electronic signature. I verify that the following information is true, and agree to be contacted by Resort Vacations, Inc., Solar Savings America and/or Take2iGi at the address entered, by text or voice contact to my cellular or home telephone numbers provided by me, in or on this electronic entry or to my email address, by way of manual or automated telephone dialing system regarding this and future promotional offers, regardless of any prior election to the contrary. I consent that any contact by phone may be recorded. I understand that I am not required to sign this agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

**I AGREE**

**Previous**          **Next**











PA - 00146





EXHIBIT "B"

## WIN 4 VIP TICKETS

## WIN
## 2 VIP SUITES

### GROVE PRESENTS...

#### THE GREAT 50K GIVEAWAY
#### NO PURCHASE OR PAYMENT OF ANY KIND IS NECESSARY TO ENTER OR WIN THIS SWEEPSTAKES

OFFICIAL RULES: CONSUMER DISCLOSURE: Eligibility: Open to U.S. legal residents age 18 or older. Sponsors, employees, and their immediate family are not eligible. Entries must be complete to be eligible. Limit one entry per person, regardless of entry method. Void where prohibited by law. Winning: First Prize will receive their choice of $50,000 in cash or $50,000 cash equivalent (odds of winning 1:300,000) towards the purchase of an automobile or other purchase. Monthly Prizes will be tickets to upcoming events (odds of winning 12:299,298). Semi Annual Prizes will be a night in a luxury suite at an upcoming event (odds of winning 2:299,999) Recipient need not be present. Official notice to a recipient will be by phone. Recipient must claim prize within 30 days. If the prize is not claimed it will be awarded in a subsequent drawing. All taxes and charges are the sole responsibility of the recipient. To receive the prize, recipient must sign an affidavit of authorization and release, including consent to use name, photo, likeness, and address by the sponsors for the purpose of advertising, publicity, and promotion, without additional compensation or permission, unless prohibited by law. General rules: Sponsors reserve the right at their sole discretion to modify, terminate, or suspend all or a portion of this giveaway, should an un-authorized human interference, fraud, printing, internet virus, hackers or other causes beyond the control of the sponsors corrupt or impair administration, security, fairness, or proper operation of this giveaway. Sponsors assume no responsibility for lost, late, incomplete or illegible entries. Sponsors are not liable for injury, loss, or damage of any kind resulting from acceptance or use of the giveaway or participation in this giveaway. This Giveaway is not promoted, sponsored and/or administrated by the management or owners of any point of promotion locations such as shopping malls, movie theaters, fairs, special events or retail stores. The Annual Giveaway ends December 31, 2014 Sponsors: Resort Vacations Inc (RVI) Fortitude Media Resort stay international. This promotion is being used for the promoting of Global Exchange Development Corp (GEDC), whose business is the sale of vacation ownership. The grand prize is guaranteed by RVI, 550 N. Golden Circle, Suite A, Santa Ana, CA 92705; GEDC, 26691 Plaza Dr., Suite 100, Mission Viejo, CA 92691. This promotion is void where prohibited. One randomly selected entrant will be chosen to receive the $50,000 grand prize. Monthly drawings will be held on the 5th day of the following month. The semiannual drawings will be held on the 5th of July, 2014 and the 5th of January 2015.Changes of the Grand Prize at equal or greater value may be substituted  If less than 50,000 qualified entries are received a prize of less value will be substituted. Odds are based on the number of entries. Grand Prize will be delivered within 30 days of final drawing date. Executed Affidavit of Eligibility along with a Liability Release and Publicity Release required  At the discretion of FM/RVI/GEDC additional prizes may be awarded. If you have any questions regarding this promotion, please contact the Promotions Dept. located at 550 N. Golden Circle, Santa Ana, CA 92705.I verify that the information provided is true, and agree to be contacted by Resort Vacations, Inc., Fortitude Media inc and its partners for Resort stay international, LLC at the above address, by text or voice contact to my cellular or home telephone numbers provided by me, in or on this electronic entry or to my email address provided regarding this and future promotional offers, regardless of any prior election to the contrary

By checking/pressing the next arrow box, this will serve as my electronic signature.  I verify that the above information is true at the above address or by text or voice contact to my cellular or home telephone numbers provided by me, in or on this electronic entry or to my email address provided regarding this and future promotional offers, regardless of any prior election to the contrary.

 Back

 Next

RVI000007

PA - 00151







*WIN 4 VIP TICKETS*

# WIN
## 2 VIP SUITES

### GROVE PRESENTS...

**WHAT IS YOUR AGE GROUP?**

☐ UNDER 24   ☐ 25 – 44   ☐ 45 – 54   ☐ 55 – 72   ☐ 73 AND ABOVE

**WHAT IS YOUR MARITAL STATUS ?**

☐ MARRIED   ☐ CO-HABITATE
LIVE WITH SIGNIFICANT OTHER   ☐ SINGLE

**WHAT IS YOUR COMBINED annual FAMILY INCOME?**
( THIS INCLUDES YOU AND YOUR SPOUSE for a period of one year )

☐ ABOVE $40,000   ☐ BELOW $39,999

**Back**   **Next** RVI000011



*WIN 4 VIP TICKETS*

**WIN**
2 VIP SUITES

**GROVE PRESENTS...**

IF NO TICKET OR CARD NUMBER IS AVAILABLE
AT YOUR EVENT OR LOCATION PLEASE PUT YEAR OF BIRTH

**WHAT IS YOUR TICKET NUMBER ?**

**WHAT IS YOUR EMAIL ADDRESS ?**

**IF YOU ARE NOT PRESENT AT TIME OF GIVE-A-WAY WE WILL CONTACT YOU VIA EMAIL TO RECEIVE YOUR PRIZE OR GIFT.**

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 0 | ◀ |
| Q | W | E | R | T | Y | U | I | O | P | - |
| A | S | D | F | G | H | J | K | L | ; | ' |
| _ | @ | Z | X | C | V | B | N | M | , | . |

**Back**

**Finished** 00013

EXHIBIT "C"

| Name: | MICHELE | Name: | | | Phone 1: | | 949-439-8867 |
|---|---|---|---|---|---|---|---|
| Last: | DEL VALLE | Last: | | | Phone 2: | | |
| Address: | | | | | Phone 3: | | |
| City: | | State: | Zip: | | Status: | | |
| Email: | | | | | Income: | | |

EXHIBIT
WIT: BRYSON
DATE: 4-13-16
Leesa Durrant, CSR 11899, RPR

| CIRCLE STATUS: | TOL | WN | DIS | NI | CB DATE ___ |
| NQ STATUS: | AG | INC | S | | |
| Name 1: | ___ | | | | |
| Name 2: | ___ | | 6 3 10 | 2 7 77 | 2 4 01   NB |

Resort Vacations
INCORPORATED

| Name: | BRIAN | Name: | | | Phone 1: | | 714-404-4333 |
|---|---|---|---|---|---|---|---|
| Last: | DEL VALLE | Last: | | | Phone 2: | | |
| Address: | | | | | Phone 3: | | |
| City: | | State: | Zip: | | Status: | | |
| Email: | | | | | Income: | | |

| CIRCLE STATUS: | TOL | WN | DIS | NI | CB DATE ___ |
| NQ STATUS: | AG | INC | S | | |
| Name 1: | ___ | | | | |
| Name 2: | ___ | | 6 3 10 | 2 7 77 | 2 4 01   NB |

Resort Vacations
INCORPORATED

Exhibit "D"

EXHIBIT 23
WIT: BRYSON
DATE: 4-13-16
Leesa Durrant, CSR 11899, RPR

**RESORT VACATIONS INC.**
**550 N. GOLDEN CIRCLE DRIVE, STE. A**
**SANTA ANA, CA 92705**

**AGREEMENT FOR SERVICES**

This Agreement made and entered into October 24, 2013, by and between Resort Vacations Inc., hereinafter referred to as "RVI," and Marketing Solutions International hereinafter referred to as "MSI" with reference to the following facts and circumstances.

MSI is a tour vendor located in the Philippines. MSI is qualified to do business in California and will act as an independent contractor. RVI is Timeshare Marketing Company, with the exclusive right to provide marketing for GEDC. RVI has all licenses needed to market and sell real estate in the State of California.

MSI wishes to act and RVI wishes to hire MSI provide qualified prospects to its Sales Centers in Southern California.  Specifics regarding which sales centers and the slot allocations will be provided in Exhibit A.

**1) APPOINTMENT OF MSI**

In consideration of the services to be rendered by MSI, RVI hereby grants to MSI during the term of this Agreement, the right to act as a Marketing Contractor to generate and solicit qualified prospective purchasers to attend a 90-minute Timeshare sales presentation.

**2) TERM OF AGREEMENT**

Unless terminated earlier as provided in this paragraph 2, this Agreement and performances under it shall be for a term of one year with automatic one-year renewals thereafter; This Agreement may be terminated by either party without penalty giving 7 (seven) calendar days written notice to the other party.

RVI may also terminate this Agreement if MSI fails for any reason to satisfy the Minimum Performance Standards, Tour Qualifications and Tour Schedule as stated in Exhibit A.

Upon any termination of this Agreement, MSI must forward for the record of any pending bookings or reservations in their pipeline. All MSI bookings must be submitted to RVI at that time and must tour within 7 (seven) calendar days after termination has been given to be eligible for payment of remaining tours. MSI will not receive payment for tours outside of those 7 (seven) days.



**3)   INDEPENDENT CONTRACTOR**

MSI's relationship to RVI under this Agreement is that of Independent Contractor. MSI is not in any way to be constructed as a servant, general agent, partner, trustee, joint venturer or co-venturer of RVI. MSI shall not be treated as an employee for Federal tax purposes or for any other purpose.

**4)   EXPENSES AND OTHER AGREEMENTS**

It is the intention of the parties that all payrolls, payroll burden, rents, phone costs, advertising, etc., required for MSI to perform this Agreement shall be the sole responsibility of and be paid by MSI. MSI has no authority from RVI to execute or make contracts or other commitments of any kind on behalf of RVI. RVI has no right and has no authority to incur any expenses for and on behalf of MSI.

**5) TOURS & COMPENSATION**

A)   Tours & Qualifications

From time to time during the term of this Agreement, RVI will designate in its sole discretion availability for tour slots and tour qualifications (Exhibit A).

B)   Compensation

MSI's compensation is $250.00 per qualified tour. MSI understands that it <u>MUST</u> have written RVI approval on all marketing collaterals for any and all communications on behalf of RVI from MSI.

MSI understands that RVI's tour week is Monday through Sunday. MSI will submit to RVI via fax / e-mail an invoice no later then Tuesday morning the following week for all qualified tours provided the week prior. RVI will reconcile MSI's invoice and will prepare check for mailing or by bank transfer for that following Friday.

**6) WARRANTIES**

MSI warrants and represents that:

A)   MSI is a tour vendor, duly registered and existing under the laws of State of California. Mark Daigle has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

B)   MSI is and shall conduct its business and operations in compliance with all applicable laws and is qualified or registered to do business in every jurisdiction where such qualification or registration is necessary.

C)   MSI holds all licensed permits and any other regulations required by law to perform the services herein.

RVI warranties that:

A)   RVI is a Corporation duly organized and existing under the laws of the State of California. It has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

B)   RVI is and shall conduct its business and operations in compliance with all applicable laws and is qualified or registered to do business in every jurisdiction where such qualification or registration is necessary.

## 7)   INDEMNITIES

RVI agrees to indemnify and defend MSI from any claim or liability, both civil and criminal, including but not limited to costs and attorney's fees, arising in any way from any breach by RVI sales caused by intentional or grossly negligent actions of this Agreement, including this covenant of indemnification.

MSI agrees to indemnify and defend RVI from any claim or liability, both civil and criminal, including but not limited to costs and attorney's fees, arising in any way from any misrepresentation or misstatement of a material fact or omission of material fact, made or claim to have been made by MSI or any of MSI's telemarketers or other employees, unless the same is stated or clearly implied by or contained in literature, letters, memos, documents or other written communication from RVI from any activities of MSI and any of its employees, in violation of this Agreement; and from any other breach of this Agreement, including this covenant of indemnification.

## 8)   ARBITRATION

At the request of any party, any dispute arising out of or in any way pertaining to this Agreement any breach thereof or any matter surviving or alleged to survive the termination of this Agreement, shall be decided by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then obtaining, unless the parties mutually agree otherwise. Notice of demand for arbitration shall be filed in writing with the other party and with the American Arbitration Association and must be made within a reasonable time after the dispute has arisen.

The award rendered by the Arbitrator or a majority of Arbitrators shall be final and not subject to appeal. Judgment may be entered upon such award in accordance with the applicable law in any court having jurisdiction, and likewise shall be final and not subject to appeal. However, unless otherwise agreed, the site of arbitration shall be in Santa Ana, California, and the discovery rules



contained in the Federal Rules of Civil Procedures then obtaining shall also apply and may be
enforced through judicial proceedings.

## 9)  GENERAL PROVISIONS

A)   Notice

All notices required hereunder shall be given by prepaid registered or certified airmail,
return receipt requested, or by email.

1)   To RVI at:
550 N. Golden Circle Drive
Ste A. Santa Ana, CA 92705
tmichalec@gevc.net

2)   To MSI at:
Unit 701 7th Floor Sunshine Garden Condominium
#481 Arayat St Mandaluyong City, Philippines 1550

daiglem@msn.com

Or at such other addresses as each such party may hereafter furnish to the others in
writing.

B)   Entire Agreement

It is understood that there are no oral agreements or representations between the parties hereto
affecting this Agreement, and this Agreement (including all Exhibits) constitutes and contains
the entire agreement of the parties and supersedes and cancels any previous negotiations,
arrangements, agreements, representations and understandings, of any, between the parties hereto
or displayed by MSI to RVI with respect to the subject matter hereof.

C)   Benefit and Survival

The covenants contained in this Agreement shall apply to, and be to the benefit of, and be
binding upon, the parties hereto, and upon their respective successors and permitted assigns, and
shall survive any termination of this Agreement.

D)   Headings

The headings are used herein are for identification purposes only and shall have no force or
effect in this Agreement.



E)   Governing Law

The laws of the State of California, the County of Orange and Los Angeles in all respects, including matters of construction, performance and remedy, shall govern this Agreement. If any portion of this Agreement shall be hold illegal or unenforceable by a court or competent jurisdiction, such portion shall be severed from this Agreement and the remainder of this Agreement shall continue in full force and effect. MSI agrees to comply with all Federal & State Do Not Call List (DNC).

F)   No Waiver

The failure to enforce any provision of this Agreement shall not operate as a waiver of that or any other provision hereof,

**IN WITNESS WHEREOF,** the parties have executed this Agreement on October 24, 2013

MSI Marketing Inc.                                  Resort Vacations Inc.


_____              _____
Mark Daigle, Owner/Operator                      Tim Michalee, V.P. of Marketing

10 28 13                                          10/29/13
_____              _____
Date                                              Date

## EXHIBIT A

### TOUR QUALIFICATIONS & SPECIAL INSTRUCTIONS

MARRIED: Clients must be between the ages of 25 – 70 for married couples or co-habitating couples. Proof of cohabitation may be provided in the form of government issued ID's, residential leases, utility bills or mail from bona fide companies that show matching addresses. Each member of the couple shall be required to provide one (1) item of proof in order to meet this requirement of proof of cohabitation. Income is to be $40,000 per year. Guests must show two forms of ID one being a picture ID and a Major Credit Card (VISA, AMEX, MC, DISC), No Check Books allowed. No children under 10 will be allowed on tour.

SINGLES: No single males. Single females will be accepted up to a maximum of 15% per wave. Single females must be 30 – 70 years of age and have an income of $50,000 or more per year.

PROOF OF CITIZENSHIP:
All clients touring a RVI facility are required to be either a US Citizens or possess a valid Permanent Resident Card.

PREMIUMS: RVI will issue at the showroom only those premiums listed on the Vendor Gift List provided to MSI. The cost of all premiums as listed on the Vendor Gift List issued to MSI clients will be deducted from MSI's total tour pay. This list is subject to change by RVI with a minimum seven (7) days' notice to MSI.

If anything is offered by MSI to any RVI client that is not listed on the Vendor Gift List, MSI may be terminated immediately, at the Marketing Director's discretion. MSI will be responsible for any cost related to such a misrep and if possible, the costs may be deducted from MSI's total weekly tour pay.

QUINELLA'S: RVI will not accept friends or family arriving on the same tour wave on same tour day. The issues that arise from these types of tours are well documented. In the event that there is such a situation where 2 or more clients arrive at the show room at the same time, only one tour will be credited.

TELEMARKETING LIST HYGENE:
In order for us to ensure compliance with ALL Federal, State and Internal DNC policies, as well as ensure that clients are not barraged by calls on behalf of RVI; RVI requires all telemarketing vendors to provide us with the calling list they plan to utilize in the next 14 day period. All lists are to be sent to datascrub@resortvacationsinc.net every second Wednesday. That file will be returned to your office within 48 hours. All data will be kept confidential.

**UPLOADING OF BOOKINGS:**

MSI to send all bookings for upload for entry into our marketing software please prepare your bookings into the template provided and then email to us at vendorupload@resortvacationsinc.net. There will be an instruction sheet that will be sent over to your office to provide the details necessary to walk through the process.

**TOUR FLOW & ALLOTMENTS:** MSI understand and agrees that their tour allotment per site is as follows:

| | | | | | |
|---|---|---|---|---|---|
| Long Beach – | 20 tours | Thursday | 5:30 pm | - | 2 |
| | | | 6:45 pm | - | 2 |
| | | Friday | 5:30 pm | - | 2 |
| | | | 6:45 pm | - | 2 |
| | | Saturday | 10:00 am | - | 2 |
| | | | 2:00 pm | - | 2 |
| | | | 4:00 pm | - | 2 |
| | | Sunday | 10:00 am | - | 2 |
| | | | 2:00 pm | - | 2 |
| | | | 4:00 pm | - | 2 |
| Encino – | 25 tours | Thursday | 5:30 pm | - | 3 |
| | | | 6:45 pm | - | 2 |
| | | Friday | 5:30 pm | - | 3 |
| | | | 6:45 pm | - | 2 |
| | | Saturday | 10:00 am | - | 2 |
| | | | 2:00 pm | - | 2 |
| | | | 4:00 pm | - | 4 |
| | | Sunday | 10:00 am | - | 2 |
| | | | 2:00 pm | - | 2 |
| | | | 4:00 pm | - | 4 |

If MSI goes over their specified allotment by more than 20%, RVI has the option not to pay for those overage tours.




EXHIBIT "E"

1   JOSEPH EHRLICH - #84359
    MARK R. MEYER - #238231
2   Losch & Ehrlich - Attorneys at Law
    425 California Street, Suite 2025
3   San Francisco CA 94104
    Telephone:    (415) 956-8400
4   Facsimile:    (415) 956-2150
    Email:    je@losch-ehrlich.com
5             mm@losch-ehrlich.com

6   Attorneys for Defendant
    Global Exchange Vacation Club
7

8                       SUPERIOR COURT OF CALIFORNIA

9                            COUNTY OF ORANGE

10  MICHELE DEL VALLE, on behalf of herself and    Case No. 30-2014-00745279-CU-MC-CXC
    all others similarly situated,
11
                                                   **DEFENDANT GLOBAL EXCHANGE**
12              Plaintiffs,                         **VACATION CLUB'S FURTHER**
                                                   **RESPONSE TO PLAINTIFF'S SPECIAL**
13        v.                                       **INTERROGATORIES, SET ONE**

14  GLOBAL EXCHANGE VACATION CLUB, a
    California corporation; and DOES 1 through 100,  Complaint Filed:    September 15, 2014
15  inclusive                                        Judge :             Hon. Steven L. Perk

16              Defendants.

17

18  PROPOUNDING PARTY:    Michele Del Valle ("Plaintiff" or "Propounding Party")

19  RESPONDING PARTY:     Defendant Global Exchange Vacation Club ("GEVC" or "Responding

20                        Party" or "Defendant")

21  SET NUMBER:           One

22  **SPECIAL INTERROGATORY NO. 1**

23        Identify the dates and time of all TELEMARKETING CALLS (the term

24  "TELEMARKETING CALLS" is defined as calls soliciting potential or existing customers to

25  purchase, agree to, or otherwise acquire products and services, including but not limited to, hotel

26  stays, vacations, timeshares, or promotional opportunities.  This includes offers to attend

27  presentations offering these types of products and services) placed by YOU (the terms

28  "DEFENDANT," "YOU," and "YOUR" refer to Defendant Global Exchange Vacation Club, its

---

GEVC's Response to Special Interrogatories, Set One                    1
Case No. 30-2014-00745279-CU-MC-CXC

1    directors, officers, employees, members, attorneys, consultants, agents, representatives,

2    predecessors, successors, independent contractors, assignors, assignees, and any person acting on its

3    behalf or at its discretion; it also includes third-parties making calls on behalf of Defendant Global

4    Exchange Vacation Club) to PLAINTIFF'S CELLULAR TELEPHONE NUMBER (the term

5    "PLAINTIFF'S CELLULAR TELEPHONE NUMBER" refers to the cellular telephone with the

6    number (949) 439-8867 at any time during the CLASS PERIOD (the term "CLASS PERIOD" is

7    defined as anytime between September 1, 2010 and the present).

8    **RESPONSE TO SPECIAL INTERROGATORY NO. 1**

9         Objection: the definition of YOU includes a vague and ambiguous list of third parties that

10   responding party lacks information concerning and cannot respond for, making the request is over-

11   broad or unintelligible.  Calls for confidential information.

12        Notwithstanding, Responding Party has not called 949-439-8867 during the period identified.

13        Responding Party does not have knowledge of any other person who has made a call to 949-

14   439-8867.

15        GEVC is a non-profit homeowners association that holds real estate in trust for its members.

16   GEVC is not involved in the marketing or sale of club memberships and does not directly or

17   indirectly make phone calls to market club memberships.  GEVC does not contract or direct the

18   marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a company

19   markets and sells memberships in GEVC.  GEVC and RVI have attempted to obtain all information

20   regarding any calls made to 949-439-8867 by any third parties related to GEVC and RVI and have

21   not additional information to provide.

22   **SPECIAL INTERROGATORY NO. 2**

23        Identify all outgoing telephone numbers, including area codes, used by YOU to place

24   TELEMARKETING CALLS to PLAINTIFF'S CELLULAR TELEPHONE NUMBER at any time

25   during the CLASS PERIOD.

26   **RESPONSE TO SPECIAL INTERROGATORY NO. 2**

27        Objection: the definition of YOU includes a vague and ambiguous list of third parties that

28   responding party lacks information concerning and cannot respond for, making the request is over-

1  broad or unintelligible.  Calls for confidential information.

2         Notwithstanding, responding party has not called 949-439-8867 during the period identified

3  and does not know of any other person who has made a call to 949-439-8867, therefore, there are no

4  outgoing numbers to identify.

5         GEVC is a non-profit homeowners association that holds real estate in trust for its members.

6  GEVC is not involved in the marketing or sale of club memberships and does not directly or

7  indirectly make phone calls to market club memberships.  GEVC does not contract or direct the

8  marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a company

9  markets and sells memberships in GEVC.  GEVC and RVI have attempted to obtain all information

10  regarding any calls made to 949-439-8867 by any third parties related to GEVC and RVI and have

11  not additional information to provide.

12  **SPECIAL INTERROGATORY NO. 3**

13         Identify the equipment (including the manufacturer and model) used by YOU to place

14  TELEMARKETING CALLS to PLAINTIFF'S CELLULAR TELEPHONE NUMBER at any time

15  during the CLASS PERIOD.

16  **RESPONSE TO SPECIAL INTERROGATORY NO. 3**

17         Objection: the definition of YOU includes a vague and ambiguous list of third parties that

18  responding party lacks information concerning and cannot respond for, making the request is over-

19  broad or unintelligible.  Calls for confidential information.

20         Notwithstanding, responding party has not called 949-439-8867 during the period identified

21  and does not know of any other person who has made a call to 949-439-8867, therefore,  there is no

22  equipment used to make such a call.

23         GEVC is a non-profit homeowners association that holds real estate in trust for its members.

24  GEVC is not involved in the marketing or sale of club memberships and does not directly or

25  indirectly make phone calls to market club memberships.  GEVC does not contract or direct the

26  marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a company

27  markets and sells memberships in GEVC.  GEVC and RVI have attempted to obtain all information

28  regarding any calls made to 949-439-8867 by any third parties related to GEVC and RVI and have

1   not additional information to provide.

2   **SPECIAL INTERROGATORY NO. 4**

3       Identify all YOUR employees (including their name, contact information, and address) who

4   placed TELEMARKETING CALLS to PLAINTIFF'S CELLULAR TELEPHONE NUMBER at

5   any time during the CLASS PERIOD.

6   **RESPONSE TO SPECIAL INTERROGATORY NO. 4**

7       Objection: the definition of YOU includes a vague and ambiguous list of third parties that

8   responding party lacks information concerning and cannot respond for, making the request is over-

9   broad or unintelligible.  Calls for confidential information.

10       Notwithstanding, responding party has not called 949-439-8867 during the period identified

11   and does not know of any other person who has made a call to 949-439-8867, therefore, there are no

12   employees to identify.

13       GEVC is a non-profit homeowners association that holds real estate in trust for its members.

14   GEVC is not involved in the marketing or sale of club memberships and does not directly or

15   indirectly make phone calls to market club memberships.  GEVC does not contract or direct the

16   marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a company

17   markets and sells memberships in GEVC.  GEVC and RVI have attempted to obtain all information

18   regarding any calls made to 949-439-8867 by any third parties related to GEVC and RVI and have

19   no additional information to provide.

20   **SPECIAL INTERROGATORY NO. 5**

21       State all facts supporting YOUR contention that Plaintiff consented to receive

22   TELEMARKETING CALLS from YOU on PLAINTIFF'S CELLULAR TELEPHONE NUMBER.

23   **RESPONSE TO SPECIAL INTERROGATORY NO. 5**

24       Objection: the definition of YOU and YOUR includes a vague and ambiguous list of third

25   parties that responding party lacks information concerning and cannot respond for, making the

26   request is over-broad or unintelligible.  Responding Party does not and cannot respond on behalf of

27   other entities or state what their contentions are.  Calls for confidential information.

28       Notwithstanding,  GEVC is a non-profit homeowners association that holds real estate in

1  trust for its members.  GEVC is not involved in the marketing or sale of club memberships and does

2  not directly or indirectly make phone calls to market club memberships.  GEVC does not contract or

3  direct the marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a

4  company markets and sells memberships in GEVC.

5         RVI obtains consent prior to obtaining the contact information of prospective customers.

6  RVI calls prospective customers or "leads," from phone numbers it has collected by obtaining the

7  consent of the person to be called.  With respect to Plaintiff, it is known that at least on September

8  28, 2014, at a Gorden Lightfoot in Anaheim, CA at the City National Grove Of Anaheim, Plaintiff

9  provided her phone number to RVI with permission to be called.  She used a touch screen device to

10  agree to be called, then provided her name and the 949-439-8867 phone number.  To clarify the

11  permission was provided as shown in RVI000007.  RVI does not obtain phone numbers until after

12  consent to being called is provided.

13         Further, despite a good faith effort to obtain information from third parties, responding party

14  lacks any further information regarding Plaintiff providing consent to being called at 949-439-8867.

15         Global Exchange Vacation Club does not make any telemarketing calls and no person makes

16  telemarketing calls on its behalf.

17         GEVC is a non-profit homeowners association that holds real estate in trust for its members.

18  GEVC is not involved in the marketing or sale of club memberships and does not directly or

19  indirectly make phone calls to market club memberships.  GEVC does not contract or direct the

20  marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a company

21  markets and sells memberships in GEVC.  GEVC and RVI have attempted to obtain all information

22  regarding any calls made to 949-439-8867 by any third parties related to GEVC and RVI and have

23  not additional information to provide.

24  **SPECIAL INTERROGATORY NO. 6**

25         Identify all forms of consent YOU contend YOU received by individuals to place

26  TELEMARKETING CALLS to those individuals' cell phones at any time during the CLASS

27  PERIOD.

28  **RESPONSE TO SPECIAL INTERROGATORY NO. 6**

1    Objection: the definition of YOU and YOUR includes a vague and ambiguous list of third

2    parties that responding party lacks information concerning and cannot respond for, making the

3    request is over-broad or unintelligible. Responding Party does not and cannot respond on behalf of

4    other entities or state what their contentions are. Calls for confidential information. Further, the

5    request is overbroad, vague, and confusing and the burden, expense, and intrusiveness of the request

6    outweighs the likelihood that the information sought will lead to the discovery of admissible

7    evidence.

8    Notwithstanding, and without waiving the objections, GEVC is a non-profit homeowners

9    association that holds real estate in trust for its members. GEVC is not involved in the marketing or

10   sale of club memberships and does not directly or indirectly make phone calls to market club

11   memberships. GEVC does not contract or direct the marketing or sales of GEVC memberships,

12   including the operations of RVI. RVI is a company markets and sells memberships in GEVC.

13   RVI obtains consent prior to obtaining the contact information of prospective customers.

14   RVI calls prospective customers or "leads," from phone numbers it has collected by obtaining the

15   consent of the person to be called. Responding party obtains consent by affirmatively agreeing to be

16   contacted through the use of a touch screen interface. The interface is shown in RVI000006-13.

17   After the person has agreed, they are prompted to provide their contact information.

18   Although not relevant to the allegations in this lawsuit, consent to being called is also created

19   when RVI is contacted by an individual indicating a desire or consent to be called. Consent is also

20   created where a person has an ongoing relationship with RVI or becomes a member of Global

21   Exchange Vacation Club. The consent is that of an ongoing business relationship between the

22   entities and their members.

23   With respect to Plaintiff, it is known that at least on September 28, 2014, at a Gorden

24   Lightfoot in Anaheim, CA at the City National Grove Of Anaheim, Plaintiff provided her phone

25   number to RVI with permission to be called. She used a touch screen device to agree to be called,

26   then provided her name and the 949-439-8867 phone number. To clarify the permission was

27   provided as shown in RVI000007. RVI does not obtain phone numbers until after consent to being

28   called is provided.

1    Further, despite a good faith effort to obtain information from third parties, responding party

2  lacks any further information regarding the forms of consent obtained by "YOU" (as it is vaguely

3  and misleadingly defined in the interrogatory) to being called at 949-439-8867.

4    GEVC and RVI have attempted to obtain all information regarding any calls made to 949-

5  439-8867 by any third parties related to GEVC and RVI and have not additional information to

6  provide.

7  **SPECIAL INTERROGATORY NO. 7**

8    Identify the number of TELEMARKETING CALLS YOU placed to individuals' cellular

9  telephones at any time during the CLASS PERIOD.

10  **RESPONSE TO SPECIAL INTERROGATORY NO. 7**

11    Objection: the definition of YOU includes a vague and ambiguous list of third parties that

12  responding party lacks information concerning and cannot respond for, making the request is over-

13  broad or unintelligible. Calls for confidential information. Further, the request is overbroad, vague,

14  and confusing and the burden, expense, and intrusiveness of the request outweighs the likelihood

15  that the information sought will lead to the discovery of admissible evidence.

16    Notwithstanding, GEVC is a non-profit homeowners association that holds real estate in trust

17  for its members. GEVC is not involved in the marketing or sale of club memberships and does not

18  directly or indirectly make phone calls to market club memberships. GEVC does not contract or

19  direct the marketing or sales of GEVC memberships, including the operations of RVI. RVI is a

20  company markets and sells memberships in GEVC.

21    RIV estimates that it and third party contractors made in excess of 8,000 calls per day to

22  persons who have provided consent to be called. Responding party cannot identify or estimate the

23  number of calls made to cellular phone numbers.

24    GEVC is a non-profit homeowners association that holds real estate in trust for its members.

25  GEVC is not involved in the marketing or sale of club memberships and does not directly or

26  indirectly make phone calls to market club memberships. GEVC does not contract or direct the

27  marketing or sales of GEVC memberships, including the operations of RVI. RVI is a company

28  markets and sells memberships in GEVC.

1 | **SPECIAL INTERROGATORY NO. 8**

2 | Identify all equipment used by YOU to place TELEMARKETING CALLS to individuals'

3 | cellular telephones at any time between during the CLASS PERIOD (including the date range such

4 | equipment was used).

5 | **RESPONSE TO SPECIAL INTERROGATORY NO. 8**

6 | Objection: the definition of YOU includes a vague and ambiguous list of third parties that

7 | responding party lacks information concerning and cannot respond for, making the request is over-

8 | broad or unintelligible. Responding party interprets "YOU" to mean the responding party and

9 | vendors who made telemarketing calls. Calls for confidential information. Further, the request is

10 | overbroad, vague, and confusing and the burden, expense, and intrusiveness of the request outweighs

11 | the likelihood that the information sought will lead to the discovery of admissible evidence.

12 | Notwithstanding, , GEVC is a non-profit homeowners association that holds real estate in

13 | trust for its members. GEVC is not involved in the marketing or sale of club memberships and does

14 | not directly or indirectly make phone calls to market club memberships. GEVC does not contract or

15 | direct the marketing or sales of GEVC memberships, including the operations of RVI. RVI is a

16 | company markets and sells memberships in GEVC.

17 | Resort Vacations, Inc.uses phones, Polycom 335, and does not know of any other equipment

18 | used during the class period.

19 | A third party vendor of RVI, InterVoice Technologies, uses Vicidial Software in a

20 | configuration that does not permit automatic dialing. Responding party does not know of any other

21 | equipment used during the class period.

22 | A third party vendor of RVI, Marketing Solutions, International, uses Vicidial Software in a

23 | configuration that does not permit automatic dialing. Responding party does not know of any other

24 | equipment used during the class period.

25 | A third party vendor of RVI, Kaleo Marketing, uses Polycom phones. Responding party

26 | does not know of any other equipment used during the class period.

27 | Despite a good faith effort to obtain information from third parties, RVI lacks any further

28 | information regarding any other equipment used by any business entities that may fall within the

overbroad and misleading definition of "YOU."

**SPECIAL INTERROGATORY NO. 9**

Identify all outgoing telephone numbers, including area codes, used by YOU to place TELEMARKETING CALLS to individuals' cellular telephones at any time during the CLASS PERIOD.

**RESPONSE TO SPECIAL INTERROGATORY NO. 9**

Objection: the definition of YOU includes a vague and ambiguous list of third parties that responding party lacks information concerning and cannot respond for, making the request is over-broad or unintelligible. Responding party interprets YOU to mean the responding party and vendors who made telemarketing calls. Calls for confidential information. Further, the request is overbroad, vague, and confusing and the burden, expense, and intrusiveness of the request outweighs the likelihood that the information sought will lead to the discovery of admissible evidence.

Notwithstanding, , GEVC is a non-profit homeowners association that holds real estate in trust for its members. GEVC is not involved in the marketing or sale of club memberships and does not directly or indirectly make phone calls to market club memberships. GEVC does not contract or direct the marketing or sales of GEVC memberships, including the operations of RVI. RVI is a company markets and sells memberships in GEVC.

The phone numbers used by RVI and all known phone numbers of vendors is as follows:

RVI:

626-427-3322
949-207-7180
949-336-2140
714-332-1277
714-465-4483
626-986-0044
714-656-4582
714-676-3044
949-274-7164

| | |
|---|---|
| 1 | 714-465-4483 |
| 2 | 714-462-9285 |
| 3 | 714-332-1067 |
| 4 | 949-284-0342 |
| 5 | 626-381-9645 |
| 6 | IVT: |
| 7 | 310-356-0464 |
| 8 | 877-276-5306 |
| 9 | 877-276-5320 |
| 10 | 877-276-5306 |
| 11 | 877-276-9713 |
| 12 | 941-200-3877 |
| 13 | 909-626-2316 |
| 14 | 909-233-7055 |
| 15 | 214-269-4350 |
| 16 | 909-243-1147 |
| 17 | 818-309-1147 |
| 18 | 818-258-8307 |
| 19 | 323-205-1069 |
| 20 | 323-345-4756 |
| 21 | 888-253-7639 |
| 22 | MSI: |
| 23 | 818-478-8966 |
| 24 | 909-271-1857 |
| 25 | 909-243-1157 |
| 26 | 714-912-6964 |
| 27 | 949-200-5342 |
| 28 | 909-200-2358 |

1  Kaleo Marketing:

2  714-604-4639

3  714-798-2354

4  714-408-4482

5  714-604-2042

6  714-551-9494

7  714-798-2352

8  714-798-2275

9  714-855-3426

10  714-598-3027

11  714-598-3029

12  714-855-3437

13  714-242-4449

14  714-798-2353

15  714-798-2276

16  714-855-3328

17  Further, despite a good faith effort to obtain information from third parties, responding party lacks

18  any further information regarding any other outgoing phone numbers used by any business entities

19  that may fall within the overbroad and misleading definition of "YOU."

20  **SPECIAL INTERROGATORY NO. 10**

21          For each telephone number identified in response to Special Interrogatory No. 9, identify the

22  service provider (e.g., AT&T, COX Communications, etc.) for each cellular telephone number.

23  **RESPONSE TO SPECIAL INTERROGATORY NO. 10**

24          Objection: the definition of YOU includes a vague and ambiguous list of third parties that

25  responding party lacks information concerning and cannot respond for, making the request is over-

26  broad or unintelligible.  Responding party interprets YOU to mean the responding party and vendors

27  who made telemarketing calls.  The interrogatory is vague and confusing in reference to "for each

28  cellular telephone number" because responding party does not call from cellular telephone numbers.

1  Calls for confidential information. Further, the request is overbroad, vague, and confusing and the

2  burden, expense, and intrusiveness of the request outweighs the likelihood of discovering admissible

3  evidence.

4        Notwithstanding, in an effort to provide a full and complete response, no phone number of

5  Global Exchange Vacation Club was identified. RVI's telephone service provider is 8x8, Inc. and

6  Airespring. Intervoice Technologies used Asia Pacific Network and Accela during the class period.

7  Marketing Solutions International used Asia Pacific Netowrk during the class period. Kaleo

8  Marketing used Accela during the class period. After making a good faith inquiry, responding party

9  cannot provide further information regarding the phone service providers used in connection with

10  the phone numbers identified above.

11  **SPECIAL INTERROGATORY NO. 11**

12        Identify the number of TELEMARKETING CALLS made to cellular phones during the

13  CLASS PERIOD.

14  **RESPONSE TO SPECIAL INTERROGATORY NO. 11**

15        Objection: this request is duplicative of No. 7, making it unduly burdensome. Further, the

16  definition of YOU includes a vague and ambiguous list of third parties that responding party lacks

17  information concerning and cannot respond for, making the request is over-broad or unintelligible.

18  Calls for confidential information. Further, the request is overbroad, vague, and confusing and the

19  burden, expense, and intrusiveness of the request outweighs the likelihood that the information

20  sought will lead to the discovery of admissible evidence. Notwithstanding, GEVC is a non-profit

21  homeowners association that holds real estate in trust for its members. GEVC is not involved in the

22  marketing or sale of club memberships and does not directly or indirectly make phone calls to

23  market club memberships. GEVC does not contract or direct the marketing or sales of GEVC

24  memberships, including the operations of RVI. RVI is a company markets and sells memberships in

25  GEVC.

26        RVI estimates that it and vendors made in excess of 8,000 calls per day to persons who have

27  provided consent to be called.

28

1 | **SPECIAL INTERROGATORY NO. 12**

2 |     Identify the number of cellular telephones YOU placed TELEMARKETING CALLS to at

3 | any time during the CLASS PERIOD.

4 | **RESPONSE TO SPECIAL INTERROGATORY NO. 12**

5 |     Objection: To the extent this request is duplicative of No. 7, it is unduly burdensome.

6 | Further, the definition of YOU includes a vague and ambiguous list of third parties that responding

7 | party lacks information concerning and cannot respond for, making the request is over-broad or

8 | unintelligible.  Calls for confidential information.  Further, the request is overbroad, vague, and

9 | confusing and the burden, expense, and intrusiveness of the request outweighs the likelihood that the

10 | information sought will lead to the discovery of admissible evidence.

11 |     Notwithstanding, GEVC is a non-profit homeowners association that holds real estate in trust

12 | for its members.  GEVC is not involved in the marketing or sale of club memberships and does not

13 | directly or indirectly make phone calls to market club memberships.  GEVC does not contract or

14 | direct the marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a

15 | company markets and sells memberships in GEVC.

16 |     RVI does not track or know the number of cellular telephone numbers that are called and

17 | therefore does not know the number of such phones or persons called.

18 |     RVI cannot determine the number of calls to cellular telephones it placed based upon the

19 | information within its custody possession or control.

20 |     RVI cannot determine the number of calls to cellular telephones "YOU" placed based upon

21 | the information within its custody possession or control.

22 | **SPECIAL INTERROGATORY NO. 13**

23 |     Identify the number of persons whose cellular telephones YOU placed TELEMARKETING

24 | CALLS to at any time during the CLASS PERIOD.

25 | **RESPONSE TO SPECIAL INTERROGATORY NO. 13**

26 |     Objection: To the extent this request is duplicative of No. 7, it is unduly burdensome.

27 | Further, the definition of YOU includes a vague and ambiguous list of third parties that responding

28 | party lacks information concerning and cannot respond for, making the request is over-broad or

1   unintelligible.  Calls for confidential information.  Further, the request is overbroad, vague, and

2   confusing and the burden, expense, and intrusiveness of the request outweighs the likelihood that the

3   information sought will lead to the discovery of admissible evidence.

4          Notwithstanding, GEVC is a non-profit homeowners association that holds real estate in trust

5   for its members.  GEVC is not involved in the marketing or sale of club memberships and does not

6   directly or indirectly make phone calls to market club memberships.  GEVC does not contract or

7   direct the marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a

8   company markets and sells memberships in GEVC.

9          RVI does not track or know the number of cellular telephone numbers that are called and

10  therefore does not know the number of such phones or persons called.

11         RVI cannot determine the number of calls to cellular telephones it placed based upon the

12  information within its custody possession or control.

13         RVI cannot determine the number of calls to cellular telephones "YOU" placed based upon

14  the information within its custody possession or control.

15  **SPECIAL INTERROGATORY NO. 14**

16         Identify the number of persons who requested to be removed from YOUR list of cellular

17  telephone numbers used by YOU to place TELEMARKETING CALLS at any time during the

18  CLASS PERIOD.

19  **RESPONSE TO SPECIAL INTERROGATORY NO. 14**

20         The request is overbroad, vague, and confusing and the burden, expense, and intrusiveness of

21  the request outweighs the likelihood that the information sought will lead to the discovery of

22  admissible evidence.  (Code Civ. Proc., § 2017.020.)  The definitions of "REFER" "RELATE" and

23  "YOUR" make the request undefined in scope and, in any case, outside the scope of discovery.  The

24  definition of YOU includes a vague and ambiguous list of third parties that responding party lacks

25  information concerning and cannot respond for, making the request is over-broad or unintelligible.

26  Further the request is not calculated to lead to admissible evidence as the request is outside the

27  elements of the claims or defenses in this action.

28         GEVC is a non-profit homeowners association that holds real estate in trust for its members.

---

1    GEVC is not involved in the marketing or sale of club memberships and does not directly or

2    indirectly make phone calls to market club memberships. GEVC does not contract or direct the

3    marketing or sales of GEVC memberships, including the operations of RVI. RVI is a company

4    markets and sells memberships in GEVC.

5           Notwithstanding, there is no "list of cellular telephone numbers" in the possession of GEVC

6    or RVI or "YOU," making the request unintelligible.

7           Further, responding party does not track or know the number of cellular telephone numbers

8    that are called and therefore does not know the number of phone numbers or persons who has

9    requested to be removed  that are related to cellular phones.

10          Responding Party cannot determine the number of persons with cellular phone numbers who

11   requested to be removed from a non-existent list, or who asked to not be called by RVI.

12          Responding Party cannot determine the number of persons with cellular phone numbers who

13   requested to be removed from a non-existent list, or who asked to not be called by "YOU".

14           Notwithstanding, in a good faith effort to provide as much information as reasonably

15   possible with the information available to responding party, there is  a list of numbers for persons

16   who have asked not to be called related to Global Exchange Vacation Club.  At about the time of the

17   initial response to this interrogatory, responding party states that about 111,156 have requested to not

18   be called.

19

20

21

22   Dated: 5-18-2015                              LOSCH & EHRLICH

23

24                                        By:

25                                              Joseph Ehrlick
                                                Mark R. Meyer
26                                              Attorneys for Defendant
                                                Global Exchange Vacation Club
27

28

---

GEVC's Response to Special Interrogatories, Set One
Case No. 30-2014-00745279-CU-MC-CXC

PA - 00183

1

**VERIFICATION**
(Code of Civil Procedure. §§ 446, 2015.5)

2

3      I, Richard Sargent, am the President of Defendant, Global Exchange Vacation Club, in the

4     above-entitled action.  I have read the responses set forth in:

5         **DEFENDANT GLOBAL EXCHANGE VACATION CLUB'S FURTHER RESPONSE**
          **TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE**

6

7     and know the contents thereof.  The same is true of my own knowledge, except as to those matters

8     which are therein stated on information and belief, and, as to those matters, I believe them to be true.

9     I declare under penalty of perjury under the laws of the State of California that the foregoing is true

10    and correct:

11

12     Dated:  4/13/16

13                                                      Richard Sargent

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GEVC's Response to Special Interrogatories, Set One                                    16
Case No. 30-2014-00745279-CU-MC-CXC

1

PROOF OF SERVICE
(C.C.P. §§ 1013a, 2015.5)

2

3          I, the undersigned, declare:

4          I am employed in the City and County of San Francisco.  I am over the age of eighteen (18)
and not a party to the within cause.  My business address is 425 California Street, Suite 2025, San
5  Francisco, California, 94104.

6          On **May 18, 2015**, I served the attached document(s):

7  **DEFENDANT GLOBAL EXCHANGE VACATION CLUB'S <u>FURTHER</u> RESPONSE TO
PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE**

8

9  On the party(s) to this action by sending a true copy thereof, addressed as follows:

10 / x /    (BY E-MAIL) I caused such documents to be delivered by e-mail to the addressee(s) as
           noted below:

11

/ x /    (BY MAIL) I caused such envelope(s), with postage thereon fully prepaid, on the date of
12         execution of this declaration, to be placed for collection and mailing in the U.S. Postal
           Service following ordinary business practices.  I am readily familiar with these said business
13         practices for collection and processing of documents for mailing and said document(s)
           was/were deposited with the U.S. Postal Service the same day in the ordinary course of
14         business in San Francisco, San Francisco County, California.

15  R. Rex Parris, Esq.
    John Bickford, Esq.
16  R. REX PARRIS LAW FIRM
    43364 10ᵗʰ Street West
17  Lancaster, CA 93534
    jbickford@rrexparris.com
18

          I declare under penalty of perjury, under the laws of the State of California, that the
19  foregoing is true and correct.  Executed  **May 18, 2015**, at San Francisco, California.

20

21          _Olivia Bivens_
                    Olivia Bivens

22

23

24

25

26

27

28

EXHIBIT "F"



MICHELE DEL VALLE
PO BOX 15884
NEWPORT BEACH, CA 92659-5884

**Page:** 7 of 15
**Bill Cycle Date:** 09/21/14 - 10/20/
**Account:** 570121752
**Foundation Account:** FAN 00028028

Visit us online at: **www.att.com**

## 949 439-8867
### MICHELE DEL VALLE

**Call Detail** - Continued

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Add'l Charges |
|------|------|------|------|------|------|------|------|
| Thursday, 09/25 | | | | | | | |
| 06:51p | SAN PE CA | 310-872-8052 | SDDV | | 2 | 0.00 | 0.00 |
| 08:05p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 08:06p | INCOMI CL | 310-872-8052 | SDDV | | 4 | 0.00 | 0.00 |
| Friday, 09/26 | | | | | | | |
| 07:43a | SAN PE CA | 310-872-8052 | SDDV | | 3 | 0.00 | 0.00 |
| 09:33a | INCOMI CL | 951-204-2059 | SDDV | | 2 | 0.00 | 0.00 |
| 09:35a | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 12:39p | RIVERS CA | 951-204-2059 | SDDV | | 1 | 0.00 | 0.00 |
| 01:31p | INCOMI CL | 714-823-6656 | SDDV | | 2 | 0.00 | 0.00 |
| 01:48p | INCOMI CL | 310-872-8052 | SDDV | | 8 | 0.00 | 0.00 |
| 02:13p | GARDEN CA | 714-823-6656 | SDDV | | 1 | 0.00 | 0.00 |
| 02:53p | INCOMI CL | 714-823-6656 | SDDV | | 1 | 0.00 | 0.00 |
| 04:40p | NEWPOR CA | 949-631-1250 | SDDV | | 1 | 0.00 | 0.00 |
| 04:41p | NEWPOR CA | 949-631-1250 | SDDV | | 2 | 0.00 | 0.00 |
| 05:23p | INCOMI CL | 714-591-3523 | SDDV | | 2 | 0.00 | 0.00 |
| 05:55p | INCOMI CL | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 06:12p | INCOMI CL | 213-220-9794 | SDDV | | 1 | 0.00 | 0.00 |
| 06:12p | LOSANG CA | 213-220-9794 | SDDV | | 4 | 0.00 | 0.00 |
| 06:48p | INCOMI CL | 310-941-8063 | SDDV | | 2 | 0.00 | 0.00 |
| Saturday, 09/27 | | | | | | | |
| 07:48a | CMTN G CA | 310-941-8063 | SDDV | | 3 | 0.00 | 0.00 |
| 07:51a | ANAHEI CA | 714-404-4333 | SDDV | | 1 | 0.00 | 0.00 |
| 08:52a | CMTN G CA | 310-941-8063 | SDDV | | 2 | 0.00 | 0.00 |
| 08:54a | ANAHEI CA | 714-404-4333 | SDDV | | 1 | 0.00 | 0.00 |
| 08:54a | CALL WAIT | 310-941-8063 | SDDV | CW | 3 | 0.00 | 0.00 |
| 08:57a | ANAHEI CA | 714-404-4333 | SDDV | | 1 | 0.00 | 0.00 |
| 09:06a | INCOMI CL | 310-941-8063 | SDDV | | 2 | 0.00 | 0.00 |
| 09:10a | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 09:15a | ANAHEI CA | 714-404-4333 | SDDV | | 1 | 0.00 | 0.00 |
| 09:19a | INCOMI CL | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 09:36a | INCOMI CL | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 11:48a | SAN PE CA | 310-872-8052 | SDDV | | 2 | 0.00 | 0.00 |
| 12:50p | INCOMI CL | 949-350-3502 | SDDV | | 5 | 0.00 | 0.00 |
| 03:15p | RANCHV CA | 949-350-3502 | SDDV | | 2 | 0.00 | 0.00 |
| 03:16p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 03:20p | NEWPOR CA | 949-274-1895 | SDDV | | 2 | 0.00 | 0.00 |
| 03:52p | SAN PE CA | 310-872-8052 | SDDV | | 3 | 0.00 | 0.00 |
| 05:41p | LOSANG CA | 323-817-8964 | SDDV | | 2 | 0.00 | 0.00 |
| 06:02p | INCOMI CL | 310-872-8052 | SDDV | | 3 | 0.00 | 0.00 |
| 07:17p | INCOMI CL | 310-872-8052 | SDDV | | 2 | 0.00 | 0.00 |
| 07:21p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| Sunday, 09/28 | | | | | | | |
| 05:26a | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 06:26a | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 09:00a | VMAIL CL | 949-439-8867 | SDDV | VM | 1 | 0.00 | 0.00 |
| 09:14a | CMTN G CA | 310-941-8063 | SDDV | | 2 | 0.00 | 0.00 |
| 09:20a | ANAHEI CA | 714-404-4333 | SDDV | | 2 | 0.00 | 0.00 |
| Monday, 09/29 | | | | | | | |
| 09:50a | NEWPOR CA | 949-631-1250 | SDDV | | 2 | 0.00 | 0.00 |

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/A Char |
|------|------|------|------|------|------|------|------|
| Monday, 09/29 | | | | | | | |
| 11:10a | ANAHEI CA | 714-404-4333 | SDDV | | 2 | 0.00 | |
| 11:23a | BEVERL CA | 310-595-4642 | SDDV | | 1 | 0.00 | |
| 12:22p | INCOMI CL | 310-595-4642 | SDDV | | 11 | 0.00 | |
| Tuesday, 09/30 | | | | | | | |
| 03:24p | INCOMI CL | 949-784-2195 | SDDV | | 2 | 0.00 | |
| 03:34p | INCOMI CL | 661-949-2595 | SDDV | | 4 | 0.00 | |
| 04:03p | INCOMI CL | 714-749-2740 | SDDV | | 4 | 0.00 | |
| 04:51p | ANAHEI CA | 714-749-2740 | SDDV | | 2 | 0.00 | |
| 05:44p | INCOMI CL | 310-872-8052 | SDDV | | 4 | 0.00 | |
| 06:34p | HNTNGT CA | 714-916-8752 | SDDV | | 1 | 0.00 | |
| 06:48p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | |
| 06:49p | VMAIL CL | 949-439-8867 | SDDV | VM | 1 | 0.00 | |
| 06:57p | INCOMI CL | 310-872-8052 | SDDV | | 9 | 0.00 | |
| 07:02p | CALL WAIT | 949-200-5342 | SDDV | CW | 1 | 0.00 | |
| 07:13p | INCOMI CL | 909-996-9927 | SDDV | | 1 | 0.00 | |
| 07:16p | INCOMI CL | 909-996-9927 | SDDV | | 2 | 0.00 | |
| 07:39p | INCOMI CL | 909-996-9927 | SDDV | | 2 | 0.00 | |
| 08:45p | INCOMI CL | 714-751-2010 | SDDV | | 1 | 0.00 | |
| 09:12p | INCOMI CL | 714-231-2587 | SDDV | | 1 | 0.00 | |
| Wednesday, 10/01 | | | | | | | |
| 10:04a | INCOMI CL | 714-235-3655 | SDDV | | 1 | 0.00 | |
| 11:08a | INCOMI CL | 714-315-3777 | SDDV | | 17 | 0.00 | |
| 11:29a | INCOMI CL | 714-315-3777 | SDDV | | 3 | 0.00 | |
| 11:36a | BEVERL CA | 310-595-4642 | SDDV | | 1 | 0.00 | |
| 12:28p | SANTA CA | 714-571-5200 | SDDV | | 25 | 0.00 | |
| 01:23p | INCOMI CL | 714-571-5200 | SDDV | | 44 | 0.00 | |
| 03:22p | INCOMI CL | 310-595-4642 | SDDV | | 4 | 0.00 | |
| 03:44p | YORBA CA | 714-312-1064 | SDDV | | 1 | 0.00 | |
| 04:13p | INCOMI CL | 949-201-6011 | SDDV | | 1 | 0.00 | |
| 05:51p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | |
| 05:53p | INCOMI CL | 310-872-8052 | SDDV | | 1 | 0.00 | |
| 05:54p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | |
| 05:55p | NEWPOR CA | 949-230-1592 | SDDV | | 4 | 0.00 | |
| 05:59p | ANAHEI CA | 714-404-4333 | SDDV | | 2 | 0.00 | |
| 06:00p | CALL WAIT | 310-872-8052 | SDDV | CW | 14 | 0.00 | |
| 06:32p | INCOMI CL | 949-784-2195 | SDDV | | 2 | 0.00 | |
| 07:48p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | |
| 07:50p | INCOMI CL | 310-872-8052 | SDDV | | 15 | 0.00 | |
| Thursday, 10/02 | | | | | | | |
| 08:16a | Toll F CL | 800-760-1480 | SDDV | | 7 | 0.00 | |
| 08:31a | Toll F CL | 800-760-1480 | SDDV | | 1 | 0.00 | |
| 08:52a | INCOMI CL | 562-692-3797 | SDDV | | 1 | 0.00 | |
| 09:13a | INCOMI CL | 626-392-7546 | SDDV | | 2 | 0.00 | |
| 09:19a | COV-BA CA | 626-392-7546 | SDDV | | 1 | 0.00 | |
| 09:58a | INCOMI CL | 416-364-1111 | SDDV | | 2 | 0.00 | |
| 10:07a | INCOMI CL | 714-552-3435 | SDDV | | 1 | 0.00 | |
| 10:20a | BLOCKED | 000-000-0000 | SDDV | | 4 | 0.00 | |
| 10:41a | COV-BA CA | 626-260-6548 | SDDV | | 3 | 0.00 | |
| 11:09a | NEWPOR CA | 949-631-1250 | SDDV | | 2 | 0.00 | |
| 11:49a | COV-BA CA | 626-260-6548 | SDDV | | 1 | 0.00 | |
| 11:51a | INCOMI CL | 626-261-3983 | SDDV | | 3 | 0.00 | |
| 12:13p | INCOMI CL | 626-261-3983 | SDDV | | 1 | 0.00 | |
| 01:06p | NEWPOR CA | 949-631-1250 | SDDV | | 3 | 0.00 | |
| 01:31p | INCOMI CL | 310-872-8052 | SDDV | | 6 | 0.00 | |

CONFIDENTIAL

PA - 00187



MICHELE DEL VALLE
PO BOX 15884
NEWPORT BEACH, CA 92659-5884

**Page:** 3 of 18
**Bill Cycle Date:** 11/21/14 - 12/20/
**Account:** 570121752
**Foundation Account:** FAN 00028028

Visit us online at: **www.att.com**

## 714 325-7358
### MICHELE DEL VALLE

**Call Detail**

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Add'l Charges |
|---|---|---|---|---|---|---|---|
| Thursday, 11/20 | | | | | | | |
| 07:57p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| Friday, 11/21 | | | | | | | |
| 07:37a | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 07:48a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 07:54a | INCOMI CL | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 08:14a | INCOMI CL | 213-738-6105 | SDDV | | 4 | 0.00 | 0.00 |
| 09:24a | INCOMI CL | 714-343-2895 | SDDV | | 2 | 0.00 | 0.00 |
| 12:09p | VMAIL  CL | 714-325-7358 | SDDV | VM | 2 | 0.00 | 0.00 |
| 12:11p | ANAHEI CA | 714-320-9562 | SDDV | | 1 | 0.00 | 0.00 |
| 12:11p | HNTNGT CA | 714-330-9562 | SDDV | | 2 | 0.00 | 0.00 |
| 03:49p | NEWPOR CA | 949-645-6545 | SDDV | | 1 | 0.00 | 0.00 |
| 03:50p | NEWPOR CA | 949-646-6545 | SDDV | | 2 | 0.00 | 0.00 |
| 06:40p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 07:58p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| Subtotal | | | | | 20 | 0.00 | 0.00 |

**Rate Code:**
SDDV  = Mobile Share with Unlimited Talk & Text

**Feature Code:**
VM  = VOICE MAIL

## 949 287-2405
### MICHELE DEL VALLE

**Call Detail**

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Add'l Charges |
|---|---|---|---|---|---|---|---|
| Saturday, 11/22 | | | | | | | |
| 05:08p | SAN PE CA | 310-872-8052 | SDDV | | 2 | 0.00 | 0.00 |
| 05:10p | SAN PE CA | 310-872-8052 | SDDV | | 4 | 0.00 | 0.00 |
| Sunday, 11/23 | | | | | | | |
| 04:16p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 06:58p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| Monday, 11/24 | | | | | | | |
| 10:24a | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 11:03a | NEWPOR CA | 949-646-6545 | SDDV | | 2 | 0.00 | 0.00 |
| 11:16a | INCOMI CL | 949-355-0010 | SDDV | | 1 | 0.00 | 0.00 |
| Tuesday, 11/25 | | | | | | | |
| 08:15a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 09:37a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 09:38a | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 12:00p | NEWPOR CA | 949-646-6545 | SDDV | | 1 | 0.00 | 0.00 |
| 12:02p | NEWPOR CA | 949-515-7624 | SDDV | | 2 | 0.00 | 0.00 |
| 02:38p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 04:41p | NEWPOR CA | 949-646-6545 | SDDV | | 5 | 0.00 | 0.00 |
| 04:46p | NEWPOR CA | 949-230-1592 | SDDV | | 9 | 0.00 | 0.00 |
| 05:03p | NEWPOR CA | 949-515-7624 | SDDV | | 3 | 0.00 | 0.00 |

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Add'l Char |
|---|---|---|---|---|---|---|---|
| Tuesday, 11/25 | | | | | | | |
| 05:05p | NEWPOR CA | 949-230-1592 | SDDV | | 6 | 0.00 | |
| 06:58p | SAN PE CA | 310-872-8052 | SDDV | | 9 | 0.00 | |
| Wednesday, 11/26 | | | | | | | |
| 09:47a | MORENO CA | 951-656-1913 | SDDV | | 4 | 0.00 | |
| 11:19a | MORENO CA | 951-656-1913 | SDDV | | 7 | 0.00 | |
| Friday, 11/28 | | | | | | | |
| 08:05a | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | |
| 08:58a | NEWPOR CA | 949-515-7624 | SDDV | | 1 | 0.00 | |
| 09:10a | IRVINE CA | 949-551-9236 | SDDV | | 11 | 0.00 | |
| 09:21a | SAN PE CA | 310-872-8052 | SDDV | | 2 | 0.00 | |
| 11:04a | PLEASA NY | 914-984-1383 | SDDV | | 1 | 0.00 | |
| 11:24a | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | |
| 02:33p | WESTMI CA | 714-222-2098 | SDDV | | 2 | 0.00 | |
| 05:55p | INCOMI CL | 714-222-2098 | SDDV | | 1 | 0.00 | |
| 06:33p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | |
| 06:36p | INCOMI CL | 310-872-8052 | SDDV | | 3 | 0.00 | |
| Saturday, 11/29 | | | | | | | |
| 09:59a | INCOMI CL | 714-222-2098 | SDDV | | 2 | 0.00 | |
| 10:15a | INCOMI CL | 714-222-2098 | SDDV | | 1 | 0.00 | |
| 10:25a | NEWPOR CA | 949-230-1592 | SDDV | | 14 | 0.00 | |
| 01:50p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | |
| Sunday, 11/30 | | | | | | | |
| 07:45a | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | |
| 08:35a | INCOMI CL | 310-872-8052 | SDDV | | 4 | 0.00 | |
| 05:04p | INCOMI CL | 949-606-5329 | SDDV | | 2 | 0.00 | |
| 08:15p | NEWPOR CA | 949-230-1592 | SDDV | | 2 | 0.00 | |
| Monday, 12/01 | | | | | | | |
| 07:47a | INCOMI CL | 213-738-6105 | SDDV | | 2 | 0.00 | |
| 08:46a | SANTA  CA | 657-622-7000 | SDDV | | 6 | 0.00 | |
| 10:51a | INCOMI CL | 949-606-5329 | SDDV | | 4 | 0.00 | |
| 10:55a | Toll F CL | 800-281-9799 | SDDV | | 4 | 0.00 | |
| 11:39a | INCOMI CL | 949-606-5329 | SDDV | | 1 | 0.00 | |
| Tuesday, 12/02 | | | | | | | |
| 10:28a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | |
| 01:41p | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | |
| 01:42p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | |
| 01:54p | LOSANG CA | 213-738-6105 | SDDV | | 4 | 0.00 | |
| 02:06p | NEWPOR CA | 949-230-1592 | SDDV | | 5 | 0.00 | |
| 02:25p | IRVINE CA | 949-233-5513 | SDDV | | 39 | 0.00 | |
| 03:30p | NEWPOR CA | 949-230-1592 | SDDV | | 2 | 0.00 | |
| 08:41p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | |
| Wednesday, 12/03 | | | | | | | |
| 08:23a | NEWPOR CA | 949-645-4898 | SDDV | | 2 | 0.00 | |
| 08:25a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | |
| 01:30p | MORENO CA | 951-656-1913 | SDDV | | 1 | 0.00 | |
| 01:32p | IRVINE CA | 949-233-5513 | SDDV | | 1 | 0.00 | |
| 08:38p | SAN PE CA | 310-872-8052 | SDDV | | 16 | 0.00 | |
| Thursday, 12/04 | | | | | | | |
| 10:41a | Toll F CL | 800-640-2920 | SDDV | | 5 | 0.00 | |
| 11:04a | INCOMI CL | 800-640-2920 | SDDV | | 11 | 0.00 | |
| 01:21p | NEWPOR CA | 949-230-1592 | SDDV | | 18 | 0.00 | |
| 07:22p | INCOMI CL | 909-243-1147 | SDDV | | 1 | 0.00 | |
| 07:26p | NEWPOR CA | 949-230-1592 | SDDV | | 19 | 0.00 | |
| 09:37p | NEWPOR CA | 949-230-1592 | SDDV | | 1 | 0.00 | |

CONFIDENTIAL

PA - 00188



MICHELE DEL VALLE
PO BOX 15884
NEWPORT BEACH, CA 92659-5884

**Page:** 5 of 18
**Bill Cycle Date:** 11/21/14 - 12/20/
**Account:** 570121752
**Foundation Account:** FAN 00028028

Visit us online at: **www.att.com**

## 949 287-2405
### MICHELE DEL VALLE

**Call Detail** - Continued

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Add'l Charges |
|------|-------|--------|------|------|-----|--------|--------|
| Saturday, 12/13 | | | | | | | |
| 11:56a | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 12:11p | VMAIL CL | 949-287-2405 | SDDV | VM | 1 | 0.00 | 0.00 |
| 12:17p | VMAIL CL | 949-287-2405 | SDDV | VM | 2 | 0.00 | 0.00 |
| 12:18p | SAN PE CA | 310-872-8052 | SDDV | | 1 | 0.00 | 0.00 |
| 12:26p | SAN PE CA | 310-872-8052 | SDDV | | 3 | 0.00 | 0.00 |
| 12:28p | MILWAU WI | 414-232-7958 | SDDV | | 1 | 0.00 | 0.00 |
| 01:33p | INCOMI CL | 310-938-3561 | SDDV | | 1 | 0.00 | 0.00 |
| 01:34p | TORRAN CA | 310-938-3561 | SDDV | | 1 | 0.00 | 0.00 |
| 04:14p | NEWPOR CA | 949-230-1592 | SDDV | | 1 | 0.00 | 0.00 |
| Sunday, 12/14 | | | | | | | |
| 07:46a | INCOMI CL | 949-230-1592 | SDDV | | 10 | 0.00 | 0.00 |
| 07:58p | INCOMI CL | 714-912-6964 | SDDV | | 1 | 0.00 | 0.00 |
| Monday, 12/15 | | | | | | | |
| 09:53a | LOSANG CA | 213-738-6105 | SDDV | | 4 | 0.00 | 0.00 |
| 10:30a | NEWPOR CA | 949-720-9422 | SDDV | | 2 | 0.00 | 0.00 |
| 01:01p | ANAHEI CA | 714-404-4333 | SDDV | | 1 | 0.00 | 0.00 |
| 03:19p | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| Tuesday, 12/16 | | | | | | | |
| 08:14a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 09:17a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 11:29a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 12:21p | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 12:36p | NEWPOR CA | 949-230-1592 | SDDV | | 6 | 0.00 | 0.00 |
| 01:19p | LOSANG CA | 213-738-6105 | SDDV | | 4 | 0.00 | 0.00 |
| 01:23p | MORENO CA | 951-656-1913 | SDDV | | 1 | 0.00 | 0.00 |
| 01:27p | IRVINE CA | 949-233-5513 | SDDV | | 1 | 0.00 | 0.00 |
| Wednesday, 12/17 | | | | | | | |
| 08:25a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 09:20a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 09:58a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 10:27a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 10:54a | ORANGE CA | 714-912-6964 | SDDV | | 1 | 0.00 | 0.00 |
| 11:01a | NEWPOR CA | 949-230-1592 | SDDV | | 11 | 0.00 | 0.00 |
| 12:33p | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 06:42p | NEWPOR CA | 949-230-1592 | SDDV | | 2 | 0.00 | 0.00 |
| Thursday, 12/18 | | | | | | | |
| 09:35a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 09:59a | Toll F CL | 877-819-9692 | SDDV | | 1 | 0.00 | 0.00 |
| 10:00a | Toll F CL | 877-819-9692 | SDDV | | 6 | 0.00 | 0.00 |
| 10:26a | Toll F CL | 877-238-0092 | SDDV | | 16 | 0.00 | 0.00 |
| 10:51a | TWIN L MI | 231-828-9451 | SDDV | | 1 | 0.00 | 0.00 |
| 10:57a | INCOMI CL | 949-230-1592 | SDDV | | 14 | 0.00 | 0.00 |
| 12:48p | Toll F CL | 877-929-2637 | SDDV | | 15 | 0.00 | 0.00 |
| 01:03p | Toll F CL | 800-640-2920 | SDDV | | 3 | 0.00 | 0.00 |
| Friday, 12/19 | | | | | | | |
| 11:52a | LOSANG CA | 213-738-6105 | SDDV | | 8 | 0.00 | 0.00 |
| 01:00p | MORENO CA | 951-656-1913 | SDDV | | 1 | 0.00 | 0.00 |
| 04:28p | NEWPOR CA | 949-230-1592 | SDDV | | 14 | 0.00 | 0.00 |
| 06:09p | BLOCKED | 000-000-0000 | SDDV | | 2 | 0.00 | 0.00 |

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/ Cha |
|------|-------|--------|------|------|-----|--------|--------|
| Friday, 12/19 | | | | | | | |
| 06:12p | MORENO CA | 951-656-1913 | SDDV | | 18 | 0.00 | |
| Saturday, 12/20 | | | | | | | |
| 09:32a | NEWPOR CA | 949-230-1592 | SDDV | | 13 | 0.00 | |
| 10:11a | NEWPOR CA | 949-230-1592 | SDDV | | 2 | 0.00 | |
| 08:35p | NEWPOR CA | 949-230-1592 | SDDV | | 21 | 0.00 | |
| Subtotal | | | | | 775 | 0.00 | |

**Rate Code:**
SDDV  = Mobile Share with Unlimited Talk & Text

**Feature Code:**
VM  = VOICE MAIL

**Data Detail**

| Time | To/From | Type/Unit | Rate Code |
|------|---------|-----------|-----------|
| Text Messages | | | |
| Friday, 11/28 | | | |
| 11:03a Rcvd | 914-984-1383 | Text Message | UNLMSG |
| 11:03a Rcvd | 914-984-1383 | Text Message | UNLMSG |
| Wednesday, 12/10 | | | |
| 10:24a Rcvd | 347-391-4862 | Text Message | UNLMSG |
| 10:24a Rcvd | 347-391-4862 | Text Message | UNLMSG |
| 10:32a Rcvd | 347-391-4862 | Text Message | UNLMSG |
| 10:32a Rcvd | 347-391-4862 | Text Message | UNLMSG |
| 10:32a Rcvd | 347-391-4862 | Text Message | UNLMSG |
| Thursday, 12/11 | | | |
| 04:31p Rcvd | 949-254-9099 | MTM TEXT MESSAG | UNLMSG |
| 04:31p Rcvd | 949-254-9099 | MTM TEXT MESSAG | UNLMSG |
| Friday, 12/12 | | | |
| 10:06a Rcvd | 949-254-9099 | MTM TEXT MESSAG | UNLMSG |
| 10:07a Rcvd | 949-254-9099 | MTM TEXT MESSAG | UNLMSG |
| Saturday, 12/13 | | | |
| 09:49a Rcvd | 717-835-4549 | Text Message | UNLMSG |
| Thursday, 12/18 | | | |
| 10:50a Rcvd | 231-828-9451 | Text Message | UNLMSG |
| Saturday, 12/20 | | | |
| 11:44p Rcvd | 719-772-3554 | Text Message | UNLMSG |
| Subtotal for Text Messages: 14 | | | |
| Total Data Detail | | | |

**Rate Code:**
UNLMSG  = Mobile Share Messaging

## 949 439-8867
### MICHELE DEL VALLE

**Call Detail**

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/ Cha |
|------|-------|--------|------|------|-----|--------|--------|
| Friday, 11/21 | | | | | | | |
| 10:24a | INCOMI CL | 310-872-8052 | SDDV | | 1 | 0.00 | |
| 10:31a | INCOMI CL | 310-872-8052 | SDDV | | 2 | 0.00 | |



MICHELE DEL VALLE
PO BOX 15884
NEWPORT BEACH, CA 92659-5884

**Page:** 5 of 23
**Bill Cycle Date:** 12/21/14 - 01/20/
**Account:** 570121752
**Foundation Account:** FAN 00028028

Visit us online at: **www.att.com**

## 949 287-2405
### MICHELE DEL VALLE

**Call Detail** - Continued

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Add'l Charges |
|------|--------------|---------------|-----------|--------------|-----|-----------------|------------------|
| Friday, 01/09 | | | | | | | |
| 03:42p | CALL WAIT | 949-355-0010 | SDDV | CW | 1 | 0.00 | 0.00 |
| 06:39p | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 06:45p | MORENO CA | 951-656-1913 | SDDV | | 8 | 0.00 | 0.00 |
| 06:53p | CALL WAIT | 949-355-0010 | SDDV | CW | 1 | 0.00 | 0.00 |
| 06:59p | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 07:43p | INCOMI CL | 949-439-1725 | SDDV | | 9 | 0.00 | 0.00 |
| 07:57p | LAS VE NV | 702-278-6250 | SDDV | | 1 | 0.00 | 0.00 |
| Saturday, 01/10 | | | | | | | |
| 07:59a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 08:26a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 11:22a | MORENO CA | 951-656-1913 | SDDV | | 1 | 0.00 | 0.00 |
| 03:37p | VMAIL CL | 949-287-2405 | SDDV | VM | 1 | 0.00 | 0.00 |
| 04:49p | NEWPOR CA | 949-230-1592 | SDDV | | 3 | 0.00 | 0.00 |
| Sunday, 01/11 | | | | | | | |
| 08:16a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 08:23a | INCOMI CL | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 08:39a | IRVINE CA | 949-439-1725 | SDDV | | 3 | 0.00 | 0.00 |
| 08:45a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 08:55a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 09:18a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 09:22a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 09:39a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 09:40a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 09:40a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 09:41a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 09:43a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 09:48a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 09:50a | INCOMI CL | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 10:05a | INCOMI CL | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 11:57a | INCOMI CL | 951-296-8752 | SDDV | | 2 | 0.00 | 0.00 |
| 11:59a | NEWPOR CA | 949-230-1592 | SDDV | | 1 | 0.00 | 0.00 |
| 12:12p | INCOMI CL | 949-230-1592 | SDDV | | 6 | 0.00 | 0.00 |
| 12:19p | TEMECU CA | 951-296-8752 | SDDV | | 5 | 0.00 | 0.00 |
| 12:25p | TEMECU CA | 951-296-8752 | SDDV | | 1 | 0.00 | 0.00 |
| 12:25p | INCOMI CL | 951-296-8752 | SDDV | | 3 | 0.00 | 0.00 |
| 03:30p | VMAIL CL | 949-287-2405 | SDDV | VM | 1 | 0.00 | 0.00 |
| Monday, 01/12 | | | | | | | |
| 08:07a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 08:09a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 08:10a | NEWPOR CA | 949-230-1592 | SDDV | | 11 | 0.00 | 0.00 |
| 09:19a | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | 0.00 |
| 09:19a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |
| 10:37a | Toll F CL | 800-275-8777 | SDDV | | 19 | 0.00 | 0.00 |
| 10:56a | Toll F CL | 800-275-8777 | SDDV | | 5 | 0.00 | 0.00 |
| 11:01a | Toll F CL | 800-275-8777 | SDDV | | 18 | 0.00 | 0.00 |
| 11:47a | NEWPOR CA | 949-640-4663 | SDDV | | 2 | 0.00 | 0.00 |
| 11:49a | NEWPOR CA | 949-640-8721 | SDDV | | 5 | 0.00 | 0.00 |
| 12:35p | Toll F CL | 800-222-1811 | SDDV | | 5 | 0.00 | 0.00 |
| 04:39p | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | 0.00 |

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/ Cha |
|------|--------------|---------------|-----------|--------------|-----|-----------------|---------|
| Monday, 01/12 | | | | | | | |
| 04:40p | MORENO CA | 951-656-1913 | SDDV | | 1 | 0.00 | |
| 05:33p | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | |
| 05:42p | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | |
| 06:23p | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | |
| 06:29p | INCOMI CL | 949-439-1725 | SDDV | | 3 | 0.00 | |
| Tuesday, 01/13 | | | | | | | |
| 07:19a | Toll F CL | 888-221-1161 | SDDV | | 5 | 0.00 | |
| 07:24a | Toll F CL | 800-222-1811 | SDDV | | 27 | 0.00 | |
| 08:21a | LOSANG CA | 213-738-6105 | SDDV | | 10 | 0.00 | |
| 11:15a | NEWPOR CA | 949-230-1592 | SDDV | | 2 | 0.00 | |
| 11:38a | INCOMI CL | 949-230-1592 | SDDV | | 8 | 0.00 | |
| 01:53p | INCOMI CL | 818-397-1593 | SDDV | | 2 | 0.00 | |
| 02:18p | LOSANG CA | 213-738-6105 | SDDV | | 1 | 0.00 | |
| 04:40p | NEWPOR CA | 949-230-1592 | SDDV | | 1 | 0.00 | |
| 04:41p | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | |
| 04:46p | UPLAND CA | 909-367-8161 | SDDV | | 2 | 0.00 | |
| 04:48p | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | |
| 04:50p | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | |
| 04:57p | INCOMI CL | 949-230-1592 | SDDV | | 15 | 0.00 | |
| Wednesday, 01/14 | | | | | | | |
| 12:41p | INCOMI CL | 714-381-7974 | SDDV | | 3 | 0.00 | |
| 01:31p | LOSANG CA | 213-738-6105 | SDDV | | 6 | 0.00 | |
| 02:33p | INCOMI CL | 714-381-7974 | SDDV | | 2 | 0.00 | |
| 02:56p | INCOMI CL | 714-381-7974 | SDDV | | 2 | 0.00 | |
| 03:54p | HEMT H CA | 951-260-2217 | SDDV | | 1 | 0.00 | |
| 04:57p | SANTA CA | 714-571-5200 | SDDV | | 5 | 0.00 | |
| 05:32p | IRVINE CA | 949-439-1725 | SDDV | | 6 | 0.00 | |
| Thursday, 01/15 | | | | | | | |
| 08:31a | INCOMI CL | 213-738-6105 | SDDV | | 8 | 0.00 | |
| 09:05a | SANTA CA | 714-571-5200 | SDDV | | 35 | 0.00 | |
| 12:55p | NEWPOR CA | 949-230-1592 | SDDV | | 2 | 0.00 | |
| 04:24p | NEWPOR CA | 949-230-1592 | SDDV | | 5 | 0.00 | |
| 08:20p | MIAMI FL | 786-233-7148 | SDDV | | 1 | 0.00 | |
| 08:21p | MIAMI FL | 786-233-7148 | SDDV | | 1 | 0.00 | |
| Friday, 01/16 | | | | | | | |
| 08:51a | LOSANG CA | 213-738-6105 | SDDV | | 6 | 0.00 | |
| 10:34a | NEWPOR CA | 949-355-0010 | SDDV | | 2 | 0.00 | |
| 11:10a | INCOMI CL | 949-720-9422 | SDDV | | 2 | 0.00 | |
| 11:32a | LOSANG CA | 213-738-6105 | SDDV | | 2 | 0.00 | |
| 03:00p | NEWPOR CA | 949-574-4811 | SDDV | | 1 | 0.00 | |
| 03:37p | NEWPOR CA | 949-574-4811 | SDDV | | 5 | 0.00 | |
| 04:36p | TEMECU CA | 951-296-8752 | SDDV | | 1 | 0.00 | |
| 04:54p | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | |
| 04:56p | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | |
| 04:56p | NEWPOR CA | 949-230-1592 | SDDV | | 9 | 0.00 | |
| 05:47p | NEWPOR CA | 949-673-3524 | SDDV | | 1 | 0.00 | |
| Saturday, 01/17 | | | | | | | |
| 08:47a | IRVINE CA | 949-439-1725 | SDDV | | 1 | 0.00 | |
| 09:11a | INCOMI CL | 949-439-1725 | SDDV | | 2 | 0.00 | |
| 09:45a | INCOMI CL | 714-398-7656 | SDDV | | 4 | 0.00 | |
| 11:08a | INCOMI CL | 951-296-8752 | SDDV | | 2 | 0.00 | |
| 12:50p | INCOMI CL | 702-278-6250 | SDDV | | 1 | 0.00 | |
| 02:17p | INCOMI CL | 949-439-1725 | SDDV | | 1 | 0.00 | |
| 04:20p | INCOMI CL | 714-398-7656 | SDDV | | 3 | 0.00 | |

EXHIBIT "G"

PA - 00191

1  JOSEPH EHRLICH - #84359
   MARK R. MEYER - #238231
2  Losch & Ehrlich - Attorneys at Law
   425 California Street, Suite 2025
3  San Francisco CA 94104
   Telephone:    (415) 956-8400
4  Facsimile:    (415) 956-2150
   Email:        je@losch-ehrlich.com
5                mm@losch-ehrlich.com

6  Attorneys for Defendant
   Resort Vacations, Inc. sued as
7  Global Exchange Vacation Club

8
                    SUPERIOR COURT OF CALIFORNIA
9
                         COUNTY OF ORANGE
10
   MICHELE DEL VALLE, on behalf of herself and   Case No. 30-2014-00745279-CU-MC-CXC
11 all others similarly situated,

12              Plaintiffs,                       **DEFENDANT'S FURTHER RESPONSE
                                                 TO PLAINTIFF'S SPECIAL
13        v.                                     INTERROGATORIES, SET TWO**

14 GLOBAL EXCHANGE VACATION CLUB, a              Complaint Filed:    September 15, 2014
15 California corporation; and DOES 1 through 100, Judge :            Hon. Steven L. Perk
   inclusive
16
17              Defendants.

18
   PROPOUNDING PARTY:    Michele Del Valle ("Plaintiff" or "Propounding Party")
19
   RESPONDING PARTY:     Defendant Global Exchange Vacation Club ("GEVC" or "Responding
20
                         Party" or "Defendant")
21
   SET NUMBER:           Two
22
                         **PRELIMINARY STATEMENT**
23
         The following responses herein are based upon information known by the Responding Party
24
   at this time following a reasonable and good faith effort to obtain such information.  Responding
25
   Party has not completed its investigation of the facts relating to this case.  There may be additional
26
27 persons having knowledge of facts or records containing information which are presently unknown

28

   ─────────────────────────────────────────────────────────
   GEVC's Response to Special Interrogatories, Set Two                    1
   Case No. 30-2014-00745279-CU-MC-CXC

1  to Responding Party.  Accordingly, additional or different information may be discovered and

2  received which may affect the accuracy and or completeness of the responses.

3  **GENERAL OBJECTIONS**

4  (a)  Responding Party objects to the Requests to the extent they purport to alter the requirements

5  of the Rules of Civil Procedure.  Responding Party will comply with the Rules of Civil

6  Procedure in responding to these Requests.

7

8  (b)  Responding Party objects to each Request to the extent that it seeks information protected by

9  the attorney-client privilege, the attorney work product doctrine, any other applicable

10  privilege or protection, or that would result in disclosure of Responding Party's counsel's

11  mental impressions, conclusions, opinions, memoranda, notes or summaries, legal research,

12  or legal theories concerning this or any other litigation.  Any inadvertent production or

13  disclosure of privileged information shall not be deemed to constitute a waiver of privilege.

14

15  (c)  Responding Party objects to each Request to the extent it seeks information from Responding

16  Party that contains sensitive, confidential, competitive, developmental or commercial

17  research information that is of a proprietary nature and/or is protected by other privacy

18  protections provided by applicable laws, rules, and/or regulations.  Any such information

19  shall not be disclosed, or shall be disclosed only pursuant to the terms of a confidentiality

20  agreement in this lawsuit and/or another appropriate protective order.

21

22  (d)  Responding Party objects to each Request to the extent it is vague, overly broad, unduly

23  burdensome, and/or seeks information which is neither relevant nor reasonably calculated to

24  lead to the discovery of admissible evidence.

25  (e)  Responding Party objects to each Request to the extent it imposes an obligation on

26  Responding Party which is greater than that required by the Rules of Civil Procedure.

27  (f)  Responding Party objects to each Request to the extent that it purports to require Responding

28  Party to respond on behalf of any person or entity other than Responding Party.

(g)   Responding Party responds to each Request based on her present knowledge.  Responding Party reserves the right to make any use of and/or introduce in any hearing or at trial, documents or information not known to exist at the time of production.

(h)   To the extent Responding Party asserts a specific objection to a particular Request, Responding Party does not thereby waive these General Objections. To the extent that Responding Party objects to a particular Request, but proceeds to respond to said Request in whole or in part, Responding Party does not thereby waive any objection to the Request.

(i)   Responding Party reserves the right to supplement its responses to any particular Request upon the discovery of additional responsive information.

**SPECIAL INTERROGATORIES**

**SPECIAL INTERROGATORY NO. 15**

Identify the dates and times of all TELEMARKETING CALLS (the term "TELEMARKETING CALLS" is defined as calls soliciting potential or existing customers to purchase, agree to, or otherwise acquire products and services, including but not limited to, hotel stays, vacations, timeshares, or promotional opportunities. This includes offers to attend presentations offering these types of products and services) placed by YOU (the terms "DEFENDANT," "YOU," and "YOUR" refer to Defendant Global Exchange Vacation Club, its directors, officers, employees, members, attorneys, consultants, agents, representatives, predecessors, successors, independent contractors, assignors, assignees, and any person acting on its behalf or at its discretion; it also includes third-parties making calls on behalf of Defendant Global Exchange Vacation Club) to PLAINTIFF'S SECOND CELLULAR TELEPHONE NUMBER (the term "PLAINTIFF'S SECOND CELLULAR TELEPHONE NUMBER" refers to the cellular telephone with the number (949) 287-2405) at any time during the CLASS PERIOD (the term "CLASS PERIOD" is defined as anytime between September 1, 2010 and the present).

1 | **RESPONSE TO SPECIAL INTERROGATORY NO. 15**

2          Specific objections: The request is compound in that it calls for multiple categories of fact

3 | and information with respect to potentially numerous persons. The request is vague, ambiguous,

4 | over-broad, unintelligible, and misleading as to "YOU," as it purports to include persons and entities

5 | that are not the responding party and for whom responding party does not have control over.

6 | Notwithstanding, the following answer is provided:

7          GEVC is a non-profit homeowners association that holds real estate in trust for its members.

8 | GEVC is not involved in the marketing or sale of club memberships and does not directly or

9 | indirectly make phone calls to market club memberships. GEVC does not contract or direct the

10 | marketing or sales of GEVC memberships, including the operations of RVI. RVI is a company

11 | markets and sells memberships in GEVC. Accordingly, GEVC have never made any telemarketing

12 | calls to plaintiff, has not used any automatic dialing system, has no outbound telephone numbers

13 | related to telemarketing to plaintiff or anyone else, has no equipment for making telemarketing calls

14 | to plaintiff or anyone else, and has no employees for making telemarketing calls.

15          Resort Vacations, Inc. (RVI) never called the telephone number 949-287-2405 at any time

16 | from September 1, 2010 through the present. Responding party is informed and believed that third

17 | party Intervoice Technologies (IVT) called 949-287-2405 January 15, 2015, but did not connect.

18 | Responding party has no knowledge as to what the outgoing Caller ID for this call was. After a

19 | good faith inquiry, responding party does not know of any other calls made to 949-287-2405.

20 | **SPECIAL INTERROGATORY NO. 16**

21          Identify all outgoing telephone numbers, including area codes, used by YOU to place

22 | TELEMARKETING CALLS to PLAINTIFF'S SECOND CELLULAR TELEPHONE NUMBER at

23 | any time during the CLASS PERIOD.

24 | **RESPONSE TO SPECIAL INTERROGATORY NO. 16**

25          Specific objections: The request is vague, ambiguous, over-broad, unintelligible, and

26 | misleading as to "YOU," as it purports to include persons and entities that are not the responding

27 | party and for whom responding party does not have control over. Notwithstanding, the following

28 | answer is provided:

1    GEVC is a non-profit homeowners association that holds real estate in trust for its members.

2 GEVC is not involved in the marketing or sale of club memberships and does not directly or

3 indirectly make phone calls to market club memberships.  GEVC does not contract or direct the

4 marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a company

5 markets and sells memberships in GEVC.  Accordingly, GEVC have never made any telemarketing

6 calls to plaintiff, has not used any automatic dialing system, has no outbound telephone numbers

7 related to telemarketing to plaintiff or anyone else, has no equipment for making telemarketing calls

8 to plaintiff or anyone else, and has no employees for making telemarketing calls.

9    Resort Vacations, Inc. (RVI) never called the telephone number 949-287-2405 at any time

10 from September 1, 2010 to the date of this response.  Responding party is informed and believes that

11 no other person making any calls on behalf or at the direction of RVI or Global Exchange Vacation

12 Club.  Accordingly, there are no outgoing telephone numbers to identify.

13 **SPECIAL INTERROGATORY NO. 17**

14    Identify the equipment (including the manufacturer and model) used by YOU to place

15 TELEMARKETING CALLS to PLAINTIFF'S SECOND CELLULAR TELEPHONE NUMBER at

16 any time during the CLASS PERIOD.

17 **RESPONSE TO SPECIAL INTERROGATORY NO. 17**

18    Specific objections: The request is vague, ambiguous, over-broad, unintelligible, and

19 misleading as to "YOU," as it purports to include persons and entities that are not the responding

20 party and for whom responding party does not have control over.  Notwithstanding, the following

21 answer is provided:

22    GEVC is a non-profit homeowners association that holds real estate in trust for its members.

23 GEVC is not involved in the marketing or sale of club memberships and does not directly or

24 indirectly make phone calls to market club memberships.  GEVC does not contract or direct the

25 marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a company

26 markets and sells memberships in GEVC.  Accordingly, GEVC have never made any telemarketing

27 calls to plaintiff, has not used any automatic dialing system, has no outbound telephone numbers

28 related to telemarketing to plaintiff or anyone else, has no equipment for making telemarketing calls

GEVC's Response to Special Interrogatories, Set Two
Case No. 30-2014-00745279-CU-MC-CXC    5
PA - 00196

1    to plaintiff or anyone else, and has no employees for making telemarketing calls.

2           Resort Vacations, Inc. (RVI) never called the telephone number 949-287-2405 at any time

3    from September 1, 2010 to the date of this response.  Responding party is informed and believes that

4    no other person making any calls on behalf or at the direction of RVI or Global Exchange Vacation

5    Club.  Accordingly, there is no equipment to identify.

6           In a further effort to provide a good faith response, the following equipment is used, in

7    general:

8           RVI uses phones, Polycom 335, and does not know of any other equipment used during the

9    class period.

10          A third party vendor of RVI, InterVoice Technologies, uses Vicidial Software in a

11   configuration that does not permit automatic dialing.  Responding party does not know of any other

12   equipment used during the class period.

13          A third party vendor of RVI, Marketing Solutions, International, uses Vicidial Software in a

14   configuration that does not permit automatic dialing.  Responding party does not know of any other

15   equipment used during the class period.

16          A third party vendor of RVI, Kaleo Marketing, uses Polycom phones.  Responding party

17   does not know of any other equipment used during the class period.

18          Further, RVI despite a good faith effort to obtain information from third parties, RVI lacks

19   any further information regarding any other equipment used by any business entities that may fall

20   within the overbroad and misleading definition of "YOU."

21   **SPECIAL INTERROGATORY NO. 18**

22          Identify all YOUR employees (including their name, contact information, and address) who

23   placed TELEMARKETING CALLS to PLAINTIFF'S SECOND CELLULAR TELEPHONE

24   NUMBER at any time during the CLASS PERIOD.

25   **RESPONSE TO SPECIAL INTERROGATORY NO. 18**

26          Specific objections:  The request is vague, ambiguous, over-broad, unintelligible, and

27   misleading as to "YOU," as it purports to include persons and entities that are not the responding

28   party and for whom responding party does not have control over.  Notwithstanding, the following

1  answer is provided:

2        GEVC is a non-profit homeowners association that holds real estate in trust for its members.

3  GEVC is not involved in the marketing or sale of club memberships and does not directly or

4  indirectly make phone calls to market club memberships.  GEVC does not contract or direct the

5  marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a company

6  markets and sells memberships in GEVC.  Accordingly, GEVC have never made any telemarketing

7  calls to plaintiff, has not used any automatic dialing system, has no outbound telephone numbers

8  related to telemarketing to plaintiff or anyone else, has no equipment for making telemarketing calls

9  to plaintiff or anyone else, and has no employees for making telemarketing calls.

10        Resort Vacations, Inc. (RVI) never called the telephone number 949-287-2405 at any time

11  from September 1, 2010 to the date of this response.  Responding party is informed and believes that

12  no other person making any calls on behalf or at the direction of RVI or Global Exchange Vacation

13  Club.  Accordingly, there are no employees to identify.  Despite a good faith effort, no further

14  information is available.

15  **SPECIAL INTERROGATORY NO. 19**

16        State all facts supporting YOUR contention that Plaintiff consented to receive

17  TELEMARKETING CALLS from YOU on PLAINTIFF'S SECOND CELLULAR TELEPHONE

18  NUMBER.

19  **RESPONSE TO SPECIAL INTERROGATORY NO. 19**

20        Specific objections:  The request is vague, ambiguous, over-broad, unintelligible, and

21  misleading as to "YOU," as it purports to include persons and entities that are not the responding

22  party and for whom responding party does not have control over.  The request is ambiguous and

23  unintelligible as to "YOUR contention" in that no such contention has been made by each of the

24  persons within the over-broad definition of "YOUR."  Notwithstanding, the following answer is

25  provided:

26        GEVC is a non-profit homeowners association that holds real estate in trust for its members.

27  GEVC is not involved in the marketing or sale of club memberships and does not directly or

28  indirectly make phone calls to market club memberships.  GEVC does not contract or direct the

1  marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a company

2  markets and sells memberships in GEVC.  Accordingly, GEVC have never made any telemarketing

3  calls to plaintiff, has not used any automatic dialing system, has no outbound telephone numbers

4  related to telemarketing to plaintiff or anyone else, has no equipment for making telemarketing calls

5  to plaintiff or anyone else, and has no employees for making telemarketing calls.

6      Resort Vacations, Inc. (RVI) never called the telephone number 949-287-2405 at any time

7  from September 1, 2010 to the date of this response.  Responding Party is not aware of any consent

8  to call 949-287-2405. Despite a good faith effort, no further information is available.

9  **SPECIAL INTERROGATORY NO. 20**

10      Identify the nature of YOUR business relationship with Resort Vacations, Inc.

11  **RESPONSE TO SPECIAL INTERROGATORY NO. 20**

12      Specific objections:  The request is vague, ambiguous, over-broad, unintelligible, and

13  misleading as to "YOU," as it purports to include persons and entities that are not the responding

14  party and for whom responding party does not have control over.  The request is also, therefore,

15  compound because it purports to request information concerning the relationship between

16  "attorneys," "employees," "independent contractors," and others and RVI.

17  Notwithstanding, the following answer is provided:

18      GEVC is a non-profit homeowners association that holds real estate in trust for its members.

19  GEVC is not involved in the marketing or sale of club memberships and does not directly or

20  indirectly make phone calls to market club memberships.  GEVC does not contract or direct the

21  marketing or sales of GEVC memberships, including the operations of RVI.  RVI is a company

22  markets and sells memberships in GEVC.

23      RVI also contracts with some vendors to provide prospective customers at sales centers for

24  tours to hear a timeshare presentation.  RVI does not control the means or methods of the

25  independent contractors, but understands that the contractors will call persons as part of their efforts

26  to provide prospective customers.

27

28

1

2

3  Dated:   5-18-2015

4

5  LOSCH & EHRLICH

6  By: _____

7  Joseph Ehrlich
   Mark R. Meyer
   Attorneys for Defendant
   Resort Vacations, Inc. sued as
   Global Exchange Vacation Club

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

VERIFICATION
(Code of Civil Procedure. §§ 446, 2015.5)

2

3       I, Richard Sargent, am the President of Defendant Resort Vacations, Inc., in the above-

4   entitled action.  I have read the responses set forth in:

5       **DEFENDANT'S <u>FURTHER</u> RESPONSE TO PLAINTIFF'S SPECIAL
        INTERROGATORIES, SET TWO**

6

7   and know the contents thereof.  The same is true of my own knowledge, except as to those matters

8   which are therein stated on information and belief, and, as to those matters, I believe them to be true.

9   I declare under penalty of perjury under the laws of the State of California that the foregoing is true

10  and correct:

11      Dated:  4/13/16

12                                                      Richard Sargent

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PA - 00201

PROOF OF SERVICE
(C.C.P. §§ 1013a, 2015.5)

I, the undersigned, declare:

I am employed in the City and County of San Francisco. I am over the age of eighteen (18) and not a party to the within cause. My business address is 425 California Street, Suite 2025, San Francisco, California, 94104.

On **May 18, 2015**, I served the attached document(s):

**DEFENDANT'S FURTHER RESPONSE TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET TWO**

On the party(s) to this action by sending a true copy thereof, addressed as follows:

/ x /   (BY E-MAIL) I caused such documents to be delivered by e-mail to the addressee(s) as noted below:

/ x /   (BY MAIL) I caused such envelope(s), with postage thereon fully prepaid, on the date of execution of this declaration, to be placed for collection and mailing in the U.S. Postal Service following ordinary business practices. I am readily familiar with these said business practices for collection and processing of documents for mailing and said document(s) was/were deposited with the U.S. Postal Service the same day in the ordinary course of business in San Francisco, San Francisco County, California.

R. Rex Parris, Esq.
John Bickford, Esq.
R. REX PARRIS LAW FIRM
43364 10th Street West
Lancaster, CA 93534
jbickford@rrexparris.com

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed on **May 18, 2015**, at San Francisco, California.

Olivia Bivens

Exhibit "H"

 **PARRIS**

43364 10th Street West, Lancaster, CA 93534
Tel: 661 949 2595  Fax: 661 949 7524
www.parrislawyers.com

December 5, 2016

**SENT VIA MAIL AND E-MAIL**
Joseph Ehrlich
LOSCH & EHRLICH
425 California Street, Suite 2025
San Francisco, CA 94104

> Re:    *Michele Del Valle v. Global Exchange Vacation Club*, No. 18:16-cv-02149
> Local Rule 7-3 Meet and Confer

Mr. Ehrlich:

We write to meet and confer pursuant to Central District Local Rule 7-3 on Plaintiff Michele Del Valle's ("Plaintiff") forthcoming Motion for Class Certification.

Plaintiff's motion will be substantially similar to the certification motion she filed in state court. Please refer to that motion and her opposition to Defendant Global Exchange Vacation Club's Motion to Strike Class Allegations for her arguments.

In order to avoid filing this motion, we ask that you stipulate to certification so that we can proceed to the merits of the case. Since the rule asks the parties to preferably meet and confer *in person*, we will give you a call tomorrow to discuss.

Thank you,

**PARRIS LAW FIRM**

John M. Bickford

Attorneys for Plaintiff and the
Putative Class

LANCASTER | LOS ANGELES | COSTA MESA

R. Rex Parris | Robert A. Parris (Of Counsel) | Alexander R. Wheeler | Jason P. Fowler | Kitty K. Szeto | Bruce L. Schechter | Patricia K. Oliver | Ryan K. Kahl
Breanna L. Schultz | John M. Bickford | Jonathan W. Douglass | Sean J. Lowe | Eric N. Wilson | Bernadette N. Manigault | Khail A. Parris | Brittney M. Schneider

PA - 00204

EXHIBIT "I"

PA - 00205



43364 10ᵗʰ Street West, Lancaster, CA 93534
Tel: 661 949 2595  Fax: 661 949 7524
www.parrislawyers.com

December 6, 2016

**SENT VIA MAIL AND E-MAIL**

Joseph Ehrlich
Mark R. Meyer
LOSCH & EHRLICH
425 California Street, Suite 2025
San Francisco, CA 94104

       Re:   *Michele Del Valle v. Global Exchange Vacation Club*, No. 18:16-cv-02149
                    Local Rule 7-3 Meet and Confer

Counsel:

       This letter confirms that, on December 6, 2016, the parties met and conferred telephonically on Plaintiff's forthcoming Motion for Class Certification, and that the parties agree that Plaintiff has satisfied her obligations under Central District Local Rule 7-3.

                            Thank you,

                            **PARRIS LAW FIRM**

                            John M. Bickford

                            Attorneys for Plaintiff and the
                            Putative Class

LANCASTER I LOS ANGELES I COSTA MESA

R. Rex Parris | Robert A. Parris (Of Counsel) | Alexander R. Wheeler | Jason P. Fowler | Kitty K. Szeto | Bruce L. Schechter | Patricia K. Oliver | Ryan K. Kahl
Breanna L. Schultz | John M. Bickford | Jonathan W. Douglass | Sean J Lowe | Eric N. Wilson | Bernadette N. Manigault | Khail A. Parris | Brittney M. Schneider

PA - 00206

EXHIBIT "3"

R. Rex Parris (SBN 96567)
Kitty K. Szeto (SBN 258136)
John M. Bickford (SBN 280929)
Eric N. Wilson (SBN 291815)
**R. REX PARRIS LAW FIRM**
43364 10th Street West
Lancaster, California 93534
Telephone:   (661) 949-2595
Facsimile:    (661) 949-7524

Attorneys for Plaintiff and the Putative Class

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

MICHELE DEL VALLE; an individual, for herself and all members of the putative class,

        Plaintiff,

    v.

GLOBAL EXCHANGE VACATION CLUB, a California Corporation, and DOES 1 through 100, inclusive,

        Defendants.

Case No.: 30-2014-00745279-CU-MC-CXC

[Assigned for all purposes to the Honorable Thierry Patrick Colaw, Dept. CX105]

**CLASS ACTION**

**DECLARATION OF MICHELE DEL VALLE**

DECLARATION OF MICHELE DEL VALLE

## DECLARATION OF MICHELE DEL VALLE

I, Michele Del Valle, declare as follows:

1.      I am over eighteen years of age and a resident of Orange County, California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.      My interests as a named plaintiff in this lawsuit are not adverse to the interests of the other putative class members.

3.      I have always put the best interests of the other potential class members first while performing my duties as a potential class representative. I have been committed to strongly prosecuting this case on behalf of myself and the other potential class members. I have always been in contact with my attorneys to keep updated on what is going on in this case, to answer any questions about my experience with Defendant Global Exchange Vacation Club ("GEVC"), to answer discovery questions, and to have my deposition taken for an entire day. I believe I have demonstrated my ability to advocate the interest of the other employees by starting this lawsuit on their behalf, helping my attorneys with their investigation and discovery, and having my deposition taken by GEVC's attorneys.

4.      I seek to be a class representative for this lawsuit. I understand that class representatives:

      a.      represent the interests of all members of the class in litigation;

      b.      have claims that are similar of those of the class and have been injured by the same acts by GEVC;

      c.      consider the interests of the class just as they would consider their own interests and in some cases must put the interests of the class before their own interests;

      d.      actively participate in the lawsuit, as necessary, by, among other things, answering discovery questions, producing documents to GEVC, and giving deposition and trial testimony if required;

      e.      may be required to travel to give such testimony;

1

PA - 00209

  f. recognize and accept that any resolution of the lawsuit, by dismissal or settlement, is subject to court approval, and must be designed in the best interest of the class as a whole;

  g. are not required to be particularly sophisticated or knowledgeable about the subject of the lawsuit;

  h. should follow the progress of the lawsuit and should provide all relevant facts to the lawyers for the class; and

  i. volunteer to represent or champion many other people with similar claims and injuries because of the importance of the case and the need that all class members benefit from the lawsuit equally, and as a result, the savings of time, money and effort should benefit all parties and the court.

5. To date, I have performed several tasks in my role as a class representative, including:

  a. meeting with my attorneys to discuss the facts of the case;

  b. reviewing documents;

  c. reviewing and responding to written discovery;

  d. providing deposition testimony; and

  e. keeping regular contact with my attorneys regarding the status of the lawsuit and providing my counsel with any information or documents they request.

6. It is my understanding that the class members are similarly positioned with respect to the issues in this case and their experiences with GEVC's common course of conduct and practices.

7. It is my understanding that class actions help to ensure compliance with the law, especially where injury to any one individual may be relatively small compared to possible legal fees associated with pursuing one's claim.

8. I do not have any interests which are inconsistent with or adverse to the interests of the class and I will make an adequate class representative. I have brought this lawsuit on behalf of myself and all others similarly situated to correct legal wrongs I believe GEVC has committed and is still committing. The legal and factual issues that pertain to the class are typical of my own legal and factual issues with GEVC.

2

DECLARATION OF MICHELE DEL VALLE

1     9.     I declare under penalty of perjury under the laws of the State of California that the

2   foregoing is true and correct.

3       Executed on this ___ day of October 2016, at Costa Mesa, California

4

5       _____

6                    Michele Del Valle

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

DECLARATION OF MICHELE DEL VALLE

EXHIBIT "4"

1   R. Rex Parris (SBN 96567)
    Kitty K. Szeto (SBN 258136)
2   John M. Bickford (SBN 280929)
    Eric N. Wilson (SBN 291815)
3   **R. REX PARRIS LAW FIRM**
    43364 10th Street West
4   Lancaster, California 93534
    Telephone:  (661) 949-2595
5   Facsimile:   (661) 949-7524

6   Attorneys for Plaintiff and the Putative Class

7

8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                                **COUNTY OF ORANGE**

10  MICHELE DEL VALLE; an individual, for        )   Case No.: 30-2014-00745279-CU-MC-CXC
    herself and all members of the putative class, )
11                                                 )   [Assigned for all purposes to the Honorable
              Plaintiff,                           )   Thierry Patrick Colaw, Dept. CX105]
12                                                 )
         v.                                        )   **CLASS ACTION**
13                                                 )
    GLOBAL EXCHANGE VACATION CLUB, a               )   **DECLARATION OF R. REX PARRIS**
14  California Corporation, and DOES 1 through     )
    100, inclusive,                                )
15                                                 )
              Defendants.                          )
16                                                 )
                                                   )
17                                                 )
                                                   )
18                                                 )
                                                   )
19                                                 )
                                                   )
20                                                 )
                                                   )
21                                                 )
22

23

24

25

26

27

28

                              DECLARATION OF R. REX PARRIS

<u>**DECLARATION OF R. REX PARRIS**</u>

I, R. Rex Parris, declare as follows:

1.      I am an attorney duly licensed to practice before all courts of the State of California and I am a principal in, and founding partner of, the R. Rex Parris Law Firm, attorneys of record for Plaintiff Michele Del Valle ("Plaintiff"). This declaration is submitted in support of Plaintiff's Motion for Class Certification. The facts set forth in this declaration are within my personal knowledge and, if called as a witness, I could and would competently testify as follows.

2.      The R. Rex Parris Law Firm has been actively engaged in this litigation since its inception. I, along with Kitty K. Szeto, John M. Bickford, Eric N. Wilson, and staff members in our firm have fully and actively participated in the litigation of this case.

3.      I have practiced law in California since December of 1980, and have handled, as class counsel, numerous significant wage-and-hour class action cases.

4.      The R. Rex Parris Law Firm is actively involved in both class action and complex litigation matters on an ongoing basis. Our firm specializes in complex class action litigation and severe, catastrophic personal injury and wrongful death matters.

5.      The R. Rex Parris Law Firm has certified numerous wage-and-hour class actions in the Superior Courts of Los Angeles County, San Francisco County, Orange County, and Kern County, as well as the United States District Court for the Central and Northern Districts of California. Our firm also has experience in appellate practice and has settled numerous class actions worth hundreds of millions of dollars on behalf of tens of thousands of California employees. Our firm has been court-appointed class counsel in multiple cases in California state and federal courts. Our firm resume, a true and correct copy of which is attached hereto as **Exhibit "A,"** accurately describes our firm's class action practice.

6.      The R. Rex Parris Law Firm also has trial experience in class actions. In August 2014, our firm obtained a $4,335,000.00 jury verdict with punitive damages in a consumer fraud class action in the San Bernardino Superior Court, which was ranked in *The Recorder's Top California Verdicts of 2014* as the second largest million dollar fraud verdict in California in 2014. Our firm first chaired the trial.

1

PA - 00214

7.    Additionally, I was litigation and lead trial counsel in *Marciano v. Fahs*, Los Angeles Case No. BC 375824, which resulted in the highest jury verdict of 2009.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this  4  day of October 2016, at Lancaster, California.

R. Rex Parris

DECLARATION OF R. REX PARRIS

PA - 00215

EXHIBIT "A"

# R. REX PARRIS LAW FIRM – SELECTED CLASS ACTION EXPERIENCE

➢ *Gutierrez vs. State Farm*, Los Angeles Superior Court Case No. BC 236552
- Plaintiffs' counsel in class action seeking overtime compensation for insurance claims adjusters employed by defendant in the State of California.   Certification granted, and then summary adjudication as to liability granted in favor of the class.  Case settled in 2004 for **$135,000,000.00**, with Final Approval granted in Department 309 and no objections filed.

➢ *Sekly vs. Allstate Insurance Company*, Los Angeles Superior Court Case No. BC240813
- Plaintiffs' counsel in class action seeking overtime compensation for insurance claims adjusters employed by defendant in the State of California.   Certification granted, and then summary adjudication as to liability granted in favor of the class.  Case settled in 2005 for **$120,000,000.00**, with Final Approval granted in Department 309 and no objections filed.

➢ *CNA Class Action Litigation*, Los Angeles Superior Court Case No. BC242487, Orange County Superior Court Case No. 01CC08868
- Plaintiffs' counsel in class action misclassification case seeking overtime compensation for insurance claims adjusters employed by defendant in the State of California.  Case settled in 2005 for **$33,000,000.00**, with Final Approval granted and no objections filed.

➢ *Parris v. Lowe's Home Improvement*, Los Angeles Superior Court Case No. BC260702
- Plaintiffs' counsel in class action seeking payment of "off the clock" hours worked by all hourly employees of Lowe's in the State of California.  Class certification ordered by the Court of Appeal. Case settled in 2009 for **$29,500,000.00**, with Final Approval granted and no objections filed.

➢ *Chavoya v. Southern California Edison Company*, Los Angeles County Superior Court Case No. BC366032 and BC425358
- Plaintiffs' counsel in class action seeking overtime compensation for employees that were reclassified in February 2006 that were not employed at Edison's San Onofre Nuclear Generator facility.  Class certification granted, in part, by the trial court.  Class was provisionally certified for settlement purposes.  Case settled in 2010 for **$29,000,000.00**, with Final Approval granted and no objections filed.

➢ *Roberts vs. Coast National Insurance*, Orange County Superior Court Case No 01CC08478
- Plaintiffs' counsel in class action seeking overtime compensation for insurance claims adjusters employed by defendant in the State of California.  Certification granted, and then the matter was tried in biding arbitration.  Case settled for in excess of **$18,000,000.00** during arbitration.

➢ *Dotson vs. Royal Sun Alliance*, Orange County Superior Court Case No. 02CC01787
- Plaintiffs' counsel in class action seeking overtime compensation for insurance claims adjusters employed by defendant in the State of California.  Case settled in 2005 for **$12,300,000.00** with Final Approval granted and no objections filed.

➢ *Ingalls v. Hallmark*, Central District of California Case Nos. CV08-04342-VBF (Ex) C/W; CV08-05330-VBF (FFMx)
- Plaintiffs' counsel in class action seeking payment of "off the clock" hours worked by all hourly employees of Hallmark in the State of California.  Class was provisionally certified.  Case settled in 2009 for **$5,625,000.00**, with Final Approval granted and no objections filed.

➤ ***Rodriguez v. Pacific Bell Telephone Company***, Los Angeles County Superior Court Case No. BC415309
  - Plaintiffs' counsel in class action seeking overtime compensation for employees employed by defendant in the State of California that were reclassified in May 2009.  Class was provisionally certified.  Case settled in 2010 for **$5,500,000.00**, with Final Approval granted and no objections filed.

➤ ***Kim v. Jamison***, Los Angeles County Superior Court Case No. BC400414
  - Plaintiffs' counsel in misclassification class action seeking overtime compensation for all salaried exempt employees (except for high-level management and Receptionists) employed by defendant in the State of California.  Class was provisionally certified.  Case settled in 2009 for **$2,797,861.24**, with Final Approval granted and no objections filed.

➤ Additionally, the R. Rex Parris Law Firm is presently lead plaintiff's counsel in numerous pending consumer and employment class action cases in California, Texas and the District of Columbia.  The R. Rex Parris Law Firm recently obtained a $370 million defamation verdict, Top Verdict in 2009, in *Marciano v. Fahs, et al.*, in the Los Angeles Superior Court Case No. BC375824.

PA - 00218

EXHIBIT "5"

R. Rex Parris (SBN 96567)
Kitty K. Szeto (SBN 258136)
John M. Bickford (SBN 280929)
Eric N. Wilson (SBN 291815)
**R. REX PARRIS LAW FIRM**
43364 10th Street West
Lancaster, California 93534
Telephone:    (661) 949-2595
Facsimile:    (661) 949-7524

Attorneys for Plaintiff and the Putative Class

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF ORANGE

| | |
|---|---|
| MICHELE DEL VALLE; an individual, for herself and all members of the putative class, | Case No.: 30-2014-00745279-CU-MC-CXC |
| Plaintiff, | [Assigned for all purposes to The Honorable Thierry Patrick Colaw, Dept. CX105] |
| v. | **CLASS ACTION** |
| GLOBAL EXCHANGE VACATION CLUB, a California Corporation, and DOES 1 through 100, inclusive, | **DECLARATION OF JEFFREY A. HANSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| Defendants. | |

PA - 00220

## DECLARATION OF JEFFREY A. HANSEN

I, Jeffrey A. Hansen, declare:

1.     My name is Jeffrey A. Hansen.  I am an adult over the age of 18, a resident of the state of California, and I reside at 2625 Kings View Circle, Spring Valley, CA 91977.  Unless indicated otherwise, I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

2.     I was asked to prepare this written expert report by Plaintiff's counsel in the above-captioned matter, R. Rex Parris Law Firm, in support of Plaintiff's Motion for Class Certification.

3.     I have been retained in this case at a rate of $300 per hour, for all services rendered, and $380 per hour for depositions.

### Experience and Credentials

4.      I am the principal of Hansen Legal Technologies, Inc.  My firm is in the business of handling Information Technology, including investigations and analysis of electronic data.  I have served as an expert or consultant in more than 150 TCPA class action lawsuits, and as an expert or consultant in numerous other civil cases.

5.     With regard to my experience as an expert and consultant in legal matters, generally, I have frequently served as an expert witness and consultant to law firms in conducting computer forensic analysis.  I have also assisted in electronic discovery issues.

6.     Specific to this case, my firm was retained to assist Plaintiff's counsel in evaluating and analyzing the telephone dialing systems used by Defendant Global Exchange Vacation Club in placing telephone calls to Plaintiff.  I have also been retained to assist Plaintiff and her counsel in evaluating and analyzing electronic data related to the calls and other electronic data associated with computer systems and/or telephone dialing systems used by Global Exchange Vacation Club.  In that respect, I have extensive experience with data warehousing, including data warehousing related to telemarketing and autodialers in general.  I am familiar with the procedures involved in such practices, and I have personally engaged in data warehousing regarding the compilation of certain lists, including

1

demographic and target audience lists for telemarketing, and have personally repaired defective lists to eliminate improperly formatted and corrupted data.

7.       I also frequently act as a consultant to companies that engage in the use of autodialers, and I am familiar with their use and procedures, and the technical aspects of that business.  In that capacity, I have assembled, configured, maintained, operated all aspects of autodialers, and interfaced with the telecommunications providers through whose networks the autodialers operate.

8.       I have set up and maintained all aspects of predictive dialers and autodialers, from predictive dialers operating with just three telephone lines to outbound call centers capable of generating over 1 million calls per hour.  When building these systems, I have used various software and hardware solutions for predictive and autodialers, both proprietary and open source, and customized those systems for their particular uses.  I myself have used and maintained predictive and autodialers, and trained others to do the same.

9.       Further, I am familiar with the manner in which outbound dial lists are used and maintained in the telemarketing industry in which Global Exchange Vacation Club operates.  Similarly, I am familiar and have experience with, and know how to use, databases containing cell block identifiers and ported number lists, both of which identify cellular type telephone numbers and are typically used in these industries.

10.      Over the last twenty-seven (27) years, I have also had extensive experience in a broad range of other areas in the electronic and information technology fields and obtained many certifications such as MCP 4.0, A+, Network+, MCP 2000, MCSA, MCSE, Linux+, I-Net+, Security+, CIW Security Analyst.  From the hardware perspective, I have extensive experience in troubleshooting and repairing at the component level, and building various systems for various purposes.  I have designed, built and maintained computer networks in a variety of environments from commercial businesses to very large DoD networks.  I have taught approximately 1,000 others the skills to become computer network engineers themselves.  I have had extensive experience in dealing with security breaches and hardening computer networks against those breaches.  I have handled many computer forensic and E-Discovery matters, including internal investigations in companies, working at the FBI sponsored Regional Computer Forensics Laboratory, and founding a computer forensics and E-

2

1   Discovery firm over 9 years ago.  I have also had extensive experience with the set-up and use of
2   predictive and auto dialers.  (See Exhibit A – Resume of Jeffrey A. Hansen.)

3       11.      I have been called to testify in the following civil matters:  *Craig Casey v. Valley Center*
4   *Insurance Agency Inc.,* Case No. 37-2008-00004378-SC-SC-CTL (San Diego Superior Court); *Stemple*
5   *v. QC Holdings, Inc.,* Case No. 12-CV-1997-CAB-WVG (S.D. Cal.); *Hahn v. Massage Envy*
6   *Franchising*, Case No: 3:12-cv-00153-DMS-BGS (S.D. Cal.); *Abdeljalil v. General Electric Capital*
7   *Corporation,* Case No: 12-cv-02078-JAH-MDD (S.D. Cal.); *Jasminda Webb v. Healthcare Revenue*
8   *Recovery Group, LLC,* Case No: C 13-0737 JD (N.D. Cal.); *Balschmiter v TD Auto Finance, LLC,* Case
9   No: 2:13-cv-01186 (E.D. Wisc.); *Jordan Marks v Crunch San Diego, LLC,* Case No. 14-CV-0348-BAS
10  (BLM) (S.D. Cal.); *Peter Olney v Job.com,* Case No: 1:12-cv-01724-LJO-SKO (E.D. Cal.); *Carlos*
11  *Guarisma v ADCAHB Medical Coverages, Inc. and Blue Cross and Blue Shield of Florida, Inc.*, Case
12  No: 1:13-cv-21016-JLK (S.D. Fla.); *Farid Mashiri v Ocwen Loan Servicing, LLC*, Case No: 3:12-cv-
13  02838 (S.D. Cal.); *Monty J. Booth, Attorney at Law, P.S. v Appstack, Inc.*, Case No. 2:13-cv-01533-JLR
14  (W.D. Wash.); *Rinky Dink, Inc. d/b/a Pet Stop v World Business Lenders, LLC*, Case No. 2:14-cv-
15  00268-JCC (W.D. Wash.); *Michael Reid and Dave Vacarro v. I.C. Sytems, Inc*., Case No. 2:12-cv-
16  02661-ROS (D. Ariz.); *Jeffrey Molar v NCO Financial Systems*, Case No. 3:13-cv-00131-BAS-JLB
17  (S.D. Cal.); *Latonya Simms v Simply Fashion Stores LTD, and ExactTarget, Inc.,* Case No. 1:14-CV-
18  00737-WTL-DKL (D. Ind.); *Sueann Swaney v Regions Bank*, Case No. CV-13-RRA-0544-S (N.D.
19  Ala.); *Hooker v SiriusXM,* Case No. 4:13-cv-00003 (AWA) (E.D. Va.); *Diana Mey v Frontier*
20  *Communications*, Case No. 13-cv-01191-RNC (D. Conn.); *Rachel Johnson v Yahoo! Zenaida Calderin*
21  *v Yahoo!,* Case No. 14-cv-2028 14-cv-2753 (N.D. IL); *Philip Charvat v Elizabeth Valente*, Case No. 12-
22  cv-5746 (N.D. IL); *Robert Zani v Rite Aid Hdqtrs. Corp*., Case No. 14-cv-9701(AJN)(RLE) (S.D.N.Y.);
23  *A.D. v Credit One Bank,* Case No. 1:14-cv-10106 (N.D. IL); *Oerge Stoba, and Daphne Stoba v*
24  *Saveology.com, LLC, Elephant Group, Inc.; Time Warner Cable, Inc.,* Case No. 13-cv-2925-BAS-NLS
25  (S.D. Cal.); and *Shyriaa Henderson v United Student Aid Funds, Inc.,* Case No. 3:13-cv-1845-L-BLM
26  (S.D. Cal.); *Marciano v Fairwinds Financial Services* Case No. 6:15-CV-1907-ORL-41 KRS (M.D.
27  Fla); *Alice Lee v Global Tel*Link Corporation* Case No. 2:15-cv-02495-ODW-PLA [consolidated with
28  2:15-cv-03464-ODW-PLA (C.D. Cal.); *Alan Brinker v Normandin's* Case No. 5:14-cv-03007-EJD-

3

PA - 00223

1    HRL (N.D. Cal); *Spencer Ung v Universal Acceptance Corporation,* Case No. 15cv127 RHK/FLN (D.

2    Minn); *Seana Goodson v Designed Receivable Solutions,* Case No. 2:15-cv-03308-MMM-JPR (C.D.

3    Cal); *Dominguez v Yahoo!, Inc.,* Case No. 2:13-cv-01887 (E.D. Penn).

4    / / / /

5    / / / /

6                                    **Work and Analyses in this Case**

7

8            12.    I have reviewed various documents and evidence from this case relating to the calls

9    made to Plaintiff, and I have reviewed various other documents relating to the use and regulation of

10   autodialers.  Specifically, I have reviewed the following documents:

11

12            (1)    Exhibit B – FCC Order 03-153;

13            (2)    Exhibit C – The Big 2 Myths You Probably Believe About Manual

14                   Dialing – Part 1;

15            (3)    Exhibit D – The Big 2 Myths You Probably Believe About Manual

16                   Dialing – Part 2;

17            (4)    Exhibit E – US patent 3,943,289;

18            (5)    Exhibit F – US patent 4,933,964;

19            (6)    Exhibit G – Noble TCPA Compliance Solution;

20            (7)    Exhibit H – ATDS and predictive dialers 1970–1992;

21            (8)    Exhibit I – Davox Marketing;

22            (9)    Exhibit J – US Patent 3229042;

23            (10)   Exhibit K – US Patent 3317678;

24            (11)   Exhibit L – FCC-15-72A1;

25            (12)   Exhibit M – FCC response to ACA;

26            (13)   Exhibit N – VICIdial For_Dummies;

27            (14)   Exhibit O – Agent Manual LowRes BW;

28            (15)   Exhibit P – Manager Manual;

                                               4

1      (16)    Exhibit Q – ViciDial brochure;

2      (17)    Exhibit R – Astricon2005 Matt Florell;

3      (18)    Exhibit S – IMS_Do_Not_Contact_Solutions;

4      (19)    Exhibit T – About_IMS;

5      (20)    Exhibit U – IMSCustomerList;

6      (21)    Exhibit V – wireless-block-identifier;

7      (22)    Exhibit W – NPAC; and

8      (23)    Exhibit X – Defendant's Global Exchange Vacation Club's Further

9              Response to Plaintiff's Special Interrogatories (Set One).

10

11      13.     Additionally, I am very familiar with the VICIdial predictive dialer. For seven (7) years,

12  I have been a user and an administrator of the VICIdial predictive dialer. I have studied the Agent

13  Manual, Administrative Manual and various other sources to master the installation, configuration and

14  use of the VICIdial predictive dialer. I have studied the source code for the astGUIclient client (the

15  user interface of VICIdial) and the database structure for the purpose of modifying code to customize

16  the predictive dialer. I have placed millions of calls using the VICIdial predictive dialer utilizing all

17  types of dialing modes (manual, preview, predictive, pre-recorded messages). Additionally, I provide

18  consulting services to a call center utilizing VICIdial in which up to 1 million calls per hour are placed.

19      14.     Based upon the documents and evidence I have reviewed, I conclude that Marketing

20  Solutions International and InterVoice Technologies used a predictive dialer, a type of automatic

21  telephone dialing system, to make telemarketing calls on behalf of Global Exchange Vacation Club.

22

23  **Global Exchange Vacation Club used a Predictive Dialer, which has the Characteristics of an**

24  **Automatic Telephone Dialing System**

25

26      15.     I have been retained in part to evaluate whether the telephone dialing system used by

27  Marketing Solutions International and InterVoice Technologies to make telemarketing calls on behalf of

28  Global Exchange Vacation Club is a predictive dialer or otherwise has the characteristics of an

"automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act, 47 U.S.C. § 227. ("TCPA"). According to the FCC:

> "The TCPA defines an 'automatic telephone dialing system' as 'equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.' The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an 'automatic telephone dialing system,' the equipment need only have 'the *capacity* to store or produce telephone numbers (emphasis added)'...."

(See Exhibit B – FCC Order 03-153 at ¶ 131-134).

16.     Within the industry, "Automatic Telephone Dialing System", or "auto-dialer" for short, has been attributed to any system with the capacity to automatically dial phone numbers.  Naturally, for a system to automatically dial phone numbers, the system must either produce or store those phone numbers.  Within the industry, these terms were not applied to systems that would only call one pre-programed number such as a home security system or speed dial, but were applied to systems used for telemarketing or call centers.  These names have been attributed to these systems for over 50 years.  There are different types of "auto-dialers" such as "predictive dialers," "power dialers," and dialers that deliver pre-recorded messages (commonly referred to as "voice broadcasting").  Within the industry these systems are not defined by any other terms when used in other dialing modes such as manual or preview.  The fact that these terms have been used to define auto-dialers for over 50 years can be corroborated or discovered by a few clicks through the Patent Office's website (new patents cite old patents) which yields these historical insights.  Because the terms used within the industry are the same as the terms used by the FCC and the TCPA, to clarify my use of the terms in my report, I will point out that when referring to the FCC's or TCPA's definition I will clarify by as I did in the previous paragraph by stating, "characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act."  Otherwise, when I use these terms, I am using them in the context which they have been used for decades within the industry.

17.     Based upon the documents and evidence I have reviewed, the telemarketing calls Marketing Solutions International and InterVoice Technologies made on behalf of Global Exchange Vacation Club were made using ViciDial, which is a predictive dialer.  (See Exhibit X – Defendant

6

PA - 00226

Responses to Special Interrogatories (Set One) No. 8.)  As explained further below, in my expert opinion, this dialing system has the characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the TCPA.

18.    ViciDial is a predictive dialer that, like other predictive dialers, calls lists of numbers organized as "campaigns."  The ViciDial predictive dialer can be used to make predictive dialed calls along with delivering pre-recorded messages by automatically calling a list of numbers and playing an audio file.  (See Exhibit N – VICIdial For_Dummies at pp. 4–8; Exhibit O – Agent Manual LowRes BW at p. 4; Exhibit P – Manager Manual at pp. 9, 22–41, 73–104; Exhibit Q – VICIdial brochure.)  The ViciDial predictive dialer is capable of dialing a list of numbers loaded into a "campaign" or "pool"[1] on the dialer.   The ViciDial predictive dialer then can automatically dial those numbers and deliver predictive dialed calls or agent-less calls delivering pre-recorded messages.  (*Ibid.*)  For predictive dialed calls, the ViciDial predictive dialer will call using multiple telephone lines per agent, and it will use all available telephone lines when making agent-less calls.  (*Ibid.*)  All phone calls, regardless of how dialed are called using the same equipment, terminals, phone, PBX, and ViciDial predictive dialer before going to the PSTN (public switched telephone network).  (*Ibid.*; Exhibit R – Astricon2005 Matt Florell at p. 18)

19.    After reviewing the above documents, based on my experience with predictive dialers and autodialers, and based on my seven (7) years of building and using ViciDial predictive dialers, I am of the opinion that Marketing Solutions International and InterVoice Technologies used a predictive dialer to make telemarketing calls on behalf of Global Exchange Vacation Club, and that the dialer has the capacity to store or produce numbers to be called, using a random or sequential number generator, and the capacity to call such numbers.  Specifically, the dialer is capable of automatically and without human intervention calling numbers that are stored as a list, which itself is stored in a table of a database.

20.    The term "predictive dialer" is a technical term used to describe the type of dialing system.   Predictive dialers all work under the same guiding principle: they transfer telephone numbers

---

[1] A "pool" is, like a "campaign," in that it is calling a list of phone numbers organized by some predefined criteria for a specific purpose.

to be called to a list or "campaign." This list of numbers is then dialed without human intervention. The calls are made, using multiple telephone lines, in advance of being connected to a live operator. Using a complex computer algorithm, the dialing system will "predict" how far in advance to make the calls in attempt to prevent time wasted in listening to rings, answering machines, disconnected phone numbers and calls that are not answered. This functionality has not changed since Davox marketed their predictive dialers in the 1980's. (See Exhibit I – Davox Marketing.)

21.     The term "predictive dialer" was not created by the FCC in their 2003 Order. Nor was the term "automatic telephone dialing system" created by Congress. These are terms that have been used to describe such equipment, by those in the industry for decades. Norman A. Sheldon filed a patent (Exhibit E – US patent 3,943,289) on July 12, 1974 for what he called a "automatic telephone dialing system" (*id.* at p. 4 column 2 line 63) which dialed numbers from a sequential number generator and delivered pre-recorded messages to telephone subscribers. He chose to use a sequential number generator because at that time computer storage was very expensive (*id.* at p. 4 column 2 lines 2–11). Although he chose to use a sequential number generator, stored lists of numbers had been used for many years prior to his patent. (See Exhibit J – US Patent 3229042; Exhibit K – US Patent 3317678.) In July 25, 1989, Bassem M. Girgis filed a patent (Exhibit F – US patent 4,933,964) for a "predictive outbound dialing system" (*id.* at p. 19 column 2 line 53) which used an "input call list" (*id.* at *figure 3*) stored in the system to call those numbers in advance predicting when a live agent would be available using a predictive algorithm. This system was designed to call out on more lines than available agents from a list of numbers, listen for rings, busy, and answered calls, and connect the calls to agents by predicting when they would be available. This is the precise capability of the predictive dialers used today and the ViciDial predictive dialer used by Marketing Solutions International and InterVoice Technologies to make telemarketing calls on behalf of Global Exchange Vacation Club. The functionality of the autodialers and predictive dialers has not changed since long before the TCPA until now with the exception that modern dialers can make more calls in a shorter period of time. Attached as Exhibit H are examples of articles and job postings illustrating that the exact same type of equipment was used over the last four decades, along with the terms "Automatic Telephone Dialing System" and "predictive dialer," long before Congress or the FCC considered the equipment. (See Exhibit H –

<div align="center">8</div>

1  | ATDS and predictive dialers 1970–1992; also see Exhibit M – FCC response to ACA at pp. 13–14 fn.
2  | 3.)  The equipment described in the TCPA and the FCC 2003 Order have precisely the same
3  | characteristics as the equipment that is in use today and used by Global Exchange Vacation Club.
4  | 22.  The fact that the dialer places calls to numbers stored by the dialing system and delivers
5  | predictive dialed calls indicates that the dialer has the characteristics of an ATDS, as it relates to
6  | predictive dialers, as clarified in the Federal Communications Commission's ("FCC") 2003 Order:

> The record demonstrates that a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call. The principal feature of predictive dialing software is a timing function, not number storage or generation. . . . [T]hese machines are not conceptually different from dialing machines without the predictive computer program attached.
>
> . . . .
>
> The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the "capacity to store or produce telephone numbers (emphasis added). . . ." It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. The basic function of such equipment, however, has not changed—the capacity to dial numbers without human intervention. We fully expect automated dialing technology to continue to develop.
>
> . . . .

9

> [T]o exclude from these restrictions equipment that use predictive dialing
> software from the definition of 'automated telephone dialing equipment'
> simply because it relies on a given set of numbers would lead to an
> unintended result. . . .  We believe the purpose of the requirement that
> equipment have the "capacity to store or produce telephone numbers to be
> called" is to ensure that the prohibition on autodialed calls not be
> circumvented. Therefore, the Commission finds that a predictive dialer
> falls within the meaning and statutory definition of "automatic telephone
> dialing equipment" and the intent of Congress.

(Exhibit B – FCC Order 03-153 ¶¶ 131–134 [finding that a predictive dialer falls within the TCPA's definition of "automatic telephone dialing system"].)

23.     Additionally, the properties of the dialing system have the precise capabilities of an ATDS as further clarified by FCC Order 12-56 (May 21, 2012), wherein, the FCC stated:

> Under the TCPA, the term "automatic telephone dialing system" is defined
> as "equipment which has the capacity (A) to store or produce telephone
> numbers to be called, using a random or sequential number generator; and
> (B) to dial such numbers." *Id.* at § 227(a)(1).  The Commission has
> emphasized that this definition covers any equipment that has the specified
> capacity to generate numbers and dial them without human intervention
> whether or not the numbers called are randomly or sequentially generated
> or come from calling lists.

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014 at 14092 ¶ 133 (2003).

24.     Thus, in my expert opinion, the dialing system (as outlined above) has the characteristics of an ATDS as contemplated by the TCPA and clarified by the FCC, because this system has the capacity to store numbers in a list and dial them without human intervention and also has the capacity to generate numbers to form a list for dialing without human intervention.

25.     A predictive dialer has the capacity of an ATDS, not because it predicatively dials calls, but simply that it has the capacity to automatically call numbers stored in a list.  The predictive algorithm in a predictive dialer predicts when agents would be available and is no way related to the storage or production of numbers. With all the predictive dialers with which I have worked in the last

10

16 years, the predictive algorithm was in no way related to the storage or production of numbers. The FCC correctly stated this, "The principal feature of predictive dialing software is a timing function, not number storage or generation." (See Exhibit B – FCC Order 03-153 ¶ 131)

26.   All predictive dialers have the characteristics of an ATDS, but not all ATDS's are predictive dialers. As the FCC stated, "The principal feature of predictive dialing software is a timing function, not number storage or generation . . . . [T]hese machines are not conceptually different from dialing machines without the predictive computer program attached." (See Exhibit B – FCC Order 03-153 ¶ 131.) I myself use the example of predictive dialers when explaining what capacities are in view in the FCC 2003 Order. I do this because there are many more features than just storing numbers in a list and automatically calling them, and using the example of the predictive dialer I can highlight that none of those other features have anything to do with computer storage or the generation of numbers. Systems, such as the one used by Marketing Solutions International and InterVoice Technologies, that are capable of calling lists of numbers to deliver a pre-recorded message or systems that call numbers to deliver a text or SMS message have no live agents involved, therefore there is little confusion on their capacity to store or produce numbers and to call them. But all those other features in a predictive dialer are in addition to storing numbers and automatically calling them. Other features found in predictive dialers such as ACD routing, AMD detection, preview mode and other dialing modes, predictive algorithms, abandon rate, cloud based, skills based routing, blended campaigns, CRM integration, types of databases used by the system, VoIP, POTS lines, T1 lines, PRI lines, operating systems, computer hardware all have nothing to do with the system's capacity to store a list of numbers and to automatically call them. For these reasons, I use the example of predictive dialers to explain what features make it an ATDS, because at the same time I can explain what features do not make it an ATDS.

27.   I would note that the ViciDial predictive dialer has the capacity to deliver pre-recorded messages to telephone consumers without the need of live agents. (See Exhibit P – Manager Manual at pp. 36–39.)

28.   The mode of operation however does not change the capacity of the system. Changing the mode of dialing is done by effectively clicking a radio button and clicking "save." The FCC

11

considered this when clarifying "capacity."  (See Exhibit M – FCC response to ACA at pp. 31–36; Exhibit P – Manager Manual at pp. 27–28.)  The administrator of a predictive dialer is not capable of taking away any functionality of the system.  The administrator can only choose to not use it.  The fact that one campaign can be configured to use preview mode and another campaign configured to use predictive, while other agents place calls manually, all occurring at the same time, illustrates the system has the current capacity regardless of the dialing mode selected for a particular campaign.  (See Exhibit P - Manager Manual at pp. 27–28.)

29.    All predictive dialers, which I have seen, also employ a "manual" mode and a "preview" mode, which presents the calling agent with information about the to-be-called party before the number is actually dialed. The agent then has the ability to accept that lead based on the information presented, or reject it and await the dialer to present a new lead to be called.  Because a dialer has a preview mode or a manual mode and the calling party may have used those modes, however, does not mean that the dialer fails to qualify as an ATDS.

30.    I am not alone in my understanding of whether manual mode has any effect on the capacity of the predictive dialer.  Recently, Ontario Systems (the creators of the popular Guaranteed Contacts predictive dialer and the FACS system), published a two part article on the subject of dialing modes and their impact on the predictive dialer's capacity as defined by the FCC.  Using the example of manually dialed calls through the predictive dialer, Ontario Systems highlights that a Predictive dialer is a predictive dialer regardless how it is used.  Manually dialing occurs when one presses all ten digits of the phone number to place the call, not a number stored on the list.  Preview mode calls the numbers from the list stored in the predictive dialer's database.  The FCC clarified that predictive dialers are an ATDS because of their capacity, not how the operator uses it.  The industry has attributed the name "predictive dialer" to these systems regardless of how they are used.  The two articles from Ontario Systems are relevant in their entirety (See Exhibit C – The Big 2 Myths You Probably Believe About Manual Dialing – Part 1;  Exhibit D – The Big 2 Myths You Probably Believe About Manual Dialing – Part 2), however, the summary highlights the main point:

In other words, if the technology you use to contact consumers has any capacity to dial predictively, or pull from a database of numbers and dial

12

them, current judicial opinion indicates it is an autodialer. Period. This is true whether you launch the call manually by pressing a field, or if you enter 10 digits on a keypad. On the other hand, it opined such a call is a manual dial if it's made using a system to contact consumers that is not tied, routed from or to, or in any way connected to your autodialer. If it's not, it is unlikely you are contacting consumers using an automatic telephone dialing system as defined by the FCC.

(Exhibit D – The Big 2 Myths You Probably Believe About Manual Dialing – Part 2.) In other words, to call cell phones, one should use a separate PBX entirely.

31.     Another manufacturer of a popular predictive dialer agrees. Noble Systems offers a solution which routes calls to wireless numbers through a separate PBX entirely. (See Exhibit G – Noble TCPA Compliance Solution.) There is no indication however that Marketing Solutions International or InterVoice Technologies had such a solution in place. On the contrary, they used the ViciDial predictive dialer. (See Exhibit X – Defendant Responses to Special Interrogatories (Set One) No. 8.)

32.     As stated above, the FCC relies upon the following definition of an "automatic telephone dialing system":

> The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have "the capacity to store or produce telephone numbers (emphasis added) . . . ."

(See Exhibit B – FCC Order 03-153 at ¶ 132.) This definition is consistent with the definition used by those in the industry long before adopted by Congress or the FCC. (See Exhibit E – US patent 3,943,289; Exhibit F – US patent 4,933,964; Exhibit H – ATDS and predictive dialers 1970-1992; Exhibit I – Davox Marketing; Exhibit J – US Patent 3229042; Exhibit K – US Patent 3317678.)

33.     Even more recently, on July 10, 2015, the FCC issued a Declaratory Ruling and Order in which the FCC clarified the term "capacity." (See Exhibit L – FCC-15-72A1 ¶¶ 10-24.)

13

34.     In light of the FCC;s July 10, 2015 Declaratory Ruling and Order where they take a broad definition of "capacity" as it relates to autodialing numbers and the generation of numbers, I would point out that making a computer generate a list of 10 digit numbers "out of thin air", is a relatively trivial task.  Computers are designed to do math and counting i.e. "to compute."  For example, typing "seq 6192486000 6192486999 > sequential_numbers_to_call.txt" creates a list of 1000 Sprint Wireless Numbers to be called (this was done on my regular laptop with no additional software installed.  In other words, my laptop running Linux has natively installed a "sequential number generator" that can produce a list of phone numbers. Windows computers have a similar command line function as well.   Typing "for /L %i in (2480000,1,2489999) do @echo 619%i >> sequential_numbers_to_call.txt" generates the same list on a Windows computer.   The ViciDial predictive dialer runs on Linux and therefore has a sequential number generator.  (See Exhibit N – VICIdial For_Dummies at p. 3.)  Of course, storage of numbers does not discriminate on how the numbers were produced as computer storage can store any kind of data regardless of how it was produced whether loaded from a list of known numbers or a list of sequentially generated numbers. (See Exhibit M – FCC response to ACA at pp. 6, 12, 13, 24, 36, 37, 38, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 52.)

35.     The FCC's orders and rulings provide me with the information that assists me in forming an opinion about whether Marketing Solutions International and InterVoice Technologies' dialing system has the characteristics of an ATDS.  Based on those orders and rulings, based upon my review of the documents and evidence provided in this case, based on my knowledge of computer storage and computer processing, and based on my knowledge of autodialers and predictive dialers, it is also my expert opinion that all of the telemarketing calls placed by Marketing Solutions International and InterVoice Technologies on behalf of Global Exchange Vacation Club were made using a predictive dialer that has the characteristics of an automatic telephone dialing system as defined by the TCPA and FCC.

36.     Analyzing the ViciDial predictive dialer used was a simple process.  To satisfy the question of whether or not the system has the technical capabilities described in the FCC's clarification of the TCPA in the 2003 report, all I had to do was investigate what the dialing equipment is capable of

14

1 doing, and using my knowledge of predictive dialers, and more specifically my knowledge of ViciDial,
2 determine if in fact those capabilities are indeed those defined in the 2003 FCC order.

3     37.    Additionally, no other physical inspection was required in determining the capabilities of
4 this system.  The physical attributes of the systems have nothing to do with the functionality of the
5 system.  A physical inspection of these systems would not show anything more than the predictive
6 dialer is a standard computer in which I have over two decades of experience with.

7     38.    After studying the manuals for the ViciDial predictive dialer and my own experience
8 with the ViciDial predictive dialer, I had far more knowledge than what was required to make an
9 informed and reliable determination of whether or not the system was able to store numbers and call
10 them automatically, or whether the system can generate numbers and call them automatically.  In the
11 case of the ViciDial predictive dialer used by Marketing Solutions International and InterVoice
12 Technologies to make telemarketing calls on behalf of Global Exchange Vacation Club, the system is
13 capable of doing both.

14     39.    In this case, the ViciDial predictive dialer has the capacity to store numbers in a
15 database, generate numbers for inclusion in a calling list, and call those numbers without human
16 intervention.  Even if the operator of the computer walks away, the dialer would continue to make those
17 calls; and it will continue to make those calls until the list of phone numbers is exhausted.  All that was
18 required was a simple and short process to determine if the dialer had such capabilities.  Over the last
19 seven years, I have studied the manuals, for the ViciDial predictive dialer to obtain a full understanding
20 of the dialer and to build and administer the dialer myself, however, all that study goes far beyond
21 answering the pertinent questions of whether or not the predictive dialer stores or produces numbers
22 and calls them automatically.

23

24            **Identification of Wireless Numbers**

25

26     40.    In this case, I was asked to determine whether it is possible to compare or "scrub"
27 Marketing Solutions International and InterVoice Technologies's call records against two telephone
28 number databases widely used by industry to identify the telephone numbers that are assigned to cell

<div align="center">15</div>

PA - 00235

phones, and identify whether the telephone numbers assigned to cell numbers have been previously or subsequently reassigned or "ported" to or from landlines.

41.     I am familiar with the databases used to determine whether a particular telephone number is a assigned to a cell phone, and determine whether the number was ever reassigned from a landline to a cell phone or vice versa, because I personally use them on a regular basis.   I have personally compared lists of telephone numbers against these same databases to identify which numbers are cell phones, and whether and when numbers had been reassigned from landline to cell phone or vice versa, on countless occasions over the years.

42.     The database I regularly use and rely on in my business to determine if a telephone number has been assigned to a cell phone is the Interactive Marketing Solutions or "IMS" wireless cell block identifier list.   This list was compiled by Interactive Marketing Solutions and the Direct Marketing Association.   (See Exhibit S – IMS Do Not Contact Solutions; Exhibit T – About IMS; Exhibit U – IMS Customer List; Exhibit V – wireless block identifier.)

43.     I believe the FCC's Enforcement Bureau, Telecommunications Consumers Division ("TCD") has relied on the IMS database, which the FCC has described as "an industry standard, commercially available database of known assigned and ported wireless numbers . . . ."   (FCC 14-59, 29 FCC Rcd 5537, ¶7, fn.16 (rel. May 8, 2014) ["TCD compared the call records to an industry-standard, commercially available database of known assigned and ported wireless numbers to determine whether the Company made robocalls to wireless telephones]; see also Interactive Marketing Solutions, Inc. Website, [http://www.ims-dm.com/index.shtml"]; DA 13-265, 28 FCC Rcd 1840, ¶ 9 and fn.25 (rel. March 15, 2013), citing Interactive Marketing Solutions, Inc. Website [http://www.ims-dm.com/index.shtml]; and DA 15-530, 30 FCC Rcd 4548, ¶7 and fn.24 (rel. May 4, 2015), citing Interactive Marketing Solutions, Inc. Website Homepage [www.ims-dm.com/mvc/index.php].)

44.     The database I regularly use and rely on in my business to determine whether a cell phone number has been reassigned or "ported" to or from a landline is the Neustar ported-to-wireless list and ported-to-landline list.   Neustar is the ultimate resource of these lists because it was selected by the FCC to be the administrator of the Number Portability Administration Center (NPAC), the telecommunication industry's common, authoritative database for routing calls for numbers ported

16

between landline and wireless.  (See Exhibit W – NPAC).  The FCC also appointed Neustar as the North American Numbering Plan Administrator, which is responsible for the U.S. telephone numbering system.  (FCC 03-153, 18 FCC Rcd 14014, ¶170 (rel. July 3, 2003) ["NeuStar as the North American Numbering Plan Administrator, the National Pooling Administrator, and the LNP Administrator makes information available that can assist telemarketers in identifying numbers assigned to wireless carriers."].)

**Identification of Calls to Wireless Numbers from the ViciDial Predictive Dialer**

45.     ViciDial is designed to log and create reports of call history.  ViciDial creates call logs in MySQL.  (See Exhibit N – VICIdial For_Dummies at p. 3.)  Reports can be generated simply by clicking on "reports" and choosing the type of report to generate.  Additionally, one could query the ViciDial database directly and export reports containing any or all columns related to each call.  The ViciDial_Log table contains a record of every call made by the system.  The vicidial_log table contains the following columns: uniqueid; lead_id; list_id; campaign_id; call_date; start_epoch; end_epoch; length_in_sec; status; phone_code; phone_number; user; comments; processed; user_group; term_reason; alt_dial.  To export this call detail record to a pipe delimited text file one only needs to type in the command:

    select * INTO OUTFILE '/path_to_file/lead_list.csv'

    FIELDS TERMINATED BY '|'

    ENCLOSED BY '^'

    LINES TERMINATED BY '\n'

    from vicidial_list;"

If I were provided with such a list I would have no difficulty identifying the calls to wireless numbers.

46.     To determine which telephone numbers from the list were cell phone numbers as of the date of the calls, I first would compare all of the telephone numbers listed in it against the numbers listed in the IMS database.  This would involve simply copying Marketing Solutions International and InterVoice Technologies' call records and the IMS wireless cell block identifier list into a conventional

17

1  database program and then executing a basic command telling the program to compare the two lists to

2  identify the matches.  This comparison could be performed manually (by simply looking at the two

3  lists), but that would take an exceptionally long period of time given the size of the lists.

4      47.    Then I would compare the list of phone numbers in Marketing Solutions International

5  and InterVoice Technologies's call records to the list of phone numbers in the Neustar database to see

6  which ones had been reassigned from landline to cell or from cell to landline. This would involve the

7  same process described above.  I would copy the Neustar ported number lists into the relational

8  database with Marketing Solutions International and InterVoice Technologies's call records and execute

9  a basic command telling the program to compare the lists to identify the matches, and simultaneously

10  identify which of the numbers that were reassigned were nevertheless wireless numbers at the time of

11  the call.  The lists include a date field showing when each number was reassigned or ported, if any.

12  This comparison also could be performed manually (by simply looking at the two lists), but once again

13  that would take an exceptionally long period of time given the size of the lists.

14      48.    Finally, for ease of understanding, I would execute a command to identify the number of

15  unique phone numbers listed in the spreadsheets, the total number of phone numbers that were assigned

16  to cell phones, and the number of cell phones that were reassigned to or from a landline at some point

17  in time.

18      49.    If necessary, I could also compare Marketing Solutions International and InterVoice

19  Technologies's call records against the lead list to identify names and addresses associated with the

20  phone numbers.  This would involve the same type of process as identifying wireless numbers and

21  would require the Defendant to export the list of leads from the ViciDial Dialer from the "vicidial_list"

22  table using the same technique as exporting the call logs.  Specifically, issuing the command:

23          "select * INTO OUTFILE '/path_to_file/lead_list.csv'

24      FIELDS TERMINATED BY '|'

25      ENCLOSED BY '^'

26      LINES TERMINATED BY '\n'

27      from vicidial_list;"

28

18

50.     I reserve the right to amend, modify or supplement the statements and opinions set forth herein as appropriate.

I declare that the foregoing is true and correct, subject to the laws of perjury of the United States.  Executed in Spring Valley, CA on this 5ᵗʰ day of October 2016.

Jeffrey A. Hansen

19

PA - 00239

EXHIBIT "A"

**Jeffrey A. Hansen**
**Spring Valley, CA 91977**
**(619) 270-2363**
**Email:  Jeff@TCPAwitness.com**


**SUMMARY OF QUALIFICATIONS:**
     IT certified professional with over 25 years of extensive troubleshooting experience

**PROFESSIONAL EXPERIENCE:**

**Testified in the following:**

     I have been called to testify in the following civil matters:

- *Craig Casey v. Valley Center Insurance Agency Inc.*, Case No. 37-2008-00004378-SC-SC-CTL (San Diego Superior Court)
- *Stemple v. QC Holdings, Inc.*, Case No. 12-CV-1997-CAB-WVG (S.D. Cal.)
- *Hahn v. Massage Envy Franchising*,  Case No: 3:12-cv-00153-DMS-BGS (S.D. Cal.)
- *Abdeljalil v. General Electric Capital Corporation*, Case No: 12-cv-02078-JAH-MDD (S.D. Cal.)
- *Jasminda Webb v. Healthcare Revenue Recovery Group, LLC* Case No: C 13-0737 JD (N.D. Cal.)
- *Balschmiter v TD Auto Finance, LLC*, Case No: 2:13-cv-01186 (E.D. Wisc.)
- *Jordan Marks v Crunch San Diego, LLC*, Case No. 14-CV-0348-BAS (BLM) (S.D.Cal.)
- *Peter Olney v Job.com*, Case No: 1:12-cv-01724-LJO-SKO (E.D. Cal.)
- *Carlos Guarisma v ADCAHB Medical Coverages, Inc. and Blue Cross and Blue Shield of Florida, Inc.*, Case No: 1:13-cv-21016-JLK (S.D. Fla.),
- *Farid Mashiri v Ocwen Loan Servicing, LLC*, Case No: 3:12-cv-02838 (S.D. Cal.)
- *Monty J. Booth, Attorney at Law, P.S. v Appstack, Inc.*, Case No. 2:13-cv-01533-JLR (W.D. Wash.)
- *Rinky Dink, Inc. d/b/a Pet Stop v World Business Lenders, LLC*, Case No. 2:14-cv-00268-JCC (W.D. Wash.)
- *Michael Reid and Dave Vacarro v. I.C. Sytems, Inc.*, Case No. 2:12-cv-02661-ROS (D. Ariz.)
- *Jeffrey Molar v NCO Financial Systems* Case No. 3:13-cv-00131-BAS-JLB (S.D. Cal.)
- *Latonya Simms v Simply Fashion Stores LTD, and ExactTarget, Inc.*, Case No. 1:14-CV-00737-WTL-DKL (D. Ind.)
- *Sueann Swaney v Regions Bank*, Case No. CV-13-RRA-0544-S (N.D. Ala.)
- *Hooker v SiriusXM*,  Case No. 4:13-cv-00003 (AWA) (E.D. Va.)
- *Diana Mey v Frontier Communications,* Case No. 13-cv-01191-RNC (D. Conn.)
- *Rachel Johnson v Yahoo! Zenaida Calderin v Yahoo!* Case No. 14-cv-2028 14-cv-2753 (N.D. IL)
- *Philip Charvat v Elizabeth Valente,* Case No. 12-cv-5746 (N.D. IL)
- *Robert Zani v Rite Aid Hdqtrs. Corp*., Case No. 14-cv-9701(AJN)(RLE)(S.D. NY)
- *A.D. v Credit One Bank* Case No. 1:14-cv-10106 (N.D. IL)
- *Oerge Stoba, and Daphne Stoba v Saveology.com, LLC, Elephant Group, Inc., Time Warner Cable, Inc.* Case No. 13-cv-2925-BAS-NLS (S.D. Cal.)
- *Shyriaa Henderson v United Student Aid Funds, Inc.* Case Number: 3:13-cv-1845-L-BLM (S.D. Cal.)
- *Marciano v Fairwinds Financial Services* Case No. 6:15-CV-1907-ORL-41 KRS (M.D. Fla)
- *Alice Lee v Global Tel\*Link Corporation* Case No. 2:15-cv-02495-ODW-PLA [consolidated with 2:15-cv-03464-ODW-PLA (C.D. Cal.)
- *Alan Brinker v Normandin's* Case No. 5:14-cv-03007-EJD-HRL (N.D. Cal)
- *Spencer Ung v Universal Acceptance Corporation,* Case No. 15cv127 RHK/FLN (D. Minn)
- *Seana Goodson v Designed Receivable Solutions,* Case No. 2:15-cv-03308-MMM-JPR (C.D. Cal)
- *Dominguez v Yahoo!, Inc*., Case No. 2:13-cv-01887 (E.D. Penn)

**2013-Present     Founder**
     **Hansen Legal Technologies, Inc., San Diego, CA**
- Established and incorporated Hansen Legal Technologies, Inc. in 2013

- Developed operating procedures for computer forensic examinations.
- Developed proper protocols in preserving electronic evidence and following chain of custody.
- Provided Forensic services for clients for class action, civil, and other consumer cases.
- Oversee all discovery phase of cases.
- Assist counsel in interrogatories, depositions, and meet and confer meetings.
- Participated in Meet and Confer, 26f conferences and misc pre-trial meetings.
- Assisted counsel in developing litigation strategies in cases
- Assisted counsel in preparing discovery including interrogatories and document requests
- Assisted counsel in evaluating responses to interrogatories and document requests
- Assisted counsel in witness examination in depositions.
- Prepaired declarations for Class Certifications, and for Motions for Summary Judgement.

**2007-2013       Co-Founder**
**Hansen and Levey Forensics, Ft Lauderdale, FL**
- Established and incorporated Hansen & Levey Forensics, Inc in 2007
- Established secure forensics laboratory for the San Diego office.
- Developed operating procedures for computer forensic examinations.
- Developed proper protocols in preserving electronic evidence and following chain of custody.
- Provided Forensic services for clients for class action, employment, civil, domestic, and juvenile cases.
- Oversee all discovery phase of cases.
- Assist counsel in interrogatories, depositions, and meet and confer meetings, and preparation for sanction hearings against opposing counsel and parties.
- Participated in Meet and Confer, 26f conferences and misc pre-trial meetings.
- Assisted counsel in developing litigation strategies in cases
- Assisted counsel in preparing discovery including interrogatories and document requests
- Assisted counsel in evaluating responses to interrogatories and document requests
- Assisted counsel in witness examination in depositions
- Performed on site acquisitions.
- Participated in mediation sessions.
- Provided Expert Testimony in Craig Casey vs. Valley Center Insurance Agency Inc.

**2000-2016       Owner**
**Pns724 San Diego, CA**
- Provided complete IT solutions for hundreds of businesses and individuals including network design, configuration, forensics, and data recovery.
- Set up and maintained 672 line outbound call center with numerous auto dialers and predictive dialers.  Maintained call lists, and DNC lists used to place hundreds of millions of calls over a five year period.
- Installed hundreds of POTS lines, "Turned up" at least 38 T1's and PRI's.

**2006       San Diego Regional Computer Forensics Laboratory (FBI sponsored computer forensics Lab)**
- Built several forensic machines with large fiber channel RAID assemblies for use in the field.
- Installed and configured systems for mobile laboratory
- Provided support in all areas from taking in evidence to calling case agents to pick up their evidence from finished cases gaining valuable experience in evidence handling.

**2004-Present     Systems Analyst**
**Amsec San Diego, CA / Lateott Bremerton, WA / HP Enterprise Services**
- Provided ATM and Ethernet fiber connectivity for secure and unsecured DOD networks.
- Troubleshot fiber connectivity issues on shore and ship facilities.

**2000-2004       Director of Training/ IT Director**
**Laptop Training Solutions, San Diego, CA**

- Provided Intrusion detection, incident response, and forensic services in a continuing effort keep the network and workstations secure.

- Planned, designed, and implemented network security for vital network services for 4 facilities, that were heavily attacked by varying methods, saving the company hundreds of thousands of dollars.
- Performed security risk assessment, performed IT control audits, developed countermeasures and provided a security policy to insure confidentiality, integrity and availability of resources.
- Performed Gap Analysis of existing systems and desired systems and migrated from Windows 2000 DNS and Exchange 2000 servers to Linux servers running Postfix and BIND to provide a more scalable network for 4 facilities providing the company the means to achieve a 450% growth.
- Planned, installed and maintained several school networks involving numerous Domain Controllers, UNIX servers, print servers, multiple nodes and routers.
- Installed and programmed Nortel phone system improving the company's ability to handle calls.
- Planned, organized and instructed computer certification courses including Microsoft Certified Systems Engineer (NT4.0, Win2000 MCSE, 2003 MCSE), Cisco (CCNA), A+, N+, Linux+, I-Net+, Security+, MOUS and  Web Page Design (HTML, Javascript, DHTML, Flash 4, Flash 5, Fireworks3, Photoshop 5) resulting in hundreds of certified students.
- Provided students with a hands on training environment involving networks with  Multiple Windows NT and Windows 2000 Domain Controllers, several workstations (Windows 95,98,NT,ME, and 2000 Professional), Novell, Unix, and Exchange Servers, and Cisco routers.
- Planned, organized and instructed a corporate training environment for TCP/IP which included addressing, standards, troubleshooting, subnetting, routing and Frame Relay
- Provided long distance support via telephone to hundreds of MCSE students throughout the country.
- Managed other instructors on training techniques for the MCSE, CCNA, Linux+, A+, Security+ and Network + courses providing a consistent system of training in all facilities.

**1998-2000        Electronic Test Technician 3**
**Action Instruments, San Diego, CA**
- Tested various types of electronics for industry and signal conditioning.
- Troubleshot and documented nearly 10,000 component level repairs.
- Assisted in improvements to the manufacturing process.
- Identified problems in product design and provided solutions to correct the problems.

**1996-1997        Network, Computer and Computer Monitor Technician /Instructor**
**United States Navy, Shore Intermediate Maintenance Activity, San Diego, CA**
- Installed and connectorized fiber optic computer networks throughout Naval Station San Diego and North Island.
- Provided network troubleshooting and management for large scale mission-critical DoD networks with over 600 nodes, routers, and servers.
- Provided upgrades, maintenance, troubleshooting, security, and repair of personal computers for 600 station LAN and the US Pacific Fleet.
- Troubleshot and repaired over 100 computer monitors to component level without technical manuals.
- Increased successful monitor repair from 10% to 95%.
- Trained shop personnel on computer monitor troubleshooting and repair.
- Researched parts, materials and techniques for Computer Monitor repair.
- Developed curriculum and instructed monitor troubleshooting and repair for the Navy Microcomputer Repair course.

**1993-1996        Electronics Technician / Computer Technician**
**United States Navy, USS Mahlon S. Tisdale (FFG-27), Combat Systems Division.**
- Provided incident response and performed forensic type of services for 36 computers following  Employee sabotage.
- Troubleshot and maintained Harris 300 AN/UYK-62(V) mini-mainframe, running Vulcan OS,  and all terminals
- Troubleshot, maintained, and upgraded hardware and software for 36 shipboard computers.
- Identified security threats, and developed countermeasures for computer systems on board.
- Troubleshot, repaired and maintained – at component level - various Univac systems making up a complex network of computers used in communications, navigation, and weapons guidance.
- Assisted in planning and running work center.

**1990-1992        Radio, Television, VCR Technician**

**LBJ Television, Wheat Ridge, CO**
- Performed component level troubleshooting of televisions, VCRs, and stereos.
- Performed in home repair of televisions.
- Introduced the repair of CD players to the company.
- Provided technical support to customers over the telephone.
- Handled customer service issues related to television repair.

**CERTIFICATIONS:**

MCP 4.0, A+, Network+, MCP 2000, MCSA, MCSE, Linux+, I-Net+, Security+, CIW Security Analyst.

Certified by Bureau For Private Postsecondary And Vocational Education, in the States of California and Oregon, as an Instructor for Computer Installation and Repair Technology, Computer Systems Networking and Telecommunications, Micro Computer Applications, Microsoft, Windows, Excel

**GUEST APPEARANCES:**

- Featured in Microsoft Redmond Magazine Sep 2007
- Computer Talk 760 KFMB San Diego, CA
- Computer Bits KBNP 1410AM and KOHI 1600 Portland, OR
- San Diego Profiler 760 KFMB San Diego, CA

**PUBLIC POSITIONS:**

**June 2012-Present          Board Member, Spring Valley Community Planning Group**

Elected board member of the Spring Valley Community Planning Group from April 2012 to Present. The purpose of the group is to advise the San Diego County Department of Planning and Land Use, the Planning Commission and the Board of Supervisors on matters of planning and land use affecting Spring Valley south of Highway 94. Members are volunteers and locally elected representing the interests of the people of Spring Valley. Items heard by the group include but are not limited to: Site Plans, Signs, Roads & Infrastructure, Parks & Recreation, Lot Splits, 2nd Dwelling Units, Day Care, Alcohol License, Tree Removal, Re-Zones.

**EDUCATION:**

| | |
|---|---|
| 2006 | Access Data Forensic Toolkit |
| | San Diego Regional Computer Forensics Laboratory, San Diego, CA |
| 2006 | Guidance Software Encase Forensic Suite |
| | San Diego Regional Computer Forensics Laboratory, San Diego, CA |
| 2005 | E-discovery – Why Digital is different – by Craig Ball |
| | San Diego County Bar Association, San Diego, CA |
| 2003 | Security: Hardening MS Windows 2000 Server Family, IIS and Exchange 2000 Servers |
| | CBI Systems Integrators, San Diego, CA |
| 1996 | Navy Standard Microcomputer Repair |
| | PRC Inc., San Diego, CA |
| 1996 | Fundamentals of Total Quality Management/ Team Skills and Concepts |
| | Shore Intermediate Maintenance Activity, San Diego, CA |
| 1993 | AN/SPS-55 Surface Search Radar |
| | Service School Command, San Diego, CA |
| 1993 | Advanced Electronics School, Communication Systems and Radar Systems |
| | Naval Training Center, Great Lakes, IL |
| 1992 | Electronic Theory |
| | Naval Training Center, Orlando, FL |
| 1990-1991 | Radio, Television, VCR Repair |
| | Warren Occupational Technical Center, Golden, CO |
| 1989-1990 | Electronic Theory |

Warren Occupational Technical Center, Golden, CO
1991    Columbine Sr. High School, Littleton, CO

**SECURITY CLEARANCE:**  Secret

References available on request

Exhibit "B"

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**REPORT AND ORDER**

**Adopted**: **June 26, 2003**                    **Released:  July 3, 2003**

By the Commission:  Chairman Powell, Commissioners Abernathy, Copps and Adelstein issuing separate statements.

**TABLE OF CONTENTS**

Paragraph Number

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ................................................................................................4
        A. Telephone Consumer Protection Act of 1991................................................4
        B. TCPA Rules ................................................................................................6
        C. Marketplace Changes Since 1992................................................................8
        D. FTC National Do-Not-Call Registry and Telemarketing Rules .....................9
        E. State Do-Not-Call Lists ............................................................................12
        F. Notice of Proposed Rulemaking ................................................................14
        G. Do-Not-Call Implementation Act ..............................................................15

III.    NATIONAL DO-NOT-CALL LIST ....................................................................16
        A. Background................................................................................................16
        B. Discussion................................................................................................25
            1. National Do-Not-Call Registry................................................................28
            2. Exemptions ........................................................................................42
            3. Section 227(c)(3) Requirements ............................................................55
            4. Constitutionality................................................................................63
            5. Consistency with State and FTC Do-Not-Call Rules ................................74

PA - 00247

**Federal Communications Commission**                                     **FCC 03-153**

IV.    COMPANY SPECIFIC DO-NOT-CALL LISTS ..................................................................86
       A. Background ............................................................................................................86
       B. Discussion ..............................................................................................................90
          1. Efficacy of the Company-Specific Rules .........................................................90
          2. Amendments to the Company-Specific Rules ...................................................92

V.     INTERPLAY OF SECTIONS 222 AND 227 ..........................................................................97
       A. Background ............................................................................................................97
       B. Discussion ............................................................................................................100

VI.    ESTABLISHED BUSINESS RELATIONSHIP ...................................................................109
       A. Background ..........................................................................................................109
       B. Discussion ............................................................................................................112
          1. Definition of Established Business Relationship ...........................................113
          2. Telecommunications Common Carriers ..........................................................119
          3. Interplay Between Established Business Relationship and Do-Not-Call
             Request ............................................................................................................124

VII.   TAX-EXEMPT NONPROFIT ORGANIZATION EXEMPTION ..................................125
       A. Background ..........................................................................................................125
       B. Discussion ............................................................................................................128

VIII.  AUTOMATED TELEPHONE DIALING EQUIPMENT .................................................129
       A. Background ..........................................................................................................129
       B. Discussion ............................................................................................................131
          1. Predictive Dialers ...........................................................................................131
          2. "War Dialing" ................................................................................................135

IX.    ARTIFICIAL OR PRERECORDED VOICE MESSAGES ...............................................136
       A. Background ..........................................................................................................136
       B. Discussion ............................................................................................................139
          1. Offers for Free Goods or Services; Information-Only Messages ..................139
          2. Identification Requirements ...........................................................................143
          3. Radio Station and Television Broadcaster Calls ............................................145

X.     ABANDONED CALLS .........................................................................................................146
       A. Background ..........................................................................................................146
       B. Discussion ............................................................................................................150
          1. Maximum Rate on Abandoned Calls ..............................................................151
          2. Two-Second-Transfer Rule .............................................................................153
          3. Prerecorded Message for Identification ........................................................155
          4. Established Business Relationship ..................................................................156
          5. Ring Duration ..................................................................................................157

XI.    WIRELESS TELEPHONE NUMBERS ................................................................................160
       A. Background ..........................................................................................................160

PA - 00248

    B.  Discussion ....................................................................................................................165
        1.  Telemarketing Calls to Wireless Numbers ......................................................165
        2.  Wireless Number Portability and Pooling .........................................................168

XII.    CALLER IDENTIFICATION .......................................................................................173
    A.  Background ...............................................................................................................173
    B.  Discussion ................................................................................................................179

XIII.   UNSOLICITED FACSIMILE ADVERTISEMENTS ..................................................185
    A.  Background ...............................................................................................................185
    B.  Discussion ................................................................................................................187
        1.  Prior Express Invitation or Permission ............................................................187
        2.  Fax Broadcasters .............................................................................................194
        3.  Fax Servers ......................................................................................................198
        4.  Identification Requirements .............................................................................203

XIV.    PRIVATE RIGHT OF ACTION ...................................................................................204
    A.  Background ...............................................................................................................204
    B.  Discussion ................................................................................................................206

XV.     INFORMAL COMPLAINT RULES .............................................................................207

XVI.    TIME OF DAY RESTRICTIONS .................................................................................208

XVII.   ENFORCEMENT PRIORITIES ...................................................................................211

XVIII.  OTHER ISSUES ...........................................................................................................215
    A.  Access to TCPA Inquiries and Complaints .............................................................215
    B.  Reports to Congress .................................................................................................217

XIX.    PROCEDURAL ISSUES ...............................................................................................218
    A.  Regulatory Flexibility Act Analysis ........................................................................218
    B.  Paperwork Reduction Act Analysis .........................................................................219
    C.  Late-Filed Comments................................................................................................220
    D.  Materials in Accessible Formats ..............................................................................221

XX.     ORDERING CLAUSES ................................................................................................222

Appendix A:  Final Rules
Appendix B:  Final Regulatory Flexibility Act Analysis
Appendix C:  Comments Filed

PA - 00249

## I.      INTRODUCTION

1.       In this Order, we revise the current Telephone Consumer Protection Act (TCPA)[1] rules and adopt new rules to provide consumers with several options for avoiding unwanted telephone solicitations.  Specifically, we establish with the Federal Trade Commission (FTC) a national do-not-call registry for consumers who wish to avoid unwanted telemarketing calls.  The national do-not-call registry will supplement the current company-specific do-not-call rules for those consumers who wish to continue requesting that particular companies not call them.  To address the more prevalent use of predictive dialers, we have determined that a telemarketer may abandon no more than three percent of calls answered by a person and must deliver a prerecorded identification message when abandoning a call.  The new rules will also require all companies conducting telemarketing to transmit caller identification (caller ID) information, when available, and prohibits them from blocking such information.  The Commission has revised its earlier determination that an established business relationship constitutes express invitation or permission to receive an unsolicited fax, and we have clarified when fax broadcasters are liable for the transmission of unlawful facsimile advertisements.  We believe the rules the Commission adopts here strike an appropriate balance between maximizing consumer privacy protections and avoiding imposing undue burdens on telemarketers.

2.       It has now been over ten years since the Commission adopted a broad set of rules that respond to Congress's directives in the TCPA.  Over the last decade, the telemarketing industry has undergone significant changes in the technologies and methods used to contact consumers.  The Commission has carefully reviewed the record developed in this rulemaking proceeding.  The record confirms that these marketplace changes warrant modifications to our existing rules, and adoption of new rules if consumers are to continue to receive the protections that Congress intended to provide when it enacted the TCPA.  The number of telemarketing calls has risen steadily; the use of predictive dialers has proliferated; and consumer frustration with unsolicited telemarketing calls continues despite the efforts of the states, the Direct Marketing Association (DMA),[2] and the company-specific approach to the problem.  Consumers often feel frightened, threatened, and harassed by telemarketing calls.  They are angered by hang-ups and "dead air" calls, by do-not-call requests that are not honored, and by unsolicited fax advertisements.  Many consumers who commented in this proceeding "want something done" about unwanted solicitation calls, and the vast majority of them support the establishment of a national do-not-call registry.  Congress, too, has responded by enacting the Do-Not-Call Implementation Act (Do-Not-Call Act),[3] authorizing the establishment of a national do-not-call registry, and directing this Commission to issue final rules in its second major TCPA proceeding that maximize consistency with those of the FTC.

---

[1] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227.  The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 *et seq*.

[2] The Direct Marketing Association (DMA) is a trade association of businesses that advertise their products and services directly to consumers by mail, telephone, magazine, internet, radio or television.  *See also infra*, note 47.

[3] Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003), *to be codified at* 15 U.S.C. § 6101 *(Do-Not-Call Act)*.

**Federal Communications Commission**                                          **FCC 03-153**

3.      The Commission recognizes that telemarketing is a legitimate method of selling goods and services, and that many consumers value the savings and convenience it provides. Thus, the national do-not-call registry that we adopt here will only apply to outbound telemarketing calls and will only include the telephone numbers of consumers who indicate that they wish to avoid such calls.  Consumers who want to receive such calls may instead continue to rely on the company-specific do-not-call lists to manage telemarketing calls into their homes. Based on Congress's directives in the TCPA and the Do-Not-Call Act, the substantial record developed in this proceeding, and on the Commission's own enforcement experience, we adopt these amended rules, as described in detail below.

## II.      BACKGROUND

### A.        Telephone Consumer Protection Act of 1991

4.      On December 20, 1991, Congress enacted the TCPA in an effort to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy and even a risk to public safety.[4]  The statute restricts the use of automatic telephone dialing systems, artificial and prerecorded messages, and telephone facsimile machines to send unsolicited advertisements.  Specifically, the TCPA provides that:

> It shall be unlawful for any person within the United States—
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—
>
> (i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);
>
> (ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or
>
> (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;
>
> (B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B);
>
> (C) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine; or

---

[4] *See TCPA*, Section 2(5), *reprinted in* 7 FCC Rcd 2736 at 2744.

PA - 00251

Case 8:16-cv-02149-DOC-JCG   Document 11-2   Filed 12/08/16   Page 254 of 437   Page ID
#:410
Federal Communications Commission           FCC 03-153

(D) to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.[5]

Under the TCPA, those sending fax messages or transmitting artificial or prerecorded voice messages are subject to certain identification requirements.[6]  The statute also provides consumers with several options to enforce the restrictions on unsolicited telemarketing, including a private right of action.[7]

5.      The TCPA requires the Commission to prescribe regulations to implement the statute's restrictions on the use of autodialers, artificial or prerecorded messages and unsolicited facsimile advertisements.[8]  The TCPA also requires the Commission to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights" and to consider several methods to accommodate telephone subscribers who do not wish to receive unsolicited advertisements, including live voice solicitations.[9]  Specifically, section 227(c)(1) requires the Commission to "compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific 'do not call' systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such privacy rights, and in terms of their cost and other advantages and disadvantages."[10]  The TCPA specifically authorizes the Commission to "require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone

---

[5] 47 U.S.C. § 227(b)(1).

[6] 47 U.S.C. §§ 227(d)(1)(B) and (d)(3)(A).  *See also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Order on Further Reconsideration, 12 FCC Rcd 4609, 4613, para. 6 (1997) (*1997 TCPA Reconsideration Order*), in which the Commission found that "[s]ection 227(d)(1) of the statute mandates that a facsimile include the identification of the business, other entity, or individual creating or originating a facsimile message and not the entity that transmits the message." (footnotes omitted).

[7] The TCPA permits consumers to file suit in state court if an entity violates the TCPA prohibitions on the use of facsimile machines, automatic telephone dialing systems, and artificial or prerecorded voice messages and telephone solicitation. 47 U.S.C. §§ 227(b)(3) and (c)(5). Consumers may recover actual damages or receive up to $500 in damages for each violation, whichever is greater.  If the court finds that the entity willfully or knowingly violated the TCPA, consumers may recover an amount equal to not more than three times this amount.  47 U.S.C. § 227(b)(3).  Consumers may also bring their complaints regarding TCPA violations to the attention of the state attorney general or an official designated by the state.  This state entity may bring a civil action on behalf of its residents to enjoin a person or entity engaged in a pattern of telephone calls or other transmissions in violation of the TCPA. 47 U.S.C. § 227(f)(1).  Additionally, a consumer may request that the Commission take enforcement actions regarding violations of the TCPA and the regulations adopted to enforce it.  *See* 47 C.F.R. § 1.41 on informal requests for Commission action and 47 C.F.R. § 1.716 on the Commission's process for complaints filed against common carriers.

[8] 47 U.S.C. § 227(b)(2).

[9] 47 U.S.C. § 227(c)(1)-(4).

[10] 47 U.S.C. § 227(c)(1)(A).

PA - 00252

solicitations."[11]

## B.      TCPA Rules

6.        In 1992, the Commission adopted rules implementing the TCPA, including the requirement that entities making telephone solicitations institute procedures for maintaining do-not-call lists.[12]  Pursuant to the Commission's rules, a person or entity engaged in telemarketing is required to maintain a record of a called party's request not to receive future solicitations for a period of ten years.[13]  Telemarketers must develop and maintain written policies for maintaining their lists,[14] and they are required to inform their employees of the list's existence and train them to use the list.[15]  Commission rules prohibit telemarketers from calling residential telephone subscribers before 8 a.m. or after 9 p.m.[16] and require telemarketers to identify themselves to called parties.[17]  As mandated by the TCPA, the Commission's rules also establish general prohibitions against autodialed calls being made without prior express consent to certain locations, including emergency lines or health care facilities,[18] the use of prerecorded or artificial voice message calls to residences,[19] line seizure by prerecorded messages,[20] and the transmission of unsolicited advertisements by facsimile machines.[21]  The TCPA rules provide that facsimile and prerecorded voice transmissions, as well as telephone facsimile machines, must meet specific identification requirements.[22]

7.        In 1995 and 1997, the Commission released orders addressing petitions for reconsideration of the *1992 TCPA Order.*  In a Memorandum Opinion and Order released on

---

[11] 47 U.S.C. § 227(c)(3).

[12] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd 8752 (1992) (*1992 TCPA Order*); *see also* 47 C.F.R. § 64.1200.

[13] Initially telemarketers were required to honor a do-not-call request indefinitely.  The Commission later modified its rules to require that the request be honored for a ten-year period.  *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397-98, para. 14 (1995) (*1995 TCPA Reconsideration Order*); 47 C.F.R. § 64.1200(e)(2)(vi).

[14] 47 C.F.R. § 64.1200(e)(2)(i).

[15] 47 C.F.R. § 64.1200(e)(2)(ii).

[16] 47 C.F.R. § 64.1200(e)(1).

[17] 47 C.F.R. § 64.1200(e)(2)(iv).

[18] 47 C.F.R. § 64.1200(a)(1)(i)-(iii).

[19] 47 C.F.R. § 64.1200(a)(2).

[20] 47 C.F.R. §§ 64.1200(a)(4) and 68.318(c).

[21] 47 C.F.R. § 64.1200(a)(3).

[22] 47 C.F.R. §§ 64.1200(d)(1) and (2); 47 C.F.R. § 68.318(d).

PA - 00253

August 7, 1995, the Commission exempted from its TCPA rules calls made on behalf of tax-exempt nonprofit organizations, clarified treatment of debt collection calls, and required telemarketers to honor a do-not-call request for a period of ten years.[23]  The Commission also extended its TCPA rules to respond to technical advances in computer-based facsimile modems that enable solicitors to become "fax broadcasters."[24]  On April 10, 1997, the Commission issued an Order on Further Reconsideration requiring that all facsimile transmissions contain the identifying information of the business, other entity, or individual creating or originating the facsimile message, rather than the entity that transmits the message.[25]

### C.       Marketplace Changes Since 1992

8.       The marketplace for telemarketing has changed significantly in the last decade. When the TCPA was enacted in 1991, Congress determined that 300,000 solicitors were used to telemarket goods and services to more than 18 million Americans every day.[26]  Congress also found that in 1990 sales generated through telemarketing amounted to $435 billion dollars.[27]  Some estimate that today telemarketers may attempt as many as 104 million calls to consumers and businesses every day,[28] and that telemarketing calls generate over $600 billion in sales each year.[29]  The telemarketing industry is considered the single largest direct marketing system in the

---

[23] *1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12397-401, paras. 12-19.

[24] *1995 TCPA Reconsideration Order,* 10 FCC Rcd at 12404-06, paras. 27-31.

[25] *1997 TCPA Reconsideration Order,* 12 FCC Rcd at 4612-13, para. 6.  The Commission also "[did] not find anything in the TCPA that would prohibit a facsimile broadcast provider from supplying identification of itself and the entity originating a message if it arranges with the message sender to do so." *Id.* at 4613, para. 6.

[26] *See TCPA,* Section 2(3), *reprinted in* 7 FCC Rcd 2736 at 2744.

[27] *See TCPA,* Section 2(4), *reprinted in* 7 FCC Rcd 2736 at 2744.

[28] In attempting to estimate the number of outbound marketing calls made each day in the United States, representatives of the Direct Marketing Association (DMA) have stated that, with as many as 1 million telemarketing representatives making 13 calls an hour, working 8 hours a day, it is possible that 104 million outbound calls are made to businesses and consumers every day.  They noted that, of these calls, as many as 41% of them may be abandoned (because they get busy signals, no answer, hang-ups, or answering machines).  *See* transcript from FTC Do-Not-Call Forum, Testimony of Jerry Cerasale, DMA, June 6, 2002 at 68.  Another study presented to the FTC during its proceeding, estimates that the annual number of outbound calls that are answered by a consumer is 16,129,411,765 (*i.e.,* 16 billion calls).  This figure does not include those calls that are abandoned.  James C. Miller, III, Jonathan S. Bowater, Richard S. Higgins, and Robert Budd, "An Economic Assessment of Proposed Amendments to the Telemarketing Sales Rule," June 5, 2002 at 28, Att. 1 (prepared for the Consumer Choice Coalition and its members, ACI Telecentrics, Coverdell & Company, Discount Development Services, HSN LP d/b/a HSN and Home Shopping Network, Household Credit Services, MBNA America Bank, MemberWorks Incorporated, Mortgage Investors Corporation, Optima Direct, TCIM Inc., Trilegiant Corporation and West Corporation).  *See Telemarketing Sales Rule, Final Rule,* Federal Trade Commission, 68 Fed. Reg. 4580 at 4629-30, n.591 (Jan. 29, 2003) *(FTC Order).*

[29] This figure represents telemarketing sales to consumers and businesses.  *See* Seth Stern, "Will feds tackle telemarketers?" (April 15, 2002) <http://www.csmonitor.com/2002/0415/p16s01-wmcn.html> (citing Direct Marketing Association statistics).

country, representing 34.6% of the total U.S. sales attributed to direct marketing.[30]  The number of telemarketing calls, along with the increased use of various technologies to contact consumers, has heightened public concern about unwanted telemarketing calls and control over the telephone network.  Autodialers can deliver prerecorded messages to thousands of potential customers every day.  Predictive dialers,[31] which initiate phone calls while telemarketers are talking to other consumers, frequently abandon calls before a telemarketer is free to take the next call.[32]  Using predictive dialers allows telemarketers to devote more time to selling products and services rather than dialing phone numbers, but the practice inconveniences and aggravates consumers who are hung up on.  Despite a general ban on faxing unsolicited advertisements,[33] and aggressive enforcement by the Commission,[34] faxed advertisements also have proliferated, as facsimile service providers (or "fax broadcasters") enable sellers to send advertisements to multiple destinations at relatively little cost.  These unsolicited faxes impose costs on consumers, result in substantial inconvenience and disruption, and also may have serious implications for public safety.[35]

_____

[30] *See* "The Economic Impact of Direct Marketing by Telephone," a study presented by Direct Marketing Association Telephone Marketing Council, <http://www.third-wave.net/economics.htm> (visited July 3, 2002).

[31] A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call.  Such software programs are set up in order to minimize the amount of downtime for a telemarketer.  In some instances, a consumer answers the phone only to hear "dead air" because no telemarketer is free to take the call.  *See Telemarketing Sales Rule, Notice of Proposed Rulemaking*, Federal Trade Commission, 67 Fed. Reg. 4492 at 4522 (January 30, 2002) (*FTC Notice*).

[32] Each telemarketing company can set its predictive dialer software for a predetermined abandonment rate (*i.e.*, the percentage of hang-up calls the system will allow).  The higher the abandonment rate, the higher the number of hang-up calls.  High abandonment rates increase the probability that a customer will be on the line when the telemarketer finishes each call.  It also, however, increases the likelihood that the telemarketer will still be on a previously placed call and not be available when the consumer answers the phone, resulting in "dead air" or a hang-up.  *See FTC Notice*, 67 Fed. Reg. at 4523.

[33] 47 U.S.C. § 227(b)(1)(C) and 47 C.F.R. § 64.1200(a)(3).

[34] The Commission or the Commission's Enforcement Bureau have issued forfeiture orders totaling $1.56 million for violations of the TCPA's prohibition on unsolicited fax advertisements.  The Commission has also proposed a $5,379,000 forfeiture against a fax broadcaster.  *See Fax.com, Inc. Apparent Liability for Forfeiture*, Notice of Apparent Liability for Forfeiture, 17 FCC Rcd 15927 (2002) *(Fax.com NAL), stayed Missouri v. American Blast Fax*, No. 4:00CV933SNL (E.D. Mo. Aug. 29, 2002).  The Enforcement Bureau has also issued 189 citations for such prohibited faxes.  For a description of the Commission's enforcements actions involving the TCPA, *see* <http://www.fcc.gov/eb/tcd/working.html>.  Under section 503 of the Act, the Commission is required in an enforcement action to issue a warning citation to any violator that does not hold a Commission authorization.  Only if the non-licensee violator subsequently engages in conduct described in the citation may the Commission propose a forfeiture, and the forfeiture may only be issued as to the subsequent violations.  *See* 47 U.S.C. §§ 503(b)(5), (b)(2)(C).

[35] *See, e.g., Fax.com NAL*, 17 FCC Rcd at 15932-33, para. 9, which describes a medical doctor's complaint about unsolicited fax advertisements he received on a line that is reserved for the receipt of patient medical data.

### D.        FTC National Do-Not-Call Registry and Telemarketing Rules

9.        In response to these changes in the marketplace, the FTC recently amended its own rules to better protect consumers from deceptive and abusive telemarketing practices, including those that may be abusive of consumers' interest in protecting their privacy.  On December 18, 2002, the FTC released an order adopting a national do-not-call registry to be maintained by the federal government to help consumers avoid unwanted telemarketing calls.  In that order, the FTC also adopted other changes to its Telemarketing Sales Rule (TSR), which are based on its authority under the 1994 Telemarketing Consumer Fraud and Abuse Prevention Act.[36]  The FTC's amended TSR supplements its current company-specific do-not-call rules with a provision allowing consumers to stop unwanted telemarketing calls by registering their telephone numbers with a national do-not-call registry at no cost.  Telemarketers will be required to pay fees to access the database and to "scrub" their calling lists of the telephone numbers in the database.[37]  The FTC's list will not cover those entities over which it has no jurisdiction, including common carriers, banks, credit unions, savings and loans, companies engaged in the business of insurance, and airlines.[38]  It also will not apply to intrastate telemarketing calls.  In addition, the FTC concluded that nonprofit organizations are not subject to the national do-not-call list; however, they must, when using for-profit telemarketers, comply with the company-specific do-not-call rules.[39]

10.        The FTC indicated in its order that it does not intend the national do-not-call registry to preempt state do-not-call laws.  Instead, it will allow all states, and the DMA if it so desires, to download into the national registry the telephone numbers of consumers on their lists.  The FTC anticipates a relatively short transition period leading to one harmonized registry, and said that it will work with the states to coordinate implementation, minimize duplication, and

---

[36] *See FTC Order*, 68 Fed. Reg. at 4580.  The FTC adopted its Telemarketing Sales Rule, 16 C.F.R. Part 310, on August 16, 1995, pursuant to the Telemarketing Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6101-6108.  The Telemarketing Act, which was signed into law on August 16, 1994, directed the FTC to issue a rule prohibiting deceptive and abusive telemarketing acts or practices.  *FTC Notice,* 67 Fed. Reg. at 4492-93.

[37] "Scrubbing" refers to comparing a do-not-call list to a company's call list and eliminating from the call list the telephone numbers of consumers who have registered a desire not to be called.

[38] Despite these jurisdictional limitations, the FTC stated that it can reach telemarketing activity conducted by non-exempt entities.  Therefore, it maintains that when an exempt financial institution, telephone company, insurance company, airline, or nonprofit entity conducts its telemarketing campaign using a third-party telemarketer not exempt from the amended TSR, then that campaign is subject to the provisions of the TSR.  *See FTC Order*, 68 Fed. Reg. 4580 at 4587.

[39] The FTC's national do-not-call registry and other amendments to the TSR have been challenged on grounds that a national do-not-call registry violates the First Amendment and that the FTC exceeded its statutory authority under the Telemarketing Consumer Fraud and Abuse Prevention Act.  *See Mainstream Marketing Services, Inc. v. FTC*, No. 03-N-0184 (D. Colo. filed Jan. 29, 2003)*. See also U.S. Security et al v. FTC*, Civ. No. 03-122-W (W.D. Okla. filed Jan. 29, 2003).  On March 26, 2003, the U.S. District Court for the Western District of Oklahoma denied plaintiffs' Motion for Preliminary Injunction of the FTC's abandoned call rules, stating that plaintiffs "have failed to show a substantial likelihood that they will prevail on the merits of their challenges to the Final Rule."  *See U.S. Security et al. vs. FTC*, No. Case CIV-03-122-W (W.D. Okla. March 26, 2003).

PA - 00256

maximize efficiency for consumers.[40]  The FTC has also announced that online registration for the do-not-call registry will be available nationwide on or around July 1, 2003.  Telephone registration will be open on the same date for consumers in states west of the Mississippi River and open to the entire country on July 8, 2003.  On October 1, 2003, the FTC and the States will begin enforcing the national do-not-call provisions of the amended TSR.[41]

11.      The FTC also adopted new rules on the use of predictive dialers and the transmission of caller ID information.  The amended TSR prohibits telemarketers from abandoning any outbound telephone call, and provides in a safe harbor provision, that to avoid liability, a telemarketer must, among several other requirements, abandon no more than three percent of all calls answered by a person.[42]  Telemarketers will also be required to transmit the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service.[43]

E.       State Do-Not-Call Lists

12.      A growing number of states have also adopted or are considering legislation to establish statewide do-not-call lists.  To date, 36 states have passed "do-not-call" statutes, [44] and numerous others have considered similar bills.[45]  Consumers remain enthusiastic about do-not-call lists, as they continue to register their telephone numbers with state lists.[46]  State do-not-call

---

[40] See FTC Order, 68 Fed. Reg. 4580 at 4641.

[41] See FTC press materials at <http://www.ftc.gov/opa/2003/06/dncaccelerated.htm> (accessed June 3, 2003).

[42] See FTC Order, 68 Fed. Reg. 4580 at 4641-45; 16 C.F.R. §§ 310.4(b)(1)(iv) and 310.4(b)(4).

[43] See FTC Order, 68 Fed. Reg. 4580 at 4623-28; 16 C.F.R. § 310.4(a)(7).

[44] Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Vermont, Wisconsin and Wyoming have no-call laws.  Of these states, Connecticut, Maine, Michigan, Pennsylvania, Vermont, and Wyoming require telemarketers to use the DMA's Telephone Preference Service (TPS) list.  See infra note 47. Alaska's statute requires telephone companies to place a black dot in the telephone directory by the names of consumers who do not wish to receive telemarketing calls.

[45] States that are considering laws to create state-run do-not-call lists are Delaware, District of Columbia, Hawaii, Iowa, Maryland, Michigan, Nebraska, Nevada, North Carolina, Ohio, Rhode Island, South Carolina, Washington, and West Virginia.

[46] In Indiana, more than 1,000,000 residential telephone numbers have been submitted to the State's do-not-call list.  In Missouri, more than 1,000,000 residential telephone numbers are now enrolled in the State's do-not-call database, placing approximately 40% of the State's households on that State's do-not-call list.  In Tennessee, 762,000 telephone numbers have been registered, representing an estimated 33% of all households.  In New York, the number of residential telephone numbers enrolled on that State's do-not-call list is nearly 2 million. Connecticut's do-not-call list contains nearly 400,000 telephone numbers, and Georgia's is nearing 360,000. Colorado has 977,000 registered phone numbers, almost half of the number of residential phone lines in the state. Texas has more than 782,000 registered phone lines.  Kentucky has 740,000 registered phone lines, representing 46% of Kentucky residents.  The Kansas list contains more than 367,000 phone lines.  Approximately 1,600,000 residents enrolled in Pennsylvania's registry in less than six weeks.  See NAAG Comments at 6, n.5.

PA - 00257

lists vary in the methods used for collecting data, the fees charged, and the types of entities required to comply with their restrictions.  Some state statutes provide for state-managed do-not-call lists, while others require telemarketers to use the Direct Marketing Association's Telephone Preference Service.[47]  In some states, residents can register for the do-not-call lists at no charge.[48] In others, telephone subscribers must pay a fee.  For example, Georgia requires its residents to pay $5 to place their phone numbers on the do-not-call list for a period of two years.[49]  To register with the Texas do-not-call list, residents must pay $2.25 for three years.[50]  In most states, telemarketers must pay to access the state do-not-call list if they wish to call residents in that state; however, such access fees vary from state to state.  In Oregon, telemarketers must pay $120 per year to obtain the state do-not-call list;[51] in Missouri, the fee is $600 per year, although telemarketers can pay less if they want only numbers from certain area codes.[52]  The state "do-not-call" statutes provide varying exceptions to their requirements.

13.      As state legislatures continue to consider their own do-not-call laws, others have, in anticipation of the national do-not-call registry, begun the process of harmonizing their lists with the national list.  The Illinois legislature, for example, passed a bill to reconcile differences between the state and federal no-call laws.  The measure would make the FTC's national no-call list the official state list for Illinois and would direct the Illinois Commerce Commission to work with local exchange providers on how to inform consumers about the existence of the list.[53] California's Attorney General's office is allowing residents to pre-register for the national registry on the internet, and says it will deliver the pre-registered California telephone numbers to the FTC as soon as it is ready to receive them.[54]  The FTC indicated in its order that it will take some time to harmonize the various state do-not-call registries with the national registry.[55] While some states will be able to transfer their state "do-not-call" registration information by the time telemarketers first gain access to the national registry, other states may need from 12 to 18

---

[47] *See, e.g.,* Wyoming (Wyo. Stat. Ann. § 40-12-301) and Maine (Me. Rev. Stat. Ann. tit. 32, § 14716 (2003). Established in 1985, the DMA's Telephone Preference Service (TPS) is a list of residential telephone numbers for consumers who do not wish to receive telemarketing calls.  The DMA requires its members to adhere to the list. Telemarketers who are not members of DMA are not required to use the list, but may purchase the TPS for a fee. *See* <http://www.dmaconsumers.org/offtelephonelist.html> (accessed April 8, 2003).

[48] *See, e.g.,* Connecticut (Conn. Gen. Stat. Ann. § 42-288a); Indiana (H.B. 1222, to be codified at Ind. Code Ann. § 24.4.7); Missouri (Mo. Rev. Stat. § 407.1098); and Tennessee (Tenn. Code Ann. § 65-4-404 (2002)); *see also* rules at Tenn. Comp. R & Regs. Chap. 1220-4-11).

[49] *See* Ga. Code Ann. § 46-5-27 (2002); *see also* rules at Ga. Comp. R & Regs. R. 515-14-1.

[50] *See* H.B. 472, to be codified at Tex. Bus. & Com. Code Ann. § 43.001.

[51] *See* Or. Rev. Stat. § 646.574.

[52] *See* Mo. Rev. Stat. § 407.1098.

[53] *See* Illinois H.B. 3407.

[54] *See* <http://nocall.doj.state.ca.us/> (accessed April 8, 2003).

[55] *See FTC Order*, 68 Fed. Reg. 4580 at 4641.

months to achieve those results.[56]

###### F.        Notice of Proposed Rulemaking

14.    On September 18, 2002, the Commission released a Memorandum Opinion and Order and Notice of Proposed Rulemaking seeking comment on whether the Commission's rules need to be revised in order to carry out more effectively Congress's directives in the TCPA.[57] Specifically, we sought comment on whether to revise or clarify our rules governing unwanted telephone solicitations[58] and the use of automatic telephone dialing systems,[59] prerecorded or artificial voice messages,[60] and telephone facsimile machines.[61]  We also sought comment on the effectiveness of company-specific do-not-call lists.[62]  In addition, we sought comment on whether to revisit the option of establishing a national do-not-call list[63] and, if so, how such action might be taken in conjunction with the FTC's proposal to adopt a national do-not-call list and with various state do-not-call lists.[64]  Lastly, we sought comment on the effect proposed policies and rules would have on small business entities, including *inter alia* those that engage in telemarketing activities and those that rely on telemarketing as a method to solicit new business.[65]  Following the FTC's announcement that it had amended its TSR, the Commission extended the reply comment period in this proceeding to ensure that all interested parties had ample opportunity to comment on possible Commission action in light of the FTC's new rules.[66]

###### G.        Do-Not-Call Implementation Act

15.    On March 11, 2003, the Do-Not-Call Act was signed into law, authorizing the

---

[56] *See* FTC Order, 68 Fed. Reg. 4580 at 4641.

[57] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking (NPRM) and Memorandum Opinion and Order (MO&O), 17 FCC Rcd 17459, CG Docket No. 02-278 and CC Docket No. 92-90 (2002) *(2002 Notice).*  In the MO&O, the Commission closed and terminated CC Docket No. 92-90 and opened a new docket to address the issues raised in this proceeding.

[58] *2002 Notice*, 17 FCC Rcd at 17468-71, paras. 13-17.

[59] *2002 Notice*, 17 FCC Rcd at 17473-76, paras. 23-27.

[60] *2002 Notice*, 17 FCC Rcd at 17477-81, paras. 30-35.

[61] *2002 Notice*, 17 FCC Rcd at 17482-84, paras. 37-40.

[62] *2002 Notice*, 17 FCC Rcd at 17468-71, paras. 13-17.

[63] *2002 Notice*, 17 FCC Rcd at 17487-96, paras. 49-66.

[64] *See FTC Notice*, 67 Fed. Reg. 4492 and *FTC Order*, 68 Fed. Reg. 4580.

[65] *2002 Notice,* 17 FCC Rcd at 17497-501, paras. 70-80.

[66] On December 20, 2002, the Commission extended its reply comment period until January 31, 2003.  *See Consumer & Governmental Affairs Bureau Announces An Extension of Time To File Reply Comments on the Telephone Consumer Protection Act (TCPA) Rules*, Public Notice, DA 02-3554 (rel. Dec. 20, 2002).

PA - 00259

FTC to collect fees from telemarketers for the implementation and enforcement of a do-not-call registry.  The Do-Not-Call Act also requires the FCC to issue a final rule in its ongoing TCPA proceeding within 180 days of enactment, and to consult and coordinate with the FTC to "maximize consistency" with the rule promulgated by the FTC.  Congress recognized that because the FCC is bound by the TCPA, it would not be possible for the FCC to adopt rules that are identical to those of the FTC in every instance.[67]  In those instances where such inconsistencies exist, Congress stated that either the FTC or FCC must address them administratively or Congress must address them legislatively.[68]  The FTC's recent rule changes expand that agency's regulation of telemarketing activities and require coordination to ensure consistent and non-redundant federal enforcement.  The FCC's jurisdiction over telemarketing practices, however, is significantly broader than the FTC's.  The FCC staff intends to negotiate a Memorandum of Understanding between the respective agencies to achieve an efficient and effective enforcement strategy that will promote compliance with federal regulations.  The FCC is required to report to Congress within 45 days after the issuance of final rules in this proceeding, and annually thereafter.[69]  The Commission released a Further Notice of Proposed Rulemaking on March 25, 2003, seeking comment on the Do-Not-Call Act's requirements.[70]  By this Order, we are complying with Congress's directives to issue final rules in our TPCA proceeding within 180 days of the Do-Not-Call Act's enactment.  Furthermore, we have consulted and coordinated with the FTC to adopt a national do-not-call list and other telemarketing rules that maximize consistency with the FTC's amended Telemarketing Sales Rule.[71]  Pursuant to the requirements of the Do-Not-Call Act, the Commission will note the remaining inconsistencies between the FCC and FTC rules in the report to Congress.  The Commission will also continue to work, within the framework of the TCPA, to maximize consistency with the FTC's rules.

## III.    NATIONAL DO-NOT-CALL LIST

###    A.        Background

        16.    *Section 227.*  The TCPA requires the Commission to protect residential telephone

---

[67] *See* H.R. REP. No. 108-8 at 4 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 671.

[68] *Id.*

[69] The Do-Not-Call Act provides that the FTC and FCC shall each transmit a report to Congress which shall include: "(1) an analysis of the telemarketing rules promulgated by both the Federal Trade Commission and the Federal Communications Commission; (2) any inconsistencies between the rules promulgated by each such Commission and the effect of any such inconsistencies on consumers, and persons paying for access to the registry; and (3) proposals to remedy any such inconsistencies."  *See* Do-Not-Call Act, Sec. 4(a).

[70] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Further Notice of Proposed Rulemaking, FCC 03-62 (rel. March 25, 2003) *(Further Notice).*

[71] *See* Comments filed by the FTC in response to the Commission's *Further Notice.  See also* NARUC Winter Committee Meetings, February 23-26, 2003, at which FCC and FTC staff discussed the national do-not-call registry and ways to harmonize federal and state programs; Letter from James Bradford Ramsay, NARUC General Counsel, to FCC filed March 14, 2003 (NARUC *ex parte*).

subscribers' privacy rights to avoid receiving telephone solicitations to which they object.[72]  In so doing, section 227(c)(1) directs the Commission to "compare and evaluate alternative methods and procedures" including the use of electronic databases and other alternatives in protecting such privacy rights.[73]  Pursuant to section 227(c)(3), the Commission "may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase."[74]  If the Commission determines that adoption of a national database is warranted, section 227(c)(3) enumerates a number of specific statutory requirements that must be satisfied.[75]  Additionally, section 227(c)(4) requires the Commission to consider the different needs of telemarketers operating on a local or regional basis and small businesses.[76]  In addition to our general authority over interstate communications, section 2(b) of the Communications Act specifically provides the Commission with the authority to apply section 227 to intrastate communications.[77]

17.     *TCPA Order and 2002 Notice.*  The Commission initially considered the possibility of adopting a national do-not-call database in the 1992 *TCPA Order*.  At that time, the Commission declined to adopt a national do-not-call registry citing concerns that such a database would be costly and difficult to establish and maintain in a reasonably accurate form.[78]  The Commission noted that frequent updates would be required, regional telemarketers would be forced to purchase a national database, costs might be passed on to consumers, and the information compiled could present problems in protecting consumer privacy.  The Commission opted instead to implement an alternative approach requiring commercial telemarketers to maintain their own company-specific lists of consumers who do not wish to be called.[79]

18.     In the *2002 Notice*, the Commission sought comment on whether to revisit its 1992 determination not to adopt a national do-not-call list.[80]  As evidenced by the persistent

---

[72] 47 U.S.C. § 227(c)(1).

[73] 47 U.S.C. § 227(c)(1)(A).

[74] 47 U.S.C. § 227(c)(3).

[75] *See* 47 U.S.C § 227(c)(3)(A)-(L).

[76] 47 U.S.C. § 227(c)(4).

[77] 47 U.S.C. § 152(b).  *See also Texas v. American Blast Fax*, 121 F. Supp. 2d 1085 at 1087-89 (W.D. Tex. 2000), *Minnesota v. Sunbelt Communications and Marketing*, Civil No. 02-CV-770 (D. Minn. Sept. 4, 2002).

[78] *1992 TCPA Order*, 7 FCC Rcd at 8760, para. 14.  At that time commenters estimated the start-up and operational costs for a national database in the first year could be as high as $80 million.  *Id.* at 8758, para. 11.

[79] *See infra* paras. 86-96 for a discussion of the company-specific do-not-call requirements.

[80] *2002 Notice*, 17 FCC Rcd at 17487-96, paras. 49-66.  On December 20, 2002, the Commission extended its reply comment period to allow parties an opportunity to comment on the FTC's order establishing a national do-not-call database for those entities over which it has jurisdiction.  *See Consumer & Governmental Affairs Bureau Announces An Extension of Time To File Reply Comments on the Telephone Consumer Protection Act (TCPA) Rules*, Public Notice, DA 02-3554 (rel. Dec. 20, 2002).

consumer complaints regarding unwanted telephone solicitations, the Commission concluded
that the time was ripe to revisit this issue as part of its overall review of the TCPA rules.[81]   In so
doing, the Commission noted that the increasing number of telemarketing calls over the last
decade, along with the increased use of various technologies, such as predictive dialers, to
contact consumers, has heightened public concern about unwanted telemarketing calls and
control over the telephone network.[82]  The Commission also noted that technological innovations
may make the creation and maintenance of a national do-not-call database more viable than in
the past.  Therefore, the Commission sought comment on whether a national do-not-call list
should be adopted and, if so, how such a list could be implemented in the most efficient and
effective manner for consumers, businesses, and regulators.  The Commission noted that a
national list would provide consumers with a one-step method for preventing unwanted
telemarketing calls.  This option could be less burdensome for consumers than repeating requests
on a case-by-case basis, particularly in light of the number of entities that conduct telemarketing
today.  In particular, the Commission sought comment on:  (1) whether the cost, accuracy, and
privacy concerns noted in 1992 remain relevant today; (2) the effectiveness of the company-
specific list in protecting consumer privacy rights; (3) changes in the technology or the
marketplace that might influence this analysis; (4) the constitutionality of a national database; (5)
satisfying the statutory requirements of section 227(c); and (6) the potential relationship of a
national database with the FTC's proposed rules and various state-adopted do-not-call
registries.[83]

        19.     The issues relating to the adoption and implementation of a national do-not-call
registry generated extensive comment from consumers, businesses, and state governments.
Individual consumers and consumer interest groups overwhelmingly support the adoption of a
national do-not-call list.[84]  In fact, several commenters support more restrictive alternatives such
as adopting an "opt-in" list for those consumers that wish to receive telephone solicitations.[85]
Commenters supporting a national do-not-call list cite the numerous and increasing receipt of
unwanted telephone solicitation calls; inadequacies of the company-specific approach due to the
failure of many telemarketers to honor do-not-call requests or, the impossibility of relaying such
requests in the case of "dead air" or hang-up calls initiated by predictive dialers; the burdens of
making do-not-call requests for every such call, particularly on the elderly and individuals with
disabilities; and the costs imposed on consumers in acquiring technologies to reduce the number

---

[81] *2002 Notice*, 17 FCC Rcd at 17487-88, para. 49 (also noting that the FTC had received over 40,000 comments
in response to its Notice on telemarketing).

[82] *2002 Notice*, 17 FCC Rcd at 17464, para. 7, n.34 (citing estimate that as many as 104 million outbound calls are
made every day).

[83] *See 2002 Notice*, 17 FCC Rcd at 17487-96, paras. 49-66.

[84] *See, e.g.*, Maureen Matthews Comments; Gloria Toso Comments; Shirley A. Weaver Comments.  *See also*
ACUTA Comments at 2; NACAA Comments at 2; Telecommunications for the Deaf Comments at 4; NJ
Ratepayer Further Comments at 2.

[85] *See, e.g.*, EPIC Comments at 2-5; Private Citizens, Inc. Comments at 3; Teresa Wilkie Comments; Benjamin
Philip Johnson Comments.

of unwanted calls.[86]  Many such commenters argue that unwanted telephone solicitations have reached the point of harassment that constitutes an invasion of privacy within their homes.[87] Others indicate that consumers are often frightened by dead-air and hang-up calls generated by predictive dialers believing they are being stalked.[88]  Several consumers indicate that they no longer answer their telephones or they disconnect the phone during the day to avoid telemarketing calls.  These commenters support the adoption of a one-step option for those consumers that desire to reduce the number of unwanted solicitation calls that they receive each day.

20.     Many consumers indicate that their state lists have reduced the number of unwanted calls that they receive and express concern that any federal do-not-call registry not undermine the protections afforded by the state do-not-call laws.[89]  Assuming that a national do-not-call database is adopted, commenters encourage the Commission to work closely with the FTC to adopt a single national registry that operates as consistently and efficiently as possible for all interested parties.[90]  State regulators generally support a national database provided that it does not preempt state do-not-call rules or preclude the states from enforcing these laws.[91]

21.     Industry representatives generally oppose the adoption of a national do-not-call database, but some support this approach provided the Commission adopts an established business relationship exemption and preempts state lists.[92]  These commenters contend that the concerns noted by the Commission in 1992, including the costs, accuracy, and privacy issues involved in creating and maintaining such a database remain valid today.[93]  In addition, industry

---

[86] *See, e.g.,* Terry L. Krodel Comments (disabled individual has difficulty answering phone); Brian Lawless (contends that consumers should not be forced to pay additional charges to stop telemarketing calls); J. Raymond de Varona Comments (telemarketers hang up when he requests to be added to do-not call list); Mandy Burkart Comments (elderly grandmother targeted by telemarketers).  *See also* AARP Comments at 1 (noting that elderly consumers are often the subject of telemarketing fraud).

[87] *See, e.g.*, Emily Malek Comments; Lester D. McCurrie Comments; Andrea Sattler Comments; Sandra S. West Comments (receives as many as 20 telemarketing calls per day).

[88] Edwin Bailey Hathaway Comments; Cynthia Stichnoth Comments.

[89] *See, e.g.,* Brenda J. Donat Comments (cancer patient appreciates reduction in calls due to Indiana Telephone Privacy Act); Alice and Bill Frazee Comments; Tammy Puckett Comments (Indiana law provides quiet for terminally ill family member).

[90] *See, e.g.*, Verizon Comments at 2; Bank of America Further Comments at 2.

[91] *See, e.g.*, NAAG Comments at 8-13; New York State Consumer Protection Board Comments at 7; Ohio PUC Comments at 3-7; Texas PUC Comments at 10.

[92] *See, e.g.,* Bank of America Comments at 2-4 (endorse national list provided it establishes a uniform national standard and retains established business relationship); Cox Enterprises Comments at 4-9 (would not oppose national list if established business relationship exemption is retained); Sprint Comments at 11-12 (state lists should be preempted); Verizon Wireless Comments at 4-6 (support national list if state lists preempted and established business relationship retained).  *See also* DMA Further Comments at 3 (should preempt states); DirectTV Further Comments at 3 (preempt); Nextel Further Comments at 8.

[93] *See, e.g.*, MBA Comments at 2; NAII Comments at 2; SBC Comments at 6; WorldCom Comments at 17.

PA - 00263

commenters argue that a national do-not-call database is not necessary because the current rules are sufficient to protect consumer privacy rights.[94]  Several note the economic importance of telemarketing and indicate that a national registry would have severe economic consequences for their industry.[95]  Several industry representatives request specific exemptions from the national do-not-call requirements for newspapers, magazines, insurance companies and small businesses.[96]  These commenters contend that they provide valuable goods or services to the public and that telemarketing is the most cost-effective means to promote those services.[97]  Representatives of various non-profit organizations oppose any extension of the national do-not-call rules to their organizations.[98]  Several commenters argue that a national registry would impose an unconstitutional restriction on commercial speech.[99]  They urge more stringent enforcement of the Commission's current rules.

        22.     *FTC Order*.  On December 18, 2002, the FTC released an order establishing a national do-not call registry.[100]  The FTC cited an extensive record that revealed that the current rules on telemarketing were not sufficient to protect consumer privacy.  The FTC's do-not-call rules provide several options for consumers to manage telemarketing calls – one of which is to allow consumers who do not want to receive telephone solicitation calls to register their telephone number with a national do-not-call database.[101]  The FTC indicates that consumers may do so at no cost by two methods:  either through a toll-free call from the phone number that they wish to register or over the Internet.[102]  Consumer registrations will remain valid for a period of five years, with the registry purged on a monthly basis of numbers that have been disconnected or reassigned.  Each seller engaged in telemarketing or on whose behalf telemarketing is conducted will be required to pay an annual fee for access to the database based

---

[94] *See, e.g.,* ABA Comments at 7; BellSouth Reply Comments at 5.

[95] *See, e.g.*, Dial America Comments at 15-18; Technion Comments at 3-4; Vector Comments at 14-15.

[96] *See, e.g.*, MPA Comments at 13-14; NAA Comments at 12-14; Seattle Times Comments at 2; Vector Comments at 14-15.

[97] *See, e.g.*, MPA Comments at 4, 13-14; NAA Comments at 13; PLP Comments at 1.

[98] *See, e.g.,* March of Dimes Comments at 2; Leukemia and Lymphoma Society Comments; Special Olympics Hawaii Comments at 2.

[99] *See, e.g.*, ATA Comments at 58-91; SBC Comments at 6, 16-17; WorldCom Comments at 19-30.

[100] *See FTC Order*, 68 Fed. Reg. at 4628-33.

[101] The FTC has awarded a contract to AT&T Government Solutions for $3.5 million to create the national registry of consumers who do not want to be contacted by telemarketers.

[102] The FTC indicates that calls will be answered by an Interactive Voice Response (IVR) system.  Consumers will be directed to enter their telephone numbers.  That number will then be checked against an automatic number information (ANI) that is transmitted with the call.  Consumers will also be able to verify or cancel their registration in the same way.  *See FTC Order*, 68 Fed. Reg. at 4638-39.

PA - 00264

on the number of area codes of data that the company wishes to access.[103]  The only consumer information that telemarketers will receive from the national registry is the registrants' telephone numbers.  The FTC's rules prohibit the sale, purchase, rental, lease, or use of the national registry for any purpose other than compliance with the do-not-call provision.[104]

23.     The FTC's national do-not-call rules will not apply to those entities over which it has no jurisdiction, including common carriers, banks, insurance companies, and airlines.  The FTC rules also will not apply to intrastate telemarketing calls.  In addition, the FTC exempts certain types of calls from the national do-not-call provisions.  Specifically, the FTC has established exemptions for calls made by or on behalf of charitable organizations,[105] calls to consumers with whom the seller has an "established business relationship"[106] (as long as the consumer has not asked to be placed on the seller's company-specific do-not-call list), and calls to businesses.  The FTC also decided to retain the provision of its rules that allows sellers to obtain the express agreement of consumers who wish to receive calls from that seller.  The FTC requires that such express agreement be evidenced by a signed, written agreement.  As a result, consumers registered on the national do-not-call list may continue to receive calls from those sellers that have acquired their express agreement.  The FTC also adopted a "safe harbor" from liability under its do-not-call provisions concluding that sellers or telemarketers that have made a good faith effort to provide consumers with an opportunity to exercise their do-not-call rights should not be liable for violations that result from an error.[107]  The FTC clarified that because wireless subscribers are often charged for the calls they receive, they will be allowed to register their wireless telephone numbers on the national do-not-call database.

24.     The FTC concluded that it does not intend its rules establishing a national do-not-call registry to preempt state do-not-call laws.  The FTC indicated its desire to work with those states that have enacted such laws, as well as this Commission, to articulate requirements and

[103] As discussed herein, the terms "seller" and "telemarketer" may refer to the same entity or separate entities.  The "telemarketer" is the entity that actually initiates the telephone call.  The "seller" is the entity on whose behalf the telephone call is being made. *See* amended 47 C.F.R. § 64.1200(f)(5) and (6).  Sellers may often hire telemarketing entities to contact consumers on their behalf. *See* amended 47 C.F.R. § 64.1200(f)(7) for the definition of "telemarketing."  Pursuant to the FTC's do-not-call program, each seller must pay for access to the do-not-call database.  Thus, telemarketing entities cannot share do-not-call data among various client sellers.

[104] *See* 16 C.F.R. § 310.4(b)(2).

[105] The FTC has concluded, however, that calls on behalf of charitable organizations will be subject to the company specific do-not-call provisions. *See FTC Order*, 68 Fed. Reg. at 4629.

[106] The FTC defines an "established business relationship" as a relationship between a seller and consumer based on:  (1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the *eighteen* months immediately preceding the date of a telemarketing call; or (2) the consumer's inquiry or application regarding a product or service offered by the seller, within the *three* months immediately preceding the date of a telemarketing call.  16 C.F.R. § 310.2(n).  Regarding the interplay between the established business relationship and do-not-call rules, the FTC concluded that if the consumer continues to do business with the seller after asking not to be called, the consumer cannot be deemed to have waived their company-specific do-not-call request. *FTC Order*, 68 Fed. Reg. at 4634.

[107] *See* 16 C.F.R. § 310.4(b)(3).

procedures during what it anticipates will be a relatively short transition period leading to one harmonized registry system.  The FTC has articulated a goal whereby consumers, in a single transaction, can register their requests not to receive calls to solicit sales of goods or services, and sellers and telemarketers can obtain a single list to ensure that they do not contravene consumer requests not to be called.[108]

### B.        Discussion

25.        As discussed in greater detail below, we conclude that the record compiled in this proceeding supports the establishment of a single national database of telephone numbers of residential subscribers who object to receiving telephone solicitations.  Consistent with the mandate of Congress in the Do-Not-Call Act, the national do-not-call rules that we establish in this order "maximize consistency" with those of the FTC.[109]  The record clearly demonstrates widespread consumer dissatisfaction with the effectiveness of the current rules and network technologies available to protect consumers from unwanted telephone solicitations.[110]  Indeed, many consumers believe that with the advent of such technologies as predictive dialers that the vices of telemarketing have become inherent, while its virtues remain accidental.  We have compared and evaluated alternative methods to a national do-not-call list for protecting consumer privacy rights and conclude that these alternatives are costly and/or ineffective for both telemarketers and consumers.[111]

26.        A national do-not-call registry that is supplemented by the amendments made to our existing rules will provide consumers with a variety of options for managing telemarketing calls.  Consumers may now:  (1) place their number on the national do-not-call list; (2) continue to make do-not-call requests of individual companies on a case-by-case basis; and/or (3) register on the national list, but provide specific companies with express permission to call them.  Telemarketers may continue to call individuals who do not place their numbers on a do-not-call list and consumers with whom they have an established business relationship.  We believe this result is consistent with Congress' directive in the TCPA that "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices."[112]

27.        We agree with Congress that consistency in the underlying regulations and

---

[108] *FTC Order*, 68 Fed. Reg. at 4638-41.

[109] *See also* H.R. REP. NO. 108-8 at 3 (2003), reprinted in 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities.  This legislation is an important step toward a one-stop solution to reducing telemarketing abuses.").

[110] *See, e.g.*, Joseph A. Durle Comments (forced to turn phone off due to constant telemarketing calls and missed call that family member had a stroke); John D. Milhous Comments; Gregory Reichenbach Comments; Christopher C. Parks Comments (receives numerous calls every day).

[111] *See* 47 U.S.C. § 227(c)(1)(A).

[112] *See TCPA*, Section 2(9), *reprinted in* 7 FCC Rcd at 2744.

administration of the national do-not-call registry is essential to avoid consumer confusion and regulatory uncertainty in the telemarketing industry.  In so doing, we emphasize that there will be one centralized national do-not-call database of telephone numbers.  The FTC has set up and will maintain the national database, while both agencies will coordinate enforcement efforts pursuant to a forthcoming Memorandum of Understanding.[113]  The states will also play an important role in the enforcement of the do-not-call rules.  The FTC has received funding approval from Congress to begin implementation of the national do-not-call registry.  Because the FTC lacks jurisdiction over certain entities, including common carriers, banks, insurance companies, and airlines, those entities would be allowed to continue calling individuals on the FTC's list absent FCC action exercising our broad authority given by Congress over telemarketers.  In addition, the FTC's jurisdiction does not extend to intrastate activities.  Action by this Commission to adopt a national do-not-call list, as permitted by the TCPA, requires all commercial telemarketers to comply with the national do-not-call requirements, thereby providing more comprehensive protections to consumers and consistent treatment of telemarketers.

### 1.      National Do-Not-Call Registry

28.      Pursuant to our authority under section 227(c), we adopt a national do-not-call registry that will provide residential consumers with a one-step option to prohibit unwanted telephone solicitations.  This registry will be maintained by the FTC.  Consistent with the FTC's determination, the national registry will become effective on October 1, 2003.[114]  Subject to the exemptions discussed below, telemarketers will be prohibited from contacting those consumers that register their telephone numbers on the national list.  In reaching this conclusion, we agree with the vast majority of consumers in this proceeding and the FTC that a national do-not-call registry is necessary to enhance the privacy interests of those consumers that do not wish to receive telephone solicitations.  In response to the widespread consumer dissatisfaction with telemarketing practices, Congress has recently affirmed its support of a national do-not-call registry in approving funding for the FTC's national database.[115]  In so doing, Congress has indicated that this Commission should adopt rules that "maximize consistency" with those of the FTC.[116]  The record in this proceeding is replete with examples of consumers that receive

---

[113] In the *FTC Order*, the FTC outlines in detail how the national registry will be administered, including how consumers may register and how sellers may purchase the list.  *See also infra*, Enforcement Priorities section, paras. 211-214.

[114] We decline to extend the effective date for the national do-not-call rules beyond October 1, 2003.  *See Ex Parte Presentations* from WorldCom to FCC, filed May 23, 2003 and June 16, 2003 (advocating a 9.5-month implementation period for the national do-not-call list requirements).

[115] *See* H.R. J. Res. 2, 108th Congress at 96 (2003) (*Consolidated Appropriations Resolution*).  *See also* H.R. REP. NO. 108-8 at 3 (2003), reprinted in 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities. This legislation is an important step toward a one-stop solution to reducing telemarketing abuses.").

[116] *See* Do-Not-Call Act, Sec. 3.

PA - 00267

numerous unwanted calls on a daily basis.[117]  The increase in the number of telemarketing calls over the last decade combined with the widespread use of such technologies as predictive dialers has encroached significantly on the privacy rights of consumers.[118]  For example, the effectiveness of the protections afforded by the company-specific do-not-call rules have been reduced significantly by dead air and hang-up calls that result from predictive dialers.  In these situations, consumers have no opportunity to invoke their do-not-call rights and the Commission cannot pursue enforcement actions.  As detailed previously, such intrusions have led many consumers to disconnect their phones during portions of the day or avoid answering their telephones altogether.  The adoption of a national do-call-list will be an important tool for consumers that wish to exercise control over the increasing number of unwanted telephone solicitation calls.

29.      Although some industry commenters attempt to characterize unwanted solicitation calls as petty annoyances and suggest that consumers purchase certain technologies to block unwanted calls, the evidence in this record leads us to believe the cumulative effect of these disruptions in the lives of millions of Americans each day is significant.  As a result, we conclude that adoption of a national do-not-call list is now warranted.  We believe that consumers should, at a minimum, be given the opportunity to determine for themselves whether or not they wish to receive telephone solicitation calls in their homes.  The national do-not-call list will serve as an option for those consumers who have found the company-specific list and other network technologies ineffective.  The telephone network is the primary means for many consumers to remain in contact with public safety organizations and family members during times of illness or emergency.  Consumer frustration with telemarketing practices has reached a point in which many consumers no longer answer their telephones while others disconnect their phones during some hours of the day to maintain their privacy.  We agree with consumers that incessant telephone solicitations are especially burdensome for the elderly, disabled, and those that work non-traditional hours.[119]  Persons with disabilities are often unable to register do-not-call requests on many company-specific lists because many telemarketers lack the equipment necessary to receive that request.[120]  Given the record evidence, along with Congress's recent affirmative support for a national do-not-call registry, we adopt a national do-not-call registry.[121]

---

[117] *See, e.g.*, Sean Herriott Comments (receives numerous telemarketing calls each day); Lester D. McCurrie (receives between 8-12 call per day); David K. McClain Comments; Greg Rademacher Comments (receives so many calls that he now refuses to answer the phone); John Rinderle Comments; Steven D. Thorton Comments; Sandra West Comments (receives 20 calls per day).

[118] *See supra* para. 8.

[119] *See, e.g.*, Karen M. Meyer Comments (86 year-old receives as many as 10 solicitation calls per day); Vivian Sinclair Comments (85 year old with cane receives numerous telephone solicitations); Mr. and Mrs. Joseph Stephanik Comments (works at night and telemarketing calls interfere with sleep); Mavis Selway Comments (husband who works at night must answer telemarketing calls during day).

[120] *See* Telecommunications for the Deaf Comments at 2-3 (noting that telemarketers often lack TTY or telecommunications relay service).

[121] *See* H.R. REP. NO. 108-8 at 3 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities.").

As discussed more fully below, however, we are mindful of the need to balance the privacy concerns of consumers with the interests of legitimate telemarketing practices. Therefore, we have provided for certain exemptions to the national do-not-call registry.

30.     While we agree that concerns regarding the cost, accuracy, and privacy of a national do-not-call database remain relevant, we believe that circumstances have changed significantly since the Commission first reviewed this issue over a decade ago such that they no longer impose a substantial obstacle to the implementation of a national registry.  As several commenters in this proceeding note, advances in computer technology and software now make the compilation and maintenance of a national database a more reasonable proposition.[122]  In addition, considerable experience has been gained through the implementation of many state do-not-call lists.  In 1992, it was estimated by some commenters that the cost of establishing such a list in the first year could be as high as $80 million.  As noted above, Congress has recently reviewed and approved the FTC's request for $18.1 million to fund the national do-not-call list.[123]  We believe that the advent of more efficient technologies and the experience acquired in dealing with similar databases at the state level is responsible for this substantial reduction in cost.

31.     Similarly, we believe that technology has become more proficient in ensuring the accuracy of a national database.  The FTC indicates that to guard against the possibility of including disconnected or reassigned telephone numbers, technology will be employed on a monthly basis to check all registered telephone numbers against national databases, and remove those numbers that have been disconnected or reassigned.[124]  The length of time that registrations remain valid also directly affects the accuracy of the registry as telephone numbers change hands over time.  As discussed more fully below, we conclude that the retention period for both the national and company-specific do-not-call requests will be five years.[125]  This is consistent with the FTC's determination and our own record that reveals that the current ten-year retention period for company-specific requests is too long given changes in telephone numbers. Consumers must also register their do-not-call requests from either the telephone number of the phone that they wish to register or via the Internet.  The FTC will confirm the accuracy of such registrations through the use of automatic number identification (ANI)[126] and other technologies. We believe that a five-year registration period coupled with a monthly purging of disconnected

---

[122] *See, e.g.*, LSSi Comments at 5-6; NCS Comments at 2-4.

[123] As noted above, the FTC has awarded a contract to AT&T Government Solutions for $3.5 million to create the national registry.  The Congressional Budget Office estimates that the FTC will collect and spend a total of about $73 million in fees over 2003-2008 to implement the national database.  *See* H.R. Rep. No.108-8 at 6 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 673.

[124] *FTC Order*, 68 Fed. Reg. at 4640.

[125] *See FTC Order*, 68 Fed. Reg. at 4640.  Our rules previously required a company-specific do-not-call request to be honored for ten years.  *See* 47 C.F.R. § 64.1200(e)(2)(vi).

[126] The term "ANI" refers to the delivery of the calling party's billing number by a local exchange carrier to any interconnecting carrier for billing or routing purposes, and to the subsequent delivery of such number to end users.  47 C.F.R. § 64.1600(b).

PA - 00269

telephone numbers adequately balances the need to maintain accuracy in the national registry with any burden imposed on consumers to re-register periodically their telephone numbers.

32.      We conclude that appropriate action has been taken to ensure the privacy of those registering on the national list.  Specifically, the only consumer information telemarketers and sellers will receive from the national registry is the registrant's telephone number.[127]  This is the minimum amount of information that can be provided to implement the national registry.  We note that the majority of telephone numbers are publicly available through telephone directories.  To the extent that consumers have an unlisted number, the consumer will have to make a choice as to whether they prefer to register on a national do-not-call list or maintain complete anonymity.  We reiterate, however, that the only information that will be provided to the telemarketer is the telephone number of the consumer.[128]  No corresponding name or address information will be provided.  We believe that this approach reduces the privacy concerns of such consumers to the greatest extent possible.  As an additional safeguard, we find that restrictions should be imposed on the use of the national list.  Consistent with the FTC's determination and section 227(c)(3)(K), we conclude that no person or entity may sell, rent, lease, purchase, or use the national do-not-call database for any purpose except compliance with section 227 and any such state or federal law to prevent telephone solicitations to telephone numbers on such list.[129]  We conclude that these safeguards adequately protect the privacy rights of those consumers who choose to register on the national do-not-call list.

33.      We conclude that the national database should allow for the registration of wireless telephone numbers, and that such action will better further the objectives of the TCPA and the Do-Not-Call Act.  In so doing, we agree with the FTC and several commenters that wireless subscribers should not be excluded from the protections of the TCPA, particularly the option to register on a national-do-not-call list.[130]  Congress has indicated its intent to provide significant protections under the TCPA to wireless users.[131]  Allowing wireless subscribers to register on a national do-not-call list furthers the objectives of the TCPA, including protection for wireless subscribers from unwanted telephone solicitations for which they are charged.

34.      Nextel argues, however, that, because the "TCPA only authorizes the Commission to regulate solicitations to 'residential telephone subscribers,'" wireless subscribers

---

[127] *FTC Order*, 68 Fed. Reg. at 4640.

[128] As noted above, the "seller" and "telemarketer" may be the same entity or separate entities.  Each entity on whose behalf the telephone call is being made must purchase access to the do-not-call database.

[129] *See* 47 U.S.C. § 227(c)(3)(K).  *See also* 16 C.F.R. § 310.4(b)(2).  We also note that telemarketers will be prohibited from selling the list to others or dividing the costs of accessing the list among various client sellers.  Such action would threaten the financial support for maintaining the database.

[130] *See, e.g.,* AT&T Wireless Reply Comments at 22; Charles Ferguson Comments; City of New Orleans Comments at 12; Texas Office of Public Utility Counsel Comments at 7.  *See also* NAAG Comments at 35-36 contending that public safety implications may arise if wireless consumers receive unsolicited marketing calls while operating automobiles.

[131] 47 U.S.C. § 227(b)(1)(iii).

PA - 00270

may not participate in the do-not-call list.[132]  Nextel states we should define "residential subscribers" to mean "telephone service used primarily for communications in the subscriber's residence."[133]  However, Nextel's application would result in "[a]t most, the Commission [having the] authority to regulate solicitations to wireless subscribers in those circumstances where wireless service actually has displaced a residential land line, and functions as a consumer's primary residential telephone service."[134]

35.     Nextel's definition of "residential subscribers" is far too restrictive and inconsistent with the intent of section 227.  Specifically, there is nothing in section 227 to suggest that only a customer's "primary residential telephone service" was all that Congress sought to protect through the TCPA.  In addition, had Congress intended to exclude wireless subscribers from the benefits of the TCPA, it knew how to address wireless services or consumers explicitly.  For example, in section 227(b)(1), Congress specifically prohibited calls using automatic telephone dialing systems or artificial or prerecorded voice to telephone numbers assigned to "paging service [or] cellular telephone service . . . ."  Moreover, under Nextel's definition, even consumers who use their wireless telephone service in their homes to supplement their residential wireline service, such as by using their wireless telephone service to make long distance phone calls to avoid wireline toll charges, would be excluded from the protections of the TCPA.  Such an interpretation is at odds even with Nextel's own reasoning for its definition – that the TCPA's goal is "to curb the 'pervasive' use of telemarketing 'to market goods and services to the home'."[135]  As described, it is well-established that wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phones.[136]  Indeed, as even Nextel recognizes, there is a growing number of consumers who no longer maintain wireline phone service, and rely only on their wireless telephone service.  Thus, we are not persuaded by Nextel's arguments.

36.     Moreover, we believe it is more consistent with the overall intent of the TCPA to

---

[132] Nextel Comments at 19.  We note that section 227(c )(1) uses the phrase "residential telephone subscribers" and that section 227(c)(3), which more specifically discusses the do-not-call database, uses the phrase "residential subscribers."  Neither of these terms is defined in the TCPA.  Thus, we see no basis in the legislative language or history for considering them to be materially different.  Nor do we see a basis for distinction in common usage.  Therefore, we will interpret them to be synonymous and will refer to both by using the term "residential subscribers."

[133] Nextel Comments at 19.

[134] Nextel Comments at 21.

[135] Nextel Comments at 20.

[136] For example, the Commission recently relied on wireless broadband PCS substitution to support "Track A" findings in two section 271 proceedings where residential customers in New Mexico and Nevada had replaced their landline service with wireless service.  *See Application by SBC Communications Inc., Nevada Bell Telephone Company, and Southwestern Bell Communications Services, Inc., for Authorization to Provide In-Region, InterLATA Services in Nevada*, WC Docket No. 03-10, Memorandum Opinion and Order, FCC 03-80 at paras. 16 - 26 (rel. April 14, 2003); *see also*  Federal Communications Commission, Seventh Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services at 32-36 (*Seventh Annual CMRS Competition Report*).

PA - 00271

allow wireless subscribers to benefit from the full range of TCPA protections.  As indicated above, Congress afforded wireless subscribers particular protections in the context of autodialers and prerecorded calls.[137]  In addition, although Congress expressed concern with residential privacy, it also was concerned with the nuisance, expense and burden that telephone solicitations place on consumers.[138]  Therefore, we conclude that wireless subscribers may participate in the national do-not-call list.  As a practical matter, since determining whether any particular wireless subscriber is a "residential subscriber" may be more fact-intensive than making the same determination for a wireline subscriber, we will presume wireless subscribers who ask to be put on the national do-not-call list to be "residential subscribers."[139]  Such a presumption, however, may require a complaining wireless subscriber to provide further proof of the validity of that presumption should we need to take enforcement action.

37.     We emphasize that it is not our intent in adopting a national do-not-call list to prohibit legitimate telemarketing practices.  We believe that industry commenters present a false choice between the continued viability of the telemarketing industry and the adoption of a national do-not-call list.  We are not persuaded that the adoption of a national do-not-call list will unduly interfere with the ability of telemarketers to contact consumers.  Many consumers will undoubtedly take advantage of the opportunity to register on the national list.  Several industry commenters suggest, however, that consumers derive substantial benefits from telephone solicitations.  If so, many such consumers will choose not to register on the national do-not-call list and will opt instead to make do-not-call requests on a case-by-case basis or give express permission to be contacted by specific companies.[140]  In addition, as discussed further below, we have provided for certain exemptions to the do-not-call registry in recognition of legitimate telemarketing business practices.  For example, sellers of goods or services via telemarketing may continue to contact consumers on the national list with whom they have an established business relationship.  We also note that calls that do not fall within the definition of "telephone solicitation" as defined in section 227(a)(3) will not be precluded by the national do-not-call list.  These may include surveys, market research, political or religious speech calls.[141]  The national do-not-call rules will also not prohibit calls to businesses and persons with whom the marketer has a personal relationship.  Telemarketers may continue to contact all of these consumers

---

[137] 47 U.S.C. § 227(b)(1)(A)(iii).

[138] S. REP. NO. 102-178 at 1 (noting that telephone solicitations are both a nuisance and an invasion of privacy).

[139] This presumption is only for the purposes of section 227 and is not in any way indicative of any attempt to classify or regulate wireless carriers for purposes of other parts of Title II.

[140] We also note that numerous alternative marketing outlets remain available to sellers, such as newspapers, television, radio, and direct mail.

[141] Such calls may be prohibited if they serve as a pretext to an otherwise prohibited advertisement or a means of establishing a business relationship.  Moreover, responding to such a "survey" does not constitute express permission or establish a business relationship exemption for purposes of a subsequent telephone solicitation.  *See* H.R. REP. NO. 102-317 at 13 ("[T]he Committee does not intend the term 'telephone solicitation' to include public opinion polling, consumer or market surveys, or other survey research conducted by telephone.  A call encouraging a purchase, rental, or investment would fall within the definition, however, even though the caller purports to be taking a poll or conducting a survey.").

despite the adoption of a national do-not-call list.  Furthermore, we decline to adopt more restrictive do-not-call requirements on telemarketers as suggested by several commenters.  For example, we decline to adopt an "opt-in" approach that would ban telemarketing to any consumer who has not expressly agreed to receive telephone solicitations.  We believe that establishing such an approach would be overly restrictive on the telemarketing industry.  As discussed more fully below, we also decline to extend the national do-not-call requirements to tax-exempt nonprofit organizations or entities that telemarket on behalf of nonprofit organizations.

38.    We agree with the FTC that a safe harbor should be established for telemarketers that have made a good faith effort to comply with the national do-not call rules.[142]  A seller or telemarketer acting on behalf of the seller that has made a good faith effort to provide consumers with an opportunity to exercise their do-not-call rights should not be liable for violations that result from an error.  Consistent with the FTC, we conclude that a seller or the entity telemarketing on behalf of the seller will not be liable for violating the national do-not-call rules if it can demonstrate that, as part of the seller's or telemarketer's routine business practice: (i) it has established and implemented written procedures to comply with the do-not-call rules; (ii) it has trained its personnel, and any entity assisting in its compliance, in the procedures established pursuant to the do-not-call rules; (iii) the seller, or telemarketer acting on behalf of the seller, has maintained and recorded a list of telephone numbers the seller may not contact; (iv) the seller or telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to the do-not-call rules employing a version of the do-not-call registry obtained from the administrator of the registry no more than three months prior to the date any call is made, and maintains records documenting this process; and (v) any subsequent call otherwise violating the do-not-call rules is the result of error.[143]  We acknowledge that the three-month safe harbor period for telemarketers may prove to be too long to benefit some consumers.  The national do-not-call list has the capability to process new registrants virtually instantaneously and telemarketers will have the capability to download the list at any time at no extra cost.  The Commission intends to carefully monitor the impact of this requirement pursuant to its annual report to Congress and may consider a shorter time frame in the future.

39.    As required by section 227(c)(1)(A), we have compared and evaluated the advantages and disadvantages of certain alternative methods to protect consumer privacy including the use of network technologies, special directory markings, and company-specific lists in adopting a national do-not-call database.[144]  As noted below, the effectiveness of the company-specific approach has significantly eroded as a result of hang-up and "dead air" calls from predictive dialers.  Consumers in these circumstances have no opportunity to assert their do-not-call rights.  As discussed more fully below, we believe that, as a stand-alone option, the company-specific approach no longer provides consumers with sufficient privacy protections.  We also conclude that the availability of certain network technologies to reduce telephone

---

[142] *See FTC Order,* 68 Fed. Reg. at 4645-46.

[143] *See* 16 C.F.R. § 310.4(b)(3).

[144] *See* 47 U.S.C. § 227(c)(1)(A).

solicitations is often ineffective and costly for consumers.  Although technology has improved to assist consumers in blocking unwanted calls, it has also evolved in such a way as to assist telemarketers in making greater numbers of calls and even circumventing such blocking technologies.[145]  Millions of consumers continue to register on state do-not-call lists despite the availability of such technologies.  Several commenters note that they continue to receive unwanted calls despite paying for technologies to reduce telephone solicitations.[146]  Several commenters also note that telemarketers routinely block transmission of caller ID.  In particular, we are concerned that the cost of technologies such as caller ID, call blocking, and other such tools in an effort to reduce telemarketing calls fall entirely on the consumer.  We believe that reliance on a solution that places the cost of reducing the number of unwanted solicitation calls entirely on the consumer is inconsistent with Congress' intent in the TCPA.[147]  For the reasons outlined in the *1992 TCPA Order*, we also decline to adopt special area codes or prefixes for telemarketers.[148]  We believe this option is costly for telemarketers that would be required to change their telephone numbers and administratively burdensome to implement.  We also decline to adopt special directory markings of area white page directories because it would require telemarketers to purchase and review thousands of local telephone directories, at great cost to the telemarketers.[149]  We also note that telemarketers often compile solicitation lists from many sources other than local telephone directories.  In addition, such directories do not include unlisted or unregistered telephone numbers and are often updated infrequently.  We also note that the record in this proceeding provides little support for this option.

      40.     We now review the other requirements of section 227(c)(1).  As required by section 227(c)(1)(B), we have evaluated AT&T Government Solutions, the entity selected by the FTC to administer the national database, and conclude that it has the capacity to establish and administer the national database.[150]  Congress has reviewed and approved funding for the implementation of that database.  We believe that it is unnecessary to evaluate any other such entities at this time.  As discussed in greater detail below, we have considered whether different methods and procedures should apply for local telephone solicitations and small businesses as required by section 227(c)(1)(C).[151]  For the reasons outlined below, we conclude that the

---

[145] *See* "New telemarketer tool trumps TeleZapper," CNN.com (February 26, 2003) <http://edition.cnn.com/2003/TECH/ptech/02/26/telemarket.tool.ap/> (noting development of software that allows telemarketers to circumvent the telezapper and other blocking devices).

[146] *See, e.g.*, Leslie Price Comments (telezapper ineffective); Josephine Presley Comments (call blocking ineffective).

[147] For example, section 227(c) prohibits consumers from being charged to place their number on a national do-not-call list.  *See* 47 U.S.C. § 227(c)(3)(E).

[148] *See 1992 TCPA Order*, 7 FCC Rcd at 8761-62, paras. 16-17.

[149] *See* 47 U.S.C. § 227(c)(4)(C) (requiring the Commission to consider "whether the needs of telemarketers operating on a local basis could be met through special markings of area white page directories").  This conclusion is consistent with the Commission's conclusion in 1992.

[150] *See* Letter from Michael Del Casino, AT&T, to Marlene Dortch, FCC, dated March 18, 2003.

[151] *See infra* para. 54.

national do-not-call database takes into consideration the costs of those conducting telemarketing on a local or regional basis, including many small businesses.  In particular, we note that the national do-not-call database will permit access to five or fewer area codes at no cost to the seller.  Pursuant to section 227(c)(1)(D), we have considered whether there is a need for additional authority to further restrict telephone solicitations.  We conclude that no such authority is required at this time.[152]  Pursuant to the Do-Not-Call Act, the Commission must report to Congress on an annual basis the effectiveness of the do-not-call registry.  Should the Commission determine that additional authority is required over telephone solicitations as part of that analysis; the Commission will propose specific restrictions pursuant to that report.  As required by section 227(c)(1)(E), we have developed regulations to implement the national do-not-call database in the most effective and efficient manner to protect consumer privacy needs while balancing legitimate telemarketing interests.

41.     As noted above, the FTC's decision to adopt a national do-not-call list is currently under review in federal district court.[153]  Because Congress has approved funding for the administration of the national list only for the FTC, this Commission would be forced to stay implementation of any national list should the plaintiffs prevail in one of those proceedings.

## 2.     Exemptions

42.     _Established Business Relationship_.  We agree with the majority of industry commenters that an exemption to the national do-not-call list should be created for calls to consumers with whom the seller has an established business relationship.[154]  We note that section 227(a)(3) excludes from the definition of telephone solicitation calls made to any person with whom the caller has an established business relationship.[155]  We believe the ability of sellers to contact existing customers is an important aspect of their business plan and often provides consumers with valuable information regarding products or services that they may have purchased from the company.  For example, magazines and newspapers may want to contact customers whose subscriptions have or soon will expire and offer new subscriptions.  This conclusion is consistent with that of the FTC and the majority of states that have adopted do-not-call requirements and considered this issue.  As discussed in further detail below, we revise the definition of an established business relationship so that it is limited in duration to eighteen (18) months from any purchase or transaction and 3 months from any inquiry or application.[156]

---

[152] This finding is dependent, in large part, on conclusions that we have reached elsewhere in this order.  For example, our conclusion that the McCarran-Ferguson Act does not necessarily prohibit the application of the national registry to insurance companies; rather, the implications of the McCarran-Ferguson Act will need to be evaluated on a case-by-case basis.  The Commission may seek further clarification or authority from Congress as necessary to support these conclusions.

[153] _See supra_ note 39.

[154] _See, e.g._, NCTA Comments at 6; NAA Comments at 14; MBA Further Comments at 4.

[155] 47 U.S.C. § 227(a)(3).

[156] _See_ amended 47 C.F.R. § 64.1200(f)(3).

PA - 00275

43.     To the extent that some consumers oppose this exemption, we find that once a consumer has asked to be placed on the seller's company-specific do-not-call list, the seller may not call the consumer again regardless of whether the consumer continues to do business with the seller.  We believe this determination constitutes a reasonable balance between the interests of consumers that may object to such calls with the interests of sellers in contacting their customers. This conclusion is also consistent with that of the FTC.

44.     *Prior Express Permission*.  In addition to the established business relationship exemption, we conclude that sellers may contact consumers registered on a national do-not-call list if they have obtained the prior express permission of those consumers.  We note that section 227(a)(3) excludes from the definition of telephone solicitation calls to any person with "that person's prior express invitation or permission."[157]  Consistent with the FTC's determination, we conclude that for purposes of the national do-not-call list such express permission must be evidenced only by a signed, written agreement between the consumer and the seller which states that the consumer agrees to be contacted by this seller, including the telephone number to which the calls may be placed.[158]  Consumers registered on the national list may wish to have the option to be contacted by particular entities.  Therefore, we conclude that sellers may obtain the express written agreement to call such consumers.  The express agreement between the parties shall remain in effect as long as the consumer has not asked to be placed on the seller's company-specific do-not-call list.  If the consumer subsequently requests not to be called, the seller must cease calling the consumer regardless of whether the consumer continues to do business with the seller.  We also note that telemarketers may not call consumers on the national do-not-call list to request their written permission to be called unless they fall within some other exemption.  We believe that to allow such calls would circumvent the purpose of this exemption.  Prior express permission must be obtained by some other means such as direct mailing.

45.     *Tax-Exempt Nonprofit Organizations*.  We agree with those commenters that contend that the national do-not-call requirements should not be extended to tax-exempt nonprofit organizations or calls made by independent telemarketers on behalf of tax-exempt nonprofit organizations.[159]  We note that section 227(a)(3) specifically excludes calls made by tax-exempt nonprofit organizations from the definition of telephone solicitation.[160]  In so doing, we believe Congress clearly intended to exclude tax-exempt nonprofit organizations from prohibitions on telephone solicitations under the TCPA.  The legislative history indicates that

---

[157] 47 U.S.C. § 227(a)(3).  *See also* H.R. REP. NO. 102-317 at 13 (1991) (suggesting that Congress did not believe such prior express permission need be in writing)  We believe that in discussing the form in which *prior express permission* must be given, Congress was addressing an exemption to the definition of telephone solicitation.  Here, we are addressing the type of prior express permission that would allow calls to consumers who already have indicated that they do not wish to receive telemarketing calls (by registering on the do-not-call list).

[158] For purposes of this exemption, the term "signed" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal or state contract law.

[159] *See, e.g.*, Association of Fundraising Professionals Comments at 3-4; Fund for Public Interest Comments at 2; March of Dimes Comments at 2; Special Olympics of Hawaii Comments.

[160] 47 U.S.C. § 227(a)(3).

commercial calls constitute the bulk of all telemarketing calls.[161]   A number of commenters and the FTC agree with Congress' conclusion as it relates to a national do-not-call list.[162]   For this reason, we decline to extend the national do-not-call requirements to tax-exempt nonprofit organizations.  A few commenters seek clarification that requests for blood donations will be exempt from the national do-not-call list.[163]   When such requests are made by tax-exempt nonprofit organizations, they will fall within the exemption for tax-exempt nonprofit organizations.

46.    *Others*.  We decline to create specific exemptions to the national do-not-call requirements for entities such as newspapers, magazines, regional telemarketers, or small businesses.[164]   For the reasons discussed above, we find unpersuasive arguments that application of the national do-not-call database adopted herein will result in severe economic consequences for these entities.  In particular, we note the exemptions adopted for calls made to consumers with whom the seller has an established business relationship and those that have provided express agreement to be called.  As noted, many consumers may also determine not to register on the national database.  Telemarketers may continue to contact all of these consumers.  We believe these exemptions provide telemarketers with a reasonable opportunity to conduct their business while balancing consumer privacy interests.   Although we agree that newspapers and other entities may often provide useful information and services to the public, given our conclusion that adoption of the national do-not-call list will not unduly interfere with the ability of telemarketers to reach consumers, we do not find this to be a compelling basis to exempt these entities.

47.    We find that the national do-not-call rules adopted today do not apply to calls made to persons with whom the marketer has a personal relationship.  As discussed herein, a "personal relationship" refers to an individual personally known to the telemarketer making the call.  In such cases, we believe that calls to family members, friends and acquaintances of the caller will be both expected by the recipient and limited in number.[165]   Therefore, the two most

---

[161] *See* H.R. REP. NO. 102-317 at 16 (1991).

[162] *See, e.g.*, Fund for Public Interest Comments at 2; March of Dimes Comments at 2; Non-for-Profit Coalition Comments at 11-13; Special Olympics Hawaii Comments.  *But see* Wayne G. Strang Comments at 7-8; Michael C. Worsham Comments at 10.  Commenters also argue that restrictions imposed on tax-exempt nonprofit organizations or organizations acting on their behalf are subject to more stringent scrutiny under the First Amendment as noncommercial speech.  *See* NPCC Comments at 15-18.

[163] *See, e.g.*, American Red Cross Comments at 2; America's Blood Centers Comments at 1.

[164] *See, e.g.,* Newspaper Association of America Comments at 12-14 (noting that newspapers are holders of second-class mail permits); Personal Legal Plans Comments at 5 (contending that small businesses should be exempt); Seattle Times Comments at 2 (proposing exemption for newspapers); Vector Comments at 7 (proposing exemption for entities that make a *de minimis* number of calls); Ameriquest Further Comments at 2 ("face-to-face" exemption).

[165] In determining whether a telemarketer is considered a 'friend' or 'acquaintance' of a consumer, we will look at, among other things, whether a reasonable consumer would expect calls from such a person because they have a close or, at least, firsthand relationship.  If a complaining consumer were to indicate that a relationship is not sufficiently personal for the consumer to have expected a call from the marketer, we would be much less likely to (continued….)

PA - 00277

common sources of consumer frustration associated with telephone solicitations – high volume and unexpected solicitations – are not likely present when such calls are limited to persons with whom the marketer has a personal relationship.[166]  Accordingly, we find that these calls do not represent the type of "telephone solicitations to which [telephone subscribers] object" discussed in section 227(c)(1).  Moreover, we conclude that the Commission also has authority to recognize this limited carve-out pursuant to section 227(c)(1)(E).  This subsection provides the Commission with discretion in implementing rules to protect consumer privacy to "develop proposed regulations to implement the methods and procedures that the Commission determines are the most effective and efficient to accomplish the purpose of this section."[167]  To the extent that any consumer objects to such calls, the consumer may request to be placed on the telemarketer's company's company-specific do-not-call list.  We intend to monitor the rules we adopt today and caution that any individual or entity relying on personal relationships abusing this exemption may be subject to enforcement action.

48.      In addition, we decline to extend this approach beyond persons that have a personal relationship with the marketer.  For example, Vector urges the Commission to adopt an exemption that covers "face-to-face" appointment calls to anyone known personally to the "referring source."[168]  We note that such relationships become increasingly tenuous as they extend to individuals not personally known to the marketer and thus such calls are more likely to be unexpected to the recipient and more voluminous.  Accordingly, referrals to persons that do not have a personal relationship with the marketer will not fall within the category of calls discussed above.

49.      We also decline to establish an exemption for calls made to set "face-to-face" appointments per se.[169]  We conclude that such calls are made for the purpose of encouraging the purchase of goods and services and therefore fall within the statutory definition of telephone solicitation. We find no reason to conclude that such calls are somehow less intrusive to consumers than other commercial telephone solicitations.   The FTC has reviewed this issue and reached the same conclusion.[170]  In addition, we decline to exempt entities that make a "*de*

(Continued from previous page) ────────────────────

find that the personal relationship exemption is applicable.  While we do not adopt a specific cap on the number of calls that a marketer may make under this exemption, we underscore that the limited nature of the exemption creates a strong presumption against those marketers who make more than a limited number of calls per day.

[166] We note that this conclusion is consistent with Congress' rationale in exempting tax-exempt nonprofit organizations and established business relationships from the definition of telephone solicitation.  *See* H.R. Rep. No. 102-317 at 14 and 16 (1991).

[167] 47 U.S.C § 227(c)(1)(E).

[168] *See* Vector Further Comments at Att. 2.  Vector makes approximately 4 million calls per year.  Vector Comments at 6.

[169] *See, e.g.,* Ameriquest Comments at 14; Vector Comments at 6-7.  Such calls may, however, be permissible when they fall within exemptions for personal or established business relationships as discussed herein.

[170] *FTC Order*, 68 Fed. Reg. 4655-56.

PA - 00278

minimis" number of commercial telemarketing calls.[171]  In contrast to Congress' rationale for exempting nonprofit organizations, we believe that such commercial calls continue to be unexpected to consumers even if made in low numbers.  As defined by one commenter, a *de minimis* number of calls would not be based on the total number of calls originating from one organization, but would be based on the number of calls placed by individual employees of the company.[172]  Thus, the telemarketing entity could circumvent the do-not-call regulations by hiring any number of individual marketers, so long as they each did not make more than 20 calls per day.  We believe that such an exemption, extrapolated to the entire direct marketing industry, would result in a significant number of unwanted telephone solicitations.  This would undoubtedly result in consumer confusion and frustration regarding the application of the national do-not-call rules.  In addition, we believe that it would be difficult, if not impossible, to monitor and enforce such a requirement.  For the reasons discussed below, we do not believe the costs to access the national database is unreasonable for any small business or entity making a "*de minimis*" number of calls.

50.     In response to the *Further Notice*, a few commenters contend that any new rules the Commission adopts would not apply to entities engaged in the business of insurance, because such rules would conflict with the McCarran-Ferguson Act.[173]  The McCarran-Ferguson Act provides that "[t]he business of insurance ... shall be subject to the laws of the ... States which relate to the regulation ... of such business."[174]  The McCarran-Ferguson Act further provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance."[175]  American Council of Life Insurers (ACLI) explains that insurers' marketing activities are extensively regulated at the state level.  The Commission's proposal, ACLI argues, "intrudes upon the insurance regulatory framework established by the states" and, therefore, should not be applicable to insurers under McCarran-Ferguson.[176]

51.     The McCarran-Ferguson Act does not operate to exempt insurance companies wholesale from liability under the TCPA.  It applies only when their activities constitute the "business of insurance," the state has enacted laws "for the purpose of regulating" the business of insurance, and the TCPA would "impair, invalidate, or supersede" such state laws.[177]  In the

---

[171] For example, Vector suggests that the Commission exempt individual direct sellers who make no more than 20 calls per day.  Vector Comments at 8-10.

[172] Vector Further Comments at 4.  Vector makes approximately 4 million calls per year.  Vector Comments at 6.

[173] *See* ACLI Further Comments at 1-3; Stonebridge Further Comments at 5-7; Cendant Further Comments at 3-4; NAII Further Comments at 3.  We note that many other commenters representing insurance interests did not raise this issue before or during the Further Notice comment period.

[174] 15 U.S.C. § 1012(a).

[175] 15 U.S.C. § 1012(b).

[176] *See* ACLI Further Comments at 1-2.

[177] *See* 15 U.S.C. § 1012(b); *see also The Chair King, Inc. v. Houston Cellular Corp.*, 1995 WL 1760037 (S.D. Tex. 1995), *vacated for lack of subject matter jurisdiction* 131 F.3d 507 (5th Cir. 1997).

PA - 00279

one case cited by commenters as addressing the interplay between McCarran-Ferguson and the
TCPA, a federal district court dismissed a claim brought against two insurance companies under
the TCPA for sending unsolicited facsimile advertisements.[178]  The *Chair King* court found that
the TCPA conflicted with a Texas law that prohibited untrue, deceptive, or misleading
advertising by insurers and their agents.  In its analysis, the court determined that insurance
advertising was part of the "business of insurance,"[179] and that the Texas law in question was
enacted for the purpose of regulating the business of insurance.[180]  The court then concluded that
because the TCPA "prohibits unsolicited insurance advertising by facsimile while the Texas
[laws] permit [such] advertising . . . so long as the advertisements are truthful and not
misleading," the TCPA conflicts with the Texas law and is preempted under McCarran-
Ferguson.[181]

      52.    To the extent that any state law regulates the "business of insurance"[182] and the
TCPA is found to "invalidate, impair, or supersede" such state law, it is possible that a particular
activity involving the business of insurance would not fall within the reach of the TCPA.  Any
determination about the applicability of McCarran-Ferguson, however, requires an analysis of
the particular activity and State law regulating it.  In addition, McCarran-Ferguson applies only
to federal statutes that "invalidate, impair, or supersede" state insurance regulation.  Courts have
held that duplication of state law prohibitions by a federal statute do not "invalidate, impair, or
supersede" state laws regulating the business of insurance.[183]  Nor is the mere presence of a
regulatory scheme enough to show that a state statute is "invalidated, impaired or superseded."[184]

      53.    We believe that the TCPA, which was enacted to protect consumer privacy
interests, is compatible with states' regulatory interests.[185]  In fact, the TCPA permits States to

---

[178] *The Chair King, Inc. v. Houston Cellular Corp.*, 1995 WL 1760037 (S.D. Tex. 1995).

[179] *See Chair King*, 1995 WL 1760037 at 3 (*citing SEC v. National Securities Inc.*, 393 U.S. 453, 460 (1960) and *FTC v. National Casualty Co.*, 357 U.S. 560 (1958)).

[180] *See Chair King*, 1995 WL 1760037 at 4.

[181] We note that the TCPA's prohibition does not specifically reference insurance advertising.  The TCPA also permits facsimile advertising to persons who have given their prior express invitation or permission.  See 47 U.S.C. §§ 227(b)(1)(C) and (a)(4).

[182] NAII explains that "[s]tate insurance codes prohibit a variety of unfair trade practices, such as rebating, deceptive advertising, inequitable claim settlement and unfair discrimination."  *See NAII Further Comments at 2.*

[183] *See, e.g., Merchant Home Delivery Serv. Inc. v. Frank B. Hall & Co. Inc.*, 50 F.3d 1486, 1492 (9th Cir. 1995) (holding federal statute prohibiting acts also prohibited under state law not to "invalidate, impair, or supersede" state law under McCarran-Ferguson); *United Farm Bureau Mut. Ins. Co. v. Metropolitan Human Relations Comm'n*, 24 F.3d 1008, 1016 (7th Cir. 1994) (holding duplicate prohibition of redlining under Indiana law not to preempt Fair Housing Act under McCarran-Ferguson Act).

[184] *See, e.g., Mackey v. Nationwide Ins. Companies*, 724 F.2d 419, 421 (4th Cir. 1984).

[185] *See U.S. v. Calvin*, 39 F.3d 1299, 1305 (5th Cir. 1994) (noting that government charges of fraud not barred by McCarran-Ferguson Act where interest in fraud protection is completely compatible with state's regulatory interests).

PA - 00280

enforce the provisions of the TCPA on behalf of residents of their State.[186]  In addition, we believe that uniform application of the national do-not-call registry to all entities that use the telephone to advertise best serves the goals of the TCPA.  To exempt the insurance industry from liability under the TCPA would likely confuse consumers and interfere with the protections provided by Congress through the TCPA.  Therefore, to the extent that the operation of McCarran-Ferguson on the TCPA is unclear, we will raise this issue in our Report to Congress as required by the Do-Not-Call Act.

54.    We conclude that the national do-not-call mechanism established by the FTC and this Commission adequately takes into consideration the needs of small businesses and entities that telemarket on a local or regional basis in gaining access to the national database.  As required by section 227(c)(1)(C), we have considered whether different procedures should apply for local solicitations and small businesses.  We decline, however, to exempt such entities from the national do-not-call requirements.  Given the large number of entities that solicit by telephone, and the technological tools that allow even small entities to make a significant number of solicitation calls, we believe that to do so would undermine the effectiveness of the national do-not-rules in protecting consumer privacy and create consumer confusion and frustration.  In so doing, we conclude that the approach adopted herein satisfies section 227(c)(4)'s requirement that the Commission, in developing procedures for gaining *access* to the database, consider the different needs of telemarketers conducting business on a national, regional, State, or local level and develop a fee schedule for recouping the cost of such database that recognizes such differences.[187]  The national database will be available for purchase by sellers on an area-code-by-area-code basis.  The cost to access the database will vary depending on the number of area codes requested.  Sellers need only purchase those area codes in which the seller intends to telemarket.  In fact, sellers that request access to five or fewer area codes will be granted access to those area codes at no cost.  We note that thirty-three states currently have five or fewer area codes.  Thus, telemarketers or sellers operating on a "local" or "regional" basis within one of these thirty-three states will have access to all of that states' national do-not-call registrants at no cost.  In addition, the national database will provide a single number lookup feature whereby a small number of telephone numbers can be entered on a web page to determine whether any of those numbers are included on the national registry.  We believe this fee structure adequately reflects the needs of regional telemarketers, small business and those marketing on a *de minimis* level.  For these reasons, we conclude that this approach will not place any unreasonable costs on small businesses.[188]

### 3.    Section 227(c)(3) Requirements

55.    We conclude that the national do-not-call database adopted jointly by this Commission and the FTC satisfies each of the statutory requirements outlined in section 227(c)(3)(A)-(L).  We now discuss each such requirement.  Section 227(c)(3)(A) requires the

---

[186] *See* 47 U.S.C. § 227(f)(1).

[187] 47 U.S.C. § 227(c)(4)(A)-(B) (emphasis added).

[188] *See* 47 U.S.C. § 227(c)(4)(B)(iii).

PA - 00281

Commission to specify the method by which an entity to administer the national database will be selected.  On August 2, 2002, the FTC issued a Request for Quotes (RFQ) to selected vendors on GSA schedules seeking proposals to develop, implement, and operate the national registry.  After evaluating those proposals, the FTC selected a competitive range of vendors and issued an amended RFQ to those vendors on November 25, 2002.  After further evaluation, the FTC selected AT&T Government Solutions as the successful vendor for the national do-not-call database on March 1, 2003.[189]  As noted above, Congress has approved the necessary funding for implementation of the national database.

56.      Pursuant to sections 227(c)(3)(B)-(C), we require each common carrier providing telephone exchange service to inform subscribers for telephone exchange service of the opportunity to provide notification that such subscriber objects to receiving telephone solicitations.  Each telephone subscriber shall be informed, by the common carrier that provides local exchange service to that subscriber, of (i) the subscriber's right to give or revoke a notification of an objection to receiving telephone solicitations pursuant to the national database and (ii) the methods by which such rights may be exercised by the subscriber.  Pursuant to section 227(c)(3)(C), we conclude that, beginning on January 1, 2004, such common carriers shall provide an annual notice, via an insert in the customer's bill, to inform their subscribers of the opportunity to register or revoke registrations on the national do-not-call database.  Although we do not specify the exact description or form that such notification should take, such notification must be clear and conspicuous.  At a minimum, it must include the toll-free telephone number and internet address established by the FTC to register or revoke registrations on the national do-not-call database.

57.      Section 227(c)(3)(D) requires the Commission to specify the methods by which registrations shall be collected and added to the database.  As discussed above, consumers will be able to add their telephone numbers to the national do-not-call registry either through a toll-free telephone call or over the Internet.[190]  Consumers who choose to register by phone will have to call the registration number from the telephone line that they wish to register.  Their calls will be answered by an Interactive Voice Response (IVR) system.  The consumers will be asked to enter on their telephone keypad the telephone number from which the consumer is calling.  This number will be checked against the ANI that is transmitted with the call.  If the number entered matches the ANI, then the consumer will be informed that the number has been registered.  Consumers who choose to register over the Internet will go to a website dedicated to the registration process where they will be asked to enter the telephone number they wish to register.[191]  We encourage the FTC to notify consumers in the IVR message that the national registry will prevent most, but not all, telemarketing calls.  Specifically, we believe consumers should be informed that the do-not-call registry does not apply to tax-exempt nonprofit organizations and companies with whom consumers have an established business relationship.  The effectiveness and value of the national registry depends largely on an informed public.  Therefore, we also intend to emphasize in our educational materials and on our website the

---

[189] *See also* Letter from Michael Del Casino, AT&T, to Marlene Dortch, FCC, dated March 18, 2003.

[190] *FTC Order*, 68 Fed. Reg. at 4638-39.

[191] *FTC Order*, 68 Fed. Reg. at 4639.

PA - 00282

purpose and scope of the new rules.

58.      Section 227(c)(3)(E) prohibits any residential subscriber from being charged for giving or revoking notification to be included on the national do-not-call database.  As discussed above, consumers may register or revoke do-not-call requests either by a toll-free telephone call or over the Internet.  No charge will be imposed on the consumer.  Section 227(c)(3)(F) prohibits any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included on the national database.  Subject to the exemptions discussed above, we adopt rules herein that will prohibit telephone solicitations to those consumers that have registered on the national database.[192]

59.      Section 227(c)(3)(G) requires the Commission to specify (i) the methods by which any person deciding to make telephone solicitations will obtain access to the database, by area code or local exchange prefix, and (ii) the costs to be recovered from such persons.  Section 227(c)(3)(H) requires the Commission to specify the methods for recovering, from the persons accessing the database, the costs involved in the operations of the database.  To comply with the national do-not-call rules, telemarketers must gain access to the telephone numbers in the national database.  Telemarketers will have access to the national database by means of a fully-automated, secure website dedicated to providing information to these entities.[193]  The first time a telemarketer accesses the system, the company will be asked to provide certain limited identifying information, such as name and address, contact person, and contact person's telephone number and address.  If a telemarketer is accessing the registry on behalf of a client seller, the telemarketer will also need to identify that client.[194]  When a telemarketer first submits an application to access registry information, the company will be asked to specify the area codes they want to access.  An annual fee will be assessed based upon the number of area codes requested.[195]  Each entity on whose behalf the telephone solicitation is being made must pay this fee via credit card or electronic funds transfer.  After payment is processed, the telemarketer will be given an account number and permitted to access the appropriate portions of the registry.[196]  Telemarketers will be permitted to access the registry as often as they wish for no additional cost, once the annual fee is paid.

60.      Section 227(c)(3)(I) requires the Commission to specify the frequency with which the national database will be updated and specify the method by which such updates will take effect for purposes of compliance with the do-not-call regulations.  Because the registration process will be completely automated, updates will occur continuously.  Consumer registrations

---

[192] *See also* 16 C.F.R. § 310.4(b)(1)(iii)(B).

[193] *FTC Order*, 68 Fed. Reg. at 4640.

[194] *FTC Order*, 68 Fed. Reg. at 4640.

[195] *Telemarketing Sales Rule Fees*, 68 Fed. Reg. 16238 (April 3, 2003) (*FTC Fees Notice*).  The FTC has proposed that sellers be charged $29 per area code with a maximum annual fee of $7,250 for access to the entire national database.   Sellers may request access to five or less areas codes for free.

[196] *FTC Order*, 68 Fed. Reg. at 4640.

PA - 00283

will be added to the registry at the same time they register - or at least within a few hours after they register.  As discussed above, the safe harbor provision requires telemarketers to employ a version of the registry obtained not more than three months before any call is made.  Thus, telemarketers will be required to update their lists at least quarterly.  Instead of making the list available on specific dates, the registry will be available for downloading on a constant basis so that telemarketers can access the registry at any time.[197]  As a result, each telemarketer's three-month period may begin on different dates.[198]  In addition, the administrator will check all telephone numbers in the do-not-call registry each month against national databases, and those numbers that have been disconnected or reassigned will be removed from the registry.[199]  We encourage parties that may have specific recommendations on ways to improve the overall accuracy of the database in removing disconnected and reassigned telephone numbers to submit such proposals to our attention and to the FTC directly.

61.     Section 227(c)(3)(J) requires that the Commission's regulations be designed to enable states to use the database for purposes of administering or enforcing state law.[200]  Section 227(c)(3)(K) prohibits the use of the database for any purpose other than compliance with the do-not-call rules and any such state law and requires the Commission to specify methods for protection of the privacy rights of persons whose numbers are included in such database.  Consistent with the determination of the FTC, we conclude that any law enforcement agency that has responsibility to enforce federal or state do-not-call rules or regulations will be permitted to access the appropriate information in the national registry.[201]  This information will be obtained through a secure Internet website.  Such law enforcement access to data in the national registry is critical to enable state Attorneys General, public utility commissions or an official or agency designated by a state, and other appropriate law enforcement officials to gather evidence to support enforcement of the do-not-call rules under the state and federal law.   In addition, as discussed above, we have imposed restrictions on the use of the national list.[202]  Consistent with the FTC's determination, we have concluded that no person or entity may sell, rent, lease, purchase, or use the national do-not-call database for any purpose except compliance with section 227 and any such state or federal law to prevent telephone solicitations to telephone numbers on such list.  We specifically prohibit any entity from purchasing this list from any entity other than the national do-not-call administrator or dispensing the list to any entity that has not paid the required fee to the administrator.  The only information that will be made available to telemarketers is the telephone number of consumers registered on the list.  Given the restrictions imposed on the use of the national database and the limited amount of information

---

[197] *FTC Order*, 68 Fed. Reg. at 4647.

[198] Appropriate state and federal regulators will be capable of verifying when the telemarketer last accessed the list.  *FTC Order*, 68 Fed. Reg. at 4641.

[199] *FTC Order*, 68 Fed. Reg. at 4640.

[200] In fact, section 227(e)(2) prohibits states from using any database that does not include the part of the national database that relates to such state.  *See* 47 U.S.C. § 227(e)(2).

[201] *See FTC Order*, 68 Fed. Reg. at 4641.

[202] *See supra* para. 32.

provided, we believe that adequate privacy protections have been established for consumers.

62.     Section 227(c)(3)(L) requires each common carrier providing services to any person for the purpose of making telephone solicitations to notify such person of the requirements of the national do-not-call rules and the regulations thereunder.  We therefore require common carriers, beginning January 1, 2004, to make a one-time notification to any person or entity making telephone solicitations that is served by that carrier of the national do-not-call requirements.  We do not specify the exact description or form that such notification should take.  At a minimum, it must include a citation to the relevant federal do-not-call rules as set forth in 47 C.F.R. § 64.1200 and 16 C.F.R. Part 310, respectively.  Although we recognize that carriers may not be capable of identifying every person or entity engaged in telephone solicitations served by that carrier, we require carriers to make reasonable efforts to comply with this requirement.  We note that failure to give such notice by the common carrier to a telemarketer served by that carrier will not excuse the telemarketer from violations of the Commission's rules.

### 4.     Constitutionality

63.     We conclude that a national do-not-call registry is consistent with the First Amendment.  As discussed in more detail below, we believe, like the FTC, that our regulations satisfy the criteria set forth in *Central Hudson Gas & Elec. v. Pub. Serv. Comm. of N.Y.*, in which the Supreme Court established the applicable analytical framework for determining the constitutionality of a regulation of commercial speech.[203]  Our conclusion is also consistent with every Court of Appeals decision that has considered First Amendment challenges to the TCPA.[204]

64.     Under the framework established in *Central Hudson*, a regulation of commercial speech will be found compatible with the First Amendment if (1) there is a substantial government interest; (2) the regulation directly advances the substantial government interest; and (3) the proposed regulations are not more extensive than necessary to serve that interest.[205]

---

[203] *Central Hudson Gas & Elec. v. Pub. Serv. Comm. of N.Y.*, 447 U.S. 557 (1980).  NAAG argues that *Central Hudson* may not even be the appropriate analytical framework to determine the constitutionality of regulations implementing the national do-not-call registry, since "[f]ar from being an impermissible regulation of speech, the registry merely works to prevent 'a form of trespass.'" NAAG Comments at 34.  We would note, however, that the Supreme Court has analyzed other measures that protected residential privacy as restrictions on commercial speech.  *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) (applied *Central Hudson* analysis to Florida Bar rules that prohibited lawyers from using direct mail to solicit personal injury or wrongful death clients within 30 days of accident.)  *See also State of Missouri v. American Blast Fax,* 323 F.3d 649 (8th Cir. 2003) (*American Blast Fax*), *pet. for rehearing pending* and *Destination Ventures* v. *Federal Communications Commission*, 46 F.3d 54 (9th Cir.1995) (*Destination Ventures*), where both the Eighth and Ninth Circuits applied the *Central Hudson* analysis to the TCPA provisions banning unsolicited fax advertising.

[204] *See Kathryn Moser v. Federal Communications Commission*, 46 F.3d 970 (9th Cir. 1995) (*Moser*) *cert. denied*, 515 U.S. 1161 (1995) (upholding ban on prerecorded telephone calls);  *American Blast Fax* (upholding ban on unsolicited fax advertising) and *Destination Ventures* (upholding ban on unsolicited fax advertising).

[205] *Central Hudson*, 447 U.S. at 566.  Specifically, the Court found that "[f]or commercial speech to come within the First Amendment, it at least must concern lawful activity and not be misleading.  Next, it must be determined (continued….)

PA - 00285

Under the first prong, we find that there is a substantial governmental interest in protecting residential privacy.  The Supreme Court has "repeatedly held that individuals are not required to welcome unwanted speech into their homes and that the government may protect this freedom."[206]

65.     In particular, the government has an interest in upholding the right of *residents* to bar unwanted speech from their homes.  In *Rowan v. United States Post Office*, the Supreme Court upheld a statute that permitted a person to require that a mailer remove his name from its mailing lists and stop all future mailings to the resident:

> The Court has traditionally respected the right of a householder to bar, by order or notice, solicitors, hawkers, and peddlers from his property.  In this case the mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings from that mailer. . . . In effect, Congress has erected a wall – or more accurately permits a citizen to erect a wall – that no advertiser may penetrate without his acquiescence.[207]

66.     Here, the record supports that the government has a substantial interest in regulating telemarketing calls.  In 1991, Congress held numerous hearings on telemarketing, finding, among other things, that "[m]ore than 300,000 solicitors call more than 18,000,000 Americans every day" and  "[u]nrestricted telemarketing can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.[208] Our record, like the FTC's, demonstrates that telemarketing calls are even more of an invasion of privacy than they were in 1991.  The number of daily calls has increased five fold (to an estimated 104 million), due in part to the use of new technologies, such as predictive dialers.[209] An overwhelming number of consumers in the approximately 6,500 commenters in this proceeding support the adoption and implementation of a national do-not-call registry.  In addition to citing concerns about the numerous and ever-increasing number of calls, they

(Continued from previous page) ———————————
whether the asserted governmental interest to be served by the restriction on commercial speech is substantial.  If both inquiries yield positive answers, it must then be decided whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."  *Id*. at 557.

[206] *Frisby v. Schultz*, 487 U.S. 474, 485.  *See also Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726, 748 (1978) ("[I]n the privacy of the home, … the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder.").

[207] *Rowan v. United States Post Office*, 397 U.S. 728 at 737-738 (1970); s*ee also Martin v. City of Struthers*, 319 U.S. 141 (1943), in which the Court struck down a ban on door-to-door solicitation because it "substituted the judgment of the community for the judgment of the individual householder," *id.* at 144, but noted in *dicta* that a regulation "which would make it an offense for any person to ring a bell of a householder who has appropriately indicated that he is unwilling to be disturbed" would be constitutional.  *Id.* at 148.

[208] H.R. Rep. No. 102-317 at 2 (1991).

[209] *See supra* para. 8.

PA - 00286

complain about the inadequacies of the company-specific approach, the burdens of such calls on the elderly and people with disabilities, and the costs of acquiring technologies to reduce the number of unwanted calls.[210]  Accordingly, we believe that the record demonstrates that telemarketing calls are a substantial invasion of residential privacy, and regulations that address this problem serve a substantial government interest.

67.    Under *Central Hudson's* second prong, we find that the Commission's regulations directly advance the substantial government interest.  Under this prong, the government must demonstrate that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree."[211]  It may justify the restrictions on speech "based solely on history, consensus, and 'simple common sense.'"[212]  Creating and implementing a national do-not-call registry will directly advance the government's interest in protecting residential privacy from unwanted telephone solicitations.  Congress, consumers, state governments and the FTC have reached the same conclusion.  The history of state administered do-not-call lists demonstrates that such do-not-call programs have a positive impact on the ability of many consumers to protect their privacy by reducing the number of unwanted telephone solicitations that they receive each day.[213]  As noted above, Congress has reviewed the FTC's decision to establish a national do-not-call list and concluded that the do-not-call initiative will provide significant benefits to consumers throughout the United States.[214]  We reject the arguments that because our do-not-call registry provisions do not apply to tax-exempt nonprofit organizations, our regulations do not directly and materially advance the government interest of protecting residential privacy.[215]  "Government [need not] make progress on every front before it can make progress on any front."[216]

68.    We believe that the facts here are easily distinguishable from those in *Rubin v. Coors Brewing Company*, 514 U.S. 476 (1995) and *City of Cincinnati v. Discovery Network,* 507 U.S. 410 (1993).  In *Coors*, the Court struck down a prohibition against disclosure of alcoholic content on labels or in advertising that applied to beer but not to wine or distilled spirits, finding that "the irrationality of this unique and puzzling regulatory framework ensures that the labeling ban will fail to achieve [the Government's interest in combating strength wars.]" In *Discovery*

---

[210] *See supra* para. 19.

[211] *Florida Bar* v. *Went For It, Inc.,* 515 U.S. 618, 626 (1995) (citations omitted).

[212] *Id.* at 628 (citation omitted).

[213] *See, e.g.*, Brenda J. Donat Comments; Alice and Bill Frazee Comments; Tammy Packett Comments.

[214] *See e.g.*, H.R. REP. NO. 108-8 at 3 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities.  This legislation is an important step toward a one-stop solution to reducing telemarketing abuses.").

[215] *See, e.g.*, ATA Comments at 85-88 and WorldCom Comments at 27-33.

[216] *United States v. Edge Broadcasting Company*, 509 U.S. 418, 434 (1993).  *See also Moser v. FCC*, 46 F.3d at 975 ("Congress may reduce the volume of telemarketing calls without completely eliminating the calls.").

PA - 00287

*Network,* the Court struck down an ordinance which banned 62 newsracks containing commercial publications but did not ban 1,500-2,000 newsracks containing newspapers, finding that "the distinction bears no relationship *whatsoever* to the particular [aesthetic] interests that the city has asserted."  Here, Congress' decision to exclude tax-exempt nonprofit organizations from the definition of telemarketing in the TCPA was both rational and related to its interest in protecting residential privacy.  The House Report finds that "the record suggests that most unwanted telephone solicitations are commercial in nature. . . .[T]he Committee also reached the conclusion, based on the evidence, that … calls [from tax-exempt nonprofit organizations] are less intrusive to consumers because they are more expected.  Consequently, the two main sources of consumer problems – high volume of solicitations and unexpected solicitations – are not present in solicitations by nonprofit organizations."[217]

69.     Commenters in our record also express the concern that subjecting tax-exempt nonprofit organizations to the national do-not-call requirements may sweep too broadly because it would prompt some consumers to accept blocking of non-commercial, charitable calls to which they might not otherwise object as an undesired effect of registering on the national database to stop unwanted commercial solicitation calls.  Both the Eighth and the Ninth Circuits found that the provisions of the TCPA, which bans unsolicited commercial faxes but not non-commercial faxes, directly advance a substantial government interest,[218] and we believe that the same distinction may be applied to the national do-not-call registry.[219]

70.     We find under the third prong of the *Central Hudson* test that our proposed regulations are not more extensive than necessary to protect residential privacy.  The Supreme Court has made clear that with respect to this prong, "the differences between commercial speech and noncommercial speech are manifest."[220]  The Court held that:

> [T]he least restrictive means test has no role in the commercial
> speech context.   What our decisions require, instead, is a fit
> between the legislature's ends and the means chosen to accomplish
> those ends, a fit that is not necessarily perfect, but reasonable; that

---

[217] H.R. REP. NO. 102-317 at 16 (1991).

[218] *See American Blast Fax* and *Destination Ventures.*

[219] We reject Vector's argument that because its direct sellers and others make a *de minimis* number of calls relative to the high-volume of calls that telemarketers make, that the national do-not-call registry, as applied to companies like Vector's, "would not directly or materially advance the government's interest." Vector Comments at 12-13.  The Supreme Court has held, in applying *Central Hudson's* second prong, that the state does not have to demonstrate that the government's interest is advanced as applied to every case.  *See Ward v. Rock Against Racism,* 491 U.S. 781, 801 (1989) ("[T]he validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case."); *Edge Broadcasting,* 509 U.S. 418, *discussing Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447 (1978) ("[T]he State was entitled to protect its interest by applying a prophylactic rule to those circumstances generally; we declined to go further and to prove that the state interests supporting the rule actually were advanced by applying the rule in … [the] particular case.").

[220] *Florida Bar,* 515 U.S. 618, 632.

> represents not necessarily the single best disposition but one whose
> scope is in proportion to the interest served …. [T]he existence of
> numerous and obvious less-burdensome alternatives to the
> restriction on commercial speech is certainly a relevant
> consideration in determining whether the fit between the ends and
> means is reasonable.[221]

In *Florida Bar*, the Supreme Court found that a prohibition against lawyers using direct mail to solicit personal injury or wrongful death clients within 30 days of an accident was not more extensive than necessary to "protect… the privacy and tranquility of personal injury victims and their loved ones against intrusive, unsolicited contact by lawyers."[222]  Similarly, the Ninth Circuit has found that the TCPA's ban on prerecorded telemarketing calls constitutes a "reasonable fit" with the government's legitimate interest in protecting residential privacy.[223]

71.    Here, we find that our regulations meet the requirements of *Central Hudson's* third prong.  Pursuant to our regulations, we adopt a single, national do-not-call database that we will enforce jointly with the FTC.  Our rules mandate that common carriers providing telephone exchange service shall inform their subscribers of their right to register on the database either through a toll-free telephone call or over the Internet.  Furthermore, telemarketers and sellers must gain access to telephone numbers in the national database and will be able to do so by means of a fully automated, secure website dedicated to providing information to these entities.  In addition, sellers will be assessed an annual fee based upon the number of area codes they want to assess, with the maximum annual fee capped at $7,250.  Our rules also provide that the national database will be updated continuously, and telemarketers must update their lists quarterly.  We find that our regulations are a reasonable fit between the ends and means and are not as restrictive as the bans upheld in the cases cited above.  In *Florida Bar*, the Supreme Court upheld an *absolute* ban against lawyers using direct mail to solicit personal injury or wrongful death clients within 30 days of an accident.  Similarly, the Ninth Circuit has upheld the TCPA's *absolute* ban on prerecorded telemarketing calls, and both the Eighth and Ninth Circuit have upheld the TCPA's *absolute* ban on unsolicited faxes.  Here, our regulations do not absolutely ban telemarketing calls.  Rather, they provide a mechanism by which individual consumers may choose not to receive telemarketing calls.  We also note that there are many other ways available to market products to consumers, such as newspapers, television, radio advertising and direct mail.[224]  In addition, there simply are not "numerous and obvious less-burdensome alternatives" to the national do-not-call registry.  The record clearly demonstrates widespread consumer

---

[221] *Id.*

[222] *Id*. at 624.

[223] *Moser*, 46 F.3d at 975; s*ee also American Blast Fax,* 323 F.3d at 658-60 (TCPA's ban on unsolicited faxes was not more extensive than necessary to "prevent … unwanted fax advertising from shifting advertising costs to unwilling consumers and interfering with their fax machines."); *Destination Ventures* (FCC sustained its burden of demonstrating reasonable fit between interest in preventing shift of advertising costs to consumers and banning unsolicited commercial faxes.).

[224] *See Florida Bar*, 515 U.S. at 633-34.

dissatisfaction both with the effectiveness of the current company-specific rules that are currently in place[225] and the effectiveness and expense of certain technological alternatives to reduce telephone solicitations.[226]  We also note that many of the "burdens" of the national do-not-call registry – issues concerning its costs, accuracy, and privacy – have been addressed by advances in computer technology and software over the last ten years.[227]  Thus, we find that our regulations implementing the national do-not-call registry are consistent with the First Amendment and the framework established in *Central Hudson*.

72.      Furthermore, we reject the arguments that the *Central Hudson* framework is not appropriate and that strict scrutiny is required because the regulations implementing the national do-not-call list are content-based, due to the TCPA's exemptions for non-profit organizations and established business relationships.[228]  For support, commenters cite to *Discovery Network*, 507 U.S. 410, in which the Court struck down Cincinnati's ordinance which banned newsracks containing commercial publications but did not ban newsracks containing newspapers.  The Court found that the regulation could neither be justified as a restriction on commercial speech under *Central Hudson*, nor could it be upheld as a valid time, place, or manner restriction on protected speech.[229]  The Court explained that "the government may impose reasonable restrictions on the time, place or manner of engaging in protected speech provided that they are adequately justified 'without reference to the content of the regulated speech'."[230]  In this case, the Court held that the City's ban which covered commercial publications but not newspapers was content-based.[231]  "It is the absence of a neutral justification for its selective ban on newsracks that prevents the city from defending its newsrack policy as content neutral."[232]

---

[225] *See supra* para. 19.

[226] *See supra* para. 39.

[227] *See supra* paras. 30-32.  We also reject Vector's argument that the failure in our rules to provide an exemption for direct sellers and others who make a *de minimis* number of calls means that our regulations do not meet the requirement of *Central Hudson's* third prong of being "narrowly tailored to ensure that … [they are]… no more extensive than necessary to serve the governmental interest." Vector Comments at 10, quoting *Central Hudson*, 447 U.S. at 565-66.  As stated above, the Supreme Court requires a "not necessarily perfect but, reasonable" fit, *Florida Bar*, 515 U.S. at 632.  In upholding a ban which prohibited lawyers from using direct mail to solicit personal injury or wrongful death clients within 30 days of an accident, even in cases where the injuries or grief was relatively minor, the Court held that, "We find little deficiency in the ban's failure to distinguish among injured Floridians by the severity of their pain or the intensity of their grief…. The Bar's rule is reasonably well tailored to its stated objective." *Id.* at 633.  Similarly, we find our regulations implementing the national do-not-call registry do not need to provide for an exemption for direct sellers and others who make a *de minimis* number of calls in order to be a "reasonable fit" between the governmental ends and means.

[228] *See* ATA Comments at 64-79 and WorldCom Comments at 36-38.

[229] *City of Cincinnati v. Discovery Network Inc. et al,* 507 U.S. 410 at 430 (1993).

[230] *Id.* at 428 (citation omitted).

[231] *Id.* at 429.

[232] *Id.* at 429-30.

73.    Here, however, there was a neutral justification for Congress' decision to exclude non-profit organizations.  As we noted *supra*, Congress found that "the two sources of consumer problems – high volume of solicitations and unexpected solicitations – are not present in solicitations by nonprofit organizations."[233]  Congress also made a similar finding with respect to solicitations based on established business relationships.[234]  Consumers are more likely to anticipate contacts from companies with whom they have an existing relationship and the volume of such calls will most likely be lower.  Furthermore, as the Eighth Circuit noted when it distinguished the *Discovery Network* case in upholding the TCPA's ban on unsolicited faxes that applies to commercial speech but not to noncommercial speech, "the government may regulate one aspect of a problem without regulating all others."[235]  Thus, we believe it is clear that our do-not-call registry regulations may apply to commercial solicitations without applying to tax-exempt nonprofit solicitations, and that such regulations are not subject to a higher level of scrutiny.  Indeed, we agree with the FTC that regulation of non-profit solicitations are subject to a higher level of scrutiny than solicitations of commercial speech,[236] and "greater care must be

---

[233] H.R. REP. No. 102-317, at 16 (1991).  ATA asserts that we cannot give weight to Congress' findings to support our decision to exclude non-profit organizations from our regulations implementing the do-not-call registry.  ATA Comments at 60-61.  ATA argues that we may only consider the record compiled in this proceeding and that its market survey of consumer attitudes regarding telemarketing commissioned in November 2002 calls into question the validity of the Congressional findings distinguishing between non-profit and commercial calls.  ATA Comments at 73-74.  We disagree.  As a preliminary matter, it is not clear to us that ATA's data support its assertion that consumers make no distinction between commercial and charitable calls.  For example, while ATA does not provide exact data, it appears from the bar graph illustrating the data that approximately twice as many consumers find charitable calls "more acceptable" than other types of unsolicited calls than find commercial calls "more acceptable" than other types of unsolicited calls (approximately 18% v. 9%).  The Congressional findings were supported by a poll undertaken by the National Association of Consumer Agency Administrators of its state level members for statistical data describing the extent to which consumer complaints about unsolicited telemarketing calls involved commercial, charitable, or political calls.  The evidence showed that the overwhelming majority of consumer complaints were about commercial calls.  H.R. REP. No. 102-137 at 16.  Both the Eighth and Ninth Circuits have credited Congress' findings relating to the TCPA.  *See American Blast Fax*, 323 F.3d at 655-656 (citing Congress' evidence in upholding the distinction between commercial and non-commercial faxes in the TCPA) and *Moser v. FCC*, 46 F.3d at 974 (finding that "[t]here was significant evidence before Congress of consumer concerns about telephone solicitation" before the passage of the TCPA).  "When Congress makes findings on essentially factual issues … those findings are entitled to a great deal of deference, inasmuch as Congress as an institution is better equipped to amass and evaluate the vast amounts of data." *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 331 n.12 (1985).  We also note that in its *1992 TCPA Order*, the Commission stated that no evidence had been presented to show that non-commercial calls represented as serious a concern for telephone subscribers as unsolicited commercial calls and unsolicited commercial calls and concluded, based on the comments and the legislative history of the TCPA, that it would not seek additional authority to curb calls by tax-exempt organizations.  TCPA Order, 7 FCC Rcd at 8773-8774, para. 40.  Congress recently reaffirmed this judgment by requiring us "to maximize consistency" with the rule promulgated by the Federal Trade Commission, which contains an exemption for non-profit organizations.

[234] *Id.* at 14.

[235] *Missouri ex rel. v. American Blast Fax*, 323 F.3d at 656 n.4 (*citing United States v. Edge Broad. Co.*, 509 U.S. 418 at 434).

[236] *FTC Order*, 68 Fed. Reg. at 4636, n. 675, *quoting from Metromedia v. San Diego*, 453 U.S. 490, 513 (1981) ("[I]nsofar as it regulates commercial speech, the San Diego ordinance meets the constitutional requirements of *Central Hudson* …. It does not follow, however, that San Diego's ban on signs carrying noncommercial (continued….)

given [both] to ensuring that the governmental interest is actually advanced by the regulatory remedy, and [to] tailoring the regulation narrowly so as to minimize its impact on First Amendment rights."[237]

## 5.    Consistency with State and FTC Do-Not-Call Rules

74.    We conclude that harmonization of the various state and federal do-not-call programs to the greatest extent possible will reduce the potential for consumer confusion and regulatory burdens on the telemarketing industry.[238]   An underlying concern expressed by many commenters in this proceeding is the potential for duplication of effort and/or inconsistency in the rules relating to the state and federal do-not-call programs.   Congress has indicated a similar concern in requiring the Commission to "maximize consistency" with the FTC's rules.[239]   As discussed below, we find that the use of a single national database of do-not-call registrants will ultimately prove the most efficient and economical means for consumer registrations and access for compliance purposes by telemarketing entities and regulators.

75.    The states have a long history of regulating telemarketing practices, and we believe that it is critical to combine the resources and expertise of the state and federal governments to ensure compliance with the national do-not-call rules.   In fact, the TCPA specifically outlines a role for the states in this process.[240]   In an effort to reconcile the state and federal roles, we have conducted several meetings with the states and FTC.[241]   We expect such coordination to be ongoing in an effort to promote the continued effectiveness of the national do-not-call program.   We clarify below the respective governmental roles in this process under the TCPA.   As noted above, we intend to develop a Memorandum of Understanding with the FTC in the near future outlining the respective federal responsibilities under the national do-not-call rules.   We note that a few commenters have expressed concern that the FTC and this Commission may adopt separate national do-not-call lists.[242]   We reiterate here that there will be only one national database.

(Continued from previous page) ————————————————

advertising is also valid …"  Commercial speech cases have consistently accorded noncommercial speech a greater a greater degree of protection than commercial speech.") and *citing Watchtower Bible and Tract Soc'y v. Village of Stratton*, 122 S.Ct. 2080 (summarized by the FTC Order as "the Court invalidated an ordinance that required anyone who wanted to engage in door-to-door canvassing or soliciting to obtain a permit before doing so, the Court went out of its way to suggest that the ordinance may have been constitutional if it were limited to commercial speech.").

[237] *FTC Order*, 68 Fed. Reg. at 4636.

[238] Thirty-six states have adopted no-call laws.

[239] *See* Do-Not-Call Act, Sec. 3.

[240] *See* 47 U.S.C. § 227(e) and (f).

[241] *See* Letter from James Bradford Ramsay, NARUC General Counsel, to FCC filed March 14, 2003 (NARUC *ex parte*); NARUC Winter Committee Meetings, February 23-26, 2003, at which FCC and FTC staff discussed the national do-not-call registry and ways to harmonize federal and state programs.  *See also* FTC Further Comments.

[242] *See, e.g.*, AARP Comments at 3; Visa Comments at 1-3.

PA - 00292

76.     *Use of a Single Database.*  We conclude that the use of a single national do-not-call database, administered by the vendor selected by the FTC, will ultimately prove the most efficient and economical means for consumer registrations and access by telemarketers and regulators.  The establishment of a single database of registrants will allow consumers to register their requests not to be called in a single transaction with one governmental agency.  In addition, telemarketers may access consumer registrations for purposes of compliance with the do-not-call rules through one visit to a national database.  This will substantially alleviate the potential for consumer confusion and administrative burden on telemarketers that would exist if required to access multiple databases.  In addition, we note that section 227(e)(2) prohibits states, in regulating telephone solicitations, from using any database, list, or list system that does not include the part of such single national database that relates to that state.[243]  Thus, pursuant to this requirement, any individual state do-not-call database must include all of the registrants on the national database for that state.  We determine that the administrator of the national database shall make the numbers in the database available to the states as required by the TCPA.[244]

77.     We believe the most efficient way to create a single national database will be to download the existing state registrations into the national database.  The FTC has indicated that the national database is designed to allow the states to download into the national registry – at no cost – the telephone numbers of consumers that have registered with their state do-not-call lists.[245]  As noted above, we believe that consumers, telemarketers, and regulators will benefit from the efficiencies derived from the creation of a single do-not-call database.  We encourage states to work diligently toward this goal.  We recognize that a reasonable transition period may be required to incorporate the state registrations in a few states into the national database.[246]  We therefore adopt an 18-month transition period for states to download their state lists into the national database.  Having an 18-month transition period will allow states that do not have full-time legislatures to complete a legislative cycle and create laws that would authorize the use of a national list.  In addition, this transition period is consistent with the amount of time that the FTC anticipates it would take to incorporate the states' lists into the national database.  Although we do not preempt or require states to discontinue the use of their own databases at this time, once the national do-not-call registry goes into effect, states may not, in their "regulation of telephone solicitations, require the use of any database, list, or listing system that does not include the part of [the national do-not-call registry] that relates to [each] State."[247]  As noted above, we believe that there are significant advantages and efficiencies to be derived from the creation and use of a single database for all parties, including states, and we strongly encourage states to assist in this effort.  The Commission intends to work diligently with the states and FTC in an effort to

---

[243] *See* 47 U.S.C. § 227(e)(2).

[244] *See* new rule at 47 C.F.R. § 64.1200(h).

[245] *FTC Order*, 68 Fed. Reg. at 4641.  Approximately 19.2 million consumers have registered on state do-not-call lists.

[246] The FTC estimates that many states will be able to transfer their do-not-call registrations to the national database prior to its implementation on October 1, 2003.  For other states it may take from 12 to 18 months to achieve this result.  *FTC Order*, 68 Feg. Reg. at 4641.

[247] *See* 47 U.S.C. § 227(e)(2).

PA - 00293

establish a single do-not-call database.

78.        *Interplay of State and Federal Do-Not-Call Regulations*.  In the *2002 Notice*, we generally raised the issue of the interplay of state and federal do-not-call statutes and regulations.[248]  In response, several parties argued that state regulations must or should be preempted in whole,[249] or at least in part,[250] and several other parties argued that the Commission cannot or should not preempt.[251]  For example, several industry commenters contend that the TCPA provides the Commission with the authority to preempt state do-not-call regulations.[252] These commenters contend that Congress intended the TCPA to occupy the field or, at the very least, intended to preempt state regulation of interstate telemarketing.  Many state and consumer commenters note, however, that the TCPA contemplates a role for the states in regulating telemarketing and specifically prohibits preemption of state law in certain instances.[253]  States and consumers note that state do-not-call regulations have been a successful initiative in protecting consumer privacy rights.  In addition, several commenters note the importance of federal and state cooperation in enforcing the national do-not-call regulations.[254]  The record also indicates that states have historically enforced their own state statutes within, as well as across state lines.[255]  The statute also contains a savings clause for state proceedings to enforce civil or

---

[248] *See 2002 Notice*, 17 FCC Rcd at 17493-96, paras. 60-66.

[249] *See, e.g.,* DMA Reply Comments at 5.  *See also* Nextel Comments at 4-6; Visa Comments at 3-4; Wells Fargo Comments at 1-2; Xpedite Comments at 14-16 (arguing that the Commission should preempt to create more uniform rules).  We note that, although Bank One raises its preemption arguments, in part, by referencing the Commerce Clause, its analysis clearly focuses on the Commission's' authority under the Communications Act to preempt. ("Congress' general power to regulate interstate commerce *and* its delegation of that authority to the FCC in the Communications Act of 1934." Bank One Further Comments at 5.)  Moreover, to the extent Bank One suggests that, in the absence of federal statutory preemption, the Commerce Clause operates to preempt states from unduly burdening interstate commerce, such a finding would require a more particularized showing with regard to the specific statute at issue and the burden on interstate commerce.  *See e.g., Exxon Corp. v. Governor of Md*., 437 U.S. 117 (1978) (considering whether state statute that prohibited oil producers and refiners from operating retail gas stations impermissibly burdened interstate commerce.).

[250] *See, e.g.,* WorldCom Reply Comments at 27-30 (arguing that state do-not-call lists are preempted by operation of law to the extent they purport to regulate interstate calls).

[251] *See, e.g.*, NAAG Comments at 12; Attorney General of Indiana Further Reply Comments.

[252] *See, e.g.*, American Express Comments at 2-3; Nextel Comments at 4-5; Visa Reply Comments 8-9.

[253] *See, e.g.*, NAAG Comments at 12; NARUC Comments at 3-4; North Dakota PSC Comments at 2; Attorney General of Indiana Further Reply Comments.

[254] *See, e.g.* NARUC Comments at 3-4; North Dakota PSC Comments at 2;  OPCDC Comments at 3; Texas PUC Comments.  In addition, a large number of consumers filed comments in this proceeding indicating that state do-not-call regulations have improved their privacy rights.  *See, e.g.*, Brenda J. Donat Comments (cancer patient appreciates reduction in calls due to Indiana Telephone Privacy Act); Alice and Bill Frazee Comments; Tammy Puckett Comments (Indiana law provides for quiet for terminally ill family member).

[255] *See* NAAG Comments at 2.  NAAG estimates that approximately 150 state enforcement actions have been taken against telemarketing companies call across state lines.

criminal statutes, [256] and at least one federal court has found that the TCPA does not preempt
state regulation of autodialers that are not in actual conflict with the TCPA.[257]

79.     The main area of difference between the state and federal do-not-call programs
relates to the exemptions created from the respective do-not-call regulations.  Some state
regulations are less restrictive by adopting exemptions that are not recognized under federal law.
For example, some states have adopted exemptions for insurance agents, newspapers, or small
businesses.[258]  In addition, a few states have enacted laws that are more restrictive than the
federal regulations by not recognizing federal exemptions such as the established business
relationship.[259]  Most states, however, exempt nonprofit organizations and companies with whom
the consumer has an established business relationship in some manner consistent with federal
regulations.[260]

80.     At the outset, we note that many states have not adopted any do-not-call rules.
The national do-not-call rules will govern exclusively in these states for both intrastate and
interstate telephone solicitations.[261]  Pursuant to section 227(f)(1), all states have the ability to
enforce violations of the TCPA, including do-not-call violations, in federal district court.[262]
Thus, we conclude that there is no basis for conflict regarding the application of do-not-call rules
in those states that have not adopted do-not-call regulations.

81.     For those states that have adopted do-not-call regulations, we make the following
determinations.  First, we conclude that, by operation of general conflict preemption law, the
federal rules constitute a floor, and therefore would supersede all less restrictive state do-not-call
rules. [263]  We believe that any such rules would frustrate Congress' purposes and objectives in
promulgating the TCPA.  Specifically, application of less restrictive state exemptions directly
conflicts with the federal objectives in protecting consumer privacy rights under the TCPA.
Thus, telemarketers must comply with the federal do-not-call rules even if the state in which they

---

[256] 47 U.S.C. § 227(f)(6)("Nothing contained in this subsection shall be construed to prohibit an authorized State
official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute
of such State.").

[257] *Van Bergen v. Minnesota*, 59 F.3d 1541, 1547-48 (8th Cir. 1995).

[258] Ala. Code 1975 § 8-19A-4; Ark. Code Ann. § 4-99-103; Fla. Stat. Ann. § 501.604.

[259] Ind. Code § 24-4.7-1-1 (no EBR exception); Idaho Code § 48-1003A (nonprofit exception for minors only).

[260] Alaska Stat. § 45.50.475; Vt. Stat. Ann. tit. 9 § 2464a; Kan. Stat. Ann. § 50-670 and § 50-671.

[261] Section 2(b) provides the Commission with the authority to apply the TCPA to intrastate communications.  *See*
47 U.S.C. § 152(b).

[262] 47 U.S.C. § 227(f)(1).

[263] *See, e.g.*, *Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000) (where state law frustrates the
purposes and objectives of Congress, conflicting state law is "nullified" by the Supremacy Clause); *City of New
York v. FCC*, 486 U.S. 57, 64 (1988) ("The statutorily authorized regulations of an agency will preempt any state
or local law that conflicts with such regulations or frustrates the purposes thereof.").

are telemarketing has adopted an otherwise applicable exemption.  Because the TCPA applies to both intrastate and interstate communications, the minimum requirements for compliance are therefore uniform throughout the nation.  We believe this resolves any potential confusion for industry and consumers regarding the application of less restrictive state do-not-call rules.

82.    Second, pursuant to section 227(e)(1), we recognize that states may adopt more restrictive do-not-call laws governing intrastate telemarketing.[264]  With limited exceptions, the TCPA specifically prohibits the preemption of any state law that imposes more restrictive intrastate requirements or regulations.  Section 227(e)(1) further limits the Commission's ability to preempt any state law that prohibits certain telemarketing activities, including the making of telephone solicitations.  This provision is ambiguous, however, as to whether this prohibition applies both to intrastate and interstate calls,[265] and is silent on the issue of whether state law that imposes more restrictive regulations on interstate telemarketing calls may be preempted.  As set forth below, however, we caution that more restrictive state efforts to regulate interstate calling would almost certainly conflict with our rules.

83.    We recognize that states traditionally have had jurisdiction over only intrastate calls, while the Commission has had jurisdiction over interstate calls.[266]  Here, Congress enacted section 227 and amended section 2(b) to give the Commission jurisdiction over both interstate and intrastate telemarketing calls.  Congress did so based upon the concern that states lack jurisdiction over interstate calls.[267]  Although section 227(e) gives states authority to impose more restrictive intrastate regulations, we believe that it was the clear intent of Congress generally to promote a uniform regulatory scheme under which telemarketers would not be

---

[264] 47 U.S.C. § 227(e)(1).

[265] Section 227(e)(1) provides that:

        (e) Effect on State Law. –

            (1) State Law Not Preempted. – Except for the standards prescribed under subsection (d) and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—

            (A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;
            (B) the use of automatic telephone dialing systems;
            (C) the use of artificial or prerecorded voice messages; or
            (D) the making of telephone solicitations.

[266] *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986); *Smith v. Illinois Bell Telephone Co.*, 282 U.S. 133 (1930).

[267] S. Rep. No. 102-178, at 3; *see also id.* at 5 ("Federal action is necessary because States do not have jurisdiction to protect their citizens against those who . . . place interstate telephone calls."); Cong. Rec. S16205 (Nov. 7, 1991) (remarks of Sen. Hollings) ("State law does not, and cannot, regulate interstate calls."); TCPA § 2(7) (finding that "[o]ver half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operation.").

PA - 00296

subject to multiple, conflicting regulations.[268]  We conclude that inconsistent interstate rules frustrate the federal objective of creating uniform national rules, to avoid burdensome compliance costs for telemarketers and potential consumer confusion.  The record in this proceeding supports the finding that application of inconsistent rules for those that telemarket on a nationwide or multi-state basis creates a substantial compliance burden for those entities.[269]

84.     We therefore believe that any state regulation of interstate telemarketing calls that differs from our rules almost certainly would conflict with and frustrate the federal scheme and almost certainly would be preempted.  We will consider any alleged conflicts between state and federal requirements and the need for preemption on a case-by-case basis.  Accordingly, any party that believes a state law is inconsistent with section 227 or our rules may seek a declaratory ruling from the Commission.  We reiterate the interest in uniformity – as recognized by Congress – and encourage states to avoid subjecting telemarketers to inconsistent rules.

85.     NAAG contends that states have historically enforced telemarketing laws, including do-not-call rules, within, as well as across, state lines pursuant to "long-arm" statutes.[270]  According to NAAG, these state actions have been met with no successful challenges from telemarketers.  We note that such "long-arm" statutes may be protected under section 227(f)(6) which provides that "nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such state."[271]  Nothing that we do in this order prohibits states from enforcing state regulations that are consistent with the TCPA and the rules established under this order in state court.

## IV.   COMPANY SPECIFIC DO-NOT-CALL LISTS

### A.      Background

86.     In the *1992 TCPA Order*, the Commission adopted a "company-specific do-not-call" approach to protect residential telephone subscriber privacy by requiring telemarketers to place consumers on a do-not-call list if the consumer requests not to receive future solicitations.[272]  In the *2002 Notice*, the Commission sought comment on whether the company-

---

[268] *See, e.g.,* 137 Cong. Rec. S18317-01, at 1 (1991) (remarks of Sen. Pressler) ("The Federal Government needs to act now on uniform legislation to protect consumers.").

[269] *See, e.g.*, AWS Further Comments at 7 (separate state requirements will confuse customers and increase costs and burdens for telemarketers); Intuit Further Comments at 2-4 (Congress intended that more restrictive state laws be preempted); Visa Further Comments at 8 (contending that state lists that are inconsistent with federal requirements should be preempted).

[270] NAAG Comments at 12.

[271] 47 U.S.C. § 227(f)(6).

[272] *1992 TCPA Order*, 7 FCC Rcd at 8765-66, para. 23.  Specifically, the Commission's rules require that persons or entities engaged in telephone solicitations must have a written policy available upon demand for maintaining a do-not-call list, must inform and train any personnel engaged in telephone solicitations in the existence and use of the list, and must record the request and place the subscriber's name and telephone number on the do-not-call list (continued….)

specific approach has proven effective in providing consumers with a means to curb unwanted telephone solicitations.[273]  The Commission noted that under the company-specific approach, consumers must repeat their request not to be called on a case-by-case basis.  Given the apparent increase in telemarketing calls, the Commission requested comment on whether this approach continues to balance adequately the interests of consumers with those of legitimate telemarketers.  In particular, the Commission sought comment on whether changes in the marketplace now make this approach unreasonably burdensome for consumers, including elderly and disabled consumers.[274]  In addition, the Commission sought comment on whether the company-specific approach should be retained if the FTC, either acting alone or in conjunction with this Commission, adopts a national do-not-call list.  Finally, the Commission sought comment on whether to consider any additional modifications to the company-specific list such as requiring companies to provide a toll-free number or website to register such requests.[275]

87.     In response to the *2002 Notice*, the Commission received a number of comments relating to the company-specific do-not-call rules.  The majority of individual consumers addressing these issues contend that the current company-specific approach is inadequate to prevent unwanted telephone solicitations.[276]  In general, they argue that the company-specific approach is extremely burdensome to consumers who must repeat their request to every telemarketer that calls; such requests are often ignored or, in the case of abandoned calls, there is no opportunity to make such a request; and that consumers have no way to verify whether they have been placed on such lists.[277]  In addition, many consumers contend that telemarketers often fail to identify themselves or provide written copies of their do-not-call policies as required by the Commission's rules.[278]  Some consumers note that these limitations make it difficult to pursue any private right of action against telemarketers.[279]  Commenters also indicate that telemarketers frequently inform them that it will take as long as two months to process their do-

(Continued from previous page) ────────────────

at the time the request is made.  47 C.F.R. § 64.1200(e)(2)(i)–(iii).  In addition, the Commission's rules require that a do-not-call request be honored for a period of ten years from the date of the request.  47 C.F.R. § 64.1200(e)(2)(vi).  In the absence of a specific request by the subscriber to the contrary, a do-not-call request applies to the particular business entity making the call or on whose behalf the call is made, and does not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.  47 C.F.R. § 64.1200(e)(2)(v).

[273] *2002 Notice*, 17 FCC Rcd at 17468-72, paras. 13-20.

[274] *2002 Notice*, 17 FCC Rcd at 17469-70, paras. 14-15.

[275] *2002 Notice*, 17 FCC Rcd at 17470, para. 17.

[276] Lyle Bickley Comments; Pete Nico, Jr. Comments.

[277] *See, e.g.*, James D. Gagnon Comments; Norman C. Hamer Comments; Rosanna Santiago Comments; Elizabeth J. Yocam Comments.

[278] *See, e.g.*, Harley H. Cudney Comments (telemarketers fail to identify themselves); Timothy Walton Comments (telemarketers failure to send do-not-call policy when requested).

[279] Gregory S. Reichenbach Comments.

not-call requests.[280]  An organization representing persons with disabilities contends that such consumers often cannot communicate requests not to be called to telemarketers.[281]

88.     Many industry commenters contend that the company-specific approach has been effective and that a national do-not-call list is therefore unnecessary.  These commenters argue that the advantages of the company-specific approach, as identified by the Commission in 1992, remain valid today.  Specifically, these commenters contend that companies already maintain such lists, the company-specific approach allows consumers to halt calls selectively, businesses gain useful information about consumer preferences, consumer confidentiality is protected, and the costs remain on the telemarketer.  A number of industry commenters request that the retention period for those consumers requesting not to be called be reduced from ten years.[282]  In general, industry commenters oppose any requirement to establish a toll-free number or website for consumers to register and/or verify their do-not-call requests.[283]  These commenters contend that any such requirement would be costly and unnecessary given their compliance with the existing rules.

89.     The FTC concluded that its company-specific do-not-call rules should be retained despite the adoption of a national registry.[284]  Although the FTC found that the company-specific list was often ineffective in protecting consumers, the FTC concluded it will work in a complementary fashion with a national do-not-call list to effectuate the appropriate balance between consumer privacy and enabling sellers to have access to customers.   While the FTC has decided to exempt telemarketing calls on behalf of charitable organizations from the national registry, it concluded that calls by for-profit telemarketers on behalf of charitable organizations will now be subject to the company-specific rules.[285]

**B.      Discussion**

**1.      Efficacy of the Company-Specific Rules**

90.     We conclude that retention of the company-specific do-not-call rules will complement the national do-not-call registry by providing consumers with an additional option for managing telemarketing calls.  We believe that providing consumers with the ability to tailor their requests not to be called, either on a case-by-case basis under the company do-not-call approach or more broadly under the national registry, will best balance individual privacy rights and legitimate telemarketing practices.  As a result, those consumers that wish to prohibit

---

[280] Thomas M. Pechnik Comments at 2; Wayne Strang Comments at 4.

[281] *See* Telecommunications for the Deaf Comments at 2.

[282] *See, e.g.*, ATA Comments at 97-100; DMA Comments at 16-18; SBC Reply Comments at 6.

[283] *See, e.g,* Household Financial Comments at 3; MBA Comments at 6-7; Nextel Comments at 7-9; Qwest Comments at 6-7.  *But see* MBNA Comments at 7.

[284] *FTC Order*, 68 Fed. Reg. at 4629.

[285] *FTC Order*, 67 Fed. Reg. at 4629.

PA - 00299

telephone solicitations from only certain marketers will continue to have the option to do so.  In addition, consumers registered on the national do-not-call registry will have the opportunity to request that they not be called by entities that would otherwise fall within the established business relationship exemption by using the option to be placed on the company-specific lists. This finding is consistent with that of the FTC.

91.     As discussed above, we agree with those commenters that contend that the company-specific do-not-call approach has not proven ideal as a stand-alone method to protect consumer privacy.  In particular, the increase in telemarketing calls over the last decade now places an extraordinary burden on consumers that do not wish to receive telephone solicitations. These consumers must respond on a case-by-case basis to request that they not be called.  The record in this proceeding is replete with examples of consumers that receive numerous unwanted telemarketing calls each day.[286]  In addition, the widespread use of predictive dialers now results in many "dead air" or hang-up calls in which consumers do not even have the opportunity to make a do-not-call request.  Such calls are particularly burdensome for the elderly and disabled consumers.  We believe, however, that the measures adopted elsewhere in this order will enhance the effectiveness of the company-specific list.  For example, the adoption of a national do-not-call registry alleviates the concerns of those consumers, including elderly and disabled consumers that may find a case-by-case do-not-call option particularly burdensome.  In addition, restrictions on abandoned calls will reduce the number of "dead air" calls.  Caller ID requirements will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers. We also note that although many commenters question the effectiveness of the company-specific approach, there is little support in the record to eliminate those rules based on the adoption of the national do-not-call list.[287]  For the reasons stated above, we retain the option for consumers to request on a case-by-case basis whether they desire to receive telephone solicitations.

## 2.     Amendments to the Company-Specific Rules

92.     We agree with several industry commenters that the retention period for records of those consumers requesting not to be called should be reduced from the current ten-year requirement to five years.[288]  As many commenters note, telephone numbers change hands over time and a shorter retention period will help ensure that only those consumers who have requested not to be called are retained on the list.[289]  Both telemarketers and consumers will benefit from a list that more accurately reflects those consumers who have requested not to be called.  The FTC has concluded and several commenters in this proceeding agree that five years

---

[286] *See, e.g.,* Nancy J. Barginear Comments; David K. McClain Comments; John A. Rinderle Comments; Ryan Tobin Comments.

[287] *But see* Nextel Comments at 7 (contending that adoption of a national do-not-call list may render unnecessary any detailed company-specific requirements).

[288] *See, e.g.*, DMA Comments at 16; Electronic Retailing Association Comments at 5-6; Ohio PUC Comments at 17.

[289] *See, e.g.*, ABA Comments at 8; AGF Comments at 3; Call Compliance Comments at 7.

**Federal Communications Commission**                                    **FCC 03-153**

is a more reasonable period to retain consumer do-not-call requests.[290]  We believe a five-year retention period reasonably balances any administrative burden imposed on consumers in requesting not to be called with the interests of telemarketers in contacting consumers.  As noted, a shorter retention period increases the accuracy of the database while the national do-not-call option mitigates the burden on those consumers who may believe more frequent company-specific do-not-call requests are overly burdensome.  We believe any shorter retention period, as suggested by a few industry commenters, would unduly increase the burdens on consumers who would be forced to make more frequent renewals of their company-specific do-not-call requests without substantially improving the accuracy of the database.  We therefore amend our rules to require that a do-not-call request be honored for five years from the time the request is made.[291]

93.     We decline at this time to require telemarketers to make available a toll-free number or website that would allow consumers to register company-specific do-not-call requests or verify that such a request was made with the marketer.  We also decline to require telemarketers to provide a means of confirmation so that consumers may verify their requests have been processed at a later date.  Telemarketers should, however, confirm that any such request will be recorded at the time the request is made by the consumer.  In addition, consumers calling to register do-not-call requests in response to prerecorded messages should be processed in a timely manner without being placed on hold for unreasonable periods of time.  Although we believe the additional measures discussed above would improve the ability of consumers, including consumers with disabilities, to register do-not-call requests, we agree with those commenters that contend that such requirements would be unduly costly to businesses.[292]  In particular, we are concerned with the costs imposed on small businesses.  The Commission will, however, continue to monitor compliance with our company-specific do-not-call rules and take further action as necessary.

94.     We conclude that telemarketers must honor a company-specific do-not-call request within a reasonable time of such request.  We disagree, however, with commenters that suggest that periods of up to 90 days are a reasonable time required to process do-not-call requests.[293]  Although some administrative time may be necessary to process such requests, this process is now largely automated.[294]  As a result, such requests can often be honored within a few days or weeks.  Taking into consideration both the large databases of such requests maintained by some entities and the limitations on certain small businesses, we conclude that a reasonable time to honor such requests must not exceed thirty days from the date such a request

---

[290] *See, e.g.*, DMA Comments at 16; Electronic Retailing Association Comments at 5-6; Ohio PUC Comments at 17-18.

[291] *See* amended rule at 47 C.F.R. § 64.1200(d)(6).

[292] *See, e.g.*, MBA Comments at 6; Nextel Comments at 7-9; Qwest Comments at 6-7.

[293] *See, e.g.*, Household Financial Services Comments at 3-4 (contending that it takes 90 days to process requests); Verizon Comments at 6 (45 days to process request).

[294] *See, e.g.*, WorldCom Comments at 40.

is made.[295]  We note that the Commission's rules require that entities must record company-specific do-not-call requests and place the subscriber's telephone number on the do-not-call list at the time the request is made.[296]  Therefore, telemarketers with the capability to honor such company-specific do-not-call requests in less than thirty days must do so.[297]  We believe this determination adequately balances the privacy interests of those consumers that have requested not to be called with the interests of the telemarketing industry.  Consumers expect their requests not to be called to be honored in a timely manner, and thirty days should be the maximum administrative time necessary for telemarketers to process that request.

95.      In addition, we decline to extend the company-specific do-not-call rules to entities that solicit contributions on behalf of tax-exempt nonprofit organizations.  The TCPA excludes calls or messages by tax-exempt nonprofit organizations from the definition of telephone solicitation.[298]  The Commission has clarified that telemarketers who solicit on behalf of tax-exempt nonprofit organizations are not subject to the rules governing telephone solicitations.[299]  In the *2002 Notice*, the Commission declined to seek further comment on this issue.[300]  We acknowledge that this determination creates an inconsistency with the FTC's conclusion to extend its company-specific requirements to entities that solicit contributions on behalf of tax-exempt nonprofit organizations.  The Commission, however, derives its authority to regulate telemarketing from the TCPA.  As noted above, that statute excludes tax-exempt nonprofit organizations from the definition of telephone solicitation.  We therefore decline to extend the company-specific requirements to entities that solicit on behalf of tax-exempt nonprofit organizations.  We note that some tax-exempt nonprofit organizations have determined to honor voluntarily specific do-not-call requests.  Other organizations may find it advantageous to follow this example.

96.      Finally, to make clear our determination that a company must cease making telemarketing calls to a customer with whom it has an established business relationship when that customer makes a do-not-call request, we amend the company-specific do-not-call rules to

---

[295] Consistent with our existing rules, such request applies to all telemarketing campaigns of the seller and any affiliated entities that the consumer reasonably would expect to be included given the identification of the caller and the product being advertised.  47 C.F.R. § 64.1200(e)(2)(v).  *See also* AGF Comments at 4 (indicating that a reasonable time to process requests is 30 days); MBNA Comments at 7 (reasonable time to process requests is a minimum of 30 days).

[296] 47 C.F.R. § 64.1200(e)(2)(iii).

[297] As noted above, the safe harbor period for compliance with the national do-not-call list is three-months.  However, given that the national list will contain many more registrants than the individual company-specific lists, we believe that it is reasonable to allow some additional time for telemarketers to comply with the national do-not-call requests.

[298] *See* 47 U.S.C. § 227(a)(3)(C).

[299] *1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12397, para. 13.

[300] *2002 Notice*, 17 FCC Rcd at 17479, para. 33.

PA - 00302

apply to any call for telemarketing purposes.[301]  We also adopt a provision stating that a consumer's do-not-call request terminates the established business relationship for purposes of telemarketing calls even if the consumer continues to do business with the seller.[302]

## V.     INTERPLAY OF SECTIONS 222 AND 227

### A.     Background

97.     In the *2002 Notice*, the Commission sought comment generally on the interplay between sections 222 and 227.[303]  Section 222, entitled "Privacy of Consumer Information," obligates telecommunications carriers to protect the confidentiality of certain information and to protect the customer proprietary network information (CPNI) created by the customer-carrier relationship.[304]  Under the CPNI rules, a customer may allow her carrier to use her CPNI for marketing purposes.  Depending on the uses the carrier intends to make of the customer's CPNI, the carrier must provide the customer notice of her CPNI rights and a means to effectuate her CPNI choice – either "opt-in" or "opt-out" consent.[305]  The TCPA, on the other hand, governs a

---

[301] *See* amended rule at 47 C.F.R. § 64.1200(d).

[302] *See* amended rule at 47 C.F.R. § 64.1200(f)(3)(i).

[303] *2002 Notice*, 17 FCC Rcd at 17471-72, paras. 18-19.

[304] The Act defines CPNI as "(A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier."  47 U.S.C. § 222(h)(1)(A) and (B) (the 911 Act amended the definition of CPNI in section 222(h) to include "location" among a customer's information that carriers are required to protect under the privacy provisions of section 222).  CPNI includes personal information such as the phone numbers called by a consumer, the length of phone calls, and services purchased by a consumer, such as call waiting.  *See Implementation of the Telecommunications Act of 1996:  Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information; Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended, 2000 Biennial Regulatory Review - Review of Policies and Rules Concerning Unauthorized Changes of Consumers' Long Distance Carriers,* CC Docket Nos. 96-115, 96-149, and 00-257, Third Report and Order and Third Further Notice of Proposed Rulemaking, 17 FCC Rcd 14860 at 14864, para. 7 (2002) (*CPNI Third Report and Order*).

[305] Opt-out approval and opt-in approval refer to methods of obtaining customer consent to use, disclose, or permit access to customers' CPNI.  The opt-in approval method "requires that the carrier obtain from the customer affirmative, express consent allowing the requested CPNI usage, disclosure, or access after the customer is provided appropriate notification of the carrier's request consistent with the requirements" adopted by the Commission.  47 C.F.R. § 64.2003(h).  Under the opt-out approval method "a customer is deemed to have consented to the use, disclosure, or access to the customer's CPNI if the customer has failed to object thereto within the waiting period [adopted by the Commission in 47 C.F.R. § 64.2009(d)(1)] after the customer is (continued….)

particular method – telemarketing – by which carriers (and other companies) market to their customers, and those customers' rights to choose whether or not they wish to receive such telemarketing calls.  Accordingly, a consumer's decision to allow her carrier to use her CPNI reflects whether she is willing to have her carrier look at her personal usage information in order to tailor its marketing[306] based on her usage patterns.  A consumer's decision to enroll on the national do-not-call list reflects her decision about whether she wishes to receive telemarketing calls.

98.     In the *2002 Notice*, the Commission tentatively concluded that a customer's request to be placed on a telecommunications carrier's do-not-call list limits that carrier's ability to market to that consumer via telephone.[307]  The Commission reasoned that "[h]onoring a do not call request under section 227 does not render a consent under section 222 a nullity, but instead merely limits the manner of contact (i.e., marketing over the telephone) consistent with the express request of the customer under section 227."[308]  Numerous commenters generally supported the Commission's tentative determination that a customer's section 222 approval to use his or her CPNI should not override that customer's request to be placed on a do-not-call list.[309]  However, some commenters urged the Commission to draw distinctions based on: (1) the type of CPNI consent received (opt-in versus opt-out); and/or (2) national and state do-not-call lists versus company-specific do-not-call lists.

99.     In particular, some commenters argued that a customer's CPNI approval should be deemed to override her request to be included on a national (or other general) do-not-call list, but should not override a request to be placed on a company-specific do-not-call list.[310]  Additionally, some commenters supported an approach where a customer's CPNI approval, if obtained through an opt-out mechanism, would not overcome the customer's request to be placed on a do-not-call list; however, opt-in CPNI approval would be deemed to overcome a customer's inclusion on a do-not-call list.[311]  A few commenters argued that any CPNI approval should be deemed to overcome a customer's inclusion on a do-not-call registry.[312]  Finally, one commenter

(Continued from previous page) ─────────────
provided appropriate notification of the carrier's request for consent consistent with the rules" adopted by the Commission.  47 C.F.R. § 64.2003(i).

[306] Such marketing is not limited to telemarketing and may include direct mail or other marketing.

[307] *2002 Notice,* 17 FCC Rcd at 17471-72, para. 19.  The Commission noted that the carrier would still be able to market to that consumer in other ways (e.g., direct mail, e-mail, etc.).  *Id.*

[308] *2002 Notice,* 17 FCC Rcd at 17471-72, para. 19.

[309] BellSouth Comments at 6; Verizon Comments at 16; Michael C. Worsham Comments at 3; Yellow Pages Comments at 6.

[310] Cingular Comments at 10; Sprint Comments at 15.

[311] AT&T Wireless Comments at 20-21.

[312] Concerned Telephone Companies Comments at 1-8; NTCA Comments at 2 ("Offering opt-out consent to the consumer's telecommunications carrier under section 222 indicates an interest in receiving information on new services that may be available either now or in the future from the carrier.").

suggested that the question of the interplay between a customer's opt-in consent to use her CPNI and request to be on a do-not-call list should be judged on a customer-by-customer basis, based on which request was made most recently.[313]

###    B.    Discussion

100.    We first note that the fact that a telecommunications carrier has current CPNI about a particular consumer indicates that the consumer is a customer of that carrier.  In that situation, there exists an established business relationship between the customer and the carrier.[314]  The established business relationship is an exception to the national do-not-call registry.[315]  However, based on the evidence in the record and as supported by numerous commenters,[316] we confirm our tentative conclusion that if a customer places her name on a carrier's do-not-call list, that request must be honored even though the customer may also have provided consent to use her CPNI under section 222.[317]  By doing so, we maximize the protections and choices available to consumers, while giving maximum effect to the language of both statutes.  At the outset, the average consumer seems rather unlikely to appreciate the interrelationship of the Commission's CPNI and do-not-call rules.  Allowing CPNI consent to trump a do-not-call request would, therefore, thwart most consumers' reasonable expectations about how a company-specific do-not-call list functions.  Equally important, permitting a consumer's CPNI consent to supercede a consumer's express do-not call request might undermine the carrier's do-not-call database as the first source of information about the consumer's telemarketing preferences.

101.    As discussed *infra*, because we retain the exemption for calls and messages to customers with whom the carrier has an established business relationship,[318] the determination that a customer's CPNI approval does not trump her inclusion on a do-not-call list should have no impact on carriers' ability to communicate with their customers via telemarketing.[319]  Carriers

---

[313] NYSCPB Comments at 5.

[314] *See* 47 C.F.R. § 64.1200(f)(4).  *See also infra* Section VI.

[315] *See supra* para. 42.

[316] BellSouth Comments at 6; Michael C. Worsham Comments at 3; Verizon Comments at 16; Yellow Pages Comments at 6.

[317] As one commenter stated "under the Commission's CPNI rules … a customer's CPNI consent does not equate to customer consent to receive telemarketing by that carrier."  AT&T Wireless Comments at 19.

[318] *See infra* para. 112.

[319] We disagree with the Concerned Telephone Companies' assertion that a customer's CPNI consent equates to a "prior express invitation or permission" to be contacted.  *See* Concerned Telephone Companies Comments at 2. As we discuss herein, a customer's CPNI consent indicates her willingness to have her telephone company use her CPNI in order to, among other things, tailor marketing proposals to her.  CPNI approval, however, is not a blanket approval for any and all marketing a carrier may decide to pursue.  A customer's affirmative decision to enroll on a do-not-call list is a much more direct and reliable indicator of a customer's willingness to receive marketing advances via the telephone.  Accordingly, we disagree with the Concerned Telephone Companies' assertion that (continued….)

PA - 00305

**Federal Communications Commission**                                      **FCC 03-153**

will be able to contact customers with whom they have an established business relationship via the telephone, unless the customer has placed her name on the company's do-not-call list; whether the customer has consented to the use of her CPNI does not impact the carrier's ability to contact the customer via telemarketing.[320]

102.     We are not persuaded by the arguments of those commenters who urge the Commission to find that CPNI consent should trump a customer's request to be placed on a do-not-call list or similarly, that CPNI consent equates to permission to market "without restriction."[321]  We note that the Concerned Telephone Companies assert that CPNI consent equates to "consent to market *without restriction* based on [customers'] CPNI."[322]  The Commission finds no support for this assertion in any Commission order or statutory provision and, as we discuss herein, we specifically determine that CPNI approval does not equate to unlimited consent to market without restriction.

103.     Similarly, a number of commenters argue that a customer's CPNI authorization "covers a number of forms of marketing, including telemarketing."[323]  However, such assertions ignore the plain fact that CPNI approval deals specifically with a carrier's use of a customer's personal information, and only indirectly pertains to or arguably "authorizes" marketing to the customer.  Do-not-call lists, on the other hand, speak directly to customers' preferences regarding telemarketing contacts.[324]  Accordingly, we are convinced that a customer's do-not-call request demonstrates more directly her willingness (or lack thereof) to receive telemarketing calls, as opposed to any indirect inference that can be drawn from her CPNI approval.

104.     Additionally, we disagree with those commenters who claim that allowing CPNI approval to trump a consumer's request to be on a national or state do-not-call list gives

(Continued from previous page) ───────────────

"consent given by a customer under the CPNI rules renders Section 227 constraints inapplicable."  Concerned Telephone Companies Comments at 2.

[320] Some commenters equated obtaining customers' consent to use the customers' CPNI with having an established business relationship.  *See* Nextel Comments at 16, section entitled "The Commission Should Interpret the Established Business Relationship Rules in a Manner Consistent With the Consent Requirements of the CPNI Rules."  We concur with those commenters who argue that the carrier's established business relationship allows the carrier to contact those customers via telemarketing who have requested to be on the national do-not-call list.  However, as we determine herein, the CPNI consent does not overcome or trump a customer's request to be included on the national do-not-call list.  *See* Cingular Comments at 10; Nextel Comments at 17; Sprint Comments at 16 ("The view that telecommunications service providers should be allowed to contact their existing customers, even if such customers have asked to be placed on a general (non-company specific) DNC list, is consistent with the Commission's view of the importance of 'established business relationships.'").

[321] Concerned Telephone Companies Comments at 2; AT&T Wireless Reply Comments at 26.

[322] Concerned Telephone Companies Comments at 2 (emphasis added).

[323] AT&T Wireless Reply Comments at 26-27.

[324] Yellow Pages Comments at 7 ("Consumers who do not want to receive solicitations via telephone are going to request to be placed on the do-not-call list, regardless of whether the consumer has consented to the use of their CPNI").

consumers greater flexibility.[325]  As stated above, a carrier's established business relationship with a customer exempts the carrier from honoring the customer's national do-not-call request.  However, as stated above, CPNI consent is not deemed to trump a carrier-specific do-not-call list request.  For similar reasons, we decline to make a distinction based on what type of CPNI consent (opt-in versus opt-out) received, as some commenters urge.[326]

105.    We do not allow carriers to combine the express written consent to allow them to contact customers on a do-not-call list with the CPNI notice in the manner that AT&T Wireless describes.  However, we do allow carriers to combine in the same document CPNI notice with a request for express written consent to call customers on a do-not-call list, provided that such notices and opportunities for consumer consent are separate and distinct.  That is, consumers must have distinct choices regarding both whether to allow use of their CPNI and whether to allow calls after registering a do-not-call request, but carriers may combine those requests for approval in the same notice document.  Finally, we find a distinction based on the type of CPNI consent unnecessary here, as carriers can avail themselves of the established business relationship exception to contact their existing customers, irrespective of the type of CPNI consent obtained.

106.    Similarly, we agree with those commenters[327] who advise against using a time element to determine whether a customer's do-not-call request takes precedence over the customer's opt-in approval to use her CPNI,[328] because adding a time element would unnecessarily complicate carrier compliance and allow carriers to game the system.  In particular, the New York State Consumer Protection Board argues that "enrollment on a national do-not-call list should take precedence over the prior implied consent through the 'opt-out' procedure, but that the latest in time should prevail regarding 'opt-in' consents."[329]  Because we determine that carriers can contact consumers with whom they have established business relationships, irrespective of those consumers' CPNI preferences, we find this proposed methodology unnecessary in determining whether a customer's CPNI consent should trump her do-not-call request.  Additionally, we note that this proposal could be manipulated by carriers to overcome consumers' do-not-call preferences, by allowing carriers to send CPNI notices to customers that are intentionally timed to "overcome" previously expressed do-not-call requests.

107.    Finally, although it was not directly raised in the *2002 Notice*, some commenters raised the issue of whether any type of do-not-call request revokes or limits a carrier's ability to

---

[325] AT&T Wireless Reply Comments at 27.

[326] AT&T Wireless Comments at 18-19 (contending that under circumstances where "the express opt-in CPNI consent includes customer consent to be contacted by telephone, AWS believes the carrier has the permission to contact the customer even if that customer has placed her name on either the carrier's or a national do-not-call list.").  *See also* NYSCPB Comments at 5.

[327] AT&T Wireless Reply Comments at 27.

[328] NYSCPB Comments at 5.

[329] NYSCPB Comments at 5.

PA - 00307

use CPNI in a manner other than telemarketing.[330]  To the degree such affirmation is necessary, we agree with those commenters who maintain that a carrier's ability to use CPNI is not impacted by a customer's inclusion on a do-not-call list, except as noted above.

108.    *Constitutional Implications*.  We disagree with those commenters who argue that our decision that a customer's CPNI approval does not trump her request to be on a do-not-call list violates the First Amendment rights of carriers and customers.[331]  Commenters cite no authority to support their arguments, and we do not believe the fact that customers have given their approval for carriers to use their CPNI implicates any additional First Amendment issues beyond those discussed in Section III.B.4., *supra*.  Accordingly, we find our rules implementing the do-not-call registry are consistent with the First Amendment as applied to any consumer, including those who have previously given their approval to carriers to use their CPNI, pursuant to section 222.  Furthermore, we believe that the exception which allows carriers to call consumers with whom they necessarily have an established business relationship renders commenters' arguments moot, as carriers necessarily have an established business relationship with any customer from whom they solicit CPNI approval.

## VI.    ESTABLISHED BUSINESS RELATIONSHIP

### A.        Background

109.    The TCPA provides that the term "telephone solicitation" does not include a call or message to any person with whom the caller has an established business relationship (or EBR).[332]  The Commission determined during its initial TCPA rulemaking that, based on the record and legislative history, the TCPA also permits an "established business relationship" exemption from the restrictions on artificial or prerecorded message calls to residences.[333]  In the *2002 Notice*, we sought comment on the exemption generally, and more specifically, on the definition of "established business relationship," and whether any circumstances have developed that would justify revisiting these conclusions.[334]  The current rules define the term "established business relationship" to mean:

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by

---

[330] AT&T Wireless Reply Comments at 26; Verizon Comments at 16; Yellow Pages Comments at 6.

[331] Concerned Telephone Companies Comments at 3.

[332] 47 U.S.C. § 227(a)(3)(B).

[333] *1992 TCPA Order*, 7 FCC Rcd at 8770, para. 34; *see also* 47 C.F.R. § 64.1200(c)(3).

[334] *2002 Notice*, 17 FCC Rcd at 17480, para. 34.

PA - 00308

either party.[335]

110.     Industry commenters overwhelmingly support retaining the exemption for calls to customers with whom companies have an established business relationship,[336] and many urge the Commission not to narrow the scope of the exemption.[337]  Many industry members are also opposed to any time limitation on the exemption,[338] or any modification of the rules that would interfere with a company's ability to market different services and products.[339]  Most consumer groups and state organizations support the exemption, provided the scope of the definition is narrowed.[340]  A few consumers advocated eliminating the exemption for prerecorded messages.[341]  Some consumer advocates disagreed with the assumption that consumers want to hear from companies with whom they have an existing relationship.  One commenter stated that because a consumer might have established a relationship with a company does not necessarily mean that he or she wishes to receive telemarketing calls from that company.[342]  Many consumers' groups argued that the relationship should be ongoing,[343] should require a completed

---

[335] 47 C.F.R. § 64.1200(f)(4).

[336] *See, e.g.,* MPA Comments at 5, 13; MBNA Comments at 7; NAII Comments at 3; SBC Comments at 10; Nextel Comments at 11-13.

[337] *See, e.g.,* ATA Comments at 101-105; NADA Comments at 2.

[338] *See, e.g.,* SBC Comments at 12-13; Intuit Comments at 6; DMA Comments at 20-21; ATA Comments at 105. *But see, e.g.,* ERA Comments at 11 (definition should cover 24 month period prior to call); AT&T Wireless Reply Comments at 18-19 (favoring the FTC's 18-month duration on the established business relationship); Scholastic Comments at 8 (3 years following payment for goods and 6 months following an inquiry); MidFirst Bank Comments at 2-3 (suggesting the existing business relationship be terminated no earlier than a period of 12 months following the last purchase and no earlier than 60 days following the closure of all accounts with a company).

[339] *See, e.g.,* HFS Comments at 6; WorldCom Comments at 14-16; Comcast Comments at 5-7; American Express Comments at 3-4.

[340] *See, e.g.,* NASUCA Comments at 17; John A. Shaw Comments at 4; TOPUC Comments at 5; NYSCPB Comments at 7-8 (should not extend to related business entities); Michael C. Worsham Comments at 10 (should delete "inquiry, application" from definition, as they do not constitute permission to receive prerecorded messages); PUC of Ohio Comments at 15 (should be limited to contact about changes or updates to current product or service); NYSCPB—Other Than DNC List Comments at 7-8, 14-17 (should not extend to related business entities or include a mere inquiry); NCL Comments at 5 (explaining that under the current definition of established business relationship, consumers have to remember the name of every company with whom they have ever had any contact in order to determine which can call legally and which cannot).

[341] Thomas M. Pechnik Comments at 3 (no authority in section 227 for an EBR exemption for artificial or prerecorded message calls); Wayne G. Strang Comments at 12 (should revoke EBR exemption for prerecorded messages).

[342] *See* AARP Comments at 6; *see also* NCL Comments at 5 (urging the Commission to require telemarketers to disclose to their customers that they plan to make telemarketing calls and to provide the opportunity for them to opt-out).

[343] *See, e.g.,* AARP Comments at 5; NASUCA Comments at 17-18.

transaction, such as a purchase or payment,[344] and should be limited in duration.[345]  Of commenters who advocated a specific time limit on the EBR, there was less consensus about how long the relationship should last following a transaction between the seller and consumer.[346]

111.    The FTC decided to provide an exemption for "established business relationships" from the national "do-not-call" registry, as long as the consumer has not asked to be placed on the seller's company-specific "do-not-call" list.  The FTC's amended Rule limits the "established business relationship" exemption to relationships formed by the consumer's purchase, rental or lease of goods or services from, or financial transaction with, the seller within eighteen (18) months of the telephone call or, in the case of inquiries or applications, to three (3) months from the inquiry or application.[347]  The FTC explained that this time frame is consistent with most state laws that include a time limit,[348] and is more in keeping with consumer expectations than an open-ended exemption.[349]  The FTC also determined that affiliates will fall within the exemption only if the consumer would reasonably expect them to be included given the nature and type of goods or services offered and the identity of the affiliate.[350]

B.         Discussion

112.    We conclude that, based on the record, an established business relationship exemption is necessary to allow companies to communicate with their existing customers.[351] Companies maintain that the exemption allows them to make new offers to existing customers,

---

[344] AARP Comments at 5.

[345] AARP Comments at 5.

[346] Some suggest 24 months (MPA Comments at 12-13 and NASUCA Comments at 17); others advocate a 36-month period (Scholastic Comments at 8 and Bank of America Comments at 4); some commenters maintain that a 12-month period would be sufficient (Sprint Comments at 18); other commenters advocated a definition comparable to the FTC's (DIRECTV Further Comments at 2; NTCA Further Comments at 2-3).  *See also* TOPUC Comments at 6 (stating that Commission rules should require that the relationship be ongoing.  To qualify as "ongoing," the customers must have completed a purchase or transaction with a specific company within 24 months prior to the call).

[347] *FTC Order,* 68 Fed Reg. at 4634; 16 C.F.R. § 310.2(n).

[348] *FTC Order,* 68 Fed. Reg. at 4634.

[349] *FTC Order,* 68 Fed Reg. at 4592.

[350] *FTC Order,* 68 Fed. Reg. at 4593-94.

[351] The "established business relationship" permits telemarketers to call consumers registered on the national do-not-call list and to deliver prerecorded messages to consumers.  The "established business relationship," however, is not an exception to the company-specific do-not-call rules.  Companies that call their EBR customers must maintain company-specific do-not-call lists and record any do-not-call requests as required by amended 47 C.F.R. § 64.1200(d).  *See infra* discussion in para. 124.  The Commission has also reversed its prior conclusion that an "established business relationship" provides the necessary permission to deliver unsolicited facsimile advertisements.  *See infra* discussion in para. 188-191.

PA - 00310

such as mortgage refinancing, insurance updates, and subscription renewals.[352]  They suggest that customers benefit from calls that inform them in a timely manner of new products, services and pricing plans.  American Express contends that its financial advisors have a fiduciary duty to their customers, requiring them to contact customers with time-sensitive information.[353]  We are persuaded that eliminating this EBR exemption would possibly interfere with these types of business relationships.  Moreover, the exemption focuses on the relationship between the sender of the message and the consumer, rather than on the content of the message.  It appears that consumers have come to expect calls from companies with whom they have such a relationship, and that, under certain circumstances, they may be willing to accept these calls.[354]  Finally, we believe that while consumers may find prerecorded voice messages intrusive, such messages do not necessarily impose the same costs on the recipients as, for example, unsolicited facsimile messages.[355]  Therefore, we retain the exemption for established business relationship calls from the ban on prerecorded messages.  Telemarketers that claim their prerecorded messages are delivered pursuant to an established business relationship must be prepared to provide clear and convincing evidence of the existence of such a relationship.

### 1.      Definition of Established Business Relationship

113.      We conclude that the Commission's current definition of "established business relationship" should be revised.  We are convinced that consumers are confused and even frustrated more often when they receive calls from companies they have not contacted or done business with for many years.  The legislative history suggests that it was Congress's view that the relationship giving a company the right to call becomes more tenuous over time.[356]  In addition, we believe that this is an area where consistency between the FCC rules and FTC rules is critical for both consumers and telemarketers.  We conclude that, based on the range of suggested time periods that would meet the needs of industry, along with consumers' reasonable expectations of who may call them and when, eighteen (18) months strikes an appropriate balance between industry practices and consumers' privacy interests.  Therefore, the Commission has modified the definition of established business relationship to mean:

---

[352] *See, e.g.*, ATA Comments at 105; Verizon Comments at 13-14.

[353] American Express Comments at 4.

[354] *See, e.g.,* Bank of America Comments at 3; ATA Comments at 101.

[355] *See infra* discussion on unsolicited facsimile messages, paras. 185-193.

[356] *See* H.R. REP. NO. 102-317 at 14 (1991) ("In the Committee's view, an 'established business relationship' . . . could be based upon any prior transaction, negotiation, or inquiry between the called party and the business entity that has occurred during a reasonable period of time. . .  The Committee recognized this relationship so as not to foreclose the capacity of businesses to place calls that build upon, follow up, or renew, within a reasonable period of time, what had once been [an] 'existing customer relationship.'")  The House Report also states that ". . . the Committee believes the test to be applied must be grounded in the consumer's expectation of receiving the call.  Consequently, the test shall consist of a determination of whether the new solicitation occurs within a reasonable period of time and the new product or service being promoted is related substantially to the prior relationship." *Id.* at 14-15.

PA - 00311

a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three (3) months immediately preceding the date of the call, which relationship has not been previously terminated by either party.[357]

The 18-month time period runs from the date of the last payment or transaction with the company, making it more likely that a consumer would expect a call from a company with which they have recently conducted business. The amended definition permits the relationship, once begun, to exist for eighteen (18) months in the case of purchases or transactions and three (3) months in the case of inquiries or applications, unless the consumer or the company "terminates" it. We emphasize here that the termination of an established business relationship is significant only in the context of solicitation calls.[358] Therefore, consistent with the language in the definition, a company's prior relationship with a consumer entitles the company to call that consumer for eighteen (18) months from the date of the last payment or financial transaction, even if the company does not currently provide service to that customer.[359] For example, a consumer who once had telephone service with a particular carrier or a subscription with a particular newspaper could expect to receive a call from those entities in an effort to "winback" or "renew" that consumer's business within eighteen (18) months. In the context of telemarketing calls, a consumer's "prior or existing relationship" continues for eighteen (18) months (3 months in the case of inquiries and applications) or until the customer asks to be placed on that company's do-not-call list.[360]

114.   *Inquiries*. The Commission asked whether we should clarify the type of consumer *inquiry* that would create an "established business relationship" for purposes of the exemption. Some consumers and consumer groups maintain that a consumer who merely inquires about a product should not be subjected to subsequent telemarketing calls.[361] Industry

---

[357] *See* amended 47 C.F.R. § 64.1200(f)(3).

[358] We also note that the act of "terminating" an established business relationship will not hinder or thwart creditors' attempts to reach debtors by telephone, to the extent that debt collection calls constitute neither telephone solicitations nor include unsolicited advertisements. *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12400, para. 17.

[359] *See* amended 47 C.F.R. § 64.1200(f)(3).

[360] *See infra* discussion on the interplay between the established business relationship and a do-not-call request, para. 124.

[361] NASUCA Comments at 17; TOPUC Comments at 5-6; NCL Comments at 5 (EBR should be narrowed to require a consumer to actually set up an account with a company for the purpose of making recurring or repeated purchases); Michael C. Worsham Comments at 10; Stewart Abramson-December 9, 2002 Comments at 4-5; NYSCPB-Other Than DNC List Comments at 15.

commenters, on the other hand, believe that companies should be permitted to call consumers who have made inquiries about their products and services, and that consumers have come to expect such calls.[362]  The legislative history suggests that Congress contemplated that an inquiry by a consumer could be the basis of an established business relationship,[363] but that such an inquiry should occur within a reasonable period of time.[364]  While we do not believe any communication would amount to an established business relationship for purposes of telemarketing calls, we do not think the definition should be narrowed to only include situations where a purchase or transaction is completed.[365]  The nature of any inquiry must, however, be such to create an expectation on the part of the consumer that a particular company will call them.  As confirmed by several industry commenters, an inquiry regarding a business's hours or location would not establish the necessary relationship as defined in Commission rules.[366]  By making an inquiry or submitting an application regarding a company's products or services, a consumer might reasonably expect a prompt follow-up telephone call regarding the initial inquiry or application, not one after an extended period of time.  Consistent with the FTC's conclusion, the Commission believes three months should be a reasonable time in which to respond to a consumer's inquiry or application.[367]  Thus, we amend the definition of "established business relationship" to permit telemarketing calls within three (3) months of an inquiry or application regarding a product or service offered by the company.

115.    We emphasize here that the definition of "established business relationship" requires a voluntary two-way communication between a person or entity and a residential subscriber regarding a purchase or transaction made within eighteen (18) months of the date of the telemarketing call or regarding an inquiry or application within three (3) months of the date of the call.  Any seller or telemarketer using the EBR as the basis for a telemarketing call must be able to demonstrate, with clear and convincing evidence, that they have an EBR with the called party.

---

[362] Verizon Comments at 15; FSR Comments at 3-4.

[363] See H.R. REP. NO. 102-317 at 14-15 (1991) (noting that if an investor had written to a mutual fund or responded to an ad requesting additional information, the fund's manager could make follow-up calls.  The Report also explains that a loan officer or financial consultant may call a telephone subscriber who had requested a loan.).

[364] H.R. REP. NO. 102-317 at 14, 15 (1991).

[365] See, e.g., TOPUC Comments at 5-6, 11 ("there is no reason for a customer who merely inquires about a product or service, or answers a survey, to be subject to future telemarketing calls"); NCL Comments at 5 (definition should be narrowed to include situations in which the consumer has set up an account with a company for purposes of making recurring or repeated purchases).

[366] Verizon Comments at 15; ATA Comments at 104; ABA Comments at 5.

[367] Most commenters who suggested a time limit on the EBR did not specify that it would apply to inquiries.  But see Scholastic Comments at 8 (for requests of information, the reasonable amount of time should be at least 6 months); DIRECTV Reply Comments at 5 (FCC should adopt the same timeframes adopted by the FTC—18 months for a purchase and 3 months for an inquiry); Intuit Reply Comments at 7 (3-month rule is not practical from the perspective of an online service provider and software company; customers may be interested in upgrading software or in new products and services several years after the initial purchase).

PA - 00313

**Federal Communications Commission**                                    **FCC 03-153**

116.   _Different Products and Services_.  The Commission also invited comment on
whether to consider modifying the definition of "established business relationship" so that a
company that has a relationship with a customer based on one type of product or service may not
call consumers on the do-not-call list to advertise a different service or product.[368]  Industry
commenters believe an EBR with a consumer should not be restricted by product or service, but
rather, should permit them to offer the full range of their services and products.[369]  Consumer
advocates who commented on the issue maintain that a company that has a relationship based on
one service or product should not be allowed to use that relationship to market a different service
or product.[370]  The Commission agrees with the majority of industry commenters that the EBR
should not be limited by product or service.  In today's market, many companies offer a wide
variety of services and products.  Restricting the EBR by product or service could interfere with
companies' abilities to market them efficiently.  Many telecommunications and cable companies,
for example, market products and services in packages.[371]  As long as the company identifies
itself adequately,[372] a consumer should not be surprised to receive a telemarketing call from that
company, regardless of the product being offered.  If the consumer does not want any further
calls from that company, he or she may request placement on its do-not-call list.

117.   _Affiliated Entities_.  In the _1992 TCPA Order_, the Commission found that a
consumer's established business relationship with one company may also extend to the

---

[368] _2002 Notice,_ 17 FCC Rcd at 17472, para. 20.

[369] NCTA Comments at 2-5 ( "[I]t is precisely because cable operators now compete with a range of other
wireline and wireless entities in providing packages of _different_ services and products that it is more important
than ever—to cable operators _and_ their customers—that operators be able to keep their customers informed of the
full range of offerings and promotions available to them."); Comcast Comments at 7-8; Cox Comments at 6-8;
Yellow Pages Comments at 8; American Express Comments at 3; DMA Comments at 28.

[370] John A. Shaw Comments at 4; PUC of Ohio Comments at 15 (should limit the contact about changes or
updates to the current product or service.  For example, a lawn care service cannot call to offer vinyl siding); Joe
Shields Further Comments at 3 (any product or service offered through telemarketing must be substantially related
to the product that created the relationship).

[371] _See_ WorldCom Comments at 9 (describing its "Neighborhood" product, which combines a special feature
package and unlimited local and long distance calling for one price); Cablevision Reply Comments at 3 (noting
that in addition to telephone and telecom products, the company owns an array of entertainment and retail venues.
 It also faces strong competition from other providers of video programming, and needs to be able to let customers
for one line of service know about other services).

[372] As required by the amended rules we adopt today, "[a] person or entity making a call for telemarketing
purposes must provide the called party with the name of the individual caller, the name of the person or entity on
whose behalf the call is being made, and a telephone number or address at which the person or entity may be
contacted."  _See_ 47 C.F.R. § 64.1200(d)(4).  The amended rules also require that all artificial or prerecorded
telephone messages shall, "[a]t the beginning of the message, state clearly the identify of the business, individual,
or other entity that is responsible for initiating the call.  If a business is responsible for initiating the call, the name
under which the entity is registered to conduct business with the State Corporation Commission (or comparable
regulatory authority) must be stated, and [d]uring or after the message, state clearly the telephone number (other
than that of the autodialer or prerecorded message player which placed the call) of such business, other entity, or
individual. . ."  _See_ 47 C.F.R. § 64.1200(b).

company's affiliates and subsidiaries.[373]  Consumer advocates maintain that the EBR exemption should not automatically extend to affiliates of the company with whom a consumer has a business relationship.[374]  Industry members argue that it should apply to affiliates that provide reasonably-related products or services.[375]  The Commission finds that, consistent with the FTC's amended Rule, affiliates fall within the established business relationship exemption only if the consumer would reasonably expect them to be included given the nature and type of goods or services offered and the identity of the affiliate.[376]  This definition offers flexibility to companies whose subsidiaries or affiliates also make telephone solicitations, but it is based on consumers' reasonable expectations of which companies will call them.[377]  As the ATA and other commenters explain, consumers often welcome calls from businesses they know.  A call from a company with which a consumer has not formed a business relationship directly, or does not recognize by name, would likely be a surprise and possibly an annoyance.  This determination is also consistent with current Commission rules on the applicability of do-not-call requests made to affiliated persons or entities.  Under those rules, a residential subscriber's do-not-call request will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product advertised.[378]

118.   *Other Issues*.  The Commission clarifies that the established business relationship exemption does not permit companies to make calls based on referrals from existing customers and clients,[379] as the person referred presumably does not have the required business relationship with the company that received the referral.  An EBR is similarly not formed when a wireless subscriber happens to use another carrier's services through roaming.[380]  In such a situation, the consumer has not made the necessary purchase or inquiry that would constitute an EBR or

---

[373] *See 1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34.

[374] NCL Comments at 5-6; NYSCPB-Other Than DNC List Comments at 7.

[375] *See, e.g.,* SBC Comments at 11 (This is consistent with sec. 272(g), which allows Bell Operating Companies to jointly market services of their long distance affiliates); Visa Comments at 6 (should also apply to co-brand and affinity partners); FSR Comments at 4 (Commission should make clear that any member of a corporate family, including subsidiaries and affiliates, should be permitted to call as long as customer has EBR with any member).

[376] Given the numerous types of business relationships, the Commission believes it appropriate to treat the issue of a consumer's "reasonable expectations" in any complaint on a case-by-case basis.  *See also* H.R. REP. NO. 102-317 at 15 (noting that contact by an affiliate of the company with whom a consumer has an established business relationship may be permissible if the solicitation by the affiliate related to a transaction in progress with the consumer or was substantially related to the product or service forming the basis of the business relationship.).

[377] *See, e.g.,* American Express Comments at 4.

[378] *See* 47 C.F.R. § 64.1200(e)(2)(v).

[379] *See* New Jersey Ratepayer Further Reply Comments at 3 (providing an exemption for referrals by existing customers would provide an open door and the element of consent would still be missing).  *But see* NAIFA Comments at 3.

[380] *See* AT&T Wireless Comments at 25 (arguing that an established business relationship is formed in such a situation).

provided prior express consent to receive telemarketing calls from that company.  We recognize that companies often hire third party telemarketers to market their services and products.  In general, those telemarketers may rely on the seller's EBR to call an individual consumer to market the seller's services and products.[381]  However, we disagree with Nextel that a consumer's EBR with a third party telemarketer, including a retail store or independent dealer, extends to a seller simply because the seller has a contractual relationship with that telemarketer.  The seller would only be entitled to call a consumer under the EBR exemption based on its own EBR with a consumer.[382]  We also disagree with WorldCom that the EBR should extend to marketing partners for purposes of telemarketing joint offers, to the extent the "partner" companies have no EBR with the consumer.[383]

## 2.    Telecommunications Common Carriers

119.    In the *2002 Notice*, we asked what effect the established business relationship exemption might have on the telecommunications industry, if a national do-not-call list is established.  According to WorldCom, telephone solicitations are the primary mechanism for, and the means by which consumers are accustomed to, purchasing competitive telecommunications services.[384]  WorldCom argues that with the advent of competition in the formerly monopolized local telephone markets, and the entry of the Regional Bell Operating Companies into the long distance market, carriers need to be able to market effectively their new services.[385]  WorldCom argues that a national do-not-call list that exempts calls to persons with whom a company has established business relationships will favor incumbent providers.[386]  According to WorldCom, incumbent local exchange carriers maintain most of the local customer base, and therefore would be able to telemarket new services to all those customers, regardless of whether they were on the national do-not-call registry, because of the established business relationship exemption.  New competitors, on the other hand, would be restricted from calling those same consumers.

---

[381] *See* Verizon Comments at 14-15.

[382] *See* Nextel Reply Comments at 15-17.  However, if a consumer purchases a seller's products at a retail store or from an independent dealer, such purchase would establish a business relationship with the seller, entitling the seller to call that consumer under the EBR exemption.

[383] *See* Notice of *Ex Parte Presentation* from WorldCom to FCC at 8, filed June 16, 2003.

[384] WorldCom Comments at 7.

[385] WorldCom Comments at 9 ("telemarketing is the most cost-effective way to introduce new products and services to the public, especially local and long distance telecommunications services that customers customize for their specific needs" (footnote omitted)).

[386] WorldCom Comments at 13; *see also* ATA Reply Comments at 30-32; Winstar Further Comments at 3-4 (maintaining that the FCC should either exempt telecommunications service providers from the do-not-call rules or implement rules that prevent incumbents from using the EBR to preserve their monopoly); CompTel Further Reply Comments at 2 (should follow WorldCom's suggestion and determine that all consumers have an EBR with all providers of local service).  *But see* Wayne G. Strang Reply Comments at 16 (suggesting that WorldCom's arguments are exaggerated as even those entities that have an established business relationship with a subscriber may not take advantage of the exemption once the subscriber makes a do-not-call request).

120.    One approach would be to narrow the "established business relationship" for telecommunications carriers, so that a carrier doing business with customers based on one type of service may not call those customers registered with the national do-not-call list to advertise a different service.[387]  We find, however, that the record does not support such an approach in the context of telemarketing calls.  Along with the majority of industry commenters in this proceeding, WorldCom maintains that companies "must have flexibility in communicating with their customers not only about their current services, but also to discuss available alternative services or products. . . ."[388]  Limiting a common carrier's "established business relationship" by product or service might harm competitors' efforts to market new goods or services to existing customers, and would not be in the public interest.

121.    WorldCom proposes instead that the Commission revise the definition of established business relationship so that all providers of a telecommunications service—incumbents and new entrants alike—are deemed to have an established business relationship with all consumers.[389]  Alternatively, WorldCom suggests that the definition of an established business relationship be revised to exclude a company whose relationship with a consumer is based solely on a service for which the company has been a dominant or monopoly provider of the service, until such time as competitors for that service have sufficiently penetrated the market.[390]

122.    Although we take seriously WorldCom's concerns about the potential effects of a national do-not-call list on competition in the telecommunications marketplace, we decline to expand the definition of "established business relationship" so that common carriers are deemed to have relationships with all consumers for purposes of making telemarketing calls.  Broadening the scope of the established business relationship in such a way would be inconsistent with Congress's mandate "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."[391]  To permit common carriers to call consumers with whom they have no existing relationships and who have expressed a desire not to be called by registering with the national do-not-call list, would likely confuse consumers and

---

[387] *See 2002 Notice*, 17 FCC Rcd at 17472, para. 20; *see also* Shaw Further Reply Comments at 13 (if there is any competition problem, the EBR for ILECS should not allow them to sell the customer additional services or products).

[388] WorldCom Comments at 15.  *See also* WorldCom Comments at 15-16 (arguing that limiting calls to those related to the customer's current service does not make sense in a market where products are increasingly integrated).

[389] WorldCom Reply Comments at 11.  *But see* Verizon Further Reply Comments at 2-3 (it would be at odds with the plain meaning of EBR to adopt WorldCom's suggestion that all consumers would have an EBR with WorldCom).

[390] WorldCom Reply Comments at 11.

[391] *See* 47 U.S.C. § 227(c)(1).

PA - 00317

**Federal Communications Commission**                                    **FCC 03-153**

interfere with their ability to manage and monitor the telemarketing calls they receive.[392]

123.    We further note that with the establishment of a national do-not-call registry, carriers will still be permitted to contact competitors' customers who have not placed their numbers on the national list.  In addition, carriers will be able to call their prior and existing customers for 18 months to market new products and services, such as long distance, local, or DSL services, as long as those customers have not placed themselves on that carrier's company-specific do-not-call list.[393]  For the remaining consumers with whom common carriers have no established business relationship and who are registered with the do-not-call list, carriers may market to them using different advertising methods, such as direct mail.  Therefore, we find that treating common carriers like other entities that use the telephone to advertise, best furthers the goals of the TCPA to protect consumer privacy interests and to avoid interfering with existing business relationships.

### 3.    Interplay Between Established Business Relationship and Do-Not-Call Request

124.    In the *2002 Notice*, we sought comment on the effect of a do-not-call request on an established business relationship.[394]  We noted the legislative history on this issue, which suggests that despite an established business relationship, a company that has been asked by a consumer not to call again, must honor that request and avoid further calls to that consumer.[395]  Consumer advocates who discussed the interplay between the established business relationship and a do-not-call request maintained that a do-not-call request should "trump" an established business relationship,[396] and that consumers should not be required to terminate business relationships in order to stop unwanted telemarketing calls.[397]  The majority of industry

---

[392] We note that of the TCPA-related complaints filed by consumers with the Commission, a substantial number have been against common carriers.  *See* Caroline E. Mayer, "Do Not Call' List Operator AT&T Leads in Complaints," Washingtonpost.com (April 23, 2003) <http://washingtonpost.com/wp-dyn/articles/A17683-2003Apr22.html> (describing the number of complaints filed against AT&T and other common carriers for do-not-call violations); *see also* ATA Comments, Appendix 16.

[393] *See supra* para. 113 for a discussion regarding termination of the established business relationship for purposes of telemarketing calls.

[394] *2002 Notice*, 17 FCC Rcd at 17480-81, para. 35.

[395] *See* H.R. REP. NO. 102-317 at 15-16 (1991) ("If a subscriber asks a company with whom it has an established relationship not to call again, that company has an obligation to honor the request and avoid further contacts. Despite the fact that objecting subscribers can be called based on an 'established business relationship,' it is the strongly held view of the Committee that once a subscriber objects to a business that calls based on an established relationship, such business must honor this second objection and implement procedures not to call that twice-objecting subscriber again.").

[396] *See, e.g.,* Thomas M. Pechnik Comments at 3; Joe W. McDaniel-Fifth December 5, 2002 Comments; City of Chicago Comments at 11-12; Philip J. Charvat Comments at 8; Mark A. Hiner Comments; Barbara Crouse Comments (receives calls from a newspaper because she is a subscriber, even when she asks to be placed on a do-not-call list); Wayne G. Strang Comments at 13; TOPUC Comments at 6.

[397] Owen O'Neill Comments at 2; City of New Orleans Comments at 10.

commenters also supported the notion that companies should honor requests from individual consumers not to be called, regardless of whether there is a business relationship.[398]  As discussed earlier, companies will be permitted to call consumers with whom they have an established business relationship for a period of 18 months from the last payment or transaction, even when those consumers are registered on the national do-not-call list, as long as a consumer has not asked to be placed on the company's do-not-call list.  Once the consumer asks to be placed on the company-specific do-not-call list, the company may not call the consumer again regardless of whether the consumer continues to do business with the company.  This will apply to all services and products offered by that company.[399]  If the consumer continues to do business with the telemarketer after asking not to be called (by, for example, continuing to hold a credit card, subscribing to a newspaper, or making a subsequent purchase), the consumer cannot be deemed to have waived his or her company-specific do-not-call request.[400]  As described above, we amend the company-specific do-not-call rules to apply to "any call for telemarketing purposes" to make clear that a company must cease making telemarketing calls to any customer who has made a do-not-call request, regardless of whether they have an EBR with that customer.[401]  We also adopt a provision stating that a consumer's do-not-call request terminates the EBR for purposes of telemarketing calls even if the consumer continues to do business with the seller.[402]

## VII.    TAX-EXEMPT NONPROFIT ORGANIZATION EXEMPTION

### A.         Background

125.    The term "telephone solicitation," as defined in the TCPA, does not include a call or message "by a tax-exempt nonprofit organization."[403]  The Commission concluded, as part of its *1995 Reconsideration Order*, that calls placed by an agent of the telemarketer are treated as if

---

[398] *See, e.g.,* DialAmerica Comments at 14; AT&T Wireless Comments at 26-27; Verizon Comments at 15; HFS Comments at 9; NCTA Comments at 5.  *But see* Bank of America Comments at 6 (a do-not-call request should not terminate the relationship, and businesses should be able to continue calling those customers).

[399] *See, e.g.,* Philip J. Charvat Comments at 8 (If product exceptions to do-not-call requests were allowed, the TCPA's effectiveness would be eviscerated.  "A 'credit card' offer declined by a consumer with a [do-not-call] demand, will be followed by a 'shopping convenience card' offer from the same entity"); Stewart Abramson-December 9, 2002 Comments at 1 (a do-not-call request should apply to the business generally, not just by product or service.  Otherwise, it would be very time-consuming for the consumer).

[400] In some instances, however, a consumer may grant explicit consent to be called during the course of a subsequent purchase or transaction.

[401] *See* amended rule at 47 C.F.R. § 64.1200(d).  *See also supra* para. 96.

[402] *See* amended rule at 47 C.F.R. § 64.1200(f)(3)(i).

[403] 47 U.S.C. § 227(a)(3).  In its initial rulemaking in 1992, the Commission concluded that, in the same vein, calls by tax-exempt nonprofit organizations also should be exempt from the prohibition on prerecorded messages to residences as non-commercial calls.  *See 1992 TCPA Order*, 7 FCC Rcd at 8773-74, para. 40; *see also* 47 U.S.C. § 227(a)(3)(C) and 47 C.F.R. § 64.1200(c)(4).

PA - 00319

the telemarketer itself placed the call.[404]  Therefore, calls made by independent telemarketers on behalf of tax-exempt nonprofits also are not subject to the rules governing telephone solicitations.[405]

126.    Over the years, the Commission has received inquiries about calls made jointly by nonprofit and for-profit organizations.  In the *2002 Notice*, we described a scenario in which a tax-exempt nonprofit organization calls consumers to sell another company's magazines and receives a portion of the proceeds.  We then asked whether such calls should be exempt from the restrictions on telephone solicitations and prerecorded messages as calls made by a tax-exempt nonprofit organization.[406]

127.    Tax-exempt nonprofit organizations explained that they rely on the expertise and operational efficiencies of professional fundraisers to conduct their fundraising campaigns. Therefore, they support the continued exemption for professional fundraisers that call on behalf of nonprofit organizations.[407]  Many commenters, while supportive of the exemption for calls by nonprofits, were concerned that it frequently has been used to veil what is in reality a commercial venture.[408]  Some commenters emphasized that "the TCPA nonprofit exemption should not function as an artifice for an inherently commercial enterprise."[409]  NAAG, for example, maintained that calls that serve to benefit for-profit companies (in whole or in part) are not calls by or on behalf of nonprofits and should remain subject to the TCPA's restrictions.[410] The Association of Fundraising Professionals similarly asserted that this type of nonprofit/for-profit initiative does not represent a "pure" charitable appeal; that the primary purpose of such a transaction is receipt of a product or service by the consumer, not the charitable transfer of

---

[404] *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12397, para. 13.

[405] *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12397, para. 13.

[406] *2002 Notice*, 17 FCC Rcd at 17479, para. 33.

[407] NPCC Comments at 12-13; March of Dimes Comments at 2; Special Olympics-Hawaii Comments; NPCC Comments at 4 ("An estimated 60 percent to 70 percent of nonprofit and charitable organizations use professional fundraisers to deliver their messages to consumers and solicit donations." (cites omitted)).

[408] NPCC Comments at 10; Donald R. Davis Comments; Private Citizen Comments at 4; Gregory S. Reichenbach Comments.

[409] NPCC Comments at 10.  *See also* Private Citizen Comments at 4; Gregory S. Reichenbach Comments.

[410] NAAG Comments at 39 (describing an example of a for-profit sending prerecorded messages "to residential phone numbers, promising to reduce interest rates and save consumers money repaying their credit card debt.  The prerecorded message did not disclose how the savings would be achieved and did not identify any nonprofit organization.  If a caller responded to the 1-800 number on the message, the caller reached the for-profit call center.  In the sales pitch that followed, the telemarketer described credit counseling services offered by a nonprofit organization.  However, the telemarketer solicited "enrollment fees" (between $199-499), payable entirely to the for-profit company. . . Consumers interested in nonprofit credit counseling would be referred to a nonprofit credit counselor, but only after they paid hundreds of dollars to the for-profit marketing company."); *see also* Wayne G. Strang Comments at 7; City of New Orleans Comments at 9-10; Donald R. Davis Comments.

funds.[411]  One commenter suggested that the test for whether a call is made on behalf of a nonprofit organization should be whether payment is made to the tax-exempt nonprofit organization.[412]  DialAmerica, on the other hand, urged the Commission to confirm that the exemption also applies when for-profits call, conduct a commercial transaction, and donate a percentage of the proceeds to nonprofit charitable organizations.[413]

## B.        Discussion

128.    We reaffirm the determination that calls made by a for-profit telemarketer hired to solicit the purchase of goods or services or donations on behalf of a tax-exempt nonprofit organization are exempted from the rules on telephone solicitation.[414]  In crafting the TCPA, Congress sought primarily to protect telephone subscribers from unrestricted commercial telemarketing activities, finding that most unwanted telephone solicitations are commercial in nature.[415]  In light of the record before us, the Commission believes that there has been no change in circumstances that warrant distinguishing those calls made by a professional telemarketer on behalf of a tax-exempt nonprofit organization from those made by the tax-exempt nonprofit itself.  The Commission recognizes that charitable and other nonprofit entities with limited expertise, resources and infrastructure, might find it advantageous to contract out its fundraising efforts.[416]  Consistent with section 227, a tax-exempt nonprofit organization that conducts its own fundraising campaign or hires a professional fundraiser to do it, will not be subject to the restrictions on telephone solicitations.[417]  If, however, a for-profit organization is delivering its own commercial message as part of a telemarketing campaign (*i.e.,* encouraging the purchase or rental of, or investment in, property, goods, or services),[418] even if accompanied by a donation to a charitable organization or referral to a tax-exempt nonprofit organization,[419]

---

[411] AFP Comments at 3.

[412] Reese Comments at 10.

[413] DialAmerica Comments at 13-14.  *See also* DialAmerica Reply Comments at 13 (DialAmerica's Sponsor Magazine Program donates 12.5% of the proceeds to the charity.).

[414] We again reiterate that calls that do not fall within the definition of "telephone solicitation" as defined in section 227(a)(3) will not be precluded by the national do-not-call list.  These may include calls regarding surveys, market research, and calls involving political and religious discourse.  *See supra* para. 37.

[415] *See* H.R. Rep. No. 102-317 at 16-17 (1991).

[416] *See* NPCC Comments at 13 ("Nonprofit and charitable organizations rely on the expertise and operational efficiencies of professional fundraisers to conduct their fundraising campaigns and disseminate their message. . . . *Such trained professionals offer significant resources, expertise and operational efficiencies that cannot be duplicated by nonprofit and charitable organizations*." (emphasis added; cites omitted))

[417] These restrictions are found in amended 47 C.F.R. §§ 64.1200(c) and (d).

[418] *See* 47 U.S.C. § 227(a)(3) and amended 47 C.F.R. § 64.1200(f)(9).

[419] Similarly, an affiliate of a tax-exempt nonprofit organization that is itself not a tax-exempt nonprofit is not exempt from the TCPA rules when it makes telephone solicitations.

PA - 00321

that call is not *by or on behalf of a tax-exempt nonprofit organization*.[420]  Such calls, whether made by a live telemarketer or using a prerecorded message, would not be entitled to exempt treatment under the TCPA.  We emphasize here, as we did in the *2002 Notice*, that the statute and our rules clearly apply already to messages that are predominantly commercial in nature, and that we will not hesitate to consider enforcement action should the provider of an otherwise commercial message seek to immunize itself by simply inserting purportedly "non-commercial" content into that message.  A call to sell debt consolidation services, for example, is a commercial call regardless of whether the consumer is also referred to a tax-exempt nonprofit organization for counseling services.[421]  Similarly, a seller that calls to advertise a product and states that a portion of the proceeds will go to a charitable cause or to help find missing children must still comply with the TCPA rules on commercial calls.

## VIII.   AUTOMATED TELEPHONE DIALING EQUIPMENT

### A.        Background

129.    The TCPA and Commission's rules prohibit calls using an automatic telephone dialing system (or "autodialer") to emergency telephone lines, to the telephone line of a guest room of a health care facility, to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.[422]  Section 227 defines automatic telephone dialing system as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[423]  In the *2002 Notice*, the Commission explained that more sophisticated dialing systems, such as predictive dialers and answering machine detection software, are now widely used by telemarketers to increase productivity.  We invited comment on these and other technologies and asked whether they fall within the restrictions on "automatic telephone dialing systems."[424]

130.    Most industry members that commented on the issue of autodialed calls argue that predictive dialers do not fall within the statutory definition of "automatic telephone dialing system," primarily because, they contend, predictive dialers do not dial numbers "randomly or sequentially."[425]  Rather, they state that predictive dialers store pre-programmed numbers or

---

[420] *See* NPCC Comments at 10; AFP Comments at 3.

[421] Unlike debt collection calls, a consumer may "terminate" an established business relationship with a company offering debt consolidation services by requesting placement on a company-specific do-not-call list.  *See supra* note 358.

[422] 47 U.S.C. § 227(b)(1)(A)(i)-(iii); 47 C.F.R. § 64.1200(a)(1)(i)-(iii).

[423] 47 U.S.C. § 227(a)(1); *see also,* 47 C.F.R. § 64.1200(f)(1).

[424] *2002 Notice*, 17 FCC Rcd at 17473-74, paras. 23-24.

[425] *See, e.g.,* Mastercard Comments at 6; Verizon Comments at 23; HFS Comments at 7; Discover Comments at 8; CBA Comments at 7-8; Bank of America Comments at 5; ATA Comments at 113-114.  *But see* American General Finance Comments at 1 (urging the Commission to clarify the definitions of "automatic telephone dialing system" (continued....)

receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers.[426]  Most consumers and consumer groups maintain that predictive dialers are autodialers; that to distinguish technologies on the basis of whether they dial randomly or use a database of numbers would create a distinction without a difference.[427]  They argue that for the recipient of the call, there is no difference whether the number is dialed at random or from a database of numbers.[428]  A few commenters contend that even when a database of numbers is used, the numbers can be dialed in sequence.[429]  In addition, LCC urges the Commission to clarify that modems used for non-telemarketing purposes are excluded from the definition of "automatic telephone dialing system."[430]

## B.        Discussion

### 1.        Predictive Dialers

131.   *Automated Telephone Dialing Equipment*.  The record demonstrates that a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls.[431]  The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers.[432]  As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.[433]  The principal feature of predictive dialing

---

(Continued from previous page) ──────────────

and "autodialer," which focus on equipment that *has the capacity* to generate random number and sequential dialing patterns, rather than on whether the equipment is actually used in that fashion).

[426] *See, e.g.,* Mastercard Comments at 6; HFS Comments at 7; Verizon Comments at 23; Discover Comments at 8.

[427] *See, e.g.,* EPIC Comments at 12; City of Chicago Comments at 9-11; Stewart Abramson Comments at 1-2; Michael C. Worsham Comments at 6.

[428] *See, e.g.,* Thomas M. Pechnik Comments at 4; Stewart Abramson Comments at 2 (FCC should not have to identify specific technologies covered by definition as technologies are always changing).  *But see* Wayne G. Strang Comments at 6 (should ask Congress to change the definition to cover all devices capable of automatically dialing calls).

[429] *See* Thomas M. Pechnik Comments at 5; Michael C. Worsham Comments at 5.

[430] *See* LCC Comments at 7.  LCC explains that, on behalf of certain clients, it installs terrestrial repeaters across the country, which receive satellite signals and retransmit the signals into areas that the signals would not otherwise reach.  The repeaters contain an on-board modem, which may be programmed to call the client's number in the event a malfunction occurs.  If the modem is programmed incorrectly, it may dial a number other than the number of the client.  *See* LCC Comments at 2-3.

[431] *See, e.g.,* HFS Comments at 7; ATA Comments at 110; ABA Comments at 3.

[432] *See* ATA Comments at 113, n. 108; DMA Comments at 21 ("Some dialers are capable of being programmed for sequential or random dialing; some are not.").

[433] Mastercard Comments at 6.

software is a timing function, not number storage or generation.  Household Financial Services states that these machines are not conceptually different from dialing machines without the predictive computer program attached.[434]

132.    The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[435]  The statutory definition contemplates autodialing equipment that either stores or produces numbers.  It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the "*capacity* to store or produce telephone numbers (emphasis added). . .."  It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies.[436]  In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily.  As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective.[437]  The basic function of such equipment, however, has not changed—the *capacity* to dial numbers without human intervention.  We fully expect automated dialing technology to continue to develop.

133.    The legislative history also suggests that through the TCPA, Congress was attempting to alleviate a particular problem—an increasing number of automated and prerecorded calls to certain categories of numbers.[438]  The TCPA does not ban the use of technologies to dial telephone numbers.  It merely prohibits such technologies from dialing emergency numbers, health care facilities, telephone numbers assigned to wireless services, and any other numbers for which the consumer is charged for the call.[439]  Such practices were determined to threaten public safety and inappropriately shift marketing costs from sellers to

---

[434] HFS Comments at 7.

[435] 47 U.S.C. § 227(a)(1).

[436] *See* 137 Cong. Rec. S18784 (1991) (statement of Sen. Hollings) ("The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies.").  *See also Southern Co. v. FCC*, 293 F.3d 1338, 1346 (11th Cir. 2002) ("While the FCC is correct that the principle of nondiscrimination is the primary purpose of the 1996 Telecommunications Act, we must construe statutes in such a way to 'give effect, if possible, to every clause and word of a statute'.") (*quoting Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted)).

[437] ATA Comments at 113.

[438] NASUCA Comments at 4-5.

[439] One commenter suggests that databases of emergency and cellular numbers are commercially available which can be used to exclude emergency numbers, health care facilities and wireless numbers from an automated dialer's calling list.  *See* ECN Comments at 3.  The Commission is not persuaded that any such databases would include all numbers covered by the prohibition at 47 U.S.C. § 227(b)(1)(A), or that such databases are sufficiently accurate.  Assuming, though, that predictive dialers can be programmed to avoid calling such numbers, there would be no reason to then exclude the dialing equipment from the TCPA's prohibition.

**Federal Communications Commission**                     **FCC 03-153**

consumers.[440]  Coupled with the fact that autodialers can dial thousands of numbers in a short period of time, calls to these specified categories of numbers are particularly troublesome.  Therefore, to exclude from these restrictions equipment that use predictive dialing software from the definition of "automated telephone dialing equipment" simply because it relies on a given set of numbers would lead to an unintended result.  Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages.  We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented.[441]  Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of "automatic telephone dialing equipment" and the intent of Congress.[442]

134.    *Predictive Dialers as Customer Premises Equipment*.  A few commenters maintain that predictive dialers are Customer Premises Equipment (CPE)[443] over which the Communications Act gives the FCC exclusive jurisdiction.[444]  The ATA and DMA urge the Commission to assert exclusive authority over CPE and, in the process, preempt state laws governing predictive dialers.  They contend that, in the absence of a single national policy on predictive dialer use, telemarketers will be subject to the possibility of conflicting state standards.[445]  In the past, CPE was regulated as a common carrier service based on the Commission's jurisdiction and statutory responsibilities over *carrier-provided* equipment.[446]

---

[440] *See* S. REP. NO. 102-178 at 5 *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972-73 (1991) ("The Committee believes that Federal legislation is necessary to protect the public from automated telephone calls.  These calls can be an invasion of privacy, an impediment to interstate commerce, and a disruption to essential public safety services.").

[441] *See* 47 U.S.C. § 227(a)(1).

[442] Because the statutory definition does not turn on whether the call is made for marketing purposes, we also conclude that it applies to modems that have the "capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  *See* 47 U.S.C. § 227(a)(1).

[443] Customer Premises Equipment is defined in the Communications Act as "equipment employed on the premises of a person (other than a carrier) to originate, route, or terminate telecommunications."  *See* 47 U.S.C. § 153(14).

[444] *See* ATA Comments at 120; ATA Further Comments at 11-12; DMA Reply Comments at 17; WorldCom Comments at 41 (asserting that predictive dialers are customer premises equipment).

[445] *See* ATA Comments at 120-122 (noting that the Commission also has authority to forebear from adopting a specific rule governing predictive dialers to promote marketplace flexibility).  *See also* DMA Comments at 17 ("Predictive dialers are customer premises equipment ("CPE"), and thus beyond the states' power to regulate pursuant to the Communications Act of 1934 and longstanding Commission rules and orders.  These policies apply because predictive dialers are used interchangeably and inseparably for both inter- and intrastate communications, and are not susceptible to a segregated regulatory framework that would govern inter- and intrastate uses separately.");  DMA Further Comments at 4.

[446] *See Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, Docket No. 20828, 77 FCC2d 384, Final Decision (1980) *(Computer II)*.  In the *Computer II* Order, the Commission explained that " In conferring jurisdiction upon this agency over 'all instrumentalities . . . incidental to . . . transmission,' the intent was '. . . to give the FCC ability to regulate any charge or practice associated with a (continued….)

**Federal Communications Commission**                                    **FCC 03-153**

The Commission long ago deregulated CPE, finding that the CPE market was becoming increasingly competitive, and that in order to increase further the options that consumers had in obtaining equipment, it would require common carriers to separate the provision of CPE from the provision of telecommunications services.[447]  As part of its review of CPE regulations, the Commission pointed out that it had never regarded the provision of terminal equipment in isolation as an activity subject to Title II regulation.[448]  While the Commission recognized that such equipment is within the FCC's authority over wire and radio communications,[449] it found that the equipment, by itself, is not a "communication" service, and therefore there was no mandate that it be regulated.[450]  None of the commenters who argue this point describe a change in circumstances that would warrant reevaluating the Commission's earlier determination and risk disturbing the competitive balance the Commission deemed appropriate in 1980.[451]  In addition, it is not the equipment itself that states are considering regulating; it is the use of such equipment that has caught the attention of some state legislatures.[452]  We believe it is preferable at this time to regulate the use of predictive dialers under the TCPA's specific authority to regulate telemarketing practices.  Therefore, we decline to preempt state laws governing the use of predictive dialers and abandoned calls or to regulate predictive dialers as CPE.

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
common carrier service in order to insure that the carrier operated for the public benefit.'"  *See Computer II*, 77 FCC2d at 450, para. 170.

[447] *Computer II*, 77 FCC2d at 442-43, para. 149; *see also In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace*, Report and Order, CC Docket Nos. 96-91 and 98-183, 16 FCC Rcd 7418, 7422, para. 5 (March 30, 2001).

[448] *Computer II*, 77 FCC2d at 451, para. 172.  The Commission explained that "[e]quipment manufacturers, distributors, and even regulated carriers routinely offer terminal equipment for sale or lease on an untariffed basis."

[449] *See Computer II*, 77 FCC2d at 451-52, paras. 172-173. ("[S]uch activities are not necessarily beyond the jurisdiction of the Commission to the extent they are encompassed within the definition of wire or radio communications in  Section 3(a) of the Act.  The definitions of wire and radio communications in Section 3(a) and (b) are far-reaching and include 'all instrumentalities, facilities, apparatus, and services incidental to such transmission.'"  Indeed we explicitly find that all terminal equipment used with interstate communications services are within the Act's definition of wire and radio communications.  However, the fact that the provision of incidental 'instrumentalities,' etc. is within the subject matter jurisdiction of the Act does not mandate regulation of the 'instrumentalities.'") (footnotes omitted).

[450] *Computer II*, 77 FCC2d at 451-452, para. 173.

[451] The Commission earlier stated that "[a]ny regulation by tariff or otherwise of terminal equipment must be demonstrated to be reasonably ancillary to the effective performance of the Commission's responsibilities under Title II or 'imperative for the achievement of an agency's ultimate purposes.'") *Computer II*, 77 FCC Rcd at 451-52, para. 173.

[452] *See* Private Citizen Comments at 7 ("California will be implementing a 1% abandonment rate soon."); HFS at 7 ("California adopted legislation requiring a maximum for abandoned calls, but the regulatory body charged with setting the maximum has, to our knowledge, been unable to establish a maximum yet.").  Oklahoma bans the use of automatic or predictive dialing devices that abandon more than 5% of calls answered per day per telemarketing campaign.  *See* Okla. Stat. tit. 15, §755.1 (2002).  Virginia failed to pass legislation proposing to regulate the use of predictive dialers.  *See* S.B. 918, 2003 Gen. Assem. (Va. 2003).

PA - 00326

### 2.    "War Dialing"

135.    In the *2002 Notice*, the Commission sought comment on the practice of using autodialers to dial large blocks of telephone numbers in order to identify lines that belong to telephone facsimile machines.  Of those commenters who weighed in on "war dialing,"[453] there was unanimous support for a ban on the practice.[454]  Commenters explained that ringing a telephone for the purpose of determining whether the number is associated with a fax or voice line is an invasion of consumers' privacy interests and should be prohibited.  Moreover, they asserted there is no free speech issue when the caller has no intention of speaking with the called party.[455]  The TCPA prohibits the transmission of unsolicited facsimile advertisements absent the consent of the recipient.  The Commission agrees that because the purpose of "war dialing" is to identify those numbers associated with facsimile machines, the practice serves few, if any, legitimate business interests and is an intrusive invasion of consumers' privacy. Therefore, the Commission today adopts a rule that prohibits the practice of using any technology to dial any telephone number for the purpose of determining whether the line is a fax or voice line.[456]

## IX.    ARTIFICIAL OR PRERECORDED VOICE MESSAGES

### A.    Background

136.    As described above, the TCPA and Commission rules prohibit telephone calls to residences using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is for emergency purposes or is specifically exempted.[457]  The TCPA permits the Commission to exempt from this provision calls which are non-commercial and commercial calls which do not adversely affect the privacy rights of the called party and which do not transmit an unsolicited advertisement.[458]  In its 1992 proceeding, the Commission determined to exempt calls that are non-commercial and commercial calls that do not contain an unsolicited advertisement, noting that messages that do not seek to sell a product or service do not tread heavily upon the consumer interests implicated by section 227.[459]

---

[453] In this context, war dialing uses automated equipment to dial telephone numbers, generally sequentially, and software to determine whether each number is associated with a fax line or voice line.

[454] *See* Thomas M. Pechnik Comments at 6; PRC Comments at 4-5; Michael C. Worsham Comments at 5; Carl Paulson Comments; Wayne G. Strang Reply Comments at 21.

[455] *See, e.g.,* Thomas M. Pechnik Comments at 5; Wayne G. Strang Reply Comments at 21.

[456] *See* amended rule at 47 C.F.R. § 64.1200(a)(7).

[457] 47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(2).

[458] 47 U.S.C. § 227(b)(2)(B).

[459] *See 1992 NPRM*, 7 FCC Rcd at 2737, para. 11.  Among the examples of calls that do not include the transmission of any unsolicited advertisement, the Commission cited calls from a business that wishes to advise its employees of a late opening time due to weather; or calls from a nationwide organization that wishes to remind members of an upcoming meeting or change in schedule; or calls from a catalogue or delivery company to confirm the arrival, shipment, or delivery date of a product to a customer.  We reiterate that such calls also would (continued….)

 The Commission also concluded that a solicitation to someone with whom a prior business relationship exists does not adversely affect subscriber privacy interests, and adopted an exemption for prerecorded messages delivered to consumers with whom a company has an established business relationship.[460]  Finally, the Commission concluded that tax-exempt nonprofit organizations should be exempt from the prohibition on prerecorded message calls to residences as non-commercial calls.[461]  In the *2002 Notice,* the Commission sought comment on artificial or prerecorded messages containing offers for free goods or services and messages purporting to provide "information only" about products or services.  We also invited comment on calls seeking people to help sell or market a business' products.  We asked whether such messages should be viewed as advertisements under the rules.

137.    The record reveals that the practice of sending prerecorded messages to residential telephone lines is widespread.[462]  Consumers are frustrated by such messages, which often fill up the tapes of their answering machines,[463] fail to identify adequately the company delivering the message, and provide no option for requesting that the company not call again.[464]  When consumers attempt to place their numbers on a do-not-call list in response to a prerecorded message, they often reach busy signals,[465] additional prerecorded messages, or are told that do-not-call requests are not processed at that number.[466]  Consumers also indicate that they have been told by telemarketers that "free" offers and informational messages are not subject to the prerecorded message prohibition, as they do not ask the called party to purchase any product or service.[467]

138.    The majority of consumers and consumer groups contend that messages offering "free" goods or services or those that claim to provide information-only are designed with the ultimate goal of soliciting consumers to buy products and services and are therefore prohibited

(Continued from previous page) ────────────────────────
typically be covered by the exemption for an established business relationship.  *See* amended 47 C.F.R. § 64.1200(f)(3).

[460] *1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34.

[461] *1992 TCPA Order*, 7 FCC Rcd at 8773-74, para. 40.

[462] NAAG Comments at 33 ("The telephone records subpoenaed for one autodialing telemarketer revealed the business was using 47 lines to leave messages that lasted less than 30 seconds.  Considering that calls could be placed over at least a 14-hour period, the equipment could leave more than half a million calls per week."); Wayne G. Strang Comments at 5; Mathemaesthetics Comments at 7; Philip J. Charvat Comments at 5.

[463] Michael Sprinker Comments; Dale Carson Comments; Judith Hanes Comments; Jean Armstrong Comments; NACAA Comments at 2-3.

[464] *See, e.g.,* NACAA Comments at 2-3; Tom Burch Comments; James D. Gagnon Comments; Neil J. Nitzberg Comments at 1; John Cox Comments; NYSCPB – Other Than DNC List Comments at 2.

[465] Debra Denson-Royal Oak Comments.

[466] Dennis C. Brown December 6, 2002 Comments at 4; David Purk Comments.

[467] *See, e.g*., NCL Comments at 5.

PA - 00328

without the prior express consent of the called party.[468]  These messages, they argue, are intended to generate future sales, and the fact that no sale occurs during the call is irrelevant to their intrusiveness.[469]  Industry members provided very few examples of prerecorded messages used to deliver advertisements.  Instead, they described the benefits of communicating with existing customers through prerecorded messages.  Commenters specifically cautioned the Commission against restricting "dual purpose" calls which, they contend, provide both a convenient customer service and cost effective marketing tool.[470]  One company explained that it uses prerecorded messages to notify its customers about delinquent bills or changes in service, and to simultaneously inform them of alternative services and products.[471]  Another commenter described messages sent by a mortgage broker alerting homeowners to lower interest rates and offering refinancing options.[472]

### B.    Discussion

#### 1.    Offers for Free Goods or Services; Information-Only Messages

139.    Congress found that "residential telephone subscribers consider automated or prerecorded telephone calls . . . to be a nuisance and an invasion of privacy."[473]  It also found that "[b]anning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion."[474]  Congress determined that such prerecorded messages cause greater harm to consumers' privacy than telephone solicitations by live telemarketers.  The record reveals that consumers feel powerless to stop prerecorded messages largely because they are often delivered to answering machines and because they do not always provide a means to request placement on a do-not-call list.

---

[468] NCL Comments at 5; Thomas Pechnik Comments at 8; TOPUC Comments at 4-5; Michael C. Worsham Comments at 9; City of New Orleans Comments at 8; J. Melville Capps Comments at 6-7; NAAG Comments at 37; NYSCPB Comments at 12; S. Abramson Comments at 4; NACAA Comments at 4; Wayne G. Strang Comments at 16; Philip J. Charvat Comments at 7; EPIC Comments at 13.

[469] *See, e.g.,* NAAG Comments at 36-37; TOPUC Comments at 5; J. Melville Capps Comments at 6; NYSCPB Comments at 12.  *See also* NAAG at 33, n. 108 (describing a prerecorded message received by many state attorneys general offices which invited the called party to call an 800 number to participate in Disney's 100th Anniversary celebration by visiting south Florida for a cost of $99 per person for three days); NAAG at 37 (describing another message that advertised a "revolutionary new product" and asked consumers to attend a local meeting to learn how to make a six-figure income.  At the meeting, consumers are encouraged to purchase new products for resale.)

[470] Wells Fargo Comments at 2; HFS Comments at 8; AT&T Wireless Comments at 27-28.

[471] Wells Fargo Comments at 2; *see also* AT&T Wireless Comments at 27-28.

[472] Joe Shields Reply Comments at 6-7.

[473] *TCPA*, Section 2(10), *reprinted in* 7 FCC Rcd at 2744.

[474] *TCPA*, Section 2(12), *reprinted in* 7 FCC Rcd at 2744-45.

PA - 00329

140.    Additionally, the term "unsolicited advertisement" means "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission."[475]  The TCPA's definition does not require a sale to be made during the call in order for the message to be considered an advertisement.  Offers for free goods or services that are part of an overall marketing campaign to sell property, goods, or services constitute "advertising the commercial availability or quality of any property, goods, or services."[476]  Therefore, the Commission finds that prerecorded messages containing free offers and information about goods and services that are commercially available are prohibited to residential telephone subscribers, if not otherwise exempted.[477]

141.    In addition, we amend the prerecorded message rule at 47 C.F.R. § 64.1200(c)(2) so that the prohibition expressly applies to messages that constitute "telephone solicitations," as well as to those that include or introduce an "unsolicited advertisement."[478]  We agree with those commenters who suggest that application of the prerecorded message rule should turn, not on the caller's characterization of the call, but on the purpose of the message.[479]  Amending the rule to apply to messages that constitute "telephone solicitations," is consistent with the goals of the TCPA[480] and addresses the concerns raised by commenters about purported "free offers."[481]  In addition, we believe the amended rule will afford consumers a greater measure of protection from unlawful prerecorded messages and better inform the business community about the general prohibition on such messages.[482]

142.    The so-called "dual purpose" calls described in the record—calls from mortgage

---

[475] 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(5).

[476] *See* 47 U.S.C. § 227(a)(4).

[477] Therefore, a prerecorded message that contains language describing a new product, a vacation destination, or a company that will be in "your area" to perform home repairs, and asks the consumer to call a toll-free number to "learn more," is an "unsolicited advertisement" under the TCPA if sent without the called party's express invitation or permission.  *See* 47 U.S.C. § 227(a)(4).  However, as long as the message is limited to identification information only, such as name and telephone number, it will not be considered an "unsolicited advertisement" under our rules.  *See* FTC Further Comments at 32.  *But see* Joe Shields Further Comments at 4-5 (arguing that all prerecorded messages that introduce a business are by definition an advertisement).

[478] The current rule exempts from the prohibition any call that is made for a commercial purpose but does not include the transmission of any unsolicited advertisement.  *See* 47 C.F.R. § 64.1200(c)(2).  We amend the rule to exempt a call that is made for a commercial purpose but does not include or introduce an unsolicited advertisement or *constitute a telephone solicitation.  See* amended rule at 47 C.F.R. § 64.1200(a)(2)(iii).

[479] *See, e.g.,* NAAG Comments at 43.

[480] *See TCPA*, Section 2(12) and (13), *reprinted in* 7 FCC Rcd at 2744-45.

[481] *See, e.g.,* Michael Worsham Comments at 9; Stewart Abramson Comments; City of New Orleans Comments at 8; J. Melville Capps Comments at 6.

[482] *See 2002 Notice*, 17 FCC Rcd at 17478, para. 31.

PA - 00330

brokers to their clients notifying them of lower interest rates, calls from phone companies to customers regarding new calling plans, or calls from credit card companies offering overdraft protection to existing customers—would, in most instances, constitute "unsolicited advertisements," regardless of the customer service element to the call.[483]  The Commission explained in the *2002 Notice* that such messages may inquire about a customer's satisfaction with a product already purchased, but are motivated in part by the desire to ultimately sell additional goods or services.  If the call is intended to offer property, goods, or services for sale either during the call, or in the future (such as in response to a message that provides a toll-free number), that call is an advertisement.  Similarly, a message that seeks people to help sell or market a business' products, constitutes an advertisement if the individuals called are encouraged to purchase, rent, or invest in property, goods, or services, during or after the call.  However, the Commission points out that, if the message is delivered by a company that has an established business relationship with the recipient, it would be permitted under our rules.  We also note that absent an established business relationship, the telemarketer must first obtain the prior express consent of the called party in order to lawfully initiate the call.  Purporting to obtain consent during the call, such as requesting that a consumer "press 1" to receive further information, does not constitute the *prior* consent necessary to deliver the message in the first place, as the request to "press 1" is part of the telemarketing call.

### 2.      Identification Requirements

143.      The TCPA rules require that all artificial or prerecorded messages delivered by an automatic telephone dialing system identify the business, individual, or other entity initiating the call, and the telephone number or address of such business, individual or other entity.[484]  Additionally, the Commission's rules contain identification requirements that apply without limitation to "any telephone solicitation to a residential telephone subscriber."[485]  The term "telephone solicitation" is defined to mean "the initiation of a telephone call or *message* for the purpose of encouraging the purchase or rental of . . . property, goods, or services . . ." (emphasis added).[486]  We sought comment, however, on whether we should modify our rules to state expressly that the identification requirements apply to otherwise lawful artificial or prerecorded messages, as well as to live solicitation calls.[487]

144.      The vast majority of consumer and industry commenters support modifying the rules to provide expressly that telemarketers must comply with the identification requirements when delivering prerecorded messages.[488]  Some consumers urge the Commission to require

---

[483] Wayne G. Strang Reply Comments at 6-7.

[484] *See* 47 C.F.R. § 64.1200(d).

[485] 47 C.F.R. § 64.1200(e)(2)(iv).

[486] 47 C.F.R. § 64.1200(f)(3).

[487] *2002 Notice*, 17 FCC Rcd at 17476-77, para. 28.

[488] AT&T Wireless Comments at 23; ARDA Comments at 9; ABA Comments at 4; Stewart Abramson Comments at 3; NCL Comments at 4; Carl Paulson Comments.

specifically that companies provide the name of the company under which it is registered to do business.[489]  They explain that a company will often use a "d/b/a" ("doing business as") or "alias" in the text of the prerecorded message, making it difficult to identify the company calling. The Commission recognizes that adequate identification information is vital so that consumers can determine the purpose of the call, possibly make a do-not-call request, and monitor compliance with the TCPA rules.[490]  Therefore, we are amending our rules to expressly require that all prerecorded messages, whether delivered by automated dialing equipment or not, identify the name of the business, individual or other entity that is responsible for initiating the call, along with the telephone number of such business, other entity, or individual.[491]  With respect to the caller's name, the prerecorded message must contain, at a minimum, the legal name under which the business, individual or entity calling is registered to operate.  The Commission recognizes that some businesses use "d/b/as" or aliases for marketing purposes. The rule does not prohibit the use of such additional information, provided the legal name of the business is also stated.  The rule also requires that the telephone number stated in the message be one that a consumer can use during normal business hours to ask not to be called again.[492]  If the number provided in the message is that of a telemarketer hired to deliver the message, the company on whose behalf the message is sent is nevertheless liable for failing to honor any do-not-call request.  This is consistent with the rules on live solicitation calls by telemarketers.[493]  If a consumer asks not to be called again, the telemarketer must record the do-not-call request, and the company on whose behalf the call was made must honor that request.

### 3.   Radio Station and Television Broadcaster Calls

145.   The TCPA prohibits the delivery of prerecorded messages to residential telephone lines without the prior express consent of the called party.[494]  Commission rules exempt from the prohibition calls that are made for a commercial purpose but do not include any unsolicited advertisement.[495]  The Commission sought comment on prerecorded messages sent by radio

---

[489] City of New Orleans Comments at 8; NCL Comments at 4; PRC Comments at 5-6.

[490] *See, e.g.,* Carl Paulson Comments; City of New Orleans Comments at 7-8; Joe Shields Reply Comments at 6-7.

[491] *See* amended 47 C.F.R. § 64.1200(b).

[492] This would be 9 a.m. – 5 p.m., Monday through Friday, during the particular telemarketing campaign.  A seller or telemarketer's telephone number must permit consumers to make their do-not-call requests in a timely manner. Therefore, the seller or telemarketer must staff the "do-not-call number" sufficiently or use an automated system for processing requests in such a way that consumers are not placed on hold or forced to wait for an agent to answer the connection for an unreasonable length of time.  We also reiterate the Commission's determination in its *1995 Reconsideration Order* that any number provided for identification purposes may not be a number that requires the recipient of a solicitation to incur more than nominal costs for making a do-not-call request (*i.e.,* for which charges exceed costs for transmission of local or ordinary station-to-station long distance calls).  *See 1995 Reconsideration Order*, 10 FCC Rcd at 12409, para. 38.  *See also* amended 47 C.F.R. § 64.1200(b)(2).

[493] *See* amended 47 C.F.R. § 64.1200(d)(3).

[494] 47 U.S.C. § 227(b)(1)(B).

[495] 47 C.F.R. § 64.1200(c)(2).

stations or television broadcasters that encourage telephone subscribers to tune in at a particular time for a chance to win a prize or similar opportunity.[496]  We asked whether the Commission should specifically address these kinds of calls, and if so, how.  The record reveals that such calls by radio stations and television broadcasters do not at this time warrant the adoption of new rules.  Few commenters in this proceeding described either receiving such messages or that they were particularly problematic.[497]  The few commenters who addressed the issue were split on whether such messages fall within the TCPA's definition of "unsolicited advertisement" and are thus subject to the restrictions on their delivery.[498]  We conclude that if the purpose of the message is merely to invite a consumer to listen to or view a broadcast, such message is permitted under the current rules as a commercial call that "does not include the transmission of any unsolicited advertisement" and under the amended rules as "a commercial call that does not include or introduce an unsolicited advertisement or constitute a telephone solicitation."[499]  The Commission reiterates, however, that messages that are part of an overall marketing campaign to encourage the purchase of goods or services or that describe the commercial availability or quality of any goods or services, are "advertisements" as defined by the TCPA.  Messages need not contain a solicitation of a sale during the call to constitute an advertisement.

## X.   ABANDONED CALLS

### A.   Background

146.   In the *2002 Notice,* the Commission noted that various technologies are widely used by telemarketers to contact greater numbers of consumers more efficiently.[500]  We explained that the use of one such technology—predictive dialing software—may result in a significant number of abandoned calls.[501]  Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those calls when a

---

[496] *2002 Notice*, 17 FCC Rcd at 17478-79, para. 32.

[497] NYSCPB states that they have not received complaints on these types of messages by radio and television stations.  *See* NYSCPB Comments at 13.

[498] Thomas Pechnik Comments at 9 (prerecorded messages sent by radio stations are commercial ads covered by the TCPA); Hershovitz Comments at 3-4 (such messages clearly prohibited under the TCPA); NAB Comments at 3 (broadcaster audience invitation calls do not promote the commercial availability or quality of property, goods or services and are therefore exempted under TCPA rules); TBT Comments at 1 (invitation to listen to a radio station is not a solicitation as defined by FCC); Michael C. Worsham Comments at 9 (true purpose of call is not charitable or political); Wayne G. Strang Reply Comments at 13-14 (calls made to increase listener/viewer shares are commercial in nature, even though no sale was made or was intended to be made); Shaw Further Comments at 4 (calls to invite a consumer to listen to a radio station are regulated by the TCPA and may not be made to numbers on the do-not-call list).

[499] *See* amended 47 C.F.R. § 64.1200(a)(2)(iii).  However, messages that encourage consumers to listen to or watch programming, including programming that is retransmitted broadcast programming for which consumers must pay (e.g., cable, digital satellite, etc.), would be considered advertisements for purposes of our rules.

[500] *2002 Notice*, 17 FCC Rcd at 17473-74, para. 24.

[501] *See supra* note 31 for a description of a "predictive dialer."

telemarketer is unavailable to take the next call.  In attempting to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call, predictive dialers may either "hang-up" on consumers or keep the consumer on hold until connecting the call to a sales representative, resulting in what has been referred to as "dead air."[502]  Predictive dialers reduce the amount of down time for sales agents, as consumers are more likely to be on the line when the telemarketer completes a call.  Each telemarketing company can set its predictive dialer software for a predetermined abandonment rate.[503]  The higher the abandonment rate, the higher the number of hang-up calls.  The Commission asked what approaches we might take to minimize the harm that results from the use of predictive dialers.[504]  We invited comment specifically on the possibility of setting a maximum rate on the number of abandoned calls.[505]

147.     The record shows that the use of predictive dialers has, in fact, become more prevalent in the telemarketing industry.[506]  The record also reveals that predictive dialers are responsible for the vast majority of abandoned telemarketing calls—both hang-ups and "dead air" calls.  Individual consumers report receiving between three and ten hang-up calls each day.[507]  Consumers often feel harassed or aggravated by "dead air" calls.[508]  Many describe the burdens these calls impose on individuals with disabilities, who often struggle to answer the telephone.[509]  Hang-ups and "dead air" calls also can be frightening for the elderly.[510]  Consumers complain that they do not have an opportunity to request placement on a company's do-not-call

---

[502] "Dead air" may also be the result of Answering Machine Detection (AMD) software which is used to determine whether the call has reached a live person or an answering machine.  AMD may be programmed to have a certain amount of time in which to determine whether an answering machine or live person has answered the call.  During this time, the consumer may experience "dead air" until either the dialer transfers the called party to a sales agent or disconnects the call.  *See* ECN Comments at 3-4; Alek Szlam Comments at 4.

[503] *See 2002 Notice*, 17 FCC Rcd at 17465, para. 7, n.38.

[504] *See 2002 Notice*, 17 FCC Rcd at 17475, para. 26.

[505] *2002 Notice*, 17 FCC Rcd at 17475-76, para. 26.

[506] *See, e.g.*, NACAA Comments at 3; Pacesetter Comments at 5; WorldCom Comments at 41. We note that the vast majority of commenters that engage in telemarketing described their use of predictive dialers.

[507] *See, e.g.*, F. Jenny Holder Comments at 1; Caroline Henriques Comments.

[508] *See, e.g.*, NCL Comments at 4 ("It is the equivalent of sending 3 door-to-door salespeople to a neighborhood with twenty homes, using a remote technology to knock on all the doors at once, and leaving seventeen homeowners standing at their doors wondering who was there."); NACAA Comments at 3-4; TOPUC Comments at 3; NAAG Comments at 34; Edwin Bailey Hathaway Comments at 1; Stewart Abramson Comments at 1; Kent Rausch Comments (worries that when his children answer the phone, there is a predator on the other end of the line).

[509] *See, e.g.*, Thomas Callahan Comments; Vivian Sinclair Comments; Carmen Brown Comments (caretaker of husband with MS); Henry Jackson Comments.

[510] *See, e.g.*, Edwin Bailey Hathaway Comments; Karen M. Meyer Comments; AARP Comments at 2.

PA - 00334

**Federal Communications Commission**                    **FCC 03-153**

list when predictive dialers disconnect calls.[511]  Abandoned calls can also interfere with Internet usage or simply tie-up telephone lines for people telecommuting or operating businesses out of the home.[512]  Many consumer groups contend that the only way to effectively alleviate these harms is to implement a zero abandonment rate on calls delivered by predictive dialers, or one as close to zero as possible.[513]  Other consumer advocates support a ban on predictive dialers altogether.[514]

148.    Telemarketers acknowledge that use of predictive dialers results in a certain percentage of dropped calls.[515]  But they contend that predictive dialers are a valuable tool for increasing productivity and lowering costs for telemarketers and, ultimately, for consumers.[516]  Some industry members oppose restrictions on the use of predictive dialers, maintaining that the industry has "natural incentives" to keep abandonment rates low to avoid alienating consumers.[517]  Others contend that a set rate would not account for the needs of various telemarketing campaigns.[518]  While many telemarketers maintain that a maximum abandonment rate would eliminate the benefits that result from the use of predictive dialers,[519] most would nevertheless support a call abandonment rate of 5 percent.[520]  A few commenters, including the DMA, would not oppose a 3 percent maximum rate.[521]  One industry commenter, who supported a set abandonment rate on predictive dialers, stated that if non-telemarketing entities continue to dial without restriction, consumers will be encouraged to join do-not-call lists.[522]

---

[511] *See, e.g.,* NACAA Comments at 3; Thomas Pechnik Comments at 2; Stewart Abramson Comments at 1; Katherine S. Raulston Comments at 1.

[512] TOPUC Comments at 3.

[513] *See, e.g.,* NAAG Comments at 34-35 (a 0% abandonment rate is the appropriate standard);  NASUCA Comments at 3; TOPUC Comments at 3; AARP Comments at 2; Michael C. Worsham Comments at 6.

[514] *See, e.g.,* Mathemaesthetics Comments at 6; NCL Comments at 4; Private Citizen Comments at 7.

[515] ATA Comments at 109.

[516] Pacesetter Comments at 5; Teleperformance Comments at 2; ATA Comments at 109;  MBNA Comments at 7; NAA Comments at 15-16; Allstate Comments at 2.

[517] ATA Comments at 109.

[518] SER Comments at 2; MPA Comments at 21.

[519] SBC Reply Comments at 4; Sytel Reply Comments at 4; DMA Reply Comments at 19.

[520] Cendant Comments at 3; CBA Comments at 8; Bank of America Comments at 5; ABA Comments at 3; DialAmerica Comments at 10; ITC Further Comments at 4.

[521] Sytel Comments at 7; DMA Comments at 31; Nextel Further Comments at 11 (stating that any Commission regulation of call abandonment rates should be no more restrictive than the maximum three percent rate established by the FTC).

[522] Sytel Reply Comments at 2, 4.

PA - 00335

149.    In its telemarketing proceeding, the FTC determined that a total ban on abandoned calls would amount to a ban on predictive dialers, and would not strike the proper balance between addressing an abusive practice and allowing for a technology that reduces costs for telemarketers.[523]  The FTC's amended Rule prohibits abandoned calls,[524] but provides in a "safe harbor" that a seller or telemarketer will not be deemed to have violated the TSR if the seller or telemarketer can show that its conduct conforms to certain specified standards, including a call abandonment rate of no more than three (3) percent, measured on a per day per campaign basis.[525]

### B.    Discussion

150.    Given the arguments raised on both sides of this issue as well as the FTC's approach to the problem, the Commission has determined to adopt a rule to reduce the number of abandoned calls consumers receive.[526]  Under the new rules, telemarketers must ensure that any technology used to dial telephone numbers abandons no more than three (3) percent of calls answered by a person, measured over a 30-day period.  A call will be considered abandoned if it is not transferred to a live sales agent within two (2) seconds of the recipient's completed

---

[523] *See FTC Order*, 68 Fed. Reg. at 4642.  The FTC found that a three (3) percent abandonment rate was "feasible, realistic" and "fully capable" of being achieved.  *Id.* at 4643.  *See also* FTC Further Comments at 33-38.

[524] Section 310.4(b)(1)(iv) of the amended TSR defines a prohibited abandoned outbound call as one in which the recipient of the call answers the call, and the telemarketer does not connect the call to a sales representative within two seconds of the person's completed greeting.  *FTC Order*, 68 Fed. Reg. at 4642.  The FTC notes that this definition of abandoned call covers "dead air" and "hang-up" calls, in which the telemarketer hangs up on a called consumer without connecting that consumer to a sales representative.  *Id.*

[525] Under FTC Rule 310.4(b)(4), a seller or telemarketer will not be liable for violating 310.4(b)(1)(iv) if: (i) the seller or telemarketer employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured per day per calling campaign; (ii) the seller or telemarketer, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; (iii) whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the seller or telemarketer promptly plays a recorded message that states the name and telephone number of the seller on whose behalf the call was placed; and (iv) the seller or telemarketer, in accordance with 310.5(b)-(d), retains records establishing compliance with 310.4(b)(4)(i)-(iii).  *FTC Order,* 68 Fed. Reg. at 4643-45.

The FTC's rules on call abandonment were to go into effect on March 31, 2003.  In response to petitions filed by the DMA and ATA, the FTC determined to stay the date by which it would require compliance with the abandoned call rules until October 1, 2003.  The FTC concluded that "staying these provisions will provide ample time for all telemarketers who use predictive dialers to obtain, install, and test the necessary hardware or software, and should alleviate concerns that predictive dialer manufacturers might not have adequate supplies of the necessary products" by the March 31 deadline.  *See* Letter from Donald S. Clark, Secretary, FTC, to Robert Corn-Revere, Ronald G. London and Paul A. Werner III, Counsel for the ATA, March 14, 2003 (available at <http://www.ftc.gov/os/2003/03/030314ataletter.htm>).  *See also Telemarketing Sales Rule* (Federal Trade Comm'n, Stay of Compliance Date), 68 Fed. Reg. 16414 (April. 4, 2003).

[526] *See 2002 Notice*, 17 FCC Rcd at 17475-76, para. 26 (seeking comment on what approaches we might take to minimize any harm that results from the use of predictive dialers and on alternative approaches to the problems associated with abandoned calls).

greeting.  When a call is abandoned within the three (3) percent maximum allowed, a telemarketer must deliver a prerecorded identification message containing only the telemarketer's name, telephone number, and notification that the call is for "telemarketing purposes."  To allow time for a consumer to answer the phone, the telemarketer must allow the phone to ring for fifteen seconds or four rings before disconnecting any unanswered call.  Finally, telemarketers using predictive dialers must maintain records that provide clear and convincing evidence that the dialers used comply with the three (3) percent call abandonment rate, "ring time" and two-second-transfer rule.

### 1.    Maximum Rate on Abandoned Calls

        151.    The Commission believes that establishing a maximum call abandonment rate is the best option to reduce effectively the number of hang-ups and "dead air" calls consumers experience.  We recognize that industry generally advocates a five percent abandonment rate, claiming that a rate lower than five percent would reduce efficiencies the technology provides.[527]  However, the Commission is not convinced that a five percent rate will lead to a reasonable reduction in the number of abandoned calls.  The DMA's current guideline, cited by many commenters, calls for an abandonment rate of no higher than five percent.[528]  And several telemarketers maintain that they now utilize an abandonment rate of five percent or lower in their calling campaigns.[529]  Consumers nevertheless report receiving as many as 20 dropped calls per day that interrupt dinners, interfere with home business operations, and sometimes frighten the elderly and parents with young children.[530]  A rule that is consistent with the FTC's will effectively create a national standard with which telemarketers must comply and should lead to fewer abandoned calls, while permitting telemarketers to continue to benefit from such technology.  It is also responsive to Congress' mandate in the Do-Not-Call Act to maximize consistency with the FTC's rules.

        152.    The three percent abandonment rate will be measured over a 30-day period, a standard supported by several industry commenters.[531]  Industry members maintain that measuring the abandonment rate on a per day basis would severely curtail the efficiencies gained from the use of predictive dialers, and may be overly burdensome to smaller telemarketers.  A per day measurement, they argue, would not account for short-term fluctuations in marketing

---

[527] However, some industry commenters indicate that a 3 percent rate still obtains productivity benefits.  *See, e.g,* WorldCom Comments at 44.

[528] *See* <http://www.the-dma.org/guidelines/dotherightthing.pdf.>

[529] *See, e.g.,* Sprint Comments at 6 (uses 5%); CMOR Comments at 6 (uses a 1% rate); WorldCom Comments at 44 (uses 3-5%); *see also* ATA Reply Comments at 70 (many telemarketers from all industries use a 5% limit on abandoned calls); Technion Comments at 5 (uses 5% abandonment rate).

[530] *See, e.g.,* Edwin Bailey Hathaway Comments; Stewart Abramson Comments at 1; Kent Rausch Comments.

[531] Reese Comments at 7; ERA Comments at 16; MPA Comments at 20; DMA Reply Comments at 19-20; DialAmerica Reply Comments at 3-4 (noting that California allows compliance with its abandoned call rules over a 30-day period); DialAmerica Further Reply Comments at 5 (stating that it can achieve an average abandonment rate of 5% or less when the measuring period spans a month).

campaigns.[532]  They further argue that the impact of abandoned calls on consumers depends more on the aggregate number of contacts made by a telemarketer over time and not on the number in any given day.[533]  The Commission believes that a three (3) percent abandonment rate measured over a 30-day period will ensure that consumers consistently receive fewer disconnected calls, and that telemarketers are permitted to manage their calling campaigns effectively under the new rules on abandoned calls.  Although we recognize that this rate of measurement differs from the FTC's rule, we believe a rate measured over a longer period of time will allow for variations in telemarketing campaigns such as calling times, number of operators available, number of telephone lines used by the call centers, and other similar factors.[534]  The record also suggests that an abandonment rate measured over a 30-day period will allow telemarketers to more easily comply with the recordkeeping requirements associated with the use of predictive dialers.[535]

### 2.      Two-Second-Transfer Rule

153.      The record confirms that many consumers are angered by the "dead air" they often face when answering the telephone.  Running to the telephone only to be met by silence can be frustrating and even frightening, if the caller cannot be identified.[536]  To address the problem of "dead air" produced by dialing technologies, the Commission has determined that a call will be considered abandoned if the telemarketer fails to connect the call to a sales representative within two (2) seconds of the person's completed greeting.[537]  Calls disconnected because they were never answered (within the required 15 seconds or 4 rings) or because they received busy signals will not be considered abandoned.[538]  This requirement is consistent with the FTC's rule.[539]

154.      *Answering Machine Detection*.  Opposition from industry to the two-second-transfer requirement appears to be based largely on its implications for use of Answering

---

[532] WorldCom Reply Comments at 20; WorldCom Further Comments at 8 (advocating that the abandonment rate be measured over a six-month period); Teleperformance Further Comments at 4; *see also* MPA Comments at 21.

[533] *See, e.g.,* Reese Comments at 7; WorldCom Reply Comments at 20.

[534] *See* ERA Comments at 16; Stonebridge Further Comments at 6 (three percent abandonment rate imposes an unnecessary burden on telemarketers, which should be alleviated by eliminating any reference to a per-day measure); Teleperformance Further Comments at 3.

[535] *See* WorldCom Reply Comments at 19-20; Reese Comments at 7.

[536] *See, e.g.,* Katherine S. Raulston Comments; Edwin Bailey Hathaway Comments; NAAG Comments at 34.

[537] *See supra* discussion on the use of prerecorded messages, paras. 136-144.

[538] Calls that reach voicemail or an answering machine will not be considered "answered" by the called party. Therefore, a call that is disconnected upon reaching an answering machine will not be considered an abandoned call.

[539] *See* 16 C.F.R. § 310.4(b)(1)(iv).

**Federal Communications Commission**           **FCC 03-153**

Machine Detection (AMD).[540]  Some industry members explain that AMD is used by telemarketers to detect answering machines, and thereby avoid leaving messages on them.[541]  The ATA and DMA maintain that if telemarketers are required to connect to a sales agent or message within 1-2 seconds, a large percentage of calls reaching answering machines will be transferred to sales agents, thereby reducing the efficiencies gained from AMD.[542]  According to these commenters, 1-2 seconds is often insufficient for AMD to determine accurately if the call has reached an answering machine.[543]  Other commenters explain that AMD is used instead by telemarketers to transmit prerecorded messages to answering machines; in such circumstances, calls that reach live persons are disconnected.[544]  It is unclear from the record how prevalent the use of AMD is in the telemarketing industry.  One commenter stated that the elimination of AMD would put "consumer-oriented" telemarketing firms out of business.[545]  However, other industry members acknowledge that AMD contributes significantly to the amount of "dead air" consumers experience,[546] and one large telemarketing firm maintains that AMD should be banned completely.[547]  The Commission believes that the record does not warrant a ban on the use of AMD.  Instead, if the AMD technology is deployed in such a way that the delay in transfer time to a sales agent is limited to two seconds, then its continued use should not

---

[540] *See, e.g.,* MBNA Comments at 7-8; ATA at 112.  *But see* Reese Comments at 6 ("Abandons should not be defined so as to include any measure of 'time to transfer,' as these timings are not available in currently installed dialers.").

[541] Technion Comments at 5.

[542] ATA Comments at 117 (suggesting a 4-second transfer requirement); DMA Reply Comments at 19 ("AMD serves perfectly legitimate business purposes causing negligible harm to consumers, but current technology simply will not ensure that 'dead air' lasts less than five seconds.").

[543] *But see* Alek Szlam Comments at 5 (stating that "[o]ne possible solution is to require the threshold in the AMD to be set to err on the side of connecting vs. disconnecting.  If the dialer cannot determine within the first second whether it is a live call or answering machine, it will assume that it is a live call and connect it to an agent.  On the agent side, when they are passed a call that turns out to be an answering machine, they should have the ability to quickly terminate the call or to push a button to play a message.  This approach will reduce the amount of dead air, while not significantly impacting the productivity of the call center agent.").  *See also* Sytel Comments at 5 ("We believe that the loss of productivity (measured in terms of talk time per agent hour) that results when answering machines are connected to agents in call centers is not significant when set against the improvement in call quality that results from having live calls connected to agents immediately i.e. not exposing consumers to 'dead air' whilst detection is done by the switch.").

[544] *See* DialAmerica Comments at 10; ABA Comments at 4; Hershovitz Comments at 9.  We reiterate that under the TCPA, it is unlawful to initiate any telephone call to any residential line using a prerecorded message without the prior express of the called party, absent an emergency or an exemption by Commission rule or order.  Delivery of a message to an answering machine does not render the call lawful.  *See* 47 U.S.C. § 227(b)(1)(B).

[545] Reese Comments at 9; *see also* Convergys Comments at 7 ("Elimination of the use of AMD would cause Convergys to re-revaluate its participation in the industry.")

[546] Sytel Comments at 3-4; Alek Szlam Comments at 4.

[547] DialAmerica Comments at 10.

adversely affect consumers' privacy interests.[548]

### 3.     Prerecorded Message for Identification

155.     As noted above, the FTC's "safe harbor" provisions require that, when a sales agent is unavailable to speak to a person answering the phone, marketers deliver a prerecorded message that states the name and telephone number of the seller on whose behalf the call was made.[549]  The Commission has similarly determined that when a telemarketer abandons a call under the three (3) percent rate allowed, the telemarketer must deliver a prerecorded message containing the name of the business, individual or other entity initiating the call, as well as the telephone number of such business, individual or other entity.  The message must also state that the call is for "telemarketing purposes."[550]  We recognize that many consumers are frustrated with prerecorded messages.[551]  However, the record also reveals that consumers are frightened and angered by "dead air" calls and repeated hang-ups.  A prerecorded message, limited to identification information only, should mitigate the harms that result from "dead air," as consumers will know who is calling them.[552]  And, they will more easily be able to make a do-not-call request of a company by calling the number provided in the message.  We note that such messages sent in excess of the three (3) percent allowed under the call abandonment rate, will be considered abandoned calls, unless otherwise permitted by our rules.  The content of the message must be limited to name and telephone number, along with a notice to the called party that the call is for "telemarketing purposes."  The message may not be used to deliver an unsolicited advertisement.[553]  We caution that additional information in the prerecorded message constituting an unsolicited advertisement would be a violation of our rules, if not otherwise permitted under 47 C.F.R. § 64.1200(a)(2).[554]

---

[548] *See* Sytel Comments at 3-5.  The Commission notes that in addition to requiring the delivery of a prerecorded identification message when a call is abandoned, Commission rules also permit prerecorded messages in limited circumstances, including when a company has an established business relationship with a consumer.  *See* 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(2).

[549] *See* FTC's amended TSR at 16 C.F.R. § 310.4(b)(4)(iii); *see also FTC Order*, 68 Fed. Reg. at 4644.

[550] By requiring such notice, we believe consumers will be less likely to return the call simply to learn the purpose of the call and possibly incur unnecessary charges.

[551] *See supra* para. 137.  *See also* Wayne G. Strang Further Comments at 5-6.

[552] *See, e.g.,* NASUCA Further Reply Comments at 8-9 (because the FTC's identification requirements mitigate the nuisance aspects of abandoned calls, the FCC should make an exception for prerecorded messages that are used to comply with the FTC's safe harbor provision).

[553] As long as the message is limited to identification information only, it will not be considered an "unsolicited advertisement" under our rules.  *See* FTC Further Comments at 32.  *But see* Joe Shields Further Comments at 4-5 (arguing that all prerecorded messages that introduce a business are by definition an advertisement).

[554] *See supra* discussion on prerecorded messages, paras. 136-144.  Contrary to the claims of some parties, even an incidental reference to a product or service could transform the identification message into a prohibited unsolicited advertisement.  *See* Nextel Further Comments at 14-15.

### 4.    Established Business Relationship

156.    While the TCPA prohibits telephone calls to residential phone lines using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, the Commission determined that the TCPA permits an exemption for established business relationship calls from the restriction on artificial or prerecorded message calls to residences.[555]  As discussed in detail above, the record reveals that an established business relationship exemption is necessary to allow companies to contact their existing customers.[556] Companies currently use prerecorded messages, for example, to notify their customers about new calling plans, new mortgage rates, and seasonal services such as chimney sweeping and lawn care.[557]  Therefore, prerecorded messages sent by companies to customers with whom they have an established business relationship will not be considered "abandoned" under the revised rules, if they are delivered within two (2) seconds of the person's completed greeting.  Similarly, any messages initiated with the called party's prior express consent and delivered within two (2) seconds of the called person's completed greeting are not "abandoned" calls under the new rules.[558]  Such messages must identify the business, individual or entity making the call and contain a telephone number that a consumer may call to request placement on a do-not-call list. We recognize that the established business relationship exception to the prohibition on prerecorded messages conflicts with the FTC's amended rule.[559]  However, for the reasons described above, we believe the current exception is necessary to avoid interfering with ongoing business relationships.

### 5.    Ring Duration

157.    The Commission also adopts a requirement that telemarketers allow the phone to ring for 15 seconds or four (4) rings before disconnecting any unanswered call.  This standard is consistent with that of the FTC, similar to current DMA guidelines,[560] and used by some telemarketers already.[561]  One industry commenter asserted that telemarketers often set the predictive dialers to ring for a very short period of time before disconnecting the call; in such cases, the predictive dialer does not record the call as having been abandoned.[562]  The practice of

---

[555] *See 1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34.

[556] *But see* FTC Further Comments at 40-41 ("The FCC may need to eliminate the established business relationship exemption with respect to prerecorded message calls, especially if, as the FTC urges, it includes in its revised TCPA regulations provisions addressing the practice of call abandonment and creating a safe harbor.")

[557] *See, e.g.,* NAAG Comments at 39; Joe Shields Reply Comments at 6-7.

[558] *See* amended 47 C.F.R. § 64.1200(a)(6)(i).

[559] *See* FTC Further Comments at 40-41 (under the FTC's amended rules, such prerecorded messages would be prohibited as abandoned calls).

[560] DMA Comments, Exhibit 1 (Guidelines for Ethical Business Practice) at 23.

[561] WorldCom Reply Comments at 20-21.

[562] Sytel Comments at 3.

ringing and then disconnecting the call before the consumer has an opportunity to answer the phone is intrusive of consumer privacy and serves only to increase efficiencies for telemarkers. Moreover, in discussing the interplay between the FTC's rules with the Commission's rules, very few commenters opposed the "ring time" requirement adopted by the FTC,[563] or raised any particular concerns about how it might work in the TCPA framework. Therefore, given the substantial interest in protecting consumers' privacy interests, as well as Congress's direction to maximize consistency with the FTC's rules, we have determined to adopt the 15 second or four (4) ring requirement.

158. Finally, consistent with the FTC's rules, the Commission has determined that telemarketers must maintain records establishing that the technology used to dial numbers complies with the three (3) percent call abandonment rate, "ring time," and two-second rule on connecting to a live sales agent. Telemarketers must provide such records in order to demonstrate compliance with the call abandonment rules. Only by adopting a recordkeeping requirement will the Commission be able to adequately enforce the rules on the use of predictive dialers.

159. The TCPA seeks primarily to protect subscribers from unrestricted commercial telemarketing calls, and therefore exempts calls or messages by tax-exempt nonprofit organizations from the definition of telephone solicitation.[564] Therefore, the Commission has determined not to extend the call abandonment rules to tax-exempt nonprofit organizations in the absence of further guidance from Congress.[565] However, the call abandonment rules will apply to all other companies engaged in telemarketing, and the existence of an established business relationship between the telemarketer and consumer will not be an exception to these rules. For these entities, the call abandonment rules will become effective on October 1, 2003. We decline to establish an effective date beyond October 1, 2003, which is consistent with the date that telemarketers must comply with the FTC's call abandonment rules.[566] This should permit telemarketers to make any modifications to their autodialing equipment or purchase any new software to enable them to comply with the three (3) percent call abandonment rate, the prerecorded message requirement and the two-second-transfer rule.

## XI. WIRELESS TELEPHONE NUMBERS

### A. Background

160. In the *2002 Notice*, the Commission noted that the TCPA permits the Commission

---

[563] WorldCom indicated that such recommendation should not be implemented, yet stated that its dialers are programmed to disconnect the call if there is no answer after 4 ring cycles, which provides sufficient time for a consumer to reach the phone. *See* WorldCom Reply Comments at 20-21.

[564] *See 1992 TCPA Order*, 7 FCC Rcd at 8773-74, para. 40.

[565] Because this will result in an inconsistency with the FTC's rules, we will discuss the call abandonment rules in the report due to Congress within 45 days after the promulgation of final rules. *See* Do-Not-Call Act, Section 4.

[566] *See* Notices of *Ex Parte Presentations* from WorldCom to FCC, filed May 23, 2003 and June 16, 2003 (advocating a 9.5-month implementation period for the call abandonment rules).

to exempt from the restrictions on autodialer or prerecorded message calls, "calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights [the TCPA] is intended to protect."[567]  In the *1992 TCPA Order*, the Commission concluded that calls made by *cellular carriers* to their subscribers for which the subscribers were not charged do not fall within the prohibitions on autodialers or prerecorded messages.[568]  We sought comment on the extent to which telemarketing to wireless consumers exists today and if so, the nature and frequency of such solicitations.[569]  We asked whether there are other types of calls to wireless telephone numbers that are not charged to the called party, and whether such calls also should not fall within the prohibitions on autodialers or prerecorded messages.[570]  We also sought comment on any developments anticipated in the near future that may affect telemarketing to wireless phone numbers.  Specifically, we asked how telemarketers will identify wireless numbers in order to comply with the TCPA when consumers are able to port numbers from their wireline phones to wireless phones,[571] or receive numbers from a thousands-block[572] that was part of a central office code previously assigned to a wireline carrier.[573]  The Commission further sought comment on whether the Commission's rules should be modified to facilitate telemarketers' efforts to comply with the TCPA.

161.    *Local Number Portability and Pooling*.  The Commission's local number portability (LNP) decisions date back to 1996, with the Commission granting a number of extensions to the effective date for wireless carriers, providing the industry and other interested parties with extensive advance notice of the impending implementation of wireless LNP.  The Commission determined in the *Number Portability First Report and Order* that LECs and certain CMRS providers operating in the 100 largest MSAs must offer local number portability, according to a phased deployment schedule.[574]  This requirement was subsequently limited by the *Number Portability First Order on Reconsideration*, in which the Commission concluded

---

[567] *2002 Notice*, 17 FCC Rcd at 17485, para. 45 (footnote omitted); *see also* 47 U.S.C. § 227(b)(2)(C).

[568] *1992 TCPA Order*, 7 FCC Rcd at 8775, para. 45.

[569] *2002 Notice*, 17 FCC Rcd at 17485, para. 43.

[570] *2002 Notice*, 17 FCC Rcd at 17485, para. 45

[571] Wireless carriers will begin providing local number portability (LNP) on November 24, 2003.  LNP "means the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another."  47 U.S.C. § 153(30).  *See also* 47 C.F.R. § 52.21(k).

[572] Wireless carriers began participating in thousands-block number pooling (pooling) on November 24, 2002.  Thousands-block number pooling is a process by which the 10,000 numbers in a central office code (NXX) are separated into to sequential blocks of 1,000 numbers each (thousands-blocks), and allocated separately within a rate center.  *See* 47 C.F.R. § 52.20(a).

[573] *2002 Notice*, 17 FCC Rcd at 17485-86, para. 46.

[574] *Telephone Number Portability*, CC Docket No. 95-116, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 8352, 8393, para. 77 (1996) (*Number Portability First Report and Order*).

that LECs and covered CMRS providers were required only to deploy LNP within switches for which another carrier has made a specific request for the provision of LNP.[575]  CMRS carriers are required to implement LNP on November 24, 2003, for switches in the top 100 MSAs requested by February 24, 2003.[576]  After November 24, 2003, CMRS carriers have 30 to 180 days from the request date to implement number portability for switches in the top 100 MSAs not previously requested and for switches outside the top 100 MSAs.[577]

162.     In the *Numbering Resource Optimization First Report and Order*, the Commission established national thousands-block number pooling (pooling) as an LNP-based numbering resource optimization measure designed to help slow the pace of area code and North American Numbering Plan (NANP) exhaust.[578]  This measure involves breaking up the 10,000 numbers in an NXX into ten sequential blocks of 1,000 numbers each, and allocating each thousands-block to a different service provider, and possibly a different switch, within the same rate center.  The Commission mandated participation in national pooling by all carriers that are required to be LNP-capable, because it believed that LNP capability was required before a carrier could participate in thousands-block number pooling.[579]  In the *Numbering Resource Optimization Fourth Report and Order*, the Commission determined that thousands-block number pooling need not be linked to a carrier's ability to provide LNP because a carrier can participate in pooling once it deploys the location routing number architecture.[580]  The Commission, therefore, concluded that all carriers, except those specifically exempted, are required to participate in thousands-block number pooling in accordance with the national rollout schedule,[581] regardless of whether they are required to provide LNP, including covered

---

[575] *Telephone Number Portability*, CC Docket No. 95-116, First Memorandum Opinion and Order on Reconsideration, 12 FCC Rcd 7236, 7272-3, paras. 59-60 (1997) (*Number Portability First Order on Reconsideration*).

[576] *Verizon Wireless's Petition for Partial Forbearance from the Commercial Mobile Radio Services Number Portability Obligation*, WT Docket No. 01-184, and *Telephone Number Portability*, CC Docket No. 95-116, Memorandum Opinion and Order, 17 FCC Rcd 14972, 14981, para. 23 *affirmed CTIA v. FCC*, No. 02-1264, 2003 WL 21293569 (D.C. Cir. June 6, 2003).

[577] *Id.* at 14985-86.

[578] *Numbering Resource Optimization*, CC Docket No. 99-200, First Report and Order and Further Notice of Proposed Rulemaking, 15 FCC Rcd 7574 (2000) (*Numbering Resource Optimization First Report and Order*).

[579] *Numbering Resource Optimization,* CC Docket No. 99-200, Third Order on Reconsideration in CC Docket No. 99-200, Third Further Notice of Proposed Rulemaking in CC Docket No. 99-200, and Second Further Notice of Proposed Rulemaking in CC Docket No. 95-116. 17 FCC Rcd 4784 at 4787, para. 9 (2002).

[580] *Numbering Resource Optimization Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Telephone Number Portability*, CC Docket Nos. 99-200, 96-98, and 95-116, Fourth Report and Order and Fourth Further Notice of Proposed Rulemaking, FCC 03-126 (rel. June 18, 2003), para. 11 (*Numbering Resource Optimization Fourth Report and Order*).

[581] *Numbering Resource Optimization Fourth Report and Order.  See also Numbering Resource Optimization*, CC Docket No. 99-200, Order, 17 FCC Rcd 7347 (2002) (*Pooling Rollout Schedule*).

Federal Communications Commission                               FCC 03-153

CMRS providers.[582]

163.   _Telemarketing to Wireless Numbers._   The record suggests that while consumers receive telemarketing calls on their wireless phones, it is not a widespread practice at this time.[583] However, some industry members believe that telemarketing calls to wireless numbers are likely to increase,[584] particularly as growing numbers of consumers use wireless phones as their primary phones.[585] One commenter pointed out that the record in this proceeding demonstrates that telemarketers would like to solicit consumers on their wireless phones.[586] Although the record does not reflect the full panoply of methods telemarketers currently use to avoid calling wireless telephone numbers, the record provides a sampling of such methods.[587] For example, the Direct Marketing Association's (DMA) Telephone Preference Service allows consumers to opt-out of national telemarketing lists, allowing consumers to register their wireless phone numbers in order to ensure that they do not receive telemarketing calls on their wireless phones.[588] Additionally, the DMA has created the "Wireless Telephone Suppression Service."[589] A number of commenters contended that telemarketing to wireless phones is not a significant problem, indicating that the industries' voluntary efforts have been successful.[590] Commenters also state that the wireless and telemarketing industries have been actively working together to ensure that telemarketing does not become a problem for wireless customers.[591]

---

[582] _See Verizon Wireless Petition for Partial Forbearance from the Commercial Mobile Radio Services Number Portability Obligation_, WT Docket No. 01-184, and Telephone Number Portability, CC Docket No. 95-116, Memorandum Opinion and Order, 17 FCC Rcd 14972, _affirmed CTIA v. FCC_, No. 02-1264, 2003 WL 21293569 (D.C. Cir. June 6, 2003).

[583] _But see_ April Jordan Comments at 1; Mark A. Hiner Comments at 2; Rhett Riviere Comments (all three of whom received marketing calls on their cell phones); AT&T Wireless Comments at 29 ("little telemarketing is directed to wireless subscribers . . . [although] such activity likely will increase.").

[584] _See, e.g.,_ CTIA Comments at 5 ("having built it, [they] will come"); AT&T Wireless Comments at 29 (reported receiving some complaints from customers regarding calls to wireless phones).

[585] ARDA Comments at 12; BellSouth Comments at 6-7. _But see_ Nextel Comments at 21-22 (whose report indicates that only 3 percent of wireless service subscribers have used their mobile phones to displace traditional residential landline service).

[586] AT&T Wireless Reply Comments at 21.

[587] Cingular Wireless Comments at 5; DMA Comments at 35; NeuStar Comments at 2.

[588] _See_ <http://www.dmaconsumers.org/cgi/offtelephonedave> (accessed June 2, 2003).

[589] Cingular Wireless Comments at 5. This service provides a list of 280 million phone numbers that are currently used or have been set aside for CMRS carriers. _Id._

[590] American Bankers Association Comments at 5; AT&T Wireless Comments at 29; American Teleservices Association Reply at 78; Cingular Wireless Comments at 4; AT&T Wireless Reply at 21. One commenter, however, state that calls to wireless phones are an existing and growing problem. CTIA Comments at 5. _See also_ AT&T Wireless Reply at 21 ("…it is likely that telemarketing to wireless phones will increase…").

[591] Cingular Wireless Comments at 4-5.

99

164.    Most consumer groups maintain that all telemarketing calls to wireless numbers should be prohibited, regardless of whether they are made using an autodialer, prerecorded message, or live sales agent.[592] The vast majority of consumer advocates contend that telemarketing calls to cell phones are as intrusive of consumers' privacy interests as calls to landline phones.[593]  Some believe they are more so, as consumers carry their cell phones on their persons, to work, and while driving.[594]  Some also contend the prohibition should apply whether the consumer incurs a per-minute charge or a reduction from a "bucket" of minutes purchased at a fixed rate.[595]  A few industry commenters agree that wireless subscribers should be protected from telemarketing calls to their wireless numbers.[596]  Other industry members contend that wireless phones should be treated like wireline phones, in part because of the difficulty in distinguishing between wireline and wireless numbers.[597]  American General Finance argues that the incremental cost of receiving a cell phone call is not significantly different from the cost of receiving a non-cellular call.[598]  Some commenters suggest permitting calls to wireless numbers when there is an established business relationship,[599] when the calls are made for survey research purposes,[600] or when consumers have provided their cell phone numbers to the calling entity.[601] The ATA urges the Commission to find that calls to cellular telephones are not "charged to the called party" as contemplated by the TCPA's restriction on autodialed calls.[602]

---

[592] *See, e.g.,* NASUCA Comments at 19 (suggesting that telemarketing calls to wireless phones be prohibited unless expressly authorized by the subscriber); NCL Comments at 6-7; TOPUC Comments at 7; NAAG Comments at 35-36.

[593] *See, e.g.*, J. Melville Capps Comments; City of New Orleans Comments at 12.

[594] *See* J. Melville Capps Comments; J. Shaw Comments at 5; NCL Comments at 6-7; City of Chicago Comments at 13; NAAG Comments at 35-36; EPIC Comments at 13 ( arguing that many consider their wireless phone more personal than their wireline phone).

[595] *See* NAAG Comments at 35; CTIA Comments at 4-5 (arguing that the depletion of one's minutes by unwanted telemarketing calls is a cost.  Telemarketers have no way of knowing what rate plan a consumer has.).

[596] *See* Sprint Comments at 10; Verizon Wireless Reply Comments at 7 (noting that statutory prohibition on autodialing and artificial messages to wireless service is absolute).

[597] ATA Comments at 126-128; ATA Reply Comments at 77-80; CBA Comments at 9 (arguing that premature amendments to the rules could stifle the evolution of mobile commerce).

[598] AGF Comments at 2.

[599] *See, e.g.*, AGF Comments at 1.

[600] CMOR Comments at 7 (if calls to cell phones are not permitted, the quality of survey research will be harmed). *But see* John Shaw Reply Comments at 13 (if survey calls are exempted from the TCPA, many sham surveys could result as telemarketers try to circumvent the regulations).

[601] HFS Comments at 10; BellSouth Comments at 6-7; Bank of America Comments at 6; AGF Comments at 1.

[602] ATA Comments at 130-134.  *See also* HFS Comments at 10 (urging the Commission to permit even those calls to wireless numbers made by autodialers and prerecorded messages).

PA - 00346

Federal Communications Commission                    FCC 03-153

### B.    Discussion

#### 1.    Telemarketing Calls to Wireless Numbers

165.    We affirm that under the TCPA, it is unlawful to make *any call* using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number.[603]  Both the statute and our rules[604] prohibit these calls, with limited exceptions, "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other common carrier service, or any service for which the called party is charged."[605]  This encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls, provided the call is made to a telephone number assigned to such service.[606]  Congress found that automated or prerecorded telephone calls were a greater nuisance and invasion of privacy than live solicitation calls.[607]  Moreover, such calls can be costly and inconvenient.[608]  The Commission has long recognized, and the record in this proceeding supports the same conclusion, that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.[609]  Wireless subscribers who purchase a large "bucket" of minutes at a fixed rate nevertheless are charged for those minutes, and for any minutes that exceed the "bucket" allowance.  This "bucket" could be exceeded more quickly if consumers receive numerous unwanted telemarketing calls.[610]  Moreover, as several commenters point out, telemarketers have no way to determine how consumers are charged for their wireless service.

---

[603] *See* 47 U.S.C. § 227(b)(1), which provides that it is "unlawful for any person within the United States to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call."

[604] 47 C.F.R. § 64.1200(a)(1)(iii).

[605] 47 U.S.C. § 227(b)(1)(A)(iii).

[606] SMS, for example, "provides the ability for users to send and receive text messages to and from mobile handsets with maximum message length ranging from 120 to 500 characters." *Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993*, 17 FCC Rcd 12985, 13051 (2002).

[607] *TCPA*, Section 2(10), *reprinted in* 7 FCC Rcd at 2744.  The TCPA prohibits the initiation of any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is for emergency purposes or is exempted by Commission rule or order.  See 47 U.S.C. § 227(b)(1)(B).

[608] *See, e.g.,* Verizon Wireless Comments at 11; J. Shaw Comments at 5; NAAG Comments at 40-41.

[609] *See, e.g.,* AT&T Wireless Comments at 24.

[610] Consistent with our determination in 1992, calls made by cellular carriers to their subscribers, for which subscribers are not charged in any way for the call (either on a per minute, per call, or as a reduction in their "bucket" of minutes) are not prohibited under the TCPA.  *See* Verizon Wireless Comments at 11 (noting that for "bucket" plans, exceeding the bucket allowance is not unusual).

PA - 00347

166.    Although the same economic and safety concerns apply to all telephone solicitation calls received by wireless subscribers, the Commission has determined not to prohibit all live telephone solicitations to wireless numbers.[611]  The national do-not-call database will allow for the registration of wireless telephone numbers for those subscribers who wish to avoid live telemarketing calls to their wireless phones.  Wireless subscribers thus have a simple means of preventing most live telemarketing calls if they so desire.[612]  Moreover, relying on the do-not-call database to control live telephone solicitations recognizes that prohibiting such calls to wireless numbers may unduly restrict telemarketers' ability to contact those consumers who do not object to receiving telemarketing calls[613] and use their wireless phones as either their primary or only phone.[614]

167.    The Commission's rules provide that companies making telephone solicitations to residential telephone subscribers must comply with time of day restrictions and must institute procedures for maintaining do-not-call lists.[615]  For the reasons described above,[616] we conclude that these rules apply to calls made to wireless telephone numbers.  We believe that wireless subscribers should be afforded the same protections as wireline subscribers.[617]

## 2.    Wireless Number Portability and Pooling

168.    Based on the evidence in the record, we find that it is not necessary to add rules to implement the TCPA as a result of the introduction of wireless LNP and thousands-block number pooling.  The TCPA rules prohibiting telemarketers from placing autodialed and prerecorded message calls to wireless numbers have been in place for twelve years.[618]  Further, the Commission's pooling requirements have been in place for several years and the porting requirements have been in place for over five years.  Accordingly, telemarketers have received sufficient notice of these requirements in order to develop business practices that will allow them to continue to comply with the TCPA.

---

[611] We note, however, that the TCPA already prohibits live solicitation calls to wireless numbers using an autodialer.  *See* 47 U.S.C. § 227(b)(1).

[612] Registration on the do-not-call database will not prevent calls from entities that have an established business relationship with a wireless subscriber.  Wireless subscribers who receive such live calls can easily make a company-specific do-not-call request.  Moreover, we note that the record reveals that telemarketing to wireless numbers is not widespread at this time.

[613] *See* Bell South Comments at 6-7; ARDA Comments at 12.

[614] A USA Today/CNN/Gallop poll found that almost one in five mobile telephony users regard their wireless phone as their primary phone.  *2002 CMRS Competition Report*, Section II.A.1.e, citing Michelle Kessler, *18% See Cellphones as Their Main Phone,* USA Today, Feb. 1, 2002.

[615] *See* 47 C.F.R. § 64.1200(e).

[616] *See supra* paras. 33-36.  *See also* 47 U.S.C. § 227(b)(1)(A)(iii).

[617] *See, e.g.,* Citigroup Comments at 6; Cingular Wireless Comments at 6-7; John Shaw Reply Comments at 14.

[618] *See supra* paras. 160-163.

PA - 00348

169.    Additionally, telemarketers have taken measures in the past to identify wireless numbers, and there is no indication that these measures would not continue to be effective for identifying wireless numbers affected by pooling and porting.  As noted above, the industry currently makes use of a variety of tools to enable it to avoid making prohibited calls.  As discussed in detail *supra*,[619] the record provides a sampling of methods, including the DMA's "Wireless Telephone Suppression Service," that telemarketers use to avoid making prohibited calls to wireless numbers.[620]

170.    LNP and pooling do not make it impossible for telemarketers to comply with the TCPA.  The record demonstrates that information is available from a variety of sources to assist telemarketers in determining which numbers are assigned to wireless carriers.  For example, NeuStar as the North American Numbering Plan Administrator, the National Pooling Administrator, and the LNP Administrator makes information available that can assist telemarketers in identifying numbers assigned to wireless carriers.  Also, other commercial enterprises such as Telcordia, the owner-operator of the Local Exchange Routing Guide (LERG) maintain information that can assist telemarketers in identifying numbers assigned to wireless carriers.  We acknowledge that beginning November 24, 2003, numbers previously used for wireline service could be ported to wireless service providers and that telemarketers will need to take the steps necessary to identify these numbers.  We also note that there are various solutions that will enable telemarketers to identify wireless numbers in a pooling and number portability environment.  We decline to mandate a specific solution, but rather rely on the telemarketing industry to select solutions that best fit telemarketers' needs.  The record demonstrates that telemarketers have found adequate methods in the past to comply with the TCPA's prohibition on telephone calls using an autodialer or an artificial or prerecorded voice message to any telephone number assigned to a cellular telephone service, a paging service, or any service for which the called party is charged for the call.  We expect telemarketers to continue to make use of the tools available in the marketplace in order to ensure continued compliance with the TCPA.[621]

171.    Moreover, the record indicates that telemarketing to wireless phones is not a significant problem, indicating that the industries' voluntary efforts have been successful.[622]  Commenters further declare that the wireless and telemarketing industries have been actively working together to ensure that telemarketing does not become a problem for wireless customers.

172.    Finally, we reject proposals to create a good faith exception for inadvertent autodialed or prerecorded calls to wireless numbers and proposals to create implied consent

---

[619] *See supra* para. 163.

[620] Cingular Wireless Comments at 5; DMA Comments at 35; Letters from Neustar to FCC, filed January 23, 2003 and May 5, 2003.

[621] *See* Letter from Neustar to FCC, filed June 4, 2003.

[622] ABA Comments at 5; AT&T Wireless Comments at 29; Cingular Wireless Comments at 4; ATA Reply Comments at 78; AT&T Wireless Reply Comments at 21.

because we find that there are adequate solutions in the marketplace to enable telemarketers to identify wireless numbers.[623]

## XII. CALLER IDENTIFICATION

### A. Background

173. In the *1992 TCPA Order*, the Commission considered whether to require telemarketers to use a special area code or telephone number prefix that would allow consumers to block unwanted telephone solicitations using a caller identification (caller ID) service. Based on cost and the "technological uncertainties associated with implementation," the Commission declined to adopt any type of network technologies to accomplish the objectives of the TCPA.[624]

174. In the *2002 Notice*, the Commission sought comment on whether network technologies have been developed over the last decade that may allow consumers to avoid receiving unwanted telephone solicitations. The Commission sought comment specifically on whether to require telemarketers to transmit the name and telephone number of the calling party, when possible, or prohibit them from blocking or altering the transmission of such information.[625] Comments filed by consumers, state utility commissions, and wireless service providers generally support a requirement that telemarketers transmit caller identification information.[626] Consumers are frustrated by the failure of many telemarketers to transmit caller ID information, which, under certain circumstances, makes it difficult for consumers to enforce the TCPA.[627] Commenters also noted that the increased use of predictive dialers has led to a corresponding increase in the number of hang-ups. Caller ID information would allow consumers, they contend, to identify those telemarketers responsible for hang-up calls.[628] Some

---

[623] *See* ATA Comments at 134-36; BMO Financial Group Comments at 6; Sprint Comments at 21; ATA Reply Comments at 82. Commenters also suggest other exceptions, such as where a subscriber uses wireless as his sole telephone service, AGF Comments at 1, or where the subscriber provides his wireless number as a contact number to a business. *Id. See also* Bank of America Comments at 6; CBA Comments at 9; BellSouth Comments at 6-7.

[624] *See 1992 TCPA Order*, 7 FCC Rcd at 8762, para. 17.

[625] *2002 Notice*, 17 FCC Rcd at 17473, para 22.

[626] Thomas Pechnik Comments at 4; TOPUC Comments at 3; Wayne G. Strang Comments at 15; Michael C. Worsham Comments at 4; Samuel E. Whitley Comments at 2; HFS Comments at 6; CTIA Comments at 7; Michael J. Blitch Comments at 5; AT&T Wireless Comments at 23; ARDA Comments at 9; Louis J Hoppman Jr. Comments; PUC of Ohio Comments at 19; TN AG Comments at 13; DialAmerica Comments at 11-12; Stewart Abramson Comments at 3; Thomas F. Kirby Comments; David Griffith Comments; Ghita & Stephan Strain Comments.

[627] *See, e.g.,* Brad Totten Comments at 3; DC Hunter Comments; James D. Gagnon Comments; Brian Klug Comments; Thomas Pechnik Comments at 4; NCL Comments at 3; EPIC Comments at 12; Verizon Reply Comments at 12.

[628] *See, e.g.,* F. Jenny Holder Comments at 1; Thomas Callahan Comments; Michael C. Worsham Comments at 2; NCL Comments at 4; Gregory S. Reichenbach Comments; TOPUC Comments at 6-7; EPIC Comments at 12; Stewart Abramson Comments at 3; Thomas Pechnik Comments at 4; AGF Comments at 4; Joe Shields Comments at 7.

PA - 00350

commenters stated that the inability to identify callers has led them to purchase other tools, such as the "telezapper," to try to stop unwanted solicitation calls.[629]  Most commenters that addressed these issues support a prohibition against the blocking of caller ID information.[630]  Several parties stated that the Commission should prohibit blocking independent of any caller ID mandate.[631]  It was also suggested that the Commission could prohibit tampering with data or providing false data.[632]

175.    Some industry members suggest that the transmission of caller ID information may not be technically possible in all circumstances.[633]  They also maintain that a caller ID requirement could be costly for telemarketers.[634]  One particular concern raised by parties opposed to a caller ID mandate is the technical feasibility of transmitting caller ID information when using private branch exchanges (PBX).  WorldCom maintains that, in situations where telemarketers use a PBX that connects to their telephone company through typical T-1 trunks, Calling Party Number (CPN) cannot be transmitted.[635]  WorldCom contends that Integrated Services Digital Network (ISDN) T-1 trunks *may* be capable of transmitting CPN, but that typical T-1 trunks do not have this capability.[636]  DialAmerica notes that it has been delivering CPN for over two years using regular T-1 trunk groups provisioned by AT&T.[637]  DialAmerica transmits an outgoing number which is captured by caller ID equipment.  If a consumer chooses to call that number, the local exchange carrier (LEC) forwards the call to DialAmerica's

---

[629] OPC-DC Comments at 6; Janice G. Farkosh Comments; Leslie Price Comments; Josephine K. Presley Comments.

[630] *See, e.g.,* Verizon Comments at 18; PRC Comments at 5; NYSCPB Comments at 9; PUC of Ohio Comments at 19.

[631] OPC-DC Comments at 6; Owen O'Neill Comments at 1; TOPUC Comments at 3; Technion Comments at 6-7; Verizon Comments at 18; PUC of Ohio Comments at 19, NASUCA Comments at 3; Thomas Pechnik Comments at 4.  *But see* NAA Comments at 17; Nextel Comments at 17-18; Comcast Comments at 14; Teleperformance Comments at 3; ABA Comments at 3 (should restrict caller ID blocking, but not require the transmission of caller ID).

[632] Stewart Abramson Comments at 3.

[633] Teleperformance Comments at 3; WorldCom Comments at 45; DMA Reply Comments at 30; Mastercard Comments at 7; Nextel Comments at 17-18; SER Comments at 2; Sprint Comments at 7; ECN Comments at 9 (asserting that telemarketers will provide caller ID when technologically feasible, and thus, the Commission need not adopt a caller ID requirement).

[634] Teleperformance Comments at 3; WorldCom Comments at 45; DMA Reply Comments at 30; Nextel Comments at 18; SER Comments at 2; Sprint Comments at 7-8.

[635] WorldCom Reply Comments at 23.

[636] WorldCom Reply Comments at 23.  We note that both typical T-1 and ISDN trunks contain 24 channels.  ISDN trunks dedicate one channel specifically to data transmission, while typical T-1 lines dedicate all 24 channels to voice transmission.

[637] DialAmerica Comments, Attachment A at 1.

customer service center.[638]  DialAmerica asserts that ISDN T-1 trunks are available from all carriers and enable a user to control whether CPN is delivered and what telephone number is displayed.[639]  WorldCom notes that even if we accept DialAmerica's assertion that ISDN trunks are universally available, carriers would have to upgrade network switches to accommodate additional digital switch ports necessitated by telemarketers' shift to ISDN-PRI trunks.[640]

176.    Telemarketers also raised technical concerns that the ability to transmit caller ID information is dependent on the deployment of Signaling System 7 (SS7).[641]  They argue that SS7 is not nationally deployed and thus the capability to transmit caller ID is not available throughout the country.[642]  Moreover, they maintain that Commission rules exempt PBX and Centrex systems from existing caller ID requirements because some of them cannot transmit CPN,[643] and not all carriers are able or permitted to transmit CPN, if they lack blocking capability.[644]  The DMA and WorldCom expressed concern that regardless of whether the telemarketer is able to transmit CPN, consumers will expect it, and may incorrectly believe a company has violated the rules.[645]

177.    Several parties argue that even if a telemarketer can transmit CPN information, how to transmit a number that is useful to consumers remains a challenge.[646]  Comments were mixed on what information actually needed to be transmitted for purposes of caller ID.  Several parties opined that the name of the telemarketing operator would be adequate identification.[647]  Others asserted that the name of the company on whose behalf the call was being made should be provided.[648]  Emergency Communications Network argued that a company's website information should be a permitted as a substitute for the name and phone number.[649]

---

[638] DialAmerica Comments, Attachment A at 2.

[639] DialAmerica Comments, Attachment A at 1.

[640] WorldCom Reply Comments at 24.

[641] "Signaling System 7" (SS7) refers to a carrier to carrier out-of-band signaling network used for call routing, billing and management.  *See* 47 C.F.R. § 64.1600(f).

[642] DMA Reply Comments at 30.

[643] *See* 47 C.F.R. § 64.1601(d).

[644] DMA Reply Comments at 29-30.  *But see* NASUCA Comments at 9; Verizon Comments at 18 (indicating that caller ID is technically viable because CPN is transmitted to the LECs).

[645] DMA Reply Comments at 30; WorldCom Reply Comments at 26.

[646] *See, e.g.,* DMA Reply Comments at 30.

[647] Jeff Mitchell Comments at 1; Martin C. Kaplan Comments at 2; City of New Orleans Comments at 8.

[648] Jeff Mitchell Comments at 1; NCL Comments at 4; Xpedite Systems Comments at 12; PRC Comments at 5.

[649] ECN Comments at 4.

PA - 00352

178.    The FTC's amended TSR mandates transmission of caller ID information and prohibits any seller or telemarketer from "failing to transmit or cause to be transmitted the telephone number, and when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call."[650] Under the FTC's rule, telemarketers may transmit any number associated with the telemarketer that allows the called consumer to identify the caller.[651]  The FTC concluded that transmission of caller ID would provide increased accountability and was technically feasible at minimal costs to telemarketers.  The DMA stated that it was concerned that technical issues were not adequately taken into account during the FTC's proceeding.  The DMA requested that the FCC initiate a comprehensive review of the technical feasibility of caller ID.[652]

## B.    Discussion

179.    The Commission has determined to require all sellers and telemarketers to transmit caller ID information, regardless of their calling systems.  In addition, any person or entity engaging in telemarketing is prohibited from blocking the transmission of caller ID information.  Caller ID information must include either ANI or CPN and, when available by the telemarketer's carrier, the name of the telemarketer.  If the information required is not passed through to the consumer, through no fault of the telemarketer originating the call, then the telemarketer will not be held liable for failure to comply with the rules.[653]  In such a circumstance, the telemarketer must provide clear and convincing evidence that the caller ID information could not be transmitted.  However, the Commission concurs with the FTC that caller ID information can be transmitted cost effectively for the vast majority of calls made by telemarketers.[654]  Caller ID allows consumers to screen out unwanted calls and to identify companies that they wish to ask not to call again.  Knowing the identity of the caller is also helpful to consumers who feel frightened or threatened by hang-up and "dead air" calls.[655]  We disagree with those commenters who argue that caller ID information only benefits those consumers who subscribe to caller ID services.[656]  Consumers can also use the *69 feature to

---

[650] *FTC Order*, 68 Fed. Reg. at 4623.

[651] *FTC Order*, 68 Fed. Reg. at 4625.

[652] DMA Reply Comments at 30.  The DMA notes that the FCC has the requisite experience to evaluate technical feasibility and a more comprehensive view of the larger issues of how a caller ID requirement might fit into the regulation of the communications network as a whole.  *See* DMA Reply Comments at 29.

[653] *See* WorldCom Reply Comments at 26 (arguing that requiring caller ID could create an expectation in the minds of consumers that they should always receive the information and that such a regulation creates a situation where companies will be unfairly accused of breaking the law, and as a consequence, face undue litigation and harm to their reputations).

[654] *See* Nextel Further Comments at 16 (stating that most telemarketers are currently capable of transmitting caller ID using their existing equipment, and that the FCC should adopt an approach similar to the FTC's, if it chooses to regulate the transmission of caller ID for telemarketing calls).

[655] Cynthia Stichnoth Comments; Stewart Abramson Comments at 1.

[656] *See, e.g.,* Sprint Comments at 7-8, CBA Comments at 8.

Federal Communications Commission                                              FCC 03-153

obtain caller ID information transmitted by a telemarketer.[657]  Caller ID also should increase
accountability and provide an important resource for the FCC and FTC in pursuing enforcement
actions against TCPA and TSR violators.[658]

180.    We conclude that while SS7 capability is not universally available, the vast
majority of the United States has access to SS7 infrastructure.  The SS7 network contains
functionality to transmit both the CPN and the charge number.[659]  Under the Commission's rules,
with certain limited exceptions, common carriers using SS7 and offering or subscribing to any
service based on SS7 functionality are required to transmit the CPN associated with an interstate
call to connecting carriers.[660]  Regardless of whether SS7 is available, a LEC at the originating
end of a call must receive and be able to transmit the Automated Number Identification (ANI) to
the connecting carrier,[661] as the ANI is the number transmitted through the network that
identifies the calling party for billing purposes.  Thus, we determine that telemarketers must
ensure that either CPN or ANI is made available for all telemarketing calls in order to satisfy
their caller ID requirements.  Whenever possible, CPN is the preferred number and should be
transmitted.[662]  Consistent with the FTC's rules, CPN can include any number associated with
the telemarketer or party on whose behalf the call is made, that allows the consumer to identify
the caller.[663]  This includes a number assigned to the telemarketer by its carrier, the specific
number from which a sales representative placed a call, the number for the party on whose behalf
the telemarketer is making the call, or the seller's customer service number.  Any number
supplied must permit an individual to make a do-not-call request during regular business hours
for the duration of the telemarketing campaign.[664]

---

[657] The *69 feature, available through many subscribers' telephone service providers, provides either: (1)
information regarding the last incoming call, and the option to dial the caller back, or (2) the ability to return the
last incoming call.  Call information, however, would not be available for an incoming call, if the caller failed to
transmit caller ID information or blocked such information.

[658] *See FTC Order,* 68 Fed. Reg. at 4623-24.

[659] "Charge number" is defined in 47 C.F.R. §64.1600(d) and refers to the delivery of the calling party's billing
number by a local exchange carrier for billing or routing purposes, and to the subsequent delivery of such number
to end users.

[660] *See* 47 C.F.R. §§ 64.1600, 64.1601.

[661] The term "ANI" refers to the delivery of the calling party's billing number by a local exchange carrier to any
interconnecting carrier for billing or routing purposes, and to the subsequent delivery to end users.  *See* 47 C.F.R.
§ 64.1600(b).  ANI is generally inferred by the switch.  Each line termination on the telco switch corresponds to a
different phone number for ANI.

[662] Provision of Caller ID information does not obviate the requirement for a caller to verbally supply
identification information during a call.  *See* 47 C.F.R. § 64.1200(e)(iv).

[663] *See FTC Order,* 68 Fed. Reg. at 4623-28.

[664] This would mean 9:00 a.m. – 5:00 p.m. Monday through Friday.  A seller or telemarketer calling on behalf of a
seller must be able to record do-not-call requests at the number transmitted to consumers as caller ID.  Therefore,
if the person answering the calls at this number is not the sales representative who made the call or an employee of
(continued….)

**Federal Communications Commission**                    **FCC 03-153**

181.    As discussed above, some commenters state that it is not technically feasible for telemarketers to transmit caller ID information when using a PBX and typical T-1 trunks.[665]  As noted by NASUCA, the Commission's rules exempt from the current caller ID rules, PBX and Centrex systems which lack the capability to pass CPN information.  Regardless of whether a call is made using a typical T-1 trunk or an ISDN trunk, ANI is transmitted to the Local Exchange Carrier for billing purposes.[666]  With both PBX and Centrex systems, the carrier can determine the billing number from the physical line being used to make a call, even if the billing number is not transmitted along that line to the carrier.  We are cognizant of the fact that with PBX and Centrex systems, the billing number could be associated with multiple outgoing lines.  Nevertheless, telemarketers using PBX or Centrex systems are required under the new rules not to block ANI, at a minimum, for caller ID purposes.

182.    We recognize that ISDN technology is preferred, as it presents the opportunity to transmit both CPN and ANI.  However, in situations where existing technology permits only the transmission of the ANI or charge number, then the ANI or charge number will satisfy the Commission's rules, provided it allows a consumer to make a do-not-call request during regular business hours.[667]  By allowing transmission of ANI or charge number to satisfy the caller ID requirement, we believe that carriers need not incur significant costs to upgrade T-1 and ISDN switches.[668]  For these same reasons, we also believe that mandating caller ID will not create a competitive advantage towards particular carriers.[669]  As typical T-1 technology is upgraded to ISDN technology, we expect that telemarketers will increasingly be able to transmit the preferred CPN instead of ANI or charge number.

183.    Finally, the record strongly supports a prohibition on blocking caller ID information.[670]  Both NCL and NASUCA state that there is no valid reason why a telemarketer should be allowed to intentionally block the transmission of caller ID.[671]  We conclude that the

(Continued from previous page) ———————————————

the seller or telemarketer who made the call, or if the telemarketer is using an automated system to answer the calls, the seller is nevertheless responsible for ensuring that any do-not-call request is recorded and the consumer's name, if provided, and telephone number are placed on the seller's do-not-call list at the time the request is made. *See also supra* note 492.

[665] *See supra* para. 175.

[666] *See* Telcordia Notes on the Networks – Notes Design and Configuration, Telcordia Technologies Special Report SR-2275, Issue 4, October 2000, pp. 4-30.  *See also*, *Administration of the North American Numbering Plan, Carrier Identification Codes (CICs)*, CC Docket No. 92-237, Second Report and Order, 12 FCC Rcd 8024 (1997).

[667] We note that a telemarketer using a service that prevents the transmission of the required caller ID information will be in violation of the Commission's caller ID rules.

[668] *See* WorldCom Reply Comments at 26.

[669] *See, e.g.,* Discover Comments at 7; DMA Reply Comments at 30.

[670] *See, e.g.,* TOPUC Comments at 3; Verizon Comments at 18; Owen O'Neill Comments at 1; Rob McNeal Comments; Jeff Mitchell Comments at 1.

[671] NASUCA Comments at 8-9; NCL Comments at 3.

109

caller ID requirements for commercial telephone solicitation calls do not implicate the privacy concerns associated with blocking capability for individuals.[672]  We recognize that absent a prohibition on blocking, a party could transmit CPN in accordance with the new rules and simultaneously transmit a request to block transmission of caller ID information.  Thus, the Commission has determined to prohibit any request by a telemarketer to block caller ID information or ANI.

184.    As explained above, the TCPA seeks primarily to protect subscribers from unrestricted commercial telemarketing calls.  Therefore, the Commission has determined not to extend the caller ID requirements to tax-exempt nonprofit organizations.  However, the caller ID rules will apply to all other companies engaged in telemarketing, and the existence of an established business relationship between the telemarketer and the consumer shall not be an exception to these rules.  For all covered entities, the effective date of the caller ID requirements will be January 29, 2004.[673]  This will provide telemarketers a reasonable period of time to obtain or update any equipment or systems to enable them to transmit caller ID information.  We decline to extend the effective date beyond January 29, 2004, which is consistent with the date on which telemarketers are required to comply with the FTC's caller ID provision.[674]

## XIII.   UNSOLICITED FACSIMILE ADVERTISEMENTS

### A.        Background

185.    The TCPA prohibits the use of any telephone facsimile machine, computer or other device to send an "unsolicited advertisement" to a telephone facsimile machine.[675]  An unsolicited advertisement is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission."[676]  The TCPA also requires those sending any messages via telephone facsimile machines to identify themselves to message recipients.[677]  In

---

[672] *See* 47 C.F.R. § 64.1601(b).

[673] *See* new rule at 47 C.F.R. § 64.1601(e).  *See also* FTC Further Comments (explaining that the goals of regulatory consistency will be promoted if the FCC adopts caller ID requirements analogous to Amended TSR 16 C.F.R. § 310.4(a)(7)).

[674] *See* Notices of *Ex Parte Presentations* from WorldCom to FCC, filed May 23, 2003 and June 16, 2003 (advocating a 13-month implementation period for the caller ID rules).  *See also* FTC Further Comments (explaining that the goals of regulatory consistency will be promoted if the FCC adopts caller ID requirements analogous to Amended TSR 16 C.F.R. § 310.4(a)(7)).

[675] 47 U.S.C. § 227(b)(1)(C).  The United States Court of Appeals for the Eighth Circuit recently upheld the TCPA's provision on unsolicited faxes as satisfying the constitutional test for regulation of commercial speech. *See Missouri ex rel Nixon v. American Blast Fax, Inc.,* 323 F.3d 649 (8th Cir. 2003) *(petition for rehearing pending).*

[676] 47 C.F.R. § 64.1200(f)(5).

[677] Specifically, the TCPA provides that the facsimile include "in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of (continued….)

the *1992 TCPA Order*, the Commission stated that "the TCPA leaves the Commission without discretion to create exemptions from or limit the effects of the prohibition."[678]  It noted, however, that facsimile transmission from persons or entities that have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient.[679]  The Commission sought comment on the effectiveness of these regulations and on any developing technologies, such as computerized fax servers, that might warrant revisiting the rules on unsolicited faxes.[680]  We specifically asked about the need to clarify what constitutes prior express invitation or permission for purposes of sending an unsolicited fax.[681]

186.    The record indicates that some consumers feel "besieged" by unsolicited faxes;[682] others explain that advertisers continue to send faxes despite asking to be removed from senders' fax lists.[683]  Consumers emphasize that the burden of receiving unsolicited faxes is not just limited to the cost of paper and toner, but includes the time spent reading and disposing of faxes, the time the machine is printing an advertisement and is not operational for other purposes, and the intrusiveness of faxes transmitted at inconvenient times, including in the middle of the night.[684]  Some of the consumer advocates maintain that the current rules are ineffective[685] and urge the Commission to take tougher measures to stop unwanted faxes by stricter enforcement measures,[686] including higher penalties.  A few home-based businesses and other companies maintain that facsimile advertisements interfere with receipt of faxes connected to their own business, and that the time spent collecting and sorting these faxes increases their labor costs.[687]

(Continued from previous page) ─────────────────

such business, other entity, or individual."  47 U.S.C. § 227(d)(1)(B).  The Commission determined that the sender of a facsimile message is the creator of the content of the message.  *See 1997 Reconsideration Order*, 12 FCC Rcd at 4613, para. 6.

[678] *1992 TCPA Order*, 7 FCC Rcd at 8779, para. 54, n. 87.

[679] *1992 TCPA Order,* 7 FCC Rcd at 8779, para. 54, n. 87.

[680] *2002 Notice,* 17 FCC Rcd at 17482, para. 37

[681] *2002 Notice,* 17 FCC Rcd at 17482-83, para. 38.  The Commission sought comment specifically on the Commission's determination that a prior business relationship between a fax sender and recipient establishes the requisite consent to receive telephone facsimile advertisement transmissions.  *See 2002 Notice*, 17 FCC Rcd at 17483, para. 39.

[682] Chris Hernandez Comments; Damien Blevins Comments; Peter LeCody Comments; Joe Shields Comments at 6; Mathemaesthetics Comments at 2.

[683] Anthony Oppenheim Comments; W. Allen Wilkens, Jr. Comments.

[684] J. Greg Coontz Comments at 15-17.

[685] NCL Comments at 6.

[686] Dennis C. Brown Comments at 13; City of New Orleans Comments at 11.

[687] Jim Carter Comments; JC Homola Comments; Autoflex Comments at 1-2; Rob McNeal Comments (unsolicited faxes costs company tens of thousands of dollars each year in materials and employee time); *see also* NCL Comments at 6 ("[P]eople who work out of their homes are especially harmed by unsolicited faxes, which use up their paper and toner and tie up their machines."); Mathemaesthetics Reply Comments at 7 ("[U]nsolicited (continued….)

PA - 00357

Industry members maintain that faxing is a cost-effective way to reach customers,[688] and that the current exemption for established business relationships works well,[689] particularly for small businesses for whom faxing is a cheaper way to advertise.[690]

## B.        Discussion

### 1.        Prior Express Invitation or Permission

187.     The Commission has determined that the TCPA requires a person or entity to obtain the prior express invitation or permission of the recipient before transmitting an unsolicited fax advertisement.  This *express* invitation or permission must be in writing and include the recipient's signature.[691]  The recipient must clearly indicate that he or she consents to receiving such faxed advertisements from the company to which permission is given, and provide the individual or business's fax number to which faxes may be sent.

188.     *Established Business Relationship*.  The TCPA does not act as a total ban on fax advertising.  Persons and businesses that wish to advertise using faxes may, under the TCPA, do so with the express permission of the recipients.  In the *2002 Notice*, we sought comment on whether an established business relationship between a fax sender and recipient establishes the requisite consent to receive telephone facsimile advertisements.[692]  The majority of industry commenters support the finding that facsimile transmissions from persons or entities that have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient.[693]  These commenters maintain that eliminating the EBR exemption for facsimile advertisements would interfere with ongoing business relationships, raise business costs, and

---

(Continued from previous page)   ————————————————————

[fax] ads caused my business fax machine to become prematurely empty, which rendered *wholly useless* the equipment my small business crucially depends on for its revenue.  When a customer of mine a short time later attempted to fax a purchase order for over $3,000 worth of my company's product, my empty fax machine was not able to capture this transaction for a significant period of time…" (emphasis in original)).

[688] ABM Comments at 4 (Members have found that targeted fax communication is cost-effective way to seek renewal "request" forms from existing subscribers, and to communicate with subscribers about industry trade shows.).

[689] MPA Comments at 22; Nextel Comments at 25; NADA Comments at 2; Scholastic Comments at 13; Reed Comments at 2-3.

[690] NADA Comments at 2; NFIB Comments at 3.

[691] The term "signature" in the amended rule shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law. *See, e.g.,* Cendant Comments at 6.

[692] *2002 Notice*, 17 FCC Rcd at 17483, para. 39.

[693] ABM Comments at 9; DIRECTV Comments at 9-19; Hunton & Williams Comments at 5-6; Lorman Further Comments at 7 (noting that parties with an established business relationship expect to be in communications with companies with which they do business, and that any company that transmits ads by fax should be required to maintain a company-specific do-not-fax list).

PA - 00358

**Federal Communications Commission**                          **FCC 03-153**

limit the flow of valuable information to consumers.[694]  They urge the Commission to amend the
rules to expressly provide for the EBR exemption.[695]  Conversely, the majority of consumer
advocates argue that the TCPA requires companies to obtain express permission from
consumers—even their existing customers—before transmitting a fax to a consumer.[696]  Some
consumer advocates maintain that the Commission erred in its 1992 determination that a
consumer, by virtue of an established business relationship, has given his or her express
invitation or permission to receive faxes from that company.[697]  They urge the Commission to
eliminate the EBR exemption, noting that Congress initially included in the TCPA an EBR
exemption for faxes, but removed it from the final version of the statute.[698]

189.    We now reverse our prior conclusion that an established business relationship
provides companies with the necessary express permission to send faxes to their customers.  As
of the effective date of these rules, the EBR will no longer be sufficient to show that an
individual or business has given their express permission to receive unsolicited facsimile
advertisements.[699]  The record in this proceeding reveals consumers and businesses receive faxes
they believe they have neither solicited nor given their permission to receive.  Recipients of
these faxed advertisements assume the cost of the paper used, the cost associated with the use of

---

[694] Nextel Reply Comments at 6.

[695] *See* Xpedite Reply Comments at 6; ABM Comments at 4-5; Nextel Comments at 25; DIRECTV Comments at
9-10; Lorman Further Comments at 8.

[696] Biggerstaff Reply Comments at 22 (noting that express permission can easily be requested from existing
customers, as paperwork is exchanged between merchants and their customers regularly); NAAG Comments at 31
(stating that treating express consent on a case-by-case basis can be costly and time-consuming, as consent is the
main defense asserted by fax advertisers.  NAAG suggests that the Commission adopt a concrete definition of
"express," meaning definite, explicit or direct, and not left to inference).

[697] NAAG Comments at 31-32 (arguing that creating an established business relationship exception runs contrary
to the clear wording of the statute.  "The TCPA defines 'unsolicited advertisement' as an advertisement sent to a
person 'without that person's prior express invitation or permission.'  A business relationship exemption would
rely on *implied* invitation or permission which is contrary to the clear wording of the statute." (emphasis in
original; footnotes omitted)); Mark R. Lee Comments; Biggerstaff Comments at 3; John Holcomb Comments at 4;
Kondos & Kondos Comments at 3-4; Marc A. Wites Comments; Wayne G. Strang Comments at 12; Michael C.
Worsham Comments at 13; Wayne G. Strang Reply Comments at 16.  *But see* NYSCPB Comments at 18
(recommends retaining the EBR as permission to receive faxes).

[698] *See* Kondos & Kondos Comments at 1-2 and Exhibit A (noting that three versions of the House predecessor
bill to the TCPA included an EBR exemption for unsolicited fax ads.  "Not only is an EBR not a defense to
unsolicited fax advertising under the TCPA, the U.S. Congress specifically included such a defense in numerous
predecessor TCPA bills and then excluded it in the law which overwhelmingly passed in 1991." Kondos &
Kondos Comments at 2); John Holcomb Comments at 4; Biggerstaff Comments at 3.

[699] *See 1992 TCPA Order*, 7 FCC Rcd at 8779, para. 54, n. 87 (finding that facsimile transmissions from persons
or entities that have an established business relationship with the recipient can be deemed to be invited or
permitted by the recipient).  *See also* 47 C.F.R. 64.1200(f)(4) for the definition of an "established business
relationship."  We emphasize that, prior to the effectuation of rules contained herein, companies that transmitted
facsimile advertisements to customers with whom they had established business relationships were in compliance
with the Commission's existing rules.

PA - 00359

the facsimile machine, and the costs associated with the time spent receiving a facsimile advertisement during which the machine cannot be used by its owner to send or receive other facsimile transmissions.[700]

190.    The legislative history indicates that one of Congress' primary concerns was to protect the public from bearing the costs of unwanted advertising.  Certain practices were treated differently because they impose costs on consumers.  For example, under the TCPA, calls to wireless phones and numbers for which the called party is charged are prohibited in the absence of an emergency or without the prior express consent of the called party.[701]  Because of the cost shifting involved with fax advertising, Congress similarly prohibited unsolicited faxes without the prior express permission of the recipient.[702]  Unlike the do-not-call list for telemarketing calls, Congress provided no mechanism for opting out of unwanted facsimile advertisements.  Such an opt-out list would require the recipient to possibly bear the cost of the initial facsimile and inappropriately place the burden on the recipient to contact the sender and request inclusion on a "do-not-fax" list.[703]

191.    Instead, Congress determined that companies that wish to fax unsolicited advertisements to customers must obtain their express permission to do so before transmitting any faxes to them.[704]  Advertisers may obtain consent for their faxes through such means as direct mail, websites, and interaction with customers in their stores.  Under the new rules, the permission to send fax advertisements must be provided in writing, include the recipient's signature and facsimile number, and cannot be in the form of a "negative option."[705]  For example, a company that requests a fax number on an application form could include a clear statement indicating that, by providing such fax number, the individual or business agrees to receive facsimile advertisements from that company.  Such statement, if accompanied by the recipient's signature, will constitute the necessary prior express permission to send facsimile advertisements to that individual or business.  We believe that even small businesses may easily obtain permission from existing customers who agree to receive faxed advertising, when customers patronize their stores or provide their contact information.  The Commission believes that given the cost shifting and interference caused by unsolicited faxes, the interest in protecting

---

[700] NCL Comments at 6; Michael J. Blitch Comments at 7; Autoflex Comments at 1-2.

[701] *See* 47 U.S.C. § 227(b)(1).

[702] 47 U.S.C. §§ 227(b)(1)(C) and (a)(4).

[703] *See, e.g.,* Blocklist.com Comments (operates a national do-not-fax list); Davide Di Labio Comments (should be a national fax list for those opposed to faxes); William B. Hayes Comments (no-fax lists are an alternative solution); Paul Aratow Comments (do-not-fax lists do not work); W. Allen Wilkins Comments (after responding to a "remove your fax number," receives more faxes).

[704] *See* 47 U.S.C. §§ 227(b)(1)(C) and (a)(4).

[705] A facsimile advertisement containing a telephone number and an instruction to call if the recipient no longer wishes to receive such faxes, would constitute a "negative option."  This option (in which the sender presumes consent unless advised otherwise) would impose costs on facsimile recipients unless or until the recipient were able to ask that such transmissions be stopped.

those who would otherwise be forced to bear the burdens of unwanted faxes outweighs the
interests of companies that wish to advertise via fax.

192.    _Membership in a Trade Association_.  In its _1995 Reconsideration Order_, the
Commission determined that mere distribution or publication of a telephone facsimile number is
not the equivalent of prior express permission to receive faxed advertisements.[706]  The
Commission also found that given the variety of circumstances in which such numbers may be
distributed (business cards, advertisements, directory listings, trade journals, or by membership
in an association), it was appropriate to treat the issue of consent in any complaint regarding
unsolicited facsimile advertisements on a case-by-case basis.[707]  In the _2002 Notice_, we sought
comment specifically on the issue of membership in a trade association or similar group and
asked whether publication of one's fax number in an organization's directory constitutes an
invitation or permission to receive an unsolicited fax.[708]  The American Business Media argued
that those willing to make fax numbers available in directories released to the public do so with
an expectation that such fax numbers will be used for advertising.[709]  Consumer advocates,
however, contend that publicly listing a fax number is not a broad invitation to send commercial
faxes.[710]  TOPUC asserted that businesses often publish their fax numbers for the convenience of
their customers, clients and other trade association members, not for the benefit of
telemarketers.[711]

193.    The Commission agrees that fax numbers are published and distributed for a
variety of reasons, all of which are usually connected to the fax machine owner's business or
other personal and private interests.  The record shows that they are not distributed for other
companies' advertising purposes.  Thus, a company wishing to fax ads to consumers whose
numbers are listed in a trade publication or directory must first obtain the express permission of
those consumers.  Express permission to receive a faxed ad requires that the consumer
understand that by providing a fax number, he or she is agreeing to receive faxed advertisements.
 We believe the burden on companies to obtain express permission is warranted when balanced
against the need to protect consumers and businesses from bearing the advertising costs of those

---

[706] _1995 Reconsideration Order_, 10 FCC Rcd at 12408-09, para. 37.

[707] _1995 Reconsideration Order,_ 10 FCC Rcd at 12408-09, para. 37.

[708] _2002 Notice_, 17 FCC Rcd at 17482-83, para. 38.

[709] ABM Comments at 8; _see also_ Brunswick Comments at 8-10; DIRECTV Comments at 11 (generally,
publication of a fax number should constitute permission, but consumers should be able to control the
circumstances under which they will receive faxes.  For example, a trade association could note in its directory
that faxes are not to be used for advertising purposes).

[710] _See, e.g.,_ NCL Comments at 6; NAAG Comments at 31; TOPUC Comments at 6; John Holcomb Comments at
4.

[711] TOPUC Comments at 6; _see also_ Mathemaesthetics Reply Comments at 7 (operators of a trade show ignored
request not to use fax number for advertising and began transmitting multi-page fax ads for services my business
has no interest in).  _But see_ NADA Comments at 3 (in deciding to become a member of a trade association, the
member voluntarily seeks the benefit of the association's services).

PA - 00361

companies.  Finally, the Commission affirms that facsimile requests for permission to transmit
faxed ads, including toll-free opt-out numbers, impose unacceptable costs on the recipients.  This
kind of "negative option" is contrary to the statutory requirement for prior express permission or
invitation.[712]

## 2.    Fax Broadcasters

194.    The Commission explained in the *2002 Notice* that some fax broadcasters, who
transmit other entities' advertisements to a large number of telephone facsimile machines for a
fee, maintain lists of facsimile numbers that they use to direct their clients' advertisements.[713]
We noted that this practice, among others, indicates a fax broadcaster's close involvement in
sending unlawful fax advertisements and may subject such entities to enforcement action under
the TCPA and our existing rules.  We then sought comment on whether the Commission should
address specifically in the rules the activities of fax broadcasters.[714]  Companies and
organizations whose members hire fax broadcasters to transmit their messages argue that the fax
broadcaster should be liable for violations of the TCPA's faxing prohibition.[715]  AIADA
maintains this should be the case, even if the fax broadcaster uses the list of fax numbers
provided by the company doing the advertising.[716]  Nextel argues that liability ought to lie with
the party controlling the destination of the fax; that fax broadcasters who actively compile and
market databases of fax numbers are the major perpetrators of TCPA fax violations.[717]  Nextel
specifically urges the Commission to find that companies whose products are advertised by
independent retailers should not be liable for TCPA violations when they have no knowledge of
such activities.[718]  Fax broadcasters disagree that they should be liable for unlawful faxes,
maintaining that many of them do not exercise any editorial control or discretion over the
content of the messages,[719] and do not provide the list of fax numbers to which the ads are

---

[712] *1995 Reconsideration Order*, 10 FCC Rcd at 12408-09, para. 37; *see also* Hunton & Williams Comments at 7
(recommends at opt-out mechanism for unsolicited faxes).

[713] *2002 Notice*, 17 FCC Rcd at 17483-84, para. 40.

[714] *2002 Notice* , 17 FCC Rcd at 17483-84, para. 40.

[715] AIADA Comments at 2; Nextel Comments at 40.

[716] AIADA Comments at 2.

[717] Nextel Comments at 38; *see also* NAAG Comments at 32 (stating that fax broadcasters that maintain their own
databases of fax numbers are the subject of the vast majority of consumer complaints and state enforcement
actions, and that fax broadcasters who determine the content of the advertisement or its destination should be held
liable for unsolicited faxes).

[718] Nextel Comments at 25, 38-40; *see also* DIRECTV Comments at 3, 9 (asking whether DIRECTV or its
independent contractors have the established business relationship with a consumer).

[719] Xpedite Comments at 5-7; Globecomm Comments at 4-5; ADVAL Reply Comments at 3 (fax broadcasters
never see the list of recipients or the faxed document, which is often uploaded directly through the Internet);
Xpedite Reply Comments at 3, 8.

transmitted.[720] Many industry as well as consumer commenters agree that only those fax broadcasters who are closely involved in the transmission of the fax should be subject to liability.[721] Reed asserts that liability should rest with the entity on whose behalf a fax is sent; that fax broadcasters are not in a position to know firsthand whether, for example, an established business relationship exists between the company and consumer.[722]

195.    The Commission's rulings clearly indicate that a fax broadcaster's exemption from liability is based on the type of activities it undertakes, and only exists "[i]n the absence of 'a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions.'"[723]  The Commission believes that, based on the record and our own enforcement experience, addressing the activities of fax broadcasters will better inform both consumers and businesses about the prohibition on unsolicited fax advertising.  The Commission has determined to amend the rules to explicitly state that a fax broadcaster will be liable for an unsolicited fax if there is a high degree of involvement or actual notice on the part of the broadcaster.  The new rules provide that if the fax broadcaster supplies the fax numbers used to transmit the advertisement, the fax broadcaster will be liable for any unsolicited advertisement faxed to consumers and businesses without their prior express invitation or permission.  We agree, however, that if the company whose products are advertised has supplied the list of fax numbers, that company is in the best position to ensure that recipients have consented to receive the faxes and should be liable for violations of the prohibition.  Therefore, the fax broadcaster will not be responsible for the ads, in the absence of any other close involvement, such as determining the content of the faxed message.[724]  In such circumstances where both the fax broadcaster and advertiser demonstrate a high degree of involvement, they may be held jointly and severally liable for violations of the unsolicited facsimile provisions.  In adopting this rule, the Commission focuses on the nature of an entity's activity rather than on any label that the entity may claim.  We believe the rule will better inform the business community about the prohibition on unsolicited fax advertising and the liability that attaches to such faxing.  And, it will better serve consumers who are often confused about which party is responsible for unlawful fax advertising.  For the same reasons, the new rules define "facsimile broadcaster" to mean a person or entity that transmits messages to telephone facsimile machines on behalf of another person or entity for a fee.[725]

196.    Some commenters ask the Commission to clarify the extent of common carriers'

---

[720] ADVAL Reply Comments at 3; Xpedite Reply Comments at 3.

[721] Xpedite Comments at 3-4; NAAG Comments at 32-33; NCL Comments at 6; ADVAL Comments at 3 ("Fax carriers should not be penalized for traffic sent by third parties.").

[722] Reed Comments at 6.

[723] *1992 TCPA Order*, 7 FCC Rcd at 8780, para. 54 (quoting *Use of Common Carriers*, 2 FCC Rcd 2819, 2820 (1987)).

[724] A high degree of involvement might be demonstrated by a fax broadcaster's role in reviewing and assessing the content of a facsimile message.

[725] *See* 47 C.F.R. § 64.1200(f)(4).

PA - 00363

liability for the transmission of unsolicited faxes.[726]  Cox specifically urges the Commission to distinguish the obligations of fax broadcasters from "traditional common carriers."[727]  As noted above, the Commission has stated that "[i]n the absence of 'a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions,' common carriers will not be held liable for the transmission of a prohibited facsimile message."[728]  We reiterate here that if a common carrier is merely providing the network over which a subscriber (a fax broadcaster or other individual, business, or entity) sends an unsolicited facsimile message, that common carrier will not be liable for the facsimile.

197.    Nextel urges the Commission to clarify that section 217 of the Communications Act does not impose a higher level of liability on common carriers than on other entities for violations of the TCPA.[729]  Section 217 provides that " [i]n construing and enforcing the provisions of this Act, the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person."[730]  The Commission declines to address the scope of section 217 in this rulemaking, which was not raised in the *2002 Notice* or in subsequent notices in this proceeding.

### 3.    Fax Servers

198.    The TCPA makes it unlawful for any person to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine.[731]  The TCPA defines the term "telephone facsimile machine" to mean "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper."[732]  The Commission sought comment on any developing technologies, such as computerized fax servers, that might warrant revisiting these rules.[733]

199.    Commenters who addressed this issue were divided on whether fax servers should be subject to the unsolicited facsimile provisions.  Some industry representatives urged the Commission to clarify that the TCPA does not prohibit the transmission of unsolicited fax

---

[726] Cox Comments at 12-19.

[727] Cox Comments at 13.

[728] *1992 TCPA Order*, 7 FCC Rcd at 8780, para. 54 (quoting *Use of Common Carriers*, 2 FCC Rcd 2819, 2820 (1987)).

[729] Nextel Comments at 40-41.

[730] 47 U.S.C. § 217.

[731] 47 U.S.C. § 227(b)(1)(C).

[732] 47 U.S.C. § 227(a)(2); this definition was incorporated in § 64.1200(f)(2) of the Commission's rules.

[733] *2002 Notice*, 17 FCC Rcd at 17482, para. 37.

118

advertisements to fax servers and personal computers because these transmissions are not sent to a "telephone facsimile machine," as defined in the statute.[734]  Nextel maintains that such faxes do not implicate the harms Congress sought to redress in the TCPA, as they are not reduced to paper and can be deleted from one's inbox without being opened or examined.[735]  Other commenters disagree, noting that there are other costs associated with faxes sent to computers and fax servers.[736]  They note that the TPCA only requires that the equipment have the *capacity* to transcribe text or messages onto paper,[737] and that computer fax servers and personal computers have that capacity.

200.    We conclude that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes.  However, we clarify that the prohibition does not extend to facsimile messages sent as email over the Internet.  The record confirms that a conventional stand-alone telephone facsimile machine is just one device used for this purpose; that developing technologies permit one to send and receive facsimile messages in a myriad of ways.  Today, a modem attached to a personal computer allows one to transmit and receive electronic documents as faxes.  "Fax servers" enable multiple desktops to send and receive faxes from the same or shared telephony lines.[738]

201.    The TCPA's definition of "telephone facsimile machine" broadly applies to any equipment that has the capacity to send or receive text or images.  The purpose of the requirement that a "telephone facsimile machine" have the "capacity to transcribe text or images" is to ensure that the prohibition on unsolicited faxing not be circumvented.  Congress could not have intended to allow easy circumvention of its prohibition when faxes are (intentionally or not) transmitted to personal computers and fax servers, rather than to traditional stand-alone facsimile machines.  As the House Report accompanying the TCPA explained, "facsimile machines are designed to accept, process and print all messages which arrive over their dedicated lines.  The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that it will be received and printed by the recipient's machine."[739]  However, Congress also took account of the "interference,

---

[734] *See* Nextel Comments at 31-32.

[735] Nextel Reply Comments at 4-5.

[736] Michael C. Worsham Comments at 20; James Suggs Comments at 1.  Commenters also note that some commercial facsimile services transmit faxes to the recipients as email attachments.  We emphasize that any rules the Commission adopts with respect to unsolicited facsimile advertisements would not extend to facsimile messages transmitted as email over the Internet.  *See* definition of telephone facsimile machine at 47 U.S.C. § 227(a)(2).

[737] Autoflex Comments at 2; J. Greg Coontz Reply Comments at 11-15, 16-17.

[738] *See* Kauffman Comments at 3.  Although fax boards alone do not have the capability to transcribe text onto or from paper, the Commission nevertheless determined that fax modem boards, which enable personal computers to transmit messages to or receive messages from conventional facsimile machines or other computer fax boards, are the functional equivalent of telephone facsimile machines.  *See 1995 Reconsideration Order*, 10 FCC Rcd at 12404-06, paras. 28-30.

[739] H.R. REP. NO. 102-317 at 10 (1991).

119

**Federal Communications Commission**                                    **FCC 03-153**

interruptions, and expense" resulting from junk faxes, emphasizing in the same Report that "[i]n addition to the costs associated with the fax advertisements, when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications."[740]

202.    Facsimile messages sent to a computer or fax server may shift the advertising costs of paper and toner to the recipient, if they are printed.  They may also tie up lines and printers so that the recipients' requested faxes are not timely received.[741]  Such faxes may increase labor costs for businesses, whose employees must monitor faxes to determine which ones are junk faxes and which are related to their company's business.  Finally, because a sender of a facsimile message has no way to determine whether it is being sent to a number associated with a stand-alone fax machine or to one associated with a personal computer or fax server, it would make little sense to apply different rules based on the device that ultimately received it.

### 4.    Identification Requirements

203.    The TCPA and Commission rules require that any message sent via a telephone facsimile machine contain the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual.[742]  In the *2002 Notice*, the Commission asked whether these rules have been effective at protecting consumers' rights to enforce the TCPA.[743]  The Commission determined in its *1997 Reconsideration Order* that a facsimile broadcast service must ensure that the identifying information of the entity on whose behalf the provider sent messages appear on facsimile messages.  In its discussion, the Commission clarified that the sender of a facsimile message is the creator of the content of the message, finding that Section 227(d)(1) of the TCPA mandates that a facsimile include the identification of the business, other entity, or individual creating or originating a facsimile message, and not the entity that transmits the message.[744]  The Commission believes that if a fax broadcaster is responsible for the content of the message or for determining the destination of the message (*i.e.,* supplying the list of facsimile numbers to which the faxes are sent), it should be identified on the facsimile, along with the entity whose products are advertised.[745]  Therefore, we amend the rules to require any

---

[740] H.R. Rep. No. 102-317 at 25 (1991).

[741] *See Covington & Burling v. International Marketing & Research, Inc. et al.,* No. 01-0004360 (D.C. Sup. Ct. (April 16, 2003) (finding a fax broadcaster liable under the TCPA for transmitting unsolicited fax advertisements to a law firm's fax server).

[742] 47 U.S.C. § 227(d)(1)(B); 47 C.F.R. § 68.318(d).

[743] *2002 Notice*, 17 FCC Rcd at 17483-84, paras. 37 and 40.

[744] *1997 Reconsideration Order*, 12 FCC Rcd at 4612-13, para. 6.

[745] *See* NAAG Comments at 32-33 (stating that only requiring the advertiser's identify has been a hindrance in enforcing the TCPA.  It has been the states' experience that fax broadcasters, who maintain their own databases and send others' advertisements to these fax numbers, frequently omit their identifying information as the sender in order to avoid detection and enforcement action.).

Federal Communications Commission                    FCC 03-153

fax broadcaster that demonstrates a high degree of involvement in the transmission of such facsimile message to be identified on the facsimile, along with the identification of the sender.[746] This will permit consumers to hold fax broadcasters accountable for unlawful fax advertisements when there is a high degree of involvement on the part of the fax broadcaster.[747] Commenters suggested the Commission clarify what constitutes an adequate identification header.[748] Consistent with our amended identification rules for telemarketing calls, senders of fax advertisements will be required under the new rules to use the name under which they are officially registered to conduct business.[749] Use of a "d/b/a" ("doing business as") or other more widely recognized name is permissible; however, the official identification of the business, as filed with state corporate registration offices or comparable regulatory entities, must be included, at a minimum.

## XIV.    PRIVATE RIGHT OF ACTION

### A.          Background

204.    The TCPA is a unique statute in that it provides consumers with two private rights of action for violations of the TCPA rules.  One provision permits a consumer to file suit immediately in state court if a caller violates the TCPA's prohibitions on the use of automatic dialing systems, artificial or prerecorded voice messages, and unsolicited facsimile advertisements.[750]  A separate private right of action permits a consumer to file suit in state court if he or she has received more than one telephone call within any 12-month period by or on behalf of the same company in violation of the guidelines for making telephone solicitations.[751] Based on inquiries received about the private right of action, the Commission asked whether we should clarify whether a consumer may file suit after receiving one call from a telemarketer who, for example, fails to properly identify himself or makes a call outside the time of day restrictions.[752]

205.    Industry commenters argue that the statutory language is clear; that only a person who has received more than one telephone call that violates the telephone solicitation rules

---

[746] *See* amended rule at 47 C.F.R. § 68.318(d).

[747] *See supra* discussion, paras. 194-195.

[748] Michael C. Worsham Comments at 11-12; NCL Comments at 6; Michael J. Blitch Comments at 7 (both seller and fax broadcaster should be identified); NAAG at 33 (should require identifying information of fax broadcaster).  *But see* Xpedite Reply Comments at 8 (requiring a fax broadcaster's identifying information could confuse consumers as to who created the message.  Uninvolved fax broadcasters should not be required to identify themselves on faxes.).

[749] *See supra* discussion on identification requirements for telemarketers, para. 144.

[750] 47 U.S.C. § 227(b)(3).

[751] 47 U.S.C. § 227(c)(5).

[752] *2002 Notice*, 17 FCC Rcd at 17486-87, para. 47.

121

within any 12-month period may file suit under the TCPA's private right of action.[753] Consumers and consumer advocates were split on the issue. Some maintained that a consumer should be permitted to pursue a private right of action for a telemarketer's first offense;[754] others acknowledged that the statute does not permit a cause of action for the first time a telemarketer violates the telephone solicitation rules.[755] Several industry commenters point out that they have been named as defendants in class action lawsuits under the TCPA in state courts.[756] They urge the Commission to determine that the TCPA's private right of action does not contemplate or permit class action lawsuits.[757] Some consumer commenters and plaintiffs' attorneys who have filed class action suits argue that foreclosing class actions would severely handicap the effectiveness of the TCPA and consumers' ability to enforce its provisions. They also contend that the FCC is not authorized to interfere with state courts' certification of class actions.[758]

### B.        Discussion

206.    The Commission declines to make any determination about the specific contours of the TCPA's private right of action. Congress provided consumers with a private right of action, "if otherwise permitted by the laws or rules of court of a State."[759] This language suggests that Congress contemplated that such legal action was a matter for consumers to pursue in appropriate state courts, subject to those courts' rules. The Commission believes it is for Congress, not the Commission, to either clarify or limit this right of action.

## XV.    INFORMAL COMPLAINT RULES

207.    In the *2002 Notice*, the Commission noted that it had released another Notice of Proposed Rulemaking in February of 2002, seeking comment on whether to extend the informal complaint rules to entities other than common carriers.[760] We sought comment in this proceeding

---

[753] Mastercard Comments at 7; BMO Financial Comments at 4; Bank of America Comments at 6; DialAmerica Comments at 14; AT&T Wireless Reply Comments at 27-28.

[754] Martin C. Kaplan Comments at 2 (acknowledging that "[u]p to one call per year is permitted . . . should be amended to total prohibition"); April Jordon Comments at 2; Wayne G. Strang Reply Comments at 16; NCL Comments at 7.

[755] NYSCPB Comments at 19; Michael C. Worsham Comments at 15 (Commission should clarify that once threshold of two calls received within one year is met all violations in any calls are actionable).

[756] *See* DIRECTV Comments at 3-4; Nextel Comments at 39.

[757] *See, e.g.*, AIA Comments at 2; AIADA Comments at 2; Kauffman Comments at 8; DIRECTV Reply Comments at 7; ABM Comments at 2.

[758] *See* Hershovitz Reply Comments at 1, 8-9; Wayne G. Strang Reply Comments at 4; *see also* City of New Orleans Comments at 11; Joe Shields Reply Comments at 9.

[759] 47 U.S.C. § 227(c)(5).

[760] *2002 Notice*, 17 FCC Rcd at 17486-87, para. 47. *See generally Establishment of Rules Governing Procedures to Be Followed When Informal Complaints Are Filed by Consumers Against Entities Regulated by the Commission; Amendment of Subpart E of Chapter 1 of the Commission's Rules Governing Procedures to Be* (continued….)

PA - 00368

on whether the Commission should amend these informal complaint rules to apply to telemarketers.  We will review this issue as part of the Informal Complaints proceeding.  All comments filed in this proceeding that address the applicability of the informal complaint rules to telemarketers will be incorporated into CI Docket No. 02-32.

## XVI.   TIME OF DAY RESTRICTIONS

208.    Commission rules restrict telephone solicitations between the hours of 8:00 a.m. and 9:00 p.m. local time at the called party's location.[761]  As part of our review of the TCPA rules, we sought comment on how effective these time restrictions have been at limiting objectionable solicitation calls.[762]  The Commission also asked whether more restrictive calling times could work in conjunction with a national registry to better protect consumers from telephone solicitations to which they object.

209.    Industry members that commented on the calling time restrictions unanimously asserted that the current calling times should be retained.[763]  Some explained that any restrictions on calls made during the early evening hours, in particular, would interfere with telemarketers' ability to reach their customers.[764]  Consumers, on the other hand, urged the Commission to adopt tighter restrictions on the times that telemarketers may call them.  Some object to calls at the end of the day and during the dinner hour;[765] others prefer that telemarketers not be able to begin calling until later in the morning.[766]  Some suggest the calling times should parallel local noise ordinances.[767]  EPIC advocated allowing consumers to specify the hours they wish to receive calls.[768]

210.    The Commission declines to revise the restrictions on calling times.  Instead, we

---

(Continued from previous page)  ————————————

*Followed When Informal Complaints Are Filed Against Common Carriers; 2000 Biennial Review*, Memorandum Opinion and Order and Notice of Proposed Rulemaking, CI Docket No. 02-32, CC Docket Nos. 94-93, 00-175, 17 FCC Rcd 3919 (2002).

[761] 47 C.F.R. § 64.1200(e)(1).

[762] *2002 Notice*, 17 FCC Rcd at 17481-82, para. 36.

[763] *See, e.g.,* ATA Comments at 105; BMO Financial Comments at 5; HFS Comments at 9; Technion Comments at 7; AT&T Wireless Comments at 28.

[764] Teleperformance Comments at 2; ATA Comments at 106.

[765] *See, e.g.,* Melva L. Taylor Comments at 1; Michael C. Worsham Comments at 11; Robert Jaglowski Comments; Linda M. Deakl Comments; Richard M. Bryant Comments.

[766] J. Melville Capps Comments; Mandy Burkart Comments; Jeff Bryson Comments; John Shaw Comments at 7 (due to the number of nighttime workers, time of day restrictions should begin at 9 am).

[767] PUC of Ohio Comments at 22-23; James Wood Comments.

[768] EPIC Comments at 13.

PA - 00369

retain the current calling times, which are consistent with the FTC's rules.[769]  We believe the current calling times strike the appropriate balance between protecting consumer privacy and not unduly burdening industry in their efforts to conduct legitimate telemarketing.  We also believe that Commission rules that diverge from the FTC's calling restrictions will lead to confusion for consumers.  Moreover, consumers who want to block unwanted calls during certain times will now have the option of placing their telephone numbers on the national do-not-call registry.  They will have the additional option of giving express verifiable authorization to only those companies they wish to hear from.  The Commission declines at this time to require companies to adhere to consumers' calling preferences, including "acceptable" calling times.[770]  We believe that the costs of monitoring calling times for individual consumers could be substantial for many companies, particularly small businesses.  The Commission may revisit this option in the future.

## XVII.  ENFORCEMENT PRIORITIES

211.    TCPA enforcement has been a Commission priority over the past several years,[771] and we intend that it remain so.  In guiding our future enforcement plans, we recognize that the FTC's recent rule changes expand that agency's regulation of telemarketing activities and require coordination to ensure consistent and non-redundant federal enforcement in this area.  Most notably, the FTC's adoption of a nationwide do-not-call registry, the related Do-Not-Call Act, and finally our adoption here of requirements that maximize consistency with those adopted by the FTC create an overlap in federal regulations governing major telemarketing activities.[772]  We hereby direct Commission staff to negotiate with FTC staff a Memorandum of Understanding between the respective staffs to achieve an efficient and effective enforcement strategy that will promote compliance with federal telemarketing regulations, consistent with the guidelines set forth below.

212.    The FCC's jurisdiction over telemarketing is significantly broader than the FTC's.  First, as noted above, the FTC does not have authority over telemarketing calls made by in-house employees of common carriers, banks, credit unions, savings and loans, insurance companies, and airlines.  In addition, the FTC's telemarketing rules pertain only to interstate transmissions.  In contrast, the FCC's telemarketing rules apply without exception to any entity engaged in any of the telemarketing activities targeted by the TCPA and the Commission's related rules, including those that involve purely intrastate activities.[773]  Given the substantial gaps in the FTC's authority over the full range of telemarketing activities, we contemplate that our enforcement staff will focus particularly on those activities and entities that fall outside the

---

[769] *See* 16 C.F.R. § 310.4(c); *see also* FTC Further Comments at 47-50 (stating that the FCC should retain its existing calling time restrictions and maintain the consistency that both agencies have sought on this issue).

[770] The Commission encourages any seller or telemarketer to comply with consumers' requests not to be called during certain times of the day.

[771] *See* <http://www.fcc.gov/eb/News_Releases/DOC-230145A1.html>.

[772] There are other overlapping regulations such as provisions governing abandoned calls, transmission of caller ID, and time-of-day restrictions.  *See supra* paras. 146-159, 173-184, 208-210.

[773] 47 U.S.C. § 152(b).  *See supra* paras. 9 and 16.

FTC's reach – airlines, banks, credit unions, savings and loans, insurance companies, and common carriers, as well as intrastate transmissions by any entity.

213.     Nevertheless, we do not contemplate Commission enforcement that targets only those activities, entities, or transmissions that are outside the FTC's jurisdiction.  The TCPA creates a statutory expectation for FCC enforcement in the telemarketing area.[774]  Moreover, the TCPA's detailed standards pertaining to do-not-call matters evince Congressional intent that the FCC assume a prominent role in federal regulation of this aspect of telemarketing, a mandate that is not altered by the Do-Not-Call Act.  Accordingly, even with the FTC's new do-not-call regulations, including its administration of a national do-not-call registry, we emphasize that the Commission must stand ready to enforce each of our telemarketing rules in appropriate cases.  For reasons of efficiency and fairness, our staff will work closely with the FTC to avoid unnecessarily duplicative enforcement actions.

214.     In determining enforcement priorities under the new telemarketing rules, we contemplate that the Enforcement Bureau will continue its policy of reviewing FCC and FTC consumer complaint data and conferring with appropriate state and federal agencies to detect both egregious violations and patterns of violations, and will act accordingly.[775]  The Enforcement Bureau has in place effective procedures to review aggregate complaint information to determine the general areas that merit enforcement actions, and to identify both particular violators and the individual consumers who may be able to assist the staff in pursuing enforcement actions against such violators.[776]  Enforcement action could include, for example, forfeiture proceedings under section 503(b),[777] cease and desist proceedings under section 312(c), injunctions under section 401, and revocation of common carrier section 214 operating authority.

# XVIII.  OTHER ISSUES

## A.      Access to TCPA Inquiries and Complaints

215.     The Commission stated that the *2002 Notice* was "prompted, in part, by the increasing number and variety of inquiries and complaints involving our rules on telemarketing

---

[774] *See* 47 U.S.C. § 227(f)(3), (7).

[775] Review of the FTC do-not-call database will be particularly important so that our enforcement staff can easily determine the date of any do-not-call request and the date that a company last downloaded information from the database.

[776] In the course of its investigations, the Enforcement Bureau will follow up with individual complainants as appropriate.  In light of the state court private right of action under the TCPA and the fact that many TCPA complaints are not against common carriers, consistent with existing practice, the staff will not necessarily contact each individual TCPA complainant.  Compare 47 U.S.C. § 208.

[777] Before initiating a forfeiture proceeding against most entities that do not hold an FCC authorization, the violator must have received a Commission citation and then engaged in an additional violation.  47 U.S.C. § 503(b)(5).

PA - 00371

**Federal Communications Commission**                              **FCC 03-153**

and unsolicited fax advertisements."[778]  A few commenters maintain that the Commission should
not consider final rules until parties have had an opportunity to analyze the consumer complaints
referenced in the *2002 Notice*.[779]  Other commenters contend that the number of complaints
received by the Commission does not necessarily demonstrate a problem that demands
government intervention.[780]  The ATA filed a Freedom of Information Act (FOIA) request with
the Commission on October 16, 2002, seeking access to the TCPA-related informal
complaints.[781]  The FOIA generally provides that any person has a right to obtain access to
federal agency records, subject to enumerated exemptions from disclosure.[782]  The FOIA
requirements do not apply to records that contain "personnel and medical files and similar files
the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."[783]
Many of the complaints sought by the ATA contain personal private information.  In addition,
the complaints are part of a system of records subject to the Privacy Act.[784]  For these reasons,
the Commission agreed to release the complaints on a rolling basis only after personal
information was redacted.[785]  In response to ATA's FOIA request, the Commission has thus far

---

[778] *See 2002 Notice*, 17 FCC Rcd at 17466, para. 8.

[779] *See, e.g.,* ATA Comments at 41-43 (stating that "[a]s a general matter, access to the [complaints] is necessary
to ensure that 'interested parties have a meaningful opportunity to participate . . . and that the Court has an
adequate record from which to determine whether the agency properly performed its functions.'"); MBNA
Comments at 10 (requesting "an opportunity to review the complaints to determine the nature of the specific
practices complained of, and the extent to which such practices reasonably require new TCPA rules . . .").

[780] *See, e.g.,* ABM Comments at 7; SBC Comments at 7-8, 17; BellSouth Comments at 4.

[781] The ATA's FOIA request was for copies of the over 11,000 complaints about telemarketing practices received
during the period January 2000 through December 2001.  The request also asked for copies of all similar
complaints about telemarketing practices the FCC has received since January 1, 2002; copies of the over 1,500
inquiries about predictive dialing received from June 2000 to December 2001; and any non-publicly released FCC
responses to the above-referenced complaints.  *See Motion For Extension of Time* filed by the ATA, CG Docket
No. 02-278, Tab 1, Electronic FOIA Request from Ronnie London.  On November 14, 2002, following a meeting
with the ATA regarding its FOIA request, CGB confirmed in a letter to ATA counsel that it would take a number
of months and considerable staff resources in order to provide the over 11,000 documents covered by the request.
*See* Letter from K. Dane Snowden, FCC, to Ronnie London, Counsel to ATA, November 14, 2002.

[782] *See* 5 U.S.C. § 552.

[783] 5 U.S.C. § 552(b)(6); *see also* 47 C.F.R. §§ 0.441 *et seq.*

[784] 5 U.S.C. § 552(a); 47 C.F.R. §§ 0.551 *et seq.*

[785] We explained that informal complaints often contain personally identifiable information such as addresses,
phone numbers, social security numbers, and personal financial information.  The ATA subsequently filed an
*Application for Review of the Freedom of Information Action*, requesting that the Commission "overturn the
staff's classification of the telemarketing complaints and predictive dialing inquiries as 'not routinely available'
documents" and immediately release them for public consideration.  *See Review of Freedom of Information Action*
filed by the ATA at 5, CG Docket No. 02-278, December 6, 2002.  (In the alternative, ATA requested that "the
Commission require the staff to significantly accelerate its release of the redacted documents in time for
consideration of them in the notice and comment period, and to substantially reduce or waive the charge
associated with producing the requested documents.")  On December 23, 2002, the ATA filed a *Motion for
Expedited Review of its Application for Review of the Freedom of Information Act Action* to "ensure that ATA and
(continued….)

126

provided approximately 2,420 redacted complaints.[786]

216.     We agree with commenters that the increasing number of inquiries and
complaints about telemarketing practices should not form the basis upon which we revise or
adopt new rules under the TCPA.[787]  Rather, such information can be considered in determining
whether to seek comment on the effectiveness of any of its rules.[788]  We note that, even in the
absence of any such complaints, the Commission is required by the Do-Not-Call Act to complete
the TCPA rulemaking commenced last year.  We disagree with commenters who suggest that
parties must have access to all of the complaints referenced in the NPRM in order to be able to
have a meaningful opportunity to participate in this proceeding.[789]  It is not the existence of the
complaints, or the number of complaints, that led the Commission to institute this proceeding to
consider revision of its TCPA rules.  Rather, our TCPA rules have been in place for more than
ten years.  We opened this proceeding to determine "whether the Commission's rules need to be
revised in order to more effectively carry out Congress's directives in the TCPA."[790]  In any
event, since September 2002, consumers, industry, and state governments have filed over 6,000
comments in this proceeding, during which time the Commission extended the comment periods
twice and released a *Further Notice* in order to ensure that parties had ample opportunity to
comment on possible FCC action.  The substantial record compiled in this proceeding, along
with the Commission's own enforcement experience, provides the basis for the actions we take
here today.

### B.       Reports to Congress

217.     The Do-Not-Call Act requires the Commission to transmit reports to Congress

---

(Continued from previous page)  ────────────────────
other parties participating in the . . . proceeding are afforded timely access to critical documents central to the
issues raised. . .by the [*2002 Notice*]."  *See Motion for Expedited Review* at 1.

[786] As directed by the ATA, the Commission stopped processing the FOIA on January 27, 2003.  The comment
period in this proceeding was subsequently extended following the release of a Further Notice, and the ATA wrote
to the Commission asking that the FOIA processing continue.  However, the ATA did not represent that it would
pay the additional FOIA fees that would accrue from the processing, and CGB wrote to the ATA for further
directions.  The ATA then paid for complaint records provided through January 27, 2003, and asked the
Commission to continue processing the request.  CGB has provided the ATA with a total of 2,420 redacted
complaints thus far.

[787] *See, e.g.,* ATA Comments at 36 (noting that "the Commission's tally of complaints, inquiries and website visits
fails to demonstrate a significant problem . . . the existence of a complaint does not amount to a violation of the
rules.")

[788] Other considerations included:  the Commission's own enforcement experience; the amount of time that had
passed since the Commission undertook a broad review of the TCPA rules, during which time telemarketing
practices have changed significantly; and the actions by the FTC to consider changes to its telemarketing rules,
including the establishment of a national do-not-call registry.  *See 2002 Notice*, 17 FCC Rcd at 17464-68, para. 7-
11.

[789] *See, e.g.,* ATA Comments at 41.

[790] *2002 Notice*, 17 FCC Rcd at 17461, para. 1.

Federal Communications Commission                                FCC 03-153

within 45 days after the promulgation of final rules in this proceeding, and annually thereafter.[791] By this Order, the Commission delegates its authority to the Chief, Consumer & Governmental Affairs Bureau, to issue all such reports.

## XIX.  PROCEDURAL ISSUES

### A.      Regulatory Flexibility Act Analysis

218.    Pursuant to the Regulatory Flexibility Act of 1980, as amended,[792] the Commission's Final Regulatory Flexibility Analysis in this Order is attached as Appendix B.

### B.      Paperwork Reduction Act Analysis

219.    This Order contains modified information collections subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  It will be submitted to the Office of Management and Budget (OMB) for review under § 3507(d) of the PRA.  OMB, the general public, and other Federal agencies are invited to comment on the modified information collections contained in this proceeding.

### C.      Late-Filed Comments

220.    We note that there were comments filed late in this proceeding.  In the interest of having as complete and accurate a record as possible, we will accept late-filed comments and waive the requirements of 47 C.F.R. § 1.46(b).

### D.      Materials in Accessible Formats

221.    To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an email to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at (202) 418-0531 (voice), (202) 418-7365 (TTY). This *Report and Order* can also be downloaded in Text and ASCII formats at: http://www.fcc.gov/cgb/policy/telemarketing.html.

## XX.   ORDERING CLAUSES

222.    Accordingly, IT IS ORDERED that, pursuant to the authority contained in Sections 1-4, 222, 227, and 303(r) of the Communications Act of 1934, as amended; 47 U.S.C. §§ 151-154, 222 and 227; and 47 C.F.R. § 64.1200 of the Commission's rules, and the Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557, the Report and Order in CG Docket No. 02-278 IS ADOPTED, and Parts 64 and 68 of the Commission's rules, 47 C.F.R. Parts 64.1200, 64.1601, and 68.318, are amended as set forth in Appendix A.  The requirements of this Report and Order shall become effective 30 days after publication of a summary thereof in the Federal Register, with the following exceptions.  As discussed herein, the national do-not-call rules at 47 C.F.R. § 64.1200(c)(2) will go into effect on October 1, 2003; the call abandonment

---

[791] *See* Do-Not-Call Act, Sec. 4.

[792] *See* 5 U.S.C. § 604.

**Federal Communications Commission**                    **FCC 03-153**

rules at 47 C.F.R. §§ 64.1200(a)(5) and (6) will become effective on October 1, 2003; and the caller ID requirements at 47 C.F.R. § 64.1601(e) will go into effect on January 29, 2004.  The amendments to the rules in § 64.1200 that contain information collection requirements under the PRA are not effective until approved by OMB.  The Commission will publish a document in the Federal Register announcing the effective date of these rules.

223.    IT IS FURTHER ORDERED that the comments addressing the applicability of the informal complaint rules to telemarketers ARE INCORPORATED into CI Docket 02-32.

224.    IT IS FURTHER ORDERED that the Commission's Consumer & Governmental Affairs Bureau shall have authority to issue any reports to Congress as required by the Do-Not-Call Implementation Act.

225.    IT IS FURTHER ORDERED that the Commission's Consumer & Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION


Marlene H. Dortch
Secretary

PA - 00375

**Appendix A**

**Final Rules**

Part 64 of the Code of Federal Regulations is amended as follows:

**PART 64 – MISCELLANEOUS RULES RELATING TO COMMON CARRIERS**

1. Authority:  47 U.S.C. § 227.

* * * * *

2. Subpart L is amended by revising the Subpart Heading to read as follows:

**Subpart L – Restrictions on Telemarketing and Telephone Solicitation**

* * * * *

3. Section 64.1200 is revised to read as follows:

§ 64.1200        Delivery restrictions.

(a) No person or entity may:

(1) Initiate any telephone call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice,

(i) To any emergency telephone line, including any 911 line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency;

(ii) To the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

(2) Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call:

(i) Is made for emergency purposes,

(ii) Is not made for a commercial purpose,

(iii) Is made for a commercial purpose but does not include or introduce an unsolicited advertisement or constitute a telephone solicitation,

130

(iv) Is made to any person with whom the caller has an established business relationship at the time the call is made, or

(v) Is made by or on behalf of a tax-exempt nonprofit organization.

(3) Use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine.

(i) For purposes of paragraph (a)(3) of this section, a facsimile advertisement is not "unsolicited" if the recipient has granted the sender prior express invitation or permission to deliver the advertisement, as evidenced by a signed, written statement that includes the facsimile number to which any advertisements may be sent and clearly indicates the recipient's consent to receive such facsimile advertisements from the sender.

(ii) A facsimile broadcaster will be liable for violations of paragraph (a)(3) of this section if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions.

(4) Use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

(5) Disconnect an unanswered telemarketing call prior to at least 15 seconds or four (4) rings.

(6) Abandon more than three percent of all telemarketing calls that are answered live by a person, measured over a 30-day period.  A call is "abandoned" if it is not connected to a live sales representative within two (2) seconds of the called person's completed greeting.  Whenever a sales representative is not available to speak with the person answering the call, that person must receive, within two (2) seconds after the called person's completed greeting, a prerecorded identification message that states only the name and telephone number of the business, entity, or individual on whose behalf the call was placed, and that the call was for "telemarketing purposes."  The telephone number so provided must permit any individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign.   The telephone number may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. The seller or telemarketer must maintain records establishing compliance with paragraph (a)(6) of this section.

(i) A call for telemarketing purposes that delivers an artificial or prerecorded voice message to a residential telephone line that is assigned to a person who either has granted prior express consent for the call to be made or has an established business relationship with the caller shall not be considered an abandoned call if the message begins within two (2) seconds of the called person's completed greeting.

(ii) Calls made by or on behalf of tax-exempt nonprofit organizations are not covered by paragraph (a)(6) of this section.

(7) Use any technology to dial any telephone number for the purpose of determining whether the line is a facsimile or voice line.

131

(b)  All artificial or prerecorded telephone messages shall:

(1) At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call.  If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated, and

(2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player that placed the call) of such business, other entity, or individual.  The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.  For telemarketing messages to residential telephone subscribers, such telephone number must permit any individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign.

(c) No person or entity shall initiate any telephone solicitation, as defined in paragraph (f)(9) of this section, to:

(1) Any residential telephone subscriber before the hour of 8 a.m. or after 9 p.m. (local time at the called party's location), or

(2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government.  Such do-not-call registrations must be honored for a period of 5 years.  Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if:

(i) it can demonstrate that the violation is the result of error and that as part of its routine business practice, it meets the following standards:

(A)  Written procedures.  It has established and implemented written procedures to comply with the national do-not-call rules;
(B)  Training of personnel.  It has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;
(C)  Recording.  It has maintained and recorded a list of telephone numbers that the seller may not contact;
(D)  Accessing the national do-not-call database.  It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than three months prior to the date any call is made, and maintains records documenting this process; and
(E)  Purchasing the national do-not-call database.  It uses a process to ensure that it does not sell, rent, lease, purchase or use the national do-not-call database, or any part thereof, for any purpose except compliance with this section and any such state or federal law to prevent telephone solicitations to telephone numbers registered on the national database.  It purchases access to the relevant do-not-call data from the administrator of the national database and does not participate

**Federal Communications Commission**                                    **FCC 03-153**

in any arrangement to share the cost of accessing the national database, including any
arrangement with telemarketers who may not divide the costs to access the national database
among various client sellers; or

(ii) It has obtained the subscriber's prior express invitation or permission.  Such permission must
be evidenced by a signed, written agreement between the consumer and seller which states that
the consumer agrees to be contacted by this seller and includes the telephone number to which
the calls may be placed; or

(iii) The telemarketer making the call has a personal relationship with the recipient of the call.

(d) No person or entity shall initiate any call for telemarketing purposes to a residential
telephone subscriber unless such person or entity has instituted procedures for maintaining a list
of persons who request not to receive telemarketing calls made by or on behalf of that person or
entity.  The procedures instituted must meet the following minimum standards:

(1) Written policy.  Persons or entities making calls for telemarketing purposes must have a
written policy, available upon demand, for maintaining a do-not-call list.

(2) Training of personnel engaged in telemarketing.  Personnel engaged in any aspect of
telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) Recording, disclosure of do-not-call requests.  If a person or entity making a call for
telemarketing purposes (or on whose behalf such a call is made) receives a request from a
residential telephone subscriber not to receive calls from that person or entity, the person or
entity must record the request and place the subscriber's name, if provided, and telephone
number on the do-not-call list at the time the request is made.  Persons or entities making calls
for telemarketing purposes (or on whose behalf such calls are made) must honor a residential
subscriber's do-not-call request within a reasonable time from the date such request is made.
This period may not exceed thirty days from the date of such request.  If such requests are
recorded or maintained by a party other than the person or entity on whose behalf the
telemarketing call is made, the person or entity on whose behalf the telemarketing call is made
will be liable for any failures to honor the do-not-call request.  A person or entity making a call
for telemarketing purposes must obtain a consumer's prior express permission to share or
forward the consumer's request not to be called to a party other than the person or entity on
whose behalf a telemarketing call is made or an affiliated entity.

(4) Identification of sellers and telemarketers.  A person or entity making a call for telemarketing
purposes must provide the called party with the name of the individual caller, the name of the
person or entity on whose behalf the call is being made, and a telephone number or address at
which the person or entity may be contacted.  The telephone number provided may not be a 900
number or any other number for which charges exceed local or long distance transmission
charges.

(5) Affiliated persons or entities.  In the absence of a specific request by the subscriber to the
contrary, a residential subscriber's do-not-call request shall apply to the particular business
entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities

PA - 00379

unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(6) _Maintenance of do-not-call lists._  A person or entity making calls for telemarketing purposes must maintain a record of a caller's request not to receive further telemarketing calls.  A do-not-call request must be honored for 5 years from the time the request is made.

(7) Tax-exempt nonprofit organizations are not required to comply with 64.1200(d).

(e) The rules set forth in sections 64.1200(c) and 64.1200(d) are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

(f) As used in this section:

(1) The terms _automatic telephone dialing system_ and _autodialer_ mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

(2) The term _emergency purposes_ means calls made necessary in any situation affecting the health and safety of consumers.

(3) The term _established business relationship_ means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

(i)  The subscriber's seller-specific do-not-call request, as set forth in paragraph (d)(3) of this section, terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller.

(ii) The subscriber's established business relationship with a particular business entity does not extend to affiliated entities unless the subscriber would reasonably expect them to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate.

(4) The term _facsimile broadcaster_ means a person or entity that transmits messages to telephone facsimile machines on behalf of another person or entity for a fee.

(5)  The term _seller_ means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

134

(6)  The term <u>telemarketer</u> means the person or entity that initiates a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(7)  The term <u>telemarketing</u> means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(8) The term <u>telephone facsimile machine</u> means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

(9) The term <u>telephone solicitation</u> means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message:

(i) To any person with that person's prior express invitation or permission.

(ii) To any person with whom the caller has an established business relationship; or

(iii) By or on behalf of a tax-exempt nonprofit organization.

(10) The term <u>unsolicited advertisement</u> means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

(11) The term <u>personal relationship</u> means any family member, friend, or acquaintance of the telemarketer making the call.

(g) Beginning January 1, 2004, common carriers shall:

(1) When providing local exchange service, provide an annual notice, via an insert in the subscriber's bill, of the right to give or revoke a notification of an objection to receiving telephone solicitations pursuant to the national do-not-call database maintained by the federal government and the methods by which such rights may be exercised by the subscriber.  The notice must be clear and conspicuous and include, at a minimum, the Internet address and toll-free number that residential telephone subscribers may use to register on the national database.

(2)  When providing service to any person or entity for the purpose of making telephone solicitations, make a one-time notification to such person or entity of the national do-not-call requirements, including, at a minimum, citation to 47 C.F.R. § 64.1200 and 16 C.F.R. Part 310. Failure to receive such notification will not serve as a defense to any person or entity making telephone solicitations from violations of this section.

(h)  The administrator of the national do-not-call registry that is maintained by the federal government shall make the telephone numbers in the database available to the States so that a

PA - 00381

State may use the telephone numbers that relate to such State as part of any database, list or listing system maintained by such State for the regulation of telephone solicitations.

§ 64.1601        Delivery requirements and privacy restrictions.

4.  Section 64.1601 is amended by adding paragraph (e) to read as follows:

* * * * *

(e)  Any person or entity that engages in telemarketing, as defined in section 64.1200(f)(7) must transmit caller identification information.

(i)  For purposes of this paragraph, caller identification information must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer.  It shall not be a violation of this paragraph to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller on behalf of which the telemarketing call is placed and the seller's customer service telephone number.  The telephone number so provided must permit any individual to make a do-not-call request during regular business hours.

(ii) Any person or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information.

(iii) Tax-exempt nonprofit organizations are not required to comply with this paragraph.

§ 68.318        Additional limitations.

5.  Section 68.318 is amended by revising (d) to read as follows:

* * * * *

(d) Telephone facsimile machines; Identification of the sender of the message.  It shall be unlawful for person within the United States to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual.  If a facsimile broadcaster demonstrates a high degree of involvement in the sender's facsimile messages, such as supplying the numbers to which a message is sent, that broadcaster's name, under which it is registered to conduct business with the State Corporation Commission (or comparable regulatory authority), must be identified on the facsimile, along with the sender's name.  Telephone facsimile machines manufactured on and after December 20, 1992, must clearly mark such identifying information on each transmitted page.

* * * * *

PA - 00382

## Appendix B

## <u>FINAL REGULATORY FLEXIBILITY ANALYSIS</u>

1.      As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[793] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the Notice of Proposed Rulemaking and Memorandum Opinion and Order[794] (*2002 Notice*) released by the Federal Communications Commission (Commission) on September 18, 2002.  The Commission sought written public comments on the proposals contained in the *2002 Notice*, including comments on the IRFA.  On March 25, 2003, the Commission released a Further Notice of Proposed Rulemaking (Further Notice), seeking comments on the requirements contained in the Do-Not-Call Implementation Act (Do-Not-Call Act),[795] which was signed into law on March 11, 2003.[796]  None of the comments filed in this proceeding were specifically identified as comments addressing the IRFA; however, comments that address the impact of the proposed rules and policies on small entities are discussed below.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[797]

### A.      **Need for, and Objectives of, the Order**

2.      Since 1992, when the Commission adopted rules pursuant to the Telephone Consumer Protection Act (TCPA),[798] telemarketing practices have changed significantly.  New technologies have emerged that allow telemarketers to better target potential customers and make marketing using telephones and facsimile machines more cost-effective.  At the same time, these new telemarketing techniques have heightened public concern about the effect telemarketing has on consumer privacy.  A growing number of states have passed, or are considering, legislation to establish statewide do-not-call lists, and the Federal Trade Commission (FTC) has decided to establish a national do-not-call registry.[799]  Congress provided in the TCPA that "individuals' privacy rights, public safety interests, and commercial freedoms

---

[793] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (*SBREFA*), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[794] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking (NPRM) and Memorandum Opinion and Order (MO&O), 17 FCC Rcd 17459, CG Docket No. 02-278 and CC Docket No. 92-90.  In the MO&O, the Commission closed and terminated CC Docket No. 92-90 and opened a new docket to address the issues raised in this proceeding.

[795] Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003), *to be codified at* 15 U.S.C. § 1601.

[796] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Further Notice of Proposed Rulemaking, 68 Fed. Reg. 16250 (March 25, 2003).

[797] *See* 5 U.S.C. § 604.

[798] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227.  The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. §§ 201 *et seq*.

[799] *See Telemarketing Sales Rule*, 68 Fed. Reg. 4580 (Jan. 29, 2003*)*.

PA - 00383

**Federal Communications Commission**                        **FCC 03-153**

of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices."[800]

3.      The *2002 Notice* sought comments on whether to revise or clarify Commission rules governing unwanted telephone solicitations, the use of automatic telephone dialing systems, prerecorded or artificial voice messages, telephone facsimile machines, the effectiveness of company-specific do-not-call lists, and the appropriateness of establishing a national do-not-call list.  In addition, in the IRFA, the Commission sought comments on the effect the proposed policies and rules would have on small business entities.[801]

4.      In this Report and Order (Order) the Commission revises the current TCPA rules and adopts new rules to provide consumers with additional options for avoiding unwanted telephone solicitations.  We establish a national do-not-call registry for consumers who wish to avoid most unwanted telemarketing calls.  This national do-not-call registry will supplement the current company-specific do-not-call rules, which will continue to permit consumers to request that particular companies not call them.  The Commission also adopts a new provision to permit consumers registered with the national do-not-call list to provide permission to call to specific companies by an express written agreement.  The TCPA rules exempt from the "do-not-call" requirements nonprofit organizations and companies with whom consumers have an established business relationship.  The definition of "established business relationship" has been amended so that it is limited to 18 months from any purchase or financial transaction with the company and to three months from any inquiry or application from the consumer.  Any company that is asked by a consumer, including an existing customer, not to call again must honor that request for five years.  We retain the current calling time restrictions of 8:00 a.m. until 9:00 p.m.

5.      To address the use of predictive dialers, we have determined that a telemarketer must abandon no more than three percent of calls answered by a person, must deliver a prerecorded identification message when abandoning a call, and must allow the telephone to ring for 15 seconds or four rings before disconnecting an unanswered call.  The new rules also require all companies conducting telemarketing to transmit caller identification information when available, and they prohibit companies from blocking such information.  The Commission has revised its earlier determination that an established business relationship constitutes express invitation or permission to receive an unsolicited facsimile advertisement.  We find that the permission to send fax ads must be in writing, include the recipient's signature, and clearly indicate the recipient's consent to receive such ads.  In addition, we have clarified when fax broadcasters are liable for the transmission of unlawful fax advertisements.

6.      We believe the rules the Commission adopts in the Order strike an appropriate balance between maximizing consumer privacy protections and avoiding imposing undue burdens on telemarketers.  In addition, the Commission must comply with the Do-Not-Call Act, which requires the Commission to file an annual report to the House Committee on Energy and Commerce and the Senate Committee on Commerce, Science and Transportation.  This report is

---

[800] *See TCPA*, Section 2(9), *reprinted in* 7 FCC Rcd 2736 at 2744.

[801] *2002 Notice*, 17 FCC Rcd at 17497-501, paras. 70-80.

138

to include:  (1) an analysis of the effectiveness of the registry; (2) the number of consumers included on the registry; (3) the number of persons accessing the registry and the fees collected for such access; (4) a description of coordination with state do-not-call registries; and, lastly, (5) a description of coordination of the registry with the Commission's enforcement efforts.[802]

B.          **Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

7.          There were no comments filed in direct response to the IRFA.  Some commenters, however, raised issues and questions about the impact the proposed rules and policies would have on small entities.  Telemarketers maintained that "telemarketing is used to introduce consumers to novel and competitive products and services,"[803] often offered by small businesses.[804]  Some commenters insisted that business-to-business telemarketing is essential for small businesses.[805]  They indicated that they rely on fax broadcasting as a cost-effective form of advertising.[806]  On the other hand, other small businesses have requested that the Commission allow their telephone numbers to be included on any national do-not-call list[807] and urged the Commission to adopt rules protecting them from unsolicited faxes.[808]  The rules adopted herein reflect not only the difficult balancing of individuals' privacy rights against the protections afforded commercial speech, but the difficult balancing of the interests of small businesses that rely on telemarketing against those that are harmed by unwanted telephone calls and facsimile transmissions.  The amended rules should reduce burdens on both consumers and businesses, including small businesses.

8.          _National Do-Not-Call List._  As discussed more extensively in the Order,[809] some commenters opposed the adoption of a national do-not-call registry, stating that company-specific do-not-call lists adequately protect consumer privacy.[810]  Other commenters supported the establishment of a national do-not-call registry, arguing that "further regulation is needed because the current system does little or nothing to protect privacy in the home."[811]  NFIB "believes that significant burdens are being placed upon businesses of all sizes in order to

---

[802] _See_ Do-Not-Call Act, Sec. 4(b).

[803] WorldCom Reply Comments at 2.

[804] NEMA Comments at 8; PLP Comments at 1.

[805] _See e.g._, Yellow Pages Comments at 2.

[806] NADA Comments at 2-3.

[807] John Shaw Reply Comments at 10; Mathemaesthetics Comments at 6; Gail Berk Comments.

[808] John Holcomb Comments at 1; Jim Carter Comments.

[809] Order, paras. 21, 88.

[810] _See e.g.,_ MBNA Comments at 4.

[811] _See e.g.,_ Privacy Rights at 2.

**Federal Communications Commission**                                    **FCC 03-153**

comply with the regulations. . ., but that small businesses bear the brunt of those burdens."[812]
NFIB suggested that women, minorities and small businesses will be affected disproportionately
by any new restrictions.[813]  And, some commenters maintained that businesses, including small
businesses, will suffer a reduction in telemarketing sales as a result of the establishment of a
national do-not-call list.[814]  SBSC, while opposed to a national do-not-call list, nevertheless
offered a recommendation that would make such a list less onerous for small businesses.  SBSC
suggested exempting local calls that might result in a face-to-face transaction from the do-not-
call list requirements.[815]  NAIFA also encouraged exempting calls which result in face-to-face
meetings and recommended an exemption for those businesses that make a *de minimus* number
of calls.[816]

9.      The Commission received comments arguing that a national do-not-call list
"would be cumbersome"[817] and too expensive for small businesses to use.[818]  DSA specifically
indicated that a national do-not-call list would increase businesses' start-up costs if they were
required to purchase the list.[819]  In addition, MBA maintained that many small lenders use
referrals from existing customers, not large lists, to attract new business.  Such referrals, MBA
suggested, will be difficult to scrub against a national do-not-call list.[820]  Some commenters
suggested that an option to help reduce the cost of a national do-not-call list for small businesses
would be to offer smaller pieces of the list to small businesses.[821]

10.     Yellow Pages urged the Commission to continue to exempt business-to-business
calls from a national do-not-call list, because small businesses benefit tremendously by
advertising in yellow pages and on-line.[822]  However, other commenters requested that small
businesses be allowed to include their telephone numbers on the national do-not-call list.[823]  One

---

[812] NFIB Comments at 1.  *See also*, PLP Comments at 4; NEMA Comments at 8.

[813] MBNA Comments at 3; MBNA Reply at 7.

[814] MBNA Comments at 3.

[815] SBSC Comments at 2-3.  *See also*, PLP Comments at 4-5; MBA Reply at 5-6; Farmers Comments at 1.

[816] NAIFA Comments at 3-4.  *See also*, DSA Comments at 6-7 and Vector Comments at 8-10.

[817] NAMB Comments at 2; NRF Comments at 9-10.

[818] MBA Comments at 3.

[819] DSA Comments at 4-5.  *See also*, NAA Comments at 10-11.

[820] MBA Comments at 3.  *See also*, MPA Comments at 10-11 ("small businesses will be daunted by or unable to
afford the computer processing time and expense involved in 'scrubbing' their relatively small marketing lists
against a [national list]"); *see also* NRF Comments at 9.

[821] Strang Reply Comments at 12.  *See also* Joe W. McDaniel-First Dec 4, 2002 Comments.

[822] Yellow Pages Comments at 2-4.

[823] Mathemaesthetics Comments at 6.

PA - 00386

small business commenter stated that ". . . telemarketing . . . interferes with business operations, especially small business operations . . . ."[824]  Another commenter argued that "people that work from home . . . should not have to be bothered with telemarketing calls that would impact their job performance and potentially their ability to make a living."[825]  Finally, some have assured the Commission that a national do-not-call list would be manageable and feasible to maintain.[826]  NCS, for example, maintained that even extremely small telemarketers could gain access to the do-not-call list at a reasonable cost using the Internet.[827]

11.     _Website or Toll-Free Number to Access Company-Specific Lists and to Confirm Requests._  The Commission sought comment on whether to consider any modifications that would allow consumers greater flexibility to register on company-specific do-not-call lists.[828]  We specifically asked whether companies should be required to provide a toll-free number and/or website that consumers can access to register their names on do-not-call lists.[829]  Some commenters argued that it would be costly if small, local businesses were required to design and maintain websites or provide toll-free numbers for consumers to make do-not-call requests.[830]  In addition, they maintained that businesses should not be required to confirm registration of a consumer's name on a company's do-not-call list.[831]  Confirmations by mail, they stated, would be expensive for a business and probably perceived by the consumer as "junk mail."[832]

12.     _Established Business Relationship._  One issue raised by commenters as particularly burdensome for small business was monitoring existing business relationships and do-not-call requests.  NFIB stated that members have found requests by existing customers to cease contacting them "unwieldy and difficult . . . to translate as a business practice."[833]  "An individual who continues to interact with a [sic] these small businesses following a 'do not contact' request does not sever the business relationship _de facto. . ._"[834]  According to NFIB, it should be the right of the business to continue to call that customer.  They argued that it should be the responsibility of the customer to terminate the relationship with that business

---

[824] Mathemaesthetics Comments at 6.

[825] David T. Piekarski Comments (Docket No. 03-62) at 1-2.

[826] NCS Comments at 4-5.  _See also_, Mathemaesthetics Comments at 7-8.

[827] NCS Comments at 5.

[828] _2002 Notice_, 17 FCC Rcd at 17470-71, para. 17.

[829] _2002 Notice_, 17 FCC Rcd at 17470-71, para. 17.

[830] MBA Comments at 6.

[831] MBA Comments at 6-7.

[832] MBA Comments at 6-7.

[833] NFIB Comments at 2.

[834] NFIB Comments at 2.

affirmatively.[835]

13.     NADA indicated that there has been no significant change that would warrant a revision of the established business relationship exemption.[836]  In fact, NADA stated that "narrowing the exemption would unnecessarily deprive small businesses of a cost-effective marketing opportunity."[837]  According to NADA, small businesses must maximize their marketing resources and the best way to do so is to direct their marketing efforts toward their existing customers.[838]

14.     While no commenter specifically addressed the effect of time limits on small businesses, several entities discussed time limits for the established business relationship rule in general.[839]  DMA indicated the difficulty in establishing a "clock" that "will apply across all the industries that use the phone to relate to their customers."[840]  DMA continued by stating "[d]ifferent business models require different periods of time."[841]  This concept was supported by Nextel, "the FTC's eighteen-month limit on its EBR rule would be inappropriate for the telecommunications industry" and would "dramatically increase administrative burdens and costs for all businesses as they would be forced to monitor and record every customer inquiry and purchasing pattern to ensure compliance with the FCC's rules."[842]

15.     _Unsolicited Facsimile Advertising and "War Dialing"._  Privacy Rights commented that the practice of dialing large blocks of numbers to identify facsimile lines, _i.e.,_ "war dialing," should be prohibited, especially because such calls cannot be characterized as telemarketing.[843]  It argued that "this practice is particularly troubling for small business owners who often work out of home offices" because it deprives the small business owner of the use of the equipment, creates an annoyance and interrupts business calls.[844]

16.     NFIB advocated on behalf of its small business members that "the ability to fax information to their established customers is an essential commercial tool."[845]  Any customer

---

[835] NFIB Comments at 2.

[836] NADA Comments at 2.

[837] NADA Comments at 2.

[838] NADA Comments at 2.

[839] _See, e.g._, NASUCA Comments at 17-18; DMA Comments at 20-21; Nextel Reply Comments at 11-13.

[840] DMA Comments at 20.

[841] DMA Comments at 20.

[842] Nextel Reply Comments 12-13.

[843] Privacy Rights Comments at 4-5.

[844] Privacy Rights Comments at 4-5.

[845] NFIB Comments at 3-4.  _See also_, NADA Comments at 2-3.

PA - 00388

who provides contact information when patronizing a business is providing express permission to be contacted by that business, including via facsimile advertising.[846]  In addition, NFIB indicated that businesses engaged in facsimile advertising should not be required to identify themselves, and that customers should be required to notify the business that they do not wish to receive such faxes.[847]  NADA agreed that the Commission should "preserve its determination that a prior business relationship between a fax sender and recipient establishes the requisite consent to receive fax advertisements."[848]  According to NADA, changing these rules would deprive small businesses of a marketing tool upon which they have come to rely.[849]

17.     Other commenters disagreed, explaining that numerous small businesses are burdened by the intrusion of ringing telephones and fax machines,[850] the receipt of advertisements in which they are not interested,[851] the depletion of toner and paper,[852] and the time spent dealing with these unwanted faxes.[853]  A few home-based businesses and other companies maintain that facsimile advertisements interfere with the receipt of faxes connected to their own business, and that the time spent collecting and sorting these faxes increases their labor costs.[854]  In fact, NFIB has received complaints from its own members "who . . . failed to realize that their membership <u>entitles</u> them to the receipt of such information via fax."[855]

18.     *Caller ID Requirements.*  In response to the Commission's proposal to require telemarketers to transmit caller ID or prohibit the blocking of such information, NYSCPB favored prohibiting the intentional blocking of caller ID information, but acknowledged that requiring the transmission of caller ID may be inappropriate for smaller firms.[856]  NYSCPB

---

[846] NFIB Comments at 3-4.

[847] NFIB Comments at 3-4.  *But see,* Mathemaesthetics Comments at 2-5.

[848] NADA Comments at 2.

[849] NADA Comments at 2.

[850] Mathemaesthetics Comments at 2.

[851] Jeff Bryson Comments; Carolyn Capps Comments at 2.

[852] Michael C. Addison Comments.

[853] John Holcomb Comments at 1.

[854] Jim Carter Comments; JC Homola Comments; Autoflex Comments at 1-2; Rob McNeal Comments (unsolicited faxes costs company tens of thousands of dollars each year in materials and employee time); *see also* NCL Comments at 6 ("[P]eople who work out of their homes are especially harmed by unsolicited faxes, which use up their paper and toner and tie up their machines."); Mathemaesthetics Reply Comments at 7 ("[U]nsolicited [fax] ads caused my business fax machine to become prematurely empty, which rendered *wholly useless* the equipment my small business crucially depends on for its revenue.  When a customer of mine a short time later attempted to fax a purchase order for over $3,000 worth of my company's product, my empty fax machine was not able to capture this transaction for a significant period of time … ." (emphasis in original)).

[855] NFIB Comments at 2 (emphasis added).

[856] NYSCPB-Other Than National DNC List Comments at 9-10.

PA - 00389

stated that "[w]hile mandatory transmission of caller ID information would undoubtedly facilitate do-not-call enforcement . . . we would not want to impose onerous burdens on smaller, less technically sophisticated firms . . . ."[857]  In addition, NYSCPB suggested that smaller businesses that lack the capability to transmit caller ID be exempt from providing caller ID information until the business installs new equipment with caller ID capabilities.[858]

### C.      Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

19.      The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[859]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[860]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[861]  Under the Small Business Act, a "small business concern" is one that:  1) is independently owned and operated; 2) is not dominant in its field of operation; and 3) satisfies any additional criteria established by the Small Business Administration (SBA).[862]

20.      The Commission's rules on telephone solicitation and the use of autodialers, artificial or prerecorded messages and telephone facsimile machines apply to a wide range of entities, including all entities that use the telephone or facsimile machine to advertise.[863]  That is, our action affects the myriad of businesses throughout the nation that use telemarketing to advertise.  For instance, funeral homes, mortgage brokers, automobile dealers, newspapers and telecommunications companies could all be affected.  Thus, we expect that the rules adopted in this proceeding could have a significant economic impact on a substantial number of small entities.

21.      Nationwide, there are a total of 22.4 million small businesses, according to SBA data.[864]  And, as of 1992, nationwide there were approximately 275,801 small organizations [not-

---

[857] NYSCPB-Other Than National DNC List Comments at 9.

[858] NYSCPB-Other Than National DNC List Comments at 10.

[859] 5 U.S.C. § 604(a)(3).

[860] 5 U.S.C. § 601(6).

[861] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comments, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[862] 15 U.S.C. § 632.

[863] 47 C.F.R. § 64.1200.

[864] See SBA, Programs and Services, SBA Pamphlet No. CO-0028, at page 40 (July 2002).

for-profit].[865]

22.     Again, we note that our action affects an exhaustive list of business types and varieties.  We will mention with particularity the intermediary groups that engage in this activity.  SBA has determined that "telemarketing bureaus" with $6 million or less in annual receipts qualify as small businesses.[866]  For 1997, there were 1,727 firms in the "telemarketing bureau" category, total, which operated for the entire year.[867]  Of this total, 1,536 reported annual receipts of less than $5 million, and an additional 77 reported receipts of $5 million to $9,999,999.  Therefore, the majority of such firms can be considered to be small businesses.

### D.      Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

23.     The rules contained herein require significant recordkeeping requirements on the part of businesses, including small business entities.  First, while the national do-not-call list will be developed and maintained by the FTC, all businesses that engage in telemarketing will be responsible for obtaining the list of telephone numbers on the national do-not-call list and scrubbing their calling lists to avoid calling those numbers.[868]  They must also continue to be responsible for maintaining their own company-specific do-not-call lists; however, this is not a new requirement, but a continuation of the Commission's existing rules.  The Commission has reduced the period of time that businesses must retain company-specific do-not-call requests from 10 years to five years.  In addition, for those businesses, including small businesses, that wish to call consumers under the "established business relationship" exemption, they must continue to maintain customer lists in the normal course of business.  Because of the time limits associated with this rule, businesses will need to monitor and record consumer contacts to assure that they are complying with the 18-month and three-month provisions in the rule.  Businesses that want to call consumers with whom they have no relationship, but who are listed on the national do-not-call list, must obtain a consumer's express permission to call.  This permission must be evidenced by a signed, written agreement.

24.     Second, all businesses that use autodialers, including predictive dialers, to sell goods or services, will be required to maintain records documenting compliance with the call abandonment rules.[869]  Such records should demonstrate the telemarketers' compliance with a call abandonment rate of no less than three percent measured over a 30-day period, with the two-second-transfer rule, and with the ring duration requirement.

---

[865] 1992 Economic Census, U.S. Bureau of the Census, Table 6 (special tabulation of data under contract to Office of Advocacy of the U.S. Small Business Administration).

[866] *See* 13 C.F.R. § 121.201, NAICS code 561422.

[867] U.S. Census Bureau, 1997 Economic Census, Subject Series:  "Administrative and Support and Waste Management and Remediation Services, Receipts Size of Firms Subject to Federal Income Tax:  1997," Table 4, NAICS code 561422 (issued Oct. 2000).

[868] Order, paras 16-85.

[869] Order, paras. 129-134, 146-159.

PA - 00391

Federal Communications Commission                                    FCC 03-153

25.     Third, with the exception of tax-exempt nonprofit organizations, all businesses that engage in telemarketing will be required to transmit caller ID information.[870]

26.     Fourth, businesses that advertise by fax will be required to maintain records demonstrating that recipients have provided express permission to send fax advertisements. Such permission must be given in writing, and businesses must document that they have obtained the required permission.[871]

### E.     Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

27.     The RFA requires an agency to describe any significant alternatives that it has considered in developing its approach, which may include the following four alternatives (among others):  "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities."[872]

28.     There were five specific areas in which the Commission considered alternatives for small businesses.  These areas were: (1) establishing a National Do-Not-Call List ((a) providing a portion of the national do-not-call list (five area codes) for free, (b) providing businesses with 30 days to process do-not-call requests, and (c) reducing the do-not-call record retention rate from 10 years to five years); (2) maintaining the current established business rule exemption and adopting the FTC's time limits of 18 months and three months; (3) establishing a call abandonment rate of three percent, rather than zero percent, and measuring the rate over a 30-day period, rather than on a per day basis; (4) continuing to prohibit facsimile advertising to residential and business numbers; and (5) declining to require businesses to maintain a website or toll-free number for do-not-call requests or confirmation of such requests by consumers.  As mentioned, *supra,* in Section B of the FRFA, small businesses presented arguments on both sides of each of these issues.

29.     *National Do-Not-Call List.*  This Order establishes a national do-not-call list for those residential telephone subscribers who wish to avoid most unwanted telephone solicitations.[873]  Although many businesses, including small businesses, objected to a national do-not-call registry,[874] the Commission determined that a national do-not-call list was necessary to carry out the directives in the TCPA.  We agreed with those commenters who maintained that the company-specific approach to concerns about unwanted telephone solicitations does not

---

[870] Order, paras. 173-184.

[871] Order, paras. 185-203.

[872] 5 U.S.C. § 603(c)(1)-(c)(4).

[873] Order, paras. 25-41.

[874] *See e.g.*, MBNA Comments at 4.

alone adequately protect individuals' privacy interests.[875]  We declined to exempt local solicitations and small businesses from the national do-not-call list.[876]  Given the numerous entities that solicit by telephone, and the technological tools that allow even small entities to make a significant number of solicitation calls, we believe that to do so would undermine the effectiveness of the national do-not-call rules in protecting consumer privacy.  In addition, we declined to permit businesses to register their numbers on the national do-not-call registry, despite the requests of numerous small business owners to do so.[877]  The TCPA expressly contemplates that a national do-not-call database includes residential telephone subscribers' numbers.  Although business numbers will not be included in the national do-not-call database, a business could nevertheless *request* that its number be added to a company's do-not-call list.

30.     The Commission considered the costs to small businesses of purchasing the national do-not-call list.  In an attempt to minimize the cost for small businesses, we have considered an alternative and determined that businesses will be allowed to obtain up to five area codes free of charge.[878]  Since many small businesses telemarket within a local area, providing five area codes at no cost should help to reduce or eliminate the costs of purchasing the national registry for small businesses.[879]  Furthermore, as suggested by NCS, small businesses should be able to gain access to the national list in an efficient, cost-effective manner via the Internet.[880]

31.     As discussed extensively in the Order, many businesses, including small business entities, requested specific exemptions from the requirements of a national do-not-call list.[881]  In order to minimize potential confusion for both consumers and businesses alike, we declined to create specific exemptions for small businesses.[882]  We believe the exemptions adopted for calls made to consumers with whom a seller has an established business relationship and those that have provided express agreement to be called provide businesses with a reasonable opportunity to conduct their business while protecting consumer privacy interests.

32.     The Commission also considered modifying for small businesses the time frames for (1) processing consumers' do-not-call requests; (2) retaining consumer do-not-call records; and (3) scrubbing calling lists against the national do-not-call registry.  In doing so, we

---

[875] *See e.g.*, Privacy Rights Comments at 2.

[876] Order, paras. 46-49, 54.

[877] *See e.g.*, Mathemaesthetics Comments at 6.

[878] Order, para. 54.

[879] *See e.g.*, MBA Reply at 3; NAA Comments at 3; SBSC Comments at 2; PLP Comments at 5.

[880] NCS Comments at 4-5.

[881] *See e.g.*, NAA Comments at 12-14 (exempt newspapers); NAIFA Comments at 3 (exempt referral calls); SBSC Comments at 2 (exempt local calls); MBA Comments at 5 (exempt calls to set up face-to-face meetings).

[882] Order, paras. 46-54.

PA - 00393

recognized the limitations on small businesses of processing requests in a timely manner.[883]
Therefore, we determined to require that both large and small businesses must honor do-not-call
requests within 30 days from the date such a request is made, instead of requiring that businesses
honor requests in less time.[884]  Although some commenters suggested periods of up to 60 to 90
days to process do-not-call requests, we determined that such an inconsistency in the rules would
lead to confusion for consumers.  Consumers might not easily recognize that the telemarketer
calling represented a small business and that they must then allow a longer period of time for
their do-not-call requests to be processed.

33.     The Commission also determined to reduce the retention period of do-not-call
records from 10 years to five years.[885]  This modification should benefit businesses that are
concerned about telephone numbers that change hands over time.  They argue that a shorter
retention requirement will result in do-not-call lists that more accurately reflect those consumers
who have requested not to be called.  Finally, we considered allowing small businesses
additional time to scrub their customer call lists against the national do-not-call database.  The
FTC's rules require telemarketers to scrub their lists every 90 days.  For the sake of consistency,
and to avoid confusion on the part of consumers and businesses, the Commission determined to
require all businesses to access the national registry and scrub their calling lists of numbers in
the registry every 90 days.

34.     *Established Business Relationship.*  We have modified the current definition of
"established business relationship"[886] so that it is limited in duration to 18 months from any
purchase or transaction and three months from any inquiry or application.  The revised definition
is consistent with the definition adopted by the FTC.[887]  We concluded that regulating the
duration of an established business relationship is necessary to minimize confusion and
frustration for consumers who receive calls from companies they have not contacted or
patronized for many years.  There was little consensus among industry members about how long
an established business relationship should last following a transaction between the consumer
and seller.[888]  We believe the 18-month timeframe strikes an appropriate balance between
industry practices and consumer privacy interests.  Although businesses, including small
businesses must monitor the length of relationships with their customers to determine whether
they can lawfully call a customer, we believe that a rule consistent with the FTC's will benefit
businesses by creating one uniform standard with which businesses must comply.

35.     *Call Abandonment.*  In the *2002 Notice,* the Commission requested information

---

[883] Order, para. 94.

[884] Order, para. 94.

[885] Order, para. 92.

[886] Order, para. 113.

[887] *See FTC Order*, 68 Fed. Reg. 4580 at 4591-94.

[888] *See, e.g.*, Bank of America Comments at 4 (36 months); MPA Comments at 12-13 (24 months); Sprint
Comments at 18 (12 months).

PA - 00394

on the use of predictive dialers and the harms that result when predictive dialers abandon calls.[889]
In response, some small businesses urged the Commission to adopt a maximum rate of zero on
abandoned calls.  They described their frustration over hang-up calls that interrupt their work
and with answering the phone "only to find complete silence on the other end."[890]  Most industry
members encouraged the Commission to adopt an abandonment rate of no less than five percent,
claiming that this rate "minimizes abandoned calls, while still allowing for the substantial
benefits achieved by predictive dialers."[891]  The Commission has determined that a three percent
maximum rate on abandoned calls balances the interests of businesses that derive economic
benefits from predictive dialers and consumers who find intrusive those calls delivered by
predictive dialers.[892]  We believe that this alternative, a rate of three percent, will also benefit
small businesses that are affected by interruptions from hang-ups and "dead air" calls.

   36.     The three percent rate will be measured over a 30-day period, rather than on a per
day basis.  Industry members maintained that a per day measurement would not account for
short-term fluctuations in marketing campaigns[893] and may be overly burdensome to smaller
telemarketers.  We believe that measuring the three percent rate over a longer period of time will
still reduce the overall number of abandoned calls, yet permit telemarketers to manage individual
calling campaigns effectively.  It will also permit telemarketers to more easily comply with the
recordkeeping requirements associated with the use of predictive dialers.

   37.     *Unsolicited Facsimile Advertising*.  The record reveals that facsimile advertising
can both benefit and harm small businesses with limited resources.  The small businesses and
organizations that rely upon faxing as a cost-effective way to advertise insist that the
Commission allow facsimile advertising to continue.[894]  Other small businesses contend that
facsimile advertising interferes with their daily operations, increases labor costs, and wastes
resources such as paper and toner.[895]  The Commission has reversed its prior conclusion that an
established business relationship provides companies with the necessary express permission to
send faxes to their customers.[896]  Under the amended rules, a business may advertise by fax with
the prior express permission of the fax recipient, which must be in writing.[897]  Businesses may
obtain such written permission through direct mail, websites, or during interaction with
customers in their stores.  This alternative will benefit those small businesses, which are

---

[889] *2002 Notice*, 17 FCC Rcd at 17475-76, para. 26.

[890] Mathemaesthetics Comments at 6.

[891] WorldCom Reply at 18-19.

[892] Order, paras. 150-152.

[893] *See, e.g.,* WorldCom Further Comments at 8; Teleperformance Further Comments at 4.

[894] NFIB Comments at 3-4.

[895] John Holcomb Comments at 1; Mathemaesthetics Comments at 2-3.

[896] Order, para. 189.

[897] Order, para. 191.

inundated with unwanted fax advertisements.

38.     _Website or Toll-Free Number to Access Company-Specific Lists and to Confirm Requests_.  Lastly, the Commission has determined not to require businesses to provide a website or toll-free number for consumers to request placement on company-specific do-not-call lists or to respond affirmatively to do-not-call requests or otherwise provide some means of confirmation that consumers have been added to a company's do-not-call list.[898]  Several commenters indicated that such requirements would be costly to small businesses.[899]  Although we believe these measures would improve the ability of consumers to register do-not-call requests, we agree that such requirements would be potentially costly to businesses, particularly small businesses.  Instead, we believe that the national do-not-call registry will provide consumers with a viable alternative if they are concerned that their company-specific do-not-call requests are not being honored.  In addition, consumers may pursue a private right of action if there is a violation of the do-not-call rules.  This alternative should reduce, for small businesses who engage in telemarketing, both the potential cost and resource burdens of maintaining company-specific lists.

39.     **REPORT TO CONGRESS:**  The Commission will send a copy of the Order, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[900]  In addition, the Commission will send a copy of the Order, including this FRFA, to the Chief Counsel for Advocacy of the SBA.  A copy of the Order and FRFA (or summaries thereof) will also be published in the Federal Register.[901]

---

[898] Order, para. 93.

[899] MBA Comments at 6-7.

[900] _See_ 5 U.S.C. § 801(a)(1)(A).

[901] _See_ 5 U.S.C. § 604(b).

PA - 00396

**Federal Communications Commission**        **FCC 03-153**

## Appendix C

### Comments Filed

*Due to the significant number of comments filed by individual consumers in this proceeding, we have listed below only those comments received from industry, consumer advocacy groups and governmental entities.  All individual consumer comments, including those cited in the Report and Order, are available for inspection on the Commission's Electronic Comment Filing System (ECFS).*

| | |
|---|---|
| ACI Telecentrics Incorporated (5-2-03) | ACI |
| Allstate Life Insurance Company (Lisa Behzad; 12-9-02) | Allstate |
| Americall Group, Inc. (11-26-02) | Americall |
| American Association of Blood Banks (Marlene H. Dortch; 12-6-02) | AABB |
| American Association of Retired Persons (AARP; 1-31-03) | AARP |
| American Bankers Association (12-9-02) | ABA |
| American Business Media (11-22-02) | ABM |
| American Express Company (12-5-02) | American Express |
| American General Finance, Inc. (12-10-02) | AGF |
| American Insurance Association (11-21-02) | AIA |
| American International Automobile Dealers Association (12-9-02) | AIADA |
| American Red Cross (12-9-02) | Red Cross |
| American Resort Development Association (11-15-02) | ARDA |
| American Teleservices Association (12-9-02) (12-23-02) | ATA |
| America's Blood Centers (Jeanne Dariotis; 12-5-02) | ABC |
| Ameriquest Mortgage Company (12-9-02) | Ameriquest |
| Association for Communications Technology Professionals in Higher Education (ACUTA, Inc.) and Association of College and University Housing Officers-International (ACUHO-I) (ACUTA and ACUHO-I; 12-9-02) | ACUTA |
| Association for Competitive Technology (12-9-02) | ACT |
| Association of Fundraising Professionals (11-27-02) | AFP |
| AT&T Wireless Services, Inc. (12-9-02) | AT&T Wireless |
| Autoflex Leasing (11-18-02) | Autoflex |
| Avinta Communications, Inc. (Abraham Y. Chen; 11-18-02) | Avinta |
| Bank of America (12-3-02) | Bank of America |
| BellSouth Corporation (12-9-02) | BellSouth |
| Blocklist.com (12-9-02) | Blocklist.com |
| BMO Financial Group (12-9-02) | BMO Financial |
| The Broadcast Team (12-6-02) | TBT |
| Brunswick Corporation (12-9-02) | Brunswick |
| Californians Against Telephone Solicitation (Robert Arkow; 12-9-02) | CATS |
| Call Compliance, Inc. (12-9-02) | Call Compliance |
| Castel, Inc. (2-28-03) | Castel |
| Cellular Telecommunications & Internet Association (12-9-02) | CTIA |
| Cendant Corporation (11-22-02) | Cendant |

PA - 00397

| | |
|---|---|
| Center for Democracy & Technology (12-9-02) | CDT |
| Cherry Communications (11-21-02) | Cherry |
| Cingular Wireless LLC (12-9-02) | Cingular |
| Citigroup, Inc. (12-12-02) | Citigroup |
| City of Chicago (11-22-02) | City of Chicago |
| CMOR (12-9-02) | CMOR |
| CNN.com (4-22-03) | CNN |
| Colorado Public Utilities Commission (12-3-02) | CO PUC |
| Comcast Cable Communications, Inc. (12-9-02) | Comcast |
| Concerned Telephone Companies (12-9-02) | CTC |
| Consumer Bankers Association (12-9-02) | CBA |
| Consumer Choice Coalition (12-2-02) | Coalition |
| Consumer Disability Telecommunications Advisory Committee (12-24-02) | CDTAC |
| Consumer Mortgage Coalition (12-19-02) | CMC |
| Convergys Corporation (12-9-02) | Convergys |
| Copilevitz and Canter, LLC (William E. Raney; 12-9-02) | Copilevitz & Canter |
| Cox Enterprises, Inc. (12-9-02) | Cox |
| DialAmerica Marketing, Inc. (12-10-02) | DialAmerica |
| Direct Marketing Association (12-9-02) | DMA |
| Direct Selling Association (12-9-02) | DSA |
| DIRECTV, Inc. (12-9-02) | DIRECTV |
| Discover Bank (12-9-02) | Discover |
| Electronic Privacy Information Center; Consumer Task Force for Automotive Issues; Remar Sutton; Consumer Action; Privacy Rights Clearinghouse; Consumer Federation of America; International Union, UAW; Free Congress Foundation; Junkbusters Corp.; Consumer Project on Technology; Computer Professionals for Social Responsibility; and Private Citizens, Inc. (12-9-02) | EPIC |
| Electronic Retailing Association (12-9-02) | ERA |
| Emergency Communications Network, Inc. (12-6-02) | ECN |
| Farmers Insurance Group (11-22-02) | Farmers |
| Financial Services Roundtable (12-12-02) | FSR |
| Florida Department of Agriculture and Consumer Services (1-8-03) | FL DACS |
| Fund for Public Interest Research, Inc. (Jon Scarlett; 12-6-02) | Fund for Public Interest |
| Globecomm Systems, Inc. (12-9-02) | Globecomm |
| Hilton Head Hospitality Resort Services (1-31-03) | Hilton Head |
| Household Automotive Finance Corporation; OFL-A Receivables Corp.; and Household Automotive Credit Corporation (12-9-02) | Household Automotive |
| Household Bank (SB), N.A. (12-9-02) | Household Bank |
| Household Finance Corp. (House Hold Finance Corporation; 12-12-02) | Household Finance |
| Household Financial Services, Inc. (12-10-02) | HFS |
| Hunton & Williams (11-22-02) | Hunton & Williams |
| IBM Corporate Market Intelligence (2-4-03) | IBM |
| Intellidyn Corporation (Kathie Fleischer; 12-4-02) | Intellidyn |
| Interactive Teleservices Corporation (Barbara Bricker; 4-10-03) (Duane L. Billingslea; 4-11-03) | ITC |

PA - 00398

**Federal Communications Commission**                                    **FCC 03-153**

| | |
|---|---|
| Intrado Inc. (11-22-02) | Intrado |
| Intuit, Inc. (12-9-02) | Intuit |
| Katz & Korin (Robert J. Schuckit; 10-5-02) | Katz & Korin |
| Kauffman Group Inc. (11-25-02) | Kauffman |
| Kondos & Kondos Law Offices (11-14-02) | Kondos & Kondos |
| LCC International, Inc. (12-9-02) | LCC |
| The Leukemia & Lymphoma Society (George Dahlman; 1-31-03 and 5-2-03) | L&LS |
| LSSi Corp. (12-9-02) | LSSi |
| Magazine Publishers of America (12-9-02) | MPA |
| March of Dimes (11-22-02) | March of Dimes |
| MasterCard International Incorporated (12-9-02) | Mastercard |
| Mathemaesthetics, Inc. (11-22-02) (*see also* Douglas M. McKenna) | Mathemaesthetics |
| MBNA America Bank, N.A. (12-9-02) (Revised 12-10-02) | MBNA |
| Metris Companies, Inc. (12-6-02) | Metris |
| Meyer Associates, Inc. ([Thoams] Caprio; 4-24-03) | Meyer |
| MidFirst Bank (1-9-03) | MidFirst |
| Mortgage Bankers Association of America (12-9-02) | MBA |
| Mortgage Investors Corporation, Inc. (12-9-02) | Mortgage Investors |
| Mothers Against Drunk Driving (1-30-03) (Wendy J. Hamilton; 5-1-03) | MADD |
| Moultrie Independent Telephone Company (12-9-02) | Moultrie |
| National Association of Attorneys General (12-9-02) | NAAG |
| National Association of Broadcasters (12-9-02) | NAB |
| National Association of Consumer Agency Administrators (Kathleen Thuner, President; 11-22-02) | NACAA |
| National Association of Independent Insurers (12-10-02) | NAII |
| National Association of Insurance & Financial Advisors (11-22-02) | NAIFA |
| National Association of Mortgage Brokers (12-9-02) (*see also* Armand Cosenza) | NAMB |
| National Association of Regulatory Utility Commissioners (11-22-02) | NARUC |
| National Association of State Utility Consumer Advocates (NASUCA; 12-9-02) | NASUCA |
| National Automobile Dealers Association (12-10-02) | NADA |
| National Cable & Telecommunications Association (12-9-02) | NCTA |
| National Consumers League (12-6-02) | NCL |
| National Energy Marketers Association (11-22-02) | NEM |
| National Federation of Independent Business (1-9-03) | NFIB |
| National Public Radio, Inc. (12-9-02) | NPR |
| National Retail Federation (12-9-02) | NRF |
| National Telecommunications Cooperative Association (11-22-02) | NTCA |
| NCS Pearson, Inc. (12-9-02) | NCS |
| NeuStar, Inc. (12-9-02) | NeuStar |
| New Orleans, Utility, Cable & Telecommunications Committee of the City Council (11-18-02) | City of New Orleans |
| Newsletter & Electronic Publishers Association (12-9-02) | NEPA |
| Newspaper Association of America (12-9-02) | NAA |
| New York State Consumer Protection Board (11-22-02) (3 comments) | NYSCPB |

**Federal Communications Commission**                              **FCC 03-153**

| | |
|---|---|
| Nextel Communications, Inc. (12-9-02) | Nextel |
| Nielsen Media Research, Inc. (1-31-03) | Nielsen |
| North Dakota Public Service Commission (12-2-02) | ND PSC |
| Not-For-Profit and Charitable Coalition (11-22-02) | NPCC |
| Office of the People's Counsel for the District of Columbia | |
|    (Elizabeth A. Noel; 12-9-02) | OPC-DC |
| Ohio, Public Utilities Commission (12-9-02) | PUC of Ohio |
| Oregon Telecommunications Association (12-3-02) | OTA |
| Pacesetter Corporation (11-20-02) | Pacesetter |
| Personal Legal Plans, Inc. (12-16-02) | PLP |
| Progressive Casualty Insurance Company (11-18-02) | Progressive Casualty |
| Privacilla.org (12-9-02) | Privacilla.org |
| Privacy Rights Clearinghouse (Beth Givens; 12-5-02) | PRC |
| Private Citizen, Inc. (12-9-02) | Private Citizen |
| Process Handler et al. For Hire, Inc. (5-14-03) | Process Handler |
| Progressive Business Publications (Edward M. Satell; 4-28-03) | Progressive Business |
| Qwest Services Corporation (12-9-02) | Qwest |
| R & D Lawn & Tree Services (11-18-02) | R & D |
| Reed Elsevier, Inc. (12-9-02) | Reed |
| Reese Brothers, Inc. (12-9-02) | Reese |
| Response Catalyst (Doug Hibbeler; 12-9-02) | Response Catalyst |
| Royal Sonesta Hotel (4-7-03) | Royal Sonesta |
| SBC Communications, Inc. (12-9-02) | SBC |
| Scholastic, Inc. (12-9-02) | Scholastic |
| The Seattle Times Company (12-9-02) | Seattle Times |
| SER Solutions, Inc. (11-19-02) | SER |
| Small Business Survival Committee (1-31-03) | SBSC |
| Special Olympics Florida (Laurie Moyson; 5-8-03) | Special Olympics FL |
| Special Olympics Hawaii (Nancy Bottelo; 1-30-03) | Special Olympics HI |
| Special Olympics Kansas (5-1-03) | Special Olympics KS |
| Special Olympics New Jersey (Suzanne Schwanda; 1-31-03) | Special Olympics NJ |
| Special Olympics New Mexico (Randy Mascorella; 4-30-03) | Special Olympics NM |
| Special Olympics New York (5-2-03) | Special Olympics NY |
| Special Olympics Ohio (Federal Communications Commission; 1-31-03) | Special Olympics OH |
| Special Olympics Virginia (5-2-03) | Special Olympics VA |
| Special Olympics Wisconsin (Dennis H. Alldridge; 1-30-03) | Special Olympics WI |
| Sprint (12-9-02) | Sprint |
| Student Parent Support Services Corp. (3-19-03) | Student Support |
| Suggs & Associates, P.C. (James [M.Suggs]; 12-4-02) | Suggs |
| Sytel Limited (12-9-02) | Sytel |
| Technion Communications Corp. (11-19-02) | Technion |
| Telatron Marketing Group, Inc. (12-9-02) | Telatron |
| Telecommunications for the Deaf (11-15-02) | TDI |
| Teleperformance USA (Julie Loppe-Peyrin; 12-6-02) | |
|    (Timothy J. Casey; 12-6-02) | Teleperformance |
| Telestar Marketing, L.P. (11-19-02) | Telestar |
| Tennessee Regulatory Authority and the | |

PA - 00400

**Federal Communications Commission**                    **FCC 03-153**

| | |
|---|---|
| Tennesse Attorney General (12-9-02) | TN AG |
| Texas, Office of Public Utility Counsel (12-9-02) | TOPUC |
| Texas, Public Utility Commission (12-3-02) | Texas PUC |
| TSI Telecommunications Services, Inc. (11-7-02) | TSI |
| U. S. Chamber of Commerce (12-26-02) | Chamber of Commerce |
| Vector Marketing Corporation (12-9-02) | Vector |
| Ver-A-Fast (12-10-02) (*see also* Bob Bensman; 11-19-02) | Ver-A-Fast |
| VeriSign, Inc. (f/n/a Illuminet, Inc.) (3-31-03) | VeriSign |
| Verizon (12-10-02) | Verizon |
| Verizon Wireless (12-9-02) | Verizon Wireless |
| Visa U.S.A. Inc. (12-9-02) | Visa |
| Wells Fargo & Company (11-5-02) | Wells Fargo |
| Winnebago Cooperative Telephone Association (1-30-03) | Winnebago |
| Worldcom, Inc. (12-9-02) | Worldcom |
| Xpedite Systems, Inc. (12-9-02) | Xpedite |
| Yellow Pages Integrated Media Association (12-9-02) | Yellow Pages |

PA - 00401

Federal Communications Commission                        FCC 03-153

**Reply Comments Filed**

| | |
|---|---|
| Adval Communications, Inc. (1-31-03) | ADVAL |
| American Teleservices Association (1-31-03) (3-5-03, correction) | ATA |
| Ameriquest Mortgage Company (1-31-03) | Ameriquest |
| AT&T Wireless Services, Inc. (1-31-03) | AT&T Wireless |
| BellSouth Corporation (1-31-03) | BellSouth |
| Cablevision Systems Corporation (1-31-03) | Cablevision |
| Cavalier Telephone, LLC (1-31-03) | Cavalier |
| CMOR (1-31-03) | CMOR |
| Coontz, J. Greg (1-8-03) | |
| DialAmerica Marketing, Inc. (1-31-03) | DialAmerica |
| Direct Marketing Association (1-31-03) | DMA |
| DIRECTV, Inc. (1-31-03) | DIRECTV |
| Hershovitz, Marc B., Michael Jablonski, Ned Blumenthal and C. Ronald Ellington (1-8-03) (3 comments) | Hershovitz |
| The International Softswitch Consortium (1-31-03) | ISC |
| Intuit, Inc. (1-31-03) | Intuit |
| LSSi Corp. (Lissi Corp; 1-31-03) | LSSi |
| Mathemaesthetics, Inc. (1-8-03) (*see also* Douglas McKenna; 1-6-03) | Mathemaesthetics |
| MBNA America Bank, N.A. (1-31-03) | MBNA |
| Mortgage Bankers Association of America (Stephen A. O'Conner; 1-31-03) | MBA |
| National Association of Broadcasters (1-31-03) | NAB |
| National Association of State Utility Consumer Advocates (NASUCA; 1-31-03) | NASUCA |
| National Public Radio, Inc. (1-31-03) | NPR |
| NCS Pearson, Inc. (1-31-03) | NCS |
| The Newspaper Association of America (1-21-03) | NAA |
| Nextel Communications, Inc. (1-31-03) | Nextel |
| Office of the People's Counsel for the District of Columbia (Elizabeth A. Noël, People's Counsel; 1-31-03) | OPC-DC |
| Private Citizen, Inc. (1-9-03) | Private Citizen |
| RoperASW (1-30-03) | RoperASW |
| SBC Communications, Inc. (1-31-03) | SBC |
| Sytel Limited (2-3-03) | Sytel |
| Teleperformance USA (4-30-03) | Teleperformance |
| Vector Marketing Corporation (1-31-03) | Vector |
| Verizon (1-31-03) | Verizon |
| Verizon Wireless (1-31-03) | Verizon Wireless |
| Visa (1-31-03) | Visa |
| VoltDelta (Brad Schorer; 12-9-02) | VoltDelta |
| Worldcom, Inc. (1-31-03) | Worldcom |
| Xpedite Systems, Inc. (1-31-03) | Xpedite |
| Yellow Pages Integrated Media Association (1-31-03) | Yellow Pages |

PA - 00402

Federal Communications Commission                                    FCC 03-153

### Further Comments Filed

| | |
|---|---|
| Active Periodicals, Inc. (5-5-03) | Active Periodicals |
| Allstate Life Insurance Company (5-5-03) | Allstate |
| American Association of Retired Persons (AARP; 5-19-03) | AARP |
| American Council of Life Insurers (5-5-03) | ACLI |
| American Teleservices Association (5-5-03) | ATA |
| America's Community Bankers (5-8-03) | ACB |
| Ameriquest Mortgage Company (5-5-03) | Ameriquest |
| Bank of America Corporation (Kathryn D. Kohler; 5-2-03) | Bank of America |
| Bank One Corporation (5-5-03) | Bank One |
| Cendant Corporation (5-5-03) | Cendant |
| Citigroup Inc. (5-19-03) | Citigroup |
| City of Chicago (5-1-03) | City of Chicago |
| Chrusch, Michael J., Esq. (5-5-03) | |
| Consumer Council of America (5-5-03) | CCA |
| Direct Marketing Association (5-5-03) | DMA |
| DIRECTV, Inc. (5-5-03) | DIRECTV |
| Electronic Retailing Association (5-5-03) | ERA |
| Federal Trade Commission (5-12-03) | FTC |
| Household Bank (SB), N.A. (5-2-03) | Household |
| InfoCision Management Corporation (5-5-03) | InfoCision |
| Interactive Teleservices Corporation | ITC |
| Intuit Inc. (5-5-03) | Intuit |
| Lorman Education Services (5-5-03) | Lorman |
| MBNA America Bank, N.A. (5-5-03) | MBNA |
| Metris Companies Inc. (5-5-03) | Metris |
| Miller Isar, Inc. (5-2-03) | Miller Isar |
| Mortgage Bankers Association of America (Kurt Pfotenhauer; 5-5-03) | MBA |
| National Association of Independent Insurers | |
|     (National Association of Independent Insures [sic]; 5-5-03) | NAII |
| National Association of Realtors | |
|     (National Association of Realtor; 5-5-03) | NAR |
| National Association of State Utility Consumer Advocates | |
|     (NASUCA; 5-5-03) | NASUCA |
| National Association of Insurance and Financial Advisors (5-2-03) | NAIFA |
| National Telecommunications Cooperative Association (NTCA; 5-5-03) | NTCA |
| Newspaper Association of America (5-5-03) | NAA |
| New Jersey State Division of the Ratepayer Advocate (5-5-03) | New Jersey Ratepayer |
| Nextel Communications, Inc. (5-5-03) | Nextel |
| Scholastic Inc. (5-5-03) | Scholastic |
| Securities Industry Association (James Y. Chin; 5-5-03) | SIA |
| Software & Information Industry Association (5-5-03) | SIIA |
| Sprint Corporation (5-5-03) | Sprint |
| Stonebridge Life Insurance Companies (5-5-03) | Stonebridge |
| Teleperformance USA (4-29-03) | Teleperformance |
| Tennessee Regulatory Authority (5-5-03) | TN RA |

**Federal Communications Commission**                                    **FCC 03-153**

Vector Marketing Corporation
   (Vector – Marketing Corporation; 4-29-03)       Vector
Verizon (5-5-03)       Verizon
Winstar Communications, LLC (5-5-03)       Winstar
Worldcom, Inc. (5-5-03)       Worldcom
Yellow Pages Integrated Media Association (5-5-03)       Yellow Pages

PA - 00404

**Federal Communications Commission**                                    **FCC 03-153**

## Further Reply Comments Filed

| | |
|---|---|
| American Council of Life Insurers (5-19-03) | ACLI |
| American Teleservices Association (5-19-03) | ATA |
| America's Community Bankers (5-8-03) | ACB |
| Ameriquest Mortgage Company (5-5-03) | Ameriquest |
| Competitive Telecommunications Association (5-19-03) | Competitive Telecom |
| DialAmerica Marketing, Inc. (5-19-03) | DMA |
| Indiana Attorney General Steve Carter (5-19-03) | Indiana AG |
| National Association of State Utility Consumer Advocates (NASUCA; 5-19-03) | NASUCA |
| New Jersey State Division of the Ratepayer Advocate (5-19-03) | New Jersey Ratepayer |
| Primerica Financial Services, Inc. (5-19-03) | Primerica |
| SBC Communications, Inc. (SBC Communications Inc.; 5-19-03) | SBC |
| Verizon (5-5-03) | Verizon |

PA - 00405

Federal Communications Commission                                    FCC 03-153

## SEPARATE STATEMENT OF
## CHAIRMAN MICHAEL K. POWELL

*Re:     Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; CG Docket No. 02-278*

Our decision today is the most sweeping consumer protection measure ever adopted by the FCC.  No longer will consumers be forced to endure unwanted telephone calls and faxes.  Under the Telephone Consumer Protection Act (TCPA) and our revised rules, consumers are empowered to choose.

The TCPA is about tools.  It gives consumers the tools they need to build a high and strong fence around their homes to protect them from unsolicited telephone calls and faxes.  It also allows other consumers to have a lower fence or no fence at all, if they wish to take advantage of these commercial messages.  Our decision makes the American consumer's toolbox more complete by creating a national do not call list and strengthening and modifying our other longstanding protections under the TCPA.  Our goal:  to maximize consumers' ability to control the messages they receive on their personal phones and faxes.

Since the enactment of the TCPA a decade ago, the rapid growth of technology has led to a five-fold increase in marketing contacts via telephone.  An increased number of telemarketing calls, the proliferation of predictive dialers, and the incomplete protections of less-comprehensive do not call lists have combined to necessitate the Commission's new approach.  Consumers want more control over their telephones – today we give it to them.

In addition to the national do not call list, our decision contains a number of other important provisions.  First, although telemarketing calls made pursuant to an existing business relationship are exempt under the TCPA, the Commission today significantly narrows the scope of that exemption to better protect consumers.  Consumers may eliminate even these commercial calls upon request.  Second, we tighten the limitations on our existing do not call rules and impose additional requirements on predictive dialers, pre-recorded messages, and calls to wireless phones.   We also require telephone solicitations to provide caller identification.  Finally we adopt stricter rules to control unsolicited fax advertising.   Taken together and combined with vigilant enforcement, our rules provide consumers with the tools they need to craft the commercial relationships they want.

Consistent with the instructions in the recently enacted Do Not Call Implementation Act, our order maximizes consistency and complements the FTC's recently amended rules.  I look forward to working with the FTC, under the fine leadership of Chairman Muris, to harmonize our rules and move forward with nation-wide implementation of the federal Do-Not-Call Registry.

PA - 00406

## SEPARATE STATEMENT OF
## COMMISSIONER KATHLEEN Q. ABERNATHY

*Re:  Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, Report and Order*

Today's decision to establish a national do-not-call list is directly responsive to consumer frustration with telemarketing overload.  Consumers are fed up with the barrage of telemarketing calls that intrude on their privacy, and they crave the ability to just say no.  Congress also has made clear the importance of giving consumers a more effective means of blocking unwanted calls.  Congress authorized establishment of a national do-not-call registry in the Telephone Consumer Protection Act of 1991, and earlier this year, it enacted the Do-Not-Call Implementation Act.  This legislation authorizes funding for the Federal Trade Commission's national registry and directs this Commission to "maximize consistency" with the FTC's Telemarketing Sales Rule.  Today's action responds to this congressional direction by providing a convenient, one-stop solution that will enable consumers to place their phone numbers on a unified national do-not-call list at no charge.

At the same time, I remain mindful that telemarketing can serve a valuable function by providing information to consumers about goods and services.  Many consumers appreciate learning about ways to save money, obtain better service, or otherwise take advantage of commercial opportunities.  Moreover, telemarketers enjoy protection under the First Amendment, which requires that any restrictions on commercial speech advance a substantial governmental interest and be no more extensive than necessary.  Accordingly, I am pleased that we have crafted rules that balance the competing interests at stake.

In particular, we have preserved and in some cases modified the exemptions for calls to consumers with whom the marketer has an established business relationship, calls to consumers who have expressly consented to being called, and calls by tax-exempt nonprofit organizations (or by independent telemarketers calling on their behalf).  Consumers should understand that, as a result of these statutory exemptions, placing a phone number on the national do-not-call list will not necessarily mean that you will receive *no* telemarketing calls.  But the small number of calls received should be more consistent with consumers' expectations of privacy, and consumers can prohibit any further contact through company-specific do-not-call lists.

I am also pleased that the Commission has established a narrow exemption from the national do-not-call list to permit marketers to contact people with whom they have a personal relationship.  I believe the record shows that Congress was concerned about anonymous calls using autodialers; it did not intend to put the Avon Lady out of business.  Consumers generally expect and welcome calls from family, friends, and acquaintances who want to promote products and services.  Restricting such calls therefore would impose a more extensive burden on speech than is necessary to achieve Congress's goals.

PA - 00407

**Federal Communications Commission**                    **FCC 03-153**

---

        In addition, the Order appropriately clarifies the interplay between federal and state
telemarketing restrictions.  While I support empowering consumers to block unwanted calls,
telemarketers should not have to comply with multiple, inconsistent rules.  Indeed, Congress
clearly called on this Commission and the FTC to establish a uniform federal regime.  Thus, the
Order appropriately clarifies that, while states may enforce the federal rules and may adopt more
restrictive rules for intrastate calls, states generally may not regulate interstate calls.

        In sum, I am pleased to support this Order, because it provides effective mechanisms for
consumers to restrict unwanted telemarketing calls, while balancing the legitimate interests that
companies and individuals have in communicating with customers and potential customers.  I
expect companies to comply with our new rules, and I look forward to working together with the
FTC and state attorneys general to ensure that consumers receive the privacy protection they
want and deserve.

PA - 00408

Federal Communications Commission                                      FCC 03-153

## SEPARATE STATEMENT OF
## COMMISSIONER MICHAEL J. COPPS

Re:     *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (CG Docket No. 02-278), Report and Order*

Few rights are so fundamental as the right to privacy in our daily lives, yet few are under such frontal assault.  Our dinners are disrupted by unwanted phone calls.  Our computer accounts are besieged with bothersome spam.  Our mailboxes are swollen with advertisements for products, goods and services.  We conduct our whole lives against the white noise of commercial solicitation.  These intrusions exhaust us, irritate us and threaten our cherished right to be left alone.

Today we have an opportunity to do something about it.  We have an opportunity to reinforce our homes against the constant invasion of commercialism and the endless nuisance of unwanted telemarketing calls.  At the direction of Congress and through coordinated action with the Federal Trade Commission, we now return a measure of privacy control to citizens.  We establish a national Do-Not-Call registry that permits each of us to choose limits on the telemarketing calls we receive.  We do this in a way that balances the First Amendment rights of marketers with the right of each individual and every household to determine the scope of permissible intrusion.  This decision represents a positive step for all of us, not only as consumers, but as citizens.  I am pleased to support it.

I am especially pleased that the rules we adopt are in harmony with those put in place by our allies in this exercise at the Federal Trade Commission.  This is consistent with Congress' direction that we "maximize consistency" with the rules adopted by our fellow agency.  This makes for a user-friendly registry.

To ensure that the Do-Not-Call list achieves the protective power and prominence that Congress intended, both agencies must now work together—and with our partners in the states—to enforce the national program we establish here today.  When the Do-Not-Call list is open for business, we will share the duty of vigilant enforcement.  We worked hard here to balance the rights and privileges of personal contacts and relationships with the right to be left alone.  I think we achieve good balance, but I never underestimate the inventiveness of some in skirting or abusing rules, and these individuals and enterprises should understand that such actions will not go unnoticed or unpunished.

We all owe a debt of gratitude to the many people at our Consumer and Governmental Affairs Bureau who worked hard to draft and coordinate and bring this item before the Commission and who will continue to labor on behalf of the American people to implement the rules and make the national registry a success.  I also want to commend my colleagues for the productive discussions we have had on this item in recent days.  The result is a little more privacy in our not-so-private society.

PA - 00409

Federal Communications Commission                                    FCC 03-153

## SEPARATE STATEMENT OF
## COMMISSIONER JONATHAN S. ADELSTEIN

*Re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (CG Docket 02-278).*

I am pleased to support this item.  By adopting a National Do-Not-Call List, we arm American consumers with a powerful tool to protect their privacy.  This is one of the most significant things that the FCC has ever done for American families.  It will benefit consumers on a daily basis and in a very personal way.  It's certainly the thing that people will notice as much as anything else we have done.  We're restoring peace and quiet around the dinner table for everyone who asks for it, and plenty will ask, myself included.  The public has sent a resounding directive telling us that uninvited telephone solicitations are not merely a distraction but are driving customers away from their phones.  Consumers have also made clear that our prior rules – without a national Do-Not-Call List – do not work to their satisfaction.  And Congress has made its wishes clear by adopting the Do-Not-Call Act which authorized the establishment of the national list.  My hope is that our actions here will allow the American public to once again view their phones as a useful connection to the world rather than a source of nightly harassment.

At the same time, we balance the interests of consumer privacy alongside the commercial speech interests of those businesses who use the telephone to offer goods and services and the interests of those consumers willing to receive such offers.  The record bears out that many consumers find telephone solicitations valuable.  According to industry estimates, outbound telemarketing generates between 300 and 600 billion dollars in annual revenues.  So, I am sensitive to the potential impact of these rules on the businesses that rely on telephones to reach their customers.  I have particular concern about the local telephone industry, where the practical effect of our established business relationship exemption may have an uneven impact on competitors.  Nonetheless, Congress has captured the will of the people – certainly, as reflected in our record – when it directed us to "maximize the consistency" of our rules with the newly-adopted FTC national list.  Congress did not explicitly provide for particular treatment of the local telephone industry in the Do-Not-Call Act, but I believe that this area warrants our special attention and monitoring.

So that our rules are no more extensive than necessary and because American consumers each hold different views about the value of telephone solicitations, we adopt a suite of options from which customers can choose the approach that best serves their needs.  Under our rules, customers may sign up for the new national Do-Not-Call List or, alternatively, may continue to receive telemarketing calls and sign up for the company-specific lists when they no longer wish to hear from a particular company.  When customers sign up for the national list, they still have the ability to grant express permission to receive calls from particular companies.  So our rules are flexible enough to allow consumers to choose the best option for them.

We have a special obligation to remain vigilant in our implementation of these rules.  Congress has asked us to report to it annually.  I look forward to those reports with the optimism that we have adopted measures that will put American consumers back in control of their phones.

EXHIBIT "C"

http://hub.ontariosystems.com/the-big-2-myths-you-probably-believe-about-manual-dialing---part-1?utm_...



HOME   ABOUT   SERVICES   PRODUCTS   DEBT TYPE   SUPPORT

CAREERS   BLOG   CONTACT

*Share:*



## The Big 2 Myths You Probably Believe About Manual Dialing – Part 1

*By: Rozanne Andersen | January 26, 2015*

Compliance, ARM Industry, TCPA

Notwithstanding available technology and a plain language reading of the TCPA and its corresponding regulations, many remain confused about what a manually dialed call actually is, or perhaps more specifically, what a manually dialed call is not - legally-speaking. More should.

To review: The Telephone Consumer Protection Act (TCPA) restricts the use of automatic dialing systems, artificial or prerecorded voice messages, SMS text messages received by cell phones, and the use of fax machines to send unsolicited advertisements. The TCPA specifies several technical requirements and restrictions for fax machines, autodialers, and voice messaging systems, and also places very specific restrictions on the use of "automatic telephone dialing systems." It applies to any



WEBINAR PRESENTED BY
Rozanne Andersen

JANUARY 29, 2015

RUNNING NAKED THROUGH THE TCPA FOREST:

How to (Correctly) Add Volume to a Manual Call Campaign - Myths Dispelled

http://hub.ontariosystems.com/the-big-2-myths-you-probably-believe-about-manual-dialing---part-1?utm_...

PA - 00412

person/entity that uses those systems.



To mitigate compliance risk, many choose to meet the TCPA's requirements by dialing consumers manually. But there are two big myths about that practice deserving clarification – Here's the first:

## Myth #1: "I can use my autodialer to make a manual call, as long as a human punches in the numbers."

The source of this myth actually comes directly from twisting, torturing, and misinterpreting the Federal Communications Commission's (FCC's) own comments about the 2003 TCPA regulations. So let's go back to the basics – What did the FCC tell us about "manual" calls?

Preceding the text of the rules, the FCC included lengthy commentary explaining its rationale for each of the final rules. In paragraph 95, the Commission explains:

> 95. The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. 27(a)(1). The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the "capacity to store or produce telephone numbers (emphasis added) * * *.

> It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. In the past, telemarketers may have used [auto] dialing equipment to create and dial 10- digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. *The basic function of such equipment, however, has not changed— the capacity to dial numbers without human intervention. We fully expect automated dialing technology to continue to develop* (Ed: emphasis added)."

See, Federal Register /Vol. 68, No. 143 / Friday, July 25, 2003 /Rules and

Regulations 441

This single line of text – bolded and italicized above – has provoked many to believe "preview dialing" was, and remains, the silver bullet to the TCPA conundrum. But please consider:

1. The FCC did not expressly state in its commentary that autodialing equipment falls outside the scope of the TCPA when it is used with human intervention – It may or may not, in fact.

2. The FCC's comments about human intervention were not included in the text of the regulations: They were simply included as commentary. Commentary does not carry the same weight as the TCPA regulation or statute.

3. The FCC clearly sent a message to the marketplace that if the basic function of automated technology/equipment is further developed and fundamentally changed, their interpretation of Congress' intent for this statute will also fundamentally change.

When you consider these three important clarifications regarding the FCC's commentary, it becomes clear that manually punching in numbers certainly doesn't mean you're dialing in compliance with the TCPA. Consider a manual contact system instead.

Provided it is implemented and maintained correctly, a manual contact system – comprised of a hardware-based dialing solution, paired with appropriate software – does not have the capacity to store or produce numbers and dial those numbers at random, in sequential order, or to dial a number from a database without direct human intervention. It's a solution you might consider bringing to your compliance team, before we move on to cover the second big myth.

*Disclaimer: Ontario Systems is a technology company and provides this blog entry solely for general informational and marketing purposes. You should not rely on the content of this material for any other purpose or as specific guidance for your company. Ontario Systems' advice, services, tools and products described herein do not guarantee compliance with any law or industry standard. You are ultimately*

http://hub.ontariosystems.com/the-big-2-myths-you-probably-believe-about-manual-dialing---part-1?utm_...

*responsible for your own company's actions and compliance efforts. Because
everyone's situation is different, you must consult your own attorneys, accountants,
and/or other advisors to obtain specific advice on your company's compliance, legal,
tax, regulatory and/or other business needs. Despite Ontario Systems' efforts to provide
current and up-to-date information, you need to recognize that the information
contained herein may become outdated quickly and may contain errors and/or other
inaccuracies.*

*© 2015 Ontario Systems, LLC. All rights reserved. Information contained in this
document is subject to change. Reproduction of this publication is not permitted
without the express permission of Ontario Systems, LLC.*



### About the Author

Rozanne Andersen , J.D., serves as Ontario Systems' Vice President and
Chief Compliance Officer. She is responsible for leading Ontario Systems'
corporate efforts and response to the CFPB's launch of compliance
examinations in the ARM industry. Rozanne is a recognized thought leader
in the area of compliance. Her advocacy work on behalf of the credit and
collection industry has resulted in landmark legislation and regulation at
both the state level and at the federal level with regard to the FDCPA, FCRA
and HIPAA.

---

## Dave Rainbolt 1/27/2015, 10:29:23 AM

Excellent!

↰ Reply to *Dave Rainbolt*

First Name *

[                                    ]

Last Name

http://hub.ontariosystems.com/the-big-2-myths-you-probably-believe-about-manual-dialing---part-1?utm_...

http://hub.ontariosystems.com/the-big-2-myths-you-probably-believe-about-manual-dialing---part-1?utm_...

Email *

Website

Comment *

☐ Subscribe to follow-up comments for this post

194

Type the text

Privacy & Terms

Submit Comment

*Sign Up for Email Updates*                                                                                    ▶

☐ *Instant Updates*                            ☐ *Weekly Updates*

Connect:                                    f   🐦   in   You Tube

---

*Blog Topics*

Compliance (35)   ARM Industry (30)   CFPB (22)   Healthcare (22)   Collections (18)   Strategies (13)   All Topics

PA - 00416

http://hub.ontariosystems.com/the-big-2-myths-you-probably-believe-about-manual-dialing---part-1?utm_...

*Author Archive*

---

Rozanne Andersen (42)   Steve Scibetta (14)   Rip Harris (9)   Steve Stone (7)   Deborah Lelinski (6)   All Authors



© ONTARIO SYSTEMS | ALL RIGHTS RESERVED | READ OUR PRIVACY POLICY

http://hub.ontariosystems.com/the-big-2-myths-you-probably-believe-about-manual-dialing---part-1?utm_...

PA - 00417

EXHIBIT "D"

http://hub.ontariosystems.com/the-2nd-big-myth-you-probably-believe-about-manual-dialing



HOME   ABOUT   SERVICES   PRODUCTS   DEBT TYPE   SUPPORT

CAREERS   BLOG   CONTACT

*Share:*



## The 2nd Big Myth You Probably Believe About Manual Dialing

*By: Rozanne Andersen | January 27, 2015*

ARM Industry, TCPA, Contact Management

Two myths exist around manual dialing. We covered the first earlier, that you can use an autodialer to make manual calls, as long as a human punches in the numbers. But at this point, we've seen that's far from a failsafe plan: The FCC's commentary – which likely created the myth – is vague at best, weighted less heavily than the TCPA's language, and subject to change.

The second myth is a bit easier to debunk:

## Myth #2: "All dialers are not necessarily autodialers, and I don't think mine is."

If you fall in the camp of folks who still wonder if your predictive dialer is an automatic telephone dialing system, as defined by the TCPA, consider the following explanation provided by the FCC in its



http://hub.ontariosystems.com/the-2nd-big-myth-you-probably-believe-about-manual-dialing

http://hub.ontariosystems.com/the-2nd-big-myth-you-probably-believe-about-manual-dialing

commentary preceding the 2003 TCPA regulations. :



96. The legislative history also suggests that through the TCPA, Congress was attempting to alleviate a particular problem—an increasing number of automated and prerecorded calls to certain categories of numbers. The TCPA does not ban the use of technologies to dial telephone numbers. It merely prohibits such technologies from dialing emergency numbers, healthcare facilities, telephone numbers assigned to wireless services, and any other numbers for which the consumer is charged for the call. Such practices were determined to threaten public safety and inappropriately shift marketing costs from sellers to consumers. Coupled with the fact that autodialers can dial thousands of numbers in a short period of time, calls to these specified categories of numbers are particularly troublesome. …

We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented. See 47 U.S.C. 227(a)(1).

**Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of "automatic telephone dialing equipment" and the intent of Congress.** Because the statutory definition does not turn on whether the call is made for marketing purposes, we also conclude that it applies to modems that have the "capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." See 47 U.S.C. 227(a)(1).

See, id.

In other words, if the technology you use to contact consumers has any capacity to dial predictively, or pull from a database of numbers and dial them, current judicial opinion indicates it is an autodialer. Period. This is true whether you launch the call manually by pressing a field, or if you enter 10 digits on a keypad. On the other hand, it opined such a call is a manual dial if it's made using a system to contact consumers that is not tied, routed from or to, or in any way connected to your autodialer. If it's not, it is unlikely you are contacting consumers using an automatic telephone dialing system as defined by the FCC.

http://hub.ontariosystems.com/the-2nd-big-myth-you-probably-believe-about-manual-dialing

http://hub.ontariosystems.com/the-2nd-big-myth-you-probably-believe-about-manual-dialing

These two myths aren't the only two that exist when it comes to manual dialing though, or when it comes to TCPA, FCC, or CFPB compliance in general, but they are certainly the most grave. TCPA litigation has taken first place for law suits against the collection industry, and the need for compliance cannot be overstated. Make this topic, and your response, the first item on your compliance agenda next month and make sure you consult with you legal counsel regarding your company's TCPA compliance initiatives.

*Disclaimer: Ontario Systems is a technology company and provides this blog entry solely for general informational and marketing purposes. You should not rely on the content of this material for any other purpose or as specific guidance for your company. Ontario Systems' advice, services, tools and products described herein do not guarantee compliance with any law or industry standard. You are ultimately responsible for your own company's actions and compliance efforts. Because everyone's situation is different, you must consult your own attorneys, accountants, and/or other advisors to obtain specific advice on your company's compliance, legal, tax, regulatory and/or other business needs. Despite Ontario Systems' efforts to provide current and up-to-date information, you need to recognize that the information contained herein may become outdated quickly and may contain errors and/or other inaccuracies.*

*© 2015 Ontario Systems, LLC. All rights reserved. Information contained in this document is subject to change. Reproduction of this publication is not permitted without the express permission of Ontario Systems, LLC.*



### About the Author

Rozanne Andersen , J.D., serves as Ontario Systems' Vice President and Chief Compliance Officer. She is responsible for leading Ontario Systems' corporate efforts and response to the CFPB's launch of compliance examinations in the ARM industry. Rozanne is a recognized thought leader in the area of compliance. Her advocacy work on behalf of the credit and collection industry has resulted in landmark legislation and regulation at both the state level and at the federal level with regard to the FDCPA, FCRA and HIPAA.

http://hub.ontariosystems.com/the-2nd-big-myth-you-probably-believe-about-manual-dialing

First Name *

Last Name

Email *

Website

Comment *

☐ Subscribe to follow-up comments for this post



3141

Type the text

Privacy & Terms

Submit Comment

*Sign Up for Email Updates*

☐ *Instant Updates*                    ☐ *Weekly Updates*

Connect:

http://hub.ontariosystems.com/the-2nd-big-myth-you-probably-believe-about-manual-dialing

## *Blog Topics*

Compliance (35)   ARM Industry (30)   CFPB (22)   Healthcare (22)   Collections (18)   Strategies (13)   All Topics

## *Author Archive*

Rozanne Andersen (42)   Steve Scibetta (14)   Rip Harris (9)   Steve Stone (7)   Deborah Lelinski (6)   All Authors



© ONTARIO SYSTEMS | ALL RIGHTS RESERVED | READ OUR PRIVACY POLICY

Exhibit "E"

# United States Patent [19]

Sheldon et al.

[11]   **3,943,289**

[45]   **Mar. 9, 1976**

[54]   **AUTOMATIC TELEPHONE CALLER**

[75]   Inventors: **Norman A. Sheldon,** Denver; **Erwin L. Dosch,** Lakewood, both of Colo.

[73]   Assignee: **Environmental Developers, Inc.,** Denver, Colo.

[22]   Filed:   **July 12, 1974**

[21]   Appl. No.: **488,071**

[52]   **U.S. Cl.** ............................... 179/6 D; 179/90 B
[51]   **Int. Cl.²** ......................................... H04M 1/44
[58]   **Field of Search** ....... 179/6 D, 5 P, 90 B, 90 BB

[56]   **References Cited**
**UNITED STATES PATENTS**

| | | | |
|---|---|---|---|
| 3,105,121 | 9/1963 | Field ................................... | 179/6 D |
| 3,301,958 | 1/1967 | Blakeslee et al. .................. | 179/6 D |
| 3,445,601 | 5/1969 | Whitely et al. ..................... | 179/6 D |
| 3,718,771 | 2/1973 | Bank .................................. | 179/90 B |

*Primary Examiner*—Vincent P. Canney
*Attorney, Agent, or Firm*—Lowe, King & Price

[57]   **ABSTRACT**

A prerecorded message is supplied to a plurality of telephone subscriber numbers automatically called in sequence from a local station. Upon placing the call to the first number, another second number is established by changing the first called number by a predetermined increment. In response to the first called number being reached, the prerecorded message is coupled to a telephone line at the local station. In response to the call being either completed or the elapse of a predetermined time during which it is expected that the called subscriber should answer the phone, a signal is derived to indicate that operations for the first party have been terminated. In response to the termination signal, the telephone is repeatedly hung up and picked up automatically until the prerecorded message has been completed and a dial tone has been detected, at which time the second number is called. The device is activated repeatedly in this manner. Counters are provided to sense the number of completed calls, the number of calls in which the called subscriber hangs up prior to the end of the prerecorded message and the number of called subscribers who cannot be reached.

**12 Claims, 3 Drawing Figures**





FIG. 1



FIG. 2

FIG. 3



PA - 00427

3,943,289

**1**

## AUTOMATIC TELEPHONE CALLER

### FIELD OF THE INVENTION

The present invention relates generally to automatic telephony apparatus and more particularly to a device for automatically calling a relatively large number of subscribers in sequence and presenting a prerecorded message to each of the subscribers who answers the call.

### BACKGROUND OF THE INVENTION

The dissemination of information to a large number of telephone subscribers such that each of the subscribers receives the same or approximately the same message has become widespread for various purposes, e.g., solicitation, advertising and data presentation. Typically, the calling and presentation of the message are performed manually by a salaried individual, thereby being relatively expensive. Also, manual dialing of a telephone is susceptible to mistakes and may result in calling of the wrong subscriber or the same subscriber being called twice in succession, with possible resulting deleterious effects on the business of the calling party.

While some devices have been designed to enable different telephone numbers to be automatically called in sequence wherein a predetermined message is presented to an answering called party, these devices have generally been utilized in conjunction with emergency warning devices. In particular, the devices have been utilized for automatically calling the numbers of police or fire departments or other parties that are responsive to an emergency situation. The prerecorded message presents information regarding the location where an emergency situation has been automatically detected by transducers such as burglary alarms, fire arms, or machinery monitoring devices.

The prior art automatic emergency calling devices, however, are not adapted to cope with certain circumstances that may result when a large number of telephone subscribers are called in sequence and presented with a prerecorded message. There is a very low probability in automatic emergency calling devices of premature hang up, i.e., the called subscriber hanging up on the prerecorded message prior to completion of the message. Also, the emergency calling devices are generally manually reset to the beginning of a message after the called party has answered and are not automatically reset to the beginning of a message prior to the next call being instigated.

Typically, the prior art devices are capable of calling only a relatively small number of subscribers. At least one of the emergency numbers being called is certain to be responsive to the call, since the called emergency numbers are fire departments, police departments, etc. Thereby, it is feasible to utilize a preprogrammed device whereon there are stored all of the numbers to be called in sequence. In many instances if a relatively large number of subscribers are to be called in sequence, the cost of storing all of the numbers on a preprogrammed device, such as a magnetic tape, may be prohibitive.

### BRIEF DESCRIPTION OF THE INVENTION

In accordance with the present invention, at a local station there is provided a new and improved device connected to a telephone line for calling a relatively large number of remote telephone subscriber stations

**2**

in sequence and presenting each of the answering subscribers with a prerecorded message. In accordance with one feature of the invention, the telephone number of subscribers called in sequence is changed by a predetermined number each time a new number is called. The number is changed by incrementing a register by a predetermined account, such as one, each time a subscriber number is called. Thereby, there is no need to provide a relatively costly preprogrammed medium for storing a large number of telephone numbers to be called.

It is recognized that there may be some bias on the part of a called subscriber to receiving a prerecorded telephone message and that there is a certain likelihood of the called answering subscriber hanging up prematurely. In the event of premature subscriber hang up, the local station is disconnected from the line, the prerecorded message is played back completely, stopped just prior to the beginning of the message, and is not begun again until a new subscriber has been reached. Thereby, the new answering subscriber is always initially presented with the beginning of the prerecorded message and the likelihood of his being attentive to the message is increased many fold.

In accordance with a further feature of the invention, circuitry is provided to detect: (1) the called subscriber not answering his receiver (because the called subscriber line was busy or did not answer his receiver), (2) a call was completed to the called subscriber and the called subscriber listened to the entire prerecorded message; and (3) the call was completed to the called subscriber and the called subscriber hung up prematurely. A counter is provided to provide an indication of the number of each of these three categories, thereby enabling a measure of the effectiveness of the device to be determined.

In accordance with another aspect of the invention, upon the termination of a completed call or upon an indication being derived that the called party could not be reached, the telephone line is repeatedly disconnected and connected to the local station until the prerecorded message cycle has been completed and a dial tone has been detected. In response to the prerecorded cycle being completed and the dial tone being detected, the apparatus is advanced so that the next number is automatically called. By repeatedly hanging up the local station and reconnecting the local station until detection of both a dial tone and completion of the prerecorded message cycle, the device of the present invention does not continuously load down the telephone line while it is not in use.

It is, accordingly, an object of the present invention to provide a new and improved automatic telephone dialing apparatus wherein a relatively large number of telephone subscribers are called in sequence.

Another object of the invention is to provide an automatic telephone dialing system for enabling prerecorded messages to be presented to subscribers to whom calls are completed, wherein the numbers of called subscribers are changed by a predetermined amount each time a new call is placed.

Another object of the invention is to provide an automatic telephone dialing apparatus wherein a prerecorded message is presented to subscribers to whom a call is completed and a record is maintained of the number of called subscribers who listen to the complete message, as well as the number of called subscribers who hang up prematurely.

3,943,289

3

Another object of the invention is to provide an apparatus for automatically calling a number of predetermined telephone subscribers and presenting a prerecorded message to subscribers to whom the call is completed, wherein the beginning of the message is always initially presented to the answering subscriber, regardless of whether the previously called subscriber listened to the entire message or only a portion of the message.

A further object of the invention is to provide a new and improved device for presenting a prerecorded message to telephone subscribers that are automatically called in sequence, wherein a new subscriber is called after the previously called subscriber has hung up or an indication is derived that the previously called subscriber did not answer his receiver.

A further object of the invention is to provide a new and improved apparatus for automatically calling telephone subscribers in sequence wherein there is a minimum line seizure time from the completion of the last call or a determination that the last call could not be completed to the initiation of the next call, even though the next call is not initiated until a dial tone is available and a prerecorded message has been completely played back so that the beginning of the message is initially supplied to the next called subscriber.

The above and still further objects, features and advantages of the present invention will become apparent upon consideration of the following detailed description of one specific embodiment thereof, especially when taken in conjunction with the accompanying drawing.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a block diagram of one embodiment of the present invention;

FIG. 2 is a circuit diagram of an alternate circuit for deriving dialing pulses, instead of touch tones; and

FIG. 3 is a circuit diagram of an alternate disconnect circuit which is adapted for use at virtually all exchanges.

## DETAILED DESCRIPTION OF THE DRAWING

Reference is now made to FIG. 1 wherein there is illustrated a block diagram of a preferred embodiment of the local automatic telephone calling system of the present invention. The apparatus illustrated in FIG. 1 broadly includes four basic parts, a calling or number control circuit 11, a called detector 12, a ready for new call detector circuit 13, and endless loop tape recorder 14 on which a prerecorded message which is to be transmitted over telephone line 15. Calling circuit 11 establishes the number of a telephone subscriber to be called and is automatically incremented by a count of one prior to the next call being instigated. Called detector circuit 12 is responsive to the called subscriber answering his receiver and includes circuitry for detecting whether the called subscriber: (a) answered the receiver and listened to the entire message, (b) answered the receiver and hung up his receiver prior to the recorded message being completed, and (c) was not reached within a predetermined time after the call was placed. The called subscriber may not have been reached because no one answered the receiver or because the line of the called subscriber was busy.

Ready for new call detector circuit 13 repeatedly disconnects and connects the receiver at the local, calling station to telephone line 15 to determine if a dial tone is available from the line. A dial tone can be

4

available from telephone line 15 only after the prerecorded message has been completed, whereby the next called subscriber is always provided with the beginning of the prerecorded message at the beginning of the call. In response to detector circuit 13 sensing that the line is available and the recorded message from the last call being completed, calling circuit 11 is actuated, causing a new number of a telephone subscriber to be called.

Endless loop tape recorder 14 includes start-stop input terminal 16 which is responsive to a bi-level signal. In response to a binary one state being applied to the bi-level signal terminal 16, a motor included in the tape recorder is activated, causing the tape of the recorder to be driven through a complete cycle to feed the prerecorded message as an audio signal to telephone line 15. The motor in tape recorder 15 is driven until the endless loop of the tape recorder has completed a cycle, at which time the motor is stopped and the recorder motor is not started again until a further binary one level is coupled to terminal 16. To enable a complete cycle of the loop to be detected, the tape includes a foil that functions as a shorting element to signal the completion of a tape loop cycle. The recorder 14 includes internal circuitry, well known to those skilled in the art, to cause the motor to stop driving the tape in response to the foil being sensed. The signal to stop the motor of recorder 14 is applied in parallel to output terminal 17 to indicate that the tape has been driven through a complete cycle and that the message on the tape has been completed. The end of message signal derived from terminal 17 serves as an input to call detector circuit 12, enabling circuit 12 to determine if the called subscriber listened to the entire message or hung up in the middle of the message prior to completion thereof.

Calling circuit 11 includes a ten stage shift register 21 having a clock input terminal 22 responsive to the output of AND gate 23. AND gate 23 is responsive to a square wave output voltage of free running multivibrator 24, having a frequency of one Hertz. AND gate 23 is enabled in response to a binary one being derived from set output terminal (Q) of flip-flop 25. Flip-flop 25 includes a set input responsive to the output of OR gate 26, having an input that is selectively coupled through manually actuated start contact 27 to a positive voltage at terminal 28. OR gate 28 also includes an input from the output of ready for new call detector circuit 13, whereby a binary one level is derived from OR gate 26 either in response to manual, initial actuation of contact 27 or in response to detector circuit 13 indicating that telephone line 15 is available and that the prerecorded message from the last call has been completed.

The binary one output of OR gate 26 activates flip-flop 25 to a set state, where it remains until a binary one signal is applied to a reset input of the flip-flop from the output of the tenth stage of register 21. In response to flip-flop 25 being activated to the reset state, AND gate 23 is disabled and the rectangular wave output of free running multivibrator 24 is not applied to clock input terminal 22 of shift register 21. Thereby, shift register 21 is cycled through its 10 stages for a time period lasting approximately 10 seconds.

The first seven stages (stages 1–7) of shift register 21 enable the seven digits of a seven digit telephone subscriber number to be actuated in sequence, similarly to manually actuating a touch tone or dial actuated telephone hand set. The number called is determined by

3,943,289

5

the state of three manually actuated decimal to four bit binary decimal converters **31, 32** and **33**, as well as the state of four cascaded divide by ten frequency dividers **34, 35, 36** and **37**, each of which derives a four bit binary coded decimal signal. Converters **31–33** are manually actuated to the exchange desired to be called and thereby derive output signals commensurate with the numerals of the first three digits of a seven digit subscriber number.

Cascaded frequency dividers **34–37** are automatically advanced in sequence immediately after the last call was placed. To this end, the output of stage eight of shift register **21** is applied to an input of frequency divider **37**, whereby the digital count in divider **37** is incremented by a count of one after the seven digits for the last called number have been dialed. By incrementing the count of divider **37** by a count of one the last digit of a seven digit telephone subscriber number is advanced by a count of one. Counters **34–37** are activated so that if the device is left in operation for a sufficiently long period of time 10,000 digital numbers are derived in sequence from dividers **34–37** to represent the 10,000 different numbers of the exchange manually entered into converters **31–33**. Each of converters **31–33** and dividers **34–37** includes internal connections for converting the digital numbers therein into binary coded decimal numbers representing the digital numbers. To this end, each of converters **31–33** and dividers **34–37** includes four separate counter stages, each of which has an output lead on which is derived a bit of the binary coded decimal signal.

To read out the seven digits of the number of a called subscriber, seven four bit gates **41–47** are provided. Each of gates **41–47** includes an enable input terminal, which when driven into a binary one state causes four bits to be passed from the four input terminals to the four output terminals of each of the gates. The four input terminals of each of gates **41–47** are respectively connected to the four output terminals of converters **31–33** and frequency dividers **34–37**. Gates **41–47** are respectively connected to output terminals of stages **1–7** of shift register **21**, whereby gates **41–47** are activated in sequence. Corresponding output terminals of gates **41–47** derive signals for corresponding binary orders of the four bit binary coded decimal signal supplied thereto. Output leads of gates **41–47** carrying signals for the same ordered bit are connected together so that the signals on leads **51, 52, 53** and **54** indicate the presence or absence of a binary signal respectively representing $2^0$, $2^1$, $2^2$ and $2^3$.

The signals on leads **51–54** are applied to binary coded decimal to touch tone converter **55** which derives output signals having ten different frequencies representing the tones of a touch phone. The multi-frequency signal derived from converter **55** is applied to telephone line **15**. The seven derived binary coded decimal signals are sequentially applied by leads **51–54** to converter **55** as register **21** is shifted through stages **1–7** so that seven tones are sequentially supplied by converter **55** to telephone line **15**. In the alternative, the binary code decimal to touch tone converter **55** can be replaced with a binary coded decimal to dialing pulse converter, as discussed in detail infra.

After the seven digit called subscriber number has been applied to phone line **15** and the number of the next called subscriber has been entered into dividers **34–37**, shift register **21** is advanced to stage nine, causing called detector circuit **12** to be activated. Called

6

detector circuit **12** includes differential, D.C. operational amplifier **56** that derives a bi-level signal. Operation amplifier **56** includes a ground input terminal connected to a ground line of telephone line **15**, a positive input terminal connected to the tip line of the telephone line, and a negative input terminal connected to the ring line of a telephone line. Amplifier **56** is relatively easily saturated to derive a positive output voltage in response to phone line **15** being initially connected to a subscriber station. When phone line **15** is disconnected from a subscriber station, the polarity of the tip and ring lines is reversed, causing the output of operation amplifier **56** to be driven to a negative voltage. Thereby, a positive going, leading edge is derived at the output of amplifier **56** in response to the called subscriber picking up his receiver, and a negative going, trailing edge is derived from the amplifier when the called subscriber hangs up his receiver.

In response to the called subscriber picking up his receiver, the prerecorded message of tape recorder **14** is supplied to telephone line **15** by supplying a binary one signal to terminal **16** of recorder **14**. To this end, leading edge detector **57** is connected to be responsive to the output of operational amplifier **56**. Leading edge detector **57** includes a differentiator and diode poled so that a pulse is derived from the detector only in response to the positive going, leading edge of the output signal of amplifier **56**, as occurs in response to the called subscriber picking up the receiver. The output pulse of detector **57** is applied to a set input terminal (S) of flip-flop **58**, having a set output terminal (Q) which is connected to start-stop input terminal **16** of recorder **14**. Flip-flop **58** includes a reset input terminal (R) responsive to the end of message signal derived from terminal **17** of recorder **14**. Thereby, flip-flop **58** is activated into a binary one state to derive a binary one output at its set output terminal for the entire time that the tape of recorder **14** is being driven through a cycle.

The bi-level output of amplifier **56**, the end of message output signal at terminal **17** of tape recorder **14**, and the signal derived from stage nine of register **21** are supplied to call detector circuit **12** to control the activation of flip-flops **61** and **62**, as well as timer **63**. Flip-flops **61** and **62**, and inhibit gates **64** and **65**, respectively connected to the set (Q) output terminals of the flip-flops, are provided to detect whether or not the called subscriber listened to the entire prerecorded message of recorder **14**. Timer **63** and inhibit gate **66**, connected to the timer output, are provided to determine if the called subscriber failed to answer his receiver, either because the receiver of the called subscriber was busy or was not picked up in a reasonable time (e.g., 25 seconds) when called. For each called subscriber, one of counters **71, 72** or **73**, respectively connected to the output terminals of inhibit gates **64, 65** and **66**, is activated to enable a record to be made of how many called subscribers (1) listened to the entire message, (2) hung up before the message was completed and (3) failed to pick up the receiver. Counters **71–73** respond to the trailing edges of the output pulses of inhibit gates **64–66** since only the trailing edges indicate which one of the three possible events took place for a particular called subscriber.

To these ends, set input terminals (S) of flip-flops **61** and **62** and a start input terminal of timer **63** are driven in parallel by the output signal of stage nine of shift register **21**. The output signal of stage nine drives flip-

3,943,289

7

flops **61** and **62** so that the flip-flops derive binary one
signals at the set output terminals (Q) thereof until
pulses are applied to the reset input terminals thereof.
In contrast, the state of timer **63** is not altered by an
output of stage nine until the timer period has elapsed
(25 seconds), at which time a pulse on the order of one
second is derived, unless the timer has been stopped.
Reset input terminal (R) of flip-flop **61** is connected to
be responsive to the end of message signal derived from
terminal **17** of recorder **14**, while the reset terminal (R)
of flip-flop **62** is connected to be responsive to an out-
put signal derived from trailing edge detector **74** that
has circuitry substantially the same as that of leading
edge detector **57**, except for reversal of the diode po-
larity. Thereby, flip-flop **61** is activated to the binary
one state from the time a binary one level is derived
from stage nine of shift register **21** until the tape of
recorder **14** has completed one cycle, while flip-flop **62**
is in the binary one state from the time a binary one is
derived from stage nine of shift register **21** until the
called subscriber hangs up his receiver.

Timer **63** includes a stop input terminal, which when
activated stops the timer and resets it to zero. Hence, a
pulse is derived from timer **63** only if there is a 25
second interval between the time a pulse is applied
from stage nine to the timer start input terminal and a
pulse is applied to the stop input terminal of the timer.
To prevent an output pulse from being derived from
timer **63** when the called subscriber picks up his re-
ceiver, the stop input terminal of the timer is connected
to be responsive to the output of leading edge detector
**57** by a connection established through OR gate **75**.

To enable only one of flip-flops **61** or **62** or timer **63**
to derive a binary one level in response to each called
subscriber being dialed, and thereby enabling only one
of counters **71–73** to be activated for each called sub-
scriber, a feedback circuit is provided between the
outputs of the flip-flops and timer and the reset inputs
of the flip-flops and the stop input terminal of the
timer. The feedback circuit includes NOR gate **76**,
having inputs responsive to the set output terminals
(Q) of flip-flops **61** and **62**. NOR gate **76** drives one
input terminal of OR gate **77**, having a second input
terminal responsive to the output signal of timer **63**.
Thereby, a binary one level is derived from OR gate **77**
in response to either of flip-flops **61** or **62** being acti-
vated to the reset state or timer **63** generating an output
pulse. Leading edge detector **80** is connected to be
responsive to the output of OR gate **77** to generate a
pulse in response to the output of the OR gate going
from a binary zero to a binary one level. The pulse is
substantially in time coincidence with: (1) the comple-
tion of the 25 second interval as derived from the out-
put of timer **63**, (2) the premature hanging up by the
called subscriber, as derived by the output of flip-flop
**62**, or (3) the termination of the prerecorded message
with the called subscriber listening to the entire mes-
sage, as indicated by the output of flip-flop **61**, which-
ever one of the three is appropriate. Detector **80** de-
rives an output signal that is coupled to the stop input
terminal of timer **63** through OR gate **75** and to inhibit
input terminals of inhibit gates **78** and **79**, respectively
connected to the reset input terminals (R) of flip-flops
**61** and **62**.

The circuitry including flip-flops **61-62**, timer **63**, OR
gates **75** and **77**, NOR gates **76** and inhibit gates **78** and
**79** and detector **80** operates as follows. The binary one
signal from stage nine of shift register **21** sets flip-flops

8

**61** and **62** and initiates the operation of timer **63**.
Thereby, flip-flops **61** and **62** derive binary one output
signals, while no pulse is derived from timer **63**. If the
called subscriber does not pick up his receiver within
25 seconds, a pulse is derived from timer **63**, actuating
counter **73**, and is coupled through OR gate **77** to cause
a pulse to be derived from detector **80**. The pulse out-
put of detector **80** is coupled to the inhibit terminals of
inhibit gates **78** and **79**, thereby preventing resetting of
the flip-flops in response to the next output of OR gate
**77**. If the called subscriber picks up his receiver prior to
completion of the 25 second period of timer **63**, a bi-
nary one signal is derived from leading edge detector
**57** and coupled through OR gate **75** to the stop input
terminal of timer **63**, thereby preventing a pulse from
being derived from the output of the timer whereby
counter **73** is not activated.

When the answering called subscriber hangs up be-
fore the message is completed a pulse is derived from
trailing edge detector **74** and coupled through gate **79**
to the reset input terminal of flip-flop **62**. Thereby,
flip-flop **62** is activated to the reset state and hang up
counter **72** is incremented by a count of one. In re-
sponse to flip-flop **62** being activated to the reset state,
a binary zero level is applied to one input of NOR gate
**76**, whereby the NOR gate derives a binary one output
that is coupled through OR gate **77** to leading edge
detector **80** that derives a pulse which is fed to the
inhibit terminals of inhibit gates **78** and **79**, and through
OR gate **75** to the stop terminal of timer **63**. Thereby,
flip-flops **61** and **62** are respectively maintained in the
set and reset states until the next number is called, at
which time a binary one level is derived from stage nine
of shift register **21**, causing both flip-flops to be driven
back to the set state.

Next assume that the called subscriber answered his
receiver and listened to the entire prerecorded message
transmitted over telephone line **15** from tape recorder
**14**. In such an event, an output pulse is derived from
end of message terminal **17** of tape recorder **14** prior to
the derivation of a pulse from trailing edge detector **74**.
In response to the end of message pulse being derived
from terminal **17**, flip-flop **61** is reset, resulting in a
binary one being derived at the output of NOR gate **76**
and being coupled to the output of OR gate **77**. The
binary one at the output of OR gate **77** is supplied to
detector **80** that generates a pulse that is supplied in
parallel to inhibit inputs of gates **78** and **79**, as well as
one of the inputs of OR gate **75**. Thereby, flip-flops **61**
and **62** remain respectively activated in the reset and
set states and timer **63** remains deactivated until the
next subscriber number has been called and a binary
one is again derived at output stage nine of shift register
**21**. Counter **71** is incremented in response to flip-flop
**61** being driven to the reset state and neither of the
counters **72** or **73** is incremented since there can be no
change in state of the circuits driving them until after
the next subscriber call is placed.

In response to a binary one output being derived
from detector circuit **80**, the phone at the local station
is repeatedly disconnected from and connected to line
**15**, i.e., hung up and picked up, until a dial tone is
detected and the entire cycle of tape recorder **14** has
been completed. The repeated hanging up and picking
up of the local phone is attained with circuit **13** which
includes a feedback loop including electro-mechanical
timers **82** and **83**, preferably having timing periods of
five seconds and two seconds, respectively. Timer **82**

PA - 00431

3,943,289

9

derives a 5 second binary one output pulse in response to a binary one being applied to its input, while timer 83 derives a short duration pulse 2 seconds after a binary one is applied to its input.

The input of timer 82 is responsive to the output of leading edge detector 80, as coupled through OR gate 89, to initiate the repeated hang up and pick up cycle. The 5 second output pulse of timer 82 is applied to coil 84 of relay 85, having normally closed contacts 86 which are connected to the tip and ring lines of telephone line 15. In response to the 5 second output pulse of timer 82, coil 84 is energized, opening contacts 86 and thereby disconnecting the local phone from line 15 for 5 seconds. Upon completion of the 5 second interval of timer 82, a binary zero output of the timer results in de-energization of relay 84 and closure of contacts 86, thereby connecting the local phone to line 15. If the local phone is not able to detect a dial tone on line 15 or an end of message pulse is not derived from lead 17 within 2 seconds after closure of contacts 86, contacts 86 are again open circuited and the local phone is again effectively hung up.

To detect when the local phone is reconnected to telephone line 15 and to enable the local phone to be connected to the line for at least 2 seconds, the output signal of timer 82 is coupled to trailing edge detector 87 which derives a relatively short duration binary one pulse in response to the output of timer 82 going from a binary one to a binary zero level. The output pulse of detector 87 is applied to timer 83. If a dial tone is not detected by detector 92 and the cycle of recorder 14 has not been completed, the pulse derived from timer 83 is coupled through inhibit gate 88 and OR gate 89 back to the input of timer 82. Timers 82 and 83 and contacts 86 are repeatedly activated in this manner until a dial tone on line 15 is detected and the cycle of recorder 14 has been completed. At that time, a binary one signal is derived from inhibit gate 91 to prevent the output of timer 83 from being fed back to the input of timer 82, causing the hang up - pick up cycle to be terminated.

To enable a binary one output to be derived from inhibit gate 91 in response to a dial tone being detected and the message on recorder 14 being completed, dial tone detector 92 is provided and connected to the tip or ring line of telephone line 15. Dial tone detector 92 is preferably a bandpass filter capable of passing any dial tone frequency, typically between 300 and 900 Hertz. The bandpass filter drives an audio detector which derives a binary one while any dial tone frequency is on line 15. The binary one output level of detector 92 is coupled through inhibit gate 91 only when the present message of recorder 14 has been completed. The binary one output of detector 92 is not coupled through inhibit gate 91 while the message of recorder 14 is being applied to the phone line 15 because the message may include audio frequencies that are the same as the dial tone, and to avoid placing a call to the next subscriber until after recorder 14 has completed a message cycle. To prevent the output of detector 92 from being coupled through gate 91 until the message of recorder 14 has been completed the set output terminal (Q) of flip-flop 58 is applied to the inhibit terminal of gate 91.

In response to a binary one output of inhibit gate 91, inhibit gate 88 is disabled, as indicated supra, to prevent further hanging up and picking up of the local telephone to telephone lines 15. The local telephone

10

remains connected to lines 15 since relay 84 cannot be activated until a pulse is again derived from leading edge detector 80. A binary one output of inhibit gate 91 also enables AND gate 93 that is responsive to the output of 2 second timer 83.

In response to an output signal of timer 83 while a binary one output is derived from inhibit gate 91, AND gate 93 applies a binary one signal to a reset input terminal (R) of flip-flop 25 via OR gate 26, thereby enabling the output signal of free running multivibrator 24 to be applied to the clock input terminal 22 of shift register 21 to repeat the cycle.

Reference is now made to FIG. 2 of the drawing wherein there is illustrated a circuit diagram of a modification of the FIG. 1 system, enabling dialing pulses to be generated instead of touch tones. In the dialing pulse generator, each of the seven digits is represented as a series of dialing pulses, rather than as a tone. The dialing pulse generator includes a four stage count down counter 101 having a load input terminal 102 which, when actuated, causes the four bit binary coded decimal signal on leads 51–54 (FIG. 1) to be loaded into the four stages of the counter. Counter 101 includes a clock input terminal 103 which decrements the count of the counter one each time a pulse is applied thereto. Counter 101 includes an output terminal 104 on which is derived a binary one signal in response to the count of the counter being reduced to zero.

Counter 101 is loaded with the four bit binary coded signal on leads 51–54 each time shift register 21 is activated to a different one of stages 1–7. To this end, the output leads of stages 1–7 of shift register 21 are respectively connected to leading edge detectors 105, one of which is provided for each of the seven stages. The output voltages of leading edge detectors 105 are supplied to OR gate 106 which thereby derives a binary one output signal approximately in synchronism with each stage of shift register 21 being initially reached. The output of OR gate 106 is coupled to load input terminal 102 of counter 101 via one shot 107 which slightly delays the derivation of a binary one signal from OR gate 106, to prevent possible false coupling of a load signal into counter 101.

In the interval between loading of counter 101 and the derivation of a binary one signal at output terminal 104, the circuit of FIG. 2 derives a number of dialing pulses equal to the count of the binary coded decimal signal loaded into the counter. To sense the duration of the interval, the output of one shot 107 is applied to a set input terminal (S) of flip-flop 108 having a reset input terminal (R) connected to be responsive to the signal derived from terminal 104. Flip-flop 108 derives a binary one output signal at a set output terminal (Q) thereof which is coupled to one input of AND gate 109. AND gate 109 has a further input responsive to an output of fixed frequency, free running multivibrator 111, having an output that is applied to clock input terminal 103 of counter 101 to decrement the count loaded into the counter. To enable count down of a maximum count of ten and simulation of telephone dialing pulses, the frequency of free running multivibrators 24 is appropriately changed from the one Hertz rate of FIG. 1 and the frequency of multivibrator 111 is set to equal that of dialing pulses of a rotary telephone dialer.

Dialing pulses from free running multivibrator 111 are coupled to telephone line 15 through AND gate 109 while flip-flop 108 is in the set state. The number

3,943,289

11                                                12

of dialing pulses coupled to line 15 from multivibrator 111 during each digit of a seven digit called number is equal to the digital value of the binary one coded signal coupled by leads 51–54 to the four stages of counter 101.

The use of operational amplifier 56 in response to a polarity reversal is suitable only with certain telephone exchanges. At other exchanges, where cross bar or solid state switching is employed, polarity reversal is not used. At such exchanges it has been found that immediately prior to ringing, one or two pulses are derived; if there are two pre-ringing pulses, they are separated by approximately ninety milliseconds. The pre-ringing pulses are followed by another pulse when the called subscriber picks up his receiver and a further pulse is derived when the called subscriber hangs up his receiver. These pulses are of relatively high level, being approximately ten times the levels of a dial tone, a ringing pulse, a touch tone, or an audio message.

To enable detection of connect, disconnect and prer-inging pulses, telephone line 15 is connected to one input terminal of operational amplifier 121 (FIG. 3), having a second input responsive to a predetermined D.C. threshold voltage. Operational amplifier 121 normally derives a low level binary zero output signal, but is driven into saturation, to derive a binary one output signal, in response to the signal on line 15 having an amplitude commensurate with the pre-ringing, connect and disconnect pulses. In response to a dial tone, ringing pulse, touch tone or audio message, amplifier 121 remains in an unsaturated state and derives a binary zero level.

The output signal of operational amplifier 121 is connected to an input of one shot multivibrator 122 which generates a binary one pulse having a duration in excess of the time separation between a pair of pre-ringing pulses; e.g., the pulse duration is 150 milliseconds. Thereby, in response to either a pre-ringing pulse, or a pair of pre-ringing pulses, whichever is appropriate for the exchange to which the local telephone is connected, one shot multivibrator 122 derives a single output pulse having a leading edge synchronized with the first pre-ringing pulse and a duration of 150 milliseconds. In response to each of a connect and disconnect pulse being received on line 15, one shot 122 derives a 150 millisecond binary one output signal. Thereby, in response to a complete cycle of ringing, call completion and call disconnect, three and only three pulses are derived from one shot 122.

To enable detection of the called subscriber receiver being connected to and disconnected from the telephone line, the output of one shot 122 is applied to a trigger input terminal (T) of flip-flop 123, as well as to inputs of AND gates 124 and 125 which respectively drive trigger inputs (T) of flip-flops 126 and 127.

Flip-flops 123, 126 and 127 are interconnected with each other and the outputs of one shot 122 and AND gates 124 and 125 so that flip-flop 126 is in a binary one state during the entire time while the called subscriber receiver is connected to the telephone line, while flip-flop 127 is in a set state from the time that the called subscriber hangs up his receiver to the time a binary one signal is derived from detector 80, FIG. 1. To these ends, the output of flip-flop 123 is connected to one input of AND gate 124 and the output of flip-flop 126 is connected to one input of AND gate 125. Flip-flops 123, 126 and 127 are responsive to the trailing edges of the output of one shot 122. The three

flip-flops include reset input terminals (R) which are connected to be responsive to the output of leading edge detector 80 so that all three of the flip-flops are in a binary zero state prior to a call being placed to each called subscriber.

Immediately prior to the receiver of the called subscriber having ringing pulses supplied thereto, flip-flop 123 is driven from the reset to the set state in response to the output of one shot multi-vibrator 122. Setting flip-flop 123 enables AND gate 124 so that when the called subscriber picks up his receiver and is connected to the line, the output pulse of one shot 122 is coupled through AND gate 124 to the toggle input of flip-flop 126, causing flip-flop 126 to be driven from the reset to the set state and disabling AND gate 125. In response to one shot 122 sensing a connection to the called subscriber, flip-flop 123 is returned to the reset state, thereby diabling AND gate 124. In response to the called subscriber hanging up his receiver and discon-necting his receiver from the line, one shot 122 derives a further binary one signal that is coupled through AND gate 125 to the toggle input of flip-flop 127, thereby changing the state of flip-flop 127 from the reset to the set state. The output pulse of one shot multivibrator 122 derived in response to the disconnect pulse on line 15 causes flip-flop 123 to be driven from the reset to the set state, but has no effect on the state of flip-flop 126 because the time required for flip-flop 123 to be reset is such that the trailing edge of the one shot 122 terminates prior to AND gate 124 being enabled.

The ring detection circuit of FIG. 3 is utilized in conjunction with the apparatus of FIG. 1 by connecting the output of flip-flop 126 to leading edge detector 57. The output of flip-flop 127 is connected to a leading edge detector 128 which senses transitions from a binary zero to a binary one state of flip-flop 127 and is utilized in place of leading edge detector 74, FIG. 1.

While there has been described and illustrated one specific embodiment of the invention, it will be clear that variations in the details of the embodiment specifically illustrated and described may be made without departing from the true spirit and scope of the invention as defined in the appended claims. For example, the incremental dialing system wherein the number is changed by a fixed amount can be replaced with a prerecorded sequence of called numbers. Also, a pair of tape recorders can be provided, one for transmitting messages and a second for receiving short duration responses from called subscribers. The apparatus can also be provided with timers for automatically controlling the time of day during which calls are placed. In accordance with a further modification, the counts stored in frequency dividers 34–37 can be detected and compared against a maximum count which, when reached, causes an alarm to be activated and inhibits the enabling of AND gate 123 so that subscribers will not be repetitively called. Also, endless loop tape recorder 14 can include two tracks, one for the audio message and the second replacing the foil for control functions. On the control track, predetermined frequencies can be provided, with a first predetermined frequency indicating the completion of a message, causing the tape drive motor to stop. A few seconds prior to the "completion of message" frequency the control track can include a second frequency, distinguishable from the completion of message frequency, and indicating that the message is about to be com-

3,943,289

13

pleted. The "about to be completed" frequency can be detected and coupled to output terminal 17 so that if the called subscriber hangs up slightly before the message is completed the completed call counter 71, rather than hang up counter 72, is actuated.

What is claimed is:

1. Apparatus for automatically supplying a pre-recorded message to a plurality of telephone subscriber stations in sequence comprising means for placing a telephone call to a telephone number, means for coupling the message to a telephone line in response to the called number being reached, counter means for storing the number to be called, means for incrementing the counter means by the same predetermined number to change the telephone number by a predetermined number to derive another number, and means responsive to the call being either completed or an indication of the called number being incapable of being reached for again activating the means for placing a call to the another telephone number; the means for placing, means for coupling, means for incrementing and means for again activating being repeatedly activated so that calls are automatically placed in sequence to a plurality of subscribers.

2. The apparatus of claim 1 wherein the counter means comprises a plurality of cascaded 10-stage frequency dividers, one of said dividers being provided for and storing the numerical value of a digit of a called subscriber number, whereby the plural dividers store plural digits of the called subscriber station number, means for incrementing the divider for the least significant bit once each time a number is called, a telephone dialing means, and means for supplying the stored digits of the dividers to the dialing means in sequence.

3. The apparatus of claim 1 wherein the counter means comprises: a shift register, an oscillator for advancing the shift register so that different shift register stages are activated in sequence, means for storing binary signals representing the digits of a called subscriber number, said means for storing for at least some of the digits comprising a plurality of cascaded 10-stage frequency dividers, telephone dialing means, gate means for selectively coupling the stored signals for each digit in sequence to the dialing means in response to different stages of the shift register being activated, and means for advancing the count of the frequency divider for the least significant digit by a count of one in response to a further one of said stages of the shift register being activated.

4. Apparatus for automatically supplying a pre-recorded message via a telephone line to a plurality of telephone subscriber stations in sequence, said line applying pulse-type signals to the apparatus in response to an operator at a called subscriber station connecting and disconnecting his station to the line, comprising means for placing a telephone call to a telephone number, means responsive to the pulse-type signals for deriving first and second signals respectively indicative of a connection being completed to the called subscriber station and the connection being broken at the called subscriber station, means for coupling the message to a telephone line in response to the first signal being derived, means responsive to the recorded message being completed for deriving a third signal, and counter means responsive to the second and third signals for indicating the number of connected subscriber stations that did not stay on the line for the entire message, means for deriving a fourth signal in response to

14

a connection not being established to the called subscriber station a predetermined time after the call was placed, means for changing the telephone number by a predetermined number to derive another number, and means responsive to the occurrence of the third or fourth signals for again activating the means for placing a call to the another telephone number; the means for placing, means for coupling, means for changing and means for again activating being repeatedly activated.

5. The apparatus of claim 4 wherein the means for deriving the first and second signals includes means for detecting voltage changes and polarity reversals on the telephone line.

6. The apparatus of claim 5 wherein the detecting means includes a saturable amplifier having a grounded reference terminal and a pair of complementary input terminals connected to tip and ring lines of the telephone line.

7. Apparatus for automatically supplying a pre-recorded message via a telephone line to a plurality of telephone line subscriber stations in sequence, said line applying pulse-type signals to the apparatus in response to an operator at a called subscriber station connecting and disconnecting his station to the line, comprising a dial tone detector for deriving an enabling signal in response to a dial tone on the line being coupled to the apparatus, means responsive to the pulse-type signals for deriving first and second control signals respectively indicative of the called subscriber station connecting and disconnecting his station to the line, means for deriving a third control signal in response to the prerecorded message being completed, means for deriving a fourth control signal in response to a called subscriber not connecting his station to the line a predetermined time after having been called by the apparatus, means for deriving a plurality of dialing signals for the subscriber stations to be called, control means responsive to the first, second, third and fourth control signals for supplying the enabling signal to the means for deriving the dialing signals so that the dialing signal for each subscriber station to be called is applied to the line in response to the enabling signal being supplied to the means for deriving dialing signals, means for changing the dialing signal from one subscriber station number to another subscriber station number after a previous subscriber station number dialing signal has been applied to the line, means responsive to the first signal for supplying the message to the line, the control means being repeatedly activated in response to at least one of the control signals so that a plurality of subscriber station numbers are called in sequence.

8. The apparatus of claim 7 wherein the means for deriving the first and second signals includes means for detecting voltage changes and polarity reversals on the telephone line.

9. The apparatus of claim 8 wherein the detecting means includes a saturable amplifier having a grounded reference terminal and a pair of complementary input terminals connected to tip and ring lines of the telephone line.

10. The apparatus of claim 7 wherein the control means includes: means responsive to the derivation of either the second or fourth signals for repeatedly connecting and disconnecting the dial tone detector to the line until the dial tone enabling signal is supplied to the means for deriving the dialing signals, and means for supplying the enabling signal to the means for deriving the dialing signals in response to the third control signal

3,943,289

**15**

being derived after the first control signal has been derived or in response to the fourth control signal being derived.

11. The apparatus of claim **7** further including counter means responsive to the second and third signals for indicating the number of connected subscriber stations that did not stay on the line for the entire message.

12. Apparatus for automatically supplying a prerecorded message via a telephone line to a plurality of telephone line subscriber stations in sequence, said line applying signals to the apparatus in response to an operator at a called subscriber station connecting his station to the line, comprising multistage shift register means for deriving a plurality of sequential output signals, N of said stages being provided for the N digits of each subscriber station number, means responsive to activation of said N stages for sequentially deriving each of the N digits of a subscriber station number and for applying the digits to the line to call a subscriber

**16**

station number, means for changing the value of a digit of a subscriber station number in response to the shift register means being activated to a first stage other than the N stages, means for coupling the recorded message to the telephone line in response to the called station being connected to the line, means for deriving a first control signal in response to the prerecorded message being completed, means for advancing the shift register to a second stage other than the N stages after all of the digits of the called number have been applied to the line, means responsive to the register being in the second stage for a predetermined time and the called station not having been connected to the line for deriving a second control signal, and means responsive to the first and second control signals for energizing the shift register to activate the N stages and the first stage in sequence so that the digits for the changed subscriber station number are applied in sequence to the line and the subscriber station number is changed.

* * * * *